Page 2

1
2  QUESTIONS BY:                              PAGE NO.
3  MR. HILKE                                      6
4  MR. HANER                                    238
5
6            INDEX OF EXHIBITS MARKED
7
   EXHIBIT      DESCRIPTION OR          PAGE
8  NO.          BEGINNING BATES NUMBER
9  Exhibit 42  Interrogatory Answers     129
10 Exhibit 43  Plaintiff 218             212
11 (Exhibits were attached.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF MISSOURI
2                   WESTERN DIVISION
3  KEITH CARNES,
4                Plaintiff,
5       vs.          Case No. 4:23-cv-00278-RK
6  ROBERT BLEHM,
   et al.,
7
              Defendants.
8
9       VIDEO DEPOSITION OF DOUG NIEMEIER,
10 produced, sworn, and examined on the 28th day of
11 February, 2024, between the hours of nine o'clock
12 in the forenoon and five o'clock in the afternoon
13 of that day, at the law offices of Wyrsch, Hobbs &
14 Mirakian, 1200 Main Street, Suite 2110, Kansas
15 City, Missouri, before SAUNDRA TIPPINS, a Notary
16 Public, and Certified Court Reporter within and for
17 the States of Missouri and Kansas, in a certain
18 cause now pending before the U.S. District Court
19 for the Western District of Missouri, Western
20 Division, wherein KEITH CARNES is the Plaintiff,
21 and ROBERT BLEHM, et al., are the Defendants.
22
23
24 **Exhibit R, 2024 Deposition of**
25 **Doug Niemeier**

Page 4

1
2  A P P E A R A N C E S
3  For the Plaintiff:
4  MR. WALLACE HILKE
   LOEVY & LOEVY
5  311 North Aberdeen Street, Third Floor
   Chicago, Illinois  60607
6  hilke@loevy.com
7
   For all Defendant except McGowan:
8
   MS. DIANE PETERS
9  WYRSCH, HOBBS & MIRAKIAN
   1200 Main Street, Suite 2110
10 Kansas City, Missouri  64105
   dpeters@whmlaw.net
11
12 For the Defendant McGowan:
13 MR. JOSH HANER
   JACKSON COUNTY COUNSELOR'S OFFICE
14 415 East 12th Street, Suite 200
   Kansas City, Missouri  64106
15 jhaner@jacksongov.org
16
   Also Present by Zoom:
17
   Mr. Keith Carnes
18
19 The Court Reporter:
20 Ms. Saundra Tippins
21
   The Videographer:
22
   Mr. Oleh Kovalchuke
23
24
25

Page 5

1
2       IT IS HEREBY STIPULATED AND AGREED,
3  by and between counsel for Plaintiff and counsel
4  for Defendants that the deposition of DOUG NIEMEIER
5  may be taken in shorthand by Saundra Tippins, a
6  notary public and shorthand reporter, and
7  afterwards transcribed into typewriting; and the
8  signature of the witness is expressly reserved.
9            * * * * *
10      THE REPORTER:  Electronic copy of
11 today's transcript?
12      MR. HILKE:  Yes.
13      MS. PETERS:  Yes.
14           * * * * *
15      THE VIDEOGRAPHER:  Here begins the
16 deposition of Doug Niemeier in the matter of Keith
17 Carnes versus Robert Blehm, et al., in the
18 District Court for the Western District of
19 Missouri, Case No. 4:23-cv-00278-RK.
20      Today's date is February 28th, 2024, and
21 the time is 9:57 a.m.  The video operator today
22 is Oleh Kovalchuke.  The court reporter is
23 Saundra Tippins.  Today's deposition is being
24 taken at 1200 Main Street, Suite 2110, Kansas
25 City, Missouri.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 4:23-cv-00278-RK   Document 99-19   Filed 09/09/24   Page 1 of 60

Page 6

1    Counsel, please introduce themselves and
2 state whom you represent.
3        MR. HILKE:  Wallace Hilke for
4 Plaintiff, Keith Carnes.  And Mr. Carnes may join
5 us by Zoom later, but he's not on yet.
6        MS. PETERS:  Diane Peters for all
7 of the Defendants except Amy McGowan.
8        MR. HANER:  And Josh Haner on
9 behalf of Defendant Amy McGowan.
10       THE VIDEOGRAPHER:  The reporter
11 will now swear in the witness.
12       DOUG NIEMEIER,
13 of lawful age, produced, sworn and examined on
14 behalf of Plaintiff, deposes and says:
15       EXAMINATION
16 QUESTIONS BY MR. HILKE:
17   Q   Good morning, sir.
18   A   Good morning.
19   Q   My name is Wallace Hilke, and like I
20 mentioned before, I'm the lawyer for Plaintiff,
21 Keith Carnes, in this lawsuit.
22   Would you please start by stating and
23 spelling your name for the record.
24   A   Doug Niemeier, D-o-u-g,
25 N-i-e-m-e-i-e-r.

Page 7

1   Q   Thank you, sir.  Sir, have you been
2 deposed before in a civil case?
3   A   I'm trying to think over 28 years.  I
4 can't even remember.  I don't think so.
5   Q   That's all right.  I'm just going to
6 start with a few kind of rules of the road to keep
7 everything moving smoothly.
8   One of them is our reporter today is
9 taking down what we say, so we've got to talk one
10 at a time.  Otherwise it'll never make sense
11 later.  Fair enough?
12   A   Yes.
13   Q   And likewise, you want to give verbal
14 answers like yes or no, instead of physical
15 gestures or like uh-huhs, which the record won't
16 take down.  Fair enough?
17   A   Okay.
18   Q   I try to only ask good questions, but
19 I don't always succeed.  If I ask you a question
20 that doesn't make sense, will you please ask me to
21 clarify it?
22   A   Yes.
23   Q   And likewise if you don't -- if you
24 respond to my question, I'll assume you understood
25 it.  Is that fair enough?

Page 8

1   A   Okay.
2   Q   We can take breaks whenever you want,
3 but if I have asked you a question, I'll ask you
4 to finish answering it before we take that break.
5 Fair enough?
6   A   Okay.
7   Q   Any reason you can think of that you
8 wouldn't be prepared to testify today?
9   A   Any reason that I wouldn't be
10 prepared?
11   Q   Yes, sir.
12   A   No.
13   Q   And do you have any -- I don't want to
14 get into your medical history, but do you have any
15 like health diagnoses of any kind that would
16 affect your recollection or ability to testify
17 accurately today?
18   A   No.
19   Q   And are you under the influence of any
20 drugs, alcohol, prescriptions that would affect
21 your ability to testify today?
22   A   No.
23   Q   All right.  Sir, have you ever been a
24 Defendant in a civil lawsuit before?
25   A   Yes.

Page 9

1   Q   How many times can you remember?
2   A   Once.  It was like my first year of my
3 career.
4   Q   And what was, what was the -- what
5 were the allegations in that lawsuit?
6   A   I don't know because it never went --
7 it never went to court.  Like I said, I didn't get
8 deposed.  So, so I believe I was, but I never --
9 no proceedings, no nothing.
10   Q   Got it.  Is there anything further you
11 can remember about that lawsuit?
12   A   First, like I said, it was one of the
13 first years of my career, first one or two years
14 of my career.
15   Q   Okay.  So I'm going to ask you some
16 questions about how you got ready for this
17 deposition.  I don't want you to reveal anything
18 that you said to your attorney or she said to you
19 because that's privileged.
20   But without revealing what you said to
21 each other, could you tell me what you did to get
22 ready for the deposition today.
23   A   I have only talked to my attorney.
24   Q   All right.  Have you reviewed any
25 documents in connection -- in preparation for this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 4:23-cv-00178-RK   Document 129-19   Filed 09/09/24   Page 2 of 60

Page 10

1 deposition?
2     A     Only -- the only documents that I've
3 looked at is what I looked at with the attorney.
4     Q     I understand.  And without telling me
5 what you said to each other, which documents did
6 you then review?
7     A     I think it was -- I don't know.  It
8 was one report.  I think it was just one report.
9     Q     Okay.  And what, what was that report
10 you looked at?
11     A     I think it was, it was a crime scene,
12 crime scene log.
13     Q     All right.
14     A     Maybe, so that -- yeah.
15     Q     And what did -- was that from -- and
16 you're aware that in this lawsuit, Keith Carnes
17 alleges he was wrongfully convicted for the murder
18 of Larry White.  Correct?
19     A     Yes.
20     Q     Was that crime scene log from the
21 night that officers and detectives went out to the
22 scene, the night when Larry White was murdered?
23     A     Yes.
24     Q     Other than that crime scene log, have
25 you looked at any documents at all relating to

Page 11

1 this case?
2     A     No.
3     Q     Have you looked at anyone's testimony?
4     A     No.
5     Q     Have you reviewed any transcripts of
6 court proceedings?
7     A     No.
8     Q     Have you looked at the investigative
9 file from the murder investigation?
10     A     No.
11     Q     Have you looked at any documents from
12 the prosecutor's office?
13     A     No.
14     Q     Any other -- and do you yourself like
15 maintain any personal files about this case, like
16 the investigative file or any other notes about
17 this murder investigation?
18     A     No.
19     Q     When -- and you were served with a
20 copy of this lawsuit when this lawsuit was --
21 around the time this lawsuit was first filed.
22 Correct?
23     A     Correct.
24     Q     And did you read the lawsuit when you
25 got it?

Page 12

1     A     Yes.
2     Q     Okay.  And so you have an
3 understanding of what Mr. Carnes' allegations are
4 in this case?
5     A     I read the -- I read the document I
6 was served.
7     Q     All right.  When -- do you recall back
8 in 2021 there was habeas corpus proceedings where
9 Keith Carnes was challenging his conviction?
10     A     I've been told that.
11     Q     All right.  Around that time, did
12 prosecutors ever talk to you about the Larry White
13 investigation?
14     A     No.
15     Q     Did you, you know, a few years ago
16 when that was happening, did you receive any
17 documents then about the Larry White
18 investigation?
19     A     No.
20     Q     Did you provide any information to
21 anyone, then, in connection with the habeas corpus
22 proceedings?
23     A     No.
24     Q     All right.  Now, do you -- I wanted to
25 define a term I'm going to use in this deposition,

Page 13

1 which is independent recollection.
2     Independent recollection is different from
3 what you can read from a document.  It's what you
4 can remember on your own, sort of, and not just
5 reading what a document says.
6     Is that fair enough?
7     A     Okay.
8     Q     Do you have an independent
9 recollection of your involvement in the Larry
10 White murder investigation?
11     A     I was -- I was there.  I was a
12 supervisor of the 1010 squad.  But I guess if you
13 have a question, I could see if I can answer it.
14     But I was a homicide sergeant for nine,
15 almost ten years, so I made a lot of scenes.
16     Q     How many -- so in those many years you
17 were a homicide sergeant, how often would you come
18 out to a homicide scene?
19     A     Anytime whenever my squad was on call,
20 I would go to the homicide scene, or if I was the
21 floor sergeant, we might respond to the homicide
22 scene and then turn it over to whoever was on
23 call.
24     Q     Uh-huh.
25     A     So the number?  I would -- it's over a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana.com
www.kentuckiana.com

Case 2:22-cv-02078-RK    Document 130-19    Filed 09/09/24    Page 3 of 60

Page 14

1 thousand.
2    Q    Okay. So I'm not --
3    A    I should, can I make a correction?
4    Q    Yes, sir.
5    A    It's over a thousand death
6 investigations. So they may not even be all
7 homicides. You could have a death investigation
8 that wasn't a homicide. We had all deaths.
9    Q    So I'm not great at math, but if
10 you're a sergeant ten years and you went to a
11 thousand scenes a year, it would be around a hundred
12 scenes a year. Fair enough?
13    A    Close.
14    Q    All right. Now, of all the scenes you
15 went out to, is there anything about the scene the
16 night of Larry White's murder that makes it stand
17 out from any of the others?
18    A    No.
19    Q    And as far as your memory today of the
20 Larry White homicide investigation, is there
21 anything that makes it stand out from any of the
22 other hundreds of homicide investigations you
23 participated in?
24    A    Could you repeat that?
25    Q    Again, sir --

Page 15

1    A    I need -- sorry. I am very hard of
2 hearing, so I should have said that at the
3 beginning. I don't hear well, so I'm probably
4 going to have to ask a lot. I'm trying to also
5 read your lips at the same time --
6    Q    Okay.
7    A    -- that you're talking. That's why
8 I'm really focusing, because I'm hard of hearing
9 now at my age, so I'm trying to pay attention and
10 listen.
11    Q    Thank you for clarifying. Out of
12 the -- out of the hundreds of homicide
13 investigations you supervised, does the Larry
14 White investigation stand out in any particular
15 way from the others?
16    A    No.
17    Q    Is that too loud for me to talk?
18    A    No. You're going to probably hear me
19 talk loud as well because ...
20    Q    Good. So what's the first thing you
21 remember from supervising the Larry White homicide
22 investigation?
23    A    I mean, I remember it only because of
24 reviewing, knowing this, right, and its location.
25 And I know the location because I've worked that

Page 16

1 area -- most of my career has been on the east
2 side.
3    So I remember it because it had something
4 to do with the restaurant on the east side of
5 29th-ish and Prospect.
6    Q    Do you remember specifically what you
7 saw when you showed up to the scene?
8    A    I don't know. I don't remember what I
9 saw.
10    Q    Do you remember who you talked to the
11 night you showed up on the scene?
12    A    Well, if you're asking me
13 independently, no. If you're asking me by looking
14 at the crime scene log, yes.
15    Q    Yeah. And I'll just ask you about
16 what you independently remember for now, and we'll
17 get to the, the more document-based questions
18 later.
19    Do you remember what the evidence was at
20 the scene when you arrived there?
21    A    No.
22    Q    Do you remember if you had any
23 information about the possible motive of a suspect
24 the night you showed up on the scene?
25    A    No.

Page 17

1    Q    Was it your role as a homicide
2 sergeant to assign cases to detectives?
3    A    Yes.
4    Q    Do you independently recall which
5 detective you assigned the case to?
6    A    I know now, but you're asking me that
7 night. I wouldn't have -- I assigned hundreds of
8 cases, so that night I wouldn't have. I know now.
9    Q    Okay. So now you can tell because
10 you've read it or learned it otherwise getting
11 ready. Is that fair?
12    A    Yes.
13    Q    But it wasn't something you
14 independently recollected before you prepared.
15 Fair enough?
16    A    Correct.
17    Q    Do you remember what leads came up in
18 the investigation the night of the homicide?
19    A    No.
20    Q    Do you remember the next thing you did
21 on the case after you came out to the scene that
22 night?
23    A    No.
24    Q    Do any details about that scene that
25 night form an independent recollection for you?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax

schedule@kentuckiana.com
www.kentuckiana.com

KENTUCKIANA
COURT REPORTERS

Case 3:21-cv-00078-RK   Document 129-19   Filed 09/09/24   Page 4 of 60

Page 18

1        A    No.

2        Q    Do you have an independent
3   recollection of how the case was closed?

4        A    No.

5        Q    Do you have an independent
6   recollection of any interactions with any
7   witnesses on the case?

8        A    No.

9        Q    Or any -- do you independently
10  remember any interactions with any officers on the
11  case?

12       A    You're asking me about what I can
13  remember specifically about that case at the time.

14       Q    Uh-huh.

15       A    No.  I -- okay.

16       Q    So other than that you were the
17  sergeant and that it was in an area you knew and
18  that there was a restaurant on the east side of
19  the scene, are there any other details that are
20  the subject of an independent recollection for
21  you?

22       A    No.

23       Q    Do you have any independent
24  recollection of the criminal proceedings that
25  followed the investigation?

Page 19

1        A    No.

2        Q    And do you have any independent
3   recollection of the post-conviction proceedings,
4   meaning the habeas proceedings in 2021?

5        A    I knew they happened, but I didn't --
6   I don't -- I didn't participate, so I don't -- no.

7        Q    What do you independently remember
8   knowing about the habeas proceedings at the time?

9        A    I mostly knew about it from the news,
10  I think.

11       Q    Is there anything other than reading
12  the newspaper articles that stands out as an
13  independent recollection for you?

14       A    I'm thinking.  I mean, I knew it was
15  going on, but I don't really know how I knew it
16  was going on.

17       Q    Yeah.

18       A    So ...

19       Q    Sitting here right now, is there
20  anyone within the police department you recall
21  talking about the proceedings?

22       A    I'm, I'm sure I probably did, but to
23  say that I remember talking to someone about it
24  today, I mean, I don't remember talking to anyone
25  about it, but if I did, I don't, I don't remember.

Page 20

1        Q    So Rob Blehm was a detective who
2   worked under you in 1010 squad.  Correct?

3        A    Yes.

4        Q    What was -- and you were his
5   supervisor?

6        A    Yes.

7        Q    Was, was officer -- was Detective
8   Blehm a strong detective in your unit?

9        A    He was good.

10       Q    What made him good?

11       A    I think his experience.  You know,
12  he -- experience is number one.  I would say Rob
13  was thorough.  He's just a good detective.  I'm
14  having trouble putting it in words, but he was
15  somebody that, you know, was a thorough detective,
16  and he was, he was good at his job and knew what
17  he was doing.  I mean ...

18       Q    And when you describe him as thorough,
19  what does that mean in the context of homicide
20  investigation?  What is -- what does thoroughness
21  entail?

22       A    You know, he followed, followed his
23  leads.  He interviewed the folks he needed to
24  interview.  He wrote reports, things detectives
25  do.

Page 21

1        Q    All right.  Was Detective Blehm
2   skilled in, skilled in questioning witnesses?

3        A    I think mostly -- yes.

4        Q    Was he skilled in interrogating
5   suspects?

6        A    Yes.

7        Q    Was he thorough in interrogating
8   suspects?

9        A    Yes.

10       Q    I recall reading he was chosen to be
11  the interrogator of the serial killer Terry Blair.
12  Do you recall that?

13       A    Yes.

14       Q    And do you know why Detective Blehm
15  was chosen to interrogate Terry Blair?

16       A    He's a good -- because he's a good
17  detective.

18       Q    Uh-huh.  And who -- do you know who
19  made the decision as to who the lead interrogator
20  should be of Terry Blair in that investigation?

21       A    Me.

22       Q    And so from all the detectives in your
23  squad, was it your opinion that Rob Blehm was the
24  best positioned to lead that interrogation?

25       A    On that case yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:21-cv-00178-RK   Document 130-19   Filed 09/09/24   Page 5 of 60

1      Q    And you didn't have any concerns that
2  he would conduct a thorough interrogation?
3        A    Are we speaking about Terry Blair?
4      Q    Sure, to start.  Yes, Terry Blair.
5        A    Sure.
6      Q    And in general did you have concerns
7  about whether Detective Blehm would conduct
8  thorough interrogations?
9        A    No.
10     Q    Did you have any -- did Rob Blehm
11  experience any performance issues that you noted
12  as his supervisor while he was under your command?
13       A    Can you repeat that?
14     Q    Yes, sir.  One of your jobs as a
15  sergeant was to monitor and address any
16  performance issues that your detectives had.
17  Right?
18       A    Yes.
19     Q    Did you ever have to do that with Rob
20  Blehm?
21       A    I don't remember addressing any issues
22  with Rob.
23     Q    All right.  And again, just to
24  clarify, you have no independent memories of
25  interacting with Rob Blehm or any other detectives

1  or officers on the Larry White murder
2  investigation.  Correct?
3        A    Correct.
4      Q    All right.  Do you recall an Avery
5  Williamson from the 1010 homicide squad?
6        A    Yes.
7      Q    And what was your -- what was your
8  impression of Mr. Williamson's performance as a
9  homicide detective?
10       A    He was on probation.
11     Q    And what does it mean to be on
12  probation?
13       A    So you're, you're transferred and you
14  have a probationary-type period.  I can't remember
15  the length back then, but I wanted to say I
16  believe now -- I will say now it's after one year,
17  you're, you're off your probationary period as a,
18  as a detective.
19       Back then, I don't know that -- I don't
20  remember the timeframe.  That was 20-some years
21  ago, and obviously policies and things change,
22  so ...
23     Q    As his sergeant, was it your job to
24  recommend whether or not Detective Williamson
25  should continue as a homicide detective after his

1  probationary period ended?
2        A    It would.
3      Q    Do you remember what you decided as to
4  Detective Williamson?
5        A    I don't remember if -- I don't
6  remember if his probation was up before he left
7  the homicide unit.
8      Q    What's your understanding of why
9  Detective Williamson left the homicide unit?
10       A    He left -- so there was sort of a
11  third -- someone had reached out to me and stated
12  while he was off duty, that he had possibly driven
13  his patrol car while he'd been drinking.  And I
14  went to my, my supervisor and told my supervisor
15  that this had possibly happened.  And he ended up
16  being transferred.
17     Q    Other than the information you got
18  about Detective Williamson possibly having, I
19  guess, consumed alcohol and drove, did you
20  identify any other issues with Detective
21  Williamson's performance while you were his
22  supervisor?
23       A    I don't, I don't recall.
24     Q    Do you recall having any impression of
25  the quality of Detective Williamson's work under

1  your supervision?
2        A    No, because he would have been
3  under -- state that one more time.
4      Q    Yeah.  I'm wondering if you remember
5  having an opinion about whether Detective
6  Williamson was a good homicide detective, not a
7  good homicide detective, or anything about his
8  performance in that role.
9        A    I don't know that I would have made
10  that assumption.  He wasn't there very long.  And
11  you're asking if he was good or excellent or
12  something.  I wouldn't -- I don't think I would
13  have formed that opinion.
14     Q    Yeah.  So sitting here today, is there
15  anything you remember about Detective Williamson's
16  time under your supervision?
17       A    He wasn't there very long.
18     Q    Yeah.  I understand that.  I just want
19  to make sure I'm -- yeah.
20       A    Sorry.  You said not speak at the same
21  time.
22       My thoughts, he wasn't there very long, so
23  I don't know that I would have formed an opinion.
24     Q    All right.  And nothing comes to mind
25  sitting here now.  Correct?

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:21-cv-00178-RK   Document 130-19   Filed 09/09/24   Page 6 of 60

Page 26

1    A    No.
2    Q    When, when you were a sergeant over
3  1010 squad, what were your responsibilities?  I'm
4  sorry.
5         As a 1010 squad sergeant, what were your
6  responsibilities?
7    A    I oversaw the -- that unit or that
8  squad.  So I had at times eight detectives, seven
9  detectives, kind of the overview of, of the squad.
10   Q    And what were the activities you
11 performed in overviewing the squad?
12   A    Come to work every day, obviously
13 assign -- when we had a homicide, I would be the
14 person that assigned the case to a detective.
15 I would review reports that they turned
16 in, kind of manage people.  I mean, I managed the
17 squad, managed their -- the people.  That's what
18 I did.
19   Q    And was it important in your role to
20 come out to homicide scenes when there was one
21 called -- strike that.
22        Was one of your responsibilities to
23 respond to scenes where a death had been
24 reported?
25   A    Most, yes.  I mean, in that amount of

Page 27

1  time, it's impossible to make every single scene,
2  but yes.
3    Q    And when you responded to the scene as
4  a sergeant, what were your responsibilities on the
5  scene?
6    A    Again, you managed -- when I showed
7  up, I would assign a detective.  They would then
8  become the lead detective of the case.  And then
9  whatever occurred from that point, if there was
10 other -- that detective needed other detectives to
11 go somewhere else, I would direct them in that
12 direction.
13   Q    And what were the responsibilities of
14 the lead detective on a death investigation?
15   A    Well, it's their responsibility then.
16 They would work the crime scene, the initial
17 scene.  There's no -- no two crime scenes are the
18 same.  So they may also be doing an area canvas or
19 they may be -- they may end up talking to a
20 witness or -- I'm talking in generalities.
21 So without knowing exactly what happened
22 at a crime scene, there's -- all these
23 responsibilities fall within the squad.
24   Q    As a sergeant, were you responsible
25 for evaluating the performance of the detectives

Page 28

1  you supervised?
2    A    Was I responsible for evaluating?
3    Q    Yes, sir.
4    A    We had, we had evaluations.
5    Q    And it was your job to complete them
6  as to the detectives you supervised?
7    A    Yes.
8    Q    And am I correct that one of the
9  things a lead detective does is maintain the case
10 file for the investigation?
11   A    Yes.
12   Q    It's their job to make sure that all
13 the reports in an investigation get to a single
14 place?
15   A    Yes.
16   Q    All the reports from the investigation
17 should end up in the case's master file.  Correct?
18   A    Yes.
19   Q    And then the master file should be
20 provided to the prosecutor when the case is
21 submitted.  Correct?
22   A    Yes.
23   Q    And all the reports on the case should
24 go to the prosecutor at that time.  Correct?
25   A    Yes.

Page 29

1    Q    Are there any kinds of reports, kinds
2  of documents collected in an investigation that
3  would not be given to the prosecutor when the case
4  is submitted as of 2003?
5    A    Is there any -- can you say that
6  again?
7    Q    I can.  Can you think of any, any
8  documents from the homicide investigations you
9  supervised, like a kind of police report, a kind
10 of, I don't know, scene report, evidence log,
11 anything that as a matter of practice would not be
12 given to the prosecutor when a case was submitted
13 in 2003?
14   A    A police report should be given, yes.
15   Q    Is there anything that shouldn't be
16 given to the prosecutor as of 2003?
17   A    The only reason I'm hesitating is I
18 can't remember what the -- we have a Crime
19 Stoppers Tips Hotline.
20   Q    Uh-huh.
21   A    I don't remember what the, what it was
22 back in 2003.  That was my reason for pause.  But
23 I don't, I don't know that that matters.
24   Q    Yeah.  So was it your understanding in
25 2003 that absolutely everything the detective has

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00178-RK   Document 129-19   Filed 09/09/24   Page 7 of 60

Page 30

1  should go to the prosecutor when the case is
2  submitted?
3      A    The case file should be copied and
4  given to the prosecutor, yes.
5      Q    Were there documents the detectives
6  gathered in homicide investigation in 2003 that
7  were not kept in the case file?
8      A    If there was, I don't, I don't recall
9  us -- I don't recall cases -- I'm thinking.
10 That's a long time ago.  I don't, I don't know if
11 there was -- I don't know what you're asking
12 about.
13          You're asking me about police reports, so
14 I don't know.
15     Q    Okay.  You would agree that all police
16 reports that -- from an investigation should go to
17 the prosecutor when the case is submitted.
18 Correct?
19     A    All police reports, yes.
20     Q    And in some other departments, the
21 detectives keep two files, like a working file
22 that would stay back, and they'd pick some reports
23 and some stuff from it to give to the prosecutor.
24          Is that how it worked in Kansas City when
25 you were a homicide sergeant?

Page 31

1      A    Did we pick out reports to keep back?
2      Q    Yes, sir.
3      A    No.
4      Q    Were there any kinds of documents you
5  can remember sitting here today that you would
6  pick out to keep back from the prosecutor?
7      A    No.
8      Q    And do you remember why that was the
9  practice, to make sure that all the homicide
10 detectives' documents from an investigation would
11 go to the prosecutor?
12     A    Why was it a practice?
13     Q    Yes, sir.  Why was that what your
14 detectives did?
15     A    That's what we're supposed to do.
16     Q    Okay.  And do you know the rationale
17 behind that, that practice, why it's what you're
18 supposed to do?
19     A    It's discovery.
20     Q    And so is it fair to say that it
21 should be the prosecutor, not the police, who are
22 deciding how to deal with the discovery in the
23 case?
24     A    Can you repeat that?
25     Q    I can.  Was it your -- I'll rephrase.

Page 32

1      Q    Was it your understanding that you wanted
2  everything to go to the prosecutor so the
3  prosecutor could decide how that material could
4  appropriately be handled?
5      A    You're asking my opinion?
6      Q    Yes, sir.
7      A    I just -- we turn over the case file.
8      Q    When you were the 1010 squad sergeant,
9  did you review the case file before it went to the
10 prosecutor?
11     A    I could have.
12     Q    Did you do it for every case that was
13 submitted?
14     A    No.
15     Q    Whose job was it to bring the case
16 file to the prosecutor when a case was submitted?
17     A    Case detective.
18     Q    And there's been testimony that in
19 2003, the case detective would typically either
20 bring that file to the prosecutor, or the
21 prosecutor might have an investigator come and
22 pick documents up.
23          Is that your recollection?
24     A    I think both of those could happen.
25     Q    Is there any other way you remember in

Page 33

1  2003 the case file got to the prosecutor?
2      A    We didn't have computers, so it was
3  you delivered it or it was paper.
4      Q    All right.  And in 2003 the detectives
5  weren't like doing electronic transfers of the
6  case file to prosecutors, as far as you remember,
7  were they?
8      A    No.  We didn't even have -- I don't
9  even know that we all had phones yet.  I know we
10 all didn't have computers yet.
11     Q    When -- in 2003, do you remember how
12 routine it was for you to review a case file
13 before it went to the prosecutor?
14     A    It's all dependent upon the case,
15 right?  It's -- time doesn't stop when I'm not
16 working, so, you know, if I was there, I probably
17 reviewed it.  If I wasn't there, I probably didn't
18 review it.
19          So I reviewed some.  I wouldn't -- I would
20 in no way, shape or form say I reviewed all of
21 them.
22     Q    Was there a rule that the detectives
23 had to check with you as a sergeant before giving
24 the case file to the prosecutors?
25     A    I don't know about a rule, but, I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:21-cv-00178-RK   Document 120-19   Filed 09/09/24   Page 8 of 60

1  mean, I reviewed most of the cases.  I think we
2  probably did have some sort of -- but I don't
3  recall having a rule or there's no policy or
4  anything like that.
5        Q    In your role as a sergeant, when you
6  reviewed the case file before it went to the
7  prosecutor, what were you looking for?
8        A    If I had a case file, just a case file
9  in front of me, you just make sure that it's
10  somewhat in order.  You know, you had regular
11  items that should be there, crime scene interview,
12  interviews, the medical examiner report, things of
13  that nature.
14        There were standards that had to be in a
15  case file before they could be submitted.  And
16  some cases, files are small and some case files
17  are -- just depends on the homicide.
18        Q    All right.  So is it fair to say that
19  you were trying to check that nothing was missing
20  that ought to be in there?
21        A    That would not be a fair statement.
22        Q    Could you -- I think, I think I've
23  misunderstood you.
24        Could you -- if you weren't looking to see
25  if something was missing, what were you checking

1  for when you looked at the case files as a
2  sergeant before they went to the prosecutor?
3        A    Like I said, every, every case would
4  have certain items that were going to be in it.  I
5  don't know that I could say I would know every
6  item of every case that's going to be there.
7        So if you handed me a case file that's
8  this big, I haven't seen every one of those
9  items, so I wouldn't know if an item was missing
10  or an item wasn't missing.
11        Q    Sure.
12        A    So, you know, to have an overall view
13  of what happened in a case, I could have multiple
14  case files going with multiple detectives at the
15  same time.
16        Q    Yeah.
17        A    As a supervisor.
18        Q    Yeah.  So if something was obviously
19  missing, like there's no crime scene report,
20  that's something you would notice and tell the
21  detective.  Right?
22        A    Could.
23        Q    And if you happen to notice something
24  was missing that you remembered from the
25  investigation, you wouldn't hesitate to ask a

1  detective, hey, I don't see this; where is that?
2  Correct?
3        A    If I notice something in a case file
4  yes.
5        Q    But you weren't necessarily reviewing
6  every page of every case file to review the
7  contents of the reports before submitted.
8  Correct?
9        A    I wouldn't review every -- I would not
10  review every single page of every single case file
11  that my squad worked, no.
12        Q    Now, other than the review you've just
13  described of the case file before it goes to the
14  prosecutor, as a homicide sergeant, did you play
15  any other role at the stage that a case is
16  submitted to the prosecutor?
17        A    Did I play another role?
18        Q    Yeah.  I'm trying to ask about your
19  responsibilities as in, for example, if a
20  detective thinks the case is ready to be submitted
21  to a prosecutor, does that detective have to get
22  approval from you before it's submitted?
23        A    If I was working, I'm sure that they
24  would bring it to me.
25        Q    Uh-huh.

1        A    But again, we, we had homicide files
2  that were submitted when I wasn't working, or if I
3  wasn't there, there might be an acting supervisor.
4        If I was there, I would have played a
5  role.
6        Q    And can you tell me what your
7  responsibilities were in that process, the process
8  of taking a case file and submitting it to the
9  prosecutor?
10        A    I guess I'm hung up on the word
11  "responsibilities" because there wasn't a
12  checklist of what a supervisor did or did not do.
13        I would have read over -- I don't remember
14  doing this in this case, but in generality, I
15  would have read over maybe the probable cause
16  statement.  You would have ran over -- read over
17  different portions of that file.
18        But you're asking me what my -- without
19  being specific, I don't know what you're asking.
20        Q    Well, to back up a little bit, as a
21  sergeant, how did you decide what you were going
22  to do when cases were submitted to the prosecutor?
23  Was that like something you had to define as to
24  how you wanted to exercise your like management
25  and supervision over your homicide detectives?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 2:20-cv-00078-RK   Document 109-19   Filed 09/09/25   Page 9 of 60

Page 38

1    A    I wasn't the end all of whether a case
2 file was submitted or not submitted.
3    Q    Uh-huh.
4    A    Obviously detectives talked with
5 prosecutors.
6    Q    Uh-huh.
7    A    We as a squad talked with prosecutors.
8 So if you're saying that it ultimately landed on
9 the supervisor to say whether a case got filed or
10 not, that wouldn't -- that would be inaccurate, in
11 my opinion.
12    And I say that because I'm not at every --
13 you're not there all the time. You don't -- I
14 mean, this is a business that is every day 24
15 hours a day.
16    Q    Yeah, and I want to be clear about
17 what I'm asking.
18    A    I'm, I'm -- I apologize, but that's
19 what I'm asking. I don't understand what you're
20 asking me.
21    Q    That's your right to clarify. And I'm
22 glad you're asking me, so we can make, make clear
23 what we're talking about.
24    So you've told me sometimes you were off
25 duty. Another sergeant was on duty. And

Page 39

1 obviously another sergeant who was on duty could
2 exercise those supervisory functions. Right?
3    A    Well, it wouldn't have been -- it
4 would have been someone within our squad would
5 have been what's called an acting sergeant. So it
6 would have been someone within my squad.
7    Q    So when you were out, any -- a
8 detective, another detective, a detective in your
9 unit could be the acting sergeant. Right?
10    A    Correct.
11    Q    And so the question I was trying to
12 ask you was responding to you saying, you know, I
13 don't have a checklist of everything, then, that
14 needs to happen when a case is submitted to the
15 prosecutor.
16    And the question I was trying to clarify
17 is, how did, how did you decide what, you know,
18 when you were there, when you were playing a
19 role, what you would do in the process of
20 submitting a case to the prosecutor, meaning was
21 there written policy you knew of that you
22 were following, or was it more about your
23 judgment and discretion as a homicide supervisor
24 in figuring out what needed to be done to move
25 the case forward? Or was it something else?

Page 40

1    A    There was no -- I don't recall a
2 written policy on that. It was discussions back
3 and forth with the prosecutor's office, and most
4 of the time that happened with the detective.
5    Q    And when you say most of the time it
6 happened with the detective, does that mean that
7 you as a sergeant wouldn't necessarily be involved
8 in that back and forth?
9    A    Some cases I was and some cases I was
10 not. I mean, of course you are. You work with a
11 squad, so like I said, you manage, manage people.
12    If you had a case, you were working with
13 the prosecutor's office. If she had a case,
14 she's working with the prosecutor's office.
15    Q    Let me, let me ask this.
16    In 2003 when you were a homicide sergeant,
17 did you expect that the detectives you supervised
18 would tell you when they were getting ready to
19 submit a case to the prosecutor?
20    A    Sure.
21    Q    And is that how you would know that if
22 you wanted to look at their case file, that was
23 your opportunity to check it, to check it at that
24 time?
25    A    They could bring it -- yes. Yes, we

Page 41

1 could -- we would know -- I would think we would
2 know or I would know that they were gonna submit
3 it.
4    Q    And did you expect that the detectives
5 would present their case file to you or ask you if
6 you wanted to look at it before they submit it?
7    A    Repeat that.
8    Q    Did you expect that the detectives you
9 supervised would bring you the case file before
10 submitting it to the prosecutor?
11    A    I think most cases I would, I would
12 see it. I mean, that's -- all case files are
13 worked on as a group back and forth.
14    So many times I would know parts of this
15 case file or parts of that case file. Sometimes
16 I knew all of case files. Sometimes you have
17 them in custody and you know the whole case file.
18 It happens in 24 hours.
19    So if you have a direct question, I'm
20 happy to answer it, but I don't understand if
21 you're -- there's no -- I already told you
22 there's no A to Z here.
23    Q    If I got your answer, and correct me
24 if I didn't, in general you'd expect the
25 detectives to present you with a case file before

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Case 3:21-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 11 of 60

Page 42

1  submitting it to the prosecutor.  Is that correct?
2      A    Most of the time.
3      Q    All right.  Can I -- and I just want
4  to make sure I've covered what you remember your
5  role being in terms of submitting a file to the
6  prosecutor.
7          Did you, did you generally play a part in
8  that process as a sergeant that I have not yet
9  asked you about?
10     A    No.
11     Q    And I want to ask you about Steve
12 Morgan.  He was another detective who worked under
13 you at 1010 squad.  Correct?
14     A    Correct.
15     Q    And how do you remember Steve Morgan's
16 performance as a detective?
17     A    It was good.
18     Q    Any performance issues you can
19 remember that he ever had with you?
20     A    No.
21     Q    What about, did Vern Huth work under
22 you after he became a homicide detective?
23     A    After he became a homicide detective
24 yes.
25     Q    And how do you remember his

Page 43

1  performance under you?
2      A    It was good.
3      Q    Any performance issues you recall?
4      A    No.
5      Q    What about Ed Begley?  Was he ever a
6  homicide detective under you?
7      A    Yes.
8      Q    Did you have any performance issues
9  with him?
10     A    No.
11     Q    Do you recall working at all with the
12 prosecutor Amy McGowan?
13     A    I know her or I know the name.  I
14 should say that.
15     Q    Do you have a memory of her from the
16 time you were a homicide sergeant?
17     A    I know she worked at Jackson County.
18 I don't remember ever -- no.
19     Q    All right.  Is there anything from
20 around this time, 2003, that you remember about
21 Amy McGowan other than that she was a Jackson
22 County prosecutor?
23     A    No.
24     Q    What about the prosecutor Dawn
25 Parsons?  Do you recall any interactions with her?

Page 44

1      A    She was a Jackson County prosecutor,
2  too.
3      Q    Anything further than that?
4      A    No.
5      Q    What about Brady Twenter?  Any
6  recollections of him?
7      A    I only know -- I've only heard his
8  name.  If I've -- if I talked to him, I don't
9  know.
10     Q    I want to ask about whether you
11 remember any --
12     A    I can't see your lips.
13     Q    Thank you.
14     A    Sorry.
15     Q    I want to ask you if you remember any
16 interactions with some people who are witnesses in
17 the Larry White investigation.
18     A    Okay.
19     Q    And I want to ask if you remember any
20 interactions either during the investigation or at
21 any other time.  Fair enough?
22     A    Okay.
23     Q    Do you have any memory of Keith
24 Carnes?
25     A    At the time, no; now, yes.

Page 45

1      Q    Do you remember ever interacting with
2  him?
3      A    No.
4      Q    Do you have any memory of him aside
5  from what you've learned from documents reviewed
6  for this case?
7      A    No.
8      Q    Any memory of Gary Kitchen?
9      A    No.
10     Q    Or Reginald Thomas?
11     A    No.
12     Q    Any memory of Mitchell Powell?
13     A    No.
14     Q    Any memory of Damon Rhodes?
15     A    No.
16     Q    Any memory of Kermit O'Neal?
17     A    No.
18     Q    Any memory of Elton Shaw?
19     A    No.
20     Q    What about Wendy Lockett?
21     A    No.
22     Q    Any memory of Lorianne Morrow?
23     A    I'm sorry?
24     Q    Lorianne Morrow.
25     A    No.

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana.com
www.kentuckiana.com

Case 4:21-cv-00778-RK   Document 189-19   Filed 09/09/24   Page 11 of 60

Page 46

1    Q    Any memory of Felicia Jones?
2    A    No.
3    Q    Any memory of Vernetta Bell?
4    A    No.
5    Q    Anthony Waits?
6    A    No.
7    Q    Margo Thomas?
8    A    No.
9    Q    Any memory of William Brown?
10   A    No.
11   Q    Ronald White?
12   A    No.
13   Q    Leslie Cole?
14   A    No.
15   Q    Marva Gray?
16   A    No.
17   Q    Any memory of, did I say this, Arnold
18 Carr?
19   A    You did, but no.
20   Q    Elvin Shelton?
21   A    No.
22   Q    Vernia Johnson?
23   A    No.
24   Q    Do you have any memory of an
25 investigation into additional suspects beyond

Page 47

1 Keith Carnes in the White homicide investigation?
2    A    Do I have any memory?
3    Q    Yes, sir.
4    A    Of additional suspects?
5    Q    Yes.
6    A    Not directly, no.
7    Q    Do you now have knowledge as to
8 additional suspects in the investigation?
9    A    I'm, I'm sure there were, but I didn't
10 read the case file, so ...
11   Q    Sitting here now, do you have any idea
12 who they are?
13   A    The?
14   Q    Additional suspects.
15   A    No.
16   Q    Do you recall reviewing and signing
17 Interrogatory responses in this case?
18   A    I don't know what that is.
19   Q    It would be -- here, one second.
20        (The reporter marked Exhibit No.
21 42.)
22   Q    (By Mr. Hilke) Exhibit 42.  Do you
23 recognize these as responses you signed on
24 September 25, 2023?
25   A    Was this the document that was sent in

Page 48

1 regards to the -- is this like an original -- I
2 don't remember.
3    Q    Okay.
4    A    Let me read over the whole entire
5 document.
6    Q    Yeah.  May I ask you a different
7 question?  Because I'm only going to ask you about
8 a couple of parts of this.
9    A    Okay.
10   Q    Do you recall earlier in this lawsuit
11 reviewing a set of answers to questions and
12 signing that they were correct?
13   A    Well, that's my signature, yes.
14   Q    All right.  And before you signed
15 this -- before you signed this verification, you
16 would have read through the answers and made sure
17 they were all true and correct.  Right?
18   A    Yes.
19   Q    And you understood that you were
20 giving an answer under oath as to the correctness
21 of the answers.  Right?
22   A    Yes.
23   Q    So I just want to ask you about, this
24 is on page two, your response to question number
25 three.

Page 49

1    A    Okay.
2    Q    I just want to ask you if you remember
3 any details beyond what's on here.
4        In your answer you said around the time of
5 the habeas hearing, Vern Huth and Rob Blehm asked
6 you if you had to testify at the habeas hearing,
7 and you said no.  Correct?
8    A    If I had to testify?  Yeah.  I did not
9 testify.
10   Q    Right.  And do you remember anything
11 else Vern Huth said to you when you talked to him?
12   A    About whether I was testifying?
13   Q    About anything related to the habeas
14 proceedings.
15   A    No.
16   Q    Do you remember anything else you said
17 to Vern Huth at that time?
18   A    I have no idea.
19   Q    As far as you remember, is that the
20 only interaction you had with Mr. Huth about the
21 2021 habeas proceedings?
22   A    I believe so, but I see Vern Huth at
23 work, so if there was, I don't recall ever talking
24 about the court case.
25   Q    Did Mr. Huth ever show you any

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  documents about the habeas proceedings?
2      A    I don't recall that.
3      Q    And, and let me ask about Rob Blehm.
4  When Rob Blehm asked you if you had to
5  testify at the habeas hearing, was he with Vern
6  Huth?  Was that the same interaction with both of
7  them?  Or was it two separate interactions?
8      A    I don't know.  I see Rob Blehm, too,
9  so I see Rob Blehm.  He still works for KCPD, so I
10 see him.  I don't know if they would have been
11 together or apart.  I don't know.  I see a lot of
12 people every day.
13     Q    Yeah.
14     A    So ...
15     Q    How did you remember they had both
16 asked you about the proceedings?
17     A    Because I think it was something that
18 had come up in conversation.  Like I said, I knew
19 about it.  Obviously I knew about it.  It was in
20 the news.  It was -- I knew that they were -- I'm
21 trying to think.  That was in 2001?
22     Q    2021.
23     A    Oh, 2021.  I'm trying to think back
24 where I was even two years ago where I was
25 assigned because I moved.  If I was at east

1  patrol -- I don't know if they were together or
2  not.
3      Q    Okay.  As far as you remember, it
4  could have been together or two separate
5  conversations.  Correct?
6      A    I don't know.  I don't remember.  I'd
7  have to look back at my -- if it was -- I'm sorry,
8  not 2001, if it was 2021, if it was at east patrol.
9  I'm not trying to assume if I'm at east patrol or
10 I'm downtown, where they're assigned, so I don't
11 know.
12     Q    And you also made a phonecall to Ed
13 Begley about this lawsuit.  Correct?
14     A    At her request.
15     Q    Did you exchange any information with
16 Ed Begley during that phonecall?
17     A    I just told him that we were gonna
18 be -- I think I had been served by a process
19 server, which I assume would be you, or not you
20 particularly, but person, and then I believe that
21 our attorney reached out and asked that I contact
22 him.  He doesn't live in Kansas City anymore.
23     Q    Now, was that two separate
24 conversations, one where you got served and then
25 after you got served, then another one later on,

1  or just one conversation you had with Ed Begley
2  about the lawsuit?
3      A    I don't remember calling him -- I
4  don't remember calling him -- I don't know if I
5  called him and said he's gonna be served or we --
6  or I was requested to call him.  I can't -- I
7  don't know which way that went.  He was gonna be
8  served one way or the other.
9      Q    Do you remember what he said to you
10 when you called him?
11     A    No.
12     Q    So let me turn your attention to
13 question 10.  And No. 10 asks if you contend there
14 was probable cause, and the answer you gave is
15 yes.  See the probable cause statement.  Correct?
16     A    Correct.
17     Q    But you haven't reviewed the probable
18 cause statement in connection with this case, have
19 you?
20     A    I would have -- I assume that I would
21 have at the time.
22     Q    Okay.  Do you have any independent
23 recollection at all today of that probable cause
24 statement?
25     A    I haven't seen it.  I haven't read the

1  case file at all.
2      Q    And so sitting here today, you no
3  longer know what the contents of that statement
4  you're referring to are.  Correct?
5      A    I would have, given that answer, I
6  would have said yes, there's probable cause
7  because we obviously -- you have to have a
8  probable cause statement to submit a case file.
9      Q    I understand that --
10     A    So I guess to answer your question --
11 what was your question before that?
12     Q    Yeah, no.  I understand what you're
13 saying.  And my question is a little different.
14 I'm asking if right now you know anything
15 about what's included in that probable cause
16 statement you're referencing.
17     A    Not sitting here without looking at
18 it.
19     Q    I mean, you could tell if you looked
20 at it, but you haven't, as far as you know, since
21 the case went to the prosecutors.  Correct?
22     A    Correct.
23     Q    Let me take you to page four, to
24 answer number 14.
25     This question asks you to identify each

Kentuckiana Reporters
39 South Wacker Drive, Suite 2700
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 13 of 60

Page 54

1  Kansas City Police Department file that's ever
2  existed, and you answer that you would have
3  reviewed the criminal investigative file before
4  it was produced to the Jackson County
5  prosecutor's office.  Correct?
6      A    That's -- I would have -- been my
7  assumption that that's what I would do, because I
8  was -- like I said to you earlier, I would review
9  those, and they would turn them in.
10     Q    And I -- the way I understood your
11 testimony before is that you often but not always
12 looked at the case file before it went to the
13 prosecutor.  Is that correct?
14     A    If I wasn't there, then I couldn't,
15 but generally yes.
16     Q    So was it something you did every time
17 you were there and the case file went to the
18 prosecutor?
19     A    I would have reviewed files.
20     Q    Yeah, but my question is a little
21 different, is whether it was something you did
22 every time you were on duty and one of your
23 detectives submitted a case file to the
24 prosecutor, if you, if you remember.
25     A    That's the issue.  You're asking me in

Page 55

1  generality, correct?  You're asking me overall?
2  Are you asking me about this one, or are you
3  asking me in general what I would have done?
4      Q    Let me ask you in general now.
5          In 2003 when you were a homicide sergeant,
6  can you state with certainty you reviewed a
7  hundred percent of the case files that your
8  detectives submitted to prosecutors if you and
9  they were on duty at the same time?
10     A    Yes, I would have reviewed case files
11 if we were both there at the same time.  I would
12 have reviewed a file.
13     Q    Okay.  So if you were on duty at the
14 time it went to the prosecutor, then a hundred
15 percent you reviewed it before it went to the
16 prosecutor.  Correct?
17     A    Well, as an investigator, I hate to
18 the say a hundred percent.  I don't recall 2003,
19 but again, back to the generality, I don't, I
20 don't recall 2003, but I said here that I'd
21 reviewed case files before they were produced to
22 the Jackson County prosecutor.
23     Q    Can you remember a single time you
24 were on duty as a homicide sergeant and your
25 detective submitted a case file for the prosecutor

Page 56

1  without you looking at it first?
2      A    I don't remember.
3      Q    And of course if you were off duty at
4  the time the case file was submitted, then --
5  actually let me ask that.
6          If you're, if you're not on duty and a
7  homicide detective in 1010 squad needs to submit
8  a case file to the prosecutor, does anyone look
9  at it before that detective gives it to the
10 prosecutor?
11     A    Could be an acting supervisor.
12     Q    So it could be another sergeant in
13 ten -- strike that.
14         It could be another detective in 1010
15 squad who is acting as acting supervisor.
16 Correct?
17     A    Correct.
18     Q    Anyone else who would have played that
19 role who you know of?
20     A    Not off the top of my head.
21     Q    And back in 2003, was there anyone
22 above you in the chain of command, like a, you
23 know, captain, lieutenant, anyone, who also had to
24 be involved when a case file, a homicide case
25 file, went to the prosecutor?

Page 57

1      A    No.
2      Q    All right.  Yeah.  And I think just to
3  be clear, sitting here today, this answer -- your
4  answer to number 14 is correct?
5      A    Well, I wrote it, so that's, that's
6  what I believed at the time I wrote it, so yes.
7      Q    Do you believe it now?
8      A    Well, yeah.
9      Q    You can set that aside.  Thank you.
10     A    Sorry.  If you can -- see, I don't
11 even remember that.
12         MS. PETERS:  What exhibit number
13 are we?
14         MR. HILKE:  It was 42.  Let's,
15 let's take a short break, please.
16         THE VIDEOGRAPHER:  We are going
17 off the record.  The time now is 11 a.m.
18         (Recess.)
19         THE VIDEOGRAPHER:  We are back on
20 the record.  The time now is 11:08 a.m.  Please
21 proceed.
22     Q    (By Mr. Hilke) Sir, I know you've had
23 a long career at the Kansas City Police
24 Department.  Could you give me a brief summary of
25 the roles you've had there over time and when

Kentuckiana Reporters
39 South Wacker Drive, Suite 7800
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule@Kentuckianareporters.com
www.kentuckianareporters.com



Page 58

1  you've had them.
2       A    You want them from when I started?
3       Q    Yes, sir.
4       A    Started the police academy in '95.
5  I'm just going to use generality of year because I
6  don't know the exacts.
7            Started as a police officer in March of
8  '96.  Was at east patrol, became a detective,
9  robbery detective, '98, '99-ish.  Became a
10 homicide detective after that.
11           I was promoted to sergeant in 2001.
12 Worked at east patrol.  A year and-a-half, two
13 years after that, I was sergeant, homicide
14 sergeant of 1010.  Was there I believe it was
15 late 2009, early 2010-ish.
16           Went to the drug interdiction squad.  I
17 was there for five or six years.  Got injured.
18 That's when I took the captain's promotion
19 process test.  I went to -- back to east on
20 dogwatch as a captain.
21           I was transferred to city hall.  Worked
22 there for a year and-a-half, two years as a
23 captain.
24           Went back to east patrol as a major.
25 Spent just a short time, a few months really, as

Page 59

1  the violent crimes commander.  And then I was
2  promoted to deputy chief.  And three years into
3  that I've been, started out with executive
4  services.  I've had the admin bureau.
5            And on January the 7th of this year, I was
6  transferred to investigations.
7       Q    Organizationally within the Kansas
8  City Police Department, is there a division or
9  unit that homicide falls under?
10      A    Well, the unit falls underneath the
11 investigations division or investigations bureau.
12 Violent crimes division.  I'm sorry, did I say
13 investigative?  Violent crimes division, which
14 falls under the investigations bureau.
15      Q    All right.  And in around 2009 or
16 2010, when you were in the drug interdiction unit
17 or whatever it's called, was that -- where was
18 that in the organizational structure relative to
19 the homicide unit?
20      A    Well, it's still an investigations
21 bureau, but it's now violent crimes is on this
22 side and narcotics is on this side.  Sorry, I'm
23 supposed to not do that.
24           The organizational chart would be, all of
25 it falls under investigations bureau.  One side

Page 60

1  is violent crimes.  The other side of the
2  organizational chart is narcotics.
3       Q    Okay.  So when -- in 2009 or 2010 when
4  you moved to drug interdiction, you were moving
5  from the violent crimes division to the narcotics
6  division.  Is that correct?
7       A    Correct.
8       Q    And was that the first time you had
9  worked in the narcotics division?
10      A    I believe so.
11      Q    Before you joined the narcotics
12 division, then, were you aware of any policies in
13 the department relating to confidential
14 informants?
15      A    Was I aware of?
16      Q    Any policies about confidential
17 informants.
18      A    I don't remember what our policy was
19 in 2003, but I'm sure we had policies.
20      Q    Was that something the homicide unit
21 dealt with in 2003, confidential informants?
22      A    I don't think we had any confidential
23 informants in the homicide unit while I was there,
24 no, that I can remember.
25      Q    In the, in the narcotics division, did

Page 61

1  you work with confidential informants?
2       A    Yes.  Well, I did not, but the
3  narcotics division had confidential informants.
4       Q    Yeah.  At any point in your career,
5  had you worked with confidential informants before
6  you got -- or strike that.  Strike that.
7            Before you got to narcotics, had you ever
8  been in a unit that had its own confidential
9  informants?
10      A    I'm trying to think of, because when
11 you use the word "confidential informant," you
12 have confidential informants who are paid.  You
13 have confidential sources who are not.
14           I personally did not.  I'm trying to think
15 of the units that I worked in, if there was any.
16 I don't recall us having any in those -- when I
17 was in narcotics, we had -- because those are
18 paid informants.
19      Q    When you were in narcotics, were you
20 aware that supervisor approval was required for
21 confidential informants?
22      A    Was I aware?
23      Q    Yes, sir.
24      A    I believe I, yeah, I believe I was.  I
25 don't remember -- I was in drug interdiction, so I

Kentuckiana Reporters
39 South Wacker Drive, Suite 2700
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedulekentuckiana@gmail.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 4:24-cv-00478-RK   Document 189-19   Filed 09/09/25   Page 15 of 60

Page 62

1  don't remember us having a lot of confidential
2  informants.
3       If we did, it wasn't like other parts of
4  narcotics.
5       Q    Okay.  Right.  So it was more
6  something that your colleagues in that division
7  dealt with than what you had a lot of experience
8  with personally?
9       A    I --
10      Q    Was it more something that your
11 colleagues in the narcotics division dealt with as
12 opposed to you personally on drug interdiction?
13      A    Yes.  Interdiction is totally
14 different than making a buy or dealing hand to
15 hand.  Ours was -- drug interdiction is narcotics
16 that are coming to or through, is the terminology
17 Kansas City.
18      So it was -- I dealt in kilos, hundreds of
19 pounds, things of that nature.
20      Q    Did you work out of the same building
21 as other narcotics officers or detectives who, you
22 know, in other parts of that, of the narcotics
23 division?
24      A    We worked in the same building, yes.
25      Q    Was there some location in that

Page 63

1  building where jackets for different confidential
2  or documentation of different confidential
3  informants was kept?
4       A    I'm trying to even think if I've ever
5  seen -- I don't know where they were kept.
6       Q    And is the location of such
7  information about confidential informants
8  something that you had seen or known about before
9  you got to the narcotics division?
10      A    Would I have known about confidential
11 informants before I got there?
12      Q    Would you have known specifically
13 about documentation, meaning files, keeping track
14 of who the informants were?
15      A    I don't think so.
16      Q    And were you ever made aware of any
17 differences in the information to be kept about
18 confidential informants and the information to be
19 kept about confidential sources?
20      A    Repeat that again.
21      Q    Were you ever made aware in the Kansas
22 City Police Department whether there were
23 different requirements for the documents that had
24 to be kept about confidential informants versus
25 confidential sources?

Page 64

1       A    I don't remember being made aware of
2  any of that.  I don't remember being made aware.
3       And again, I don't, I don't -- I don't
4  believe I personally have ever had a confidential
5  informant myself.  I have a lot of confidential
6  sources, but I don't know about an informant.
7       Q    So at what stage in your career did
8  you begin using confidential sources?
9       A    Early when I was on the -- I was on
10 the street.
11      Q    Meaning when you were a patrol
12 officer?
13      A    Yes.
14      Q    And can you tell me, how did that --
15 and when you say you had confidential sources
16 early in your career, what did that entail?
17      A    Obviously the neighborhoods we worked
18 were dangerous.  I just think of one particular
19 area that I was a patrol officer, and there was a
20 lady that had lived on that block for a long time.
21      It wasn't the same as when she moved there
22 many years ago.  So I would have considered her a
23 confidential source, because if something
24 happened, she did not want to be involved, but
25 she wanted her neighborhood back.  So she could

Page 65

1  say what was going on in her block.
2       So that would be an example.  I remember
3  her specifically.
4       Q    And what did you do information --
5  differently for the information you got from
6  confidential sources as opposed to regular
7  sources?
8       A    Well, she was someone that would, for
9  me, she would be someone that would bring me
10 information if -- you asked me what I would do
11 different?
12      Q    Yes.
13      A    For if she was bringing me information
14 on what was going on, on her block, I wouldn't put
15 her name out there, because everyone would know
16 that it was her.
17      It would be different if I showed up and
18 the four of us were there and everybody's gonna
19 be in the report.
20      Q    And what did you do to make sure that
21 the names of your confidential sources wouldn't be
22 revealed?
23      A    I don't know that I was ever, in my
24 time at least, patrol as an officer, I don't know
25 that I was ever asked.

Kentuckiana Reporters
39 South Wacker Drive, Suite 2700
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 16 of 60

Page 66

1    Q    I mean, if you were writing a report
2  with information from a confidential source, would
3  you write them down as a confidential source
4  instead of writing down their name?
5    A    I'm sure I have reports written like
6  that. That was 1990 -- now you're asking me to
7  recall from 1996. But I'm sure there probably is
8  a report throughout that says that.
9    Q    And how, how did you learn -- strike
10 that.
11      Did anyone tell you that that's how you
12 should record information from confidential
13 sources?
14   A    I'm sure I learned it somewhere. I
15 didn't know that before I became a police officer.
16   Q    Do you recall how you learned to do it
17 that way?
18   A    No.
19   Q    And as far as you remember, did your
20 supervisors ever tell you not to do that?
21   A    No.
22   Q    Was it your understanding that that
23 was a standard -- strike that.
24      Did you tell your confidential sources
25 that they could expect confidentiality from you?

Page 67

1    A    I don't remember having a conversation
2  with them to say that you are -- I'm speaking of
3  people that talk to me. I don't remember having
4  any conversations with them about that.
5       I never -- they would have been a source,
6  so I never paid anyone to be an informant.
7       So they would have just been sources in
8  the neighborhood. If they -- if they saw
9  something, they would have -- if it would have
10 been something, they would have had to come forth
11 and reveal who your source is if you're asked.
12 And I don't know that I was asked.
13   Q    Did you do anything to -- strike that.
14      When you didn't write down your sources'
15 names, how did you keep -- how did you remember
16 who it was who gave you the information?
17   A    I mean, for me it would have been
18 location, I would guess, because what's going on
19 in my head is I had a certain area. I was radio
20 311 and 321. That was my district. I knew
21 everybody in it. And I knew, I knew what was
22 going on. I knew, I knew my neighborhood back
23 in -- this is way different.
24      I don't know how old you are, and I'm not
25 asking you, but I'm older. And we used to

Page 68

1  actually get out and walk our district. We used
2  to walk the street. We used to go door to door.
3  So you knew people. Policing is a lot different
4  in 2023 than it was in 1996. So I knew it by
5  area.
6    Q    Did you continue to use confidential
7  sources when you became a detective?
8    A    No one's coming to mind.
9    Q    Did the detectives you supervised in
10 1010 squad use confidential sources?
11   A    I'm trying to think of a situation,
12 but I'm not -- if they did, I don't know.
13   Q    When you used confidential sources,
14 were you aware of any written policy that governed
15 how you should -- any requirements for those
16 sources?
17   A    No.
18   Q    And did your supervisors -- well,
19 strike that.
20      I think you said before, your supervisors
21 never asked you who your confidential sources
22 were, and so you never had occasion to tell them.
23 Is that correct?
24   A    I was never asked.
25   Q    All right. Did you tell them?

Page 69

1    A    Did I tell my supervisors who my
2  confidential sources were?
3    Q    Yes, sir.
4    A    You're asking me from a conversation
5  from '96, '97, '98. I have no idea if I would
6  have told them who they were or they were not. I
7  don't know.
8    Q    Sitting here today, you don't have any
9  reason to believe one way or another. Is that
10 fair?
11   A    That's fair.
12   Q    So I know you recently -- you recently
13 reviewed the crime scene report from the Larry
14 White homicide.
15      Do you recall that the area involved is
16 roughly like Olive to Prospect on 29th Street?
17   A    I think it's that general vicinity.
18   Q    Was that an area you patrolled when
19 you were on east patrol?
20   A    That was not my district as an officer
21 or a sergeant, but that's 330 sector, and I was
22 320 sector, so I would go -- you would still
23 answer calls there, but that wasn't the one that
24 you patrolled every day.
25      It's -- we have it divided. It's

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedulekentuckiana@gmail.com
www.kentuckianareporters.com

Case 3:21-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 17 of 60

1  imaginary lines.  This is 20 sector, this is 30
2  sector, this is 40 sector.  Ten sector is up
3  here.
4          So that would have been two blocks south
5  of 20 sector, which means if there's a call
6  there, we're still going to it.  So you would
7  spend most of your time in that, that area,
8  so ...
9          If you're asking me -- I already forgot.
10  I started talking too much.
11      Q    It's all right.  I was just asking if
12  you patrolled that area.  And it sounds like you
13  responded to calls there, but it's not where you
14  patrolled.  Fair enough?
15      A    Fair.
16      Q    So I want to ask you about how
17  searches were documented in 1010 squad when you
18  were the homicide sergeant, meaning how evidence
19  was recovered and photographs were taken when, for
20  example, a residence was searched.
21          Did -- would you expect the detectives you
22  supervised to have photograph, photographs taken
23  if a residence was searched relative to a
24  homicide investigation?
25      A    Would I expect that a -- say that

1  again.
2      Q    Yeah.  So in a homicide investigation
3  when you were sergeant, one investigative
4  technique is to search residences that might have
5  evidence.  Correct?
6      A    You have a search warrant.
7      Q    Or also with permission from the
8  occupants.  Right?
9      A    Well, that would be consent.
10      Q    Sure.  So you could search with
11  consent or a warrant.  Correct?
12      A    Could.
13      Q    And was that -- and you might look
14  for, you know, weapons, proceeds of the crime,
15  evidence of involvement in criminal activity.
16          Are those all things you might look for
17  when conducting a search?
18      A    Could.
19      Q    And so when your detectives searched
20  residences for that kind of evidence, how did you
21  expect them to document their search?
22      A    Well, they should write a report.
23      Q    What information should be in the
24  report?
25      A    Whether they did -- if they did a

1  consent to search, there should be a consent to
2  search, I would think.  And they would write what
3  they did.
4          If it was a search warrant, there would
5  obviously be a search warrant, and then they
6  would document what happened.
7      Q    Should that documentation list the
8  people who were involved in searching the
9  location?
10      A    Running scenarios through my -- it
11  could.
12      Q    Would you expect them to?
13      A    They could, they could document what
14  they did at the, at the search warrant.  I don't
15  know.  If I'm, if I'm there, I'm going to document
16  what I did.  They should document what they did.
17      Q    I guess I'm just, I'm just -- I'm just
18  trying to understand whether -- or strike that.
19  I'll ask it as a question.
20      A    That would be great.
21      Q    Did you have an expectation one way or
22  another as to whether a detective who writes a
23  report on a search warrant would make sure that
24  the participants in that search are documented
25  somewhere?

1      A    If someone participated in the, in the
2  search?
3      Q    Yes, sir.
4      A    I would, I would think someone -- it
5  would be -- I would, I would think someone would
6  document if these two people went out and did a --
7  but where my mind is, I don't know that we
8  document if crime scene is there, we document
9  every single person that's there, because I don't
10  know every single person that's there, because
11  they're going to document their own.
12      Q    Yeah.
13      A    And maybe I don't understand your
14  question, because sometimes your questions for me
15  is not registering, if that makes sense.  Like
16  you're asking a question, and I'm not for sure
17  what you're asking totally, because this
18  doesn't -- it may mean one thing to you, but it's
19  meaning something else to me.
20          Does that make sense?  I'm not trying to
21  avoid what you're asking.  I'm just trying to
22  figure out what you're ...
23      Q    No.  I understand.  And I think I
24  understood your answer, which is if crime scene is
25  there and doing a search, a detective might rely

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20cv00178-RK   Document 189-19   Filed 09/09/24   Page 18 of 60

Page 74

1  on them to more thoroughly document the search
2  that's performed.  Correct?
3      A    Could, yeah.  That's what -- that's
4  what I didn't understand.  If you -- when you ask
5  your question the way you do, I'm trying to
6  understand it better.
7      Q    And as another example, if detectives
8  conducted -- is this something that can happen?
9  Detectives conduct a search of a
10 residence, but crime scene technicians don't come
11 to the scene?
12     A    That could happen.
13     Q    And if that happened and the
14 detectives know that crime scene isn't coming,
15 would you then expect them to write down who was
16 involved in searching the residence?
17     A    They could, yes.
18     Q    And that's -- and I know they could
19 write it down, but I'm asking if you would expect
20 them to -- that would be part of a thorough and
21 complete report in your review as a sergeant?
22     A    Correct.  But if you're asking if
23 somebody -- we could debate this.
24          You could have five people go there and
25 two people go in, in the house and look around,

Page 75

1  or all five people could go in and look around.
2  How they document is up to the --
3      Q    Right.
4      A    -- to the person.
5      Q    Would you agree that either way, the
6  report should mention who came into the house to
7  actually search it?
8      A    On most occasions, I would, I would
9  guess that the detective would document that.
10     Q    When would you expect detectives to
11 have photographs taken of a house that they
12 searched -- I'm trying to think how I want to give
13 you this example.  Give me just a second.
14          As a homicide sergeant, did you have an
15 opinion about when detectives should take
16 photographs during the searches that they
17 participated in, like searches of residences or
18 other locations?
19     A    If they've found evidence, if they
20 have found evidence, most of the time crime scene
21 is going to come collect that evidence, so that's
22 gonna be.
23          So if there's nothing found or there's
24 nothing located or something of that nature --
25 and I'm trying to think back because I think we

Page 76

1  still had Polaroids back then.  I don't know what
2  kind of cameras we had or even if we had cameras
3  back then.  Obviously in 2023 we have other ways
4  that we can document things that we did not have
5  back then.
6          So to go that far back and ask that
7  question, I don't know that they had the ability
8  back then.  I can't, I can't recall if we had
9  that.
10         So back to the beginning of this, if they
11 found something that they believed, I would
12 expect that they would call crime scene to have
13 something done.
14     Q    Uh-huh.
15     A    If not, I don't, I don't remember the
16 tools that we had available to us.  And I again
17 date myself by saying Polaroid.
18         We may have had digital something by then,
19 but I still think we were on film.  I don't know.
20     Q    Yeah.  And does your answer change if
21 the residence belongs to a suspect?  Would you
22 always expect photographs of the suspect's house,
23 or if nothing is found would it be okay for the
24 detectives to end the search without photographs?
25     A    Again, I think I would answer the same

Page 77

1  way.  I don't know what -- if there was something
2  that they should call crime scene for, then they
3  should call crime scene if that's -- to recover
4  evidence.
5      Q    Uh-huh.
6      A    If there's no evidence, there's
7  nothing of evidentiary value or their ability to
8  make that, I don't know that they would photograph
9  it.  I don't know that they would.
10         And again, like I said, I don't recall
11 what we had in 2003 to do that, because it's
12 not -- it's not 2023 where we all have a camera
13 readily available.
14         Like I said, I don't remember even when we
15 all got phones.  I never had a phone till I was
16 on the police department.
17     Q    Now I want to ask you some questions
18 now about your expectations as a homicide sergeant
19 when you supervised 1010 squad.  I'm especially
20 interested in 2003 because that's when the
21 investigation happened.  But if -- so if you need
22 to specify that it changed over time, you can do
23 so, but that's especially what I'm answering --
24 asking about.
25         Does that make sense?

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule Depos@kentuckiana.com
www.kentuckianareporters.com

Page 78

1     A    You want my answers to be from what I
2  remember in 2003 and what my expectation would
3  have been then with the things that we had
4  available to us?
5     Q    Yes, sir.
6     A    Thank you.
7     Q    Did you expect the detectives you
8  supervised to keep an open mind in their
9  investigations?
10    A    Yes.
11    Q    Did you expect them to always follow
12 the evidence objectively?
13    A    Yes.
14    Q    Was it your practice that the most
15 important thing is to not get the wrong person?
16    A    Repeat that, please.
17    Q    Yeah.  Was it -- did you expect your
18 detectives to act as though the most important
19 thing is to not get an innocent person convicted?
20    A    You never want to have an innocent
21 person convicted.
22    Q    Do you agree that, you know, in your
23 supervisory practice at that time, that's even
24 more important than getting a guilty person?
25    A    If I'm -- you switched your question

Page 79

1  around two ways there.  Say that again.
2     Q    Do you agree that --
3     A    We don't want to -- we never want to
4  find a person -- we're looking for a suspect of a
5  crime.
6     Q    Right.  Do you agree that avoiding
7  convicting the innocent is even more important
8  than convicting the guilty?
9     A    Correct.
10    Q    And did you expect your detectives to
11 begin their investigation by trying to identify
12 suspects?
13    A    Did I expect them to begin their
14 investigation by doing that?
15    Q    It might be a bad question.
16         What I'm really asking about is, was an
17 early step in homicide investigations you
18 supervised to try to identify suspects?
19    A    You're always trying to, when you have
20 a homicide, you're always trying to identify the
21 suspect.
22    Q    And is an early step in investigating
23 trying to see if you can rule in or rule out the
24 suspects you start to identify?
25    A    Yes.

Page 80

1     Q    So if a suspect has a strong alibi,
2  that might be one way you can rule them out of an
3  investigation, of an investigation.  Correct?
4     A    If they have an alibi, it could.
5     Q    And if they don't have an alibi or
6  their alibi starts falling apart, that might start
7  to implicate them.  Correct?
8     A    Correct.
9     Q    Did you expect your detectives to ask
10 thorough questions about the alibis of potential
11 suspects?
12         Did I expect them to?
13    Q    To ask thorough questions about
14 suspects' alibis?
15    A    I expect my detectives to do
16 interviews that are thorough.
17    Q    And as to alibis, did that involve
18 asking for details when someone says they have a
19 such-and-such alibi?
20    A    Without knowing exactly what you're
21 saying, you either alibi -- they should be able to
22 say whether somebody has an alibi or they don't
23 have an alibi.
24    Q    Sure.  So I want to ask about details
25 you would expect your detectives to ask when

Page 81

1  investigating an alibi.
2         You know, you'd expect them to ask a
3  suspect where they were at the time of the crime.
4  Right?
5     A    Could, or you may already know.
6     Q    What do you mean you may already know?
7     A    Well, it depends on the case.  You're
8  asking me in general.  Are you asking me -- you're
9  asking me in general is what I'm hearing.  And if
10 I'm wrong, correct me.
11         But you ask questions sometimes you
12 already know the answer to.
13    Q    So you could ask about an alibi even
14 if you already know?
15    A    No.  You asked about a suspect.  You
16 said suspect.  You asked me -- you said, would you
17 ask a suspect about that?  And I said you may not
18 ask because you may already know.  And you were
19 asking in generalities.
20         I may -- I looked at a case yesterday.  I
21 have a picture of someone in a particular spot at
22 a particular time, and I'm talking about
23 yesterday, with there they are.  They're standing
24 there looking at a camera.  I wouldn't ask them
25 where they are.  I know where they were.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule Depos@kentuckiana.com
www.kentuckianareporters.com

Case 1:20-cv-04156-RK   Document 189-19   Filed 09/09/24   Page 21 of 60

1    Q    Right.
2    A    So that's what I'm -- that's where my
3  mind was.
4    Q    I understand.
5    A    Not trying to be argumentative, sir.
6  I just -- you were asking the suspect.
7        So there's multiple ways that different
8  detectives or myself or anyone else might ask
9  their questions, but they may already know the
10 answer to the question that they're asking.
11   Q    Yeah.  So let me -- and I want you to
12 clarify every time.  We need to.  So I really do
13 appreciate it.
14        Let's talk about the situation when a
15 detective you supervise is investigating a
16 suspect's alibi.  Is that -- does that make
17 sense?
18   A    So yes.
19   Q    So the detective doesn't know if the
20 suspect was there or not and wants to see if
21 they're going to claim they were somewhere -- were
22 somewhere else.
23        Does that make sense?
24   A    They may ask that question, yes.
25   Q    Well, I mean, if you're talking to a

1  suspect of a murder and, you know, you're
2  questioning them, and you don't know if they were
3  there or not, would you expect a detective to do
4  that, to see if they have an alibi or not?
5    A    Depends.  It depends on what
6  information you have on the case.  It depends on
7  what information you have elsewhere.  But that
8  could be part of it, yes.
9    Q    Why wouldn't you ask a suspect if they
10 had an alibi at the time and -- at the time of the
11 crime?
12   A    It's on the case detective that's
13 doing that interview, but if you -- like I just
14 said earlier, it just depends on like the one
15 yesterday.  I might have known where they were at.
16   Q    But that's outside our hypothetical,
17 right?  I'm asking the series of questions about a
18 hypothetical where you're questioning a suspect
19 and you don't have definitive evidence of whether
20 or not they were there.
21        Does that make sense?
22   A    Right.  But that's what I'm trying
23 to -- you're giving me a hypothetical, and I'm
24 giving you the hypothetical back of it depends.
25 Each case depends.

1    Q    Yeah.
2    A    So I don't, I don't know how to answer
3  your question because I wasn't asking -- if it's
4  not me, I don't know what questions they're gonna
5  ask.
6        They may ask a different question than I'm
7  asking, just like if there was an attorney
8  besides you, they might ask me a different
9  question.
10   Q    Yeah.
11   A    So to ask me a hypothetical, I'm just,
12 I'm just saying that they could.  They could ask
13 where were you, or they may have already known
14 where someone was.  You're asking me in general.
15   Q    But do you see how you're changing my
16 hypothetical?  I'm asking you to work with a
17 hypothetical.  A detective's questioning a
18 homicide suspect about a murder.
19   A    Uh-huh.
20   Q    And the detective doesn't know if they
21 were there or not.  Right?  And so I'm asking
22 about -- and so I don't want to talk about
23 situations where the detective already knows --
24   A    Okay.
25   Q    -- that the suspect was somewhere

1  else.  I want to talk about situations where the
2  detective isn't yet certain if the suspect was at
3  the scene of the crime or not.
4    A    Okay.
5    Q    Does that make sense?
6    A    Sure.
7    Q    And is that a situation that would
8  arise in your homicide investigations, that the
9  detectives you supervised sought alibi information
10 from suspects they believed may have committed the
11 crime?
12   A    Yes.
13   Q    And that's not uncommon, right?  If
14 you have the opportunity to interrogate a suspect,
15 you may not yet have a hundred percent proof that
16 they were even there or not.  Correct?
17   A    We may not have a hundred percent
18 proof that they were there.  That's correct.
19   Q    And that actually happened when you
20 were supervising homicide investigations in 2000,
21 right, interrogations under just those
22 circumstances.  Right?
23   A    Well, it wasn't in 2000.
24   Q    2003?
25   A    In 2003.  So I'm sure there were

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule Depos@kentuckiana.com
www.kentuckiana.com

Page 86

1  situations that we didn't know, and there were
2  situations where we were.
3      Q   Yeah, yeah.
4      A   And again, I apologize.  I'm not
5  trying to twist things.  I'm just trying to
6  understand myself.  That's what I was asking
7  earlier.
8          Some of your questions I didn't
9  understand.  And if that's the case, that's not
10 what I was trying to do.
11     Q   No.  You're just fine.
12     A   Okay.
13     Q   Let's, let's stick to this
14 hypothetical.
15     A   Right.
16     Q   In 2003 in your practice supervising
17 homicide detectives --
18     A   Uh-huh.
19     Q   -- in the hypothetical we've just been
20 talking about now, where it's not yet proven if
21 the suspect was at the scene or not, what kinds of
22 questions would you expect your detective to ask
23 about the suspect's alibi?
24     A   They could ask time, place, about
25 their -- about the suspect's alibi, where they

Page 87

1  were, what time, what place, those kinds of
2  things.  Usually an alibi has to do with time and
3  place.
4      Q   Sure.  And is it a good idea when
5  interrogating a suspect about their alibi to lock
6  that suspect into a specific, into a specific
7  explanation of where and when they were?
8      A   You can lock them in, or sometimes
9  those change throughout the -- I've had
10 interrogations where they change as the
11 investigation goes along or the interrogation goes
12 along or an interview goes along.
13     Q   Yeah.
14     A   You know, they'll change, so ...
15     Q   Is an example of that you've seen, you
16 know, a suspect gives an alibi, you confront them
17 with contradictory evidence, and then they come up
18 with a new alibi or change their story?
19     A   Oh, I've had cases like that.
20     Q   And is that -- all right.  And so in
21 getting a suspect's alibi, you want -- you
22 mentioned time and place.  You want them to tell
23 you where they were and when they were there.
24 Right?
25     A   That's from -- for Doug Niemeier that

Page 88

1  would be an alibi.  You have to -- time and place.
2      Q   And if -- and right.  So let me -- and
3  in your, in your personal practice, right, would
4  you also ask a suspect if anyone else was with
5  them at the time of their alibi?
6      A   That's -- if you have an alibi,
7  somebody is gonna have to verify that.
8      Q   So you'd want to know who all was with
9  them at the time that they were supposedly
10 somewhere else.  Right?
11     A   Yeah.
12     Q   And you typically ask if they ever
13 left and came back during the time they're talking
14 about?
15     A   Left and came back?
16     Q   Yeah.  You know, like someone says I
17 was at home all night; I couldn't have done it.
18 Would you ask, did you ever leave the house that
19 night?
20     A   You could have a question like that.
21     Q   And that would be a good idea, right,
22 so they can't later say, well, I actually stepped
23 out for five minutes.  Right?
24     A   You could ask the question of -- you
25 can ask questions about alibis or any of someone's

Page 89

1  actions of time and place.
2      Q   Well, what about in your practice as a
3  homicide detective?  Is that the kind of detail
4  you would expect to lock a suspect into so they
5  can't change their story later?
6      A   I could.  I could.  Like I said, I
7  don't, I don't think -- I think every one of those
8  are different.  It depends on the information that
9  I have at the time.
10         And I understand what you're asking me,
11 and yes, you can do that, but there are
12 circumstances where you would not do that.
13     Q   Sure.
14     A   Or you're asking what I would do or
15 what I did in my tenure.
16         When you're in a room and you're
17 discussing something with someone --
18     Q   Uh-huh.
19     A   -- you may, you may already have
20 information of -- that you know who -- you may
21 have already -- I may have already talked to
22 someone that says that they were with you or that
23 they were someplace else.
24         But I guess to say that's exactly how I
25 would do it, I can't say that's exactly how I

Kentuckiana Reporters
39 South Wacker Drive, Suite 7,700
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana.com
www.kentuckiana.com

Case 1:20-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 22 of 60

Page 90

1  would do it, but in practice, excuse me, in
2  practice that's, that's what I would do for an
3  alibi, is time and place.
4      Q    Yeah.
5      A    If you were -- they said they were at
6  home and they wasn't at home, I would ask them.
7      Q    And I know there's always an
8  exception.  Right?
9      A    Right.
10     Q    Every rule as an exception.  But that
11 said, the best practice is to make a suspect get
12 specific, not vague, about the alibi they're
13 claiming.  Right?
14     A    More specific, the better.
15     Q    And when you were a supervisor, you
16 expected your detectives for suspects to get
17 specific, not just vague, if they were
18 interrogating a suspect about an alibi.  Correct?
19     A    Again, I'm not going to say that this
20 is the expectation whenever they are doing the
21 interview.  I'm not in there.
22     Q    Right.
23     A    I would want them to do the very best
24 whenever they're talking to someone, interview, in
25 an interview of a witness, interview of a suspect.

Page 91

1  I want them to ask the best questions that they
2  can.
3      Q    Well --
4      A    But if you're asking me my
5  expectation, expectations would be to do a good
6  job.
7      Q    Uh-huh.  If you believed that one of
8  your detectives had been too vague, had let a
9  suspect keep it too vague on an alibi, would you
10 have hesitated to counsel them that they need to
11 get more specifics going in the future?
12     A    If they were too vague on an alibi,
13 would I counsel them in the future?
14     Q    Yeah.  Is that something you would, in
15 your practice, you would have -- like was part
16 of -- let me back up.
17          Was part of your job as a sergeant to give
18 guidance to the detectives you supervised?
19     A    Yes.
20     Q    And you reviewed all of the reports
21 they submitted.  Correct?
22     A    Yes.
23     Q    You had a chance to see how they said
24 they were doing their investigations.  Right?
25     A    Yes.

Page 92

1      Q    And part of your job was if you
2  thought they needed to perform better, you could
3  have a conversation with them about what they
4  needed to do to improve.  Correct?
5      A    Yes.
6      Q    And even if they were performing well,
7  if you saw opportunities for improvement, you
8  wanted them to do the best they could.  Right?
9      A    I would be -- yeah.
10     Q    And so you would always -- you
11 would -- did you give feedback of some kind to all
12 of the members of your unit at some point or
13 another about their performance?
14     A    I'm sure I did.
15     Q    Yeah.  So all I'm asking is, if
16 you see one of your detectives is interrogating a
17 suspect and it looks like they're being -- letting
18 the suspect be too vague about their alibi, is
19 that something that you would have addressed with
20 that detective?
21     A    I could have.  I could have.  Or I may
22 have.  It's one of those things of if I saw it or
23 I thought they should ask a different question, or
24 if I was watching an interrogation or I was
25 watching an interview --

Page 93

1      Q    Yeah.
2      A    -- I could have.  I absolutely could
3  have.
4      Q    All right.  Now, I'm going to go back
5  to a previous -- a thing we were talking about a
6  little earlier.
7          Do you remember me asking you about the
8  process of ruling suspects out or ruling suspects
9  in over the course of an investigation?
10     A    Well, you just asked me that just a
11 few minutes ago, yes.
12     Q    Yeah.  Did you expect your detectives
13 to document the information they learned to rule
14 in or rule out suspects?
15     A    Do I expect them to document how?
16     Q    Yes, sir.
17     A    I'm trying to, just so you know what
18 I'm thinking, I'll think out loud, I can't
19 remember the -- if we had -- what was our form
20 numbers then?  I can't remember the form number.
21 I mean, you have them.
22          I'm just -- police, police verbiage, you
23 would have like a -- they might write a report
24 that is a suspect development report.  Is that
25 what I'm looking for?  Something like that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00278-RK   Document 189-19   Filed 09/09/24   Page 23 of 60

Page 94

1    Or they might write a report that this
2  person was a suspect, but they're no longer a
3  suspect for whatever reason.
4    Q    Sure.
5    A    I can't think of the -- what did we
6  write, 107s?  107s?
7    Q    Let me give you a couple of examples.
8    A    Yeah.
9    Q    Like if a detective interrogates a
10 suspect and --
11   A    Okay.
12   Q    -- the suspect, you know, gives a
13 clean alibi say, right, the detective should write
14 down what the suspect told them about what their
15 alibi was.  Right?
16   A    If somebody was a suspect and they had
17 an alibi, should the detective write it down?
18   Q    Yeah.
19   A    Yes.
20   Q    They should write down all the details
21 that that suspect gave about their alibi.  Right?
22   A    Yes.
23   Q    And if the detective then corroborates
24 the alibi by talking to another witness, they
25 should write down what that witness told them,

Page 95

1  too.  Right?
2    A    If they can, yes.
3    Q    All right.  When you say if they can,
4  you mean if they actually got such information.
5  Correct?
6    A    Correct.
7    Q    And so when that case file -- when
8  you -- somewhere in the case file in some form, if
9  a detective got information that let them rule out
10 a suspect, that information should be in some way
11 contained in the case file.  Correct?
12   A    If they ruled out a suspect?
13   Q    Yes, sir.
14   A    I would, I would think there would be
15 a report somewhere.
16   Q    And is that consistent with how you
17 expected the detectives you supervised to document
18 their investigations?
19   A    Yeah.  They should be documenting what
20 they're doing throughout the investigation.
21   Q    Another step in an investigation is if
22 there's an eyewitness, a detective should
23 interview them.  Correct?
24   A    I'm sorry, I had to pop my back.
25   Q    That's all right.

Page 96

1    A    Can you repeat that, because I
2  couldn't read your lips.
3    Q    If in an investigation, if a detective
4  identifies an eyewitness, they should interview
5  the eyewitness.  Right?
6    A    Of course.
7    Q    And the detective should write down
8  all the details that the eyewitness gives them.
9  Correct?
10   A    Or they may take a statement from the
11 eyewitness.
12   Q    Either way, the detective should make
13 sure everything the eyewitness had to say is
14 documented.  Correct?
15   A    Sure, yes.
16   Q    And that's what you expected of your
17 detectives.  Correct?
18   A    Yes.
19   Q    Did -- at a crime scene, once you
20 assume -- once you assign a case detective, does
21 that case detective take control of the crime
22 scene?
23   A    Yes.
24   Q    Different question.  In suspect
25 interrogations in 2003, did you generally have two

Page 97

1  detectives present?
2    A    I think on most, most would have two.
3  I'm trying to think back, but yeah, most would
4  have two.
5    Q    What about for eyewitnesses?  Did you
6  usually try to have two detectives when
7  interviewing eyewitnesses?
8    A    I think we had two, but there may --
9  may not always had two available.  But for the
10 most part, I think that we would have two.
11   Q    What was the reason for having two
12 detectives for eyewitnesses?
13   A    I don't know why we had two.  I think
14 mostly because detectives worked in pairs for the
15 most part, so that's, that's the answer I would
16 give, is because most of the time, they worked
17 together.
18   Q    All right.  In 2003, did the homicide
19 detectives you supervised use six-pack photo
20 identifications to identify suspects with
21 witnesses?
22   A    Did we use six -- say that again.
23   Q    I'm saying six-pack photo
24 identifications, like a piece of paper with six
25 photos on it.

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    So you want to -- I didn't understand
2 the six-pack.
3         We had photo, photo lineups.  Sometimes we
4 used those.  Sometimes we used, you would lay out
5 six photographs like a full-size paper.
6    Q    Yeah.
7    A    With six.
8    Q    And why did detectives show six
9 photographs when asking a witness to identify a
10 suspect?
11    A    I think that was the standard photo
12 lineup, was six.
13    Q    Why not just show one photo of the
14 suspect and ask is this him?
15    A    Unless it's immediate, right after the
16 crime, you'd be -- you wouldn't -- you would
17 never -- I don't believe you would show one photo,
18 unless you're at the -- I'm thinking back to my
19 robbery days.
20         If we had a robbery and we caught the
21 person outside, then you would say that's them.
22 Other than that, you would do a photo lineup.
23    Q    And that makes sense.  And I'm
24 wondering why.
25         What was your understanding as a

1 supervisor of what's the problem with just
2 showing one photo of a homicide suspect and
3 asking is this him?
4    A    You should show a photo lineup.  I
5 mean, that's what -- that's how you do an
6 investigation.  That's how you're taught to do an
7 investigation.
8    Q    Sure.  Would it be, would it be fair
9 to the suspect to just show their photo and say,
10 hey, is this the guy?
11    A    I would not want my detective to do
12 that.
13    Q    Would you be concerned that showing
14 just one photo of the suspect would be too
15 suggestive, too suggestive to the witness?
16    A    Again, I wouldn't want my detectives
17 to show one photo.
18    Q    I know you wouldn't have wanted, but
19 I'm trying to get at, why not?  What makes you
20 think that's not a good way to show a suspect to a
21 witness?
22    A    Yeah, it's not, it's not the way we --
23 it's not the way we do it.  We put them in a photo
24 lineup.
25    Q    I understand.

1    A    So that they -- the witness has an
2 opportunity to look at the photo lineup, and they,
3 they choose which one that they believe would be
4 the suspect.
5    Q    So I understand, that was -- that was
6 the purpose, but I'm not getting -- I'm not
7 understanding --
8    A    I'm not understanding your question, I
9 guess.  Why would I -- say that again, please.
10    Q    Yeah.  Why is it, in your
11 understanding when you were a supervisor, why is
12 it important to show -- strike that.
13         What, if anything -- well, strike that.
14         As a homicide supervisor, did you
15 understand that one purpose of showing six photos
16 instead of just one was to be fair to the
17 suspect?
18    A    Yes.
19    Q    Did you understand that one reason to
20 show six photos and not just one is to make sure
21 that the witness is making a reliable
22 identification?
23    A    Yes.  We want them to have a photo
24 lineup for identification purposes, if I'm -- I'm
25 trying to follow you.  I'm just --

1    Q    Would you, would you have been
2 concerned if you had a detective who was showing
3 witnesses just one photo of a suspect instead of
4 six that that showing just one photo would not
5 have been reliable enough?
6    A    In most cases, like I said, most cases
7 you should be showing a photo lineup.
8    Q    That's because --
9    A    There's reasons -- there's reasons
10 like before, happens you might show one photo,
11 because there has been times that that -- but for
12 the most part, to answer your question, yes.
13    Q    And when you might show one photo, is
14 that like exigent circumstances, like the crime
15 just happened and the guy is right around the
16 corner, that kind of thing?
17    A    Could be, yep.
18    Q    Are there other circumstances you're,
19 you're thinking of where showing just one photo of
20 a homicide suspect would be appropriate?
21    A    I can't remember ever doing it.
22    Q    And in your practice as a homicide
23 supervisor, do you agree it's totally
24 inappropriate for a detective to confirm a suspect
25 identification with a witness after it's made?

Kentuckiana Reporters
39 South Wacker Drive, Suite 770
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-04146-RK   Document 159-19   Filed 09/09/24   Page 25 of 60

Page 102

1    A    You used a lot of terms there that
2 contradict in my brain.  Can you say that again?
3    Q    It was a bad question.
4    After a detective --
5    A    After a detective.
6    Q    So start over.
7    If a -- if a witness makes an
8 identification in a photo identification
9 procedure, is it okay for the detective to say
10 good job; that's the guy?
11    A    I don't know why they would do that.
12    Q    Is --
13    A    For me, you lay those out.  If they
14 say this is the person, turn it over.  They put
15 their initials and the date on the back.  And
16 that's -- we tell them thank you, and that's,
17 that's that.
18    I don't -- if you're telling me that
19 happened, I would be surprised.
20    Q    All right.  And you're not supposed to
21 validate a witness' identification after they make
22 it, are you?
23    A    I have not.
24    Q    Would you expect your detectives to
25 avoid being suggestive -- well, strike that.

Page 103

1    Would you be concerned if a detective were
2 to validate -- you supervised were validating
3 suspect identifications after witnesses picked a
4 suspect?
5    A    If you, if you said that happened, I'd
6 be surprised.
7    Q    And I'm just asking it, I'm more
8 asking about your practices as a homicide
9 supervisor than any specifics from this case.
10    And it sounds like, it sounds like, if I'm
11 understanding you, it would, it would not meet
12 your standards for an investigator to confirm,
13 you know, with a witness making a suspect
14 identification for them to then validate that
15 identification in that same interaction.  Is that
16 correct?
17    A    Again, I would say I would be
18 surprised if that happened.
19    Q    And in your practice, would you have
20 talked to a detective if you learned they did
21 that?  Would that have been a deviation from what
22 you understood to be appropriate in photo
23 identification?
24    A    If I was -- if I learned that that
25 happened, I would assume I would have talked to

Page 104

1 somebody and said did this happen, obviously,
2 because I don't do that.
3    Q    All right.  And would you tell the
4 detective -- would you have told the detective not
5 to do that in the future?
6    A    Yeah.  I would -- I would, again I
7 would be surprised if that happened.  And if I was
8 made aware of it, I would probably say that's --
9 not do that.
10    Q    Now, when you supervised homicide, was
11 it the detective -- do you know whose job it was
12 to make a photo array if one were shown to a
13 witness?
14    A    It could be any detective in the -- it
15 could, it could be the case detective.  It could
16 be any one of those detectives.
17    Q    In 2003, how regularly did you use
18 live lineups of suspects?
19    A    We used them more when I was a robbery
20 detective I think than homicide.  I'm just trying
21 to think through this.
22    If we used them -- how often we used them,
23 again we used them a lot when I was a robbery
24 detective.  I don't know how much we used them in
25 homicide.

Page 105

1    Q    Were photo identifications more common
2 in homicide than live lineups?
3    A    I think in all lineups they're more
4 common, even when I was in robbery.  They're more
5 common -- photo lineups are more common than live
6 lineups.
7    Q    I want to ask some questions about
8 report writing.
9    Did you expect your homicide detectives to
10 reduce everything they learned to writing in
11 their investigations?
12    A    Put everything in writing?
13    Q    All the information they learned
14 during their investigations.
15    A    Yes, in regard to the investigation.
16 I'm just thinking of if we didn't have a court
17 reporter taking down every word, we were taking a
18 conversation, no conversation gets a hundred
19 percent related.
20    Q    Right.
21    A    That's the reason I answered that way.
22    Q    Right.  You'd expect it to have all
23 the details relevant to the investigation.  Right?
24    A    Better question.  Yes.  Thank you.
25    Q    Right.  And would you -- did you

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Page 106

1  expect them to be thorough as to all the details,
2  all the details of the investigation they learned,
3  because you don't necessarily know at the
4  beginning how an investigation will develop?
5      A    I would expect them to be thorough.
6      Q    And you knew that detectives needed to
7  take detailed reports in case they were called to
8  testify later about what they did.  Correct?
9      A    Yes.
10      Q    And you expected detectives to write
11  down what they learned close in time to when they
12  learned it.  Correct?
13      A    Say that ...
14      Q    Yeah.  You expected detectives to
15  write down what they learned in their
16  investigations close in time to when they learned
17  it.  Correct?
18      A    Should.  Close in time meaning?
19      Q    Would you say like within a week you
20  would have a report of what you did?
21      A    A week would be a good time.  And the
22  reason I say that is it depends on -- I will just
23  tell you, last week here, we've had a major
24  shooting at a parade.  It's gonna be a minute
25  before everything gets written down.  And I'm not

Page 107

1  saying that's always normal.
2      But we had a homicide two nights ago where
3  113 shots were fired.  It's gonna take a while to
4  get things written down.  So I'm using a recent
5  example.  It's hard to put an example on what's
6  recent in time.
7      Yes, the expectation is you should get
8  your notes, you should have the information, and
9  then you're gonna be able to write it down.  So
10  again, what's reasonable for one may not be
11  reasonable in another.
12      So I just use those as examples of this
13  just happened in the last two weeks for homicide
14  detectives.
15      Q    Yeah.  All right.  And you expected
16  your detectives to write everything down, whether
17  it was good or bad for any given suspect.  Right?
18      A    Should.
19      Q    And you expected your detectives to
20  write down anything that could be exculpatory or
21  beneficial to a criminal suspect.  Correct?
22      A    They should write down what -- the
23  information that they have.
24      Q    All right.
25      A    Either way.

Page 108

1      Q    And was it your understanding as a
2  supervisor that a criminal Defendant has a right
3  to information the police learned that may help
4  them in a criminal case?
5      A    Yes.
6      Q    And so you would find it -- strike
7  that.
8      And so that was -- was this a strong
9  expectation you had, that anything exculpatory,
10  potentially exculpatory, would get written down
11  that a detective learned?
12      A    You said was that a strong
13  expectation?
14      Q    Yes, sir.
15      A    That's -- it's an expectation.
16      Q    All right.
17      A    I mean, we're not letting people know
18  that they're supposed to do their job.
19      Q    And, all right.  So any -- so the
20  information detectives learn to either implicate
21  or exculpate, right, make a suspect look guilty or
22  innocent, should get written down either way.
23  Right?
24      A    Yes.
25      Q    And the -- you expected your

Page 109

1  detectives to be thorough as to any identifying
2  information about suspects they learned.  Correct?
3      A    Try again.
4      Q    Yeah.  If a witness told one of your
5  detectives information about what a suspect was
6  wearing at the time of the crime, you'd expect
7  them to write everything, all the details that
8  were shared with them.  Correct?
9      A    Yes.  And can we, one second?  I'm
10  having a hard time because you're not -- you're
11  not vocal.  I'm trying to hear you, but I'm also
12  trying to, as I said, and you're not speaking the
13  same way you were.  I apologize.
14      I'm trying to make sure I get the question
15  right, but I can't read your lips.  They're not
16  moving anymore.
17      Q    All right.
18      A    And that's why I'm -- why I'm focusing
19  really hard on your -- just so you know, whenever
20  I'm not trying to read them.
21      Q    Thank you.  And would you give the
22  same answer for any physical features, like if a
23  witness describes the build, height, physical
24  qualities of a witness, that should also -- those
25  details should all be documented by a detective.

Kentuckiana Reporters
39 South Wacker Drive, 9227 Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 27 of 60

1  Correct?
2      A   A detective should document all the
3  information that they are given.
4      Q   And you'd expect them to as a
5  supervisor.  Correct?
6      A   I would expect that.
7      Q   And any photo identification procedure
8  that a detective conducts should also be
9  documented.  Correct?
10     A   Any photo?
11     Q   Identification procedure, like showing
12  six photos or showing a photo of someone and
13  asking the witness if they recognize him.
14     A   Yes.
15     Q   A detective should write down, you
16  know -- strike that.
17         And so that would include any positive or
18  negative identification from any witness.
19  Correct?
20     A   If they showed a photo lineup, it
21  should be documented.
22     Q   After you approved your detectives'
23  reports, did anyone else review those reports in
24  the chain of command?
25     A   No.

1      Q   In 2003, homicide detectives you
2  supervised typically carried a notepad with them
3  to take notes.  Correct?
4      A   Correct.
5      Q   And their job was to take all the
6  details they wrote down and make sure it got into
7  a report.  Correct?
8      A   Yes.
9      Q   After that, they were allowed to shred
10  their notebooks.  Correct?
11     A   Yes.
12     Q   Did you as a supervisor ever look at
13  any of the physical notebooks the detectives you
14  supervised carried?
15     A   No.
16     Q   So as a supervisor, you would have
17  relied on them to make sure the details in the
18  notebooks got into their written reports.
19  Correct?
20     A   Correct.  Can we take a break?
21     Q   Yeah.
22         THE VIDEOGRAPHER:  We are going
23  off the record.  The time now is 12:18 p.m.
24         (Recess.)
25         THE VIDEOGRAPHER:  We're back on

1  the record.  The time now is 12:31 p.m.  Please
2  proceed.
3      Q   (By Mr. Hilke) Sir, you described a
4  dogwatch shift before.  What's dogwatch?
5      A   I don't think I did, but I will tell
6  you what dogwatch is.
7      Q   Please.
8      A   If I did, I don't remember already.
9  Dogwatch would be overnights.
10         I think in homicide at that time in 2003
11  would have been eleven at night to seven in the
12  morning.
13     Q   And was that a shift for the homicide
14  unit, the dogwatch shift?
15     A   There was a permanent dogwatch shift.
16     Q   Were detectives in 1010 squad put on
17  that shift?
18     A   Not permanently, but I think they had
19  to -- I think we had to send a detective there to
20  cover.  Like one detective would go at whatever
21  point in time.  It was a rotation.
22     Q   Right.
23     A   If I remember correctly.  We've had,
24  over the years, we've had multiple different ways
25  to try to cover that overnight shift.  So at the

1  time even so far as back when I was in robbery, I
2  had to -- I was a detective, you had to cover the
3  dogwatch.  Robbery would give someone.  Sex crimes
4  would give someone.  So ...
5      Q   When -- was it your understanding in
6  2003 that if you observed misconduct by an
7  officer, you were required to report it?
8      A   You should.
9      Q   Did you believe that was a requirement
10  that applied to you?
11     A   I would.
12     Q   And in your, in your career, have you
13  reported misconduct of other officers?
14     A   I haven't.
15     Q   Have other officers reported
16  misconduct --
17     A   Correction.  I already told you when
18  you asked me that question as to whether it was
19  on -- you asked me about Avery Williamson earlier.
20     Q   Uh-huh.
21     A   There's an example of it was brought
22  to my attention and I told my supervisor.  What I
23  was thinking was while I was on duty, did I
24  observe something.
25         So to correct what I was saying, I have,

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Page 114

1 so yes, the answer is I have.
2 Q   Okay.  And anytime -- have you ever
3 reported misconduct from your own personal
4 observations while at the Kansas City Police
5 Department?
6 A   I'm trying to think of a specific
7 case.  I don't, I don't know of a specific case
8 from my -- me observing it with my own two eyes,
9 but, you know, I have reported just -- I'll just
10 use that incident.
11 Q   And is that the only specific example
12 that you're able to think of right now?
13 A   Right now, yeah.  I don't -- nothing
14 is coming to my mind.
15 Q   In the time you were on 1010 squad,
16 either as a detective or a supervisor, were you
17 ever aware of anyone in that unit other than Avery
18 Williamson having misconduct reported against
19 them?
20 A   Was I aware of anyone?
21 Q   Yes, sir.
22 A   I'm trying to think of all the people
23 that worked there.  I can't, I can't think of
24 anything that I -- I don't know.  I don't think
25 so.  I don't, I don't remember it.

Page 115

1 Q   During the time you were a detective
2 or supervising 1010 squad, did you ever become
3 aware of any like evidence disclosure or -- well,
4 strike that.
5 You remember before we talked about the
6 obligation to write down information that's
7 exculpatory for criminal Defendants?
8 A   Uh-huh.
9 Q   And are you familiar with Brady and
10 Giglio as constitutional obligations to ensure
11 that information is documented and turned over?
12 A   Yes.
13 Q   Are you aware of any issues arising
14 while you were a detective or supervisor on 1010
15 squad regarding how those obligations were
16 complied with, like any issues that information
17 was not getting written down or was not getting
18 given to the prosecutor?
19 A   If there was, I'm not aware of it.  If
20 you have something, I'm happy to look at it, but I
21 don't remember it.
22 Q   And are you aware of any sort of
23 integrity or honesty issues that affected any
24 homicide detectives during the time you worked on
25 or supervised homicide?

Page 116

1 A   Not that I remember.
2 Q   I want to ask about interrogation now.
3 When you were a homicide detective, was it
4 your practice to avoid giving information to
5 witnesses and suspects that they didn't already
6 have?
7 A   Was it my practice?
8 Q   Yes, sir.  And did you --
9 A   You have to have a conversation, so
10 you're going to have to -- there's always in an
11 interrogation or an interview you're going to have
12 to -- it's not a one-sided conversation.  You
13 would never get any information one way or the
14 other.
15 Q   In your practice when you worked in
16 homicide, were you aware of a risk involved if you
17 give to a suspect or witness details about the
18 crime that they may not have independently known
19 themselves?
20 A   I don't know what you mean by risk,
21 but they have to -- you have to be able to have a
22 conversation back and forth with someone, of
23 course.
24 Q   Okay.
25 A   It's not completely one-sided

Page 117

1 conversation, if that's what you're asking.  You
2 said whenever you interrogate someone.
3 They are going to have to know that you
4 know some of the information.  Otherwise there's
5 no conversation.
6 Q   Were you trained that -- well, strike
7 that.
8 Were you trained as a homicide detective
9 to avoid being overly suggestive in your
10 interviews and interrogations?
11 A   I don't think we were -- I don't think
12 I was trained to be overly suggestive.
13 Q   Were you trained of a risk of
14 contamination of feeding information to witnesses
15 that they can then -- does that make sense?
16 A   I wish your questions were more just
17 direct, because they're like so open, I'm not for
18 sure what the -- so I'm trying almost to also
19 interpret what you're asking.
20 So to answer your question, I'm doing the
21 best I can with your question.  Like I said
22 earlier, I don't think we connect every time on
23 what you -- what you're asking me.
24 Q   And I'm trying.
25 A   I know.

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule Depo-Scheduling.com
www.kentuckianareporters.com

Page 29 of 60

Case 2:20-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 29 of 60

Page 118

1    Q    And I'll ask you to keep asking me to
2  clarify every time.
3    A    Sure.
4    Q    Because I'm going to assume you
5  understood me unless you tell me, so I need you to
6  tell me every time you don't understand my
7  question.
8    A    Okay.
9    Q    Here's what I'm asking.  Let me back
10 up and ask you something different.
11      Does the idea of non-public facts relative
12 to a homicide investigation mean anything to you?
13   A    Sure.
14   Q    What's a non-public fact?
15   A    Should be something that's known only
16 to people that were either, A, there.
17   Q    Uh-huh.
18   A    B, known to detectives.  I could have
19 been there, but I told you something that would
20 fit into the crime scene.  There's a lot of things
21 that would fit into that, under that umbrella, but
22 it wasn't reported on the 6 o'clock news.
23   Q    And why are non-public facts important
24 in a homicide investigation?
25   A    Well, they're important because it

Page 119

1  leads in some cases, in some case it leads to
2  validity of, of a statement, or maybe it leads to
3  knowing that someone's not being totally truthful,
4  both ways.
5    Q    So if, if as a -- if a homicide
6  detective interviews a witness and they provide on
7  their own a non-public fact, that helps to
8  validate their statement.  Correct?
9    A    Well, it doesn't validate their
10 statement.  I mean, you're asking if it validates
11 their statement if they provide a non-public fact.
12 How would that validate their statement?
13   Q    Let me ask differently then.
14      Why is it important to know if a witness
15 can provide non-public facts in a homicide
16 investigation?
17   A    Well, you would like -- you'd like
18 folks to provide what they, what they've seen,
19 what they've known, what they've heard, and then
20 it's part of the puzzle of a, for lack of a better
21 term, part of a puzzle to put a case file
22 together.
23      So it depends on how they say it, when
24 they say it, all those kinds of things.  So yes,
25 if you ask -- I forget the beginning.  Is it

Page 120

1  important?  It may, it may add to what another
2  witness said, or it may fill in the blank of what
3  they didn't know.  It could be a multitude of
4  things.
5    Q    And is it sometimes a good idea in a
6  homicide investigation to wait to share non-public
7  facts with a witness so you can see what they
8  independently know?
9    A    Is it good?
10   Q    A good idea.
11   A    Again, it depends on what the
12 situation is, but for the most part if you're,
13 you're interviewing someone, you want to get their
14 story.
15      I don't, I don't think we just come out
16 and go -- I'm going say what I.  I'm not going to
17 come out and say this weapon was used, this was
18 done, this was done, now tell me your story.
19 That doesn't make sense.
20   Q    Yeah.
21   A    And I'm not trying to be a smart, but
22 there is conversation back and forth anytime
23 you're with another human being.
24      But in a situation like that, you want to
25 try to get their story and then again put it

Page 121

1  together with the rest of them.
2    Q    Yeah.  And would you expect the
3  detectives you supervise to do the same thing, to
4  try to get the story that the witnesses had in the
5  process --
6    A    I would hope.  I would hope.
7    Q    Now, would you expect -- would you
8  expect the detectives you supervised to avoid
9  leading witnesses during interviews?
10   A    Meaning leading?  Normally you would
11 ask a witness tell us what you --
12   Q    Sure.
13   A    What would you -- explain leading.
14   Q    Is that a term you've heard before in
15 your experience conducting and supervising
16 homicide investigations, the idea of leading
17 questions?
18   A    I would, I would say we ask questions
19 to solicit answers.
20   Q    No.
21   A    Not -- I'm sorry.
22   Q    I'm sorry.  I just want to make sure
23 you understood my question.
24      My question now is just if you've ever
25 heard that term before, the idea of a leading

Kentuckiana Reporters
39 South Wacker Drive, Suite 730
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedulekty@kentuckiana.com
www.kentuckiana.com

Case 1:20-cv-00078-RK   Document 169-19   Filed 09/09/24   Page 30 of 60

Page 122

1  question relative to an investigation.
2      A    I don't know that I've heard a leading
3  question. Like I said --
4      Q    Yeah.
5      A    -- I would ask questions to solicit a
6  response.
7      Q    Yeah.
8      A    And maybe that's the -- what you're
9  getting at. I don't --
10     Q    No.
11     A    No?
12     Q    I appreciate you telling me that it's
13 not a term you've really heard of before --
14     A    Okay.
15     Q    -- because that gives me a chance to
16 clarify, and that's what I'll do now.
17     A    Okay.
18     Q    So what you said before, you know,
19 asking what a witness knows, like if you ask a
20 witness what did you see, what do you remember,
21 those are kind of open-ended, right? The witness
22 is free to respond however they want. Right?
23     A    Yes.
24     Q    What was a witness wearing? What
25 color was their clothing if you saw it? That's

Page 123

1  kind of more open-ended. Right?
2      A    Or leading. I'm leading you to give
3  me the answer to what color, so, but yes. I mean,
4  I would, I would ask that. I would ask that
5  question. Did you see what they were wearing, how
6  tall are they, race, sex, height, weight, all
7  those things.
8      Q    So the way I'd typically use the terms
9  is, you know, did you see what color their shirt
10 was is open-ended, but, you know, was he wearing a
11 black shirt would be more leading because it
12 suggests it might have been black.
13     Does that make sense to you?
14     A    Better, okay, because I -- we would
15 use those terms differently.
16     Q    Sure. And so I guess the question,
17 what I want, I want to ask is, did you expect your
18 detectives to ask open-ended questions like what
19 did you see, as opposed to leading questions like,
20 you know, was the shirt black, you know? Were
21 they 6 feet tall?
22     Does that make sense?
23     A    Could.
24     Q    What was your expectation as far as
25 how open-ended versus leading as we've been

Page 124

1  defining it now the questioning of witnesses would
2  be?
3      A    I think you could ask -- every, every
4  interview and interrogation is different. So
5  open-ended would probably be a better way of going
6  about it.
7      Q    Uh-huh.
8      A    But if I have talked to you for a half
9  an hour, and we're to that point of I'm like was
10 it -- was the shirt red or was the shirt reddish
11 or was the shirt orange or what, you know, was the
12 shirt, was the shirt blue or was it blue?
13     You know, I mean, I'm not trying to be
14 that way, but open-ended would probably be a
15 better, probably be a better route. But at some
16 point you're going to hone in as an interviewer
17 and be like I need to narrow this down.
18     Q    Uh-huh.
19     A    So if I was asking questions, it might
20 start off as open-ended. It might narrow it down.
21 Just depends on the interview, I'm sure just like
22 we're doing today. Yes?
23     Q    So did you expect that your detectives
24 at all times would avoid suggesting to a witness
25 what the correct answer is to their questions?

Page 125

1      A    I don't -- I wouldn't suspect a
2  detective to, to solicit an answer, you know. Say
3  that again.
4      Q    Yeah. It would be -- you would have
5  expected that -- strike that.
6      You expected the detectives you supervised
7  to avoid suggesting to a witness what the right
8  answer was to the questions that the detective
9  asked. Correct?
10     A    I don't believe that they're gonna
11 suggest an answer or solicit an answer that they
12 specifically want. Is that what you're --
13     Q    That's right. You would have expected
14 that that is totally inappropriate and they would
15 not do it?
16     A    I wouldn't suspect that.
17     Q    Not just that you wouldn't suspect it.
18 You expected that they would avoid any, any kind
19 of suggestive behavior in that regard. Correct?
20     A    I didn't, I didn't say -- I didn't say
21 it earlier. You may ask a question after you've
22 been in an interview. Again, if you ask me is
23 this question suggestive, I'd tell you if I
24 believe it is or it isn't or if this one is.
25     But you're asking me in generalities, does

Kentuckiana Reporters
30 South Wacker Drive, Suite 2250
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-RK   Document 189-19   Filed 09/09/24   Page 31 of 60

1  this ever happen?  That's hard for me to narrow
2  down.  As you've already told me, you're like we
3  can't -- we're never gonna narrow down to a
4  hundred percent on things in this.
5      So to say that it hasn't happened or
6  wouldn't happen, I'm not gonna say that that
7  hasn't or wouldn't, because over the course of a
8  conversation just like we're having, you started
9  open-ended, and you're starting to narrow them
10 down.  So that's what I'm getting at.
11     So the overall expectation would be you
12 would have an open-ended question.
13     Q    And sir, I want to just focus you on
14 the question I'm asking so you're answering the
15 question I'm asking and not my previous questions.
16 I just want you to focus on this question.
17     A    Okay.
18     Q    Did you expect as a homicide
19 supervisor that your detectives would avoid
20 suggesting to a witness how they should answer
21 their questions, like what answer they wanted the
22 witness to give?
23     A    I would, I would again say I don't
24 suspect that they would ask a question.  Instead
25 of suspect, my expectation, that's what you're

1  asking, my expectation would be that they would
2  ask those open-ended questions.
3      Q    And the reason to ask open-ended
4  questions is so you don't suggest to a witness how
5  they should answer your questions.  Correct?
6      A    If you have an open-ended question,
7  it's for the witness to be able to give their
8  statement, yes.
9      Q    All right.
10     A    Sorry we had to go through that.  I
11 don't understand.
12     Q    Sometimes the -- well, I'm going to
13 keep trying to keep it specific so we can move
14 through.  I'll do my best.
15     A    Thanks.
16     Q    And you're fine.
17     A    Okay.
18     Q    I'll just ask another question now.
19     A    Okay.
20     Q    Now I want to give you an example of a
21 question in the context of an interrogation.
22     If a witness denies knowing of a suspect's
23 involvement, is it appropriate for a detective to
24 tell that witness other people have said it was
25 suspect A; why didn't you hear it was suspect A?

1      A    In that context that you're saying?
2      Q    Yes, sir.
3      A    If I'm interviewing a witness, I'm
4  just going to repeat so I know that we're on the
5  same page.
6      If a detective is interviewing a witness
7  and they ask the question how come basically your
8  answer is not the same as witness A, because they
9  said it was suspect number one?  Is that what you
10 just said?
11     Q    It's close.
12     A    Close?  That's why --
13     Q    You got like 90 percent.
14     A    Okay, try it again.
15     Q    The hypothetical is homicide detective
16 is questioning witness.
17     A    Okay.
18     Q    Witness has already told detective I
19 don't, I don't know who was involved.
20     A    Okay.
21     Q    And homicide detective asks witness,
22 other people have said it was suspect A.  Why
23 haven't you heard it was suspect A?
24     Is this an appropriate question?
25     A    Kind of depends on if they already

1  know the answer to the question that they're
2  asking the subject.  It depends.  It depends on
3  the information that that detective has at the
4  time on the way that they worded that question.
5      If they have nothing or they have -- they
6  may -- as I said early on, a lot of times when
7  detectives are asking questions they already know
8  the answers.  We all know that.  It's kind of
9  like attorneys.  A lot of times they already know
10 the answer when they ask the question.
11     So in this, this instance, the detective
12 may already know that the person knows for
13 whatever reason that they know.
14     Q    Uh-huh.
15     A    So they could ask it that way.  They
16 could ask it that way.  Come and walk in the room
17 and sit down, that probably would not be my first
18 question.  But throughout the course of -- as I
19 will say, many times in homicide investigations,
20 interviews sometimes last as long as
21 interrogations.  Right?
22     So that's where I -- that's what's going
23 through my mind when you ask these questions, is
24 what would that be?  What would that consist of?
25 What would that be?

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 130

1      Q   That makes sense.  Yeah.
2      A   Just to give some context.
3      Q   Would you agree that a detective
4  should have a good reason before they tell one
5  witness that another witness has identified a
6  particular suspect?
7      A   I would think.
8      Q   In 2003, witness and suspect
9  statements could be written in a report or taken
10 by stenographer.  Correct?
11     A   I believe so.
12     Q   Do you remember if you used video or
13 audio recordings for interviews and interrogations
14 in 2003?
15     A   I don't think so.  We changed at some
16 point.  We finally changed.  But most you sit down
17 with a typist and literally would ask a question,
18 they would give a statement, and they would type
19 it out one by one.
20         And that wasn't even on all witnesses.  I
21 mean, it wasn't -- yeah.  I'm dating myself.
22 You're making me feel great.
23     Q   Do you know why the 1010 squad didn't
24 use video or audio recordings in 2003?
25     A   The department didn't have -- we had

Page 131

1  like one room, I think, if I remember correctly,
2  and you may be able to help me.  If I remember
3  right, we had one room that you recorded maybe a
4  suspect statement on.  And I think it was on VHS
5  tape back then.
6      Q   Is there a reason the squad didn't use
7  audio recordings statements more?
8      A   I don't think we had any sort of
9  policy on that.  I don't think that was the
10 standard in 2003, to record.
11         What's different, if we had, it probably
12 would have been on a cassette tape that -- well,
13 I think that's the only way we would have had to
14 record it, was a cassette tape, if we did.  But
15 that didn't happen on any case, if I remember.
16     Q   I want to, I want to ask a little bit
17 more about like exculpatory evidence as to
18 possible suspects.
19         Based on your knowledge as a homicide
20 supervisor, would you agree that evidence that
21 points to the innocence of a suspect is
22 exculpatory?
23     A   Yes.
24     Q   Do you agree that evidence that
25 another suspect may have committed the crime is

Page 132

1  exculpatory?
2      A   Evidence that somebody else could have
3  committed it?
4      Q   Yes, sir.
5      A   I believe so, yes.
6      Q   Do you agree that evidence showing a
7  witness against a suspect may be lying is
8  exculpatory?
9      A   A witness -- I looked away from you.
10 Sorry, I looked down.
11     Q   I'll ask it again.
12         Do you agree that evidence that undermines
13 the credibility of a witness against a suspect is
14 exculpatory?
15     A   Yes.
16     Q   And do you agree that would include
17 any prior inconsistent statements a witness has
18 made about the crime at issue?
19     A   I think any, any evidence that was
20 made should be disclosed.
21     Q   Yeah.  And if -- if a witness against
22 a suspect is receiving some benefit for their
23 participation, that also needs to be disclosed.
24 Right?
25     A   What is -- what does that mean?

Page 133

1      Q   A benefit could be money.  It could
2  also be consideration as to criminal charges
3  against them.
4          If a detective knows a witness is getting
5  benefits for their testimony, they have to write
6  that down.  Right?
7      A   If a detective -- I don't know that
8  that's ever happened, so I don't, I don't know
9  that I've ever been in a situation.
10         A detective should write down if a witness
11 is receiving benefits for testifying?
12     Q   For example, it happens in narcotics,
13 right?  There's a process to give money to
14 witnesses for their help solving crimes.  Right?
15     A   Right, but not testimony.  Your
16 statement was or your question was, should a
17 detective write down if a witness is being
18 compensated for testifying?
19         And that's -- I don't know that we've
20 ever -- in narcotics if people -- people could be
21 paid to go buy narcotics.  That's an example.
22     Q   Isn't it part of the expectation for
23 informants in narcotics that they will cooperate
24 with the prosecution, including potentially
25 testifying if necessary?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case No. 1:20-cv-04156-RK   Document 183-19   Filed 09/09/24   Page 33 of 60

1    A    Yeah.  I would assume they do.  I
2  didn't, I didn't run any informants, so I don't
3  know exactly the details of what a quote/unquote
4  informant.
5    I just know the over -- I don't, I don't
6  know that I've had or seen myself any, in
7  narcotics, have seen anybody that's a
8  confidential informant.
9    Q    Yeah, yeah.
10   A    And they may have.  I just didn't have
11 any myself.
12   Q    So this -- if a witness is getting
13 benefits, money, consideration for participating
14 in investigation, that's something that needs to
15 be documented.  Right?
16   A    If they're getting -- yeah.  If
17 they're getting money, I would, I would think
18 that -- if you're talking about like a
19 confidential informant, I would think that we
20 would document that we're paying somebody for
21 information.
22   Q    And would that be an example of the
23 kind of information you've been trained that a
24 criminal Defendant has a right to receive?
25   A    Again, I didn't, I didn't have any, so

1  I don't know if it -- I know you're asking my
2  training.  I'm trying to think back what I've
3  done.
4    Q    Uh-huh.
5    A    I don't know if they receive that or
6  they didn't receive that.  I never had one, so I
7  know it's hard to believe, but I didn't have any.
8    Q    No.  I believe you.  I'm just asking
9  about --
10   A    Yeah.  I'm just trying to think.
11   Q    And to be specific, my question is
12 about your training and your understanding of what
13 needed to be disclosed.
14   A    Right.
15   Q    And if, if you don't remember or you
16 don't know, that's fine.
17   A    Right.
18   Q    I'm just wondering if it falls under
19 the definition of what you were trained and what
20 you understood criminal Defendants have a right to
21 receive.
22   A    Right.  I don't know about -- I don't
23 know about that specifically.
24   Q    Okay.
25   A    Per se.

1    Q    All right.  If, in reviewing a case
2  file -- well, let me back up.
3    As a sergeant, when you reviewed the case
4  files for submission to the prosecutor, if you
5  happened to notice any kind of document you knew
6  existed was missing, you would tell the detective
7  to include it.  Right?
8    A    If I knew something was missing, of
9  course I would.
10   Q    Yeah.
11   A    But sometimes I wouldn't know what was
12 and what was not because they're -- these files
13 were massive, but ...
14   Q    Understood.
15   A    Yeah.
16   Q    Andy my question was just if, you
17 know --
18   A    If I knew, I would say something,
19 yeah.
20   Q    And if you knew of exculpatory
21 information that surfaced in the investigation but
22 you didn't see it in the case file, is that
23 something you would also tell a detective to make
24 sure was included?
25   A    I would tell them to turn over

1  everything we have.
2    Q    Yeah.  Now, do you remember, was it --
3  strike that.
4    Was it unusual for case detectives to
5  communicate with prosecutors as prosecutors like
6  proceeded in criminal cases for the homicides
7  they investigated?
8    A    Can you reword that?  You got --
9    Q    Yeah.  Was it usual for homicide
10 detectives to help prosecutors with the cases they
11 had worked on?
12   A    They could if -- I mean, normally in
13 generality here, if a prosecutor came and said,
14 hey, we needed help on, doesn't even have to be
15 our case, they might say somebody else's case, but
16 we're homicide, so if they needed help with
17 something, I'm sure we would help them.
18   Or if the prosecutor asked a detective
19 questions, I mean, it is part of the prosecution.
20   Q    Yeah.  And it's typically led by the
21 prosecutor, right?  The prosecutor says what they
22 need, and then the detectives respond?
23   A    For the most part yes.
24   Q    And it wasn't unusual for that to
25 happen, was it?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 138

1      A    We work closely with the prosecutor's
2  office when it comes to case files, yes.
3      Q    And so other could prosecutor -- in
4  your experience, would prosecutors, for example,
5  call detectives and ask them for more information
6  about the reports they had written?
7      A    I don't know what -- I don't know.
8  There's a conversation between the detective and
9  them, but, I mean, they -- I'm sure that there's
10  conversation back and forth between a detective
11  and the prosecutor.
12      Q    Yeah.
13      A    Because if you read something, the
14  interpretation of words on a piece of paper may be
15  different than what the conversation had or the
16  tone, just like today.
17      I mean, 2023, I can't read a text without
18  understanding it, cause there's no, no human
19  interaction behind a text message besides you're
20  like they're mad at me, they're upset with me.
21  And I get it all the time from my adult children.
22      So that's what I'm, that's what I'm
23  thinking of, is I'm sure there are conversations
24  back and forth, because there's no -- when you
25  read something on paper, there's no, there's no

Page 139

1  tone to it.  You read it.  So if that makes
2  sense.
3      Q    It does.  And is it typically the case
4  agent who's the point of contact for the
5  prosecutor as a case develops?
6      A    Should be.
7      Q    So would you expect -- would you
8  expect requests from the prosecutor relative to a
9  homicide investigation to typically run through
10  that case detective?
11      A    I would.
12      Q    And does that -- do homicide
13  investigators, do they get looped in when evidence
14  from a homicide is tested at the prosecutor's
15  request?
16      A    I don't remember if they did that back
17  then.  I think they do now.  I don't -- I couldn't
18  tell you what the -- I don't know what happened in
19  2003.
20      Q    That's fair.  That's how it would
21  happen now, but you don't remember that?
22      A    I can't.  A lot of things have changed
23  since then.
24      Q    Now, the 1010 squad, when you
25  supervised it, had a -- strike that.

Page 140

1      Am I correct that the 1010 squad had a
2  high clearance rate during the times you
3  supervised it?
4      A    It was good.
5      Q    And did it -- I think I read that it
6  had the highest clearance rate of all the homicide
7  squads in the department.
8      Does that seem right to you?
9      A    I don't know if it was the highest,
10  but ...
11      Q    Yeah.
12      A    I mean, it was -- we had a good
13  clearance rate.  However, this past year we had
14  one of the highest clearance rates ever on the
15  police department, too.  We had the most homicides
16  ever in Kansas City, so plus one of the highest
17  clearance rates ever.
18      Q    Let me ask you -- I want to go back to
19  the topic of probationary detectives in the
20  homicide, in the 1010 squad.
21      Was a probationary detective typically
22  supervised by a more experienced detective?
23      A    Yes.
24      Q    And when Avery Williamson -- my
25  understanding is that -- so when you were a

Page 141

1  sergeant in 1010 squad, you would be the
2  supervisor, but an experienced detective would
3  also sort of be the supervisor of a probationary
4  employee, a detective.  Is that correct?
5      A    It would be like a training officer.
6      Q    Training officer.  Now --
7      A    Or training detective.  I apologize.
8      Q    All right.  Now, and in 2003, my
9  understanding is Williamson was a probationary
10  detective, and Rob Blehm was his supervising
11  detective.
12      Do you have any memory of, of that?
13      A    Yes.
14      Q    All right.  What was the difference in
15  Rob Blehm's responsibilities with Mr. Williamson
16  and your responsibilities with Mr. Williamson when
17  he was a probationary detective?
18      A    So Rob Blehm would have basically to,
19  make this as simple as possible, and I'm sure you
20  already know, would have shown him day-to-day
21  operations of how to do the job.  We call it FTO
22  in the field, field training officers.  Like out
23  of the police academy you're placed with a police
24  officer.
25      We did the same thing with a detective.

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 4:20-cv-00078-RK   Document 139-19   Filed 09/09/24   Page 35 of 60

1  And Rob would have been his quote/unquote FTO as
2  a detective.  So they would have worked cases
3  that way, or he would have followed Rob to
4  basically that's your on-the-job training.
5       So my role probably, or not probably, my
6  role as a supervisor of the squad is same as it
7  was before.  I mean, he is a detective.  He is an
8  employee.  But he's also reporting kind of to his
9  trainer.
10      Q   So in terms of your responsibilities
11  as a sergeant, it would be the same towards a
12  probationary detective as any other detective?
13      A   Should be, yes.
14      Q   Did you choose who the field training,
15  who the training detectives were to be?
16      A   I don't know if I chose back then
17  because I don't, I don't know whether we had --
18  we -- I don't remember if we had people that were
19  already the trainers.  I know Rob wasn't the only
20  one.  I think we had some other people in our
21  squad that had trained detectives as well.
22      So I don't know if we had -- I don't know
23  if we had a list.  I don't know if that was Rob
24  was the person, because over the course of time
25  that has changed.  So I don't know.  I couldn't

1  tell you if I assigned it.  If Rob said I did,
2  then I probably did, but I don't, I don't know if
3  I assigned him to do that.
4       Q   Okay.  And in terms of the
5  probationary detectives, are their duties any
6  different than the more experienced detectives?
7       A   Well, they may not -- it just depends
8  on the situation, but they may -- they're a
9  detective.
10      Q   Uh-huh.
11      A   But they may not -- they need to see
12  all aspects of what being a detective is.  So, you
13  know, if they have not, you're going to
14  hopefully -- hopefully their training person will
15  say, hey, we have not done a body exam.  We have
16  to go to the morgue.  We have to go to here.  We
17  have to go there.
18      So, you know, is there responsibilities?
19  I mean, you're -- they're with their training
20  detective.  I would, I would rely on that person
21  to make that decision of where they're going.
22  But they are a detective, and they report to me
23  ultimately.
24      Q   Okay.  So the training detective may
25  say you're not ready to do this; I want you to see

1  this first; I want you to accompany and witness
2  this, that kind of thing.  Correct?
3       A   Could.
4       Q   And the training detective, would you
5  expect that a training -- that a probationary
6  detective would follow the directions of the
7  training detective they're partnered with?
8       A   Would they follow their direction?
9       Q   Yes, sir.  Would you expect them to?
10      A   Well, I would, I would, I would expect
11  that they would be following their direction.
12      Q   Okay.  Was there any point in a
13  probationary detective's progression where they
14  become qualified to conduct interrogations, to be
15  an interrogating detective?
16      Is there any like policy or practice as to
17  what point that would be?
18      A   No.
19      Q   Is it at the discretion of the
20  training, the training detective?
21      A   Yeah, or it could be -- or it could be
22  the supervisor.  It's kind of a fluid.  Back then
23  it was kind of a fluid situation.
24      Q   Right.
25      A   So it could be either/or.

1       Q   So as a supervisor, you could always
2  say we need help; get in here and do this.  Right?
3       A   Could.
4       Q   Now, homicide investigations could
5  like -- strike that.
6       In a homicide investigation, it's typical
7  for the -- to receive reports from other units,
8  like patrol or the crime scene techs.  Correct?
9       A   Yes.
10      Q   And the reports that those other units
11  generate go to the case detective.  Correct?
12      A   They, they should.
13      Q   Yeah.  Was that what typically
14  happened, that they would get routed to -- reports
15  from other units would get routed to the case
16  detective?
17      A   They should.
18      Q   And, well, when you say that, did they
19  often --
20      A   I don't, I don't know how -- that's
21  why I'm saying they should, is you're saying from
22  different units.  That means back then somebody
23  put their report in an envelope, put a name on it
24  and shipped it to the correct detective.
25      Q   Yeah.

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 36 of 60

1   A   So when I say the words they should.
2   Q   Yeah.
3   A   You said crime scene. Crime scene
4  does their report.
5   Q   Yeah.
6   A   They should take that and put it in an
7  envelope and ship it to the detective.
8   Q   When you were a homicide supervisor,
9  did you have recurring problems with reports from
10 other units not coming to the detectives?
11  A   I wouldn't, I wouldn't say it that
12 way.
13  Q   Do you remember any specific issues
14 with that process at all when you were the
15 supervising sergeant of homicide?
16  A   I wouldn't say there's some glaring
17 thing. But I again, talking about hundreds of
18 thousands of pieces of -- now we just hit a
19 button. It wasn't that way back then. It was all
20 hand-delivered.
21  Q   Yeah.
22  A   So to answer both of your questions,
23 they should put them in an envelope and send them
24 to the case detective, is what they should do.
25  Q   Right.

1   A   Is there -- was there a glaring
2  problem back then? No.
3   Q   Okay. And we've had testimony that in
4  the homicide unit, there is kind of a box at the
5  front desk where reports from other units could
6  come in.
7       Is that, is that what you recall?
8   A   That is correct.
9   Q   And then --
10  A   Until you said it I forgot, but yes,
11 there was a box at the front that people dropped
12 the reports in.
13  Q   And then once they got to the front
14 desk, they could be associated with the case and
15 given to the case detective. Right?
16  A   That is true.
17  Q   And at some point the department
18 started scanning reports so there would be an
19 electronic copy also. Is that correct?
20  A   Yes.
21  Q   And once the department started
22 scanning reports, they could also be delivered
23 electronically to the case detective. Correct?
24  A   I think so. IT is not my specialty by
25 no means, but I would say yes, they could be sent

1  electronically. I don't know when that happened.
2   Q   Yeah. You would -- yeah. You
3  don't -- you don't independently --
4   A   I can barely text and FaceTime, so
5  just FYI. No. I'm just kidding.
6   Q   That's all right. Okay. And I know,
7  I know you said you don't remember any glaring
8  issues with reports getting delivered to case
9  detectives, but I just, I want to make sure I
10 finish exploring what you remember before I move
11 on.
12      Do you have any memory of any specific
13 problem with a unit completing a report on a
14 homicide case and it never got to your detective?
15  A   I wouldn't have known.
16  Q   Sure. But I mean, you know, it never
17 came up like six months later, a year later,
18 whatever, we find out, shoot, we never got this?
19 You don't remember that ever happening, do you?
20  A   I don't remember.
21  Q   Okay. I think I can go a little while
22 longer, but I'm wondering if you'd like a break at
23 this point.
24  A   No. I'm good unless somebody else
25 needs one.

1       (Discussion off the record.)
2   Q   (By Mr. Hilke) I'm going to show you
3  Exhibit 3. Do you see here a document with the
4  heading case Status Report?
5   A   Yes, sir.
6   Q   We've had testimony that this was a
7  document detectives would submit when they
8  submitted a case to a prosecutor.
9       Is that familiar to you?
10  A   327, yes.
11  Q   And what's typed here is what the
12 detectives actually wrote, what the detectives
13 completed when they submitted it. Correct?
14  A   I believe so.
15  Q   And what's handwritten at the
16 bottom -- actually strike that.
17      What's handwritten is what the prosecutors
18 would write when they -- after they received it
19 and gave it back. Correct?
20  A   I was looking at the document, so I
21 wasn't looking at you, but I think I heard. So if
22 you would just repeat it again so I can make sure.
23  Q   The handwriting is from the
24 prosecutors. Right?
25  A   I believe this is. I don't know, I

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:21-cv-00518-RK   Document 139-19   Filed 09/09/24   Page 37 of 60   Page 37 of 60

Page 150

1  don't know if this is or that prosecutor's office
2  number I believe is theirs.  But some of these
3  other things I don't know.
4          Q.    Okay.
5          A.    I don't know whose handwriting that
6  is.
7          Q.    When you say what's at the bottom, do
8  you mean what's below the arraignment trial data
9  heading?
10         A.    Yes.
11         Q.    And when you say the prosecutor's
12 office number, you mean what's in the upper left
13 as 949559.  Correct?
14         A.    Correct.
15         Q.    And when homicide detectives submitted
16 a case, was it the practice at the time that the
17 prosecutor's office would return this sheet with
18 information for them?
19         A.    I don't know exactly how ours got
20 returned.  Sometimes it could be fugitive
21 apprehension and arraignment unit would bring
22 these back, or maybe the prosecutor did.
23         I can't tell you exactly who did or who
24 did not bring these back, because sometimes --
25 I'm just telling you in my investigative career

Page 151

1  total.  I know you're talking about homicide.
2          Q.    Yeah.
3          A.    You would, you would file a case, and
4  it may be there for a little while before it came
5  back.
6          Q.    Yeah.
7          A.    And then fugitive apprehension and
8  arraignment section for the KCPD would pick those
9  up and bring them back over.
10         So to answer your question who brought
11 this, I have no idea.
12         Q.    Yeah.  And I guess I'm not really as
13 concerned with who brought it back.
14         But what the prosecutors did with the
15 submission would come back to homicide, right?
16 You'd find out, for, example whether they were
17 going to file or not based on the charges.
18 Correct?
19         A.    Yes.  If I'm understanding you
20 correctly, we're gonna find out whether they filed
21 or they didn't file.
22         Q.    And was that typically in the format
23 of completed information on the same form that was
24 given to the prosecutors?
25         A.    Are you talking about this form?

Page 152

1          Q.    Yes, sir.
2          A.    Well, yes.  I believe we would have
3  this returned.
4          Q.    Sure.  So and sometimes -- and just so
5  I'm understanding, if homicide submitted a form of
6  this kind to the prosecutors, they'd expect to get
7  it back with the result of what the prosecutors
8  were gonna do with it.  Correct?
9          A.    I think we -- I mean, I don't know if
10 there's an expectation on getting this form back.
11         Q.    Yeah.
12         A.    I know 327 always went with a probable
13 cause statement to the prosecutor.
14         Q.    Uh-huh.
15         A.    So if I was gonna get this back, I
16 don't really know if I had an expectation I was
17 gonna get it back, but I think we got them back
18 in --
19         Q.    Yeah.
20         A.    Actually I think they came back,
21 sometimes they came back in stacks.
22         Q.    Yeah.
23         A.    Meaning all cases.  I'm not just
24 talking about mine.  And then fugitive
25 apprehension would come up, and here's all the

Page 153

1  cases that were filed in Jackson County.
2          Q.    And that was what you observed as a
3  supervisor, right?  You would get these forms back
4  eventually from the prosecutor's office.  Correct?
5          A.    At some point.
6          Q.    Right.  Not necessarily at any time,
7  but it would come back.  Correct?
8          A.    For the most part yes.
9          Q.    Okay.  Do you remember anytime when
10 you didn't get one back that you submitted?
11         A.    Again, if I didn't get it back, I
12 would have had to be looking for a particular one.
13         Q.    Sure.
14         A.    So I don't know if I ever had that --
15 I don't know if I ever had that happen or I didn't
16 have that happen.
17         Q.    Sure.  You have no memory either way.
18 Correct?
19         A.    Correct.  And if I was upset and
20 wanted one, maybe I would have called.  I don't
21 know.  That's a long time ago.
22         Are we done with this?
23         Q.    Yeah.  You can set that the aside.
24         A.    Thank you.  Otherwise I'll be
25 distracted and look at it.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedulekentuckiana@gmail.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00078-RK   Document 169-19   Filed 09/09/24   Page 38 of 60

Page 154

1    Q    When you reviewed investigative files
2 that were given to the prosecutor upon submitting
3 a case, did that file have any particular like
4 physical, like was it, you know, clipped or bound
5 or otherwise organized in any specific kind of
6 way?
7    A    It changed over my time there.  I'm
8 trying to think of all the ways that we had it at
9 one point.
10       I mean, there was like I think two-hole.
11 At one point in time we three-hole punched them.
12 There was one point in my career we two-hole
13 punched them at the top.  And a lot of that,
14 believe it or not, all had to do with people
15 didn't like the way they did and that it stuck
16 together or it wouldn't go through a copy
17 machine.
18       So I remember discussions somehow, because
19 I thought it was ridiculous, of how we -- where
20 the holes were at on our pieces of paper.
21    Q    All right.
22    A    Because that was, you know, back then
23 it was some of the least of my worries, was
24 whether we punched the holes in the top or the
25 side.

Page 155

1    Q    Do you remember --
2    A    Sounds crazy I can remember that
3 conversation.
4    Q    Do you remember how it was in 2003?
5    A    If you showed me, I could probably see
6 which side the -- if you showed me a copy of
7 something, you could probably see where the holes
8 are punched.
9    Q    I'm showing you Exhibit 11.  Do you
10 see in front of you an investigative report by
11 Detective Morgan?
12    A    Yes.
13    Q    Drawing your attention to the second
14 paragraph, he writes, and this is about the night
15 of the Larry White homicide for context.
16    A    Can I --
17    Q    He writes, Upon arrival, contact was
18 made with Sergeant Niemeier of the 1010 homicide
19 squad, who advised that there were three witnesses
20 to the shooting and that they were all detained at
21 the scene.
22       Do you see where it says that at the top
23 of the second paragraph?
24    A    Yes.
25    Q    And does that mean anything to you,

Page 156

1 like detaining witnesses at the scene of a
2 homicide?
3    A    Does it mean anything to me?
4    Q    Yeah.  Do you know what that means,
5 like when he writes, We detained the witnesses at
6 the scene of the homicide?
7    A    That they were there.  They were
8 available to be interviewed.
9    Q    Right.  So that just means that they
10 were -- that they were available?  It doesn't mean
11 they were told they couldn't leave, does it?
12    A    I wouldn't think so.  That would be a
13 question for Morgan.
14    Q    Sure.
15    A    It says, Contact was made with
16 Sergeant Niemeier, who advised that there were
17 three witnesses to the shooting and that they were
18 all detained at the scene.
19       I would say they were at the scene.  We've
20 worked hundreds of homicides.  They're there.  I
21 wouldn't take that as any other way as they were
22 there to be interviewed.
23    Q    I understand.
24    A    My interpretation.
25    Q    Understood.  Now, was, was there

Page 157

1 any -- did the detectives you supervise tell
2 witnesses at a homicide that they couldn't leave
3 until they got questioned?
4    A    No.
5    Q    That's not something you've familiar
6 with.  Correct?
7    A    That they couldn't leave?
8    Q    That they couldn't leave.
9    A    Then you would be under arrest --
10    Q    Right.
11    A    -- if you couldn't leave.
12    Q    And you can't arrest someone just for
13 being a witness.  Right?
14    A    Correct.
15    Q    You're not allowed to suggest to them
16 that they're not allowed, free to leave.  Correct?
17    A    They can leave.
18    Q    And you can't, as a detective, you
19 can't tell them otherwise.  Correct?
20    A    You can't, you can't arrest people
21 that are witnesses because they just want to
22 leave.
23    Q    Okay.
24    A    If that's what you're asking.  So I'm
25 two back from you.  You're going too fast for me.

Kentuckiana Reporters
30 South Wacker Drive, Suite 2675
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule Depositions Online
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Case 1:20-cv-03118-RK   Document 199-19   Filed 09/09/24   Page 39 of 60

1  I guess what I'm -- I think I answered it right
2  there.
3        Q    I think so.  I think what you -- I
4  think what you told me is, you told me a detective
5  can't arrest witnesses just for being witnesses?
6        A    Correct.
7        Q    And what I understand you to be saying
8  is that that means you can't tell witnesses
9  they're not free to leave.  Is that fair?
10       A    That's fair.
11       Q    Now, there were -- the file shows
12  three witnesses who were interviewed the night of
13  the shooting:  Leslie Cole, who is one who was
14  walking like a block south; and then there were
15  two people working at that restaurant you
16  mentioned, the Fish Town restaurant, Marva Gray
17  and William or Bill something or other.
18       And the only reason I'm asking you that or
19  telling that you is to ask if knowing the names
20  or kind of who those witnesses were gives you any
21  independent recollection at all of that night.
22       A    I didn't even know there was three
23  witnesses at the scene until you just put that in
24  front of me.
25       Q    All right.  I don't have anything more

1  about this.  Exhibit, Exhibit 31.
2            MS. PETERS:  Wally, I'm going to
3  put this on the bottom of that stack so it doesn't
4  get lost.
5        Q    (By Mr. Hilke) Do you see in front of
6  you a two-page report?
7        A    Yes.
8        Q    And you see that it's signed by Vern
9  Huth at the bottom of page one?
10       A    Yes.
11       Q    Do you have any memory of seeing this
12  report before?
13       A    Only the other day.
14       Q    Was it one you looked at to get ready
15  for this deposition?
16       A    Yeah.  There was, what I just told
17  you, there was a crime scene thing kind of stapled
18  to it.  If I remember, it was that and these two
19  pages.  That's all I've seen.
20       Q    Okay.  And when you, when you looked
21  at this report the other day, did it spark any
22  memory at all?
23       A    It was the first time I had seen it.
24       Q    And did it make you recall any
25  independent recollection of the investigation?

1        A    No.
2        Q    Let me point you to the second page.
3        Do you see that Officer Huth and Begley
4  described being contacted by what he describes as
5  a confidential informant about the homicide?
6        A    First paragraph.
7        Q    And do you see on the second paragraph
8  they say that the witness told -- or Huth writes
9  that the witness told him she observed a black
10  male running from 29th and Olive, being chased by
11  two other black males firing guns at him?
12       A    The first five lines of the second
13  paragraph.
14       Q    And do you see that she also
15  describes, the informant, the route that the
16  victim and the shooters took in terms of how, how
17  the victim was chased during the crime on the next
18  paragraph?
19       A    Yes.
20       Q    And then the final detail that Huth
21  provides about what this witness told him is that
22  the two shooters kept chasing him and shooting at
23  him.
24       Do you see that in sort of the fourth
25  paragraph there?

1        A    It states, The two black males
2  continue the pursuing him while firing rounds from
3  an unknown weapon.
4        Q    All right.  In terms of the homicide
5  unit's practices when you were its supervisor,
6  when patrol officers contacted with witnesses to a
7  homicide, was there any expectation as to whether
8  the patrol officer should question the witnesses
9  or turn them over to homicide?
10       A    Was there any expectation?
11       Q    Actually let me take a step back.
12       When you were a patrol officer, did you
13  ever contact with witnesses who were witnesses to
14  homicides or other serious crimes?
15       A    I'm sure I did.
16       Q    And when you did that, was it your
17  practice to refer them to like investigators for
18  questioning?
19       A    If I found them to have information, I
20  mean, I would have to figure out they had
21  information, then yes, then I would turn them over
22  to homicide or robbery or whatever.
23       Q    And is that how you were trained to do
24  it?
25       A    I'm not sure -- was I trained to do

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule@Kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

1  that?  I suppose in my field training if I
2  interviewed someone and they had information
3  regarding a case, I would turn them over.
4       Q    And what you just read here, would
5  this be an example of a witness with information
6  who should be turned over to investigators?
7       A    Hold on.  Let me read, please.  Sorry,
8  I just wanted to read the rest of the report and
9  make sure I wasn't missing something.
10       Can you ask me the question again, please?
11       Q    I can.  Is the witness who Huth
12  describes contacting with an example of a witness
13  who in your training should be turned over to
14  investigators?
15       A    Someone that could?  Just reading
16  this, this little bit of information right here
17  says she stated that she observed a black male
18  running at 29th and Olive being pursued by two
19  other black -- I'm kind of working through this.
20  I guess I should do it quietly so you don't have
21  to type.  Sorry.
22       I would say he, he could have.  On the
23  other hand, if this is one of those I don't have
24  enough information in this report right here for
25  you to tell me or him to tell me if we didn't

1  already have that information from witnesses that
2  were there that night.  I don't know.
3       So to answer your question, he could have,
4  but I don't know with this little bit of
5  information right here, if there was more for it.
6       I see my name in this report as well that
7  he states, which I don't remember, that I was out
8  at the scene on the 7th, so ...
9       Q    And we'll get to that.
10       A    Yeah.
11       Q    And my question is not about what Huth
12  did or should have done.
13       A    Or should have done.
14       Q    My question is about your training.
15       A    Training, yeah.  Now -- I'm sorry.
16       Q    So I'll ask it.
17       A    Yeah.
18       Q    As a patrol officer, if you talk to a
19  witness, and the witness says, oh, yeah, I saw a
20  homicide, like I saw a shooter, I saw two people
21  shooting, I saw the victim running, that's
22  someone who in your training you would have turned
23  over to the detectives.  Right?
24       A    Yeah.  I think I would have.  I think
25  I would have and said, hey, I was contacted by

1  this person.  I think I would.
2       Q    You would have not have said, okay, go
3  on your way then?  That's enough information for
4  us right now?  Right?  You would have tried to get
5  the detectives in touch with an eyewitness to a
6  shooting.  Correct?
7       A    You're asking about what I would do?
8       Q    Yes, sir, your training.
9       A    I'd -- I believe so.  I think he wrote
10  a report.
11       Q    And I'm not suggesting he did
12  otherwise.  I'm just asking about your training.
13       A    Yeah.
14       Q    And, and you wouldn't have said, okay,
15  it's my turn to be a homicide investigator, and
16  I'm gonna ask you an exhaustive set of questions
17  about everything you remember and everything you
18  did, would you have?
19       A    You're asking me what I would have
20  done?
21       Q    In your practice as a patrol officer
22  per your training.
23       A    The only reason I had that look is
24  it's been a long time ago.
25       Q    Okay.

1       A    Again, I think it goes back to the
2  thing if I would have asked enough questions to
3  know that somebody's -- I would have asked enough
4  questions to know that somebody knew what they
5  were talking about.  That's what I would have
6  done.
7       Q    Sure.  And as a homicide sergeant, you
8  interacted with patrol officers at numerous crime
9  scenes.  Right?
10       A    There's patrol officers at every crime
11  scene that I go to.
12       Q    And, and you'd interact with them,
13  right?  You'd talk to them on the scene and
14  things.  Correct?
15       A    Sure.
16       Q    And, and if you were responding to a
17  scene, you might ask the officers if there were
18  any witnesses who, who you should know about.
19  Right?
20       A    At a crime scene yes.
21       Q    And if they told you there were
22  witnesses, you would try to have a detective
23  question the witnesses.  Correct?
24       A    I just did that in Exhibit 11.
25       Q    Right.  The general practice would be

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
Louisville, Kentucky 40202
www.kentuckianareporters.com

Page 166

1  for the detectives, not patrol officers, to
2  question the witnesses at the scene.  Right?
3       A    Well, question, yes, but, but the
4  original responding officers or officers would
5  have to interview someone to begin with to know
6  that they are a witness for us to -- for a
7  detective to speak to.
8       So they're gonna get -- people are gonna
9  get questioned prior to a detective questioning
10  them, if that make sense.
11      Q    Yeah.
12      A    We don't just go, this group right
13  here.  It's got to be human interaction.
14      Q    And if -- that makes sense.  And if I
15  understand the distinction, the patrol officers
16  obviously have to talk to people to know who is a
17  witness, but then the further questioning that
18  happens is generally going to be done by the
19  investigators or the detectives.  Correct?
20      A    Could, yes.
21      Q    And if the -- if there are detectives
22  and officers on the scene for detailed questioning
23  about a crime, it's gonna be the detectives in
24  your practice who are doing that questioning.
25  Correct?

Page 167

1       A    Detailed questioning on the, on the
2  scene?
3       Q    Yes, sir.
4       A    Yeah.
5       Q    But like you said, patrol officers are
6  not prohibited from asking enough questions to
7  find out if a witness has information.  Correct?
8       A    Not prohibited.
9       Q    They wouldn't be doing their job if
10  they didn't try to get a general sense of what a
11  witness knows before, you know, in that first
12  interaction.  Correct?
13      A    Correct.
14      Q    So I know even reviewing this, you
15  have no independent recollection of any
16  interactions associated with this, do you?
17      A    I have no independent recollection,
18  and I didn't review literally besides what I've
19  told you I reviewed.  That's it.  I didn't go back
20  and read the case file.  I didn't go back and read
21  a single report, nothing.
22      Q    I understand.  If you had interviewed
23  this eyewitness to the shooting, you would have
24  written a report on it.  Correct?
25      A    If I interviewed?

Page 168

1       Q    The eyewitness Huth contacted with
2  who's mentioned in this report.
3       A    I interviewed the person that's in
4  this report?
5       Q    Yes, sir.
6       A    I would have thought so.
7       Q    Yeah.  And that was a practice, right?
8  Any, any eyewitness interview between a detective
9  and a witness is going to be documented in a
10  detective's report.  Correct?
11      A    I would, I would think so.
12      Q    If any of your detectives had
13  subsequently interviewed, you know -- strike that.
14      You don't have any reason to believe that
15  one of your detectives would have interviewed
16  this witness and then failed to write a report on
17  it, do you?
18      A    Do I have any reason to believe?
19      Q    Yes, sir.
20      A    Do I have any reason to believe that
21  one of my detectives interviewed that person and
22  didn't write a report?
23      Q    Yes, sir.
24      A    I have no -- I have no recollection to
25  believe that, no.

Page 169

1       Q    It would be contrary to their practice
2  to interview a witness and not write a report on
3  it.  Correct?
4       A    I don't believe on -- I know anything
5  about if that did happen.  I don't know.  And
6  I -- and far as practice goes or otherwise, I
7  don't know if someone did or did not.  I know
8  some -- I was not made aware if, so ...
9       Q    Yeah.
10      A    Not to be rude, but my right eye is
11  about to give out on me again, so whenever we get
12  to a stopping point.  It doesn't have to be right
13  now, but when we do.
14      Q    I'll try to finish this, and then it
15  shouldn't be long.
16      A    Okay, thank you.
17      Q    The practice when you were a
18  supervisor was if a detective writes -- interviews
19  a witness, that they write a report on it.
20  Correct?
21      A    Practice is if they interview a
22  witness, they write a report.
23      Q    That's all I'm asking on that.  Let's,
24  let's take a break now.
25      A    Perfect.

Kentuckiana Reporters
39 South Wacker Drive, Suite 7
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
www.kentuckianareporters.com

Case 1:20-cv-04699-RK   Document 189-19   Filed 09/09/24   Page 42 of 60

1      THE VIDEOGRAPHER:  We are going
2  off the record and the time now is 1:44 p.m.
3           (Recess.)
4           THE VIDEOGRAPHER:  We are back on
5  the record.  The time now is 2:33 p.m.  Please
6  continue.
7      Q    (By Mr. Hilke) I'm going to show you
8  that last exhibit, Exhibit 31, for one more
9  minute here.
10     A    Yes, sir.
11     Q    So obviously as the report in the
12 investigation, this is a document that if the
13 detectives have it, they should have given to the
14 prosecutor when they submitted the case.  Correct?
15     A    I believe so.
16     Q    And if you had -- if you knew this
17 report existed and you noticed it missing from the
18 file, you would have told someone to put it in the
19 file.  Right?
20     A    If I knew it was missing and I knew it
21 was -- say that again.
22     Q    If when you --
23     A    Gotta focus again.  Sorry.
24     Q    All right.  If when the file was sent
25 to the prosecutor you noticed that this report was

1  missing, you would have said make sure that goes
2  in the file.  Correct?
3      A    If I knew it was.
4      Q    Right.  Is that correct?
5      A    Did I know if it was missing?
6      Q    No, sir.
7      A    If I knew it was missing, I would have
8  said put it in there.
9      Q    Perfect.  And so Detective Huth has
10 testified in this case about the identity of the
11 confidential informant mentioned in this report,
12 and he's verified that it's Wendy Lockett, who was
13 a trial eyewitness against Keith Carnes in his
14 criminal trial.  I'm sharing that with you now to
15 set up my next question.
16      As a homicide supervisor, if you knew that
17 a eyewitness against a suspect had given a
18 previous statement about the crime, would you
19 have made sure that statement was documented?
20     A    You said the person that they're
21 referring to in this has been interviewed and was
22 a witness in the trial?
23     Q    Yes, sir.
24     A    Okay.
25     Q    Now, I guess what I -- I guess what

1  I'm asking is -- well, I'll start here.
2      A    Okay.
3      Q    Do you recall that Keith Carnes in
4  2003 generally wore an eyepatch?
5      A    I think he -- I don't know if he does
6  still, but I think he did then.
7      Q    Yeah.  And do you notice that Wendy
8  Lockett in the statement Huth has recorded here
9  doesn't mention per the report anything about an
10 eyepatch?
11     A    I didn't read anything about an
12 eyepatch in this report you handed me.
13     Q    And Wendy -- and the witness here
14 doesn't say that she knows either of the shooters.
15 Right?
16     A    I didn't read that.
17     Q    And she doesn't indicate she has any
18 idea who any of the three men were in the report.
19 Correct?
20     A    I didn't read the report that it's
21 Wendy Lockett.  You're telling me that it's Wendy
22 Lockett, so ...
23     Q    Yeah.
24     A    The person -- this report doesn't say
25 anything that you just said.

1      Q    Right.  Now, if you knew as a homicide
2  supervisor that the person interviewed -- well,
3  strike that.  Actually strike that for a second.
4      You knew Vern Huth to be -- I think you
5  said this before -- a thorough detective and
6  investigator.  Correct?
7      A    He worked for me as a detective.
8      Q    And he was good and thorough.  Right?
9      A    Yes.
10     Q    And would you expect, you know, in
11 2003, would you expect that if your investigators
12 had talked to the witness, to a witness like the
13 one described in this report, they would have
14 asked her if she knew who committed the shooting?
15     A    I don't think Vern -- you asked about
16 my detectives.
17     Q    Your detectives.
18     A    I don't think Vern Huth was a
19 detective.
20     Q    He wasn't.
21     A    Okay.  He eventually was.
22     Q    Right.
23     A    But I don't think at this point.  So
24 you're asking me would my detectives that I had at
25 the time.

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule.Depo@kygreport.com
www.kentuckianareporters.com

Case 4:20-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 43 of 60

Page 174

1    Q    Right.
2    A    So I don't want to be confused if
3 you're asking me about Vern Huth and what he
4 should have been doing or you're asking about what
5 a detective should have done.  That's all I'm
6 asking for a clarification.
7    Q    I'm asking about what your detectives
8 should have done.
9    A    Okay, so ask it again so I'm not
10 confused, please.
11    Q    Sure.  So when interviewing a witness,
12 like matching the details in this report, if your
13 detectives talked to that witness, you'd expect
14 them to ask if the witness knew who the shooter
15 was.  Right?
16    A    I would, I would ask a detective to.
17    Q    Yes.
18    A    I don't know.  Do we -- did we
19 interview her?
20    Q    I don't know either, sir.  I'm just
21 asking what you would expect them to do when
22 talking to this witness.
23    A    Right.  I would expect if we talked to
24 a witness, that we would document that, if that's
25 the question.

Page 175

1    Q    Yeah.  And that if a witness says, you
2 know, I saw the shooter and I saw the victim,
3 you'd ask that witness, do you know who they were?
4 Right?
5    A    Yeah, but I just asked you if we -- if
6 we interviewed her, and you said you don't know if
7 we interviewed her or not.
8    I think -- I guess what I'm asking you is,
9 if we did interview, I could read it, and I would
10 know what we asked her.
11    Q    Sure.  So on Friday, Vern Huth
12 testified that he believes he referred this
13 witness to a detective in the homicide squad after
14 he spoke to the witness.
15    A    Oh, okay.
16    Q    And so if he did that and one of your
17 detectives interviewed this witness, they should
18 have asked this witness if they -- if she knew who
19 the shooter was.  Right?  That would be your
20 expectation and your practice as a homicide
21 supervisor?
22    A    It would probably, it would probably.
23 If we had an interview, we would ask if they knew.
24    Q    Yeah.  And your detective -- you'd
25 expect your detective to write down whatever the

Page 176

1 witness told you about that shooter.  Right?
2    A    We've been through that.  Yes.
3    Q    And this, this report doesn't mention
4 Wendy Lockett by name.  Right?
5    A    I don't see Wendy Lockett's name on
6 this report, no.
7    Q    I'll tell you that seven days after
8 this, on October 14, 2003, Wendy Lockett gave an
9 interview to detectives.  And in the statement
10 that was taken, she said Keith Carnes was the
11 shooter.  That's one of the reports we have.
12    A    So we did interview her.
13    Q    Yeah.  There's a report of an
14 interview seven days after this interaction.
15    Does that make sense?
16    A    Yes, but I just asked, and you said we
17 didn't, so that's why I'm asking.  I was just
18 asking you did we interview this person, and you
19 said no.  But if we did interview this person,
20 that's what I was asking if I could ...
21    Q    Yeah.
22    A    See, if that makes sense.
23    Q    It does.  Let me, let me put two
24 things in front of you and confirm that we
25 understand them so I can set up my next question.

Page 177

1    A    Okay.
2    Q    And those two things are, one,
3 Detective Huth testified that the day he spoke to
4 this witness, as on October 7, he gave her to one
5 of the homicide detectives; and two, separately,
6 seven days later on October 14, there's a report
7 of an interview of Wendy Lockett by one of your
8 detectives on October 14, so separate incident,
9 speaking to Ms. Lockett.
10    Are you with me so far?
11    A    I'm with you.
12    MS. PETERS:  I'm going to object
13 to the extent that misstates Huth's deposition
14 testimony.
15    MR. HILKE:  I think it's right,
16 but the record will reflect it.  And so just
17 follow with my --
18    MS. PETERS:  I don't think that's
19 right.
20    Q    (By Mr. Hilke) I think it's -- I'll
21 ask you to follow my hypothetical for now, and if
22 the record is wrong, it'll correct it later, but
23 follow me for now.  Assume I'm right and what
24 you've got is -- well, strike all that.
25    Actually it's going to be faster for me to

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Quintero Reporter info@kentuckiana.com
www.kentuckianareporters.com

Case 3:17-cv-00278-RK   Document 189-19   Filed 09/09/24   Page 44 of 60

1 show this to you, Exhibit, Exhibit 21. You can
2 keep that for a second.
3      A    Okay.
4      Q    Showing you the second page of
5 Exhibit 21.
6      Do you see that Detective Williamson
7 memorializes an interview with Wendy Lockett on
8 October 14? Do you see that?
9      A    Your question was did the interview --
10 this is page two of this packet that you gave me.
11     Q    Yeah.
12     A    But on page one there's a different
13 date for questioning advisory. Is that right?
14     Q    Sure. Page one shows a questioning
15 advisory on a prior day. Right?
16     A    Yeah.
17     Q    Now, my question is, on the page I
18 showed you, page two, that report indicates that
19 your detectives interviewed Wendy Lockett on
20 October 14. Correct?
21     A    Correct.
22     Q    Now, if you go to the next page, and
23 you see that they actually took a statement from
24 Wendy Lockett. Correct?
25     A    Correct.

1      Q    And in that statement, if you look at
2 the very beginning, Wendy Lockett says in that
3 statement that Keith Carnes was the shooter.
4 Correct? Actually can I interrupt you? She says
5 that Tre was the shooter. Right?
6      A    Well, I'm reading her statement right
7 now. I'm getting to the point where I think we're
8 going to get to what the question you asked.
9      Q    Go ahead.
10     A    So I just --
11     Q    Yeah. You can finish. Thanks.
12     A    (Witness looking at exhibit.) So to
13 answer your question, she refers to him as Tre.
14 And then when she's shown a photo lineup, she
15 picks out number five and said -- and then answers
16 number five is Tre. Tre's photograph is of Keith
17 Carnes, black male, 3/7 of '70.
18     Q    Gotcha. And I think she may also
19 mention an eyepatch somewhere in there.
20     Do you see mention an eyepatch as well?
21     A    Right here, yes.
22     Q    Sure. And if you compare it to the
23 report Huth took on October 7, there's nothing in
24 the October 7 report about the shooter being Tre,
25 is there?

1      A    No.
2      Q    There's nothing in there either about
3 the shooter, either of the shooters having an
4 eyepatch, is there?
5      A    No.
6      Q    So to make a full disclosure of this
7 investigation, the file should have indicated that
8 Wendy Lockett was interviewed on October 7, 2003;
9 that this was Wendy Lockett's prior statement
10 before she was interviewed on October 14, 2003.
11 Correct?
12     A    I don't want to do semantics with
13 words, but I don't know that a full statement is
14 what I would consider a statement. If you're
15 asking -- if you're asking what this report is
16 compared to this report, they're not the same
17 thing.
18     Q    My question is a little different.
19     A    Okay.
20     Q    And I'm asking about your practices as
21 a sergeant in the homicide unit.
22     You would, in submitting the file to the
23 prosecutor, you would expect the detective to
24 make the prosecutor aware that Wendy Lockett, one
25 of the main eyewitnesses who gave a statement on

1 October 14, was also interviewed on October 7 and
2 said what Huth wrote in his report. Correct?
3      A    Would I expect that these two reports
4 would be in the -- I would assume that they were.
5      Q    And not just the reports, but the
6 information, too, right, for the prosecutor? To
7 evaluate the case they need to know that Wendy --
8 that the confidential informant on October 7 was
9 Wendy Lockett, the same witness who later gave the
10 statement on October 14. Right?
11     A    I guess the person that's on -- in
12 this report is the person that's in this report.
13     Q    Yeah.
14     A    So if I'd known about this or would
15 have, then it would have been, would have been
16 there.
17     Q    Yeah. And as the report is written,
18 Huth's report, that report doesn't name Wendy
19 Lockett anywhere, does it?
20     A    No.
21     Q    And so some additional
22 documentation -- you would have expected some
23 additional documentation so the prosecutor could
24 put two and two together, that the same person
25 interviewed on October 14 made this past statement

Kentuckiana Reporters
30 South Wacker Drive, Suite 2260
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 45 of 60

Page 182

1  on October 7.  Correct?
2          A    The person who made that statement.  I
3  don't know if I'd classify it the way your
4  question is, but you're telling me that the person
5  that is in this is it.  That's what you told me.
6  But you also told me we didn't interview that
7  person.  And you're telling me that that's the
8  person that is this person.
9          I'm just generally in my head, why we put
10  a pickup out on the 13th or questioning advisory
11  on the 13th, they pick her up, and then we
12  interview her on the 14th.
13          So if you're asking me if this is Wendy
14  Lockett, I didn't know this was Wendy Lockett.
15  If that's not what you're asking me -- what
16  you're asking me is if this was included, the
17  answer to that was -- you're shaking your head,
18  so try again.
19          Q    Yeah.  What I'm asking is, do you see
20  how if the prosecutor just got these two reports,
21  they would have no way of knowing that the person
22  in the October 7 statement was the same person who
23  gave the October 14 statement?
24          A    I don't think they would know.  No,
25  they wouldn't know.

Page 183

1          Q    And so for a detective you supervise
2  to give a complete disclosure, they would have had
3  to document in some way the connection between
4  these two reports.  Right?
5          A    Either I'm confused or I'm not
6  understanding what you're asking.  Did the
7  detectives know about this report?  Is that what
8  you're asking?
9          Q    No.  It's different.  Like --
10          A    If the detectives knew about the
11  report and they interviewed somebody, they should
12  take a report.
13          Q    Right.
14          A    But I don't know that they
15  interviewed -- what I'm getting at is I don't
16  know.
17          Q    Yeah.
18          A    If you have something that says that
19  they interviewed them, then I would want to see
20  that.
21          Q    Yeah.
22          A    If this is what -- when they learned
23  about Wendy Lockett and they put a questioning
24  advisory out and then they did document it.  I
25  guess that's what I'm getting at.  And I think

Page 184

1  we're missing here.
2          Q    Yeah.  Let me clarify --
3          A    Okay.
4          Q    -- in a way I think that'll help.
5          A    Okay.
6          Q    Assume that you've got a detective and
7  they're putting together this case file to give to
8  the prosecutor.
9          A    You're asking, me to assume something.
10          Q    I'm asking you to assume.  It's a
11  hypothetical.
12          Assume they know -- they have Huth's
13  report, right, the one we're looking at, and
14  assume they know this is Wendy Lockett.
15          A    Okay.
16          Q    The same person who gave the statement
17  on October 14.
18          As a supervisor, would it be permissible
19  for them to withhold that information from the
20  prosecutor?
21          A    They didn't.
22          Q    I think you're not accepting my
23  hypothetical, and I want to focus on exactly what
24  I'm asking, because I'm asking about your
25  practices as a homicide supervisor.

Page 185

1          A    Yeah.
2          Q    Would you find it acceptable if your
3  detective --
4          A    Uh-huh.
5          Q    -- had this confidential informant
6  report, knew that that person was later
7  interviewed separately, and chose not to disclose
8  to the prosecutor that that eyewitness had
9  actually been interviewed before?
10          A    Well, they should have disclosed if
11  they had been interviewed before.
12          Q    And if the report didn't have -- you
13  know, if the report leaves that person anonymous,
14  would you have expected that detective to document
15  that that confidential informant was in fact the
16  same person interviewed on a later occasion?
17          A    If we interviewed her.
18          Q    Yeah.  If, if the detective had that
19  knowledge, he knew you've got a confidential
20  informant who's the same person as interviewed
21  later, that detective, if he knew it, should have
22  written that down to be put in the file.  Right?
23          A    I would guess if we knew it.  I guess
24  where I'm having trouble is it looks to me like we
25  didn't interview her.  That's where I'm getting

Kentuckiana Reporters
30 South Wacker Drive, Suite 2210
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana.com
www.kentuckiana.com

Case 1:20-cv-03118-RK   Document 189-19   Filed 09/09/24   Page 47 of 60

Page 46..60

Page 186

1  confused probably, because I'm like if we, if we
2  figured it out, if we figured out or conversation
3  or whatever happened --
4        Q    Yeah.
5        A    -- then we know that.  So on 10/13 we
6  put in a questioning advisory for a Wendy Lockett,
7  but it's not until the 14th that she's located and
8  transported down.
9             So that's where I guess I'm getting
10 confused with.
11       Q    Yeah.
12       A    I feel like, I feel like they did
13 that.
14       Q    And let me be --
15       A    I could be wrong.
16       Q    Let me be specific about what I'm
17 asking, too.
18       A    That's helpful.
19       Q    Keeping with our hypothetical right
20 now, the detective knows that this confidential
21 informant is the same person that they're
22 interviewing later.
23            It's not enough for that detective to just
24 give -- let the prosecutor know, yeah, we
25 interviewed later.  They should also document and

Page 187

1  by the way, that's the same person who was
2  interviewed and gave a statement as a
3  confidential informant earlier.  Correct?
4        A    If, assume all these things, if a
5  detective knew or I'm assuming that -- then people
6  should document if they talk to someone.
7        Q    Yeah.
8        A    Which I think I've said all along.
9        Q    And for that documentation to be
10 sufficient, it would have to reveal that the
11 identity of the person in Huth's report is the
12 same as the identity of the person in the
13 October 14 interview.  Correct?
14       A    You're asking, you're asking me if
15 this report should have said that this report?  Is
16 that what you're asking me?
17       Q    Yeah.  I'm asking you if this report
18 on October 14 or some other report by one of your
19 detectives should have made the link clear between
20 the confidential informant Huth interviewed and
21 the witness who the detectives later interviewed.
22       A    So just so I'm perfectly clear, you're
23 thinking there should be a report in between the
24 two of these linking these together?
25       Q    Either a report in between or

Page 188

1  something in detectives' October 14th report that
2  says -- tells the prosecutor, by the way, we're
3  not talking to this person for the first time.
4  She already said something, and Vernon Huth wrote
5  it down?
6        A    It's possible that could have
7  happened.  I don't know that it -- I don't know
8  that it had to happen.  But, I mean, it's possible
9  that we could have.
10            They could have written a report or -- but
11 I don't know that -- I don't know that it's a
12 must that there be, if this is the report that
13 happened here and this is -- they went and picked
14 up this person and interviewed her.
15       Q    Uh-huh.  Uh-huh.  Yeah.
16       A    Because, as I said, you're the one --
17 you're the first one that's brought it to me or
18 when I asked you.
19       Q    Let me make sure I understand your
20 answer fully.
21            So if the prosecutor never learned that
22 the confidential informant in Vern Huth's report
23 was the same person who the detectives
24 interviewed on October 14, would that have been
25 acceptable to you as a supervisor?

Page 189

1        A    I probably would have asked questions.
2  I mean, I would have asked -- I would ask
3  questions.  I don't -- like I said, I don't know
4  that I knew that.
5        Q    I'm not saying you did.  We're in --
6  we're understanding your practices at this time.
7        A    Right.  Well, it's hard for me to go
8  back -- we're going back and forth, hypothetical,
9  not a hypothetical and assuming.
10            So, and I'm not being frustrated.  I'm
11 just trying to answer your -- I really am trying
12 to answer your question.
13       Q    I know.
14       A    Hypothetically I would ask a question.
15       Q    What question would you have asked?
16       A    Do we know who this is?  Or how do we
17 get from A to B maybe?
18       Q    And if you found out they were the
19 same person, would you have told that detective to
20 do anything?
21       A    I would have told him to go out and
22 get her and talk to her.  And I think that's what
23 we did.
24       Q    I think we're --
25       A    Like if I, if I had -- if I have this

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule@kentuckiana.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 48 of 60

Page 190

1  and they say it's such-and-such, we want need to
2  talk to that person.  Go get that person so we can
3  talk to them and get a statement.
4      Q   All right.
5      A   That's what, that's what we did.  Or
6  it appears, it appears in this case that's what we
7  did.  We figured out that maybe there was
8  somebody, and we brought them forth and had them
9  give a statement, if that makes sense.
10     Q   Yeah.  And after that, right?  You've
11 got -- you've got the confidential informant
12 statement, and now your detective has also
13 interviewed the witness.  That's the point you're
14 at in the hypothetical.  Correct?
15     A   Do we have it?
16     Q   Yeah.
17     A   And then we have the statement.
18     Q   Yeah.
19     A   Uh-huh.
20     Q   Okay.  After that, would it have been
21 acceptable to you as a supervisor if that
22 detective said, well, I'm going to give these --
23 both these reports to the prosecutor, but I'm not
24 going to tell him that this confidential informant
25 was Wendy Lockett?

Page 191

1      A   I think that -- I think it's in the
2  case file.
3      Q   How --
4      A   I don't, I don't know how we're gonna
5  go through and go, hey, by the way, this is, this
6  is this and this is this.  It should have been in
7  the case file.
8      Q   What should have been in the case
9  file?
10     A   Whether -- hypothetically,
11 hypothetically you're asking if we have this and
12 we have this report, are they -- is there this
13 report in the middle hypothetically to bridge the
14 gap?
15     I don't, I don't know that it needed to be
16 in the case file or if it should have been in the
17 case file.
18     You're asking me practices.  I don't know
19 that that's happened.  I don't know that I've
20 used -- again, going back to this confidential
21 deal, I told you before, I don't know that I had
22 any.
23     Q   Let me -- let me take a step back now.
24     A   Okay.
25     Q   When your detective submitted a case

Page 192

1  to a prosecutor --
2      A   Uh-huh.
3      Q   -- did you expect them to disclose all
4  the statements they had gotten from witnesses?
5      A   Yes.
6      Q   And did you expect them, if, if there
7  is an eyewitness who made multiple statements,
8  would you expect the detective to let the
9  prosecutor know that all those statements came
10 from that same eyewitness?
11     A   Well, so we're hypothetical-ing again.
12 Right?
13     Q   Yeah.
14     A   So a statement, you've shown me a
15 statement in this case.  So that's a statement.
16     Q   Uh-huh.
17     A   Okay?  This is a report from a -- any
18 other case.
19     Q   I see.
20     A   This is a report.  If they got a
21 statement from someone, absolutely, I think they
22 should.  And I think if they documented something,
23 they should.
24     Q   And you're making a distinction,
25 right, that a statement is something that they

Page 193

1  sign and give as opposed to a report?
2      A   Absolutely.
3      Q   Okay.  So let me take a step back so
4  I'm defining my terms clearly now.
5      A   Okay.
6      Q   Because I can see how we got off
7  track.
8      A   Okay.
9      Q   So you've got in front of you two
10 documents.  Right?
11     A   Sorry.
12     Q   No.  This is your job to clarify, and
13 it's my job to keep going till we understand each
14 other.
15     A   Okay.
16     Q   First you've got the report from Huth,
17 right, the one we've just looked at on October 7.
18 Right?
19     A   Yes, sir.
20     Q   Huth writes down what Wendy Lockett
21 tells him during their conversation, correct?  Or
22 sorry.
23     You know, you can see I'm, I'm trying not
24 to get us tripped up on this stuff I'm not as
25 concerned about.  Right?

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 48..51

Case 3:20-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 48 of 60

Page 194

1    So assume Vern Huth is right and this is
2  Wendy Lockett, okay?  Let's keep that assumption
3  for these questions.  Can we do that?
4       A    As long as it's okay with everyone
5  here.
6       Q    All right.  So on one hand here you've
7  got a report where Vern Huth has written down what
8  he said Wendy Lockett told him, correct?  You
9  can -- can you accept that as what this report
10  contains for now?
11       A    This is a --
12       Q    Hypothetical.
13       A    Hypothetically this is a report from a
14  field officer on a Form 100, correct.
15       Q    Yeah.
16       A    This is, this is just, this is just an
17  informational, informational report, a Form 100
18  information.
19       Q    And some of the information here is
20  what Vern Huth says Wendy Lockett told him?  It's
21  what he says this witness told him.  He's told us
22  that's Wendy Lockett.  Fair enough?
23       A    Okay.
24       Q    And then separately in the other
25  exhibit, you've got the statement your detective

Page 195

1  took from Wendy Lockett seven days later.  Right?
2       A    Wendy Lockett came in, it appears.
3  They put a questioning advisory out on the 13th.
4  It appears she was there on the 14th.  And Avery
5  Williamson took a, a statement from her.
6       Q    Okay.
7       A    So yes, I agree with all that.
8       Q    And so with both of those in front of
9  you, do you see how if Rob Blehm is the case
10  agent, just submits these two reports to the
11  prosecutor without anything additional, there's no
12  way the prosecutor would associate Wendy Lockett
13  in Vern Huth's report with Wendy Lockett in Avery
14  Williamson's report?
15       A    Well, her name is not on -- Wendy
16  Lockett's name is not on this report.  It's on
17  this one, so ...
18       Q    Right.  So the prosecutors would think
19  there's only one time Wendy Lockett talked to the
20  officers or detectives unless someone told them
21  that Vern Huth's report was Wendy Lockett.
22  Correct?
23       A    So if the prosecutor, unless they told
24  them, unless they -- the detectives told the
25  prosecutor.

Page 196

1       Q    Yeah.  And so that's -- so let me ask
2  about that.
3       Would you have expected your detectives to
4  let the prosecutor know in some way that the
5  Wendy Lockett in Vern Huth's report -- strike
6  that.
7       Would you expect your detectives to let
8  the prosecutors know in some way that the
9  October 14 statement is not the first time Wendy
10  Lockett talked to police, but that Vern Huth
11  actually memorialized something prior with her?
12       A    So I would expect -- and we're using
13  this word -- many things in a case file, whether
14  it be this report and this report, that there's
15  going to be questions asked when the -- when the
16  case file is taken apart.  There may be many
17  questions asked of what is this, what is this, in
18  a multitude of things, because like we have
19  already discussed earlier in this, I think there
20  would be questions on, you asked me a question
21  about does the prosecutor come back and talk to a
22  case detective or otherwise.  Right?
23       So that may have been a question that was
24  asked of Blehm, or that may have been a question
25  that was asked of Avery Williamson.  Does this --

Page 197

1  does this match up, or does it not?  That could
2  have been asked of them.
3       Q    That wasn't my question.  My question
4  was whether you would have expected your
5  detectives to tell the prosecutors that it's not
6  just one police contact with Wendy Lockett; it's
7  two police contacts with Wendy Lockett.
8       Would you have expected your detectives to
9  of their own initiative make that fact known to
10  the prosecutors?
11       A    Uh-huh.  They could have.  They could
12  have.  Then again, I don't -- I wish I would have
13  read this whole case file so I would have known
14  what their possible thought process would have
15  been.
16       Because when you have a case file, they
17  may have -- they may have said this, this report
18  goes with this report.  There may have been other
19  reports in there that could have done that.  So
20  the expectation.
21       Q    Uh-huh.
22       A    You're asking me to get into eight
23  detectives' minds and say did you do -- did you,
24  did you go with this one report and match it with
25  this one report?  And I don't know that I have the

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule Depos@kentuckiana.com
www.kentuckianareporters.com

Case 2:20-cv-00078-RK   Document 159-19   Filed 09/09/24   Page 49 of 60

Page 198

1  expectation that they would do that through the
2  entire case file.
3      I think that's a working process between a
4  prosecutor and the case detective.
5      Q   So if the prosecutor never asked and
6  the detectives never told them and the information
7  that Wendy Lockett had a prior -- had prior talked
8  to officers and said what Huth says here never got
9  to the prosecutor, that could have been all right
10 in your estimation?
11     A   I didn't say that.
12     Q   Well, that's what I'm asking.
13     A   I didn't say that.  I said I don't --
14 I don't know the conversation that they had, and I
15 don't know -- if you're asking me if they should
16 have or they shouldn't have, again, I go back to
17 what I've been saying the entire day.
18     You know, that's a conversation that
19 either, A, did or did not happen between a
20 detective.  And if -- if there was other things
21 or there are in the case file, and the prosecutor
22 asked where the detective disclosed it, I have no
23 idea.  And it's not -- and you're asking me if I
24 expect them to.
25     Q   Yeah.

Page 199

1      A   They could.  They should.  They might.
2  I mean, I mean, we're, we're -- we're in a case
3  file however big it may be, and I think you're
4  picking out one, one certain thing on this one
5  deal right here.
6      So, you know, I'm trying to think through
7  of what that is, and with you and I, the words
8  mean, will mean quite a bit, because we didn't
9  figure out what a -- I can't figure out what a
10 statement is whenever you say expect.
11     Yeah, I mean, I expect that some sort of
12 conversation happened between them.
13     Q   What kind of conversation did you --
14 do you expect happened?
15     A   I assume much like any conversation
16 with the Jackson County prosecutor or Clay County
17 or Cass County or any prosecutor that's working
18 their case file.
19     Q   What information do you expect your
20 detectives would have given relative to what we've
21 just been talking about?
22     A   Any -- if the prosecutor's office
23 asked them any questions about their case file,
24 they should be answering them.
25     Q   And I want to be clear.  I'm not

Page 200

1  asking you to speculate about, you know, who did
2  what or who said what.  But you did say before you
3  expected your detectives to document any
4  exculpatory information.  Correct?
5      A   I would expect them to document
6  things.
7      Q   And looking at these two reports,
8  there are inconsistencies in them, right?  In
9  Huth's report, Lockett doesn't say anything about
10 an eyepatch or the identity of the shooter, but
11 she gives both of them in her statement.  Correct?
12     A   Well, you say inconsistencies, but,
13 but that may have been what she said on the --
14 this date at this time.  Well, it doesn't say the
15 location, but this was obviously taken out, out
16 somewhere, not at headquarters.  This is what I
17 would consider a formal statement at headquarters.
18     So again, you asked about an eyepatch.
19 There's nothing about an eyepatch there.  There
20 is in this statement.  But there are some
21 similarities in this statement about chasing and
22 shooting as compared to this one.  That is if
23 you're asking me what you just did about an
24 eyepatch, there's not an eyepatch in this one,
25 but there is in this one.  But there are

Page 201

1  similarities, too.
2      Q   Right.  There are both inconsistencies
3  and similarities between the two.  Correct?
4      A   Correct.
5      Q   And you understand that if a witness
6  has made prior inconsistent statements, even if
7  they've also made similar statements, that that
8  may be exculpatory for a Defendant.  Correct?
9      A   Prior --
10     Q   Inconsistent statements?
11     A   But I don't know what's -- I don't
12 understand what the inconsistent is right now that
13 you're getting at.
14     Q   You just said there are
15 inconsistencies, for example mentioning an
16 eyepatch and not, mentioning the identity and not?
17     A   She states what she stated to Huth,
18 and in this one she mentions what she stated in a
19 formal statement.
20     Q   Right.  She didn't say anything about
21 an eyepatch or the identity of the shooter in her
22 statement seven days before.  Right?
23     A   Correct.
24     Q   And that's the kind of thing that
25 you'd expect to be asked of a witness who came

Kentuckiana Reporters
30 South Wacker Drive, Suite 2275
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 5:20-cv-00278-RK   Document 157-19   Filed 09/09/24   Page 50 of 60

Page 202

1  forward?  Well, strike that.  Strike that totally.
2       Why would it be, if you're saying it would
3  be, and I'm not sure you are, why would it be
4  ever an acceptable -- why would it be acceptable
5  for an detective you supervised not to reveal to
6  the prosecutor that a witness they got a
7  statement from had an inconsistent statement --
8  had said inconsistent things to an officer seven
9  days before?
10      A    Why would that be okay?
11      Q    Yes, sir.
12      A    I didn't say it was.
13      Q    Would it?
14      A    I don't, I don't know a scenario where
15  it would be acceptable.
16      Q    That's information you would always
17  expect that -- well, strike that.  Strike that.
18  Let me ask you something else.
19      By the way, of course you don't
20  independently recall anything about the Huth
21  statement we went over.  Correct?
22      A    I don't know anything about what
23  you're talking about, but you --
24      Q    No.
25      A    You've given it to me.  I'm going off

Page 203

1  the information you've given me.
2       Q    Yeah.  And you don't have any memory
3  of any specific interactions with prosecutors in
4  this case.  Correct?
5       A    None.
6       Q    Okay, and one more question.
7       Talking about the manner you expected your
8  detectives to disclose information to
9  prosecutors, you expected they would make sure
10  any relevant information is documented in some
11  way in the file when they turn it over.  Correct?
12      A    Correct.
13      Q    All right.  Let me move on to another
14  exhibit.  That's not the right one.
15           (The reporter marked Exhibit No.
16           43.)
17      Q    (By Mr. Hilke) Exhibit 43.  This is a
18  document that was in the case file that we
19  inspected in this lawsuit for the White homicide
20  investigation.
21      Do you see in front of you a Form 327?
22      A    Yes.
23      Q    And it's only partially complete.
24  Right?
25      A    Yes.

Page 204

1       Q    And am I -- if this had been submitted
2  to the prosecutor, you would have expected to get
3  something back explaining whether the charges were
4  approved or not at some point.  Correct?
5       A    From looking at this, this isn't -- I
6  definitely know this isn't complete, like you
7  said.
8       Q    Uh-huh.
9       A    Because there's only two detectives'
10  names on it to begin with.
11      Q    Uh-huh.
12      A    And like the one you showed me
13  earlier, that was -- it would have been anybody
14  who had worked on it.  So I would believe -- the
15  question was, is if this had gone over, it would
16  have came back with writing on it?  Is that what
17  you're asking?
18      Q    Yes, sir.
19      A    Well, this sheet right here I don't
20  believe probably -- I don't know for sure, but it
21  doesn't have a prosecutor's number on it, so I
22  don't know that it did.
23      Q    Sure.  And all right.  So separate
24  from whether this did, if in this investigation
25  your detectives had submitted charges against Gary

Page 205

1  Kitchen in this case, you would expect them to
2  have received back a document from the
3  prosecutor's office at some point where the
4  prosecutors had filled out their part in whether
5  or not they were gonna file charges.  Correct?
6       A    I believe the only time that gets
7  filled out is if they are charged.
8       Q    What comes back if the person isn't
9  charged?
10      A    Uh, I don't know the form number.  I
11  call it a yellow sheet, but I don't know the form
12  number.
13      Q    So you'd expect the appropriate
14  document, even though you don't know the form
15  number, to come back if the suspect wasn't
16  charged.  Correct?
17      A    If it was submitted.
18      Q    If it was submitted, you'd expect to
19  get that form back.  Correct?
20      A    If it was submitted, I would, I would
21  believe we would receive something back.
22      Q    And would that typically then go in
23  the case file?
24      A    I think, I think so, yes.
25      Q    Is there anywhere else where you kept

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00078-RK   Document 193-19   Filed 09/09/24   Page 51 of 60

Page 206

1  that kind of thing?
2       A    I'm on -- the reason I tell you that
3  is I was just thinking is this -- would they have
4  been anywhere else?  But I think they would have
5  been in the case file.
6       Q    And you don't have any memory of
7  whether charges were submitted against any
8  suspects other than Keith Carnes in this
9  investigation, do you?
10      A    I don't know.
11      Q    By the way, you mentioned you had
12 familiarity with the area where Larry White's
13 murder happened near the restaurant that was on
14 the east side of it.  Is that correct?
15      A    I've worked the east side my entire
16 career.
17      Q    Yeah.  In 2003, were you aware that
18 Vern Huth had a good network of witnesses in that
19 area?
20      A    I think anybody that works the area
21 has a good network.
22      Q    Do you know anything specific about
23 Vern Huth's network?
24      A    Not specifically, but ...
25      Q    Was he -- anything general you

Page 207

1  recollect about Vern Huth or the witnesses he had
2  relationships with when was a patrol officer?
3       A    No.  I mean, he was a good, good
4  officer.  I think he was a good detective.
5       Q    When -- in the homicide unit, your
6  detectives could use questioning advisories to try
7  to get in touch with witnesses.  Correct?
8       A    Yes.
9       Q    And were, to your knowledge, were the
10 patrol officers allowed to arrest witnesses on
11 questioning advisories?
12      A    They're not arrested.  It's a
13 questioning advisory.  They can contact -- you can
14 go contact.  That's why we put them in there, is
15 if you come into contact with somebody, it's a
16 questioning advisory.
17      Q    Right.  So as far as you know,
18 officers were not allowed to threaten to arrest
19 witnesses if they wouldn't cooperate with the
20 questioning advisory.  Correct?
21      A    Say that again.
22      Q    Officers weren't allowed to threaten
23 I'm going to arrest you unless you come in for a
24 questioning advisory.  Correct?
25      A    Well, the only reason you would arrest

Page 208

1  someone is if they had a warrant or if they -- you
2  can't arrest for a questioning advisory.
3       Q    Say somebody with a questioning
4  advisory out for them did have a warrant.  Could
5  an officer then tell them I'm going to take you in
6  on this warrant unless you cooperate?
7       A    I wouldn't want them to do that.
8       Q    Do you know whether they were
9  prohibited from doing that?
10      A    Are they prohibited?
11      Q    Yes, sir.
12      A    Like I said, I wouldn't want them to
13 do that.
14      Q    But I understand what you'd want them
15 to do and what --
16      A    You're asking me what one of 1500
17 officers would do or Vern Huth would do?  I'm just
18 telling you I wouldn't do that.
19      Q    My question is actually neither.  It's
20 about the policies and the rules that the police
21 department had.
22           And I'm wondering if you know --
23      A    The questioning, you can't -- you
24 shouldn't threaten somebody's arrest because they
25 won't cooperate on a questioning advisory.

Page 209

1       Q    Sure, yeah.  And even if there's a
2  warrant out for them, you can't hold that over
3  their head when you're asking them to come in for
4  questioning.  Fair?
5       A    You can arrest them for their warrant,
6  and then if they have that and they're under
7  arrest, you could call me and say, hey, we have a
8  questioning advisory for Doug Niemeier and he's
9  under arrest.  I'd be like thank you.
10      Q    Sure.  But you can't say, well, I'm
11 going to arrest you for it unless you cooperate?
12      A    As I already stated.
13      Q    Thank you.  In 2003 when you were a
14 homicide supervisor, can you tell me who was above
15 you in the chain of command?
16      A    I laugh because I had so many, I don't
17 even know.  I had, I think I was there nine years
18 and had ten captains.
19      Q    Can you remember who was above the
20 captain level then?
21      A    I wouldn't have had a clue who my --
22 you mean major, deputy chief?  Who was even the
23 chief in 2003?  I don't even -- I have --
24           MS. PETERS:  Easley.
25      A    Rick Easley was my chief.  I'll

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 5:20-cv-00078-RK   Document 139-19   Filed 09/09/24   Page 52 of 60

Page 210

1  believe Diane.  I had nine or ten captains in the
2  amount of time that I was a sergeant there, so --
3       MS. PETERS:  I'm sorry.  It may
4  have been Corwin by that time.  I'm sorry.  I'm
5  making it worse.
6       A   So to answer your question, I had a
7  lot of them.
8       Q   (By Mr. Hilke) Okay.
9       A   And now that I am a commander, we move
10  around -- they move us around.
11       Q   Sitting here today, do you have any
12  belief as to whether Keith Carnes was guilty of
13  the murder of Larry White?
14       A   Do I believe he was guilty?
15       Q   Yes, sir.
16       A   Yes, I believe he was guilty.
17       Q   Why do you believe he was guilty?
18       A   He went in front of a jury and was
19  found guilty.
20       Q   You're aware that his conviction was
21  overturned in the habeas proceedings.  Correct?
22       A   I understand.
23       Q   Is there anything other than the
24  jury's finding of guilt that makes you believe
25  he's guilty today?

Page 211

1       A   I believe that -- I haven't looked at
2  it in 21 years now, but I believe he's guilty.  I
3  mean, I believe he's guilty.
4       Q   And are there any facts you
5  independently remember about the investigation
6  that support that belief for you?
7       A   No.  I believe he -- he had a trial,
8  and he was found guilty.  That's what -- I mean,
9  if I went back and read everything, it might give
10  you some more things of why, but I haven't ever
11  done that.
12       Q   Have you -- all right.
13       Any other reasons you can think of right
14  now?
15       A   No, sir.
16       Q   I'll show you Exhibit 24.  This is a
17  documentation of the interrogation of Keith Carnes
18  in this case.  I'd --
19       A   I can't see.
20       Q   I'm sorry.  Thank you.  This document
21  is the interrogation of Keith Carnes in this case.
22  I'd like -- I'd like to turn you to page three.
23  That's Avery Williamson's report.  Will you look
24  there now, please.
25       A   (Witness complies.)

Page 212

1       Q   And will you take a minute, please, to
2  review the report of this interrogation.
3       A   (Witness looking at exhibit.)
4       Q   The next page is just criminal
5  records.  I want to focus you on the interrogation
6  right now.
7       Have you had a chance to review the body
8  of the interrogation, Avery Williamson's report?
9       A   His report, yes.
10       Q   And you see from it that it looks like
11  they interrogated Keith Carnes for about an hour?
12       A   Yes.
13       Q   And, and do you see that Carnes did
14  not invoke during this interrogation?  He didn't
15  ask to leave or to get a lawyer at any time?
16       A   Okay.
17       Q   And do you notice that the detectives
18  never asked Keith Carnes where he was?  Strike
19  that.
20       They never asked him what other location
21  he was at during the night of the murder?
22       A   I don't know if they asked him or they
23  didn't ask him.  It's not in this two little
24  paragraph report that was completed.
25       Q   Well, you said before you expected

Page 213

1  them to write down all the details.  Right?
2       A   I agree.
3       Q   So --
4       A   I'm just saying that it's not in this
5  report that they did or they did not.
6       Q   Sure.  And let me rephrase.
7       You'll notice that according to -- the
8  report doesn't indicate that they ever asked
9  Mr. Carnes where else he was the night of the
10  shooting.  Right?
11       A   Correct.
12       Q   The report doesn't indicate that they
13  asked him who could confirm his alibi the night of
14  the shooting.  Correct?
15       A   Correct.
16       Q   The report doesn't indicate that he
17  was confronted with any of the eyewitnesses
18  against him.  Correct?
19       A   The report does not.
20       Q   The report doesn't indicate that they
21  ever challenged or tried to see how he'd react
22  when confronted with evidence against him.  Right?
23       A   Correct.
24       Q   And in homicide interrogation, if
25  you're interrogating a suspect, the best time to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 4:20-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 54 of 60

1  do that is in the first interrogation.  Correct?

2      A    In the first interrogation?

3      Q    Yes, sir.  And meaning down the road,
4  if Keith -- if your suspect gets a lawyer, your
5  opportunity is not likely to be as good to get
6  answers to your questions.  Correct?

7      A    Depends on the -- depends on the case.
8  Sometimes it does.  You're asking -- you just
9  asked me can I get answers when someone gets a
10  lawyer.  The answer is yes, I can.

11     But if you're asking -- I didn't, I didn't
12  understand the first interrogation.  Usually you
13  have one interrogation and then the attorney asks
14  for an interview.

15     Q    Right.

16     A    So you understand where I'm going?

17     Q    I do.

18     A    Okay.

19     Q    You said usually there's just one
20  interrogation of a suspect.  Correct?

21     A    There's an interrogation, yes.

22     Q    And so do you -- how -- is this, is
23  this a kind of thorough suspect interrogation you
24  expected from your detectives?

25     A    It's not the -- this would not be the

1  best report, but it's -- it's not, it's not the
2  biggest report I would have seen.

3      Q    Assume, assume that the only
4  information the detectives got is in this report.

5      If that's true, is this a thorough
6  interrogation of the suspect to a homicide?

7      A    I don't, I didn't watch -- I don't
8  remember watching the one hour and -- one hour and
9  five minute interrogation.

10     So as far as what was captured in this
11  report right here --

12     Q    Uh-huh.

13     A    -- you asked me questions, is it in
14  there?  The answer is no.  But I will say, yes, I
15  said to be thorough.

16     Was that all captured in maybe this
17  report?  Probably not.

18     Q    So you think that -- so your opinion
19  would be that it was probably -- strike that.

20     Are you saying that you think the
21  interrogation was probably more thorough than the
22  sum of what this report indicates?

23     A    Well, in comparison, 2023, '24, forget
24  the year, to 2003, we now, we now have everything
25  on video, right?  Everything is on video.  Would

1  have been the whole hour and five minutes, because
2  we have that ability.

3      So what happened in that hour and five
4  minutes, I don't know, because you're giving me
5  this report, and that's what I have to go off of.
6  So that's what I, that's what I have.

7      Q    Sure.  So sitting here, you don't have
8  any opinion on whether this interrogation would
9  have been more thorough than what the report lists
10  or not.  Correct?

11     A    Correct.  That would be something to
12  ask Williamson.

13     Q    Can you think of any good reason why
14  Blehm and Williamson shouldn't have asked
15  Mr. Carnes to give a more complete alibi in this
16  interrogation?

17     A    He may not have.  He may have sat
18  there quietly for an hour and five minutes.  I
19  don't know.  That question may have been asked and
20  he may have sat there quietly.  I don't know.

21     Q    I'm not asking if they asked it or
22  not.  I'm asking if --

23     A    Right.

24     Q    -- you can think of a good reason not
25  to ask a homicide suspect in a case like this to

1  give a detailed account of their alibi.

2      A    And what I'm asking you is, I don't
3  know that they didn't do that.  They could have
4  done that and he could have -- I've been in
5  interrogations where you sit there and the person
6  sits there quietly the entire time and doesn't --
7  they might, they might talk for five minutes and
8  you are talking -- you the detective are talking
9  for an hour, and they sit quiet the entire time.

10     I've had those kinds.  I've had kinds --
11  so to ask me if -- to ask me if they should have
12  or could have, they may have.  I don't know if
13  they did.

14     Q    So I know you don't know if they did.

15     A    Yeah.

16     Q    Do you agree that they should have?

17     A    Well, they could have.  They may have
18  never got to that point if he was sitting there
19  quietly.  It's not -- it's not a point to come
20  right out and if I'm discussing a conversation
21  with you --

22     Q    Uh-huh.

23     A    -- and you're not responding to that
24  conversation at all.

25     Q    Uh-huh.

Kentuckiana Reporters
39 South Wacker Drive, Suite 2727
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 218

1      A    I could have asked that question.  I
2  didn't get a response.  I could have asked you a
3  bunch of questions and got zero response from it.
4      I don't know if that's what happened in
5  this case.  I'm just saying from my personal
6  experience, I have had that happen.  And you're
7  asking me should they have asked that question.
8      They could have, but they didn't have to
9  if he wasn't responding to any of their prior
10 questions.  If he's not responding to any of
11 their prior questions, then they may not have
12 asked him that question.
13     Q    Sure.  So --
14     A    I mean, every situation is different
15 in a, in a -- in every kind of investigation,
16 especially homicide investigation.
17     Q    So one reason that it would have been
18 all right not to ask for a detailed alibi is if
19 the witness isn't giving you anything at all, so
20 it's not productive to pursue it.  Is there any
21 other good reason not to ask a homicide suspect to
22 provide a detailed alibi?
23     A    I'm sure there's, there's reasons not
24 to ask, but that's the one that came to my mind
25 immediately, is plenty of people go into an

Page 219

1  interrogation room and sit there.  They say
2  they're willing to talk to you, and they answer a
3  couple of questions, and they sit there quietly.
4  I mean, that happens a lot.
5      Q    And I know you've given me that one
6  example.  And I'm asking --
7      A    I'm trying to think of -- that's why
8  I'm trying to think of other examples.  I think I
9  gave an example earlier.  I don't know that it
10 applies in this case.  I don't know that it
11 applies in this case.  But it surely applies on
12 some of the cases I just worked this week.  Or I
13 didn't work them.  Let me back up.
14     I didn't work them.  They're in the
15 investigations bureau right now.  But someone is
16 on camera, someone's picture.  There's different
17 reasons.  So, and I know that's not the case in
18 this one, but there are reasons why you would not
19 or you wouldn't have to.
20     Q    And that's what I'm -- I'm trying to
21 flesh out.
22     So far I've heard you say, one, if the
23 suspect shuts down entirely; and two --
24     A    Uh-huh.
25     Q    -- if there is total proof that they

Page 220

1  are in a certain place.
2      A    Could be.
3      Q    And I'm trying to think if there are
4  any other exceptions that come to mind to the
5  general principle that you gave before, that
6  determining a suspect alibi and boxing them out of
7  that alibi is important in an investigation.
8      A    It is.  But sitting here as we speak
9  right now --
10     Q    Yeah.
11     A    -- I might -- it's kind of like when
12 you take a test.  I might get up and you walk out
13 of here and be like, oh, my gosh this is it.
14     Q    Yeah.
15     A    But as I sit here right now, I don't
16 know that I'm going to come up with five reasons
17 for you.
18     Q    Yeah.
19     A    I'm trying.  But there may not be one
20 either.
21     Q    Uh-huh.
22     A    It's one of those situations where
23 just from experience the big one is people will
24 answer -- people will agree to talk to you and
25 answer a few questions, and then they won't answer

Page 221

1  anything.
2      Q    And here where Mr. Carnes said he
3  wasn't in the area of the shooting, you'd expect
4  the detectives to at least try to follow up on
5  that response.  Correct?
6      A    I would, I would think that they would
7  have checked out what he had to say.
8      Q    And sitting here now, you don't know
9  whether, or if they didn't, why they didn't.
10 Right?
11     A    You would have to ask them.
12     Q    I'm going to show you next Exhibit 27.
13 I'll ask you to go to page three, which is a
14 statement of Gary Kitchen.
15     A    Page three?
16     Q    It's what I have open for you.
17     Now, Gary Kitchen was another suspect in
18 the shooting.  Will you please -- yeah, sorry,
19 will you please read the statement now.
20     A    (Witness looking at exhibit.)
21     Q    Are you done with that one page right
22 now?
23     A    I'm sorry?
24     Q    Are you done with that one page?
25     A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana.com
www.kentuckiana.com

Case 1:20-cv-03678-RK   Document 189-19   Filed 09/09/24   Page 55 of 60

Page 222

1    Q    I've got like two questions for you on
2 this, I think.
3         And knowing you have no independent
4 recollection of what did happen, would you have
5 expected your detective to ask questions like --
6 about the alibi, like how long were you at
7 that -- at your house that night?  Just stay with
8 me for a minute and I'll rephrase a little.
9    A    Please.
10   Q    So from this report, you see that Gary
11 Kitchen claims an alibi the night of the shooting.
12 He says I was at my house.  Correct?
13   A    It says, it says he's at a location.
14 I don't know if that's his house.  But that may
15 have been exactly what it said.
16   Q    Good.  I'll specify.  He says, I'm
17 sorry, you're right.  He says -- he says he left
18 the area of the shooting before the shooting
19 happened.  Right?
20   A    Correct.
21   Q    So to thoroughly establish his alibi,
22 you would expect your detectives to ask where he
23 went before the shooting, right?  I'm not --
24   A    I just wanted to make sure the
25 addresses, because I got confused when you were

Page 223

1 like -- I finally got something that I was correct
2 on.
3         So it says where he was and that he had
4 left prior to.  So your question was --
5    Q    Let me ask it again so you've got it.
6    A    Okay.
7    Q    I want to be clear.  This is not a
8 question about what he did or did not do.
9         Does that make sense?
10   A    Okay.
11   Q    This is only a question about what you
12 expected as a homicide supervisor.
13        Does that make sense?
14   A    Okay.  Yes.
15   Q    If a suspect to a shooting says I went
16 somewhere else before the shooting happened, like
17 Gary Kitchen does in this statement, would you
18 expect the detective to establish where that
19 suspect went?
20   A    So you had me stop at this page.  I
21 was going to read the statement.
22        Did we ask that question?  I don't know.
23   Q    But that's the thing.  I'm not asking
24 you if he asked it.  I'm not interested at all in
25 whether he asked it.  I just want to know your

Page 224

1 expectations as a homicide supervisor.
2         Is that a question you would expect your
3 detective to ask?
4    A    That's a question they could ask.
5    Q    Would you expect it?
6    A    There's a lot of things that we could
7 expect, but I hope they asked the question where
8 did, where did you go when you left there?
9    Q    That's part of getting a detailed
10 enough alibi that you can use it later to support
11 your investigation.  Right?
12   A    Correct.
13   Q    And would you also expect the
14 detective to ask how long did you stay, like how
15 long were you at that next location?  What times
16 were you there?
17   A    They could.
18   Q    And that would also be a good part of
19 establishing a specific alibi that you could
20 challenge or confront later.  Correct?
21   A    Could.
22   Q    And you would also want to ask who was
23 with you, who can corroborate your alibi.
24 Correct?
25   A    If we're asking in a general alibi

Page 225

1 situation, which we've already done, I think I
2 said yes.
3    Q    Okay.  And --
4    A    So can I read this guy's statement or
5 no?
6    Q    No.  I don't want to get into details
7 about the statement, about this specific
8 statement.  I think all I want to establish --
9 actually let me ask you this first.
10        Do you agree that in general, there is no,
11 no reason to -- not to try to pin down those
12 details with a suspect in a homicide?
13   A    If they're willing to talk to you.
14   Q    Okay.
15   A    If they're willing to provide that.
16   Q    Now, okay.  Now I'm going to invite to
17 you read the rest of it, and then I'll ask you
18 this question when you're done.
19        My question is, after your review, do you
20 see anything that makes you think it wouldn't
21 have been a good idea to ask more details about
22 the alibi?  Does that make sense?
23   A    If there wouldn't have been?
24   Q    Yeah.  Because you said, oh, sometimes
25 there's no reason to ask about the alibi, or it's

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:V:00228-RK   Document 189-19   Filed 09/09/24   Page 56 of 60   PageID #:60

Page 226

1  not going to be fruitful or such-and-such.  And
2  what I want you to tell me after you read it is
3  whether anything makes you think that the
4  detectives should not have asked more about the
5  alibi.  Does that make sense?
6       I just want to make sure you understand
7  what I'm asking you to look for.  And if you
8  don't, I want to clarify before you do, because I
9  know it's getting late, and I want to keep us
10  moving.
11       A    I'm still moving.  But you're asking
12  me a question of the -- after, after I read this,
13  is there a reason not to ask about an alibi?
14       Q    Perfect.  Go ahead.
15       A    (Witness looking at exhibit.)  Okay.
16       Q    So my question again is, having read
17  the statement that was given plus the report of
18  the interrogation, do you have any reason to think
19  that the detectives should not have asked
20  Mr. Kitchen to confirm the details of his alibi?
21       A    They could have in this statement.
22  There's no -- if you're asking me if there's any
23  reason?
24       Q    Yeah.
25       A    Not that I am aware of.

Page 227

1       Q    Okay.  And do you recall that -- I'll
2  represent, and you didn't see Mr. Kitchen name any
3  of the people who were at the house with him in
4  his statement or the report of the interrogation,
5  did you?
6       A    No.
7       Q    I'll how you Exhibit 28.  You can, you
8  can keep that or just stack it there.  This is an
9  interrogation of another suspect.
10       If you go to the fourth page, then final
11  page, you'll see it was conducted on December 4,
12  2003.  This is an interrogation on December 4,
13  2003.  And the last page is a report of the
14  interrogation.  I'll ask you to turn there.
15       A    (Witness complies.)
16       Q    You can ignore the highlighting.
17  That's my fault.  Please go ahead and read the
18  statement like you're doing now.
19       A    (Witness looking at exhibit.)  Okay.
20       Q    Okay.  So do you see in this report
21  that Reginald Thomas is questioned about his
22  whereabouts on the night of Larry White's murder?
23       A    Yes.
24       Q    And he states that he was actually at
25  Gary Kitchen's home along with some others.

Page 228

1  Correct?
2       A    Correct.
3       Q    And what kinds of questions or
4  followup would have been appropriate here to
5  either confirm or deny the alibi that Reginald
6  Thomas was claiming?
7       A    I don't know if followup was done,
8  but, but what I did read was the listed subject
9  stated he did not witness any -- or let's see.
10  Hold on.  That's not it.  I can't find it.
11       Q    Top of paragraph three, did not
12  witness anything?
13       A    No.  The listed subject stated he was
14  given an opportunity to read the discovery to the
15  above captioned case by an attorney hired by Keith
16  Carnes.  The listed subject stated he was never
17  inside of 2404 East 29th.
18       And you asked what questions.  If he was
19  allowed to look at the discovery paperwork that
20  was already presented, it would be a little
21  difficult -- you're asking what you would.  It
22  would be a little difficult to follow up
23  questions with him after he's already obviously
24  read discovery from an attorney.
25       Q    Why would that make it difficult to

Page 229

1  ask him more questions?
2       A    I mean, you can ask him questions, but
3  it's the same.  You brought it up earlier of, what
4  questions do you ask?  When do you ask them?  You
5  have to, you have to have an interaction with
6  somebody.
7       Q    Uh-huh.
8       A    So some of the things you know the
9  answers to; some of the things you don't know the
10  answers to when you're asking someone questions in
11  an investigation.  And if he's read the entire
12  discovery, which that's what this report states he
13  said, I don't know that I said -- I don't know
14  what I just said, but it's a little tough to ask
15  questions if he's already read the entire case
16  file.
17       Q    So it seems kind of pointless to
18  question him at all after you learned that?
19       A    No.  I didn't say that, because you
20  don't know.  You can question him.
21       Q    Uh-huh.
22       A    But, I mean, that's a concerning line
23  to me.  I don't, I don't remember that.  I don't
24  remember reading that or remember that line.
25       Q    Yeah.

Kentuckiana Reporters
39 South Wacker Drive, Suite 7780
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana.com
www.kentuckiana.com

Page 230

1    A    But that would be concerning to me,
2  that he was allowed to read discovery by an
3  attorney that was hired by Keith Carnes and then,
4  then how do we, how do we then get to December the
5  4th?  That is a question I would have.
6    Q    Uh-huh.  So I think you actually
7  started along a different question.  I want to
8  focus on this question about --
9    A    Okay.
10   Q    -- alibi.  Actually just, just to call
11 your attention, did you notice on the first page
12 that there was a pickup order for Reginald Thomas
13 for homicide that's -- that initiated this
14 interrogation?
15   A    So that was on 10/16.
16   Q    Right.  And do you -- now, when
17 there's a pickup order for homicide, that means
18 one of your detectives believes there is probable
19 cause to arrest someone for committing a homicide.
20 Correct?
21   A    Could, yes.
22   Q    Can it mean anything else if you have
23 a pickup to arrest someone and it says pickup for
24 homicide?
25   A    Yeah.  They can be arrested for 24

Page 231

1  hours.
2    Q    No.  My question is --
3    A    I'm sorry.
4    Q    I'm just asking, the fact that in
5  order to put out a pickup order for a crime, your
6  detective must have probable cause to believe that
7  someone committed that crime.  Correct?
8    A    Should have probable cause to believe
9  that they've committed the crime, yes.
10   Q    So the point this interrogation
11 happens, a detective has already decided there's
12 probable cause that Reginald Thomas was involved
13 in this homicide.  Correct?
14   A    There was probable cause to issue a
15 pickup, or there was enough in the entire case
16 file to believe or he was named or something.  I
17 don't know because I haven't read it all.  There
18 was something that gave the detective that, yes.
19   Q    And the probable cause to issue a
20 pickup is the same as a probable cause to arrest
21 for the crime.  Correct?
22   A    Probable cause to arrest, yes.
23   Q    And so as someone arrested in
24 connection with a homicide as a suspect in the
25 homicide, all the things you said before about

Page 232

1  general principles of establishing alibi would
2  apply.  Correct?
3    A    I believe so.
4    Q    And now are there any actions you
5  would have expected your detective -- strike that.
6        Do you recall that when we looked at Gary
7  Kitchen's, the report of his interrogation and
8  his statement, he didn't say anything about
9  Reginald Thomas being with him at his house?
10   A    In that report that I read, that's
11 correct.
12   Q    Now, would you expect the detectives
13 to follow up with Gary Kitchen and ask him whether
14 Reginald Thomas was actually at his house that
15 night?
16   A    Did they?
17   Q    Sir, I'm just asking what you'd expect
18 as a homicide supervisor.
19   A    I don't know if they did.  I don't
20 know if they did.  They could have.
21   Q    Can you answer that question, whether
22 you'd expect them to follow up about the alibi
23 with Gary Kitchen in this instance?
24   A    I don't know that we had the
25 information at the time.  I guess you're asking

Page 233

1  after December the 4th, if I'm -- if your
2  question, the way I'm hearing it, after December
3  the 4th, you're asking if we followed back up with
4  Gary Kitchen?
5    Q    I'm asking about your expectations.  I
6  know you don't remember the investigation.
7    A    Right.
8    Q    But based on the reports you've just
9  read, right, on October 14, Gary says, I couldn't
10 have done it.  I was somewhere else.  It doesn't
11 mention anyone else.
12       A month and-a-half later Reginald Thomas
13 says I couldn't have done it I was at Gary --
14 with Gary at his house.  Now, Gary's never said
15 if Reginald Thomas was there or not.
16       Is that a detail you would have expected
17 your detectives to corroborate based on this
18 information?
19   A    They could have, yes.
20   Q    And that would be good, good detective
21 work.  Right?
22   A    It would be followup work.
23   Q    Yeah.  And it doesn't make sense to
24 just let Reginald Thomas off the hook here on his
25 sole say-so that he was somewhere else, does it?

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00078-RK   Document 189-19   Filed 09/09/24   Page 58 of 60

Page 234

1      A    I don't know that that's, that's how
2  it occurred.
3      Q    Right.  And --
4      A    I don't know that, I don't know that
5  he was -- you're saying that he was let go because
6  of his statement.  He could have been let go
7  because of something else that's in this case
8  file.  I don't know.
9      Q    For as long as the detectives are
10  still seeking a second shooter, Reginald Thomas
11  should not be excluded as a suspect until someone
12  or something else can corroborate his statement
13  that he wasn't there.  Correct?
14      A    I didn't say that he wasn't.  You're
15  asking me.  I'm just telling you that without
16  having read this entire case file --
17      Q    Yeah.
18      A    -- I don't know if there's more
19  information or not that corroborated why he would
20  have been.  I don't know.
21      Q    Right.  And --
22      A    You're asking me on this one specific
23  thing.  I don't know if it's -- I doubt he's
24  released because he says, oh, I didn't do it.
25      Q    Sure.  You would expect --

Page 235

1      A    You've shown me multiple suspects,
2  which that happens in homicides where you have
3  multiple possible suspects.
4      Q    Yeah.
5      A    You just stated we let him go because
6  he said he wasn't there.  That's not -- you're
7  asking my expectations.
8      My belief would be that there is more to
9  this that would either exonerate him or he's
10  still in the suspect pool.  I don't know because
11  I haven't read through that.
12      Q    All right.  I understand.
13      A    So if that answers your question, my
14  expectation is there's, there's obviously more to
15  this than just this one line of I was with him.
16      But like I said, the other thing that is
17  disturbing is he's reading discovery from an
18  attorney.
19      Q    Right.  Right.  And I think I've got
20  your answer, but you'd expect the detectives to
21  have something more than just Reginald Thomas'
22  say-so?
23      A    Said I didn't do it.
24      Q    Yeah.  You'd expect something more
25  before you let him -- before you stop

Page 236

1  investigating him.  Right?
2      A    Yes.
3      Q    Is that a yes?
4      A    Yes.
5      Q    And you mentioned that -- and I think
6  you answered.
7      One good followup step would have been to
8  go back to Gary, and by the way, was he really
9  with you then?  Right?
10      A    They could have.
11      Q    And another good step would be
12  Reginald Thomas lists some more alibi individuals,
13  and to talk to them and see if they give the
14  consistent account.  Right?
15      A    Say that again, please.
16      Q    Yeah.  Like if a suspect gives as an
17  alibi I was with Bob, a good step is to talk to
18  Bob and see if their stories match up.  Right?
19      A    Can, yes.
20      Q    And as you said, these investigations
21  are complex, so there are lots of steps and lots
22  of information that could have been developed to
23  exonerate Reginald Thomas.  Correct?
24      A    Could have been other affirmation.  I
25  don't know.

Page 237

1      Q    All right.  Okay.  And there was --
2  some of the witnesses in this case said that there
3  were two shooters or two people involved in
4  shooting at and chasing the victim.
5      In 2003 there was no rule in your homicide
6  unit that if you caught one suspect in a
7  two-shooter homicide, you had to stop
8  investigating the second suspect.  Correct?
9      A    No.
10      Q    You always wanted to catch as many
11  responsible parties as possible.  Correct?
12      A    If there were two people, if there
13  were two suspects, we should be looking for two
14  suspects.
15      Q    All right.  In everything we've looked
16  at today, has it prompted any additional
17  independent recollection?
18      A    No.
19      Q    Are there any topics I've asked you
20  about where you need to clarify or have further
21  information to add that you thought of since we
22  started?
23      A    No.
24      Q    In that case, sir, I think I'm done
25  for today.  If your counsel has questions for you,

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule Depos@kentuckiana.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 5:20-cv-00078-RK   Document 180-19   Filed 09/09/24   Page 59 of 60

1  I may have some to follow, but if not.
2      I'll thank you for your time at the end.
3          MR. HANER:  I'll have a few
4  questions briefly.
5          MS. PETERS:  I don't have any
6  questions.
7          THE WITNESS:  Thank you.
8          EXAMINATION
9  QUESTIONS BY MR. HANER:
10     Q   Briefly, lead detective Blehm was
11 previously deposed, and he testified that he
12 didn't independently -- lead detective Robert
13 Blehm was previously deposed, and he testified
14 that he didn't independently recollect Amy
15 McGowan's involvement in the White homicide
16 investigation.
17     I think you testified today.  I just want
18 to be clear for the record.  Do you independently
19 recollect Amy McGowan's involvement in the White
20 homicide investigation?
21     A   I don't know what part she played in
22 the investigation.  I have no idea.
23     Q   Okay.  And then so it would be your
24 testimony that Amy McGowan was never directing or
25 leading the investigation?

1          MR. HILKE:  Object to form.  Go
2  ahead.
3      A   So I -- will you repeat it then?
4      Q   (By Mr. Hilke) Yeah.  Is it fair to
5  say that Amy McGowan, do you ever -- do you ever
6  independently recollect Amy McGowan controlling
7  the investigation into the homicide?
8      A   Like controlling when we were doing
9  it?  No, no.  Not when we were controlling -- like
10 when we were working it?  No.  I don't remember
11 that.
12     Q   Okay.  And then I have no further
13 questions.  Thank you.
14         MR. HILKE:  We're done.
15         THE REPORTER:  Read and sign?
16         MS. PETERS:  Yes.
17         THE VIDEOGRAPHER:  All right.
18 This concludes deposition of Doug Niemeier, and
19 the time now is 4:03 p.m.
20         (The deposition ended and the
21     witness was excused at 4:03 p.m.)
22
23
24
25

1          CERTIFICATE OF REPORTER
2      I, Saundra Tippins, Certified Court Reporter
3  (Missouri) and Certified Shorthand Reporter
4  (Kansas), do hereby certify that the witness whose
5  testimony appears in the foregoing deposition was
6  duly sworn by me pursuant to Section 492.010 RSMo;
7  that the testimony of said witness was taken by me
8  to the best of my ability and thereafter reduced to
9  typewriting under my direction; that I am neither
10 counsel for, related to, nor employed by any of the
11 parties to the action in which this deposition was
12 taken, and further that I am not a relative or
13 employee of any attorney or counsel employed by the
14 parties thereto, nor financially or otherwise
15 interested in the outcome of the action.
16
17
18
19
20
21     Certified Court Reporter
       State of Missouri No. 254
22
       Certified Shorthand Reporter
23     State of Kansas No. 1613
24
25

Kentuckiana Reporters
39 South Wacker Drive #2377
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS