IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MISSOURI

WESTERN DIVISION

KEITH CARNES,

        Plaintiff,

vs.        Case No. 4:23-cv-00278-RK

ROBERT BLEHM, et al.,

        Defendants.

VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF
THE KANSAS CITY MISSOURI BOARD OF POLICE
COMMISSIONERS, a Defendant, through its designated
representative, ERIC S. DILLENKOFFER, a witness,
taken on behalf of the Plaintiff, pursuant to
Notice, on May 13, 2024, before

SUSAN J. MUCKENTHALER

Certified Verbatim Reporter, Certified in Missouri
and Kansas.

---

**Page 2**

APPEARANCES

For Plaintiff:
  MR. WALLACE G. HILKE
  LOEVY & LOEVY
  311 North Aberdeen Street, 3rd Floor
  Chicago, Illinois 60607
  hilke@loevy.com
  (312) 243-5900

For Defendant Amy McGowan:
  MR. JOSHUA N. HANER
  ASSISTANT COUNTY COUNSELOR
  415 East 12th Street, Suite 200
  Kansas City, Missouri 64106
  jhaner@jacksongov.org
  (816) 881-3975

For all other Defendants:
  MS. DIANE F. PETERS
  WYRSCH HOBBS & MIRAKIAN, PC
  1200 Main Street, Suite 2110
  Kansas City, Missouri 64105
  dpeters@whmlaw.net
  (816) 221-0080

STIPULATIONS

    It was stipulated and agreed by and between
counsel that the deposition officer can administer a
binding oath to the witness by videoconference.

---

**Page 3**

TABLE OF CONTENTS

EXAMINATION

Questions By Mr. Hilke    6

Questions By Ms. Peters    141

Questions By Mr. Hilke    158

EXHIBITS

1 - "Notice of Rule 30(b)(6) Deposition of    8
    Kansas City, Missouri Board of Police
    Commissioners"

2 - "Wanted/Cancellation Notice," 10/13/2003    28

3 - "Kansas City Missouri Police Department    45
    Investigative Report" for Love, 12/9/2002

4 - "Kansas City Missouri Police Department    67
    Statement," Wendy Lockett

5 - "Kansas City Missouri Police Department    85
    Statement," Felicia Jones

6 - 8/29/2000 memorandum re: "Lineup    91
    Procedure"

7 - "Miranda Waiver" for Kitchen, 10/14/2003    94

8 - "Judgment," 7/19/2004    116

9 - "Procedural Instruction: Recovered    123
    Property Procedure," 4/8/2004

---

**Page 4**

TABLE OF CONTENTS (Continued)

10 - "Procedural Instruction: Detaining and    125
    Questioning Persons; Arrest; Search and
    Seizure," 9/1/2004

11 - "Kansas City Missouri Police Department    137
    Report Form," 10/7/2003

CERTIFICATE OF REPORTER    161

ERRATA SHEET    162

SIGNATURE PAGE    163

Reporter's Note: Electronic exhibits provided by
counsel were made OCR searchable (PDF), downsampled
to 600 dpi, digitally labeled if not previously
labeled, flattened, archived as original exhibits,
and provided electronically to all ordering counsel.
Processing electronic exhibits can change the file
size, resolution, and metadata of files originally
provided.

(ph) indicates a phonetic spelling.

[sic] indicates the text is as stated.

Quoted text is as stated by the speaker.

# Exhibit S (2024 Deposition of Eric Dillenkoffer)

8700 Monrovia, Suite 310      (913) 825-2510
Lenexa, Kansas 66215-3500      Fax (913) 825-2530
www.cornerstonekc.net      Cornerstone      office@cornerstonekc.net
Court Reporting Company LLC

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 1 of 41

Page 5

1    THE REPORTER:  Good morning.  My name is
2 Susan Muckenthaler.  I am a Missouri-certified court
3 reporter.  We are now on the record.  Today's date
4 is May 13th, 2024, and the time is approximately
5 9:43 a.m.
6    This is the Zoom-recorded deposition of
7 Eric Dillenkoffer in the matter of Keith Carnes
8 versus Robert Blehm, et al., Case No.
9 4:23-cv-00278-RK.  The video recording is not being
10 externally monitored or recorded by a videographer.
11    Would counsel please identify yourselves
12 and whom you represent and agree on the record that
13 there is no objection to this deposition officer
14 administering a binding oath to the witness by
15 videoconference.
16    MR. HILKE:  Wally Hilke for plaintiff
17 Keith Carnes.  No objection.
18    MS. PETERS:  Diane Peters for all
19 defendants except Amy McGowan.  And no objections.
20    (Witness sworn.)
21    MR. HILKE:  And just for the record before
22 we start, Ms. Peters has just informed me that Josh
23 Haner, counsel for Amy McGowan, is in court and will
24 join us later but has given us permission to
25 proceed.  And so we'll -- we'll go ahead and proceed

Page 6

1 now.
2    EXAMINATION
3 BY MR. HILKE:
4    Q.  Sir, could you please start it by stating
5 and spelling your name for me.
6    A.  Sure.  Eric Dillenkoffer.  It's E-r-i-c.
7 Last name is D-i-l-l-e-n-k-o-f-f-e-r.
8    Q.  Thank you, sir.
9    And, Mr. Dillenkoffer, have you had your
10 deposition taken before?
11    A.  Yes.
12    Q.  And what was the most recent time?
13    A.  Back -- probably 2020.
14    Q.  Okay.  So it's been a few years.  I'm
15 going to start by going over a few rules.  You may
16 be familiar with them, but they will just keep us
17 moving smoothly today.  We are, you know, being
18 recorded, and our reporter is taking down everything
19 for the record.  So it's important we speak one at a
20 time so she can make a clean record today.
21    Does that make sense?
22    A.  Yes.
23    Q.  You know, the connection is not always the
24 best, and my questions, likewise, are not always the
25 best.  And so if you don't understand me today --

Page 7

1 either because of the connection or because my
2 question didn't make sense to you -- will you please
3 ask me to repeat or rephrase my question?
4    A.  Yes, I will.
5    Q.  And, likewise, if you answer my question,
6 I'll assume you have understood it.  Is that fair
7 enough?
8    A.  Yes.
9    Q.  Is there any reason you couldn't give
10 honest and accurate testimony today?
11    A.  No, there is not.
12    Q.  And I'll just ask you -- and you're
13 familiar with this as well -- to give verbal answers
14 like "Yes" or "No" so that the reporter can take
15 down a clean record of what was said and what
16 answers were given.  Is that fair enough?
17    A.  Understood.  Yes.
18    Q.  And, sir, you understand you're here today
19 to give testimony as a -- on behalf of the Kansas
20 City Missouri Board of Police Commissioners; is that
21 correct?
22    A.  Yes.
23    Q.  And have you had the opportunity to review
24 a copy of the notice of topics?  Meaning the topics
25 on which you will give testimony today.

Page 8

1    A.  Yes, I have.
2    Q.  So we'll mark Exhibit 1.  Do you see in
3 front of you a document titled "Notice of
4 Rule 30(b)(6) Deposition of Kansas City Missouri
5 Board of Police Commissioners"?
6    A.  I do.
7    Q.  Scrolling down to the fourth page, there
8 is a list of topics.  Topic No. 3 specifies that
9 we're seeking testimony on "the Kansas City Police
10 Department's written and unwritten policies, general
11 orders, practices, customs, rules, and techniques
12 relating to the following topics, as they existed
13 between January 2003 and December 2003 [sic]."
14    And then Subtopic A describes "the
15 documentation and preservation of information
16 learned during a criminal investigation" and gives
17 more details on what that topic entails.
18    Do you see that in front of you?
19    A.  I do.
20    Q.  And is Topic 3A a topic that you're
21 prepared to give testimony on today?
22    A.  I'm sorry?
23    Q.  Is Topic 3A one of the topics that you're
24 prepared to give testimony on today?
25    A.  Yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstoneekc.net
Cornerstone
Court Reporting Company Llc
(913) 825-2510
Fax (913) 825-2530
office@cornerstoneekc.net

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 2 of 41

1    Q.  And then, scrolling down, there's also
2  Topics B, C, and D regarding production and
3  disclosure of exculpatory evidence, interrogations
4  and interviews of witnesses and suspects, and
5  identification procedures, respectively.
6        Do you see those topics in front of you?
7    A.  Yes, I do.
8    Q.  Are you prepared to testify on those
9  topics today?
10   A.  Yes.
11   Q.  And then I -- Topic E is "discipline of
12  police officers."  That's not one of the topics
13  you're testifying on today; correct?
14   A.  That is correct.
15   Q.  Topics F through H address how to conduct
16  an -- homicide investigation, the use of witnesses
17  in criminal investigations of incentivized accusers;
18  and questioning advisories, pickup orders, and other
19  methods of designating witnesses to be stopped in
20  questions [sic].
21       Do you see those topics in front of you?
22   A.  I do.
23   Q.  Are those topics you're prepared to
24  testify on?
25   A.  Yes.

1    Q.  And then am I correct you're also prepared
2  to testify on Subtopic J regarding training for
3  officers and detectives on the topics you've just
4  identified above that you will be testifying on?
5    A.  Yes.
6    Q.  Okay.  And those are all the topics that
7  you're testifying on today; correct?
8    A.  I believe so, yes.
9    Q.  Okay.  Thank you.
10       So have you reviewed any documents to
11  prepare for your deposition today?
12   A.  I have.
13   Q.  What documents have you reviewed?
14   A.  The criminal case itself, and then some of
15  the policies and procedures pertinent to the time
16  frame that we discussed here.
17   Q.  And as to the criminal case, what
18  documents specifically about the criminal case have
19  you reviewed?
20   A.  I would believe generally what we would
21  call the "case file" and also some of the trial
22  transcripts from it.
23   Q.  Okay.  And so when you say the "case
24  file," does that include police reports about the
25  investigation into the murder of Larry White in

1  2003?
2    A.  Yes.  I would say generally that just when
3  I refer to "case file," that would be what I was
4  provided by Ms. Peters in regard -- that would --
5  that I would consider the case file.
6    Q.  Sure.
7        Did it also include any documents about
8  sort of collecting and inventorying any physical
9  evidence in that homicide investigation?
10   A.  Yes.  As far as crime scene reports and
11  things like that.  Not policies in regard to how
12  it's done or anything like that.  But -- but, yes,
13  it would have the reports in there in regard to
14  that.
15   Q.  Okay.  And then you mentioned reviewing
16  some specific -- some policies pertinent to this
17  time period; is that correct?
18   A.  Yes.
19   Q.  And do you recall what -- what --
20  specifically what policies you looked at to prepare
21  for this deposition?
22   A.  I couldn't tell you offhand all the
23  specific ones.  I know there were ones in there
24  from -- about Miranda warning and Miranda waivers,
25  stuff like that.

1    Q.  Yeah.
2        MR. HILKE:  Diane, instead of me trying to
3  go over them one at a time, would these be the same
4  policies that you disclosed, like, back in October
5  and that you emailed to me?
6        MS. PETERS:  Correct.  All the ones that I
7  emailed to you this morning right before this
8  deposition are the -- all the policies that he
9  reviewed for the deposition.
10       MR. HILKE:  Thank you for that.
11   Q.  (By Mr. Hilke)  So other than the policies
12  Diane just described and the case file she provided
13  to you, are there any other documents you reviewed
14  to prepare for the deposition?
15   A.  No.
16   Q.  Okay.  And other than -- other than
17  Ms. Peters -- and I -- I don't want to know the
18  details of what you said to her or what she said to
19  you -- did you talk to anyone else to prepare for
20  this deposition?
21   A.  Not to prepare, no.
22   Q.  Okay.  Did you -- did you talk to anyone
23  else about the investigation into the murder of
24  Larry White?
25   A.  Not any specifics about it, but just

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net
Cornerstone
Court Reporting Company llc
(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net
Case 4:23-cv-00278-RK  Document 139-20  Filed 09/09/24  Page 3 of 41

Page 13

1  generally that I was going to be providing a
2  deposition in regard to -- in a homicide case that
3  Kansas City worked back in the early 2000s.
4      Q.  Okay.  And in those conversations, did you
5  receive any information about the policies and
6  practices of that time?
7      A.  No.
8      Q.  And you've had a chance to study the
9  30(b)(6) notice I showed you a second ago and the
10 topics that you're going to be testifying on?
11     A.  Yes, I have.
12     Q.  Okay.  As you reviewed those topics, did
13 you recall any additional policies beyond the ones
14 that Ms. Peters has given you that pertained to
15 those subject matters?
16     A.  No.  Not offhand, no.
17     Q.  Okay.  So is it fair to say that in
18 testifying on the policies of the police department,
19 you're going to be relying specifically on the
20 policies that Ms. Peters has given you?
21     A.  And just general knowledge from my
22 experience working on the police department.
23     Q.  Okay.  Well, that's what I meant to ask
24 you about -- is, you know, for example -- you know,
25 take the first topic about documenting and

Page 14

1  preserving information learned during a criminal
2  investigation.  As you prepared for this deposition,
3  did you recall any policies on that topic beyond the
4  ones you've been provided?
5      A.  No.
6      Q.  Okay.  What about producing and disclosing
7  exculpatory evidence?  Did you recall any policies
8  on that topic beyond the ones you've been provided?
9      A.  No.
10     Q.  And what about interrogating or
11 interviewing witnesses?  Did you recall any policies
12 aside from the ones you've been provided?
13     A.  No.
14     Q.  On -- on any of the topics, did you recall
15 any policies other than the ones you've been
16 provided?
17     A.  No.
18     Q.  So when you -- you described, you know, in
19 general your knowledge of the policies of Kansas
20 City, is there something specific you have in mind
21 that pertains to the -- the policies we're going to
22 be talking about today?
23     A.  No.  I mean, not unless it's just
24 pertinent to the question that you ask.  But nothing
25 is popping up in my head in regard to anything else.

Page 15

1      Q.  Okay.  Anything else you reviewed or did
2  to prepare for the deposition that I haven't asked
3  you about today?
4      A.  Honestly, I think the only thing I did
5  when I was first approached was this -- was did a
6  brief search on the Internet just for news articles
7  in regard to the case because I had no prior
8  knowledge of any -- of the case or any specifics to
9  it.
10     Q.  I understand.  Okay.
11         Could you please give me -- can -- can you
12 tell me -- when did you -- you previously worked for
13 the Kansas City Police Department; is that correct?
14     A.  Yes.
15     Q.  And you no longer work there; is that
16 correct?
17     A.  That is correct.
18     Q.  When did you start your career at the
19 Kansas City Police Department?
20     A.  January of 1993.
21     Q.  Okay.  Before that, had you had any prior
22 law enforcement experience?
23     A.  Other than schooling, no.
24     Q.  Okay.  And what was -- what was your
25 schooling?

Page 16

1      A.  Just some criminal justice classes in
2  college prior to that.
3      Q.  Okay.  Could you please walk me through a
4  time line of your employment at the Kansas City
5  Police Department, meaning the positions you held
6  and the periods for which you held them.
7      A.  Sure.
8          Some of these might be a little -- just
9  kind of guessing dates but generally should be
10 pretty accurate.
11         But started in 1993.  I graduated the
12 academy in June of 1993.  From there I was assigned
13 to -- as a uniform patrol officer until -- I believe
14 it was fall of '96.  And from there I went into
15 investigations, where I started in our domestic
16 violence unit as a detective.
17         My dates bounce around a little bit, but
18 generally from -- then I -- I spent a little less
19 than a year in domestic violence and went to the
20 homicide unit as a detective.  In that period up
21 until 2006, I believe, I -- I was still a detective,
22 but I did a couple other stints in a couple other
23 units, one being our fugitive apprehension and
24 arraignment unit and then also as a detective in our
25 gang -- gang unit.  I can provide a little more

8700 Monrovia, Suite 310                              (913) 825-2510
Lenexa, Kansas 66215-3500                            Fax (913) 825-2530
www.cornerstonekc.net          Cornerstone          office@cornerstonekc.net
                        Court Reporting Company llc
Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 4 of 41

1  dates to those if you need -- need me to.
2      After that I went back to patrol for a
3  while.  I was wanting to, basically, study for
4  promotional exams.  So I left, went back to patrol.
5      Then went back to homicide in 2012.  Then
6  was promoted 2013 to sergeant.  2013 to 2000- --
7  through 2000- -- I believe late -- mid -- mid-2015 I
8  was a sergeant in patrol -- uniform patrol and then
9  went to -- back into violent crimes investigations.
10     And from 2000- -- mid-2015 to when I
11 retired in 2021, stayed there in our assault unit
12 and as part of our critical incident investigation
13 team.
14     And then retired in September of '21.
15     Q.  Got it.
16     And since you retired in 2021, have you
17 done any other work for the Kansas City Police
18 Department?
19     A.  No.
20     Q.  Okay.  And I should ask -- are you being
21 compensated for your testimony today?
22     A.  Yes.
23     Q.  Okay.  What compensation are you receiving
24 for your testimony today?
25     A.  Just a contract cash payment or check

1  payment for it.
2      Q.  How much is it?
3      A.  $2,500.
4      Q.  Okay.  Now, from 1997 to 2006 when --
5  yeah.  You said you could break down a little the --
6  maybe by more detail the different postings you
7  have.  Could you tell me -- you mentioned homicide
8  detective, fugitive apprehension, and gang unit.
9  Could you break down for me how long you spent in
10 each role.
11     A.  Absolutely.  I was in a fugitive
12 apprehension unit roughly 2000, 2001.  That entailed
13 kind of what I said -- going after wanted fugitives,
14 people with felony warrants, and also to assist in
15 the -- kind of the court arraignment aspect of that
16 and getting -- getting arraignment and charges for
17 people pertinent to Kansas City Police Department.
18     And then my time in the gang unit was
19 right around the time of this homicide, I believe,
20 October 20- -- 2003.  And I was there for two and a
21 half years.  That involved, kind of as the name
22 implied, working subjects that were gang-affiliated.
23 Most of it was narcotics-related, but when I went
24 there at the time, we were trying to morph into some
25 more violent crime investigations within that unit

1  also.
2      Q.  Did you remain in the gang unit when you
3  transferred -- did you stay in the gang unit till
4  you transferred out of the investigations unit in
5  2006 and went back to patrol?
6      A.  No.  I went back to homicide for another
7  year and a half maybe -- year, year and a half.
8      Q.  Got it.
9      And at the ti- -- at the times you worked
10 in the homicide unit, was homicide organized into
11 different squads?
12     A.  Yes, it was.
13     Q.  And which squads did you -- did you work
14 in at the times you were in the homicide unit?
15     A.  So at the -- at those times, there was
16 three different squads.  I guess for the lack of --
17 they were assigned numbers.  It was 1010 squad, 1020
18 squad, and 1030 squad.
19     My first squad was, I believe, 1030 squad.
20 This is a few years back.  So -- and then when I
21 transferred back I was in -- I'm sorry.  I can't
22 remember if it was 1010 or 1020 squad, but it was
23 not the squad that was headed up by
24 Sergeant Niemeier or with -- or those detectives, if
25 that clarifies.

1      Q.  It -- it does.  You never worked directly
2  with Sergeant Niemeier; is that correct?
3      A.  Not under his direct supervision.  We
4  would have peripheral assistance between squads,
5  but -- but generally each homicide case itself was
6  a -- investigated by that squad that you were in
7  that -- that it got assigned to.
8      Q.  Now, my -- what I've heard and what we've
9  heard in the testimony from detectives thus far is
10 that there was training for new detectives when they
11 promoted to detective, but there wasn't a separate
12 program -- like, training program once you joined
13 the homicide squad specifically.  Was that true in
14 the 2003-to-2005 time period?
15     A.  So the new-detective training was
16 really -- it wasn't mandated right as you became a
17 new detective, whether it was homicide or -- or any
18 other detective position.  You know, it was a
19 schooling that they would put on maybe annually.
20     Q.  Uh-huh.
21     A.  Maybe every other year just depending.
22 Probably depending on budget, depending on manpower.
23 You know, as far as that, we called it just
24 "detective school."
25     As far as homicide itself, again, there

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 5 of 41

1   wasn't anything, once you went into the unit,
2   specific to that.  As the department or as a unit
3   could get training, typically through outside
4   sources, that would be made available to, you know,
5   a handful of detectives at a time.  And again, that
6   was probably more budgetary -- I'm speculating --
7   than -- than really anything else.
8       Q.  Yeah.  That makes sense.
9           Do you have -- do you have knowledge of
10  any specific such trainings that were offered from
11  2003 to 2005?
12      A.  I couldn't tell you specifically in that
13  time frame.  I -- I've been to a number of different
14  trainings put on by outside -- usually when I say
15  "outside entities," it's usually department members
16  from other departments that have -- that have
17  started training -- doing training and putting those
18  on.
19      Q.  Right.
20      A.  But -- but through that time frame, I
21  can't -- I can't tell you specifically --
22  specifically what I did during that time frame.
23      Q.  I understand.
24          And I think your testimony was that what
25  the trainings were -- you know, the topics and how

1   often -- was dependent on budget.  And it might be
2   different, how many detectives could be sent to
3   them, because they were budget dependent; is that
4   correct?
5       A.  Yes.
6       Q.  Okay.  I can show you an example, if it's
7   helpful, but my understanding is that both the
8   police chief and the board of police commissioners
9   approve policy on behalf of the Kansas City Police
10  Department.  Is that correct?
11      A.  I believe so, yes.
12      Q.  Okay.  Now, I want to ask a few questions
13  about the -- are you familiar with the term of -- of
14  a "master file" as a way of collecting documents in
15  the course of a homicide investigation?
16      A.  Yes.
17      Q.  Okay.  And when a -- when -- when the
18  department investigated a -- and sorry -- by the
19  way, I'd like us to agree that when I'm asking you
20  questions, we're talking about 2003 to 2005 -- the
21  time period in the notice -- unless one of us
22  specifies otherwise.  Is that fair?
23      A.  Understood.  Yes.
24      Q.  It will save us some time.
25          But -- so from 2003 to 2005, when the

1   department investigated a homicide, was a case
2   detective assigned to the investigation?
3       A.  Yes.
4       Q.  And was the case detective responsible for
5   maintaining the master file in relation to the
6   investigation?
7       A.  Yes.
8       Q.  Okay.  Can you talk me through what was
9   the process for creating and maintaining a master
10  file during this time period?
11      A.  At that time most of it was still paper.
12  So, generally, if you were the case detective, you
13  know, you were responsible for putting that paper
14  file together.  We had a -- a format that we would
15  typically put those files in.
16          When I say "format" -- all your crime
17  scene reporting or evidentiary reports would be in
18  one section.  All your interviews or interr- -- your
19  interviews or statements from witnesses would be in
20  one section.  Your suspects would have a section to
21  themselves.  And then, you know, miscellaneous-type
22  section.
23          And then your front section would
24  typically be your court documents, you know, whether
25  there's a warrant or just some of our internal

1   reports that would be used to send over to the
2   courts -- probable cause, reports like that.
3       Q.  Was the practice to maintain the reports
4   chronologically?  Meaning in the order the reports
5   were dated.
6       A.  I would say, again, generally within each
7   section, yes.  You know, so the -- I think the
8   easiest one to explain would be witness statements,
9   witness information.  We -- we would generally do
10  chronologically within that, yes.
11      Q.  Would you expect -- was -- was the
12  practice to do the same for police reports?  Meaning
13  if, you know, patrol officers or detectives have
14  written reports that were relating to the
15  investigation that those would be placed
16  chronologically as well?
17      A.  Yes.  Within each section, yes.
18      Q.  Okay.  And was there -- I did not observe
19  in the policies the City has produced a policy that
20  tells how the master file should be kept.  Did you
21  review any such policy in preparation for this
22  deposition?
23      A.  No.
24      Q.  Was it -- was the method by which homicide
25  maintained the master files taught by hands-on

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net                    Cornerstone
                                         Court Reporting Company LLC
(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 6 of 41

Page 25

1  training?  Meaning a new detective would learn how
2  to do it from the other detectives?
3      A.  Yes.
4      Q.  And the -- was the practice of the
5  homicide unit that the case detect--- you know, say
6  a patrol officer collects a piece of evidence at --
7  at the homicide scene or writes a report relative to
8  the homicide.  Is the case detective responsible for
9  receiving that report and including it in the master
10  file?
11      A.  They were responsible for putting it in
12  the master file to the -- yeah, they were
13  responsible to the extent that they know that
14  that -- that information has been passed from, let's
15  say, patrol down to investigations.
16      So yes.  I mean once that -- if that
17  information comes through -- whether it's through
18  interdepartment means or whether it's through an
19  officer dropping that report off or just, you know,
20  maybe crime scene reports -- those typically can
21  take a while to get.  Once they're -- they're down
22  there, yes, those would be given to that detective.
23  And then they're responsible for making sure that
24  that's in the file.
25      And then I would also add that the -- the

Page 26

1  controlling supervisor of that squad also does have
2  responsibility to make sure that the detectives are
3  following through with keeping these files up to
4  date.
5      Q.  And in this time period, how did
6  sergeant -- and when you say the "controlling
7  supervisor," is that going to be the sergeant for
8  any given homicide squad who has that
9  responsibility?
10      A.  Yes.
11      Q.  And during this time period, what were
12  sergeant -- what -- what was the practice among
13  sergeants to ensure that the detectives kept a
14  complete master file?
15      A.  The first thing would be for the
16  sergeant -- would just to be approving any reports
17  that were initiated by the detectives within the
18  unit.  And then I would -- each -- each sergeant
19  would have their own procedure, I guess, or their
20  own way of doing things.  But, I mean, you're the
21  person in charge.  It's your job to make sure that
22  these -- you know, these files are as accurate as
23  possible and that nothing is being missed.  So a
24  little vague, but I'd say that that was the
25  procedure that, you know, the sergeant was the

Page 27

1  ultimate -- ultimately the responsible party for
2  those.
3      Q.  Would you agree that, in -- in general,
4  that's part of the chain of command model of the
5  department?  That if you're a supervisor, you're
6  responsible for what your subordinates do?
7      A.  Yes.
8      Q.  And other than -- other than the chain of
9  command responsibility that sergeants had, did the
10  department do anything to monitor whether its
11  sergeants were adequately reviewing the master files
12  in the homicide division?
13      A.  I would not know at that time how that was
14  being done.
15      Q.  Sure.
16      Sitting here -- and, by the way, who --
17  who was -- who supervised the homicide sergeants
18  during this time period?  Meaning what was the rank
19  or title of the sergeants' supervisor?
20      A.  There was a captain specifically assigned
21  to the homicide unit that was over the -- the
22  sergeants within that unit.
23      Q.  Do you know who the captain was or who the
24  captains were during this time period?
25      A.  I couldn't tell you specifically.  I could

Page 28

1  give you a list of captains.  I don't know who it
2  was at -- specifically at this point in time.
3      Q.  But fair -- but, sitting here right now,
4  you're not aware of any activities that the captains
5  undertook during this time period to make sure that
6  the master files were complete and accurate; is that
7  correct?
8      A.  That's correct.
9      Q.  Want to show you an example.  One second.
10  This is Exhibit 2.
11      MR. HILKE:  Diane, this is Vern Huth --
12  the part of this I'm showing is Vern Huth's 20- --
13  October 14 report from arresting Gary Kitchen.  I
14  don't think I sent it to you.  I only have one or
15  two questions about it.
16      Do you want a minute to find it or for me
17  to send it to you?
18      MS. PETERS:  No.  That's okay.  You can go
19  ahead.
20      MR. HILKE:  Thanks.
21      Q.  (By Mr. Hilke)  So I'm showing you the --
22  the second page of this document.  This is a Kansas
23  City Missouri Police Department report form.  It's a
24  Form 100 signed by Officer V. Huth, and it's got a
25  case number written in the upper right here.  Do you

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 7 of 41

1  see that here?
2       A.   Yes.
3       Q.   So -- and I -- the second page of -- it's
4  page 3 of the PDF, second page of the report -- is
5  the report form narrative, and it describes
6  executing an outstanding pickup issued by the
7  homicide unit for the listed subject.  The author,
8  Vern Huth, was a patrol officer at the time he wrote
9  this report.
10          Do you see that here?
11      A.   Yes.
12      Q.   And then there's a -- a "logged" and
13  "scanned" portion on the bottom left of the first
14  part of the report.  Do you see that there?
15      A.   Yes.
16      Q.   So what we've -- there's been testimony
17  that in a homicide investigation, if a patrol
18  officer writes a report -- like, this would be an
19  example of one relative to a homicide -- after
20  completing it, a copy of the report would be sent to
21  the homicide unit.  Is that correct?
22      A.   Yes.
23      Q.   And then at the homicide unit, that report
24  would be directed to the case detective so that they
25  would have a copy of the report; is that correct?

1       A.   Generally, those would go through the
2  supervisor and then down to the case detective.
3       Q.   Okay.  So first to the sergeant -- so it
4  would go to one of the three sergeants of the three
5  squads.  And then they would make sure it gets to
6  the case detective; is that --
7       A.   Yeah.
8       Q.   -- correct?
9       A.   That -- that was the -- the process.  It
10  was a -- it was a pan in each sergeant's office
11  where everything would go pertinent to the cases
12  that squad was working.  Then that sergeant would
13  disseminate any report out specific to whatever
14  case.
15      Q.   And then the detective's job after they
16  get the report is to make sure it gets to the master
17  file for the investigation; correct?
18      A.   Yes.
19      Q.   And then the sergeant is supposed to, you
20  know, review -- be keeping tabs on the master file.
21  So if the sergeant sees the report wasn't included,
22  they can make sure that it is; is that correct?
23      A.   That -- that would be specific to each
24  sergeant.  Really, I would say the sergeant's
25  overarching goal is to make sure that anything --

1  that all the follow-up that needed to be done in
2  regard would be done.  I would -- I would say there
3  is a chain of command.  Ultimately, you're
4  responsible for your subordinates.
5          But, you know, that case detective was the
6  one that probably knew the best, knew -- knew
7  everything about that case and needed to make sure
8  that everything was included in there correctly.
9       Q.   Okay.  So if -- if I understand
10  the test- -- your testimony, it's a sergeant's job
11  to make sure the investigation proceeds, but not
12  necessarily to -- for example, at the end of the
13  case, review the master file and make sure all of
14  the reports ended up there.  Is that correct?
15      A.   Well, they would.  I'm -- I'm just
16  thinking back to this time.  It would have been more
17  difficult to ensure everything was there.  It's kind
18  of the -- if you don't know -- "you don't know what
19  you don't know" type stuff from a sergeant's
20  standpoint.  So ...
21          But yes.  I mean, they -- they need to
22  make sure -- ultimately, it's their responsibility
23  to make sure that that case file or master file
24  is -- is accurate and complete as possible.
25      Q.   And -- and was that a standard step at --

1  during this time period for sergeants?  Meaning once
2  the investigation is completed, did the sergeants
3  routinely review the investigation master file to
4  ensure that it was complete?
5       A.   I couldn't tell you if -- I was just a
6  detective at that time.  I guess I'm kind of relying
7  on my later experience as a sergeant.  But at that
8  time I wouldn't know specifically what each sergeant
9  would do to ensure that.
10      Q.   Okay.
11      A.   So I couldn't answer that question.
12      Q.   And you don't have a -- you -- you don't
13  have any reason to believe that there was a uniform
14  practice among the sergeants?  Meaning they all
15  handle that issue the same way -- how much and
16  whether they reviewed the master file at the end of
17  an investigation.  Is that correct?
18      A.   I -- I wouldn't know --
19      Q.   All right.
20      A.   -- on that.
21      Q.   And, certainly, you -- you -- one second.
22          At the beginning, you know -- in early
23  2003, during the time period we're discussing today,
24  you were a homicide detective in the department;
25  correct?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Case 4:23-cv-00278-RK  Document 139-20  Filed 09/09/24  Page 8 of 41

Page 33

1    A.  Yes.  Right around -- like I said earlier,
2  right around October of 2003, I transferred to the
3  gang unit.  But, yes, right around that time I was a
4  homicide detective.
5    Q.  And so around that time when you were a
6  homicide detective, you weren't aware of any
7  standard practice for review of your master files at
8  the end of an investigation, were you?
9    A.  By the supervisor or sergeant?  Or by the
10  case detective?
11    Q.  By the sergeant.
12    A.  I could only tell you my experience with
13  my squad.  You know, I -- I felt that we had a
14  sergeant that was -- that -- that would make sure,
15  you know -- that would touch base with us to make
16  sure we were -- everything was in the file and
17  complete and off to the prosecutor's office, if
18  necessary.  I just couldn't tell you, with the other
19  squads, how their supervisors or sergeants were --
20  were doing that.
21    Q.  For your sergeant -- and who was your
22  sergeant at the time?
23    A.  It was Dave Bernard at the time.
24    Q.  Okay.  Did Sergeant Bernard actually look
25  through, you know, your entire master file every

Page 34

1  time?  Or, like you said, did he just check in with
2  you to ask you if you had included everything in
3  there?
4    A.  Yeah.  I would say it was more the latter.
5  I mean, he was just -- I felt he was a conscientious
6  supervisor that would want to make sure that we
7  were -- we had everything in there.  But, again, it
8  wasn't sitting down going through every single page.
9    Q.  Yeah.
10    A.  You know, going through it.
11    Q.  Other than reviewing and signing
12  detectives' reports, during this time period did the
13  Kansas City Police Department require its sergeants
14  to do any -- any further review of the homicide
15  detectives' investigations?
16    A.  I would not know that.
17    Q.  So not that you're aware of; is that fair?
18    A.  Not that I'm aware of.  That's correct.
19    Q.  And -- one second, please.
20    Did -- I haven't -- I haven't seen
21  anything in this in the policies.  In the policies
22  you reviewed, are you aware of any document that
23  guides sergeants in any way about how they should
24  review reports?  Meaning what information they
25  should look for, what questions they should ask,

Page 35

1  et cetera, before approving a homicide detective's
2  report?
3    A.  From that time frame, no, I'm not aware.
4    Q.  Okay.  And as a matter of practice, was
5  there any standard as to what information the
6  homicide sergeants routinely reviewed for when they
7  approved their detectives' reports during this time
8  period?
9    A.  Could you repeat that.  I want to make
10  sure I understand correctly.
11    Q.  Yeah.  Like, for example -- I guess
12  I'll -- I'll just repeat the question.
13    As -- as a matter of practice, was there
14  any specific information or specific steps taken
15  that sergeants did when they reviewed homicide
16  detectives' reports?
17    A.  I think -- I mean, the sergeants were
18  typically -- or in my case, the sergeant was very
19  aware of what was going on with the investigation
20  and would routinely ask questions, you know, about
21  reports, whether it be interviews or other
22  information gained.  I mean, they were very active
23  in it.
24    Now, if you're asking if there's a very
25  specific procedure, like a check-the-box-type

Page 36

1  procedure, I'm not aware of that.
2    Q.  Okay.  So it was more about -- well,
3  strike that.  One second.
4    Coming back to the master file, when, you
5  know -- if copies needed to be made of documents
6  relative to the investigation -- for example, giving
7  a copy of -- giving documents from the case file to
8  the prosecutor -- were those documents -- were
9  copies made out of the master file?  Was that the
10  source of the originals from which copies were made?
11    A.  Yes.
12    Q.  And who was responsible -- you know,
13  taking that example, giving documents to the
14  prosecutor -- during this time frame, who was
15  responsible for copying documents for the
16  prosecutor?
17    A.  Typically that would be the case
18  detective.
19    Q.  And am I -- where were the master files
20  kept within the homicide division during the course
21  of investigations?
22    A.  Each squad had file cabinets that would be
23  locked, you know, when -- when that squad was not
24  there at work.  So they would be secured in -- in
25  those cabinets.

8700 Monrovia, Suite 310                                        (913) 825-2510
Lenexa, Kansas 66215-3500                                       Fax (913) 825-2530
www.cornerstonekc.net                                   office@cornerstonekc.net

Cornerstone
Court Reporting Company LLC

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 9 of 41

1    Q.  So all of the detectives shared a set of
2  file cabinets in which the master files -- I
3  mean -- strike that.
4         Within each of the three squads, each
5  squad has its own set of file cabinets in which all
6  the detectives in that squad keep their master
7  files; is that correct?
8    A.  Yes.
9    Q.  And it's locked so that only detectives
10 from that squad can put things in or can add things
11 to those master files; is that correct?
12   A.  I wouldn't say generally just to add
13 stuff.  I would say to make sure information wasn't
14 being taken out of there or information from these
15 files was not for other people's eyes.
16   Q.  Okay.
17   A.  To protect the integrity of the files.
18   Q.  Right.
19       And that's -- and the -- the prac- -- am I
20 correct that the practice was that when a report is
21 entered to a master file, you know, unless it's like
22 from a different investigation and put there in
23 error, it should remain in the master file
24 permanently; is that correct?
25   A.  Yes.

1    Q.  And are homicide -- homicide investigation
2  files preserved indefinitely?
3    A.  Yes.  That's my understanding.
4    Q.  And I -- I think we discussed this before.
5  But you're not aware of any specific policies during
6  this time frame that address the review and approval
7  of police reports; is that correct?
8    A.  No.  I'm not aware of any specific written
9  policy or anything at -- at that time.
10   Q.  Let me ask you about the practice, then.
11 Was there a -- you know, for example, I noticed
12 there were no dates from when supervisors signed
13 reports, at least in the reports we've seen.  Was
14 there any practice as to how soon after a report is
15 written it should be signed during this time period?
16   A.  As soon as possible is -- is about as good
17 a answer I could get.  I mean, once these reports
18 were done, they were given to the supervisors.
19       And I will add that this is a -- the --
20 the approval of officers' reports was not just
21 specific to homicide or investigations.  That's for
22 any report, whether written by a patrol officer --
23 would be reviewed and signed by a supervisor up
24 through, you know, the investigation --
25 investigative personnel also.

1    Q.  Sure.
2        And let me -- let me clarify my question.
3  I -- I didn't see any policies about sort of the
4  process or time line for approving reports from
5  anyone, being -- be it a patrol officer or -- or a
6  detective or anyone else.  Is that your
7  understanding as well?
8    A.  Yeah.  From that time frame, I -- I could
9  not tell you if there was a specific policy anywhere
10 that dictated that.
11   Q.  Okay.  There -- there's not -- there's no
12 such policy that you were aware of, sitting here
13 right now; is that correct?
14   A.  Correct.
15   Q.  So -- okay.  So -- but the practice in
16 homicide during this time was when a report is
17 written, it should be approved as soon as possible;
18 is that correct?
19   A.  Yes.
20   Q.  And were -- in homicide during this time,
21 when the sergeant is out for whatever reason, was
22 there an acting sergeant among the detectives who --
23 who took the rank?
24   A.  Yes.  But not typically to approve
25 reports.  But sometimes there could be time frames

1  where a detective was handling some of the
2  sergeant's responsibilities.
3    Q.  And why -- why wouldn't acting sergeants
4  approve reports?
5    A.  That -- that was -- my experience would be
6  that was that separation between, you know, the
7  chain of command there, not having other detectives
8  just generally approve a report for you, that it
9  would go through a supervisor -- so for their
10 awareness, you know, specific -- especially for a
11 case or -- like a homicide case.
12   Q.  Well, am I correct on -- that one of the
13 reasons why the sergeants approve reports and
14 they're supposed to approve them as soon as possible
15 is so that sergeants can have, like, timely
16 knowledge of what steps are being taken in the
17 investigations they supervise?
18   A.  Oh, absolutely.  But I wouldn't say that
19 we -- the sergeants relied on the information from
20 the report to have that timely knowledge.  That
21 knowledge was always being verbally provided to your
22 supervisor if they were available, you know, pretty
23 much real time.
24   Q.  Yeah.  And that's -- it sort of was one of
25 the reasons, I guess, to do both -- to get, you

1 know, verbal updates all the time and get reports
2 and review them quickly so sergeants would have
3 multiple points to be apprised of the investigation?
4     A.  Yes.  And for -- for grammatical issues,
5 potentially, also.
6     Q.  Yeah.  And so if -- I'm just trying to
7 understand.  That's one reason why detectives
8 weren't allowed to approve each other's reports;
9 right?  That then you lose the benefit of the report
10 going to the sergeant so that you're making sure
11 they are up to speed on everything that happens; is
12 that fair?
13     A.  Yes.
14     Q.  One second.
15          Is there any reason why -- well, strike
16 that.
17          Were sergeants required to -- to indicate
18 the date on which they approved the reports of their
19 subordinates?
20     A.  No.  Not that I'm aware of.
21     Q.  Do you know why not?
22     A.  No.
23     Q.  After the sergeant approved a report in
24 homicide investigations during this time frame, are
25 you aware of any requirement for the captain or

1 another superior to review those reports?
2     A.  No.
3     Q.  And after the sergeant reviewed and
4 approved a report, was there any place that report
5 was kept other than the master file?  Meaning was
6 there, like, a secondary storage of approved reports
7 separate from the master file during this time
8 period?
9     A.  Yes.  I believe our records unit would get
10 copies of all the reports as well as the file
11 that -- that we kept.  But I could not tell you any
12 specific procedure on that at the time.
13     Q.  So the -- and when you say "the file that
14 was kept," did the records unit receive the approved
15 reports as well as a copy of everything in the
16 master file?
17     A.  At some point they did, yes.  I -- again,
18 for that time period, I don't know specifically when
19 they would get everything.  But, you know, like the
20 offense report -- they would automatically get a
21 copy of the offense report, you know, pretty
22 quickly.  You know, within a day or so of that
23 report being done.
24          But all the other reports -- I mean,
25 only -- and I only say that because, you know, a

1 homicide case file -- some of these reports might be
2 com- -- might not be coming in for weeks or months,
3 and typically those would be crime scene-type
4 reports, lab reports.  Just something we didn't have
5 any control over.  It wasn't somebody doing a report
6 and just not -- you know, and withholding it.
7     Q.  I understand.
8     A.  So those were just specific -- being
9 time-dependent on what was being done with -- with
10 that issue.
11     Q.  Yeah.  So my -- am I correct that --
12 and -- and that wouldn't be unusual.  Right?  Like
13 if you need to do, for example, testing of crime
14 scene evidence, that's going to be dependent on
15 whatever backlog you may have at the crime lab or
16 anything else; right?
17     A.  Correct.
18     Q.  And so separate from such a report going
19 to the detective and going into the master file,
20 like, an evidence or a lab report could also be sent
21 straight to the records unit and preserved by them;
22 correct?
23     A.  At that time, I don't -- I could not tell
24 you what that procedure was.
25     Q.  Okay.  Do you have any reason to say

1 that -- to think that the only way the records unit
2 would get reports during this time period was
3 through copies made from the master file?
4     A.  It could possibly be, yeah.  Because some
5 of those reports were generated specifically within
6 the homicide unit and would make it into the master
7 file before a copy could potentially go down there.
8 But, again, I couldn't tell you specifically to that
9 time frame that procedure.
10     Q.  And just so that I'm understanding,
11 it's -- it's equally possible that the crime scene
12 could make a report that goes straight to records
13 separate and apart from going to the master file,
14 and you just don't know either way for this time
15 period.  Is that fair?
16     A.  Yes, that's fair.
17     Q.  Okay.  One second.  All right.
18          So are you familiar that there is a -- for
19 an example.  Well, I'll just ask.
20          Are -- are you familiar that some report
21 forms during this time period, in the bottom right
22 corner, have a field for, like, file number or file
23 page number?
24     A.  That does sound familiar, yes.
25     Q.  What was the -- what was the purpose of

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Page 45

1  that field during this time period?
2      A.  Are you talking about in the field?  Or,
3  let's say, what we're talking about, like the master
4  file?
5      Q.  Yeah.  Now -- now, I'm just talking in
6  general.  And let me -- let me show you an
7  example --
8      A.  Okay.
9      Q.  -- so I can specify what I'm talking
10 about.
11         Okay.  This is Exhibit 3.  It happens to
12 be from the Kristi Carroll case not -- not the Larry
13 White case, but it's a -- it's a form that I believe
14 is used in both.  And just showing you the bottom
15 right -- do you see where it says "File Page
16 No. 196"?
17     A.  You're -- the screens are blocking just
18 that corner.  Sorry.
19     Q.  That's -- that's okay.  You may have to
20 use the mouse to move it so you can see what I'm
21 trying to show you.
22     A.  Okay.  Yes.
23     Q.  Okay.  So you see where it says "File Page
24 Number" at the bottom right of this Form 107 report?
25     A.  Yes.

Page 46

1      Q.  What was the purpose of that -- of -- of
2  the file page number in police reports during this
3  time period?
4      A.  Okay.  So specific to that -- that would
5  be -- so when we were giving information to the
6  prosecutor's office, you have to understand that
7  there would be multiple times that we would be
8  giving information to them.  We wouldn't withhold
9  reports from the prosecutor's office, especially if
10 somebody had been charged -- we would not be
11 withholding of any of those reports.  So we're going to
12 be giving them multiple reports, multiple incomplete
13 case files over the course of a time period.
14         Once that case is con- -- what we
15 consider, basically, a completed case, we -- we
16 would give them a -- our complete file, and that
17 file would be numbered in such case like that from 1
18 to whatever it would take just as a -- just as a
19 process to ensure that they're getting -- you know,
20 so you don't want a prosecutor to come back and go,
21 "Well, I'm missing page 43 through 48," for example.
22 You know, they have -- "Okay.  We've got 1
23 through 200 on this file.  And this is" -- "what we
24 have is a complete case file now."  So that's what
25 that numbering is down at the bottom of that corner

Page 47

1  there.
2      Q.  And when you describe giving multiple
3  incomplete case files earlier in the -- in -- like,
4  in an investigation or a prosecution -- let me ask:
5  Do you mean that you would give the prosecutor all
6  the reports that had been developed, but there might
7  be subsequent reports or testing that didn't exist
8  and couldn't be given?  Or do you mean that it
9  wasn't the practice to give the whole file, all the
10 documents, until later in the prosecution?
11     A.  I would say the first.  It was only
12 reports that -- lab reports, let's say, that we did
13 not have yet.  We would not intentionally withhold
14 anything from the prosecutor's office.  It -- only
15 because we had not had access to those reports at
16 that time.
17     Q.  Okay.  So during this time period, the
18 practice was to -- you know, first, to give
19 everything to the prosecutor that you have when
20 homicide detectives share documents with the
21 prosecutor; is that correct?
22     A.  Yes.
23     Q.  And then second is a fail-safe.  The
24 practice at the time was to number the complete file
25 at some point and share it with the prosecutor so

Page 48

1  that there could be no doubt that everything had, in
2  fact, been given to the prosecutor?
3      A.  Correct.
4      Q.  Okay.  If you know, was there any event or
5  instance that caused the department to start
6  numbering its -- numbering the case files given to
7  prosecutors as a -- as a method to ensure that a
8  complete disclosure was made?
9      A.  I'm not aware of any.
10     Q.  And, then, as far as you know -- well,
11 strike that.
12         To your knowledge, that would have been
13 the procedure -- the numbering of the case files --
14 for all homicide investigations during the time
15 period we're discussing; is that correct?
16     A.  Yes.
17     Q.  So we -- Dawn Parsons, who was the
18 prosecutor in the two criminal trials of Keith
19 Carnes for Larry White's murders [sic], gave a
20 deposition last week.  And she said there that she
21 recalled going to the homicide division, like,
22 before trials to talk to the detectives and make
23 sure that they had given her all the reports in
24 their investigations.
25         Do you have any knowledge of whether that

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500        Cornerstone              Fax (913) 825-2530
www.cornerstonekc.com         Court Reporting Company llc     office@cornerstonekc.net

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 12 of 41

1  was a practice during this time period?  That
2  detectives would meet with prosecutors before trial
3  to make sure that the prosecutors had the complete
4  file?
5      A.  Yes.  That was -- that was a normal course
6  of business.
7      Q.  Okay.  And I -- she also testified that
8  during that time period there was no shortage of
9  murder prosecutions.  And so the murder prosecutors
10 were pretty busy.
11         Am I correct that those meetings to make
12 sure all the reports were given to the prosecutor
13 before trial would typically happen not long before
14 the actual criminal trial in those cases?
15     A.  Well, I would say that the meetings
16 themselves were not specific to just getting the
17 case files.  We, just as a course of business, would
18 have regular -- would be regularly in face-to-face
19 contact with our assigned prosecutors.  I mean,
20 that's -- we just had a close working relationship
21 with them and would routinely meet with them for --
22 you know, in regard to the investigations.  Making
23 sure that they had all the information was one part
24 of that.
25     Q.  I understand.

1         So as -- so for the homicide detectives
2  during this time period, as prosecutors prepared for
3  a trial, the detectives would meet frequently with
4  prosecutors to talk about the case and make sure the
5  prosecutors were fully informed; is that correct?
6      A.  Yes.
7      Q.  All right.  So I want to talk now about
8  practices for interviewing and taking statements
9  from witnesses during this time period.
10        MS. PETERS:  Say, Wally, since you're
11 moving to a new topic, do you mind if we take just,
12 like, a five-minute bathroom break?
13        MR. HILKE:  Let's go ahead.
14        MS. PETERS:  Okay.  Thank you.  Okay.
15        THE REPORTER:  Okay.  Going off the record
16 at 10:45 a.m.
17        (A recess was taken.)
18        THE REPORTER:  Back on the record at
19 10:52 a.m.
20     Q.  (By Mr. Hilke)  So, sir, I want to ask you
21 now about the process for -- the practices for
22 interviewing and taking statements from witnesses in
23 homicide investigations during this time.  Am I
24 correct that the -- in the homicide division there
25 were three rooms for witness interviews or

1  interrogations during this time period?
2      A.  Yes.
3      Q.  And the preferred method for interviewing
4  a witness who might have knowledge of a homicide was
5  to take them to headquarters and interview them at
6  the -- at the -- at the police headquarters on,
7  like, Locust Street; is that correct?
8      A.  Yes.
9      Q.  And the detective would start by
10 interviewing the witness in one of those interview
11 rooms; is that correct?
12     A.  Correct.
13     Q.  And if the detective wanted to memorialize
14 that conversation or that witness's knowledge, he
15 had the option of then taking a statement from the
16 witness; is that correct?
17     A.  Yes.
18     Q.  What were the different options detectives
19 had for memorializing a witness statement during
20 this time period?
21     A.  I think the only option we had during that
22 time was -- that we would use was to -- we had our
23 stenographers that worked there that would -- we
24 would actually take them over to -- there was a
25 separate portion with -- on the floor within the

1  homicide unit where they would sit in front of a
2  computer and we would ask them the questions, you
3  know.
4         It was -- it was a format, I mean, and
5  when I say "a format," you know, generally your
6  name, date of birth, you know, the -- just very
7  generic questions to establish the statement.  And
8  then we would ask them in their own words to provide
9  what information they had in regard to the case that
10 we were working.
11     Q.  Okay.  And so when witnesses during this
12 time period were taken to the stenographer, was the
13 stenographer required to write down the questionings
14 exactly how it's asked and the answer exactly how
15 it's given?
16     A.  Yes.
17     Q.  And then -- by the way, part of the
18 process could include showing photographs to the
19 witness for identification purposes; correct?
20     A.  During the interview, yes.
21     Q.  And we've had -- was there a practice as
22 to -- was part of the practice at the time that
23 photographs could be shown to see if a witness could
24 make an identification during the initial interview?
25 Meaning in the interview room before the witness is

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 13 of 41

Page 53

1  taken to the stenographer?
2      A.  Yes, that would be the practice.
3      Q.  Okay.
4          (The arrival of Mr. Joshua Haner was noted
5  by the reporter.)
6          MR. HILKE:  And I see Mr. Haner is joining
7  us.
8      Q.  (By Mr. Hilke)  So then after --
9          MS. PETERS:  Hey, Wally --
10         MR. HILKE:  Yeah.
11         MS. PETERS:  -- I apologize.  I just want
12  Mr. Dillenkoffer to know that Josh Haner -- who he
13  is, since we've made a record of him, but he
14  represents Amy McGowan in this case.
15         THE WITNESS:  Oh, okay.
16         MR. HANER:  Thank you, all.
17     Q.  (By Mr. Hilke)  So -- okay.  And so then
18  if a wit- -- subsequently -- so if a witness makes
19  an identification to a detective in the interview,
20  the detective then has the option of showing the
21  photograph again during a stenographer statement and
22  memorializing the identification then; is that
23  correct?
24     A.  That would be part of when we memorialized
25  it -- is providing that information, yes.

Page 54

1      Q.  Okay.  Now, the statements during this
2  time period did not have a signature box for the
3  stenographer to complete; correct?
4      A.  Correct.
5      Q.  Did the stenog- -- and I've seen some
6  examples of this.  Was it a practice of the
7  stenographers -- would put their initials on the
8  statement so that -- to record that they were the
9  ones who had written the statement?
10     A.  Yes.  I believe typically down at the
11  bottom of the report.
12     Q.  What was the purpose of having the
13  stenographers put their initials on the statement?
14     A.  Again, just to identify who the person was
15  that was typing it out.
16     Q.  Okay.  And was there a concern that, you
17  know, later if the witness says, "Oh, I was" -- you
18  know, "I was coerced.  I was pressured.  That's not
19  what I said," that it would be useful to know who
20  the stenographer was in case it became an issue
21  later?
22     A.  I suppose that could be the case.  I just
23  never ran into any issue in regard to anything like
24  that.  It was just a standard practice that -- that
25  was done when I was there.

Page 55

1      Q.  Okay.  Did the department in this period
2  have a rule about whether detectives could type a
3  statement in that same format?
4      A.  I don't know of any specific rule.  I can
5  just tell you the typing skills of the detectives
6  would not have made it very practical to do
7  something like that.
8      Q.  I've -- we had similar testimony that it
9  was something that -- that was, you know -- or we --
10  we deposed Steve Morgan, who was an investigator --
11  a detective who did some work on the Larry White
12  case, and he said, you know, at times he had done it
13  himself, but that it was hard because it was kind of
14  hard to type it.
15         Am I correct that there wouldn't be
16  anything wrong with that?  That there was no
17  prohibition on detectives typing the statement for a
18  witness to sign if they needed to or thought -- or
19  found it appropriate to do so?
20     A.  No prohibition.  I would just say that it
21  was -- they were very rare, rare examples of that
22  happening.  And that was -- would only be due to
23  extreme circumstances dictating that -- within the
24  homicide unit.
25     Q.  And can you explain what you mean by

Page 56

1  "extreme circumstances"?
2      A.  If there's not being a stenographer
3  available.  But they were -- we had stenographers
4  scheduled 24/7 on our floor there to -- to take
5  these statements.  And I -- I can't think of --
6  offhand, of any specific example, you know, that
7  would be an extreme case where we wouldn't have them
8  available.
9      Q.  Yeah.  There's been testimony that the
10  stenographers used, like, the equivalent of a
11  regular computer keyboard as opposed to, like, the
12  kind of shorthand machine you might see a court
13  reporter use.  Is that correct?
14     A.  That was correct.  It was a -- what I
15  would call a desktop computer.
16     Q.  All right.  During this time period, did
17  each stenographer have their own separate office?
18     A.  I believe so.  Yeah.  I believe so.  I
19  mean, I couldn't tell you whether they would use
20  other ones or not.
21     Q.  Okay.
22     A.  I mean, we had multiple stenographer --
23  little cubicles for each one.
24     Q.  Okay.  And so there -- it wasn't like
25  there was just one desk and one computer.  There

8700 Monrovia, Suite 310                                                    (913) 825-2510
Lenexa, Kansas 66215-3500                                              Fax (913) 825-2530
www.cornerstonekc.com          Cornerstone          office@cornerstonekc.net
                            Court Reporting Company LLC
Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 14 of 41

Page 57

1 were multiple, like, areas in which stenographers
2 could sit and type a statement; is that correct?
3     A.  Yes.
4     Q.  And so even if a stenographer was on duty,
5 if they were busy or backed up taking statements, a
6 detective could use another computer, another desk,
7 and take the statement themselves; is that correct?
8     A.  Yes.
9     Q.  Okay.  Now, the stenographers had -- a
10 rule the stenographers had to follow was they type
11 up exact- -- the questions exactly as they're asked
12 and the answers exactly as they're given; is that
13 correct?
14     A.  Yes.
15     Q.  Were detectives -- if a detective were to
16 type up a statement, were they -- did they have to
17 follow the same rule?  Meaning they had to take down
18 verbatim the question as it was asked and the answer
19 as it was given?
20     A.  Well, the detective would be asking the
21 question -- if they're typing it also.  So what I --
22 I would presume they would be typing what they're
23 asking.
24     Q.  I guess what I mean is when a -- when a
25 detective summarizes a conversation with a witness,

Page 58

1 they're not required to try to do it verbatim;
2 right?  They're allowed to summarize; correct?
3     A.  Yes.
4     Q.  Are detectives allowed to summarize in
5 that fashion if and when they type statements from
6 witnesses?
7     A.  No.  We -- we would, as a matter of
8 practice, make sure that what was being asked and
9 what was being answered was verbatim.  And I -- I
10 can -- just going a little further detail, the
11 detective would typically be sitting right next to
12 the stenographer and watching on the screen what was
13 being typed.  So we weren't -- you know, we are
14 aware of what was being typed at that point in time
15 when we were asking that question.
16     Q.  Yeah.  And, just to be clear, because
17 we've had testimony that detectives, at least on
18 rare occasion, typed the statements themselves, my
19 question is about what detectives are supposed to do
20 when their hands are at the keyboard typing up a
21 statement.  And my question is the detectives typing
22 up the statement -- were they required to write down
23 verbatim questions and answers?
24     A.  Yes.
25     Q.  Did the department have any rules about

Page 59

1 which witnesses or what kind of information needed
2 to be recorded via a witness statement as opposed to
3 summarized in a report?
4     A.  I could tell you from my experience that
5 we would take a formal -- I will say a "formal
6 statement" -- that's one being typed out by a
7 stenographer -- from witnesses when they were
8 providing firsthand witness information to -- to a
9 crime, like -- and I'm using this as a broad
10 example -- but "I witnessed John Doe commit this
11 crime" -- you know, they would provide it.
12         If -- if it was information that was not
13 necessarily identifying in purpose, we typically
14 would not take a formal statement from them at that
15 time.
16     Q.  And was that a -- like, in the nature of a
17 policy or a prohibition?  Or more of a general
18 practice for what kind of information is best
19 recorded on a witness statement?
20     A.  It's a general practice.
21     Q.  Okay.  And when you say -- when you
22 describe firsthand knowledge relative to the crime
23 being investigated, was -- could -- could you
24 explain for me what's -- what's encompassed by
25 "firsthand knowledge," like what kinds of things

Page 60

1 you're referring to when you describe firsthand
2 knowledge of crime.
3     A.  Identifying characteristics or the ability
4 to identify a suspect or other subjects involved in
5 a crime.  I would just use an example -- if we were
6 doing an area canvass, and a neighbor said, "Well, I
7 was sitting in my living room" -- and, again, I'm
8 generalizing -- "but I heard shots outside my living
9 room."  We wouldn't bring that person down and have
10 them give a formal statement to provide that
11 information.
12     Q.  Right.
13         It would be appropriate if there was
14 information of a nature that might identify or have
15 an identifying characteristic of a suspected
16 perpetrator; is that correct?
17     A.  I wouldn't say just a general identifying
18 characteristic but, you know, more specific
19 characteristics to -- to something like that.
20     Q.  Sure.
21         Let me -- I can share this example, if
22 it's helpful to see it.  But in the Kristi Carroll
23 homicide file, there's an example of a witness
24 giving a statement.  And the witness has lent his
25 car to someone in exchange for some crack cocaine.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com
Cornerstone
Court Reporting Company LLC
(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net
Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 15 of 41

Page 61

1   And I don't know all the details, but I suspect that
2   the vehicle he lent has some tie to the murder;
3   right?  So that it has some link to the -- who the
4   perpetrator might be, if he can say he lent it to
5   the perpetrator.
6       Does that example make sense to you?
7   A.  Yes.
8   Q.  That witness, then, memorialized --
9   there's a statement of it.  There's a statement
10  saying "I lent my car to so-and-so."
11      Is that an example of something
12  sufficiently identifying?  Like, for example, tying
13  a murder vehicle to a particular person?  That would
14  deserve -- that would be appropriately memorialized
15  in a statement?
16  A.  I believe so, yes.
17  Q.  Okay.  So, likewise, if a witness saw
18  someone fleeing from the scene of a murder with a
19  rifle, would you expect that witness's knowledge to
20  be memorialized in a written statement?
21  A.  Not necessarily.  Again, it would -- I
22  think it's -- it's always going to be a judgment
23  call.  But it's going to be how much information are
24  they providing and how specific is that information
25  going to be.

Page 62

1   Q.  Is there -- why -- why wouldn't it -- why
2   wouldn't it be a good idea to take a statement from
3   someone who had seen a potential perpetrator fleeing
4   a homicide with a gun?
5   A.  Again, I -- I think it depends on what
6   information they're providing.  If it's not an
7   identifying person, if it's -- if they can't
8   identify much to it other than that -- again, it's
9   going to be a judgment call.  But, you know, it's --
10  at -- what purpose down the road is that information
11  going to provide that could be impeached or anything
12  like that?
13  Q.  Can you tell me what you mean by -- when
14  you say, like, "could be impeached."
15  A.  Well, speci-- I -- I would -- I would
16  say we give formal statements, you know, if they're
17  going to be able to identify somebody and say, "I
18  know that this is the person that did this, and in
19  my statement I'm doing that."  I don't want to
20  minimize the information provided, but a -- if
21  they're just seeing a dark shadow with a gun --
22  again, that's a judgment call -- but, you know, what
23  specific information does that provide that -- that
24  could provide specific testimony maybe down the
25  line?

Page 63

1   Now, again, you know, we might not get a
2   statement from that person.  But that could be in
3   the course of speaking with prosecutors or -- that
4   they might say, "Hey, we need to get a statement
5   from this person," and later on down the line, we
6   could.  I think that's probably the best answer I
7   can give on that.
8   Q.  As a -- you know, as a practice during
9   this time period, were statements generally only
10  taken when a specific person could be identified,
11  either by name or photograph, by the witness?
12  A.  Typically, yes.  And I -- I would extend
13  it to maybe even -- to your example earlier, maybe
14  it was a vehicle -- very specific vehicle that could
15  be tied to somebody.
16  Q.  And am I correct that -- like we've talked
17  about this as a practice -- am I correct that you're
18  not aware of any policy that governed when
19  statements should and not -- should and should not
20  be taken from witnesses during this time period?
21  A.  That's correct.
22  Q.  Let me ask a question about making photo
23  identifications.  The -- when making photo
24  identifications during a typewritten statement, it's
25  necessary to -- well, strike -- strike that.

Page 64

1   Am I correct that during this time period
2   the process for making photo identifications during
3   a typewritten statement was the detective would --
4   would show a photo and say -- you know, ask them a
5   question about it?  Like, "Could you identify
6   any" -- "know anyone or do you see the person you
7   named here?"
8   And then the witness would verbally answer
9   "Yes" and say, "It's No. 4," "It's No. 6," "Yes.
10  It's so-and-so" -- basically give a verbal question
11  and answer while being shown the photograph to
12  memorialize it in the statement?
13  A.  That process would actually be done prior
14  in -- during the interview phase of that.  And then
15  it would be brought up during the formal statement
16  also.
17  Q.  And I -- you know, I saw the policy on
18  lineups, but I didn't see any policy about photo
19  identifications, like, photo -- showing photos to
20  witnesses.
21  Are you aware of any such policies during
22  this time period for showing -- for photographic
23  identifications with witnesses?
24  A.  You're talking specifically outside of a
25  formal lineup; correct?

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                                  Fax (913) 825-2530
www.cornerstoneexc.net          Cornerstone          office@cornerstoneexc.net
Court Reporting Company LLC

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 16 of 41

Page 65

1    Q.   Yes, sir.
2    A.   No.  I'm not aware of any specific policy
3  in regard to showing a photo for a -- an
4  identification purpose.
5    Q.   Okay.  And, similarly, I didn't see in the
6  discovery in this case any -- any, like, form that
7  was used, meaning a form that a witness would, you
8  know, sign when making a photo identification.
9        Are you aware of any form that was given
10  to witnesses when they made photo identifications
11  during this time period?
12    A.   Outside of -- of just initialing or dating
13  the actual photograph itself, no.
14    Q.   Was there a practice at the time as to
15  where and how witnesses should sign and initial --
16  sign and date the -- the photographs?
17    A.   It would be the form -- like, let's say,
18  with a -- for a -- for a lineup -- it would be that
19  lineup that was specifically viewed by them.
20    Q.   Yeah.
21    A.   If they identified somebody, it would be
22  initialed and dated.  And then that lineup would be
23  recovered as evidence.
24    Q.   And when you say "the lineup," you're
25  referring to, like, if you've got a piece of paper

Page 66

1  with six photos on it shown to a witness; is that
2  correct?
3    A.   Yes.  Or it could -- it could be a single
4  photograph also, you know, outside of a lineup for
5  just -- for identifying -- you know, just
6  identifying a person.
7    Q.   Okay.  And just to keep our testimony
8  clear, I'll ask you about live lineups for a minute
9  later, but right now I'm just asking about
10  identifications by photograph.  Is that fair enough?
11    A.   Yes.
12    Q.   Okay.  So when -- was there any practice
13  as to whether -- you know, and photos were shown to
14  witnesses both ways; right?  They could be shown as
15  single photograph.  They could also be shown as six
16  photos together.  Is that correct?
17    A.   Yes.
18    Q.   And was six the number that was used when
19  doing a photo lineup?
20    A.   Yes.
21    Q.   And for the -- the photo lineups with six
22  photos, were witnesses required to circle the photo
23  they were identifying and initial it?
24    A.   That was not a requirement that I'm aware
25  of.  That was standard practice amongst a number of

Page 67

1  detectives I know.
2    Q.   Was there any practice of having witnesses
3  sign or initial and date the back of a six-photo
4  identification instead of next to the photo they had
5  identified?
6    A.   Well, I would say the purpose of the
7  initialing and the dating was just to identify that
8  specific lineup to the one that they viewed.  A
9  detective could have multiple ways of making that --
10  of memorializing that identification, whether it was
11  through the statement itself or whether it was
12  through circling the photograph or -- I -- I would
13  say there's more than one way to do that as long as
14  the person that they're picking is memorialized
15  somehow within that investigation.
16    Q.   Okay.  So it was done multiple ways by
17  different detectives, like the ways you've
18  described, during this time period; is that correct?
19    A.   I would say that's possible, yes.
20    Q.   Okay.  Exhibit 4 -- this is a statement of
21  Wendy Lockett from the White homicide investigation
22  dated October 14, 2003.  Do you see this on my
23  screen?
24    A.   Yes.
25    Q.   This is an example of the typewritten

Page 68

1  verbatim statements we've been talking about;
2  correct?
3    A.   Yes.  I'm sorry.  I'm -- I got it.  I just
4  wanted to make sure -- yes.  I see it.
5    Q.   One second.
6        So on page 2 of this document, near the
7  bottom of what I'm showing you here, there's a
8  question:  "I'm showing you a photo lineup which
9  consists of six black males with similar features.
10  Do you recognize anyone?"
11        Answer:  "No. 5 is Tre."
12        And is this in line with the kind of --
13  is -- is that question and answer consistent with
14  how photographs would be shown to witnesses as a
15  practice during this time period?
16    A.   For a lineup, yes.
17    Q.   And you'd expect that before this was
18  being taken in a statement, that same photo lineup
19  has been shown to the witness and she's indicated
20  that she can identify someone and who it is in the
21  preceding interview; is that correct?
22    A.   Yes.
23    Q.   And there is -- you know, other than --
24  there is -- during this time, as a practice, there
25  wasn't any other sort of admonition to the witness

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Page 69

1 before making a photo identification, was there?
2     A.  As far as -- I guess I would need you to
3 expand on that a little bit.
4     Q.  Yeah.  Let -- let me take a step back.
5         The goal of taking the typewritten
6 statement is to have a record of the identification
7 the witness made; correct?
8     A.  Well, to have a record of what -- I mean,
9 what they would have seen, you know, what they would
10 have experienced; but, yes, the -- the photograph or
11 the lineup itself would be part of that statement.
12     Q.  And, by the way, was the practice that,
13 you know, any -- any important information that was
14 given to or received from the witness would be -- if
15 a statement was taken -- would be memorialized in
16 that statement?
17     A.  As deemed by that detective, yes.
18     Q.  And -- meaning you wouldn't -- but -- so
19 let me put it this way.  In the question and answer
20 here, the detective is asking the question kind of
21 open-ended.  He doesn't say, "Do you see" -- "do you
22 see Tre here?"  He says, "Do you recognize anyone?"
23 so that the witness can make an independent, you
24 know, decision without being, like, led or
25 influenced by the detective; correct?

Page 70

1     A.  Correct.
2     Q.  And so if there was any separate
3 admonition -- right? -- like, if the detective was
4 going to say, for example, you know, "You don't have
5 to pick anyone.  The suspect may not be in these
6 photos," something like that, you'd expect that to
7 be documented in the statement; correct?
8     A.  Not necessarily.
9     Q.  And why wouldn't you expect it to be
10 documented in the statement?
11     A.  Well, I think there -- it's -- in the
12 statement itself, you're just memorializing the fact
13 that they did pick somebody out in there.  I mean,
14 the -- the goal when showing the photo spread is to
15 be as neutral as possible and not to lead on the
16 person in any way.
17        Obviously, you know, we're talking about a
18 specific crime.  You know, so you're talking,
19 you know -- you're asking them if they recognize
20 anybody from that crime.  Sometimes they might pick
21 that pers- -- somebody out and say, "I know that
22 person, but they're not involved in the crime."  You
23 know, but that would be part of the initial
24 interview.
25     Q.  Okay.  So let's call that, like, an

Page 71

1 admonition -- right? -- like a -- and is that
2 something you're familiar with from any point in
3 your career?  Like, the idea that a witness should
4 be admonished before making an identification?
5     A.  Can you explain a little more by what you
6 mean by just "admonished."
7     Q.  Well, I can, but first let me ask you
8 this.  Is that a term you've heard before in your
9 career?  Like an admonishment given to witnesses
10 before making identifications?
11     A.  I mean, I know what an admonishment is,
12 not necessarily specific just to photo lineups.
13     Q.  Does it have -- does that term have any
14 meaning at all to you in the context of witness
15 identification?
16     A.  Generally, yes.
17     Q.  Okay.  What does it mean to you?
18     A.  I would say you're just -- well, giving
19 them parameters as to why we're -- we're trying to
20 identify somebody, you know.  And we're -- we're
21 investigating a specific event.  That's why we're
22 talking to them.
23     Q.  So by "parameters," you mean, you know,
24 "We're here investigating a homicide.  We want to
25 know what you know about it"?

Page 72

1     A.  Yeah.  I mean, it -- but the photo lineup
2 itself is not just going to be presented in a
3 vacuum.  I mean, this would be after talking with
4 them to determine what they might or -- or might not
5 know.
6        I mean, if a person says that they didn't
7 see anything or don't know anything, we're not going
8 to drop down a photo spread in front of him and say,
9 "Do you recognize anybody in regard to this crime?"
10     Q.  Okay.  So -- so let me ask this.  As a
11 practice during this time period, was there anything
12 detectives -- detectives regularly told witnesses
13 before presenting photos to them?
14     A.  I would say as a general rule, in my
15 experience, what I did and what detectives I worked
16 around did, yes.
17     Q.  And what did you and the detectives you
18 worked with do before you showed photos to witnesses
19 in homicide investigations in this time period?
20     A.  Well, if they provided information that we
21 believe that they could potentially identify a
22 person involved in the crime, we would -- before we
23 would show them the -- the lineup, we'd explain to
24 them, "Hey, I'm going to show you a lineup, and it's
25 going to be of six subjects."  You know, and we

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net
Cornerstone
Court Reporting Company LLC
(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net
Case 4:23-cv-00278-RK  Document 139-20  Filed 09/09/24  Page 18 of 41

Page 73

1  would make every effort possible to make sure that
2  they had similar features, and we would typically
3  say that to them, and say -- and then ask them, "Do
4  you recognize anybody within this photo spread?"
5       And if they did, we would have them, you
6  know, expound on that. And "Who do you recognize?"
7  and -- and "Under what circumstances do you
8  recognize them?"
9  Q.  It -- it sounds like -- is that pretty
10 much the way the question is asked here?  "I'm
11 showing you a photo lineup which consists of," you
12 know, "six black males with similar features.  Do
13 you recognize anyone?"
14 A.  Yeah.  I would say that what's in the
15 statement is consistent with what we would do in the
16 interview prior.
17 Q.  Okay.  And so you wouldn't -- during this
18 time, there was -- is it fair to say that, to your
19 knowledge, that's the extent of it?  That there
20 isn't sort of a separate or different instruction
21 that's given to witnesses before they look at
22 photos?
23 A.  So the only -- if there was any
24 difference, the admonishment or the setup would only
25 be "Hey, this is why we're showing you this."

Page 74

1  Q.  And meaning because, like, in -- in and when
2  you say "why we're showing you this" -- of what kind
3  of explanation generally would be given?
4  A.  You know, "We're going to show you a photo
5  spread.  Just" -- "and let us know if there's
6  anybody you recognize in" -- "in this photo lineup."
7  Q.  Okay.  And I apologize if it's -- if I
8  asked this before.  But is it fair to say that, as
9  far as you know, there is no, like, policy or manual
10 as to what witnesses needed to be told before making
11 photo identifications?
12 A.  No, I'm not aware of any from that time.
13 Q.  Okay.  And one of the policies you
14 reviewed had to do with live lineups, but that
15 policy specifically addressed live lineups, not
16 photo identification procedures --
17 A.  I believe --
18 Q.  -- correct?
19 A.  I believe so.  I'm sorry.  Yes.
20 Q.  Was there any policy about -- well, strike
21 that.
22      I -- because I think you've said -- strike
23 that.
24      Was there any practice as to under what
25 circumstances a witness should be shown six photos

Page 75

1  together as -- as opposed to being shown one photo
2  to be -- to make an identification?
3  A.  So the general practice of that was if we
4  were showing them a single photograph, it was
5  typically somebody that they knew that we might not
6  know the full identity of.  And so it was just to
7  confirm that identity so if we had to go track this
8  person down and speak with him, we knew we were
9  going after the right person.
10      And I would say just because -- and in a
11 lot of my experience in cases like this, people use
12 nicknames, didn't have full names.  So, you know,
13 "You're referring to so-and-so by nickname.  I'm
14 showing you a photo.  Is this the person you're
15 referring to?"
16      You know, if it -- had we pulled that
17 photo from a booking photo or something like that
18 and had the information, that was just a
19 confirmation that we had the -- the right person
20 that we were trying to identify.
21 Q.  And as the practice at the time, what was
22 different about showing six photos?  What was
23 different about the purpose for showing six photos
24 together?
25 A.  That was more for suspect purposes, where

Page 76

1  they would not have a direct connection to that
2  person.
3  Q.  What do you mean by -- that you wouldn't
4  use a six-pack if the witness had a direct
5  connection to the person, if I understood correctly?
6  A.  I guess I could just use an example.  Say
7  it's a domestic violence case you're working, or I'm
8  working it, and the person is saying that they -- it
9  was their live-in boyfriend that committed an act of
10 violence against them.
11 Q.  Yeah.
12 A.  The presumption is -- is that they live
13 with that person, they know that person.  I don't
14 need to show them a photo lineup to identify that
15 person.  I'm just trying to make sure I have the
16 right person identified so if I'm going to be
17 submitting a criminal case against that person, I'm
18 submitting it for the correct person.
19 Q.  Now, am I correct that in homicide
20 investigation as a detective, you're not necessarily
21 just interested in the person who pulled the trigger
22 or held the knife but also anyone who participated
23 in the execution of a homicide?  Is that fair?
24 A.  Yes.
25 Q.  So, for example, if there was a lookout,

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net
Cornerstone
Court Reporting Company LLC
(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net
Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 19 of 41

1  you're interested in developing evidence on that
2  lookout; correct?
3      A.  Yes.  And just potentially identifying
4  that person to see what information they might have,
5  but yes.
6      Q.  Okay.  And is the same true if someone --
7  if someone orders a killing?  If someone directs
8  someone else to commit a murder, as a detective you
9  want to develop evidence on -- on the person who
10  ordered the killing; is that fair?
11     A.  Yes.
12     Q.  And same for if there's an a -- you know,
13  a getaway driver, you want evidence on the getaway
14  driver; correct?
15     A.  Yes.
16     Q.  And the practice at this time was to
17  investigate and develop evidence on all such
18  participants in homicides; correct?
19     A.  Yes.
20     Q.  In terms of these six-pack
21  identifications -- or strike that.
22         You didn't use the word "six-pack," but I
23  did.  I just mean a photo spread with six photos in
24  it, which you said was more appropriately used for
25  suspects who the witness is not, like, int- -- very

1  familiar with.
2         Was the practice at this time to use the
3  six-photo identification for any kinds of
4  participants?  Meaning, you know, the getaway
5  driver, the lookout, the person who orders the hit,
6  the person who pulled the trigger -- all of those,
7  if they're identified in the course of an
8  investigation, should be identified through
9  six-photo identifications?
10     A.  I would say it would just be dependent on
11  the information you have at the time.
12     Q.  What -- what information would make the
13  difference?
14     A.  Well, I mean, if somebody specifically
15  identifying them as an accomplice in a crime, yes,
16  but I think that sometimes could be a -- kind of a
17  gray area.  If we're just trying to identify other
18  subjects involved, we might find out later, yes,
19  they are more complicit than maybe we knew or didn't
20  know.  But -- at that point of an investigation, I
21  think a lot of times, generally, you're just trying
22  to identify whoever you can that might have any
23  involvement, whether it be a witness, a suspect, or
24  an accomplice.  You're just trying to identify
25  people who might have information.

1      Q.  Let me -- let me take a step back and ask,
2  from the department's perspective, why use
3  six-photograph identifications at all?  Why not just
4  always used a single photo of the person who you --
5  you know, if there's someone you think the witness
6  is talking about or you have a suspect, why not
7  always use a single photo?
8      A.  In my opinion, that would be leading.
9      Q.  And so it -- is it fair to say it --
10  showing six photos when you're talking about a
11  suspect preserves the integrity of the
12  investigation?
13     A.  Yes.
14     Q.  And so if -- as a practice if, at the time
15  you take an identification, you think that a person
16  could be a suspect -- a person being identified
17  could be a suspect, in general, the appropriate
18  thing to do is to show the witness six photos and
19  ask them to make an identification; correct?
20     A.  I think ideally that could be.  But,
21  again, the -- the dynamics of some of these
22  investigation at the speed of which you're
23  investigating them, potentially with a num- --
24  trying to triage that amongst a number of other
25  cases -- you want to know -- you're just trying to

1  identify people to, at some point in time,
2  potentially get information.
3      Q.  I guess it's --
4      A.  It's -- it's not --
5      Q.  Go ahead.
6      A.  I was going to say it's not in -- it was
7  never in an effort to try to circumvent getting a --
8  an unbiased identification.  You know, just the
9  dynamics of these investigations, you're just trying
10  to identify people as you're -- as this information
11  is coming in.
12     Q.  Sure.
13         I guess I'm -- you said -- you gave an
14  answer, in part, that ideally, yes, when a detective
15  thinks someone is a suspect, the identification
16  procedure should generally involve six photographs
17  shown to a witness.  And I guess what I want to
18  understand is whether there was a general practice
19  on that point, whether as a practice, in general,
20  detectives used six-photo spreads when they were
21  trying to make a suspect identification.
22         Are you able -- do you know whether that's
23  true or not?
24     A.  Yes.  That would be a general practice.
25  If we were trying to identify a suspect and we were

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonexc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonexc.net

1  trying to be as neutral as possible with that
2  witness to have them provide an identification
3  that's unbiased by us, we would use the -- we would
4  want to use that six-person lineup or photo spread.
5      Q.  And would you agree with me that you,
6  know, as a practice, the converse of that is that if
7  you're making an identification and you don't think
8  someone is likely to be a suspect, but you want to
9  identify them, you'd expect to use a single photo
10  because, among other things, it's more expedient to
11  use a single photo, and these are fast-paced
12  investigations typically?
13      A.  That could be part of it, yes.
14      Q.  So let me point you back to Exhibit 4 for
15  a minute here.  I'm going to scroll you up to
16  page 2 -- the top of the page 2, where it says
17  "Question:  Was there anyone else with Tre when the
18  shooting occurred?
19      "Answer:  Fuzzy and Debo.
20      "Note:  Ms. Lockett was shown a picture of
21  Damon Rhodes, b/m, 5/14/75, and she identified him
22  as 'Debo.'  Ms. Lockett was shown a picture of
23  Mitchell Powell, b/m, 11/25/70, and she identified
24  him as 'Fuzzy.'"
25      Did I read that correctly?

1      A.  Yes.
2      Q.  And then the -- the next question asks if
3  Fuzzy and Debo had any weapons.  There are no
4  further questions and answers about the
5  identifications of Debo or Fuzzy.
6      Do you see that?
7      A.  There was no other -- I'm sorry.  Just
8  repeat that last portion.  "There was no other ..."
9      Q.  No other question and answer where
10  Ms. Lockett is asked a question about Fuzzy or Debo
11  or gives an answer about them.  Do you see that?
12      A.  Yes.
13      Q.  I mean, about their -- about identifying
14  them.  Do you see that?
15      A.  Yes.
16      Q.  So you talked about -- before about how
17  photo identifications are supposed to be documented
18  when a typewritten statement is taken.  And that
19  being that you show the photo, and it should say
20  something like "Question:  Do you recognize this
21  person?"
22      "Answer:  Yes, it's Debo."  Something to
23  that effect.
24      Was that your testimony?
25      A.  For -- for lineups?  Yes.

1      Q.  Okay.  And so am I correct that in a
2  typewritten statement there should be a question and
3  an answer about each photo and not just a note
4  saying Ms. Lockett was shown in making an
5  identification?  That that's, then, a summary and
6  not a verbatim identification for purposes of the
7  statement?
8      A.  I don't know that -- that I would agree
9  that necessarily it would have to be a question in
10  each one.  It was just to memorialize that the two
11  people she was referring to by nickname -- it was
12  i- -- just identifying those two people.
13      Q.  But let me -- let me ask it this -- let me
14  ask this:  If the stenographer is writing down what
15  happened, and Wendy Lockett in this interview
16  identified a picture as Debo, she must have said
17  something during that interview; right?
18      A.  During the prior interview, not during the
19  actual typing of the formal statement.
20      Q.  So is the stenographer -- you know, in the
21  Kansas City Police Department's practice, is the
22  stenographer allowed to take information from the
23  prior interview that the stenographer didn't witness
24  and add it to the statement?
25      A.  No.  They would only add what's -- what's

1  being stated at that time in their presence.
2      Q.  Okay.  So we agree that if Ms. Lock- -- if
3  the statement says Ms. Lockett identified the
4  picture of Damon Rhodes as Debo, she must have said
5  something in the stenographer's presence; correct?
6      A.  I -- I don't know.
7      Q.  I -- I mean, I -- and I guess I don't want
8  to ask you to speculate about what happened that you
9  don't have personal knowledge of.  In terms of the
10  practice, it would only be appropriate for the
11  stenographer to write down things that the
12  stenographer personally observed during the taking
13  of the statement; correct?
14      A.  At the direction of the detective, yes.
15      Q.  Okay.  And so if the stenographer is
16  following the rules and the statement says that a
17  witness made an identification, that should mean
18  that the stenographer witnessed an identification
19  take place; correct?
20      A.  No.  She's typing down what that
21  detective -- and that's why, I believe, it's
22  classified as a note in here, that that detective
23  provided that information to be added to the
24  statement.
25      Q.  Okay.  Okay.  So where it says "note," the

8700 Monrovia, Suite 310                                   (913) 825-2510
Lenexa, Kansas 66215-3500                                  Fax (913) 825-2530
www.cornerstonekc.net          Cornerstone          office@cornerstonekc.net
                        Court Reporting Company LLC
Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 21 of 41

Page 85

1  way stenographers used that was it was a place that
2  could include information they got from the
3  detective separate and apart from what they
4  witnessed during the witness interview; is that
5  correct?
6      A.  Right.  That -- that would not be just
7  a -- a -- not a statement -- that just not -- would
8  be not something that the -- the stenographer is
9  just typing based on their observation.  That would
10  be the detective noting that in the statement.
11     Q.  Okay.  And, by the way, as a matter of
12  practice among the detectives, where a witness has
13  identified someone at the scene of the homicide and
14  they're being asked about it, the typical practice
15  was for the detective to do the identification
16  procedure again in front of the stenographer so it
17  could be fully recorded; correct?
18     A.  I would say for the -- for photo -- for
19  lineups, yes.
20     Q.  Okay.  I'm going to mark another exhibit.
21  This is Exhibit 5.  This is the statement of Felicia
22  Jones, also taken in the White homicide
23  investigation.  This is a 4-page statement.
24         Are you able to see this on your screen?
25     A.  Not yet.

Page 86

1      Q.  How about now that I have hit the "share"
2  button?
3      A.  Yes.
4      Q.  Okay.  All right.  So in this statement,
5  Ms. Jones is being asked questions about who she saw
6  on the night that Larry White was murdered.  At the
7  bottom of page 3, it says "Question:  I'm now
8  showing you a single photograph of another black
9  male.  Do you recognize the person in the
10  photograph?
11         "Answer:  Yes.  That's Reggie.  He was
12  laying down on the couch in the apartment building.
13  He's the one that told the other boys to 'Make him
14  disappear.'"
15         Do you see that?
16     A.  Yes.
17     Q.  And I'll show you -- at the top of page 1
18  there's this exchange -- "Question:  While you were
19  at Reggie's, did you overhear a conversation between
20  Reggie and the boys in the apartment?
21         "Answer:  Yes.  They had woke Reggie up.
22  Apparently, they had woke him up before I got there
23  because he was on the couch.  And he just said,
24  'Make him disappear.'
25         "When you heard that statement, did you

Page 87

1  believe that he was talking about the kid on the
2  corner selling?
3         "Answer:  I didn't know who he was talking
4  about at first.  But then when I went outside, they
5  had to be talking about the kid selling on the
6  corner."
7         Did I read those correctly?
8      A.  Yes.
9      Q.  And I'll -- I'll represent that there's
10  other evidence, you know, in the investigation that
11  the kid selling on the corner is Larry White, the
12  victim of the homicide.
13         Does that make sense?
14     A.  Yes.
15     Q.  Am I correct that based on the information
16  that you gathered here, that Reginald Thomas had
17  said "Make him disappear" in reference to a homicide
18  victim, that according to the practice of the
19  detectives at the time, you would expect a six-photo
20  identification procedure in regards to Reginald
21  Thomas?
22     A.  I wouldn't speculate only because I don't
23  know more in-depth what was the context of what --
24  what that discussion was about within the -- the
25  interview.  So I wouldn't, no.  I wouldn't say one

Page 88

1  way or the other.
2      Q.  Okay.  And just to be -- and is that your
3  answer even assuming the following context -- if I
4  give you the context -- this is a detective talking
5  to a witness about a homicide, and the witness has
6  told the detective Reggie Thomas told -- told some
7  people in his apartment to make the murder victim
8  disappear right before the murder.
9         If you assume that context, would you have
10  the same answer?
11     A.  Yeah.  Because I'm only going by what I
12  could see in the statement here, not what was in
13  that detective's mind or what the conversation was
14  prior to that -- what made -- what made him
15  determine to do it that way.
16     Q.  All right.  And from your knowledge as a
17  homicide detective at this time and your testimony
18  that a six-photo identification is a -- is a step to
19  preserve the integrity of an investigation when
20  identifying a suspect, can you think of any reason
21  it wouldn't have been a good idea to use a six-photo
22  identification in reference to Reginald Thomas in
23  this interview?
24     A.  I mean, I can't -- no, I can't think of
25  any reason why it wouldn't have been.

8700 Monrovia, Suite 310                    (913) 825-2510
Lenexa, Kansas 66215-3500                    Fax (913) 825-2530
www.cornerstonekc.net          Cornerstone          office@cornerstonekc.net
Court Reporting Company LLC
Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 22 of 41

1      Q.  As a matter of practice at the time, were
2  detectives given discretion to use single-photo or
3  six-photo identifications based on what they thought
4  was appropriate?
5      A.  I would say that's accurate.
6      Q.  And so even if, in the example we just
7  looked at, the detective considered Reginald Thomas
8  a suspect at the time of the interview, there was no
9  policy preventing him from using a single-photo
10 identification with a suspect in a witness
11 statement; is that correct?
12     A.  I wouldn't speculate because I don't know
13 what that detective's mindset was on him at the
14 time.
15     Q.  Let me ask a better question just about
16 the policies.  Was there any policy in effect at the
17 time preventing a detective from using a
18 single-photo identification of a suspect in a
19 homicide investigation?
20         MS. PETERS:  I'm going to object -- well,
21 strike that.
22         I withdraw my objection.
23         Go ahead and answer.
24     A.  Sorry.  Just go ahead and just give me the
25 question one more time if you could.

1      Q.  (By Mr. Hilke)  Yeah.  During this time
2  period, was there any policy that a detective
3  couldn't show a single photo of a suspect in an
4  identification procedure with a witness?
5      A.  There was no policy that I was aware of
6  that specifically prohibited that.
7      Q.  Okay.  Let me ask you a -- okay.  And I --
8  I think you testified to this -- you testified in
9  this topic earlier, but just to clarify -- was there
10 any policy that police could only take a statement,
11 meaning a typewritten statement, from witnesses who
12 directly observed the homicide?
13     A.  There was no policy that I'm aware of that
14 would prohibit statements other than just that.
15     Q.  Okay.  Meaning police -- meaning
16 detectives could take statements when they thought
17 it would aid the investigation regardless of whether
18 the witness had actually seen the homicide taking
19 place?
20     A.  Correct.
21     Q.  Okay.  And there was no policy that
22 six-photo identifications could only be conducted
23 with witnesses who observed the actual homicide; is
24 that correct?
25     A.  Correct.

1      Q.  Let me -- exhibit-- Exhibit 6 -- this is
2  one of the lineup policies that was shared with us.
3  It's dated August 29th, 2000.
4         Do you see this document in front of you?
5      A.  Yes.
6      Q.  Is this one of the documents you reviewed
7  for this deposition?
8      A.  Yes.
9      Q.  And would this have been the policy in
10 effect in the 2003-to-2005 period?
11     A.  I would assume so.
12     Q.  So I want to call your attention to some
13 steps in the lineup identification process.  I'm on
14 page 2.  So Step 4 says when you do a lineup, you
15 should provide witnesses with Lineup Identification
16 Form -- Form 202 P.D. -- and give instructions on
17 marking the suspect's number on the form; is that
18 correct?
19     A.  I would have to look at the Form 202 P.D.
20 to be specifically familiar with it.  Just looking
21 at a form number -- I'm sorry.  I -- I just don't
22 know specifically without looking at that form.
23     Q.  Yeah.  I'm -- let me just ask -- according
24 to this policy, when a witness participates in a
25 lineup, they're given a form, and they're supposed

1  to mark the suspect's number on the form if they
2  make an identification; is that correct?
3      A.  Is that for the videotaped or live
4  lineups?  Or ...
5      Q.  Let's -- let's go to the top.  So at the
6  top, this policy says that "This memorandum sets
7  forth the procedures used in conducting a lineup of
8  a criminal suspect."
9         Do you see that?
10     A.  Yes.
11     Q.  And then No. 1 and 2 say try to get all
12 the victims and witnesses to view the same lineup
13 and try to show three fill-ins for each suspect.
14         Do you see that?
15     A.  Yes.
16     Q.  And it describes various procedures for an
17 investigation sergeant inspecting the lineup, that
18 the lineup should be videotaped, the detective
19 should assign each person a position, and some
20 instructions about viewing individually as group,
21 making them speak and turning or moving.
22         Do you see all that?
23     A.  Yes.
24     Q.  And then it describes a Form 181 that's
25 completed for listing certain information on the

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net
Cornerstone
Court Reporting Company LLC
(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Page 93

1  suspect and the fill-ins.
2       Do you see that?
3       A.  Yes.
4       Q.   And then we get to No. 4, and it says
5  Form 202 is what you give to the witnesses, and you
6  should give them instructions on marking the
7  suspect's number among other things.
8       Do you see that?
9       A.  Correct.
10      Q.   And then in No. 5 it says after the
11 lineup, separate the witnesses and then inquire if
12 identification has been made.  And "if a positive or
13 a tentative identification is made, retain the
14 Form 202 P.D. for file."
15      Do you see that?
16      A.  Yes.
17      Q.   So according to this policy, the Form 202
18 should be retained for file if a positive or a
19 tentative identification is made; is that correct?
20      A.  Yes.  And my understanding is that is for
21 live lineups that would be done.
22      Q.   Right.
23      And I can -- I can and will be happy to
24 show you the rest of the report.  But I didn't see
25 anything in this policy requiring Form 202 to be

Page 94

1  retained if no identification was made.
2       Are you aware of any such requirement in
3  the policy?
4       A.  No.  I'm not aware of any policy that
5  would require it to be kept if there was no
6  identification made.
7       Q.   Okay.  So -- oh.  Mark Exhibit 7.  These
8  are some documents related to the arrest and
9  interrogation of Gary Kitchen, who was questioned in
10 connection with the Larry White homicide.  All
11 right.
12      I'm going to show you on page 3 of this
13 report it describes the subject of the report as
14 "Suspect Interrogation, Gary D. Kitchen, Black male,
15 July 23, 1980."
16      Do you see that?
17      A.  Yes.
18      Q.   Am I correct that "Suspect Interrogation"
19 would be written as the subject of a report in a
20 homicide investigation during this time period when
21 the person being interrogated is a suspect in the
22 crime being investigated?
23      A.  Correct.
24      Q.   And there are certain, like,
25 constitutional protections, like giving Miranda

Page 95

1  warnings, for example, that need to accompany the
2  interrogation of a suspect; correct?  If they have
3  been arrested?
4       A.  Correct.
5       Q.   And then scrolling down to page 4 of the
6  PDF, the statement that's been taken here is titled
7  "Suspect Statement."  Do you see that?
8       A.  Yes.
9       Q.   And that's a different title than the
10 statement would have if it were just a witness.
11 Like, going back to Felicia Jones, Exhibit 5, for a
12 second here -- that just says "Statement," not
13 "Suspect Statement"; correct?
14      A.  Correct.
15      Q.   Going back to Exhibit 7, other than --
16 other than the statement being titled the "Suspect
17 Statement" instead of a "Statement," are there any
18 differences in how, as a practice, detectives would
19 take a suspect statement as opposed to just a
20 statement from a witness?
21      A.  No.  The general practice would be
22 iden- -- almost identical to a -- it would be the
23 same with the stenographer doing it, other than
24 what's included in the report there -- is just
25 the -- the statement about Miranda and that it

Page 96

1  was -- that they were willingly waiving the right in
2  giving that statement.
3       I would say that would be the only
4  addition to -- to a suspect statement as opposed to
5  just, like, a witness statement.
6       Q.   During this time period, did -- are you
7  familiar with -- and I'm forgetting the names of
8  them -- but, like, proactive policing community
9  units or other divisions within patrol that did not
10 respond to calls for service but instead did more
11 proactive policing?
12      A.  Yes.
13      Q.   Am I correct that those units were
14 sometimes assigned to assist in the investigation of
15 homicides?
16      A.  Yeah.  They could be assigned to assist in
17 the investigation of any investigative unit if it
18 deemed necessary.  But, yes, homicide would have
19 been one.
20      Q.   And during that time period, officers in
21 those proactive units would be expected to, you
22 know, have relationships or connections to people
23 who lived or frequented the neighborhoods to which
24 they were assigned; correct?
25      A.  Yes.

8700 Monrovia, Suite 310                                        (913) 825-2510
Lenexa, Kansas 66215-3500                                       Fax (913) 825-2530
www.cornerstonekc.net          Cornerstone          office@cornerstonekc.net
                               Court Reporting Company LLC
Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 24 of 41

1    Q.   And so, for example, if there is a drug
2  homicide, as a matter of practice, you'd like to be
3  able to talk to people from the area who buy or sell
4  drugs; right?
5    A.   Absolutely.
6    Q.   And if there are, like, people doing
7  prostitution in the area, they may also be useful
8  witnesses because they're, you know, out on the
9  street on whatever hours and may have seen
10  something; is that fair?
11    A.   Yes.
12    Q.   And those are -- and so as a practice is
13  it fair to say that the homicide detectives relied
14  on those patrol officers and their relationships to
15  develop witnesses to solve their cases?
16    A.   I don't know that we relied on it, but
17  we -- I definitely believe that that was -- that
18  that assisted us in having officers out there that
19  knew the people and could potentially, through other
20  means, be able to garner information that could be
21  utilized.
22    Q.   Yeah.  I -- I -- so I -- I don't know if
23  "relied" was the right word for me to use.  But was
24  it fair to say that those patrol officers in a
25  proactive capacity, you know, as a practice played a

1  role in solving some homicides that the homicide
2  detectives investigated during this time period?
3    A.   Yes.
4    Q.   Okay.  So -- by the way, did the -- am I
5  correct that one of the -- one of the practices
6  among homicide detectives was to try to develop
7  reliable information to solve homicides?
8    A.   You're going to have to probably expand on
9  that a little bit.
10    Q.   Yeah.  Actually, let me ask it a different
11  way.
12         Would you agree, in your experience
13  investigating homicides, that when you investigate a
14  homicide, you get a lot of information and you have
15  to sort out what's true and what's not?
16    A.   Yes.
17    Q.   And it's not uncommon to, you know, get
18  information or hear things from witnesses that turns
19  out to be false or partially true or misleading; is
20  that fair?
21    A.   That's correct.
22    Q.   And, in fact, it can be useful evidence in
23  an eviden- -- in a homicide investigation to
24  establish that a witness or a suspect is telling
25  lies about a homicide.  Would you agree?

1    A.   Absolutely.
2    Q.   And that if you can -- if you can prove a
3  lie and confront a witness or a suspect on it, you
4  might be able to close a homicide that way; is that
5  fair enough?
6    A.   I agree.
7    Q.   And so documenting everything you learn,
8  but then -- you know, then, I guess, evaluating the
9  truth or reliability of what you're told is -- was
10  part of the practice for solving homicides during
11  these years; correct?
12    A.   Yes.
13    Q.   So one -- one second, please.
14         One -- was it -- was it uncommon during
15  this time period for there to be witnesses to
16  homicides where those witnesses had addictions to
17  illicit drugs?
18    A.   Was it common or uncommon?  I'm sorry.
19  You said "common" or "uncommon"?
20    Q.   I said, "Was it" -- "was it uncommon."
21         Yeah, my question was was it uncommon to
22  come into contact with witnesses who had drug
23  addiction in homicide investigations during this
24  time period?
25    A.   I would say it was common, if that

1  clarifies.
2    Q.   It does.
3    A.   Okay.
4    Q.   And so among the homicide detectives at
5  this time -- and was there a practice of -- well,
6  let me -- let me start with policies, actually.
7         Was there any policy you were aware of --
8  of whether and how to document that a witness to a
9  hom- -- that a witness had, like -- had an addiction
10  to drugs?
11    A.   Was there a policy?  No.
12    Q.   Okay.  Was there a practice?  Like, if as
13  a detective, you learn that a witness has a drug
14  addiction, that that's something that should be
15  documented or not?
16    A.   I think it was a practice.  And I think it
17  probably extended more so as to anything that you
18  observed in them at the time.
19    Q.   Sure.
20         So meaning if they seem intoxicated during
21  an interview with an officer, that's something that
22  you should write down?
23    A.   Absolutely.  Yes.
24    Q.   But in -- in terms of investigating was
25  there any prac- -- you know, say you're talking to

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 25 of 41

1  an eyewitness who you learn or believe has a drug
2  addiction.  Was there a practice whether that
3  witness should be asked whether they were under the
4  influence of drugs while witnessing the crime?
5      A.  I think the practice, again, would have
6  gone back as to whether they were displaying
7  anything that might -- that -- that seemed out of
8  the ordinary or their behavior was dictating that.
9      Q.  Sure.
10         And so if a witness is interviewed, you
11  know, for example, days after the crime, the
12  practice would be to write down anything you saw in
13  them then, but not necessarily to ask them whether
14  they were using drugs at the time they witnessed the
15  crime; is that correct?
16      A.  I wouldn't say it was uncommon to do that.
17  Again, I think that the situation would kind of
18  dictate that, you know.  If they said they were
19  smoking crack at the time -- and, again, this is a
20  generalization -- you might expand on that.  But we
21  weren't just asking every single person, you know,
22  whether -- what addictions they might have or not
23  have, you know, when we were talking with them.
24      Q.  Okay.  Right.  So then certainly the
25  detectives would write down what the witness said.

1  But would you typically have any expect- -- strike
2  that.
3         Was there any general practice one way or
4  the other about whether to ask if a witness had
5  recently used drugs at the time they witnessed the
6  crime?
7      A.  I would say, yeah, there was probably a
8  pretty standard practice.
9      Q.  Okay.  And then was practice to write down
10  whatever the witness said?  Like, if you ask a
11  witness a question like that, you want to record
12  what they told you?
13      A.  Yeah.  I would think it would be
14  important.
15      Q.  And that was how detectives generally did
16  it during this time period?
17      A.  In -- would it -- I guess -- yeah.  I
18  mean, they would ask the question.  I guess, are you
19  saying in practice would they -- would they always
20  be asking a person that?  Or ...
21      Q.  No.  I'm -- I'm sorry.  I'm -- I meant, in
22  general, if the detectives ask a question, they
23  would write down what the witness told them?
24      A.  Yes.  If they -- I mean, if it was a
25  pertinent question, yes.

1      Q.  What do you mean "if it was a pertinent
2  question?"
3      A.  Well, pertinent answer, I guess, yes.
4      Q.  What do you mean if it's a "pertinent
5  answer"?
6      A.  Pertinent to the crime.  I mean ...
7      Q.  Wouldn't whether a witness had used drugs
8  before witnessing a homicide always be pertinent to
9  the crime because it goes to their reliability of
10  their information?
11      A.  Yes.  If you're -- if you're talking
12  specifically to that question and that question was
13  asked, yes, I believe it should be documented.  I
14  thought you meant just questions in general.  So I'm
15  sorry.
16      Q.  No.  You're fine.  And I just want to
17  be -- because I'm trying to get your testimony on
18  practices and not just, I guess, what you
19  personally -- should be done.
20         So just to clarify, that was generally the
21  practice.  What a witness tells you that goes to the
22  reliability of, you know, their observations of a
23  homicide is something a detective is going to write
24  down in the department's practice; is that fair?
25      A.  I believe so, yes.

1      Q.  Okay.  So would you agree with me -- well,
2  strike that.
3         I want to ask -- as a practice during this
4  time period -- about concerns that could arise with
5  the eyewitness testimony and whether those were
6  concerns that detectives did anything to address.
7         Here's one.  One concern, if taking a
8  statement from someone who sells drugs, is that they
9  might give false information to try to get a
10  competing drug dealer arrested.
11         Is that a concern that arose in the
12  practice of the homicide detectives during this time
13  period?
14      A.  I -- yeah, that would be a concern that
15  could arise, yes.
16      Q.  Another one is if you're interviewing
17  someone addicted to drugs, they might be just trying
18  to get back on the street as soon as possible and
19  just eager to answer questions in whatever way will
20  end the interaction.
21         Is that a concern that arose in the
22  practice of detectives during this time period?
23      A.  Yes.  Those could arise also.
24      Q.  And the third one would be if a witness
25  has, you know, a warrant or is on probation or on

Page 105

1  parole that they might feel pressure to cooperate so
2  that they don't get, you know, sent to jail or
3  violated.
4        Is that a concern that arose for
5  detectives during this time period?
6      A.  Yep.  That could be something that could
7  arise also.
8      Q.  Okay.  Now, was there anything -- let me
9  start with that probation/parole/warrant issue.  As
10 a practice, was there anything detectives did to
11 address that concern?  Meaning to reduce the
12 pressure on a witness who is on probation, parole,
13 or has an arrest warrant?
14     A.  Generally, no.  I mean, because we had
15 certain parameters -- I mean, would we address that
16 with them?  Yes.  But, I mean, typically we'd
17 address them that, you know, we couldn't make
18 decisions on those things.  We -- you know, that
19 those decisions would have to be either made by
20 probation or parole officers, prosecutors, and all
21 that.
22     Q.  So is it fair to say that the practice
23 would be to say, you know, "Look, I know you're on
24 probation; you've got a warrant.  Whether you
25 cooperate with me or not has nothing to do with how

Page 106

1  that's going to go.  You can talk to me if you want
2  to.  I can't help you with those issues"?
3      A.  No, not necessarily.  I mean, we were not
4  in the position to promise them anything.  But, I
5  mean, if they were a cooperative individual and
6  their probation officer wanted to know how they
7  acted when they were in contact with the police,
8  which could potentially be a condition of their
9  probation, we would be honest with them.
10     Q.  Uh-huh.
11     A.  With their -- you know, with their
12 probation officer, let's say.
13     Q.  Sure.
14        And that -- is that something you actually
15 experienced in your career?  Like, did you have
16 conversations with probation officers and other
17 people relative to witnesses you interviewed?
18     A.  Yeah.  I would say mostly if -- it would
19 be if they were reaching out to us.  I don't know
20 that we proactively reached out to many during the
21 course of the investigations.
22     Q.  If -- if the witness had been cooperative
23 with you, that's something you would mention to a
24 probation officer who called you about them; is that
25 fair?

Page 107

1      A.  Sure.  Yeah.
2      Q.  And what about the concern about people
3  addicted to drugs?  That they're just -- that they
4  might just say whatever they can to get back on the
5  street as fast as they can.
6        Was there anything that as a practice the
7  homicide detectives did during this time period to
8  address that concern?
9      A.  We would try to vet their statement as
10 much as we could in a situation like that.  I would
11 say that the practice was that people would try to
12 say they knew nothing way before they would
13 implicate somebody just to get it -- you know, away
14 from the police or out of a statement.
15     Q.  Well, and that's -- that's, like, a
16 common -- that's a common obstacle in a homicide
17 investigation; right?  That witnesses are reluctant
18 to provide information?
19     A.  I think that's common in any type of
20 investigation, that witnesses -- citizens or
21 subjects are reluctant to speak with the police.
22     Q.  Well, how -- you know, as a practice, you
23 know, and, you know, there are several witnesses in
24 this -- well, strike that.
25        As a practice, how did detectives during

Page 108

1  this time period get witnesses who were, you know,
2  dealing drugs, using drugs, engaged in prostitution
3  to come -- to come into the station and give
4  statements on these crimes?
5      A.  Building a rapport with people.  It's your
6  reputation as a detective.  You know, that would get
7  out to the streets.  "Hey, you know, this detective
8  has always treated me respectfully."  That's a big
9  thing out there sometimes -- is just the level of
10 respect you give and how somebody treats you.  I
11 mean, that -- that's -- that's one of a multitude of
12 things.  But it's just establishing rapport with
13 people.
14     Q.  And the -- and the concern I mentioned
15 before about if someone may be giving information to
16 try to put a competing drug dealer out of
17 business -- was there anything detectives did in
18 investigation to try to address that concern as a
19 practice during this time period?
20     A.  Again, I would say that you're just trying
21 to vet and you're trying to confirm somebody's
22 statement by what they're telling you.  And that, as
23 a matter of practice, would typically be when you're
24 doing that.  If they're providing alibi information
25 or they're providing any other information,

1  there's -- the sergeant or other detectives are
2  listening in on this, and then they're following up
3  on some of those things, you know, real time a lot
4  of times.
5      Q.  Sure.
6          By the -- by the way, am I correct that,
7  as a matter of practice, all of the steps taken in
8  an investigation should be memorialized in a report?
9      A.  You try to, yeah.
10     Q.  So if -- if a witness is interviewed, the
11  expectation is that there's going to be a report
12  memorializing the information given?
13     A.  Yes.
14     Q.  And if -- you gave the alibi example.  If
15  an alibi is being vetted and detectives follow up
16  and talk to people and check if it's true or not,
17  that validation should also be documented in a
18  report; correct?
19     A.  Yeah.  I mean -- yes.
20     Q.  And, likewise, if a -- you know, if a
21  weapon is retrieved, there should be a record
22  that -- of what the weapon was and how it was
23  inventoried; correct?
24     A.  Yes.
25     Q.  And -- hang on a second.

1          MR. HILKE:  Let's -- let's take a break
2  for a minute here.
3          THE REPORTER:  We're going off the record
4  at 12:18 p.m.
5          (A recess was taken.)
6          THE REPORTER:  Back on the record at
7  12:36 p.m.
8      Q.  (By Mr. Hilke) Sir, in -- in looking over
9  the policies I reviewed, I didn't see any policy
10  that defined exculpatory evidence.  Did you see any
11  such policy?
12     A.  No.
13     Q.  I didn't see any policy relating to the
14  disclosure of exculpatory evidence.  Did you see any
15  such policy?
16     A.  No.
17     Q.  Are you independently aware of any such
18  policy in effect during this time period?
19     A.  No.
20     Q.  I want to ask about -- and I can pull up
21  the topic, if it helps, but one of the topics
22  relates specifically to -- let me find it here.
23  It's, you know, what -- what it describes as
24  "incentivized accusers," but it defines it as
25  witnesses facing pending or potential criminal

1  charges including revocation or probation -- of
2  probation or parole.
3          Do you recall that topic in the notice?
4      A.  Yes.
5      Q.  So one question I have is -- in the
6  practice of homicide detectives at this time, when
7  interviewing a witness, was it typical to know
8  whether they had pending charges against them?
9      A.  I would say so, yeah, for the most part.
10     Q.  Is that typically among -- you know, like,
11  if you're running someone's information in the
12  course of your investigation, that's typically
13  information a detective is going to identify?
14     A.  Yes.
15     Q.  And, well, let me -- let me start with
16  this one.  Was there -- you know, if a witness
17  wanted consideration of some kind, you know, like
18  reducing their charges or having, you know, a
19  prosecution dropped or favorable treatment, was
20  there any process among homicide detectives to be
21  able to discuss or offer consideration for
22  participating in an investigation?
23     A.  We couldn't offer anything, but as --
24  again, as general practice, we would let them know
25  that we could speak with the prosecutor that was

1  handling the case we were investigating and relay
2  that to them so they could, you know, make a
3  decision on their part, whether it need to be
4  contacting another prosecutor if, you know, they
5  were charged within that same county or anything
6  like that.  But we would, you know, just like --
7  like I said, we let them know that we would speak
8  with the prosecutor and relay that information to
9  them.
10     Q.  Okay.  So you know -- of course, you know
11  the police department is a separate entity from the
12  prosecutor and thus cannot agree to drop charges or
13  change a course of a prosecution of its own power;
14  is that correct?
15     A.  Correct.
16     Q.  But it sounds like detectives were able to
17  say, you know, if you cooperate, we will communicate
18  that to the prosecutor in the charges you have
19  pending against you; is that correct?
20     A.  I don't think we would -- would solicit
21  that.  That would be something that, if they asked,
22  "Hey, look, I'm" -- you know, "I've got a pending
23  charge on me I'm concerned about."
24          "Okay."  You know, "We'll talk about what
25  we're talking about here, and when we give your

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Page 113

1  information to the prosecutor, we'll let them
2  know" -- you know, "about that." And then they can
3  make that decision on that end.
4      Q.  Okay. And in -- in the policies I
5  reviewed, I didn't see anything that addresses how
6  detectives should proceed if a witness makes such a
7  request, meaning asks if anything can be done on
8  charges against them.
9          Are you aware of any such policies?
10     A.  No.
11     Q.  And as a matter of practice -- and so, for
12 example, you're not aware of any policies requiring
13 anything to be documented if a witness asks about
14 getting help on charges against him; is that
15 correct?
16     A.  Correct.
17     Q.  And you're not aware of any policies that
18 require the detective to write anything down if they
19 talk to a prosecutor on a witness's behalf after
20 they've cooperated; is that correct?
21     A.  Correct. We would basically just consider
22 ourselves the messengers on that, and that would be
23 something that would be handled outside the scope of
24 what we were doing.
25     Q.  Okay. So as a matter of practice, is it

Page 114

1  fair, then, that you wouldn't expect, you know, any
2  of those conversations in which a detective is
3  messenger to be documented in a police report?
4      A.  Not typically, no.
5      Q.  And the -- am I correct that the
6  department had a more formal system of cooperation
7  within its narcotics division?
8      A.  Yes. I would -- I would say yes.
9      Q.  And they -- they would have, for example,
10 a system where you could actually become a
11 registered informant with the department for
12 purposes of working off charges or getting paid or
13 things like that; is that correct?
14     A.  Yes.
15     Q.  And the homicide division didn't have
16 anything like that, did it?
17     A.  No, we did not.
18     Q.  And the homicide division had no system
19 for either establishing or documenting confidential
20 informants, did it?
21     A.  Correct.
22     Q.  Okay. Let me change topics for a minute.
23 The investigative file for the Kristi Carroll
24 homicide investigation was produced to us in this
25 case. And that's an investigation you were

Page 115

1  personally involved in; correct?
2      A.  Yes.
3      Q.  And so you're aware that a court found
4  that a -- an exculpatory report was not given to the
5  defense in Yntell -- that's Y-n-t-e-l-l -- Duley's,
6  D-u-l-e-y-'s homicide prosecution and overturned his
7  conviction on that basis.
8          Are you familiar with that?
9      A.  Yes.
10     Q.  Have you reviewed the -- the judge's
11 opinion, the PCR habeas opinion overturning that
12 conviction?
13     A.  Yes. It's been years. It would have been
14 around the time that over -- when that case was
15 overturned that I would have read that, but I have
16 not since then.
17     Q.  And I will -- I will happily show it to
18 you if it helps to refresh your memory, and you can
19 let me know if you'd like me to do that.
20         Do you recall that the judge in that
21 habeas proceeding said, "Well, there was a witness
22 statement saying that, even though they don't like
23 Yntell Duley, he didn't do it. And, in fact,
24 someone else did it. And it doesn't appear that
25 that report ever got to the prosecutor or the

Page 116

1  defense."
2          Do you recall that?
3      A.  I don't recall the specifics of the
4  report. I do recall that that was -- that that was
5  brought up, yes.
6      Q.  Okay. I'm not going to spend a lot of
7  time on this, but I'm going to mark this Exhibit 8.
8  Let's see. Do you see this document in front of
9  you?
10     A.  I do.
11     Q.  And do you see that it's a nine-page
12 document described as a "judgment"? And see it's --
13 it was -- yeah. Sorry. Do you see that it -- in
14 the case of Yntell Duley versus State of Missouri?
15     A.  Yes.
16     Q.  Just going to draw your attention to this
17 paragraph on the second page, specifically that one
18 of Mr. Duley's allegations in his successful habeas
19 petition was that he "was denied due process and a
20 fair trial because the State failed to comply with
21 the Brady rule by not providing defendant's counsel
22 with exculpatory evidence, commonly recognized as
23 withholding evidence. The exonerating evidence was
24 contained in a police report in which a witness,
25 Terry Hutton, told Police Officer Everett Babcock

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com
(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net
Cornerstone
Court Reporting Company LLC
Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 29 of 41

Page 117

1  that he and two identified friends were present at
2  the Duley crime scene; that Duley did not like Duley,
3  but Duley did not shoot Kristi Carroll and others;
4  that another person, 'Nose,' did the shooting, then
5  re-enacted the manner in which the shooting took
6  place.  And that because the defendant took the case
7  rap, 'Nose' and Eddie provided funds for defendant's
8  attorney's fees and for his mother."
9          Do you see that?
10     A.  Yes.
11     Q.  Does that refresh your recollection of
12  the -- of sort of the evidence at issue in this
13  postconviction proceeding?
14     A.  Yes.
15     Q.  So do you know -- do you have any
16  knowledge of why that report was not provided to
17  prosecutors in that prosecution?
18     A.  No.  I have no specific knowledge of why
19  that full report wasn't provided at the time.  Was
20  not aware of it at the time.
21     Q.  And as a matter of the practices in place
22  in the homicide unit from 2003 to 2005, can you
23  think of any explanation of how a patrol officer
24  could write an exculp- -- a report with exculpatory
25  information and yet it is not provided to the

Page 118

1  prosecutor following the investigation?
2      A.  Well, just to correct, I believe that
3  detect- -- Everett Babcock was a detective at that
4  time in a separate squad.
5      Q.  Okay.
6      A.  I can speculate on why those things would
7  happen.  I can't tell you specifically on why this
8  one was not there.  It would be speculation on my
9  part as to how something like that could occur.
10     Q.  Yeah.  And without asking you to
11  speculate, is there anything you know about the
12  practices in the detective division from 2003 to
13  2005 that would have allowed a report like that to
14  go missing?
15     A.  I don't know that I would clarify it as
16  missing.  I understand what you're saying, but
17  the -- the records-keeping and the way cases were
18  kept track of then compared to the way they are now
19  electronically, which allows for cross-referencing,
20  is much different.
21         So, again, I don't want to get into a
22  bunch of speculation on this one.  But through
23  inattention, somebody might not know that "Hey,
24  this" -- "this report needs to go into this file
25  because that case report number does not match a

Page 119

1  case" -- you know, "from another case."
2         But, again, I think I'm getting into the
3  speculation part on that.
4      Q.  Yeah.  Would -- I'm -- right.  So is it --
5  is it fair to say that, aside from an administrative
6  error, meaning, like -- actually, let me ask you
7  a -- a different question for a minute, please.
8         I'm taking you back to Exhibit 2.  At the
9  bottom of the second page of Exhibit 2, there's a
10  stamp that says "logged," and it also says "scanned"
11  on the police report there.  Do you see that?
12     A.  Yes.
13     Q.  Do you know what those fields mean?
14     A.  Yes.  Typically that would be the -- when
15  that report was written by that officer, that
16  officer would turn that report in at the respective
17  patrol division that they worked in.  The clerks
18  there would then, at some point in time during a
19  shift -- I would presume after that report was read
20  and approved by a sergeant -- would scan those
21  reports -- either scan them or copy them to be
22  disseminated.  And what it looks like to me is that
23  that's that clerk's serial number in the "logged"
24  portion in there.
25     Q.  Okay.

Page 120

1      A.  So that's an administrative function at
2  the respective patrol division where that report was
3  turned in.
4      Q.  Okay.  And it -- it's specifically
5  relating to -- it's specifically a step in the
6  dissemination process; correct?  That for a report
7  like this that relates to a homicide, before you
8  make the copy that's going to go over to homicide,
9  you're going to stamp it so you've got a record that
10  it was processed in the patrol station?
11     A.  Yeah.  So earlier when I was testifying to
12  the fact that the records unit would get copies of
13  reports, this would be an example of that.
14     Q.  Okay.
15     A.  When we're going to get it, but the
16  homicide unit is not going to be the only -- we --
17  we weren't going to retain the only copy of this
18  report.  When that's logged and -- like that, it
19  means it's being copied and -- I wouldn't know if
20  they were scanned at that time or if they were just
21  copied and, you know, actually sent to the records
22  unit or -- or wherever they were going to be
23  disseminated.
24     Q.  Yeah --
25     A.  But that's what that indicates to me.

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                                  Fax (913) 825-2530
www.cornerstonekc.com          Cornerstone          office@cornerstonekc.net
                        Court Reporting Company LLC
Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 30 of 41

1    Q.  Okay.  And does the -- the fact that the
2  stamp says not just "logged" but also "scanned"
3  indicate anything to you as to the practice of
4  scanning these documents during the time?
5    A.  No.  I -- I don't know whether they were
6  scanning them at that time or not.
7    Q.  Yeah.  And then in terms of the
8  distribution, there is a -- you described earlier
9  the process of routing reports that relate to a
10  homicide so that it goes literally to the homicide
11  division to be distributed to the appropriate
12  sergeant; is that correct?
13    A.  The -- yeah.  That's the hope, ultimately,
14  that through this process it would get there.  The
15  other avenue would be the officers themselves -- if
16  they've been in contact with that specific unit --
17  is, you know, maybe -- maybe not handing off another
18  copy.  But for -- for this -- for what you're
19  speaking of here, yes, you're correct.
20    Q.  Okay.  When -- so in -- in addition to the
21  sort of official communication, if the patrol
22  officer has been working with a detective, they also
23  have the ability to bring a copy to them and hand
24  one that way also; is that correct?
25    A.  Correct.

1    Q.  And then there's also the records unit,
2  which is responsible for maintaining its own copy of
3  documents that are, you know, scanned or copied in
4  this fashion; is that correct?
5    A.  Correct.
6    Q.  Okay.  So then let me -- give me one
7  second.
8       So -- sorry.  One second.  Going back to
9  Exhibit 8 and turning back to the report that this
10  court found was exculpatory and withheld in Yntell
11  Duley's prosecution, your testimony, I think, before
12  was that administrative error is always possible,
13  but you don't personally know why this report didn't
14  get disclosed; correct?
15    A.  Correct.
16    Q.  And we've been provided more than 2,700
17  pages from the investigative file in this case.  And
18  the report described here is not in there.  And so
19  because the detect- -- the homicide detective is
20  responsible for maintaining the master file, the
21  master file generally only includes documents that
22  the homicide -- the case detective has personally
23  placed in there; is that correct?
24    A.  Yes.
25    Q.  And if a report was copied by the records

1  division but not placed by the homicide detective
2  into the master file, that's one reason why a report
3  could be missing from the master file and yet the
4  department retains a copy of it; is that correct?
5    A.  Yes, I think you're absolutely correct.
6    Q.  Stop sharing this.
7       I want to ask you about evidence handling.
8  And I'll pull up the policy titled "Handling
9  Physical Evidence Policies A," Exhibit 9.  Can you
10  see this document now?
11    A.  Yes.
12    Q.  And, again, you're not aware of any
13  policies about handling evidence beyond the ones
14  that you reviewed that were given to you by
15  Ms. Peters; is that correct?
16    A.  That's correct.
17    Q.  Sorry.  On -- on page 1, we've got a
18  policy issued April 2004.  Do you see that here?
19    A.  Yes.
20    Q.  And this policy rescinds, like, seven
21  separate procedural instructions and department
22  memorandums.  Do you see that there -- actually, six
23  separate.  Do you see that?
24    A.  Yes.
25    Q.  So I -- let me take you to page 13, and

1  there's a section on "Recovered Property -
2  Surveillance Tapes or Disks."  Do you see that
3  there?
4    A.  Yes.
5    Q.  And Subsection 1 says "All surveillance
6  tapes or disks that contain recorded images valuable
7  in the filing of felony charges against a suspect or
8  suspects will be recovered as evidence in accordance
9  with this directive."
10       Do you see that there?
11    A.  Yes.
12    Q.  And, as far as you know, was that the
13  policy throughout the 2003-to-2005 period?  That
14  tapes or disks with recorded images valuable in
15  filing felony charges must be recovered?
16    A.  I -- I can only tell you what -- that it
17  would be from the date that this policy came into
18  effect and beyond.  I don't know if that was the
19  specific policy from any of the rescinded ones
20  prior.  And I know, because of that asterisk next to
21  the "J" on there, that indicates that's a new
22  addition to a policy.  So that's what I can tell you
23  on that.
24    Q.  Okay.
25    A.  I know from -- what -- four -- April 8th,

Page 125

1 2004, and on that was the policy, specific.
2    Q.  Okay.  And as written, this policy --
3 would you agree with me that this policy requires a
4 collection of inculpatory recorded images, meaning,
5 for example, videos or photographs that tend to
6 establish the guilt of a suspect?
7    A.  I -- I don't know that it specifically
8 says that in there.  Does --
9    Q.  Do --
10    A.  -- it says "valuable" -- I mean, I -- I --
11 other than what it specifically says in there, yes.
12    Q.  Sure.
13       I mean, do you -- do you understand the
14 phrase "valuable in the filing of felony charges
15 against the suspects" differently?  That it means
16 something other than tending to inculpate the
17 suspect?
18    A.  No.  I agree with what you're saying.
19    Q.  Okay.  Are you aware of anywhere in these
20 policies where it's required to collect recorded
21 images that are exculpatory of a suspect?
22    A.  I am not.
23    Q.  Okay.  Let me mark another exhibit.
24 Exhibit 10.  This is a document -- "Interrogating
25 Interviewing Policies A."

Page 126

1       Do you see this on your screen?
2    A.  Yes.
3    Q.  And on page 2, there's a definition of
4 "Questioning Advisory - Do Not Arrest."  And it
5 clarifies that a questioning advisory is not the
6 basis for an arrest or booking of an individual, it
7 doesn't indicate probable cause, and that "the
8 subject should be informed of the measures required
9 to satisfy the questioning advisory, the location to
10 respond to voluntarily, et cetera"; is that correct?
11    A.  Yes.
12    Q.  And are you aware of anywhere else in the
13 policies you reviewed that questioning advisories
14 are addressed?
15    A.  No, I'm not.
16    Q.  And what does -- where that -- where this
17 definition says "the subject should be informed of
18 the measures required to satisfy the questioning
19 advisory" -- what does that mean?
20    A.  Typically would mean that if somebody came
21 across this subject, they would have to run them
22 through the -- you know, our computer system for
23 this to -- to pop up.  But if it popped up, the
24 subject would be given, you know, the opp- -- to
25 say, "Hey, look.  The detectives want to talk to you

Page 127

1 in regard to a case."
2       You know, if they're not being detained or
3 arrested for any other reason, they would be -- they
4 would be advised of which detective wanted to talk
5 to them and a contact number for them or a contact
6 number for the unit and encouraged to get in touch
7 with them.
8       Maybe some additional information would be
9 garnered from that person that would allow the
10 detectives to get in touch with them.
11    Q.  So the -- so then the -- the measures
12 required to satisfy the questioning advisory -- the
13 phrase "satisfy the questioning advisory" is
14 confusing to me.  Do you know what it means to
15 "satisfy a questioning advisory"?
16    A.  Well, for it -- just to have it purged
17 otherwise.  I mean, it would stay in the system
18 typically for the 90 days, you know, until that
19 person was contacted.  If -- if at that 90-day mark,
20 they weren't contacted, you know, at that point in
21 time, a decision would be made whether or not we
22 could reissue another one, you know, or leave it in
23 there, or -- or get rid of it.
24       But there's no leg- -- I don't see any
25 legal satis- -- you know, satisfaction in regard to

Page 128

1 this.  I mean, we're just trying to talk to a
2 person, and this is advising officers that "Hey, if
3 you run across this person, such-and-such detective
4 or unit wants to speak with them in regard to a
5 case."
6    Q.  And, by the way, we talked before a little
7 bit about community or proactive patrol officers.
8 Do their duties include trying to make contact with
9 people who had questioning advisories -- advisories
10 issued on them?
11    A.  Yeah.  That could be a duty that they had.
12    Q.  How were questioning advisories
13 distributed?
14    A.  It would just be put into the system,
15 like, our computer system, under that person's name.
16 So if they were ran, just like a warrant would -- it
17 would pop up underneath their record to notify the
18 officer.  Let's say they stop this person and for
19 whatever reason they ran them through the computer
20 system.  The dispatcher would relay that information
21 back -- "Oh, hey, by the way, this person's got a
22 questioning advisory out of the homicide unit."
23    Q.  Okay.
24    A.  You know, if we were looking for them and
25 we were in touch with officers in the field and

8700 Monrovia, Suite 310                                        (913) 825-2510
Lenexa, Kansas 66215-3500                                      Fax (913) 825-2530
www.cornerstonekc.net          Cornerstone          office@cornerstonekc.net
                        Court Reporting Company llc

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 32 of 41

1  asking them to proactively look, that information
2  could be, you know, provided to them ahead of time.
3      Q.  And so, by the way, if someone who's the
4  subject of a questioning advisory is contacted and
5  doesn't want to talk, is the questioning advisory
6  then immediately purged?  Or does it still stay in
7  the system for 90 days?
8      A.  No, it would still stay in the system.
9      Q.  Okay.  So they may find themselves being
10  questioned multiple times about it if they decide
11  that they don't want to come in to be -- give a
12  statement?
13      A.  Well, not -- not questioned in regard to
14  the questioning advisory itself or the crime.
15  Because they -- the -- the officer -- the patrol
16  officer, uniform officer that stopped them is not
17  going to typically question or -- you know, question
18  them in regard to whatever case it is because they
19  probably wouldn't know much information in regard to
20  that case, if that makes sense.
21      Q.  I -- I chose my words poorly.  What I
22  think I should have asked is, you know, if -- if I'm
23  in Kansas City and there's a questioning advisory
24  out for me, I can expect every time I'm contacted by
25  police and they run my name for the next 90 days,

1  they're going to ask me about the advisory until it
2  gets purged from the system?
3      A.  Yes.
4      Q.  Okay.  And, alternatively, if someone
5  stopped and they -- the questioning advisory is
6  addressed with them, and they decide to come in and
7  talk to the investigative unit, then that act of
8  coming in to talk is going to -- is going to -- is
9  going to close the questioning advisory about them;
10  is that correct?
11      A.  Yeah.  Typically, that would -- that would
12  be the satisfaction met.
13      Q.  Okay.  And is that -- back to this policy.
14  When it uses the phrase "the measures required to
15  satisfy the questioning advisory" -- is the only way
16  to satisfy the questioning advisory to come in and
17  talk to the investigative officers?
18      A.  Typically, yes.  But, I mean, you know, if
19  they're -- we've had witnesses or people with
20  informa -- with questioning advisories that maybe
21  it took going out there to talk with them, you know.
22  But at least they were located.  Maybe we weren't
23  able to locate them prior, but they were located and
24  said, "Look, I'm not going in.  If they want to come
25  out and talk with me" -- "we would -- we would make

1  every measure to do that -- to question them.  We
2  would prefer to do it, obviously, you know, on our
3  turf, but if we weren't able to, that -- that would
4  be a -- an instance where it would be satisfied.
5      Q.  I understand.  So it could, you know -- in
6  some circumstances it could be outside of the
7  detectives' offices instead of at the detectives'
8  offices.  But either way, the advisory is only
9  satisfied if the detectives interview the subject of
10  the advisory; is that correct?
11      A.  Yeah.  I mean, it could be satisfied by --
12  let's say they have warrants come out on them at
13  some point in time after the fact; they were
14  arrested.  It would be an alert to either the
15  officer arresting them or to the detention unit
16  to -- to get ahold of that -- respective detectives
17  and say, "Hey, this person is in custody down here."
18  You know, it just provides another opportunity for
19  them -- for us to -- to be able to talk with them.
20      Q.  Sure.
21      So it could also be satisfied if the
22  subject is arrested, and then it's up to the
23  detective to try to talk to them because they're --
24  they're now being detained; is that correct?
25      A.  Yeah.  Detained outside of the -- you

1  know, for something outside of the questioning
2  advisory itself.
3      Q.  Sure.
4      Are there any other methods you know of by
5  which a questioning advisory can be satisfied?
6      A.  I would guess the only other way -- maybe
7  learning that, through other sources, that they
8  might not have had information that we needed, and
9  then we would purge that questioning advisory.
10      Q.  Okay.  And they're also -- the department
11  also issued pickup orders to make arrests of
12  suspects in investigations; correct?
13      A.  Yes.
14      Q.  What's the standard for -- or in its
15  practice, was there a standard detectives had to
16  meet before requesting that a pickup order be issued
17  for a suspect?
18      A.  That there was probable cause to arrest
19  them in regard to some offense.
20      Q.  Okay.  And did the department have a
21  different standard for the necessary probable cause
22  to issue a pickup order and the necessary probable
23  cause to detain a suspect beyond 20 hours after
24  arrest?
25      A.  No.  I'd say it was the same.  I mean, it

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonexc.net
(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net
Cornerstone
Court Reporting Company LLC

Page 133

1  would -- regardless of whether it was an on-view
2  arrest or a pickup arrest, we still have the time
3  frame to get a warrant for them.
4      Q.  Yeah.  Did -- so I know it -- and by the
5  way, I'm changing topics now.
6          Confidential -- we talked about
7  confidential informants being a mechanism specific
8  to the narcotics detectives within the department.
9  Did patrol officers who assisted in homicide
10 investigations have any system for log -- for
11 signing up or documenting confidential informants?
12     A.  No.
13     Q.  Now, was there -- in the homicide
14 detectives' practice in 2003 to 2005, did they at
15 time receive reports from patrol officers where
16 patrol officers would identify witnesses as a
17 confidential informant or confidential source?
18     A.  I've seen reports like that, yes.
19     Q.  Okay.  And I haven't seen any policies
20 regarding, you know, how and when to make such
21 designations.  Are you aware of any such policies?
22     A.  No.  There are no policies in regard to
23 patrol officers and confidential informants.
24     Q.  Okay.  And is the same true for homicide
25 detectives?  They also don't have any policies on --

Page 134

1  during this time period on confidential informants
2  or confidential sources?
3      A.  Yeah.  We had no mechanism for any of that
4  within violent crimes.
5      Q.  So in the practice in homicide
6  investigations, what was the significance of a
7  patrol officer designating a witness as a
8  confidential informant or confidential source?
9      A.  I'd say a mistaken belief.  Just because
10 it would be in a report doesn't mean we would have
11 treated them that way.
12     Q.  Uh-huh.  And in the homicide detectives'
13 practice, when an officer wrote down that a witness
14 was a confidential source or confidential informant,
15 was there a practice of how to get information
16 about, you know, who that witness was?
17     A.  I don't know that there was a general
18 practice that we had in place.  I would say the
19 general practice would be if it were real time, we
20 would get ahold of the officer and say, no, that
21 person -- we need to -- that person needs to be
22 identified.  We need to know who they are and make
23 every attempt for us to be talk with them.
24     Q.  Sure.
25     A.  Again, there was no policy -- we would not

Page 135

1  treat that person in any way as any type of
2  confidential source or informant on our end.
3      Q.  Sure.
4      A.  It --
5      Q.  Go ahead.  No.  Go ahead.  I'm sorry.
6      A.  I was just -- right -- and the only other
7  difference would be -- is whether or not we were
8  getting that report from that officer real time or,
9  you know, that report is getting dropped in the pan
10 a day later.  I don't know specifically -- I'm --
11 I'm not giving any specific incident.  But either
12 way we'd be making every attempt to identify that
13 person through that officer with ever -- for
14 whatever means we deemed necessary to identify them
15 and get them spoken to.
16     Q.  Sure.
17         So if the -- if the witness described as a
18 confidential informant or a confidential source was
19 an eyewitness and had seen, you know, some portion
20 of a homicide, for example, the expectation would be
21 that the detectives are going to find out who that
22 witness is and that they're going to treat them just
23 like any other witness in the investigation?
24     A.  Absolutely.  Because there is no mechanism
25 for them to be deemed that through patrol.  We would

Page 136

1  not consider them a confidential informant.
2      Q.  Yeah.  And then -- am I correct that the
3  expectation would be -- well, strike that.
4          In the practice at the time, because such
5  a witness is going to be treated like any other
6  witness, if the detectives, you know, speak with the
7  witness, get information from them, they're going to
8  write a report on that interview just like any other
9  report in their investigation; correct?
10     A.  I presume so, yes.
11     Q.  And because they're documenting a homicide
12 investigation and because what, you know -- there's
13 no confidential informant mechanism, the practice
14 for the detective would be to write down the name
15 and other identifying information of that source;
16 correct?
17     A.  Correct.
18     Q.  But as -- as far as you're aware, as to
19 that patrol officer and the report they wrote, where
20 they wrote down a confidential informant or
21 confidential source, that patrol officer is
22 permitted to keep the identity in their memory,
23 meaning they weren't required to document the name
24 of that source anywhere else; is that correct?
25     A.  I -- I wouldn't necessarily agree with

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                                  Fax (913) 825-2530
www.cornerstonexc.net                                      office@cornerstonexc.net
Cornerstone
Court Reporting Company llc
Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 34 of 41

1 that.
2    Q.  So what -- was the requirement that a
3 patrol officer write down the name of any witness
4 they speak to?
5    A.  If they're documented in a report and they
6 know it, yes.
7    Q.  Okay.  And what's your -- what's your
8 basis for saying that that was a requirement?
9    A.  Well, I mean, if they're documented in --
10 documented in a report -- that there's no mechanism
11 that I'm aware of that would allow them to keep them
12 confidential in that regard.  The only way we
13 typically dealt with -- we wouldn't -- I wouldn't
14 even call them "confidential."  We'd call them
15 "unknown."
16    Somebody is approaching you by phone or
17 something saying, "Hey, I have information," we're
18 going to write that information down.  But we might
19 not be able to get their name.  But that would be
20 the only way I would consider -- outside of, you
21 know, like -- like, a narcotics investigation where
22 you're a registered confidential informant -- of
23 documenting something without having somebody's
24 name.
25    Q.  One second.  So I marked this Exhibit 11.

1 This is a report dated October 7, 2003.  It's in the
2 Larry White homicide investigation.  It's signed by
3 V. Huth.
4    Do you see this document on your -- on
5 your screen?
6    A.  Yes.
7    Q.  And the -- taking you to the second page,
8 the first paragraph of the narrative says "On
9 10/7/03 at 1155 hours, Police Officer Begley and I
10 were contacted by a confidential informant in regard
11 to information on a homicide that occurred on
12 10/6/03 at 28th and Wabash."  Do you see that?
13    A.  Yes.
14    Q.  And then says "She stated that on
15 10/6/03 at approximately 8:30 p.m. she observed a
16 black male running from 29th and Olive (apartment
17 buildings), being pursued by two other black males
18 who were firing guns at him.  She stated that the
19 black male ran north in the alley just east of the
20 above-mentioned apartments, jumped a fence, and ran
21 eastbound beside 2846 Wabash.  The two black males
22 continued pursuing him while firing rounds from an
23 unknown weapon."
24    Do you see that?
25    A.  Yes.

1    Q.  And then if you look up at the first page
2 of the report, there's no subject here, meaning that
3 the person described as a "confidential informant"
4 in the report is not further identified there.
5    Do you see that?
6    A.  That's what that officer that wrote the
7 report labeled them as, correct.
8    Q.  Right.  And I -- I understand your
9 testimony is -- you know, confidential informant --
10 that's not an official thing.  There's no mechanism.
11 There's no tracking.  There's no process for
12 anything like that in the department during this
13 time period for patrol officers.  Is that correct?
14    A.  That's correct.
15    Q.  So consistent with your testimony, a
16 homicide detective during these years receiving this
17 report would find out from the author who the
18 confidential informant is; right?
19    A.  I would -- I would suspect so, yes.
20    Q.  And consistent with your testimony, any
21 subsequent interaction with the confidential
22 informant would be documented in a report, and that
23 report would identify who the confidential informant
24 was.  Is that correct?
25    A.  My only caveat would be presuming that the

1 officer that -- that came in contact with this
2 person was able to get identifying information from
3 them, yes.
4    Q.  And showing you to the bottom of the form,
5 Officer Huth writes at the bottom "It should be
6 noted that the above-mentioned informant has in the
7 past given us reliable information in regard to
8 numerous crimes."
9    Do you see that?
10    A.  Yes.
11    Q.  And so, presumably, this is not a person
12 unknown to Officer Huth at the time he wrote this
13 report.  Would you agree?
14    A.  That would be my -- I can only speculate
15 on that.
16    Q.  Sure.
17    MR. HILKE:  I'm going to go over my notes.
18 Can we take a short break, please.
19    THE COURT REPORTER:  Going off record at
20 1:22 p.m.
21    (A recess was taken.)
22    THE REPORTER:  Back on the record at
23 1:27 p.m.
24    MR. HILKE:  Sir, I don't have any more
25 questions for now.  I appreciate your time today.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 35 of 41

Page 141

1     MS. PETERS:  I have a few.
2     Can -- this is a question for the court
3  reporter.  I want to make sure you can hear me.
4     THE REPORTER:  I can hear you.
5     MS. PETERS:  You can?
6     THE REPORTER:  Yes, I can.
7     MS. PETERS:  Okay.  I'm off-camera.  So
8  I'll -- I'll try to speak up.
9     EXAMINATION
10 BY MS. PETERS:
11    **Q.  Mr. Dillenkoffer, I have some questions**
12 **for you regarding training of homicide detectives**
13 **from the time frame 2003 to 2005.  And I want to**
14 **start with what you referred to earlier as**
15 **"detective school."  What is detective school?  And,**
16 **again, I'm referring to the time frame 2003 to 2005.**
17    A.  So detective school would have typically
18 been put on by supervisors from investigative units
19 or, I would say, very tenured detectives.  But it
20 was very general just in terms of putting a case
21 together, probable cause, reasonable suspicion,
22 interview techniques, interrogation techniques,
23 maybe go into a -- even a little bit of court
24 testimony-type training.  All very, I would say,
25 kind of 101, general -- just training on the

Page 142

1  differences between being a patrol officer.  Report
2  writing would be another one.  You know, writing
3  reports in regard to an investigative case instead
4  of offense report, let's say.
5     **Q.  And detective school -- how long was**
6  **detective school?**
7     A.  Generally, it was a week long, you know,
8  Monday through Friday.
9     **Q.  Was it all classroom?**
10    A.  Majority classroom, yes.
11    **Q.  Were there parts of detective school that**
12 **were outside the classroom?**
13    A.  Generally no, unless, occasionally, they
14 might try to maybe go into a courtroom and talk with
15 a judge or have a judge kind of give some
16 information.  But generally it would have been just
17 classroom, Monday through Friday, training.
18    **Q.  And was detective school held at the**
19 **police academy at KCPD?**
20    A.  Either the academy or at headquarters
21 somewhere, really where space is available.
22    **Q.  Do you recall if the general topic of**
23 **identifying evidence for a case file would have been**
24 **taught in detective school during this time frame?**
25    A.  If so, it would have been very general

Page 143

1  evidentiary -- classroom.
2     **Q.  Would a topic such as exculpatory evidence**
3  **have been taught in detective school during this**
4  **time frame?**
5     A.  It was --
6     MR. HILKE:  I just want to -- oh, just
7  object to foundation.
8     You can answer.
9     THE WITNESS:  I'm sorry?
10    **Q.  (By Ms. Peters)  He objected to**
11 **foundation.  So let me rephrase my question.**
12    **Did you attend detective school yourself?**
13    A.  No, I did not.
14    **Q.  Okay.  Did you work with other detectives**
15 **that did attend detective school?**
16    A.  Yes.
17    **Q.  Okay.  And did you work with detectives**
18 **that attended detective school in the time frame of**
19 **2003 to 2005?**
20    A.  Yes, I would have.
21    **Q.  Okay.  Did you teach at detective school?**
22    A.  Later -- not during that time frame, but
23 later in my career, yes.
24    **Q.  And what time frame did you teach at**
25 **detective school?**

Page 144

1     A.  Would have -- I would say 2000 to -- 2015
2  and on, after I was a -- a sergeant within an
3  investigative unit.
4     **Q.  So 2015 to 2000- --**
5     A.  '21.
6     **Q.  So back to the time frame of 2003 to 2005,**
7  **were you generally aware of what was taught at**
8  **detective school?**
9     A.  Yes.
10    **Q.  And how were you aware of that?**
11    A.  I would say just amongst the normal
12 discourse between detectives and sergeants of what
13 would be taught.  I can remember the time that it
14 was decided I wasn't going to go because all the
15 topics we were talking about I had been doing and
16 working -- doing for a number of years at that
17 point.
18    **Q.  And, again, I'm going to ask you are --**
19 **are you aware whether a topic such as exculpatory**
20 **evidence was taught at detective school from 2003 to**
21 **2005?**
22    A.  I'm not aware.  I -- I couldn't tell you
23 whether that was or not during that time frame.
24    **Q.  What about -- same time frame -- what**
25 **about the topic of Brady issues or Brady-Giglio**

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                                  Fax (913) 825-2530
www.cornerstonekc.net          Cornerstone          office@cornerstonekc.net
                          Court Reporting Company LLC
Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 36 of 41

Page 145

1  material?  Was that a topic that was taught in that
2  time frame at detective school?
3       A.  I believe that would be a topic that would
4  have been gone over.
5       Q.  Okay.  Now, you testified that you didn't
6  go to detective school --
7       A.  Correct.
8       Q.  -- right?
9           And was detective school only for homicide
10  detectives?
11      A.  No.  That would have been for anybody who
12  was being assigned as a detective from a patrol
13  officer or uniformed officer.
14      Q.  Was the general requirement at KCPD that
15  all new detectives at some point had to go to
16  detective school?
17      A.  Wasn't a requirement.  It was -- but it
18  was something that they wanted to, in a timely
19  fashion, get people who were becoming detectives
20  into that to give them some additional training.
21      Q.  Okay.  And what would be "a timely
22  fashion"?
23      A.  Ideally, within a year of becoming a
24  detective is when they would try to do it.
25      Q.  Would it -- would it be assumed if someone

Page 146

1  was working as a detective longer than a year or
2  they were already practicing -- well, strike that.
3           Was it assumed that after a year of being
4  a detective on the job that the detect- --
5  one-week-long detective school really had nothing
6  additional to offer?
7       A.  Yes.  The -- the school itself would have
8  a limited number of spots.  So I think it was -- was
9  kind of on an individual, case-by-case detective who
10  they would decide would be going to detective
11  school --
12      Q.  Okay.
13      A.  -- based on experience.
14      Q.  Okay.  So we talked about detective
15  school.  I want to move now -- and I only want to
16  talk about the homicide -- or homicide detectives,
17  2003 to 2005.  What kind of -- what was the training
18  like?
19      A.  Typically training would be outside.  As I
20  had said before, it would be outside training where
21  an instructor or a member of an outside police
22  department would have a course they would put
23  together and typically bring to our department.
24          And the -- and the only reason I say
25  that -- that -- because of cost constraints,

Page 147

1  typically if we would host some sort of training,
2  the hosted department would get so many free seats
3  or, you know, free slots within the training.  So
4  that's how, typically, the training that we would
5  get would come to us.
6       Q.  And did you attend any of that type of
7  outside training from 2003 to 2005 when you were a
8  homicide detective?
9       A.  I can't specifically say during that time
10  that it -- there was multiple training opportunities
11  I had throughout my career in homicide.  So ...
12      Q.  You can't pin it down to that just
13  specific time frame?
14      A.  No, I cannot.
15      Q.  Okay.  Okay.  So aside from the outside
16  training, how did a homicide detective learn how to
17  do his job as a homicide detective?
18      A.  So, typically, I would say members were
19  not -- would not become homicide detectives directly
20  from the field.  They would typically go to other
21  units, whether it be domestic violence, could be sex
22  crimes or juvenile unit.  That's where you would get
23  your initial -- and almost all of it was, like,
24  on-the-job training at that point.
25          So going into homicide, because the -- the

Page 148

1  relative number of cases that you would get assigned
2  compared to another unit would not be the same, you
3  typically had a period where you were not the
4  primary, not going to be a case detective, not going
5  to be interrogating subjects, initially.  They would
6  start you off, you know, with witness interviews and
7  other aspects of the investigation.  And then as
8  time went on, you'd be given more responsibilities.
9       Q.  Okay.  So from -- from what I understand
10  from your testimony -- is that the practice at KCPD
11  at -- from 2003 to 2005 was -- in order for someone
12  to become a homicide detective -- maybe not always,
13  but typically they would have been a detective in
14  another unit first?
15      A.  Yes.
16      Q.  Okay.  And then once they're a new
17  homicide detective, they're not given as many cases
18  as a more senior homicide detective?
19      A.  Correct.
20      Q.  And what are some other differences for a
21  new homicide detective learning the job?  For
22  example, is a new homicide detective limited to a
23  certain type of case?
24      A.  So yes.  And to explain that, it really
25  goes into the process of how we investigated

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                                   Fax (913) 825-2530
www.cornerstonekc.net          Cornerstone          office@cornerstonekc.net
                               Court Reporting Company LLC

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 37 of 41

1 homicide cases back then. You were either -- for
2 lack of a better term, we were investigating either
3 "smoking gun" cases, where you -- you would get
4 there and you would know who your suspect was. So
5 you weren't trying to develop a suspect per se -- as
6 opposed to what we called kind of the "whodunit"
7 cases, which were our murder squad cases, where
8 you're basically going in cold. You don't know who
9 your suspect is, and you're having to develop all
10 that.
11        Generally it's thought that a smoking
12 gun-type case is not as involved as a -- what would
13 be a murder-squad-type case that we were working.
14    **Q. Okay. And was there -- now there's -- I**
15 **will tell you there's been prior testimony in this**
16 **case that a new homicide detective would be working**
17 **with a -- kind of like a -- an FTO or field training**
18 **officer, but it would be a -- another more senior**
19 **homicide detective. Is that something that was**
20 **practiced at KCPD in the homicide unit from 2003 to**
21 **2005?**
22    A. Yes. And not necessarily specific just to
23 the training aspect of it. We generally worked in
24 pairs as detectives, even going out and talking with
25 people.

1        So there -- you know, a lot of times
2 there'd be two of you there. So just the aspect of
3 having two people there that, you know, you're
4 allowing one person to learn while they're doing it.
5 It wasn't just because we wanted -- it wasn't just
6 for our training purpose that we were doing that.
7 We just typically worked in pairs, and that allowed
8 for that.
9        And you wouldn't put -- you know, let two
10 tenured detectives be a -- you know, partner up and
11 then two nontenured detectives partner up. You
12 would -- the sergeant would typically split them up
13 where you had a tenured detective and a newer
14 detective, you know, working together. So just
15 organically that's how you learned.
16    **Q. How long would a new homicide detective**
17 **work with a training detective during this time?**
18    A. Our rotations were three-month rotations
19 on how we worked murder squad and -- working a day
20 shift, working a -- an evening shift. So I would
21 say one to two three-month rotations would be pretty
22 standard depending on how they were picking up
23 things.
24        Also, depending on your caseload. Because
25 a part of what we also did in homicide was work

1 suicides and dead bodies. So even though criminally
2 we weren't turning a case over to the prosecutor's
3 office, a lot of the investigative techniques were
4 identical.
5        So if they had busy months where they were
6 working a lot of dead bodies, a lot of suicides,
7 that might shorten, you know, their training period
8 just depending on how much exposure they were
9 getting to doing a lot of the things you'd be doing
10 in a homicide investigation.
11    **Q. Okay. Let me break that up a little bit**
12 **so I understand. Is it your testimony that**
13 **rotations were two to three months in the homicide**
14 **unit?**
15    A. The squad rotation was three months, where
16 one -- we had three squads; so one squad would work
17 a month of days, then you would transition to a
18 month of evenings. And during those times, we would
19 only work the quote -- the -- the "smoking gun"
20 murders.
21        And then we would do a 28-day rotation
22 where we're doing the murder squad, where you're on
23 call. You were not working any other cases; you
24 were just on call to handle those cases where
25 somebody was found dead and there was no suspect.

1 You'd get called in regardless of whether you're
2 working or you're off time, and then you would come
3 in and work those.
4    **Q. And would a new homicide detective be**
5 **working with a training detective through three**
6 **28-day cycles at the least?**
7    A. Yes.
8    **Q. Okay. To get all the experience of all**
9 **the different types of cases that you've just**
10 **described?**
11    A. Right.
12    **Q. Okay. I have -- I want to switch a topic**
13 **here. I have a question or two about Exhibit 6.**
14        MS. PETERS: If you don't mind, Wally, can
15 you pull that up. I believe I have the correct
16 exhibit number.
17        MR. HILKE: Yeah. That's the lineup
18 policies; right?
19        MS. PETERS: Yes.
20        MR. HILKE: Sure.
21    **Q. (By Ms. Peters) Okay. I have just really**
22 **one question for you. But to -- to kind of lay the**
23 **foundation for it -- you correct me if I'm wrong --**
24 **but earlier when you were testifying about**
25 **Exhibit 6, which is the policy on live lineups;**

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company llc

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 38 of 41

Page 153

1  correct?
2      A.  Yes.
3      Q.  I believe you testified that -- well, and
4  let me back up.  What's the form -- what is a
5  Form 202 as it -- as it is referred to in this
6  policy?
7      A.  I do not remember specifically.  I would
8  have to look at that form to -- to -- to actually
9  tell you.  We did not do live lineups very often.
10 So they're just not forms that I'm very familiar
11 with.
12     Q.  Was a Form 202 a form where a eyewitness
13 would mark on it if the eyewitness made a positive
14 identification in the live lineup?
15     A.  Yes.
16     Q.  Okay.
17         MR. HILKE:  Sorry.  Just object to
18 foundation.
19         You can answer.
20     Q.  (By Ms. Peters)  And I believe that's what
21 you testified to earlier; correct?
22     A.  Yes.
23     Q.  Okay.  A Form 202 was not retained if a
24 witness did not make a positive identification; is
25 that correct?

Page 154

1      A.  I believe that's correct.  Yes.
2      Q.  Okay.  Do you know why that is?  Why the
3  Form 202 would not be retained if a positive
4  identification was not made?
5      A.  I -- I would just say because it's not
6  memorializing anything pertinent that happened that
7  could not just be put in a report.  It wasn't of
8  evidentiary purposes that "Hey, look, they
9  identified somebody" and they -- they put a marking
10 on it by initials or date or somewhat.  It could
11 just be memorialized in a report by a detective
12 saying, "Nobody was identified from this."  You
13 know, we felt that that served its -- the same
14 purpose in itself.
15     Q.  And would -- as part of that report
16 memorializing that no positive identification was
17 made from a live lineup, would there be any
18 additional information that would be required to be
19 in that report about the live lineup itself?
20     A.  Not that I'm aware of.
21     Q.  Would there be any information required to
22 be in the report regarding the names of the
23 individuals, for lack of a better word, displayed in
24 the live lineup?
25     A.  Yeah.  I believe that information would be

Page 155

1  provided -- what individuals were put into a live
2  lineup.  But, again, I've done very, very few live
3  lineups in my career.  We just didn't typically in
4  our -- in homicide use them.
5      Q.  And why is that?  Do you know why that is
6  that live lineups were not typically used?
7      A.  I would say the reasoning -- typically
8  when live lineups were used was if maybe -- in
9  robberies, and I use that because I think robberies
10 would use more live lineups where the -- where
11 the -- the witnesses were saying that the -- the
12 suspect said something specifically.
13         So the live lineup itself was not just a
14 photograph but maybe -- you know, inflection in
15 voice or tone of a person's voice also might be
16 something, you know -- that that's being used during
17 that.  And typically maybe not having the person --
18 and you'd have to have the person in custody also in
19 order to do the live lineup.  So we -- we typically,
20 you know, a lot of times did not have that
21 opportunity.
22     Q.  Okay.  I want to switch gears to
23 Exhibit 11, which is Vern Huth's October 7, 2003,
24 report.  Is that up on the screen?
25     A.  Yes.

Page 156

1         MS. PETERS:  Can you scroll to the second
2  page, Wally, please.
3         MR. HILKE:  Yes.
4         MS. PETERS:  Okay.  Thank you.
5      Q.  (By Ms. Peters)  So we discussed this
6  report earlier in your testimony with Mr. Hilke.
7  This is a report that was submitted by Vern Huth
8  regarding a confidential eyewitness -- at least
9  as -- as documented by Vern Huth, a confidential
10 informant eyewitness to the murder of Larry White.
11         Do you see that?
12     A.  Yes.
13     Q.  Okay.  And I -- you testified about that
14 earlier, and I just wanted to clarify a few
15 quest- -- some testimony here.  So if a patrol
16 officer wrote this report -- very similar or a
17 report like this out in the field, I believe your
18 testimony was earlier that if a homicide detective
19 found out about it, he would document the identity
20 of that confidential informant; correct?
21     A.  Yes.
22     Q.  And how would he do that?
23     A.  Well, I would say -- and there -- there
24 are a couple different options.  If -- getting this
25 report, getting ahold of that officer, number one,

8700 Monrovia, Suite 310                                              (913) 825-2510
Lenexa, Kansas 66215-3500                                           Fax (913) 825-2530
www.cornerstonekc.net          Cornerstone          office@cornerstonekc.net
Court Reporting Company LLC
Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 39 of 41

Page 157

1  saying, "Hey, you're going to have to do an
2  additional report identifying this person."
3        Or if we were able to get ahold of that
4  person, we -- we could do a report saying that, you
5  know, "We talked with this person. We're treating
6  him as an eyewitness. This is their name." You
7  know, if it turned out that they were a person that
8  was, quote, labeled as a confidential informant or
9  source in a report, we could say, you know, "It
10  should be noted that this is" -- "that this person
11  we're talking to is the person that was originally
12  labeled as such and such in a previous report." We
13  would connect it somehow to -- to clarify that.
14        Q.  So it would be the practice -- in the
15  practice of a homicide detective in the time frame
16  2003 to 2005 to document not only the name of that
17  confidential informant but also to get a statement
18  from that confidential informant; correct?
19        A.  Yes.
20        Q.  And also to link up that confidential
21  informant with the report from the patrol officer;
22  correct?
23        A.  Yes. Assuming somebody had the name of
24  that person when they talked to them.
25        Q.  Okay. And also assuming that the homicide

Page 158

1  detective had a copy of that report by the patrol
2  officer identifying a confidential informant
3  eyewitness; correct?
4        A.  Yes.
5        Q.  Obviously, if the homicide detective
6  doesn't have a copy of that report, he may not
7  understand that the patrol officer was calling the
8  eyewitness a "confidential informant" and wouldn't
9  know to document it as -- as you just identified;
10  correct?
11        A.  Correct.
12        Q.  All right.
13        MS. PETERS:  I don't have anything
14  further.
15        Josh?
16        MR. HANER:  No questions.
17        MR. HILKE:  I have -- I have just a few.
18              EXAMINATION
19  BY MR. HILKE:
20        Q.  You -- Ms. Peters had asked you some
21  questions about whether detectives typically work an
22  assignment other than homicide before joining
23  homicide. Are you aware of any specific
24  requirements that applied in 2003 to 2005 that a
25  detective had to satisfy before joining the homicide

Page 159

1  unit?
2        A.  No, I'm not aware of any specific ones.
3        Q.  You testified a little about the period in
4  which a new homicide detective would work with a
5  more senior detective. Are you aware of any
6  specific requirements as to the nature or length of
7  that training period?
8        A.  No. Not at that time.
9        Q.  And you were asked some questions about
10  identifications and nonidentifications during live
11  lineups. Are you aware of anywhere in any of the
12  policies you've reviewed that it is specifically
13  required that an -- a witness's nonidentification at
14  a live lineup be documented?
15        A.  No, I'm not aware.
16        Q.  All right.
17        MR. HILKE:  That's all I have.
18        MS. PETERS:  We'll read and sign.
19        THE REPORTER:  Okay. Same orders as last
20  time?
21        MS. PETERS:  Yes, from Diane.
22        THE REPORTER:  Okay.
23        MR. HILKE:  Yes. An e-tran, regular
24  delivery, please.
25        THE REPORTER:  Okay.

Page 160

1        MR. HANER:  And I do not need anything on
2  behalf of defendant McGowan.
3        (The deposition concluded at 1:54 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.com

Case 4:23-cv-00278-RK   Document 139-20   Filed 09/09/24   Page 40 of 41

Page 161

```
1              CERTIFICATE OF REPORTER
2
3        I, Susan J. Muckenthaler, a Certified Court
4   Reporter of the State of Missouri, do hereby
5   certify:
6        That prior to being examined, the witness
7   was first duly sworn;
8        That said testimony was reported by me at
9   the time and place hereinbefore stated and was
10  thereafter reduced to typewriting under my
11  direction;
12       That the foregoing transcript is a true
13  record of the testimony given by said witness;
14       That I am not a relative or employee or
15  attorney or counsel of any of the parties or a
16  relative or employee of such attorney or counsel or
17  financially interested in the action.
18       Witness my hand and seal May 24, 2024.
19                    Susan J. Muckenthaler
                      Certified Court Reporter
20                    KS #1719, MO #1406
21                    Susan J. Muckenthaler
22                    Susan J. Muckenthaler
23                    Missouri Supreme Court
24                    Certified Court Reporter
25
```

Page 163

```
1              SIGNATURE PAGE
2   RE:  Keith Carnes v. Robert Blehm, et al.
3
4   ____ I certify that I have read my testimony and
5        request that NO changes be made.
6
7   ____ I certify that I have read my testimony and
8        request that the above changes be made.
9
10
11
12        _____
13        Eric S. Dillenkoffer
14
15
16        Subscribed and sworn to before me this
17  ____ day of _____, 20____
18
19
20        _____
21        Notary Public
22        State of _____
23        County of _____
24        My commission expires _____
25  SJM
```

Page 162

```
1              ERRATA SHEET
2   RE:  Keith Carnes v. Robert Blehm, et al.
3   PG/LN      Correction and Reason for Change
4   ____ _____
5   ____ _____
6   ____ _____
7   ____ _____
8   ____ _____
9   ____ _____
10  ____ _____
11  ____ _____
12  ____ _____
13  ____ _____
14  ____ _____
15  ____ _____
16  ____ _____
17  ____ _____
18  ____ _____
19  ____ _____
20  ____ _____
21  ____ _____
22
23        _____
24        Eric S. Dillenkoffer
25  SJM
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net
Cornerstone
Court Reporting Company LLC
(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net