Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF MISSOURI
 2                WESTERN DIVISION

 3
   KEITH CARNES,
 4
              Plaintiff,
 5
        vs.                    Case No. 23-cv-00278-RK
 6
   ROBERT BLEHM, et al.,
 7
              Defendants.
 8

 9

10

11

12

13        DEPOSITION OF LORIANNE MORROW, a Witness,
14 taken on behalf of the Defendants Board of Police
15 Commissioners, Avery Williamson, Vernon Huth, Robert
16 Blehm, Doug Niemeier, Steve Morgan, and Ed Begley,
17 pursuant to Notice, on June 5, 2024, at the Law
18 Offices of Wyrsch Hobbs & Mirakian, PC, One Kansas
19 City Place, 1200 Main Street Suite 2110, Kansas
20 City, Missouri 64105, before

21

22             CHERIE L. HOUSE

23

24 Registered Professional Reporter, Certified Court
   Reporter of the States of Kansas and Missouri.
```

Page 2

```
 1             APPEARANCES
 2 For the Plaintiff:
 3    Mr. Wallace Hilke
      LOEVY & LOEVY
 4    311 North Aberdeen Street, Suite 3
      Chicago, Illinois 60607
 5    (872) 772-1926
      hilke@loevy.com
 6
 7 For the Defendants Board of Police Commissioners,
   Avery Williamson, Vernon Huth, Robert Blehm, Doug
 8 Niemeier, and Steve Morgan, and Ed Begley:
 9    Ms. Diane Peters
      WYRSCH HOBBS & MIRAKIAN, PC
10    One Kansas City Place
      1200 Main Street Suite 2110
11    Kansas City, Missouri 64105
      (816)221-0080
12    dpeters@whmlaw.net
13
   For the Defendant McGowan:
14
15    Mr. Joshua N. Haner
      Office of the County Counselor
      Jackson County Courthouse
16    415 East 12th Street, 2nd Floor
      Kansas City, Missouri 64106
17    (816) 881-3279
      jhaner@jacksongov.org
18
19
20
21
22
23
24
25
```

**Exhibit W2 (Morrow's 2024 deposition)**

Page 3

```
 1             TABLE OF CONTENTS
 2                                      Page
 3 Stipulation                            4
 4 LORIANNE MORROW
      Examination by Ms. Peters           4
 5    Examination by Mr. Haner           77
      Examination by Mr. Hilke          140
 6    Reexamination by Ms. Peters       144
 7 Certificate of Reporter              148
   Certificate of Deposition            149
 8 Letter                               150
   Errata Sheet                         151
 9 Signature of Witness                 152
10
              EXHIBITS
11
   Exhibit       Description            Page
12    No.
13    1     Diagram (1 page)             16
14    2     10/13/03 Statement (5 pages) 23
15    3     Interview of Lorianne Morrow 43
            10/26/04 (2 pages)
16
17    4     Trial Transcript Excerpt Testimony  45
            of Lorianne Morrow 4/19/2003
18          (11 sheets)

19    5     Affidavit                    52
            Bates Plaintiff 1834
20    6     Transcript Testimony of Lorianne   67
            Morrow from 2021 Habeas Trial
21          (68 pages)
22    7     Affidavit 10/3/14 (2 pages)  71
23 Reporter's Note:  The exhibits were retained by the
   court reporter, scanned by Lexitas, and returned to
24 Ms. Peters.
25
```

Page 4

```
 1           STIPULATION
 2      IT IS STIPULATED AND AGREED by and between
 3 the respective parties hereto that said deposition
 4 shall be signed by the witness before the time of
 5 trial of this case.
 6      P R O C E E D I N G S
 7      (The deposition commenced at
 8      9:05 a.m.)
 9           LORIANNE MORROW,
10 a witness, being first duly sworn, testified under
11 oath as follows:
12           EXAMINATION
13 BY MS. PETERS:
14   Q.  Can you state and spell your name, ma'am,
15 for the record?
16   A.  Lorianne Morrow, L-O-R-I-A-N-N-E,
17 M-O-R-R-O-W.
18   Q.  We started your deposition last Friday,
19 right?
20   A.  Right.
21   Q.  You got ill or you started feeling ill, so
22 we stopped your deposition, correct?
23   A.  Correct.
24   Q.  And we're here today to finish your
25 deposition; is that your understanding?
```



1    A.   Yes, ma'am.

2    Q.   Okay.  Just to remind you again -- and
3  you -- this is the first time you and I have met in
4  person, correct?

5    A.   Right.

6    Q.   It's nice to meet you.

7    A.   It's nice to meet you, too.

8    Q.   I represent the board of police
9  commissioners; Avery Williamson; Vernon Huth; Robert
10  Blehm; Doug Niemeier, N-I-E-M-E-I-E-R; Steve Morgan;
11  and Ed Begley, B-E-G-L-E-Y.  Those are all police
12  officers and police detectives.

13    A.   Okay.

14    Q.   And you understand this is a lawsuit that
15  Keith Carnes has filed against those people?

16    A.   Yes, ma'am.

17    Q.   Okay.

18        MR. HILKE:  I'll just remind you to
19        pause a beat because as questions get
20        underway, I may need to object.

21        THE WITNESS:  Okay.

22        MR. HILKE:  And that will help us
23        make a clean record.

24    Q.   (By Ms. Peters)  So today your deposition
25  is in person.  Last week it was over Zoom.  So I

1  want to let you know if you need to take a break to
2  use the restroom or you need more coffee or any
3  reason, you let me know and we'll take a break.  And
4  I didn't get a chance to show you where the
5  bathrooms were, but they're just around the corner
6  in the hallway, okay?  And if you need to use the
7  restroom, we can stop, and I'll show you where they
8  are, okay?

9    A.   Yes, ma'am.

10    Q.   Since last Friday, at the end of your
11  deposition until now, have you reviewed any
12  documents in preparation for your deposition?

13    A.   No, ma'am.

14    Q.   Have you spoken to anyone since last
15  Friday until now about your deposition?

16    A.   No, ma'am.

17    Q.   I'm trying to remember exactly where we
18  left off in your deposition, and I believe we left
19  off -- I believe we ended your deposition discussing
20  your meetings with Amy McGowan, the prosecutor, so
21  I'm going to pick up on where we left off and try
22  not to repeat whatever I've asked you.  I'm going to
23  try to pick up where we left off, okay?

24    A.   Okay.

25    Q.   You testified already last Friday that you

1  encountered Amy McGowan about a week after the
2  homicide of Larry White out in the area where the
3  homicide occurred; is that correct?

4    A.   Correct.

5    Q.   And we discussed that, correct?

6    A.   Correct.

7    Q.   And then last Friday you also testified
8  that you went to Amy McGowan's office on one
9  occasion when Sheriff Anthony -- last name
10  unknown -- picked you up and drove you to her
11  office; is that correct?

12    A.   Correct.

13    Q.   And when I asked you last Friday when you
14  thought that occurred, if I understand correctly,
15  you don't remember; is that right?

16    A.   Correct.

17    Q.   I think you testified last Friday that you
18  thought it was about a month after the homicide of
19  Larry White, but that you couldn't really remember?

20        MR. HILKE:  No, sorry, sorry.  I'll
21        just object to the extent it misstates the
22        testimony.

23        And you can answer.

24    A.   Correct.

25    Q.   (By Ms. Peters)  Okay.  When you went to

1  Amy McGowan's office for the first time when
2  Sheriff Anthony picked you up there, where did
3  Sheriff Anthony pick you up at?

4    A.   From my home.

5    Q.   Was anyone at home with you at the time
6  Sheriff Anthony picked you up?

7    A.   No.

8    Q.   Did you know that Sheriff Anthony was
9  coming to pick you up?

10    A.   Yes.

11    Q.   How did you know that?

12    A.   She had called me.

13    Q.   When you say "she," you mean Amy?

14    A.   Amy.

15    Q.   Amy McGowan?

16    A.   Um-hum.

17    Q.   Yes?

18    A.   Yes.

19    Q.   When Amy McGowan called you, what was said
20  during that phone conversation?

21    A.   Well, she wanted me to come into her
22  office.

23    Q.   What else do you recall being said in that
24  phone conversation?

25    A.   She wanted to meet me, and that's --

www.lexitaslegal.com                    Lexitas operates in all 50 states and 18 countries    •    California Firm Registration #179


1 basically, it was it.

2    Q.  And you agreed to meet with her?

3    A.  Yes.

4    Q.  Did Amy McGowan say anything to you in

5 that phone conversation that she would have someone

6 pick you up?

7    A.  Yes.

8    Q.  What did she say about that?

9    A.  She was -- she was sending Anthony.  He is

10 an Italian guy, so he'd been working for the Jackson

11 County Courthouse for a long time, so I guess they

12 send him to pick up people.

13    Q.  Okay.  So -- and -- and was -- I think we

14 discussed this last Friday, but was Anthony a

15 sheriff's deputy?

16    A.  I don't -- I don't know what they really

17 would call it because he would be working for the

18 prosecutor to pick --

19    Q.  I'm just going to call him "Anthony" if

20 that's okay with --

21    A.  Yes.

22    Q.  -- you?

23       Okay.  So Anthony picked you up and drove

24 you to Amy McGowan's office?

25    A.  Yes, ma'am.

1    Q.  Did Anthony go into Amy McGowan's office

2 with you during the meeting with Amy McGowan?

3    A.  No, he took me upstairs to where her

4 office was at, and then he left.

5    Q.  And who was in the meeting, if anyone,

6 between you and Amy McGowan?

7    A.  Just me and Amy.

8    Q.  Okay.  And you testified last Friday that

9 during this meeting you told Amy McGowan that Reggie

10 and Kiki did the shooting of Larry White, correct?

11    A.  Yes, ma'am.

12    Q.  And then you testified last Friday that

13 Amy McGowan told you to say it was Keith Carnes; is

14 that right?

15    A.  Yes, ma'am.

16    Q.  During this meeting with Amy McGowan, this

17 first meeting with Amy McGowan in her office, did

18 she show you any photographs?

19    A.  She showed me photographs, yes, ma'am.

20    Q.  What photographs did she show you?

21    A.  She showed me a photograph of -- a photo

22 lineup and then a photograph of Keith Carnes.  In

23 the lineup photograph that was also Reggie and Kiki.

24    Q.  In the photo lineup, was there a photo of

25 Reggie, Kiki, and Keith Carnes?

1    A.  Keith Carnes' photo was separate from

2 theirs.

3    Q.  This photo lineup that included photos of

4 Reggie and Kiki, did it have other photographs?

5    A.  Yes.

6    Q.  Do you recall --

7    A.  It's like -- it had like three at the top

8 and three at the bottom.

9    Q.  So six photographs all together?

10    A.  Um-hum, um-hum.

11    Q.  Yes?

12    A.  Yes, ma'am.

13    Q.  You just have to say "yes" because --

14    A.  Yes.  Okay.

15    Q.  And were the six photographs all on one

16 page?

17    A.  Yes.

18    Q.  Okay.  And can you describe how Amy

19 McGowan showed you the photo lineup of six photos,

20 including the photo of Reggie and Kiki?

21    A.  She had -- you know, have a photo book

22 with all the mugshots in it, and that's how she

23 showed them to me.

24    Q.  So in this photo book -- and you correct

25 me if I'm wrong -- did she just turn to a page that

1 had the photo lineup on --

2    A.  No, ma'am, she took the page out, took the

3 page out.

4    Q.  So she showed you this photo lineup that

5 included Reggie and Kiki, and what did she say to

6 you when she showed that to you?

7    A.  She was saying to me -- she told me she --

8 and I was -- kept telling her -- I said, "No, it

9 wasn't -- it wasn't Keith," because at the time I

10 only knew him by Tre.  I didn't really even know

11 this man real name.  I didn't know him by Keith

12 Carnes.  I only knew him by Tre.

13       And she's -- we was talking, and she --

14 she was showing me the photograph.  And then I told

15 her, "These two guys with the six lineup" because --

16 Kiki was on the top of the photo line, and Reggie

17 was at the bottom.  Like I said, it's three at the

18 top and three at the bottom when they show you the

19 photo mugshots.

20    Q.  Okay.  So there was a conversation that

21 you and Amy had before she showed you the photo

22 lineup is that --

23    A.  Yes.

24    Q.  What was the conversation you had with Amy

25 McGowan before she showed you the lineup?

888-893-3767
www.lexitaslegal.com
Lexitas Operates in all 50 states and 18 countries.
California Firm Registration #179

LEXITAS

1 **A. She was coaching me what to say. In other**
2 **words, she was telling me where the shell casings**
3 **landed and she also had Larry White's picture, you**
4 **know, after the autopsy picture over there and**
5 **showing me everything. She was trying to coach me**
6 **what to say.**
7 Q. So she told you where the shell casings
8 were found?
9 **A. Yes, ma'am.**
10 Q. And she showed you an autopsy photo of
11 Larry White?
12 **A. Yes, ma'am.**
13 Q. And she did that before she showed you the
14 photo lineup?
15 **A. After.**
16 Q. Okay. Before she showed you the photo
17 lineup, what conversation did you have with her that
18 you can recall before she --
19 **A. Before?**
20 Q. -- showed you the photo lineup?
21 **A. She was -- she was telling me to say that**
22 **Keith Carnes did it and not Reggie and not Kiki.**
23 Q. Okay. Had you already told her that
24 Reggie and Kiki did it?
25 **A. Yes, ma'am.**

1 Q. So at what point then does she show you
2 this photo lineup that included Re-- -- Reggie and
3 Kiki?
4  MR. HILKE: I just object to form.
5  But you can answer.
6 **A. She showed it to me maybe like 5 to 10**
7 **minutes into our conversation.**
8 Q. (By Ms. Peters) Okay. And when she
9 showed you the photo lineup, did she say anything to
10 you as she showed it to you?
11 **A. She told me that they didn't do it, and**
12 **Kiki -- and let me specify -- Kiki and Reggie didn't**
13 **do it. And she said Keith Carnes did it.**
14 Q. Kiki is K-I-K-I, correct?
15 **A. His first name is Gerald Kitchen, I'm**
16 **thinking.**
17 Q. Do you know how to spell Kiki?
18 **A. I really don't get to --**
19  MS. PETERS: For the court reporter
20  it's K-I-K-I.
21  THE REPORTER: Thank you.
22 Q. (By Ms. Peters) So after Amy McGowan
23 showed you the photo lineup and -- and told you it
24 wasn't -- she told you it wasn't Reggie and Kiki or
25 she told you not to say it was Reggie and Kiki?

1 **A. She told me not to say it was Reggie and**
2 **Kiki.**
3 Q. What happened after that?
4 **A. We talked some more. She showed me the**
5 **weapon that was used in the murder, like she showed**
6 **me photos of the area.**
7 Q. She showed you the actual weapon?
8 **A. Yes, ma'am. It's in the office.**
9 Q. What did Amy McGowan tell you when she
10 showed you the actual weapon, if anything?
11 **A. She said, "This was the gun that killed**
12 **Larry White," which it was. It was the weapon.**
13 Q. Was it the gun that you recall seeing?
14 **A. Yes, ma'am.**
15 Q. Okay. And you said that she showed you
16 photos of the area. Do you mean the area where the
17 homicide took place?
18 **A. Yes, ma'am.**
19 Q. Okay. Did you recognize any of those
20 photos that she was showing you?
21 **A. Yes, ma'am. I'm very familiar with the**
22 **area.**
23 Q. What, if anything, did Amy McGowan say
24 when she showed you the photos of the area?
25 **A. Well, she told me -- she say, "I'm about**

1 **to show you this, so when we go to trial, just**
2 **let -- let them know that you knew where the shell**
3 **casings landed."**
4  **And she showed me the house where the**
5 **shell casings was at; and, you know, that's what she**
6 **showed me, the pictures of the shell casings, the**
7 **house.**
8 Q. As you sit here today, do you remember
9 where those shell casings were that Amy McGowan
10 tol- -- showed you?
11 **A. On the porch.**
12 Q. I'm going to -- let me mark Exhibit 1.
13  (Lorianne Morrow Exhibit No. 1 was
14  marked for identification.)
15 Q. (By Ms. Peters) Ms. Morrow, I'm going to
16 hand you what I've marked as Deposition Exhibit 1.
17 **A. Um-hum.**
18 Q. Do you recall seeing that diagram last
19 Friday during your --
20 **A. Yes.**
21 Q. -- deposition?
22 **A. Yes.**
23 Q. On this Exhibit 1, can you point out where
24 you saw the shell casings that Amy McGowan showed
25 you a picture of?

Lexitas operates in all 50 states and is accredited where required Registration #138
California Firm Registration #179

2:23-cv-00215-DJC-JDP Document 104-8 Filed 09/09/24 Page 4 of 38



1     A.  2846 Wabash would be the house -- this
2 house.
3     Q.  At what point, during your meeting with
4 Amy McGowan, did she show you the single photograph
5 of Keith Carnes?
6     A.  When --
7       MR. HILKE:  So sorry.
8       Just object to form, asked and
9    answered.
10       You can answer.
11     A.  She showed me the photograph of Keith
12 Carnes at the -- after she had the lineup.  It
13 was -- his picture was the first on her desk.
14     Q.  (By Ms. Peters)  And what, if anything,
15 did Amy McGowan say when she showed you the picture
16 of Keith Carnes?
17     A.  I was explaining to her that Reggie and
18 Kiki did the murder, and she even said, "No, no, no,
19 no.  Keith Carnes did the murder."
20     Q.  Okay.
21     A.  So I'm assuming that he -- they was trying
22 to get him anyway, thinking that he was a big drug
23 dealer, and it wasn't him.  It was Reggie all along.
24     Q.  And then what happened after Amy McGowan
25 showed you the photograph of Keith Carnes?

1     A.  I kept telling her it wasn't him.  And she
2 said, "You're going to say it was him when we go to
3 trial."  When I went to trial and when his lawyer
4 asked me about certain questions and I answered, and
5 he never came back and -- I was hoping that he did
6 ask me that question:  "How did you know where the
7 shell casings was?" because I couldn't see the shell
8 casings, or I didn't know where they was at.
9     Q.  After Amy McGowan told you, "You're going
10 to go to trial and say it was Keith Carnes," what
11 did you say if anything?
12     A.  I was saying, "No, it wasn't."
13     And then she said to me, "If you don't say
14 this, I will plant drugs on you.  You will go to
15 jail."  And I have never been in jail in my life.
16     And I was scared, so I did what I was told
17 because I had -- at the time I had seven children.
18 I still have seven children.
19     Q.  Okay.  How long do you recall this meeting
20 with Amy McGowan lasting?
21     A.  Thirty-five minutes.
22     Q.  Okay.  Do you recall how the meeting
23 wrapped up or ended with Amy McGowan?
24     A.  No.  I can't remember how it wrapped up.
25     Q.  Did you tell Amy McGowan that you would

1 say it was Keith Carnes?
2     A.  Yes, ma'am.
3     Q.  And then did you get a ride home from
4 Anthony?
5     A.  Yes, ma'am.
6     Q.  Did you have another meeting with Amy
7 McGowan after that meet- -- that first meeting?
8     A.  I had -- the first meeting that I had with
9 Amy was on the streets when I first met her, and the
10 second one was in the office.
11     Q.  Did you have a third meeting with Amy
12 McGowan?
13     A.  At the third time, I think it was Dawn
14 Parsons.
15     Q.  Do you recall about when you had the
16 meeting with Dawn Parsons?
17     A.  I can't remember the date, because we
18 really didn't "meet" meet, but we talked a little
19 bit because she had called me.  She talked a little
20 bit.  And I wanted to tell her, but I didn't know
21 how to tell her what was going on.
22     Q.  What was said during the meeting with Dawn
23 Parsons?
24     A.  Well, she was just telling me about the
25 trial date and everything and it was coming up.

1 That was our meeting.
2     Q.  Did Dawn Parsons coerce you in any way?
3     A.  No, ma'am.
4     Q.  Did Dawn Parsons tell you, you have to say
5 it's Keith Carnes?
6     A.  No, ma'am.  At this point she had no idea
7 what was going on.
8     Q.  Did Dawn Parsons promise you anything for
9 testifying?
10     A.  No, ma'am.
11     Q.  Did the prosecution in this case or the
12 police make any deals with you to testify in the
13 Keith Carnes criminal trial?
14     A.  No, ma'am.
15     Q.  And let me break that up.  I'm sorry.
16     Okay.
17     Q.  Let me just break it up.  Did Dawn Parsons
18 make any deals with you in exchange for your
19 testimony against Keith Carnes?
20     A.  No, ma'am.
21     Q.  Okay.  Did the police make any deals with
22 you in exchange for your testimony against Keith
23 Carnes?
24     A.  No, ma'am.
25     Q.  Okay.  Was the meeting that you had with

Lexitas operates in all 50 states and is certified where required.
California Firm Registration #179



1 Dawn Parsons before the criminal trial of Keith
2 Carnes?
3    **A.   Maybe five minutes before we walked into**
4 **the courtroom, yes, because she had just met me.**
5 **She really had -- didn't know who I was, not in**
6 **person.**
7    Q.   Do you recall that there were two criminal
8 trials for Keith Carnes?
9    **A.   I really can't recall.**
10    Q.   When you met with Amy McGowan the first
11 time out in the area where the homicide occurred,
12 was that before or after you talked to the police?
13    **A.   Before.**
14    Q.   And then the meeting that you had with Amy
15 McGowan in her office, was that before or after you
16 talked to the police?
17          MR. HILKE:  Objection to foundation.
18          You can answer.
19    **A.   Before.**
20    Q.   (By Ms. Peters)  You spoke to the police
21 one time; is that correct?
22    **A.   Yes, ma'am.**
23    Q.   So if I understand your testimony
24 correctly, you had met with Amy McGowan two times
25 before you talked to police?

1    **A.   Yes, ma'am.**
2    Q.   And you testified last Friday that you
3 talked to two detectives, correct?
4    **A.   Yes, ma'am.**
5    Q.   And that was at police headquarters?
6    **A.   Yes, ma'am.**
7    Q.   And when you talked to police, you
8 testified the two detectives told you to say it was
9 Keith Carnes, correct?
10    **A.   Yes, ma'am, because at this point it --**
11 **yes, ma'am.  Yes.  Yes, ma'am.**
12    Q.   Did you tell the two detectives that it
13 was not Keith Carnes?
14    **A.   Yes, ma'am.**
15    Q.   Did you tell the two detectives that it
16 was Kiki and Reggie that did --
17    **A.   Yes, ma'am.**
18    Q.   Let me finish my questions because when we
19 talk over top of each other she can't type down what
20 we're saying.  Let me ask that again.
21          Did the two detective -- did -- strike
22 that.
23          Did you tell the two detectives that Kiki
24 and Reggie did the shooting of Larry White --
25    **A.   Yes, ma'am, I also picked out the lineup**

1 **picture again -- once again.**
2    Q.   All right.  Ms. Morrow, let me show you --
3          (Lorianne Morrow Exhibit No. 2 was
4          marked for identification.)
5    Q.   (By Ms. Peters)  I've marked as Exhibit 2
6 a copy of your statement on the last three pages,
7 and on the first page is a police report.  Do you
8 see that?
9    **A.   Yes, ma'am.**
10    Q.   Let's first talk about the last three --
11 hang on.  Excuse me.  Correct that.  Let me correct
12 that.
13          The last four pages is a copy of your
14 statement, correct?
15    **A.   Yes, ma'am.**
16    Q.   And on the last four pages, do you see --
17 strike that.
18          On the first three pages of your
19 statement, do you see the initials "LM" at the
20 bottom?
21    **A.   Yes, ma'am.**
22    Q.   Are those your initials?
23    **A.   Yes, ma'am.**
24    Q.   And did you write your initials on that?
25    **A.   Yes, ma'am.**

1    Q.   And then on the last page there, it's --
2 the statement is signed "Lorianne Morrow"; is that
3 your signature?
4    **A.   Yes, ma'am.**
5    Q.   And if you look on the last page, there's
6 two signatures under the witness lines.  One states
7 "Detective Avery Williamson."  Do you recognize the
8 name Avery Williamson as being one of the detectives
9 that questioned you?
10    **A.   No, ma'am.  I -- it was some time ago.**
11    Q.   Okay.  On the second line is the signature
12 of Detective Robert Blehm.  Do you recognize the
13 name Robert Blehm as being one of the detectives
14 that --
15    **A.   No, ma'am.**
16    Q.   And if I understand your testimony from
17 last Friday, your testimony is that the detectives
18 typed this statement up and then handed it to you to
19 sign; is that correct?
20    **A.   Yes, ma'am.**
21    Q.   And when they typed it up, they left the
22 room -- left you in a room by yourself and typed it
23 up, correct?
24    **A.   It was like -- how do you do those**
25 **office where you have those little things, dividers**

Lexitas Operates in all 50 states and 9 countries. California Firm Registration #179

3:23-cv-00257-RK   Document 80-2   Filed 09/09/24   Page 6 of 38



1 to divide the office, yes, ma'am.  It's like a --
2 what do they call them?
3      Q.   Do you mean to say "cubicle"?
4      A.   Yes.
5      Q.   Now, in this statement of yours, it has
6 several questions and answers, correct?
7      A.   Correct.
8      Q.   I'm going to let you -- when's the last
9 time you reviewed that statement?
10      A.   I haven't seen none of it, being honest
11 with you.
12      Q.   Did you review that statement?  Do you
13 recall if you reviewed your statement --
14      A.   No, ma'am.
15      Q.   -- before --
16           MR. HILKE:  Sorry, just you have to
17      let her get the full --
18           THE WITNESS:  Oh.
19           MR. HILKE: -- question out.
20           THE WITNESS:  Sorry.
21      Q.   (By Ms. Peters)  It's not how normal
22 people talk so --
23      A.   Right.
24      Q.   -- it's hard to answer questions in a
25 deposition.

1           Did you review your statement to
2 detectives before you testified at Keith Carnes'
3 trial?
4      A.   No, ma'am.
5      Q.   Do you believe the last time you reviewed
6 this statement is when you signed it?
7      A.   Yes, ma'am.
8      Q.   If we look at the first page of your
9 statement, if you turn that page to the -- yes, the
10 first page of your statement, would you review that?
11 And I'm going to ask you what is not true --
12      A.   Okay.
13      Q.   -- okay?
14           But I'm going to give you time to review
15 it.
16      A.   Yes, ma'am.
17           MR. HILKE:  Are you asking her to
18      read all four pages before we answer
19      questions about it?
20           MS. PETERS:  That seems fair.
21           MR. HILKE:  All right.
22      Q.   (By Ms. Peters)  I'm going to give you
23 time to review the entire statement since you've not
24 seen it in a long time.
25      A.   Okay.

1      Q.   Okay.  Let's look at the first page of
2 your statement.
3      A.   Yes, ma'am.
4      Q.   And to expedite this -- this might be
5 easier -- can I hand you a pen, and can you just
6 mark on there what is not true --
7      A.   Oh, okay.
8      Q.   -- on the first page?
9           MR. HILKE:  I'm going to object to
10      the form.
11           But you can answer.
12           THE WITNESS:  Okay.
13      A.   You said what's not true?
14      Q.   (By Ms. Peters)  Correct.
15      A.   Okay.
16      Q.   And let's just -- let me just see the
17 first page, if you don't mind.
18      A.   Um-hum.
19      Q.   I'll show it to the other attorneys.
20           MS. PETERS:  (Shows exhibit to
21      counsel.)
22           MR. HILKE:  Thank you.
23      Q.   (By Ms. Peters)  So on that first page,
24 Ms. Morrow, you've circled the last three questions
25 and answers as being untrue, correct?

1      A.   Correct.
2      Q.   So if you look at the question right
3 above -- so it's the fourth question.
4      A.   Um-hum.
5      Q.   It says "After you observed Larry selling
6 the crack cocaine, what did you observe next?"
7           And the answer is "Tre came out of the
8 building hollering at him, and then he started
9 chasing him toward the alley"; is that true?
10      A.   This statement I made is not true at all.
11 I was told to say what I'd have to say.
12      Q.   Okay.  So do you need to also question --
13 excuse me -- do you also need to circle the -- your
14 answer --
15      A.   Um-hum.
16      Q.   -- on this first page --
17      A.   Um-hum.
18      Q.   -- to the question I just read?
19      A.   The -- the first one?
20      Q.   This question right here (indicating).
21      A.   Okay.
22      Q.   Okay.  So that's also untrue, the fourth
23 question --
24      A.   Yes.
25      Q.   -- from the bottom, correct?

1    A.  Yes.

2    Q.  Okay.  On these four questions on this
3  first page that you've marked as untrue, the
4  first -- excuse me -- the four questions from the
5  bottom --

6    A.  Um-hum.

7    Q.  -- did -- if you had to correct those
8  statements to make them true, would you be able to
9  do that?

10    A.  Yes.

11    Q.  And how would you do that to make those
12  answers true?

13        MR. HILKE:  Object to form, compound.

14        But you can answer.

15    A.  Change the name from Tre to Reggie.

16    Q.  (By Ms. Peters)  And if we turn to the
17  second page, would you do the same thing, ma'am:
18  Would you circle what answers are untrue on the
19  second page of your statement?

20        MR. HILKE:  Again, I'm going to
21      object to form.

22        But you can answer.

23    A.  Yes, ma'am.

24    Q.  (By Ms. Peters)  Okay.  Did you get a
25  chance to review that and circle what was not true

1  on the second page?

2    A.  Yes, ma'am.

3    Q.  Okay.  Do you mind if I see that?
4      I'm going to show it to the other
5  attorneys.

6        MS. PETERS:  (Shows exhibit to
7      counsel.)

8        MR. HILKE:  Okay.

9        MR. HANER:  Okay.

10    Q.  (By Ms. Peters)  And on the second page of
11  your statement, you've identified four answers that
12  are untrue, correct?

13    A.  Yes, ma'am.

14    Q.  So I want to ask you about the
15  questions -- two questions in the middle that you
16  did not circle.  You were asked -- or your statement
17  says "Question:  What kind of gun did Kiki have?"

18        Answer says "His was small.  It wasn't as
19  big as the one Tre had."

20        Was that a true statement?

21        MR. HILKE:  Objection to form.

22        You can answer.

23    A.  I meant to circle this question.  I'm
24  sorry.

25    Q.  (By Ms. Peters)  Is that entire answer

1  untrue?  What kind of gun --

2    A.  No --

3    Q.  Hang on one second.  So let me break it
4  up.

5        The question is "What kind of gun did Kiki
6  have?"

7        The answer on here says "His was small."

8        Is that part of your answer true?

9    A.  Yes, ma'am.

10    Q.  Okay.  And so is the part that's untrue
11  there was your -- the answer here:  "It wasn't as
12  big as the one Tre had"?

13    A.  Yes, ma'am.

14    Q.  If you look at the next question:  "Did
15  Kiki fire any shots?" and the answer says "No."

16        Is that a true statement?

17    A.  That's correct.

18    Q.  If you don't mind.  (Takes exhibit from
19  witness.)

20    A.  Um-hum.

21    Q.  If you look at the very next question
22  underneath there --

23    A.  Um-hum.

24    Q.  -- it says "What happened when Larry
25  collapsed at Fish Town?"

1        Answer:  "Tre rolled him over then shot
2  him some more, probably five times."

3        Is that a true or untrue statement?

4    A.  Untrue.

5    Q.  Can you circle that, please?

6    A.  Okay.

7    Q.  The next question:  "Did you see these
8  shots or did you" -- strike that.

9        Next question:  "Did you see these shots
10  or did you see them?"

11        Answer:  "I heard them, seen the fire from
12  the bullets."

13        Is that a true statement?

14    A.  Yes.

15    Q.  And the next question:  "Did you actually
16  see the shots at Fish Town, or did you hear them?"

17        Answer:  "I heard them."

18        Is that a true statement?

19    A.  Yes.

20    Q.  Okay.  Can you turn to the third page?
21  And you take your time.

22    A.  Okay.  Thank you.

23    Q.  And I'm going to ask you again to circle
24  the answers that are untrue.

25        MR. HILKE:  Same objection as before.



1          But you can answer.
2     Q.   (By Ms. Peters)  Are you finished?
3     **A.   Um-hum.**
4     Q.   Okay.  Let me have them take a look.
5          MS. PETERS:  (Shows exhibit to
6     counsel.)
7     Q.   (By Ms. Peters)  Okay.  Ma'am, let's go
8 over to the third page of your statement.  The very
9 first question at the top:  "What was Kiki wearing?"
10        Answer:  "He was dressed in all black
11 also."
12        Is that a true statement?
13    **A.   Yes, ma'am.**
14    Q.   And then the next question:  "Ms. Morrow,
15 I'm showing you a picture of a black male.  Is this
16 the man you know as Kiki?"
17        Answer:  "Yes."
18        And then it says "Note:  It should be
19 noted the picture shown to Ms. Morrow was that of
20 Gary D. Kitchen, b/m, 7/23/80."
21        Did the detectives show you a picture of
22 Kiki?
23    **A.   Yes.**
24    Q.   And did you identify that picture as being
25 Kiki?

1     **A.   Yes, ma'am.**
2     Q.   Okay.  So that question and answer is
3 true, correct?
4     **A.   Correct.**
5     Q.   The next question and answer:
6 "Ms. Morrow, I'm now showing you photograph lineup
7 containing six similar depicted black males.  Is any
8 of these pictures Tre?"
9          Answer:  "Yes, Number 5."
10         And then it states "Note:  Number 5 is
11 identified as Keith L. Carnes, b/m, 3/7/70.
12 Ms. Morrow placed her initials and the date on the
13 back of the lineup."
14         Now, you've circled that as being untrue,
15 correct?
16    **A.   Correct.**
17    Q.   What parts of that is untrue?
18    **A.   Because when -- the first line of pictures**
19 **they showed me Keith -- not Keith Carnes, but Gary**
20 **Kitchen, which is Kiki and Reggie -- and I picked**
21 **the pictures out to them and told them that's who**
22 **really did the shooting.**
23    Q.   And did the police then show you a
24 photograph lineup of six photos that included a
25 picture of Tre or Keith Carnes in it?

1     **A.   Yes.**
2     Q.   And did you identify Keith Carnes as
3 Number 5 in that photograph lineup?
4     **A.   Yes, ma'am.**
5     Q.   Is it your testimony today that you
6 identified Keith Carnes in that photograph lineup,
7 but you told the detectives Keith Carnes did not do
8 the shooting?
9     **A.   Yes, ma'am.**
10    Q.   If you don't mind.  (Looks at document.)
11    **A.   Um-hum.**
12    Q.   The next question and answer is "How do
13 you know the victim, Larry?"
14         Answer:  "I've been knowing him because he
15 grew up around my son.  He went to school with my
16 son."
17         And that's true, correct?
18    **A.   Correct.**
19    Q.   The next question and answer:  "How do you
20 know Tre?"
21         Answer:  "I purchased drugs from him."
22         Is that true?
23    **A.   Correct.**
24    Q.   How well did you know Keith Carnes before
25 the homicide of Larry White?

1     **A.   I didn't know him at all.**
2     Q.   Did you know him from purchasing drugs
3 from Keith Carnes?
4     **A.   Yes, from other people.**
5     Q.   What do you mean "from other people"?
6     **A.   I was purchasing drugs for someone else.**
7 **It could have been undercover, but, you know, I**
8 **don't know.  Maybe because they was trying to close**
9 **down the drug house.  I don't know.**
10    Q.   So if I understand your testimony, you
11 were purchasing drugs from Keith Carnes to sell to
12 other people?
13    **A.   Yes, ma'am.**
14    Q.   Did you have any type of business
15 relationship with Keith Carnes?
16         MR. HILKE:  Object to form.
17         You can answer.
18    **A.   No, ma'am, with Reggie.  You want me to**
19 **explain it to you?**
20    Q.   (By Ms. Peters)  Yes, please.
21    **A.   Reggie was the one that was running the**
22 **drug house.  Keith Carnes was just one of the people**
23 **up there helping selling it for him.  Is that more**
24 **clear for you?**
25    Q.   Yes, I think that's clear.

Lexitas Operates in all 50 states and 18 countries with a Registration #198



1    A.   Okay.

2    Q.   So the last two questions on that page,
3 I'll read the second-to-last one: "Why were you
4 at 29th and Olive?"

5        And answer was "I was walking from my
6 friend's house at 3208 (sic) Brooklyn to my
7 boyfriend's house at 2604 Benton."

8        And that's a true statement?

9    A.   Yes.

10    Q.   And then the very last question and
11 answer --

12    A.   It should have been -- excuse me  -- it
13 should have been walking from my niece's house, not
14 a friend.

15    Q.   Okay.

16    A.   And the "Brooklyn" part is wrong.  It's
17 30- -- 3008 Wabash.

18    Q.   Okay.  Okay.  So the question:  "Why were
19 you at 29th and Olive?" it should say "I was walking
20 from my niece's house at 3008 Wabash to my
21 boyfriend's house at 2604 Benton"?

22    A.   Yes, ma'am.

23    Q.   And then the very last question:  "Who
24 else witnessed the shooting?"

25        Answer:  "Wendy Lockett; Lisa, a black

1 female about 30 years old; Red, black male -- he
2 works the door at the drug house -- and Star, a
3 white female.  She's in her 30s.  There were several
4 other people."

5        Was that a true statement?

6    A.   Yes, ma'am.

7    Q.   Okay.  And then if you turn to the very
8 last page, did the -- did the detectives -- do you
9 see the very top question there?  It says "Is there
10 anything else that you wish to add to this
11 statement?"

12        And the answer is "No."

13        Do you see that?

14    A.   Yes.

15    Q.   Did the detectives ask you:  "Is there
16 anything else you wish to add to this statement?"

17    A.   Yes, they did.

18    Q.   And your answer was no?

19    A.   Yes, ma'am.

20    Q.   And did the detectives hand you a copy of
21 this written statement and ask you, "will you read
22 and sign this statement?"

23    A.   I really don't recall because I really
24 don't remember none of this in the statement right
25 here.  I don't recall.  I don't remember because

1 it's been 20-some years ago.

2    Q.   I understand.  And I should have asked you
3 that first.  Do you remember giving this statement
4 to detectives?

5    A.   I remember talking to a detective.  I --
6 some of it is true, but not all of it.

7    Q.   As you sit here today, you don't remember
8 whether detectives handed you a copy of your
9 statement and ask you to review it and sign it?

10    A.   I don't remember.

11    Q.   Do you remember, ma'am, how you got
12 home -- well, strike that.

13        When you were finished giving an interview
14 to the police, how did you leave police
15 headquarters?  Do you recall?

16    A.   Someone took me -- the police took me
17 home.

18    Q.   Do you recall where they took you?

19    A.   26th and Benton.

20        (Phone rings.)

21    Q.   (By Ms. Peters)  I'm going to stop for a
22 second because your phone is ringing.

23    A.   Yeah, I thought it was 26th and Benton
24 most likely.

25    Q.   You say most likely 26th and Benton; is

1 that your --

2    A.   Yes --

3    Q.   -- testimony?

4    A.   -- ma'am.

5    Q.   Do you actually recall where police
6 dropped you off at?

7    A.   This remember -- this is where I was at
8 2604 Benton, so I -- that's -- that's where they
9 dropped me off at.

10    Q.   And is that where you lived at the time?

11    A.   No, ma'am.

12    Q.   Is that where your boyfriend lived at the
13 time?

14    A.   Yes, ma'am.

15    Q.   Is that where you stayed at the time?

16    A.   Yes, ma'am.

17    Q.   When police dropped you off at 2604 Benton
18 after your statement, how many police officers drove
19 you back to 2604 Benton?

20    A.   One.

21        MR. HILKE:  Sorry.  I just object to
22    form, it misstates testimony.

23        You can answer.

24    A.   One.

25    Q.   (By Ms. Peters)  Do you recall who that

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required by law. Nevada Registration #118F
California Firm Registration #179

LEXITAS

1  was?

2  **A.  No, ma'am.**

3  Q.  Was it one of the detectives in the room

4  with you when you gave your statement?

5  **A.  I'm thinking so, yes.**

6  Q.  Do you recall?

7  **A.  I don't recall which one it was, but he**

8  **was a very nice gentleman.**

9  Q.  Do you recall if there was any

10  conversation from police headquarters back to 2604

11  Benton between you and the officer or detective?

12  **A.  No.**

13  Q.  When police dropped you off at 2604

14  Benton, did they offer you any money?

15        MR. HILKE:  Sorry, objection to

16        foundation.

17        You can answer.

18  **A.  No.**

19  Q.  (By Ms. Peters)  Did they promise you

20  anything that you recall?

21  **A.  No.**

22  Q.  Do you recall how you got to police

23  headquarters to give your statement?

24  **A.  Police officer.**

25  Q.  A police officer picked you up?

1  **A.  Yes, ma'am.**

2  Q.  Where did the police officer pick you up

3  from?

4  **A.  At the same location, 2604 Benton.**

5  Q.  Did you know that a police officer was

6  coming to pick you up at 2604 Benton to give a

7  statement?

8  **A.  Yes.**

9  Q.  Do you recall how you knew that?

10  **A.  I really can't recall.**

11  Q.  Had you talked to the police at any time

12  about the homicide of Larry White before going to

13  headquarters and giving a statement?

14  **A.  No, ma'am.**

15  Q.  Did you see -- do you recall seeing Amy

16  McGowan at police headquarters when you gave your

17  statement to police?

18  **A.  No, ma'am.  I only met her on the street**

19  **and at her office.**

20  Q.  Do you know an officer by the name of

21  Vernon Huth?

22  **A.  No, ma'am.**

23  Q.  If you turn to the first -- the very first

24  page of Exhibit 2 --

25  **A.  Um-hum.**

1  Q.  -- if you look at the top of this page --

2  I'm sorry.  Let me show you.

3  **A.  Yes, ma'am.**

4  Q.  This very first page (indicating).

5  **A.  Um-hum.**

6  Q.  On this very first page it states

7  "Lorianne Morrow," and it has an address:  "11130

8  Eastern, Grandview, Missouri."  Do you see that?

9  **A.  Yes, ma'am.**

10  Q.  Are you familiar with that address?

11  **A.  Yes, ma'am.**

12  Q.  What is that address?

13  **A.  That was really where I actually stayed.**

14  Q.  Okay.  You can set that aside.

15  **A.  Okay.**

16  Q.  I'm going to show you another document.

17        MS. PETERS:  (Hands document to

18        counsel.)

19        MR. HILKE:  Thank you.

20        MR. HANER:  Thank you.

21        (Lorianne Morrow Exhibit No. 3 was

22        marked for identification.)

23  Q.  (By Ms. Peters)  I'm going to show you a

24  document that I've marked as Exhibit 3.  I'm going

25  to ask you to review it.  It's two pages.

1        MR. HILKE:  Sorry.  Again, how many

2        pages?

3        MS. PETERS:  I just have two.

4        MR. HILKE:  Me too.  Thanks.

5  Q.  (By Ms. Peters)  Have you seen this

6  document before, Ms. Morrow?

7  **A.  No, ma'am.**

8  Q.  Okay.  If you look on the front -- on the

9  first page, it says at the top, "Interview of

10  Lorianne Morrow taken October 26, 2004, in Jackson

11  County Prosecutor's Office.  Also present:  Amy

12  McGowan, assistant prosecuting attorney."  Did I

13  read that correctly?

14  **A.  Yes, ma'am.**

15  Q.  Do you recall giving a -- well, strike

16  that.

17        Do you know who Willis Toney is?

18  **A.  He was Keith Carnes' lawyer.**

19  Q.  Do you ever recall meeting with Willis

20  Toney back in 2003, 2004, 2005?

21  **A.  No, ma'am.**

22  Q.  Do you recall meeting with Willis Toney

23  and Amy McGowan on October 26, 2004?

24  **A.  No, ma'am.**

25  Q.  Are you denying that happened, or do you

www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #118F
California Firm Registration #179

1  not recall?

**2  A.  I don't recall.**

3  Q.  Okay.  We can set that aside.

**4  A.  Okay.**

5       MS. PETERS:  (Hands document to

6  counsel).  I'm going to give you the

7  double-sided just because I'm trying to

8  save paper.

9       Yours is two-sided.

10      (Lorianne Morrow Exhibit No. 4 was

11  marked for identification.)

12  Q.  (By Ms. Peters)  Ma'am, I'm going to hand

13  you a document that I've marked as Deposition

14  Exhibit 4 and just ask you to review that.

15      MR. HILKE:  Are you asking her to

16  read all the 41 pages of the transcript?

17      MS. PETERS:  I'm just going to ask

18  her to review it, and I'm going to ask her

19  if she recognizes this as her testimony.

20  Q.  (By Ms. Peters)  So, no, you don't have to

21  read every single page unless you want to.

**22  A.  No, ma'am.**

23      (Off the record at 10:08 a.m.)

24      (On the record at 10:17 a.m.)

25  Q.  (By Ms. Peters)  Ms. Morrow, the document

1  that I handed to you that's been marked as

2  Exhibit 4, do you recognize that as your trial

3  testimony from April 19, 2005, in the murder trial

4  against Keith Carnes?

**5  A.  Yes, ma'am.**

6  Q.  Okay.  Can you turn to page 25?  Do you

7  mind if I take a look?

**8  A.  Um-hum.**

9  Q.  Okay.  If you look at page 25 --

**10  A.  Um-hum.**

11  Q.  -- on line 10:

12      Question:  "Did you ever talk to the

13  police?"

14      Answer:  "Yes, I did."

15      "Do you know when that was?"

16      Answer:  "On the 12th."

17      Question:  "October 12?

18      Answer:  "(The witness nods her head.)"

19      Question:  "Six days after this?"

20      Answer:  "Yes, ma'am.

21      Question:  "Did they come to you or did

22  you go to them?"

23      Answer:  "Well, I've known his uncle also.

24  I was talking to his Uncle Tim about what had

25  happened."

1      Did I read that correctly?

**2  A.  Yes.**

3  Q.  And is that what you testified to at the

4  April 2005 trial?

**5  A.  Yes.**

6  Q.  Is it -- did you know Larry White's uncle

7  named Tim?

**8  A.  Yes, ma'am.**

9  Q.  What's Tim's last name?

**10  A.  White.**

11  Q.  And I understand that Tim White is

12  deceased now; is that correct?

**13  A.  Yes, ma'am.**

14  Q.  How did you know Tim White?

**15  A.  I knew Tim White because he grew up with**

**16  my children.**

17  Q.  And just for the record, Tim White was the

18  uncle of Larry White?

**19  A.  Yes, ma'am.**

20  Q.  Did you talk to Tim White about the

21  homicide of Larry White?

**22  A.  Yes, ma'am.**

23  Q.  When did you do that?

**24  A.  I really don't remember the date.**

25  Q.  Was it before you talked to police about

1  the homicide of Larry White?

**2  A.  I really don't remember.**

3  Q.  Do you recall what you told Tim White

4  about the homicide of Larry White?

**5  A.  I told him -- it was Tim White, and he had**

**6  another brother -- there -- there was -- there's**

**7  quite a few of those White boys, but they all**

**8  deceased except a couple of them.  I told them that**

**9  I witnessed the murder of his nephew.**

10  Q.  What else do you recall, if anything,

11  telling Tim White?

**12  A.  I was having nightmares.  So it was Tim**

**13  White, Michael White -- because they had a brother**

**14  named Michael as well -- and they used to come down**

**15  to our house -- because I used to live on Olive -- I**

**16  mean Wabash, 3014 Wabash is where I used to live.**

**17  And they used to come over to my house because one**

**18  of them liked my sister.**

**19      And I discussed what happened because I**

**20  couldn't sleep, and before these last few years that**

**21  this man was incarcerated, I would feel -- I really**

**22  was a nervous break (sic).  I got really, really**

**23  sick, and I had to talk to somebody about it.  And**

**24  this lady reached out to me.**

**25      So when I talked to her about it, I was**



1  sick, and I told her, "Come and do this deposition
2  for me because I might pass away."  I didn't know
3  anything at that point in time if I was going to
4  make it to clear this man's name or what really
5  happened.  I mean, it's still haunting me.  I just
6  want this off my chest.
7      Q.  I understand.  When you talked to Tim
8  White about the homicide of Larry White, what --
9  what do you recall telling Tim White?
10     A.  I told him that Reggie and Kiki was the
11  shooter of your nephew, and they -- I don't know.
12  It was just like a whole big old mess.  And then I
13  think I also spoke to Larry's mother.  I can't
14  remember her name, you know.  And the -- the corner
15  where Larry was standing on is actually the
16  corner where their house used to be.  Where he was
17  standing on, when he was selling drugs, it was a big
18  house on the corner where his whole family used to
19  live at.
20     Q.  You told Tim White and Michael White that
21  Kiki and Reggie killed Larry White?
22     A.  Yes, ma'am.
23     Q.  And you don't recall when this
24  conversation happened?
25     A.  I don't recall.

1      Q.  What, if anything, do you recall either
2  Tim White or Michael White saying to you?
3      A.  They said they was calling his sister,
4  which is Larry's mom.  And I don't remember how
5  they -- we got back in touch with each other,
6  because like I said, we all -- the whole
7  neighborhood is where everybody lived at, so we grew
8  up there.
9      Q.  When you told Tim White and Michael White
10  that Kiki and Reggie killed Larry White, do you
11  recall if they told you to talk to the police?
12     A.  Yes, ma'am.
13     Q.  What do you recall about that?
14     A.  Well, they said they wanted me to talk
15  to the police about what happened and what I seen.  And
16  I said, "I will do that," you know.
17     Q.  So -- so it must have been your
18  conversation with Lar-- with Tim White and Michael
19  White that have been before you talked to the
20  police; is that correct?
21     A.  Yes, ma'am.
22     Q.  Okay.  If you look at page 26 -- I'm
23  sorry, it's just right below 25.
24     A.  Oh.
25        MR. HILKE:  Right here (indicating).

1        MS. PETERS:  Thanks, Wally.
2      Q.  (By Ms. Peters)  At the top of page 26,
3  line 3, it says:
4        Question:  "Did you go to the police or
5  did they come to you?"
6        Answer:  "The police picked me up."
7        Question:  "How did you notify that you
8  wanted to talk to them?"
9        Answer:  "Through the family."
10       And then:  Question:  "Then did you go to
11  the police department?"
12       Answer:  "Yes, ma'am."
13       Was that your testimony in April 2005,
14  Ms. Morrow?
15     A.  Yes, ma'am.
16     Q.  Do you recall if Larry White's family
17  contacted the police on your behalf?
18     A.  I don't recall.
19     Q.  Did Tim White or Michael White ever tell
20  you who they thought killed their nephew Larry
21  White?
22     A.  No, they had no idea.
23     Q.  Did any member of the White family tell
24  you who they believed killed their son -- excuse
25  me -- killed their relative Larry White?

1      A.  No, ma'am.
2        (Lorianne Morrow Exhibit No. 5 was
3        marked for identification.)
4      Q.  (By Ms. Peters)  I'm going to hand you a
5  document I've marked as Exhibit 5, and ask you to
6  review that.  It is one page.
7        Do you recognize what I've marked as
8  Exhibit 5, Ms. Morrow?
9      A.  Yes, ma'am.
10     Q.  What is that?
11     A.  Swearing under oath.  "When I was
12  questioned by the detective on my original police
13  statement regarding the murder of Larry White that
14  occurred on 10/6/03, I ended up stating to them that
15  I had only heard gunshots.  I didn't see Keith
16  Carnes shoot Larry White.  The original prosecutor,
17  Amy McGowan, coerced me in the second trial by
18  revealing to me that the shell casing were on the
19  porch of the corner house of 28th and Wabash in
20  order for me to frame Keith Carnes for the crime
21  with my testimony."
22     Q.  Is this an affidavit that you signed?
23     A.  Yes, ma'am.
24     Q.  And that's your signature on there,
25  correct?



Page 53

1    A.   Yes, ma'am.

2    Q.   Did you type up this affidavit?

3    A.   No, ma'am.

4    Q.   Who typed up this affidavit?

5    A.   I don't really know who did this.

6    Q.   Do you know if Keith Carnes typed up this

7  affidavit?

8    A.   I don't even know.

9    Q.   Do you recall when you signed this

10  affidavit?

11    A.   No, ma'am.

12    Q.   If we look at the notary signature, it

13  says "Denise Bowlen," B-O-W-L-E-N.  Do you see that?

14    A.   Yes, ma'am.

15    Q.   Do you know who Denise Bowlen is?

16    A.   No, ma'am.

17    Q.   When you signed this affidavit and had it

18  notarized, do you recall where you did that?

19    A.   No, ma'am, I don't recall.

20    Q.   If you look at Denise Bowlen, the notary's

21  signature, it says "My commission expires June 29,

22  2015."  Do you see that?

23    A.   Yes, ma'am.

24    Q.   Do you -- can you recall whether you

25  signed this affidavit before June 29, 2015?

Page 54

1    A.   I can't recall, ma'am.

2    Q.   Okay.  Did you receive any phone calls

3  from Keith Carnes while Keith Carnes was

4  incarcerated in prison?

5    A.   No, ma'am.

6    Q.   I took the deposition of Keith Carnes in

7  this lawsuit about one month ago.

8    A.   Um-hum.

9    Q.   And Keith Carnes testified in his

10  deposition that he talked to you on the phone while

11  he was incarcerated in prison for the murder of

12  Larry White.

13    A.   I'm -- I probably talked to him, but I

14  don't recall because at the time I was really,

15  really sick.

16    Q.   Okay.  Do you recall -- you don't recall

17  who typed up this affidavit?

18    A.   No, ma'am, I don't.

19    Q.   Do you recall how you received this

20  affidavit?

21    A.   I've never received -- I never had this

22  affidavit with me at all.  Like I said, all this

23  from the trial, I've never seen any of it.

24    Q.   I believe you testified last Friday that

25  you have a son named Junius Morrow?

Page 55

1    A.   Yes, Junius Morrow.

2    Q.   How does Junius Morrow spell his first

3  name?

4    A.   J-U-N-I-U-S.

5    Q.   I asked you that for the court reporter.

6    A.   Okay.

7    Q.   Did you ever have any conversations with

8  your son Junius Morrow about the homicide of Larry

9  White?

10         MR. HILKE:  Object to the foundation.

11         You can answer.

12    A.   Well, I'm -- the -- how I know about

13  everything, my -- I had two nephews.  Wayland and

14  Robert Morrow is my two nephews was incarcerated

15  with Keith Carnes, and they -- you know, I can

16  remember them calling me about the situation, but I

17  can't remember Keith calling.  He might have called

18  me.

19    Q.   (By Ms. Peters)  And when your two nephews

20  who are incarcerated with Keith Carnes called you

21  about the situation, you mean the -- the homicide of

22  Larry White?

23    A.   Yes.

24    Q.   And did your two nephews call you from

25  prison?

Page 56

1    A.   Yes, ma'am.

2    Q.   Do you recall about when those phone calls

3  occurred?

4    A.   When I first got a call from my nephew, it

5  was like maybe the end of 2013.

6    Q.   Do you recall about how many phone calls

7  you had with your two nephews from prison?

8    A.   Two.

9    Q.   Can -- so the first phone call -- two

10  phone calls?

11    A.   Um-hum.

12    Q.   Yes?

13    A.   Yes.

14    Q.   Let's talk about the first phone call

15  first.  The first phone call that you received from

16  your nephews that were incarcerated from prison, do

17  you recall which nephew or both --

18    A.   Wayland.

19    Q.   What's Wayland's last name?

20    A.   Morrow.

21    Q.   Do you recall what Wayland Morrow was

22  incarcerated -- what prison?

23    A.   He was -- it was in the same prison with

24  Mr. Carnes.

25    Q.   Do you know how Wayland spells his first



1  name?

2      A.  I don't know.  No.

3      Q.  What was -- and Wayland called you,

4  correct?

5      A.  Correct.

6      Q.  What do you recall being said between you

7  and Wayland in that first phone call?

8      A.  He called me.  He read his -- what they

9  call discovery when they get in prison.  And he said

10  that everything -- he said, "It don't look right.

11  Everything that discovery look -- look false, like,

12  fake."  In the discovery, they got big old paperwork

13  they give you when you're in prison.  And he's

14  saying, "This man is really innocent, Auntie.  Maybe

15  you should try to talk to somebody about this."

16      Q.  Okay.  What do you recall saying to your

17  nephew Wayland during that first phone call?

18      A.  When we -- when we talked, I said, I

19  was -- "I don't know who to contact about it."

20      And then he said, "Well, maybe he can get

21  somebody to help him, and they probably need to talk

22  to you," which I never talked to anybody that was

23  representing him afterwards when he was

24  incarcerated, so...

25      Q.  When your nephew Wayland said, "Maybe you

1  should talk to him," who was he referring to?

2      A.  He was talking to, I think, at this

3  point -- Keith had another attorney trying to help

4  him with getting out of this mess.

5      Q.  What else do you recall from that first

6  phone call between you and Wayland?

7      A.  I don't recall too much.  He just said, "I

8  love you, Auntie, and just look at the discovery."

9  You know, I've never had any -- a hold of his

10  discovery, so I wouldn't know what to look for.

11      Q.  Did your nephew Wayland mail you anything?

12      A.  No, ma'am.

13      Q.  So this second phone call that happened

14  between you and your nephews from prison, how soon

15  did that phone call occur after the first phone call

16  between you and Wayland?

17      A.  Maybe a couple of months.

18      Q.  And the second phone call was between you

19  and whom?

20      A.  Robert.

21      Q.  Robert?

22      A.  Robert Morrow, yes.

23      Q.  And what do you recall being said in that

24  second phone call between you and Robert Morrow?

25      A.  He said the same thing as Wayland Morrow

1  said to me.  It was just a brief conversation.

2      Q.  And Robert Morrow said to you, "The

3  discovery doesn't look right, Auntie"?

4      A.  Yes, ma'am.

5      Q.  And did you receive anything in the mail

6  from your nephew Robert from prison?

7      A.  No, ma'am.

8      Q.  And you don't recall ever having any phone

9  conversations with Keith Carnes from prison?

10      A.  I maybe have -- had a phone conversation

11  with him probably during the time I was sick, maybe

12  like after 2014, because 2014, August the 8th,

13  that's when I got really, really sick, and I was in

14  the hospital.

15      Q.  Okay.  But as you sit here today, you do

16  not recall?

17      A.  I do not recall.

18      Q.  Do you recall either one of your nephews

19  who were incarcerated with Keith Carnes asking you

20  to sign an affidavit?

21      A.  I recall -- it wasn't my nephew at the

22  time.  We're going to go back to Junius Morrow, my

23  son, and he was also incarcerated with Keith Carnes,

24  and I think he signed an affidavit as well.

25      Q.  Did this document that we're looking at

1  that's been marked as Exhibit 5, do you recall if

2  anyone asked you to sign an affidavit similar to

3  this?

4      A.  I -- I wrote one for his lawyer at the

5  time that he was trying to get him out of jail.  I

6  did do affidavits because I went down to Commerce

7  Bank and had it notarized.  So you'll probably see

8  it was on a piece of paper.

9      Q.  Okay.  You're talking about a different

10  affidavit?

11      A.  Yes.

12      Q.  Is the affidavit that you've signed that's

13  been marked Exhibit 5, is that a true statement?

14      A.  Yes, ma'am.

15      Q.  In this Exhibit 5, your affidavit that you

16  signed, there's nothing in this affidavit that talks

17  about the police or the detectives that took your

18  statement, right?

19          MR. HILKE:  Object to form.

20      A.  Right.  Correct.  Can I say something?

21          MR. HILKE:  You have to wait for a

22      question.

23          THE WITNESS:  Okay.

24      Q.  (By Ms. Peters)  My question is going to

25  be what do you -- what would you like to say?

1    A.  Okay.  In all this, the police department
2  didn't know about what Amy did, so I just want to
3  make that clear because the detective didn't have
4  anything to do with that.  It was -- I was just
5  coerced to say what I was supposed to say, and
6  that's how they got involved.
7    Q.  How do you know that the police didn't
8  know what Amy did?
9    A.  Because they didn't, because she came to
10  me, not -- the police didn't make me say these
11  things.  Amy told me to say these things, and I was
12  threatened.  And I didn't want to go to prison.
13  Like I said, I have -- at the time my kids was
14  young, and I had to take care of my children.
15    Q.  And you talked to Amy McGowan before you
16  ever talked to the police, right?
17    A.  Yes, ma'am.
18    Q.  So when you talked to the police, did you
19  just report to the police what Amy McGowan told you
20  to say?
21    A.  Yes, ma'am.
22        MR. HILKE:  Wait a minute.
23        THE WITNESS:  Sorry.
24        MR. HILKE:  It's okay.
25        Object to form, misstates testimony.

1        You can answer.
2    A.  Yes, ma'am.
3    Q.  (By Ms. Peters)  So when you told the
4  police that Keith Carnes did it, you were telling
5  the police what Amy McGowan told you to say?
6        MR. HILKE:  Same objection.
7        You can answer.
8    A.  Yes, ma'am.
9    Q.  (By Ms. Peters)  And when Amy McGowan met
10  with you the two times we've already discussed,
11  there were no police officers around?
12    A.  Wasn't none around at all.
13    Q.  So did the police actually coerce your
14  statement to them?
15        MR. HILKE:  Object to form.
16        You can answer.
17    A.  I was -- when I told them what I was told
18  to say, that's what I told the police officer.  They
19  had nothing to do with the statement.  I just was
20  told to tell them that Keith Carnes murdered this
21  young man.
22    Q.  (By Ms. Peters)  Okay.  So the two
23  detectives that you talked to, did you actually tell
24  them then that Reggie and Kiki did the shooting?
25    A.  Yes, ma'am, I explained it to them.  Yes,

1  ma'am.
2    Q.  And they told you, "No, Keith Carnes did
3  it"?
4    A.  I don't -- I can't remember everything
5  that happened because it was so long ago.
6    Q.  But at any rate, you told the police that
7  Keith Carnes did it because Amy McGowan had told you
8  to say that?
9    A.  Yes.
10        MR. HILKE:  Same objection.
11        You can answer.
12    A.  Yes, ma'am.
13    Q.  (By Ms. Peters)  The police never told you
14  to say it was Keith Carnes?
15        MR. HILKE:  Objection, misstates the
16        testimony.
17        You can answer.
18    A.  I don't remember how everything went down.
19    Q.  (By Ms. Peters)  When you met with Amy
20  McGowan on the two times we've talked about already
21  that you met with her, you were afraid?
22    A.  Yes, ma'am.
23    Q.  Your testimony is that Amy McGowan
24  threatened you, correct?
25    A.  Correct.

1    Q.  And you've also testified today after you
2  met with Amy McGowan in her office that you agreed
3  with Amy McGowan that you were going to say it was
4  Keith Carnes, correct?
5    A.  Correct.
6    Q.  So as you sit here today, do you believe
7  that the police detectives that took your statement
8  told you to say it was Keith Carnes, or is that
9  something that you volunteered to them because you
10  were afraid?
11        MR. HILKE:  Object.  Object to form.
12        You can answer.
13    A.  I was afraid so I volunteered that to
14  them.
15    Q.  (By Ms. Peters)  Okay.  And you never told
16  the police detectives that you had a meeting with
17  Amy McGowan before meeting with them; is that
18  correct?
19    A.  That's correct.
20    Q.  You had never told the police detectives
21  that Amy McGowan had threatened you?
22    A.  No, ma'am.
23    Q.  You never told the police detectives that
24  Amy McGowan told you to say it was Keith Carnes?
25    A.  No, ma'am.



1    Q.   So you told -- if I understand you right,
2 you told the detectives that Kiki and Reggie killed
3 Keith Carnes; is that correct?
**4    A.   Correct.**
5    Q.   And then you also told detectives that
6 Keith Carnes killed Larry White because you were
7 afraid?
**8    A.   Correct.**
9    Q.   The police never told you who to say
10 killed Larry White, correct?
11        MR. HILKE:  Object to form, misstates
12        testimony.
13        You can answer.
**14    A.   No.**
15    Q.   (By Ms. Peters)  So the police detectives
16 never told you to say it was Keith Carnes, correct?
17        MR. HILKE:  Same objection.
18    Q.   (By Ms. Peters)  I'm just trying to
19 clarify.
**20    A.   No.  No.**
21    Q.   Okay.  I think I understand.
22        The police detectives never told you to
23 say Keith Carnes shot and killed Larry White,
24 correct?
25        MR. HILKE:  Same objection and asked

1        and answered.
**2    A.   Correct.**
3    Q.   (By Ms. Peters)  Okay.  Thank you.
**4    A.   Maybe you had to put it another way.  I**
**5 don't know.**
6    Q.   And the police detectives never told you
7 to say that Kiki and Reggie killed Larry White,
8 correct?
**9    A.   Correct.**
10    Q.   Okay.  This Exhibit No. 5, ma'am, in front
11 of you, do you recall if this is the first time that
12 you identified on paper that Amy McGowan coerced you
13 at the trial?
14        MR. HILKE:  Objection to foundation.
15        You can answer.
**16    A.   Correct.  This is the first time I've seen**
**17 this paper.**
18    Q.   (By Ms. Peters)  When is the -- do you
19 recall the first time you ever told anyone that Amy
20 McGowan told you to identify Keith Carnes as the
21 shooter?
**22    A.   I don't remember.**
23    Q.   Okay.  You can set this aside.
24        MS. PETERS:  I paper-clipped that --
25        it's two-sided -- for you guys.

1        (Lorianne Morrow Exhibit No. 6 was
2        marked for identification.)
3    Q.   (By Ms. Peters)  Ms. Morrow, I'm going to
4 hand you a document that I've marked as Exhibit 6,
5 and I'm going to present to you -- I'm going to
6 allow you to look at this, but I'm going to present
7 to you that this is a copy of your testimony from
8 Keith Carnes' trial in 2021.  And I have just a
9 handful of questions for you about that.
10        MR. HILKE:  Just for the record,
11        you're asking her to look at it but not to
12        read every page at this point, correct?
13        MS. PETERS:  Correct, Wally.
**14    A.   Okay.  How much do you want me --**
15    Q.   No, you don't need to read all of it,
16 okay?
**17    A.   Okay.**
18    Q.   Ma'am, what I've marked as Exhibit 6, did
19 you get a chance to look at that document?
**20    A.   6, what page?**
21    Q.   It's -- that I marked as Exhibit 6.
**22    A.   Yes.**
23    Q.   Did you get a chance to review that?
**24    A.   Yes, ma'am.**
25    Q.   And does Exhibit 6 appear to be your

1 testimony at Keith Carnes' habeas trial?
**2    A.   Yes, ma'am.**
3    Q.   Okay.
4        MR. HILKE:  Just for the record, you
5        looked at, like, the first six pages,
6        correct?
**7        THE WITNESS:  Yes.**
8    Q.   (By Ms. Peters)  Do you need to look at
9 more of it?
**10    A.   No.**
11    Q.   Okay.  Just looking at the first six
12 pages, you recognize that that's your testimony?
**13    A.   Yes, ma'am.**
14    Q.   Okay.  Can you turn to page 63?
15        And at the very top of page 63, the
16 question is "So is it your testimony today that you
17 lied to both police and during the trial that Keith
18 Carnes was the shooter?"
19        Answer:  "Yes, ma'am, I did."
20        Question:  "And is it your testimony
21 that" -- strike that.
22        Question:  "And is it your testimony this
23 the reason you lied is because you were coerced by
24 Amy McGowan?"
25        Answer:  "Yes, ma'am."

1      Question: "And because you were scared of
2 Reggie Thomas?"
3      Answer:  "Yes, ma'am."
4      Question:  "And because you also had some
5 pressure from Larry White's family?"
6      Answer:  "Yes."
7      Did I read that correctly?
8    A.  It shouldn't have been answered "Yes."  It
9 was "No."  That's incorrect.
10    Q.  Which -- which question and answer should
11 be "No"?
12    A.  "And because you also had some pressure
13 from Larry White's family?"
14    Q.  Okay.  Did you testify -- let me ask you
15 about that question:  At Keith Carnes' habeas trial,
16 did you testify that, yes, Larry White's family
17 pressured you, and that's why you said it was Keith
18 Carnes?
19      MR. HILKE:  Objection to foundation
20      and asked and answered.
21      You can answer.
22    A.  It should have been "No."  When they asked
23 me that question, it was yes because they never
24 ever pressured me to do anything.
25    Q.  (By Ms. Peters)  Okay.  Okay.  I

1 understand that, and my question is a little bit
2 different.  My question is at Keith Carnes' habeas
3 trial when you were asked "And because you also had
4 some pressure from Larry White's family?"  Did you
5 testify "Yes"?
6    A.  I said -- it said "Yes" right here, but I
7 don't remember saying "Yes" to that question because
8 there was so many questions asked by different
9 people.
10    Q.  I understand.  As you sit here today, your
11 testimony is Larry White's family never pressured
12 you?
13    A.  Yes, ma'am.
14    Q.  Is it your testimony today still that you
15 lied to both police and during the trial of Keith
16 Carnes saying that Keith Carnes was the shooter?
17    A.  Correct.
18    Q.  And the reason that you lied is because
19 you felt pressure from Amy McGowan?
20    A.  Yes, ma'am.
21    Q.  And the reason you lied to police and at
22 trial is also because you were afraid of Reggie
23 Thomas?
24    A.  Yes, ma'am.
25      Can I say something?

1    Q.  Yes.
2    A.  At the trial, Reggie was there; and when I
3 was testifying, he did me like this (demonstrating).
4 So I constantly move around just not to be
5 threatened anymore.
6      MS. PETERS:  And just for the record,
7      I'm going to state that when the witness
8      said, "Reggie did this," she took her hand
9      and moved it across her throat.
10    Q.  (By Ms. Peters)  Correct?
11    A.  Correct.
12    Q.  Okay.  You can set that aside.  Do you
13 need to use the restroom?
14    A.  Now I do.
15    Q.  I figured.  Let's take a quick break.
16      (Off the record at 10:59 a.m.)
17      (On the record at 11:05 a.m.)
18      (Lorianne Morrow Exhibit No. 7 was
19      marked for identification.)
20    Q.  (By Ms. Peters)  Ms. Morrow, I'm going to
21 hand you a document I've marked as Exhibit 7.  It's
22 two pages.  Do you recognize that document?
23    A.  Yes.
24    Q.  What is it?
25    A.  Affidavits (sic).

1    Q.  Is this your affidavit that you signed on
2 October 3, 2014?
3    A.  Yes.
4    Q.  I have just a couple of questions for you
5 about this affidavit --
6    A.  Okay.
7    Q.  -- okay?
8      On the first page, where it says at the
9 top, "One day I was walking down 28th Street heading
10 to Michael Thompson's house," do you see that?
11    A.  Yes.
12    Q.  Okay.  I'm going to read it because I have
13 a question for you:  "One day I was walking
14 down 28th Street heading to Michael Thompson's house
15 at 2604 Benton when two white police officers pulled
16 up and said my name, and they told me the district
17 attorney needed to talk with me.  They placed me in
18 the police car and took me downtown.  I went to a
19 office where the prosecutor lady name Amy was at."
20 Did I read that correctly?
21    A.  Yes.
22    Q.  Is this referring to the time that you met
23 with Amy in her office?
24    A.  Yes, ma'am.
25    Q.  Okay.

LEXITAS

1   A.  No, no, no.  Take that back.  It was
2  afterwards again, I guess, before the trial was;
3  because the first time Anthony took -- I just
4  remembered this one.  Anthony took me down there.  I
5  forgot what they call the man, but he -- he works in
6  the office.
7     Q.  So you have already talked about a time
8  where Anthony picked you up and took you to Amy
9  McGowan's office, correct?
10    A.  Correct.
11    Q.  And so when we look at your affidavit here
12 that's been marked as Exhibit 7, did you meet with
13 Amy McGowan on another occasion in her office?
14    A.  I'm thinking I did, yes.
15    Q.  Do you recall?
16    A.  I don't recall, but it had to have been
17 when they picked me up.
18    Q.  Okay.  Is this accurate that two white
19 police officers pulled up and took you to the
20 district attorney's office?
21    A.  Yes, ma'am, they was in an unmarked car.
22    Q.  Okay.  Do you recall the names of those
23 two officers?
24    A.  No, ma'am.
25    Q.  Do you recall that they put you in the car

1  and then took you to Amy McGowan's office?
2     A.  Yes, ma'am.
3     Q.  Okay.  So this would have been a second
4  meeting you had with Amy McGowan in her office -- a
5  third meeting all together with Amy McGowan?
6     A.  Yes.
7     Q.  Do you recall if this meeting with Amy
8  McGowan where the two white police officers picked
9  you up, was that before or after you talked to the
10 police?
11         MR. HILKE:  Objection to foundation.
12         You can answer.
13    A.  It was after.
14    Q.  (By Ms. Peters)  Okay.
15    A.  I'm going to say.
16    Q.  Do you recall what happened at this third
17 meeting with Amy McGowan?
18    A.  I can't really recall all the things that
19 was said and done.
20    Q.  And I'm going to show you -- I'm going to
21 have to look at this for a minute.  I'm going to
22 direct your attention to this line here in the
23 middle of the first page (indicating).
24    A.  Right here (indicating)?
25    Q.  Yeah.  Where it starts with "Right after,"

1  do you see that?
2     A.  Okay.
3     Q.  It says in your affidavit "Right after
4  that, she called somebody to come get me, and those
5  two same white officers came back and picked me up
6  and dropped me back off."  Did I read that
7  correctly?
8     A.  Correct.
9     Q.  And do you recall anything about these two
10 white officers picking you up from Amy McGowan's
11 office and dropping you back off?
12    A.  Well, the funny thing is they had a
13 picture of me I guess because -- I don't know what
14 trial it was.  They was trying to actually find me,
15 and at this point I'm still afraid for my life.  I'm
16 still afraid for everything that's going on.  So I
17 left and I moved to Olathe, Kansas.  I did a lot of
18 moving around.
19    Q.  Okay.  In the car ride with the two white
20 police officers to Amy McGowan's office, do you
21 remember any conversation you had with the two white
22 police officers?
23    A.  The only thing they said they was looking
24 for me about the trial, so they picked me up and
25 that was it.  It was nothing else after that.

1     Q.  Okay.  And when the two white police
2  officers picked you up from Amy McGowan's office, do
3  you recall any conversation with the two white
4  police officers during that time?
5     A.  No, ma'am.
6     Q.  Did these two white police officers ever
7  threaten you?
8     A.  No, ma'am.
9     Q.  Did these two white police officers ever
10 tell you what to say at trial?
11    A.  No, ma'am.
12    Q.  Do you recall if these two white police
13 officers were different than the two detectives that
14 took your statement?
15    A.  They was different, yes, ma'am.
16    Q.  You had no conversation with these two
17 white police officers about the homicide of Larry
18 White; is that correct?
19    A.  Only thing they had said to me they was
20 picking me up to take me to go meet Amy, and that
21 was it.
22    Q.  Okay.  Ma'am, I don't have any further
23 questions for you.  I appreciate your time.
24    A.  Okay.
25

1             EXAMINATION

2  BY MR. HANER:

3     Q.  I'll have a few. Ms. Morrow, I'm Josh

4  Haner. I represent defendant, Amy McGowan, in this

5  matter, so I have some follow-up questions.

6       Just to conclude, I've heard a few

7  different things in the testimony today.

8       Did you meet with Amy two or three times?

9        MR. HILKE: Object to foundation.

10       You can answer.

11    **A.  I think it was probably three because**

12  **the -- the last time the police officer picked me up**

13  **off -- going to my friend's house, and they had my**

14  **picture. And I think this was during trial they was**

15  **trying to find me because I was afraid. I was**

16  **trying to get away.**

17    Q.  (By Mr. Haner) And you said, "during

18  trial." What trial?

19        MR. HILKE: Objection to foundation.

20       You can answer.

21    **A.  I think this was the second trial if I'm**

22  **correct. I don't remember.**

23    Q.  (By Mr. Haner) Okay. And is it your

24  understanding that Amy McGowan was involved in the

25  second trial?

1    **A.  Yes.**

2    Q.  And do you know around what year this was?

3    **A.  No, sir.**

4    Q.  Do you believe it was 2003?

5        MR. HILKE: Objection to form.

6       You can answer.

7    **A.  I don't remember.**

8    Q.  (By Mr. Haner) Okay. So you don't know

9  about how many years after you saw the murder that

10  you were picked up for the second -- for the trial?

11  You don't know that gap?

12    **A.  I really don't know the gap.**

13    Q.  Okay. And so your testimony was you met

14  with Amy when she kind of pulled up on you in the

15  streets initially a week after the murder; is that

16  correct?

17    **A.  Correct, but she -- can I explain to you?**

18    Q.  Yeah.

19    **A.  She pulled up on 29th Street. Wendy**

20  **the -- Lockett was talking to her, and I don't know**

21  **what they was saying, but she pulled -- she asked me**

22  **to come to her car, so that's why I'm -- what**

23  **happened.**

24    Q.  And about how many days after the murder

25  was this?

1        MR. HILKE: Objection to form, asked

2     and answered.

3       You can answer.

4    **A.  I really -- I would say maybe two or three**

5  **days.**

6    Q.  (By Mr. Haner) And what was your

7  understanding of how Amy McGowan two to three days

8  after the murder knew that you had actually

9  witnessed the murder?

10    **A.  I'm assuming that Wendy told her that I**

11  **was there as well -- Wendy Lockett told her that I**

12  **witnessed the murder.**

13    Q.  And was Wendy Lockett at the scene when

14  the murder happened?

15    **A.  Yes, sir.**

16    Q.  And how do you know Wendy Lockett?

17    **A.  Me and Wendy Lockett grew up together, so**

18  **I've been knowing her a long time.**

19    Q.  Do you consider yourselves friends?

20    **A.  No.**

21    Q.  Why not?

22    **A.  She's a snake.**

23    Q.  And how so?

24    **A.  Well, if I go back to the point to where**

25  **one of her sisters got killed, like, in the**

1  **early '70s and she had something to do with it, but**

2  **she never got charged with it. And then she's an**

3  **informant for the police officers, you know, and she**

4  **was an informant for Amy.**

5    Q.  And how do you know that she was an

6  informant for Amy?

7    **A.  She told me.**

8    Q.  What did she say?

9    **A.  That she worked -- she's working for the**

10  **prosecutor's office, and she was an informant, and**

11  **she -- you know, she was informing for the drug task**

12  **force because they had ran all of these older people**

13  **out of their house -- apartments, and those**

14  **buildings was nothing but drug -- it wasn't like**

15  **that at first.**

16    Q.  And so she told you that she was an

17  informant?

18    **A.  Yes, sir.**

19    Q.  And how did that come up in a

20  conversation?

21    **A.  She was just talking. She was like --**

22  **when Wendy get high on drugs, she just run her**

23  **mouth, period.**

24    Q.  And in that area did Keith Carnes sell

25  drugs in the area of the scene of the murder?

LEXITAS

1    A.   Yes.

2    Q.   And Reggie Thomas also sold drugs?

3    **A.   He was the big-time deal.  He was the one**
4    **that brought the drugs for them to sell.**

5    Q.   Okay.  And you would get drugs from Reggie
6    Thomas?

7    **A.   Yes.**

8    Q.   Would you get drugs from Keith Carnes?

9    **A.   Yes.**

10   Q.   And there was no issue with Wendy being at
11   the drug house when she's a known snitch?

12        MR. HILKE:  Object to form and
13        foundation.

14        But you can answer.

15   **A.   They probably didn't know she was a**
16   **snitch.  At that time they probably didn't know it.**

17   Q.   (By Mr. Haner)  But you knew it at the
18   time?

19   **A.   Yes.**

20   Q.   And then -- so it's your understanding
21   that Amy knew you were a relevant witness when she
22   pulled up on the streets because Wendy Lockett had
23   told her that you were in fact at the crime scene?

24   **A.   Yes, sir.**

25   Q.   And prior to Amy rolling up on you on the

1    streets, you hadn't talked to any police?

2    **A.   Yes, sir.**

3        MR. HILKE:  So the question was you
4        hadn't -- had not talked to any --

5        MR. HANER:  Sorry.  I'll clear it up.

6    Q.   (By Mr. Haner)  Before Amy found you on
7    the streets, according to you, at that time had you
8    spoken to any police about the murder?

9    **A.   No, sir.**

10   Q.   And then when was your second meeting with
11   Amy?

12        MR. HILKE:  Objection, asked and
13        answered.

14        You can answer.

15   **A.   In her office.**

16   Q.   (By Mr. Haner)  And was that before you
17   had spoken to police?

18   **A.   Yes, sir.**

19   Q.   And this is when an Italian man, Anthony,
20   picked you up and took you to her office?

21        MR. HILKE:  Objection, asked and
22        answered.

23        You can answer.

24   **A.   Yes, sir.**

25   Q.   (By Mr. Haner)  Okay.  And I believe you

1    also -- you stated that she had the murder weapon in
2    her office at this time?

3    **A.   Yes, sir.**

4    Q.   How was the murder weapon stored in her
5    office?

6    **A.   It was stored with -- I guess with the --**
7    **the case file on the murder because it was just**
8    **sitting, like, up against the wall.**

9    Q.   In a case file?

10   **A.   No.  She had boxes sitting up there, and**
11   **then next to the boxes, there was the gun.**

12   Q.   And what was the gun packaged in?

13   **A.   It wasn't packaged.  It just had a tag on**
14   **it.**

15   Q.   And it was just a loose gun?

16   **A.   Yes.**

17   Q.   And did you also see a case file that
18   Ms. McGowan had for the Larry White homicide?

19        MR. HILKE:  Objection to foundation.

20        You can answer.

21   **A.   I don't remember seeing the case file.  I**
22   **just remember seeing photos of everything.**

23   Q.   (By Mr. Haner)  So all she had was photos
24   and the gun?

25        MR. HILKE:  Objection, form.

1        You can answer.

2    **A.   Yes.**

3    Q.   (By Mr. Haner)  And how do you know that
4    the -- the gun she had in her office at that time
5    was the murder weapon?

6    **A.   That's the one the police confiscated, the**
7    **AK-47.**

8    Q.   So is it your understanding that at this
9    second meeting with her in her office before you had
10   talked to the police, the police had already
11   confiscated the gun and given it to the prosecutor?

12   **A.   Yes.**

13        MR. HILKE:  Objection, foundation.

14        You can answer.

15   **A.   Yes.**

16   Q.   (By Mr. Haner)  And you mentioned in this
17   second meeting that she showed you some photos.  Was
18   it a photo lineup or a photo book?

19        MR. HILKE:  Form.

20        You can answer.

21   **A.   It was a photo book, but she took the --**
22   **the lineup pictures out of the book.  Like it was**
23   **like three at the top, three at the bottom.**

24   Q.   (By Mr. Haner)  And I believe you
25   previously testified that when she first met with

1  you when she rolled up on the -- rolled up on you on
2  the streets, that she had a photo book?
3      A.  Yes, sir.
4      Q.  Is it the same photo book that was shown
5  in the office in the second meeting?
6      A.  I don't really think so.  It just had --
7  not the photo book, but the -- a single picture
8  of --
9      Q.  Yeah.
10      A.  -- Mr. Carnes and a six-picture photo of
11  Kiki and Reggie.
12      Q.  Knowing that you hadn't talked to the
13  police, were you surprised to see that this woman
14  had photos of people that were at the scene of the
15  murder?
16      A.  I was really surprised.
17      Q.  Why were you surprised?
18      A.  Because I -- I've never seen a prosecutor
19  come on the scene be- -- for a police officer to
20  talk to witnesses, I've never seen that done.
21      Q.  And why do you believe you had not seen
22  that done before?
23      A.  Because this is the first time I ever
24  witnessed a murder, and I didn't know what was going
25  around.  This is just new to me.  Like I said, I've

1  lived in this area for years, and we never had these
2  type of problem.
3      Q.  So you had never heard of a situation
4  where the prosecutor had more facts about an
5  investigation of a murder before the cops did?
6          MR. HILKE:  Form.
7          You can answer.
8      A.  Correct.
9      Q.  (By Mr. Haner)  And you believe that
10  Ms. McGowan would have had these correct facts on
11  who was at the murder from her snitch Wendy Lockett?
12      A.  Correct.
13      Q.  And at the first meeting with her that
14  you -- allegedly happened on the streets, did she
15  threaten and coerce you at that time?
16      A.  Yes, sir.
17      Q.  And how so?
18      A.  Threatened that if -- plant drugs on me
19  and put me in jail.  And I don't have a record.
20      Q.  Did you find the alleged threat to be
21  credible that a prosecutor would somehow plant drugs
22  on you?
23      A.  Yes.
24      Q.  And why did you believe that to be
25  credible?

1      A.  Because there are -- there are --
2  prosecutors and police officers are crooked.
3      Q.  And so the threats were to plant drugs on
4  you and then to make you catch a case?
5      A.  Yes.
6      Q.  What were the other threats?
7      A.  It was the same thing:  Taking my children
8  away from me, and I wasn't about to have that, no.
9      Q.  How did she threaten to take your children
10  away?
11      A.  If you put me in jail, then my children
12  are gone.  They're going to be -- well, they're
13  going to be with their father anyway, but, you know,
14  I don't want to be separated from my kids, no.
15      Q.  And so those are the two threats made on
16  the street?
17      A.  Yes.
18      Q.  And was she vocalizing those threats from
19  the driver's seat of a vehicle?
20      A.  Yes.
21      Q.  And you came and approached the driver's
22  side of the car?
23      A.  She called me to the passenger side of the
24  car because when she -- when Wendy Lockett -- she
25  was leaning in, and I don't know what she was saying

1  to her, but this is what's happened -- this is the
2  honest to God truth.  I wanted to get all of this
3  off my chest so I could have a peace of mind.  I
4  mean...
5      Q.  So it's your testimony that these threats
6  were communicated through the car in the presence of
7  Wendy Lockett also?
8      A.  Yes.
9      Q.  So Wendy Lockett would have also heard
10  these threats made to you?
11      A.  Yes.
12      Q.  Was Wendy Lockett receiving the same
13  threats?
14          MR. HILKE:  Objection to form.
15          You can answer.
16      A.  I don't know.
17      Q.  (By Mr. Haner)  Did you hear Ms. McGowan
18  say anything to Ms. Lockett?
19      A.  I didn't actually hear their conversation.
20  I know they were just talking.
21      Q.  And you don't know what about?
22      A.  No.
23      Q.  But Ms. Lockett was able to hear your
24  conversation with Ms. McGowan?
25      A.  Yes, because she was, like, standing,

Lexitas provides services in all 50 states and 39 licensed reporting firms
California Firm Registration #179



1 like, behind me because I was, like, far away from
2 her when they were conversating. So she was
3 standing behind me. I don't know what she told Amy,
4 but...
5    Q.   How did Wendy know that you would be at
6 that location on the streets when Ms. McGowan came?
7         MR. HILKE: Objection to form and
8         objection to foundation.
9         You can answer.
10   **A.   Once again, I grew up in that**
11 **neighborhood, and I know a lot of people, so I**
12 **walked through that way to go over to -- he was my**
13 **boyfriend at the time -- house, and it's -- it's not**
14 **far.**
15   Q.   (By Mr. Haner) And going back to the
16 second meeting in her office before you had talked
17 to the police, what threats did she make then?
18         MR. HILKE: Form, asked and answered.
19         But you can answer.
20   **A.   She made the same threats.**
21   Q.   (By Mr. Haner) To plant drugs on you and
22 get you thrown in jail?
23   **A.   Yes, sir.**
24   Q.   And which would also result in you losing
25 your kids?

1    **A.   Yes, sir.**
2    Q.   And then what circumstances led to you
3 meeting with the cops, I believe, on December 13?
4         MR. HILKE: Objection to foundation,
5         and asked and answered.
6         And I think you meant like in October
7         not in December, right?
8         MR. HANER: Yeah. Yeah.
9    Q.   (By Mr. Haner) October 13 is when you
10 made your statement to the police. You -- you agree
11 with that?
12         MR. HILKE: Objection to --
13         MS. PETERS: It's October 12.
14   Q.   (By Mr. Haner) Well, October 12.
15   **A.   Yes. Yes.**
16   Q.   Do you know about what time of day that
17 was?
18   **A.   Maybe around noon -- noontime. I don't**
19 **remember.**
20         MR. HILKE: Josh, may I explain?
21         MR. HANER: Yes.
22         MR. HILKE: The report is dated
23         October 13, but it references a statement
24         that was given the day prior on
25         October 12.

1         MR. HANER: Oh.
2         MR. HILKE: So that's where you're
3         getting the 13th from.
4         MR. HANER: I appreciate it. So --
5         thank you, Wally.
6    Q.   (By Mr. Haner) So you went into the
7 police department on October 12, 2003?
8    **A.   Yes.**
9    Q.   And I believe it says that 2045 hours. Is
10 that about 10:00 at night?
11         MS. PETERS: Josh? Sorry.
12         MR. HANER: Sorry, yeah?
13         MS. PETERS: Josh, you need to learn
14         how to do military time.
15         MR. HANER: Oh, shoot.
16         MS. PETERS: Subtract 12.
17         MR. HANER: Yeah.
18         MS. PETERS: Subtract 12.
19         MR. HANER: Yeah. Okay.
20   Q.   (By Mr. Haner) So it would have been
21 closer to 8:00 at night?
22   **A.   Probably, yeah. I really don't remember.**
23   Q.   And the police officers just picked you up
24 out of the blue?
25   **A.   Yes, sir.**

1    Q.   And this report -- and I can't -- what
2 exhibit was this marked as?
3         MR. HILKE: 2.
4    Q.   (By Mr. Haner) This report in Exhibit 2,
5 it indicates that the listed subject voluntarily
6 came to police headquarters.
7         MS. PETERS: Do you want her to see
8         that?
9         MR. HANER: Yeah.
10         MS. PETERS: (Hands document to
11         witness.)
12   Q.   (By Mr. Haner) And, Ms. Morrow, if you'll
13 look at -- it's the very first paragraph. It's the
14 second sentence.
15   **A.   Okay. At the -- I didn't voluntarily come**
16 **to no police department. At that time I think I was**
17 **picked up by the police to go down there and make a**
18 **statement.**
19   Q.   And were you surprised to be picked up in
20 this manner?
21   **A.   Of course.**
22   Q.   And why was it surprising to you?
23   **A.   I'm like, "Why is the police picking me**
24 **up?" I mean, my thing at the time that the young**
25 **man got killed, I wanted to call -- they got the --**



1 the hotline, tip hotline, or whatever it is, with --
2 Alvin Brooks was running it. I wanted to call the
3 tip hotline.
4    Q.   And what would you have told the tip
5 hotline?
6    **A.   What I saw, who did it.**
7    Q.   And was that that Reggie Thomas did it?
8    **A.   Yes, sir.**
9    Q.   Did you ever call the tip hotline?
10   **A.   No, sir.**
11   Q.   Why not?
12   **A.   The police had picked me before I even had**
13 **any chance to do anything.**
14   Q.   And about how many days after your second
15 meeting with Amy McGowan in her office did the
16 police pick you up?
17            MR. HILKE: Objection to foundation
18       and form, asked and answered.
19            You can answer.
20   **A.   They picked me up and took me to her**
21 **office to go meet with her.**
22   Q.   (By Mr. Haner) And -- and I'm talking
23 about when you made the police statement.
24   **A.   Repeat that again.**
25   Q.   When you made the statement to the

1 police --
2    **A.   Uh-huh.**
3    Q.   -- on October 12.
4    **A.   I mean, days that I -- before me going to**
5 **her office?**
6            MR. HILKE: I'm sorry, were you
7       clarifying the question?
8            **THE WITNESS: I'm trying to let him**
9       **clarify.**
10   Q.   (By Mr. Haner) Yeah, so I guess I'm
11 trying to get a timeline of when you spoke with Amy
12 McGowan and when you did not. And if we can just
13 try to agree upon a few dates.
14        So the murder happened on October 6, 2003.
15 Do you agree with me on that?
16   **A.   I agree.**
17   Q.   And then you said your first contact with
18 Amy McGowan was a few days after that, and that's
19 when she rolled up on you in the streets?
20   **A.   Yes, sir.**
21   Q.   About how many days after October 6 was
22 that?
23            MR. HILKE: Objection to form, asked
24       and answered multiple times.
25            You can answer.

1    **A.   I don't remember how many days between her**
2 **and the police -- me seeing the police officer.**
3 **It -- it -- maybe a week or so.**
4    Q.   (By Mr. Haner) So one week after the 6th
5 is when she rolled up on you in the streets?
6            MR. HILKE: Objection, misstates
7       testimony, asked and answered.
8            You can answer.
9    **A.   It was three days after the murder she**
10 **rolled up on me.**
11   Q.   (By Mr. Haner) Okay. So then that would
12 be maybe around October 9?
13   **A.   Yes.**
14            MR. HILKE: Same objection.
15            You can answer.
16   Q.   (By Mr. Haner) Okay. And then you said
17 you had a second meeting with her in her office?
18   **A.   Yes, sir.**
19   Q.   And that second meeting was before you
20 talked to the police?
21   **A.   The -- I talked -- I think I talked to the**
22 **police before I went for the second meeting because**
23 **it was -- it was in between time.**
24   Q.   And -- and you guys can correct me if I
25 was wrong -- my understanding was you said that you

1 had spoke to her on the streets and then in the
2 office before you talked to the police and made the
3 police statement. Do you remember something like
4 that?
5    **A.   I don't remember all of it, no. I**
6 **remember talking to her on the streets, and I**
7 **remember talking to the officers, but I don't know**
8 **what time in between that me and the police officers**
9 **met. I don't remember.**
10   Q.   Okay. So we know you met with the police
11 on October 12, 2003. Would you agree with me on
12 that?
13   **A.   Probably, yes.**
14   Q.   And that's what Exhibit 2 outlines.
15   **A.   Okay. Yes.**
16   Q.   And so sitting here today, do you remember
17 whether or not you met with Amy McGowan in her
18 office between the meeting with her on the streets
19 and the time you made the police report on
20 October 12?
21            MR. HILKE: Objection, asked and
22       answered.
23            You can answer.
24   **A.   Can you specify what you're saying?**
25   Q.   (By Mr. Haner) Yeah. So between the time



1 that you spoke with Amy on the streets and the time
2 that you went to the police station and made the
3 police report, did you have that meeting with Amy in
4 her office in that time between those two?
5          MR. HILKE:  Same --
6     **A.  Yes.**
7     Q.  (By Mr. Haner)  Okay.  And so that would
8 have been sometime between October 9, 2003 and
9 October 12, 2003, that you had the meeting in the
10 office?
11          MR. HILKE:  Just objection to form,
12          asked and answered, and misstates
13          testimony.
14          You can answer.
15     **A.  Yes.**
16     Q.  (By Mr. Haner)  And so this meeting in her
17 office that would have occurred before the police
18 station.  I think you said that's when the Italian
19 man Anthony took you to her office?
20     **A.  Correct.**
21     Q.  Okay.  And then when did the two white
22 officers take you to Amy McGowan's office?
23          MR. HILKE:  Same objections.
24          You can answer.
25     **A.  For the third time -- I think it was just**

1 **after all that happened.  I don't remember what**
2 **date.  It was a while.  I think it was awhile before**
3 **I went in there because I -- I was moving just to**
4 **get away from all of this drama.**
5     Q.  (By Mr. Haner)  And do you believe it was
6 a year later?
7          MR. HILKE:  Same objections.
8          You can answer.
9     **A.  I don't remember.**
10     Q.  (By Mr. Haner)  So you don't know if it
11 was a week later or a year later?
12     **A.  I don't remember.  It -- it's -- I don't**
13 **remember how long it was.**
14     Q.  Okay.  And when Amy McGowan rolled up on
15 you on the streets, can you show on this map where
16 it was at?
17          MS. PETERS:  Exhibit 1?
18          MR. HANER:  Yes, Exhibit 1.
19     Q.  (By Mr. Haner)  Where you guys were
20 standing.
21          MR. HILKE:  Are you asking her to
22          mark it or just tell you?
23          MR. HANER:  You can mark it.
24     **A.  (Complies.)**
25     Q.  Okay.  In the volleyball court area?

1     **A.  Yes.**
2     Q.  And could you mark on that map about where
3 the White family lived?
4          MR. HILKE:  Objection to foundation.
5     Q.  (By Mr. Haner)  And if it's not on the
6 map, that's okay.
7          MR. HILKE:  Sorry, just foundation.
8          Where they lived at what time?
9     Q.  (By Mr. Haner)  At the time that Amy
10 McGowan rolled up on you in the street, where was
11 the Whites' residence at?
12     **A.  It was on -- I would say that it would**
13 **be 29th and Olive on the corner.  It would be on the**
14 **left-hand side.**
15     Q.  Okay.  So it's not represented on this
16 map?
17     **A.  No.**
18     Q.  Okay.
19     **A.  No.**
20     Q.  That's fine.
21     **A.  See, no, it would be right here where it**
22 **says "Olive," and then you're going to have 29th**
23 **Street because there's Prospect, so it would be**
24 **right up at the top.**
25     Q.  Okay.  Yeah, right at the top?

1     **A.  Um-hum.**
2          MR. HANER:  I forgot the -- the
3          habeas transcript.  What exhibit is it?
4          Is it Exhibit 6?
5          MS. PETERS:  6.
6     Q.  (By Mr. Haner)  Ms. Morrow, if you could
7 pull out Deposition Exhibit No. 6, and if you could,
8 turn to page 46.  And starting at line 6:
9          Question:  "Do you remember back in 2003
10 when you met with Amy, how many times did you meet
11 with her?"
12          Answer:  "Three or four times."
13          Was that your testimony in the habeas
14 proceeding?
15     **A.  Yes.**
16     Q.  And the question then:  "Three or four
17 times, okay.  Let's talk about the first time that
18 you met with her.  Can you tell me about that first
19 meeting?"
20          Answer:  "The first meeting she came to
21 the Whites' house of the grandmother.  I would say
22 it was on the other side like Chestnut on the other
23 side of Prospect."
24          Question:  "So when you say the Whites'
25 house, are you talking about Larry White?"



1      "Yes."

2      Question:  "And is that a member of his

3  family?"

4      Answer:  "Yes."

5      Question:  "All right.  Did you meet Amy

6  at the Whites' house?"

7      "Yes."

8      Was that your testimony in Mr. Carnes'

9  habeas trial?

10     **A.  Yes.**

11     Q.  Is it your testimony today that you met

12  Amy on the streets and not at the Whites' house?

13     **A.  I met her on the streets at the Whites'**

14  **house and downtown at the -- on 12th and -- the big**

15  **building, guys, the Jackson County Courthouse**

16  **because that's where her office was.**

17     Q.  So was Wendy Lockett at the Whites' house

18  when you met with Amy?

19     **A.  The second time?  No.**

20     Q.  And the second time, what do you mean "the

21  second time"?

22     **A.  Okay.  I met Amy -- the first time I met**

23  **Amy was after the homicide.  I'm going to clear this**

24  **up.  The second time I met Amy was at the White**

25  **house, the White -- his grandmother's house because**

1  **his grandmother's house was on the other side of**

2  **Prospect, on maybe 28th and Chestnut, I want to say.**

3  **And the third time I met her was in her office**

4  **because I don't know what kind of connection she had**

5  **with the White family or was she just giving them**

6  **something what happened to their son or grandson,**

7  **you know.**

8      Q.  When did the meeting at the White family's

9  house happen?

10     **A.  It had to have been -- I -- I don't**

11  **remember what day, what year, and how long after the**

12  **one on the -- the meeting on the streets, I don't**

13  **remember how long after.**

14     Q.  You would agree with me that the meeting

15  at the White house was the first time you met with

16  her?

17         MR. HILKE:  Object to form.

18         You can answer.

19     **A.  No.**

20     Q.  (By Mr. Haner)  Going back to the

21  deposition exhibit, the question is "Let's talk

22  about the first time you met with her.  Can you tell

23  me about that first time?"

24      "The first meeting she came to the Whites'

25  house of the grandmother.  I would say it was on the

1  other side of, like, Chestnut or the other side of

2  Prospect.

3      Did I read that correctly?  It's lines --

4  it's lines --

5      **A.  Where?**

6         MS. PETERS:  Oh, hang on, Josh.  Hang

7      on.

8         MR. HILKE:  It's page 46.

9         THE WITNESS:  Okay.

10     **A.  Okay.  Where were you reading at?**

11     Q.  (By Mr. Haner)  It starts with line 9, and

12  it said that you had met "Three to four times,

13  okay."  And then it goes "Let's talk about the first

14  time you met with her.  Can you tell me about that

15  first meeting?"

16      Answer:  "The first meeting she came to

17  the Whites' house of the grandmother.  I would say

18  it was on the other side of like Chestnut and on the

19  other side of Prospect."

20      Is that your answer?

21     **A.  The first time I met Amy was on 29th and**

22  **Wabash, right there by the court.  The second time I**

23  **met Amy was at the Whites' house.  The third time I**

24  **met Amy was downtown in Jackson County Courthouse.**

25     Q.  So this testimony at the habeas proceeding

1  is incorrect?

2      **A.  Yes, incorrect.  It should have dated --**

3  **said what I was telling them.**

4      Q.  What do you mean?

5      **A.  I told them the same thing:  I met her the**

6  **first time -- and I'm not lying -- I met her on 29th**

7  **and Wabash.  That was the first time.  That was**

8  **three days after the murder.  I don't remember the**

9  **second time when I met her at the White house.  I**

10  **don't remember the date.  And the third time I met**

11  **her at 1200 -- well, 1400 East 12th Street, or**

12  **whatever the Jackson County address is, that's the**

13  **third time I met her.  So, you know, they should**

14  **have had it because I said it how we met and**

15  **everything.  And this is the honest to God truth.  I**

16  **want to get this over with.  I have a life of my**

17  **own.  I have surgery set up on the 29th of July.**

18  **Sorry.**

19     Q.  And so were those three times the only

20  times you met with Amy McGowan?

21         MR. HILKE:  Objection to form, asked

22      and answered.

23         You can answer.

24     **A.  That I remember, yes.**

25     Q.  (By Mr. Haner)  And I believe that you

888-893-3767
www.lexitaslegal.com
4:23-cv-00155-RK-MDH   Document 104   Filed 08/08/24   Page 26 of 38
Exhibit B - Excerpts of Depo of Lorianne Morrow - Volume II
Sales Tax Rates in all 50 states and 33 licensed court reporters in Nevada Registration #18B
California Firm Registration #179
Page 26 of 38



1 previously testified today that two officers, two
2 white officers later picked you up and brought her
3 to her office for the second office meeting.  Do you
4 recall that?
5     A.  Yes, I recall that.
6     Q.  Okay.  So is it four times?
7     A.  Yes, it was so long ago to remember how
8 many times I went downtown because, like I said, I
9 was concentrating on my health, and that was my
10 thing.
11    Q.  Yeah, and I understand that.  I'm just --
12 I'm just trying to lay out the facts for my client
13 to get an understanding of the timeline.
14    A.  Oh, yeah.
15    Q.  And previously the testimony in this
16 deposition, you had mentioned that you met with them
17 on the street and that you mentioned twice in the
18 office.  And then I brought up the deposition
19 transcript and now you agree that there was a White
20 family meeting?
21    A.  Yes.
22    Q.  So I'm just trying to get all of the facts
23 for my client.
24    A.  Okay.  Yeah, because I have to --
25        MR. HILKE:  There's no question.

1        THE WITNESS:  Okay.
2     Q.  (By Mr. Haner)  So when did you meet with
3 the White family?
4     A.  I couldn't remember the day that it
5 happened.  I don't remember the -- the right -- the
6 actual date that we met up.
7     Q.  Did the White family tell you that you
8 needed to go talk to the cops?
9     A.  They said that as well.  I seen his uncle
10 because I was explaining to his Uncle Tim what
11 happened to their nephew.
12    Q.  And did they tell you that they think
13 Keith Carnes did it?
14        MR. HILKE:  Objection to form, asked
15        and answered.
16        You can answer.
17    A.  No.  They don't even know Keith Carnes.
18 They don't.
19    Q.  (By Mr. Haner)  And I believe you
20 previously testified in this deposition that they
21 never offered you money to say Keith Carnes did it;
22 is that correct?
23        MR. HILKE:  Objection to --
24    A.  Correct.
25        MR. HILKE:  -- foundation.

1        You can answer.
2     Q.  (By Mr. Haner)  And on the same exhibit,
3 page 47, line 2:
4        Question:  "When did you meet" -- "When
5 you met with Amy at the Whites' house, did she tell
6 you who you should identify as the shooter?"
7        Answer:  "Yes."
8        Next question:  "And was this meeting with
9 Amy, was this before or after you went and gave your
10 statement?"
11        Answer:  "It was before we ever came down
12 to the Jackson County Courthouse to her office."
13        Question:  "Okay.  So are you talking
14 about the second time that you met with her?"
15        Answer:  "Uh-huh."
16        "So the second time you met with her you
17 came down to her office?"
18        "Yes."
19        "The prosecutor's office?"
20        "Yes (sic)."
21        Did I read that correctly, Ms. Morrow?
22    A.  Yes.
23    Q.  Is this testimony from the habeas -- it's
24 testimony that you testified to?
25    A.  Yes.

1     Q.  Is there anything inaccurate about this
2 testimony?
3        MR. HILKE:  Objection to form.
4        You can answer.
5     A.  Everything right here is correct
6 (indicating).
7     Q.  (By Mr. Haner)  So the question on
8 line 12:  "So the second time you met with her you
9 came down to her office?"
10        Answer:  "Yes."
11    A.  Yes.
12        MR. HILKE:  Sorry, there's no
13        question yet.
14    Q.  (By Mr. Haner)  How is that statement
15 still correct based on your testimony today?
16        MR. HILKE:  Objection to form and
17        foundation.
18        You can answer.
19    A.  Like I said, I -- I put -- the timelines
20 to put in -- you know, it was so long ago when all
21 of this happened.  I have to remember everything
22 that happened that day because, you know, I put it
23 in the back of my mind so I can go on with my life
24 because it's hard.
25        THE REPORTER:  "Because" what?



1     A.   I put it in the back of my mind so I can
2  go on with my life because I'm sick anyway.
3          MR. HILKE:  Sorry, just for
4     clarification --
5          THE WITNESS:  Um-hum.
6          MR. HILKE:  -- when the reporter asks
7     you what you said, she's just asking you
8     to repeat exactly what you said, not to
9     add anything new.
10         THE WITNESS:  Yes.
11    Q.   (By Mr. Haner)  So this question on
12 line 12, the time you went to the prosecutor's
13 office was really the third time you had met with
14 her?
15         MR. HILKE:  Objection to foundation,
16    and asked and answered.
17         You can answer.
18    A.   Yes.
19    Q.   (By Mr. Haner)  Okay.  Now, turning to
20 page 49 of the deposition --
21         MR. HILKE:  Just for the record, this
22    is the habeas transcript.
23         MR. HANER:  Thanks, Wally.
24    Q.   (By Mr. Haner)  And for page 49 of the
25 transcript, line 1, says:

1      Question:  "Did Larry White's family ever
2  tell you who they thought the shooter was?"
3      Answer:  "Yes."
4      Question:  "And who did they think it
5  was?"
6      "Keith."
7      Did I read that correctly?
8     A.   Yes.
9     Q.   And was that your testimony in the habeas
10 trial?
11    A.   Yes.
12    Q.   So the White family did tell you that they
13 think Keith did murder?
14    A.   Yes.
15    Q.   And did they want you to implicate Keith
16 in it?
17    A.   No.  Can I explain?
18    Q.   Yeah, why not?
19    A.   The reason why they thought that he was
20 the murderer because it was -- it was just more to
21 me there because they had a friend -- more people in
22 the -- over there than me.  They had a friend that
23 lived on the corner of 29th and Wabash.  He's
24 deceased now.  I can't remember his name, but he
25 also talked to the White family about it.

1     Q.   And he had told them that he thought Keith
2  did it?
3     A.   Yes.
4     Q.   And then continuing on page 49, line 6.
5     A.   Okay.
6     Q.   Question:  "Did they ever tell you that
7  you should identify him as the shooter?"
8      Answer:  "Yes.  And they would pay me.
9  And I said no."
10     Question:  "So they offered to pay you
11 money?"
12     Answer:  "Yes."
13     Did I read that accurately?
14    A.   Who are -- excuse me, who are you --
15    Q.   Did I accurately read your trial testimony
16 from this transcript?
17    A.   Yes, but who are you talking about?  Can
18 you explain that?  Who are you talking about?
19    Q.   Yeah, so the lawyer questioned and asked
20 you:  "Did they offer to pay you money?"  Your
21 answer was "Yes."
22    A.   Okay.
23    Q.   You previously testified in this
24 deposition that the White family did not offer you
25 to pay you money -- or did not offer you money to

1 testify for Keith, correct?
2     A.   It wasn't -- it wasn't the White family
3  that offered me money.  They -- they was poor, so
4  they couldn't offer me no money to -- I wouldn't
5  testify for no money, you know.  I would tell the
6  truth, period.
7     Q.   Then why did you answer the question that
8  "Yes.  And they would pay me"?
9     A.   I'm thinking that she was asking me
10 another question.  Maybe I thought she was asking me
11 about the police officer or anything like that, and
12 they didn't -- I feel -- or Amy, that's what I --
13 that's what my thinking was.
14    Q.   Going down further.
15    A.   Okay.
16    Q.   "So they offered to pay money --"
17     You answered:  "Yes."
18     Question:  "-- to identify Keith Carnes?"
19     Your answer:  "They came to my house."
20     Question:  "Okay.  So Amy came to -- who
21 came to --"
22     Your answer:  "Larry's mother."
23     Did I read that correctly?
24    A.   Yes.
25    Q.   Question:  "Larry's mother came to your



1  house and said she would pay you money if you
2  identified Keith?"
3      "Yes."
4      "Was that threatening to you?"
5      "Yes."
6      Did I read that correctly?
7  **A. Yes.**
8      Q. And was that your trial testimony in Keith
9  Carnes' habeas case?
10  **A. Um-hum.**
11      MS. PETERS: Yes?
12      **THE WITNESS: Yes, I'm sorry.**
13      Q. (By Mr. Haner) Do you agree with me? Is
14  it still your testimony sitting at today's
15  deposition that the White family never offered you
16  money to testify against Keith?
17  **A. They -- they was trying to offer me money,**
18  **but no. They was offering money, yes, when you say**
19  **it like that. You know, when they said, Larry's**
20  **mother came to my house and said she would pay you**
21  **to identify Keith?**
22      **And I said, "Yes."**
23      **And they -- the question was, "Was that**
24  **threatening to you?"**
25      **I said, "Yes."**

1      **"Did it scare you?"**
2      **"I felt threatened with Reggie as well**
3  **because I had to move to Olathe, Kansas, from Kansas**
4  **City. And then I moved to St. Louis, Missouri."**
5      **And then it said question again: "Okay.**
6  **So the combination between Larry's family and Amy's**
7  **family made you move?**
8      **And the answer should have been "It wasn't**
9  **just Amy. It -- it was Larry and Reggie." And I**
10  **said, "Yes." The answer was "Larry or Reggie."**
11      **You said, "Larry?" What -- that didn't**
12  **make no sense right there. Let me go back to it. I**
13  **said that was from li- -- from ques- -- from**
14  **lines 24, 25, and then it went over to 1 here:**
15  **"Larry, Reggie, yes." I don't know what they was**
16  **asking about that, but...**
17      MR. HILKE: Ms. Morrow, do you
18      need -- do you need a break before we
19      continue?
20      **THE WITNESS: Yes.**
21      MR. HILKE: Is that all right, Josh?
22      MR. HANER: Of course.
23      MR. HILKE: Let's take a break.
24      (Off the record at 11:59 a.m.)
25      (On the record at 12:35 p.m.)

1      Q. (By Mr. Haner) All right. Ms. Morrow,
2  Josh Haner again, and we'll continue with our
3  questioning.
4      And referring to the dep- -- the
5  transcript exhibit page 49 that we had left off on.
6  And going back to lines 15, 16, and 17 where the
7  question -- it was question: "Larry's mother came
8  to your house and said she would pay you money if
9  you identified Keith?"
10      Answer: "Yes."
11      Sitting here today, is that a truthful
12  statement in this transcript?
13  **A. Yes.**
14      Q. Okay. So Larry White's family did offer
15  you money to identify Keith?
16  **A. Yes.**
17      Q. Okay. And when you had your first
18  encounter with Amy McGowan on the street, Wendy
19  Lockett was present; is that correct?
20  **A. Correct.**
21      Q. Are there any other named individuals you
22  could testify today that were present and saw the
23  interaction of Ms. McGowan and you?
24      MR. HILKE: Object, asked and
25      answered on Friday.

1      You can answer.
2  **A. She's deceased now. The girl is deceased.**
3      Q. (By Mr. Haner) Okay. Was that Felicia
4  Jones maybe?
5  **A. Yes. It was -- it was -- it was two other**
6  **girls because she -- one -- one of them went by the**
7  **name of Red.**
8      Q. Okay.
9  **A. Yeah. So it was -- it was a total of like**
10  **three of us there, four people.**
11      Q. And what were you and Wendy Lockett doing
12  before Amy McGowan arrived in her vehicle?
13  **A. I was talking to Ms. Jones. I really**
14  **don't interact with Ms. Lockett.**
15      Q. And what would you have been talking to
16  Ms. Jones about?
17  **A. You know how you walk and you have just a**
18  **conversation. She said, "Hi, you look nice. What**
19  **you doing?" and stuff like that. And I just was**
20  **wanting to just move on where I was going to.**
21      Q. Okay. So you're just walking along the
22  street. It wasn't a group of people corralled on a
23  corner?
24  **A. Yes.**
25      MR. HILKE: Object to form.

3:18-cv-00533-RRB    Document 237-4    Filed 09/27/24    Page 29 of 58



Page 117

1        You can answer.

2    A.   It was just like Wendy and two other young

3 ladies standing -- standing there because like --

4 we -- it was two other people -- two other people

5 besides Wendy was standing there.  You get what I'm

6 saying?

7    Q.   (By Mr. Haner) Kind of.  And just --

8 could you describe the scene of where people were

9 standing or if people were walking?  Or what was the

10 situation?

11       MR. HILKE:  Asked and answered.

12       You can answer.

13    A.   They was standing on the corner.

14    Q.   (By Mr. Haner) Okay.  And so Ms. McGowan

15 stopped around the corner of the street and

16 interacted with Ms. Lockett?

17    A.   Yes.

18    Q.   And prior to Ms. McGowan pulling up,

19 Ms. Lockett was hanging out on the corner?

20    A.   Yes.

21    Q.   Were you also hanging out on the corner?

22    A.   No.

23    Q.   You just happened to be walking by?

24    A.   Yes, sir.

25    Q.   And then this happenstance of you just

Page 118

1 walking by, Ms. McGowan called your name out?

2       MR. HILKE:  Object to form.

3    A.   I don't think --

4       MR. HILKE:  You may answer.

5    A.   -- she knew my name, but like I said she

6 talked to Ms. Lockett first, so Wendy knew my name

7 because we grew up together.  We went to the same

8 school together, and that's probably how she knew

9 who I was.

10    Q.   (By Mr. Haner) Okay.  And so is it fair

11 to say it was just by luck that you were walking by

12 Ms. McGowan and Ms. Lockett at that moment?

13       MR. HILKE:  Foundation.

14       You can answer.

15    A.   Yes.

16    Q.   (By Mr. Haner) Okay.  And it was just --

17 and I'll withdraw that.

18       Going back to Exhibit 5, it is the

19 affidavit that you -- it's the one-page affidavit.

20       MS. PETERS:  Can we pause for a

21    minute, please?

22       MR. HILKE:  Yes.

23       (Off the record at 12:42 p.m.)

24       (On the record at 12:43 p.m.)

25       MR. HILKE:  Back on the record.

Page 119

1        MR. HANER:  Back on the record.

2    Q.   (By Mr. Haner) And just a few more

3 questions, Ms. Morrow.  And this is Exhibit 5

4 that -- this is the affidavit.  Do you know if this

5 was the first affidavit that you wrote relating to

6 your testimony in Keith Carnes' case?

7    A.   No, it's not because -- can I explain?

8    Q.   Yes, please.

9    A.   Because I had written an affidavit for

10 Keith Carnes and -- and for his other lawyer, and I

11 sent -- it should -- you all should have had it in

12 the record.  I don't remember where I put it at, but

13 I did -- wrote affidavits for the other attorney

14 that was supposed to be handling his case when he

15 was incarcerated.

16    Q.   And did you feel any pressure from family

17 members to complete an affidavit?

18       MR. HILKE:  Object to form.

19       You can answer.

20    A.   No.

21    Q.   (By Mr. Haner) So the fact that you had

22 family members incarcerated with Keith, the man that

23 you testified against, that wasn't a concern to you

24 at all?

25    A.   No concern at all.

Page 120

1    Q.   You weren't concerned of potential

2 retaliation from those family members?

3    A.   No.

4    Q.   And what was your understanding of your

5 son Junius's conversations with Keith?

6    A.   Well, he was also incarcerated with Keith.

7 So I don't understand what their conversation was

8 because I wasn't there.

9    Q.   And at one point was Junius not

10 incarcerated but they seen a probation violation?

11    A.   At one point, but he -- my son was

12 incarcerated.  Then he wasn't incarcerated.

13    Q.   And then did he get incarcerated again

14 after that?

15    A.   Yes.

16    Q.   And he knew Keith Carnes throughout all of

17 this?

18    A.   No.  He met him also again in jail.

19    Q.   Okay.  And you don't believe that he felt

20 threatened at all by Keith?

21    A.   No.

22    Q.   You don't think Keith ever said, "Your mom

23 snitched on me"?

24    A.   No.  You -- you see my -- big as my son

25 is, I don't think he would ever be threatened by

Lexitas provides all 50 states and 39 licensed court reporting Nevada Registration #118B
California Firm Registration #179



1 Keith.

2    Q.  And in this affidavit in Exhibit 5, it

3 states "The original prosecutor, Amy McGowan,

4 coerced me in the second trial by revealing to me

5 that the shell casings were on the porch of the

6 corner house of 28th and Wabash in order to meet to

7 frame Keith Carnes with my testimony."

8    Did I read that correctly?

9   **A.  Correct.**

10    Q.  And in this affidavit you then indicate

11 that she had threatened to plant drugs on you; is

12 that correct?

13   **A.  Not in this one because they didn't ask me**

14 **those questions, correct.**

15    Q.  And who didn't ask you those questions?

16   **A.  Whoever -- I don't remember who took this**

17 **affidavit right here.  I really don't.**

18    Q.  So the questions about planting drugs,

19 were those questions asked by Latahra Smith?

20        MR. HILKE:  Object to form.

21        You can answer.

22  **A.  No.**

23    Q.  (By Mr. Haner)  Who asked those questions?

24  **A.  I don't remember who asked me those**

25 **questions.**

1    Q.  Who did you first -- who was the first

2 person you told that Amy McGowan allegedly

3 threatened to plant drugs on you?

4        MR. HILKE:  Object to form.

5        You can answer.

6  **A.  I don't remember.**

7    Q.  (By Mr. Haner)  Was it in one of your

8 affidavits?  Was that the first time you told -- or

9 you stated that Amy McGowan coerced you?

10  **A.  I don't --**

11       MR. HILKE:  Same objection.

12  **A.  Okay.**

13       MR. HILKE:  You can answer.

14  **A.  I don't remember because, like I said, a**

15 **lot of this stuff happened a long time ago.  And**

16 **I've been sick, so in between it, I don't remember.**

17    Q.  (By Mr. Haner)  And I believe you

18 testified that Reggie Thomas at the trial kind of

19 made a cutthroat sign to you?

20  **A.  Yes.**

21    Q.  And you previously said that you had

22 bought drugs from Reggie?

23  **A.  Yes.**

24    Q.  And that Reggie was kind of one of the big

25 fish in the drug exchange community?

1  **A.  Yes.**

2    Q.  Did you and him have a business

3 relationship with selling drugs?

4        MR. HILKE:  Objection, asked and

5       answered.

6       You can answer.

7  **A.  No, because it was an apartment full of**

8 **people that he has selling for him.**

9    Q.  (By Mr. Haner)  And he would sell to you,

10 and then you would resell?

11  **A.  Yes.**

12    Q.  And I believe you also indicated that you

13 had pressure from the White family to point the

14 finger at Keith, correct?

15  **A.  Correct.**

16    Q.  At the time of your trial testimony, who

17 were you more pressured by, the White family or

18 Reginald Thomas?

19  **A.  Reginald Thomas.**

20    Q.  Because he was the person in the

21 background saying (demonstrating)?

22  **A.  Yes, he was also at the trial.**

23    Q.  You would agree with me that Prosecutor

24 Amy McGowan wasn't at the trial making the similar

25 gestures as Mr. Thomas, correct?

1  **A.  Correct.**

2    Q.  And you believe that Reginald Thomas did

3 the murder?

4  **A.  Correct, he did.**

5    Q.  And you in fact saw him do the murder?

6  **A.  Correct.**

7    Q.  So if you were called to testify today in

8 court in a case against Reginald Thomas, you would

9 affirmatively say he was a murderer?

10  **A.  Correct.**

11    Q.  And on the converse, if there was a trial

12 today and Keith Carnes was on trial, would you say

13 that you were his alibi witness?

14  **A.  Yes.**

15    Q.  And what would make you a good alibi

16 witness for him?

17  **A.  Because Mr. Carnes was standing on the**

18 **porch of the apartment.**

19    Q.  And then you saw that, and then you saw

20 the other person that did the murder so you could

21 alibi him?

22  **A.  Yes.**

23    Q.  In Mr. Carnes' deposition about a month

24 ago, in had indicated that Reginald Thomas could

25 have been his alibi witness.  Do you have any



1 concerns about how Reginald could be the alibi
2 witness when you saw him do the murder?
3        MR. HILKE:  Object to form.
4        But you can answer.
5    **A.   Okay.  I'll explain it to you.  I don't**
6 **know about him saying Reginald could be, but I seen**
7 **Reggie Thomas kill this man.  He couldn't be his**
8 **alibi witness because he was standing on the porch.**
9 **Maybe the young ladies that was standing there could**
10 **probably alibi Keith better than Reggie because**
11 **Reggie was the shooter that killed -- he -- he's the**
12 **one that killed Mr. White.**
13    Q.   So when Keith said that Reggie could have
14 alibied him, based on your eyewitness of the events,
15 you would disagree with that?
16        MR. HILKE:  I think I would just
17        object to the extent it misstates
18        testimony.
19        You can answer.
20    **A.   I disagree.**
21    Q.   (By Mr. Haner)  And -- and you had
22 interactions with Latahra Smith; is that correct?
23    **A.   I met her, yes.**
24    Q.   And you met her on multiple occasions?
25    **A.   Yes.**

1    Q.   And would she sometimes pick you up or
2 take you to doctors appointments?
3    **A.   She did one time I was really sick, yes.**
4    Q.   And do you still have communications with
5 her?
6    **A.   No.**
7    Q.   And are you aware that Latahra Smith also
8 reached out to Wendy Lockett?
9    **A.   Yes, I'm aware.**
10    Q.   Kind of similar to how she reached out to
11 you?
12    **A.   Yes.**
13    Q.   And she was doing this in part of her KC
14 Freedom Project in efforts like that; is that your
15 understanding?
16    **A.   Correct.**
17    Q.   And she reached out to Wendy Lockett
18 because like yourself she was one of the
19 eyewitnesses at the criminal trials?
20    **A.   Correct.**
21    Q.   Are you aware that Wendy Lockett filled
22 out an affidavit similar to like the affidavit
23 Latahra Smith had you fill out?
24    **A.   I don't know what they had going on, but**
25 **probably so.  I don't know.**

1    Q.   Did Latahra tell you that she was working
2 with Wendy to get her testimony recanted?
3    **A.   Yes.**
4    Q.   And what was she saying she was doing to
5 get that recantation done?
6    **A.   She hadn't met with Wendy yet, but I don't**
7 **know what she was doing at the time because I wasn't**
8 **there.**
9    Q.   But she just told you that Wendy was also
10 going to --
11    **A.   Was one of the witnesses.**
12    Q.   Okay.  And I'll represent to you that
13 Wendy Lockett had previously filled out an affidavit
14 like this one with Latahra Smith, and in her
15 deposition a couple of months ago, she indicated
16 that the statements made about coercion by Amy
17 McGowan were not true.  Do you understand that Wendy
18 Lockett is now saying that Amy McGowan did not
19 coerce her?
20        MR. HILKE:  Object to foundation.
21        You can answer.
22    **A.   I understand she said that, but Wendy**
23 **Lockett is a big liar as well.**
24    Q.   (By Mr. Haner)  And in short, at the
25 habeas testimony, Wendy Lockett indicated that

1 Latahra Smith actually coerced her in ways to recant
2 her statement.  Are you aware of that?
3    **A.   No.**
4    Q.   Did you ever feel coerced or pressured by
5 Latahra Smith at all?
6    **A.   No.**
7    Q.   And how did Amy McGowan know to go to the
8 Whites' house?
9        MR. HILKE:  Object to foundation.
10        You can answer.
11    **A.   I really don't know that answer to that**
12 **question.**
13    Q.   (By Mr. Haner)  Did they tell you that
14 they had called the prosecutor to come to their
15 house?
16        MR. HILKE:  Same objection.
17    **A.   I don't remember.**
18    Q.   (By Mr. Haner)  Would you consider it to
19 be happen chance (sic) that she arrived at the
20 Whites' house when you happened to be there?
21        MR. HILKE:  Same objection.
22    **A.   Yes.**
23    Q.   (By Mr. Haner)  Okay.  So similar to the
24 incident where she rolled up to you on the street,
25 and when she found you at the Whites' house, it was

888-893-3767
www.lexitaslegal.com
Lexitas provides Daily 50 states and 39 licensed court reporters.
California Firm Registration #179



1  just kind of situational luck?
2        MR. HILKE:  Objection to --
3  **A.  Right.**
4        MR. HILKE:  -- foundation.
5        You can answer.
6  **A.  Right.**
7     Q.  (By Mr. Haner)  And just to kind of --
8  I'll withdraw that.
9        And did you ever make any efforts to tell
10 the police that you felt coerced by Amy McGowan?
11 **A.  No.**
12    Q.  And did you ever tell Dawn Parsons that
13 you felt coerced by Amy McGowan?
14 **A.  I never told her anything.**
15    Q.  So about how long did you keep this
16 secret?
17       MR. HILKE:  Object to form.
18       You can answer.
19 **A.  For as long as this man was incarcerated.**
20    Q.  (By Mr. Haner)  And I believe that you
21 previously testified that your niece Brenda White
22 had told the White family that you had said you saw
23 Reginald Thomas and Kiki do it, correct?
24 **A.  Correct.**
25    Q.  And in the previous transcript, trial

1  transcript, you had indicated that the White family
2  believed Keith Carnes did it; is that correct?
3  **A.  Correct.**
4     Q.  Did you try to explain to them that Keith
5  Carnes didn't do it and that Reginald Thomas and
6  Kiki did it?
7  **A.  I don't remember.**
8     Q.  Do you believe that would have been an
9  important thing to tell them?
10 **A.  Do I believe?  Yes, it would have been an**
11 **important thing to tell them.**
12    Q.  So when they were offering you money to
13 implicate Keith, you didn't tell them, "It wasn't
14 Keith.  It was Reggie and Kiki"?
15       MR. HILKE:  Objection, asked and
16       answered.
17       You can answer.
18 **A.  I don't remember any of that right now**
19 **because it was just too long ago.**
20    Q.  (By Mr. Haner)  Okay.  But you would agree
21 with me at that time that would have been something
22 important to tell them?
23 **A.  Yes.**
24    Q.  And why would it be important?
25 **A.  To tell them what really happened.  I'm --**

1  I'm telling them what I was coerced to say, what I
2  was told to say to them; so that's how it all
3  happened.
4        And right now I'm sorry this man had to go
5  through all of this.  I went to a psychiatrist.  I
6  have to -- and I'm still going through this because
7  I kept all of this in the back of my mind.  I didn't
8  want this.
9     Q.  So what was your understanding of why the
10 White family believed Keith did it?
11       MR. HILKE:  Foundation.
12       You can answer.
13 **A.  The understanding why I think they believe**
14 **he did it because there was a guy that lived on the**
15 **corner -- in the corner house on 29th and Wabash,**
16 **and he was a friend to the White people.  I don't**
17 **know if he's still living or not.  I forgot his**
18 **name, but I don't know if he's still living or not,**
19 **but he also spoke with the White family.**
20    Q.  (By Mr. Haner)  And so he told them that
21 Keith did it?
22 **A.  Yes.**
23       MR. HILKE:  Objection to foundation.
24       You can answer.
25 **A.  Yes.**

1     Q.  (By Mr. Haner)  Okay.  So it wasn't Amy
2  McGowan that coerced them into believing that Keith
3  did it?
4        MR. HILKE:  Objection to foundation.
5        You can answer.
6  **A.  I don't think he even met Amy McGowan.  I**
7  **don't even think he even got involved in the case.**
8     Q.  (By Mr. Haner)  But he believed Keith had
9  done it?
10       MR. HILKE:  Objection to foundation.
11       You can answer.
12 **A.  Yes.**
13    Q.  (By Mr. Haner)  And just to be clear for
14 the record, you didn't challenge the Whites' belief
15 that Keith did it by telling them, "No, I saw it,
16 and it was Reggie and Kiki"?
17       MR. HILKE:  Objection, asked and
18       answered multiple times and foundation.
19       You can answer.
20 **A.  Would you repeat the question?**
21    Q.  (By Mr. Haner)  Yeah.  Knowing that the
22 White family believed that Keith had did it, and
23 they were offering to pay you money, you didn't tell
24 them, "No, Keith didn't do it.  Reggie and Kiki did
25 it and I saw it"?

888-893-3767 | Notes Taken in all 50 states and 35 licensed countries Nevada Registration #118B
www.lexitaslegal.com                    California Firm Registration #179

Page 133

1          MR. HILKE:  Objection, asked and
2      answered and foundation.
3      You can answer.
4      A.  Well, I -- I -- I don't -- they believed
5  at that point because of what the other guy said and
6  then what I had to tell them that this man did this
7  and he didn't do it, the actual shooter was Reggie,
8  I seen it with my own eyes.  I've been scared for my
9  life all these years because I've moved back and
10  forth out of town, you know, just to get away from
11  this because Reggie was still out on the street, so
12  I had to move on away from -- I don't know if he was
13  going to do something to me because he knew I was a
14  witness.  He knew I seen his face, so I'm -- this is
15  my life.  This is my life.  This is my kids' life.
16  My kids didn't know nothing about it.  Only reason
17  why my son Junius learned about it is because he was
18  in jail with Mr. Carnes.  I never explained none of
19  this to them.  I kept my family out of this mess.
20      Q.  (By Mr. Haner)  And just to be clear for
21  the record, when you made your statement to the
22  police, you told the police that it was Reginald
23  Thomas and Kiki?
24          MR. HILKE:  Objection, asked and
25      answered.

Page 134

1      You can answer.
2      A.  Yes.
3      Q.  (By Mr. Haner)  Okay.  And prior to your
4  habeas testimony, did you meet with any lawyers to
5  prepare for that?
6      A.  Prepare for what?
7      Q.  Your testimony at the habeas hearing.
8      A.  No.
9      Q.  You didn't meet with --
10      A.  Oh, yes.  Yes, I did.  His attorney -- one
11  of his attorney -- it was a lady.  I can't remember
12  her name.  We only met one time.
13      Q.  And was that one of Keith's attorneys?
14      A.  Yes.
15      Q.  And what was your meeting about?
16      A.  About the trial.
17      Q.  And what were you going to testify to?
18      A.  Yes.
19      Q.  And were you told of any specific things
20  that you needed to testify to?
21      A.  No.
22      Q.  So they just said, "Just tell the truth"?
23      A.  Correct.
24      Q.  They didn't coach you or suggest any way
25  you should answer questions?

Page 135

1      A.  They didn't coach me on anything, sir.
2      Q.  Okay.  So the inconsistencies between the
3  deposition you took and then your later trial
4  testimony, that was just changes in your memory?
5          MR. HILKE:  Object to the form and
6      foundation.
7      You can answer.
8      A.  Change my memory how?
9      Q.  (By Mr. Haner)  So if there --
10      A.  Specify.
11      Q.  -- if there were things when you were
12  deposed that you didn't mention in your deposition
13  but then you mentioned them at trial, was that just
14  a change in your memory is what caused that
15  information to not be in the deposition, but for
16  that information to be presented at trial?
17          MR. HILKE:  Same objection.
18      A.  The things that was in my mind, I had to
19  tell what I saw, what I carried in my heart for all
20  these years.  This man was locked up.  I have to --
21  like I said, I've been to a psychiatrist for this.
22  I'm on medication for this.  I tried to forget, but
23  to -- when I mentioned it to Ms. Latahra, she -- I
24  had to tell her.  I had to tell somebody that I
25  was on my deathbed, you know.  I was very sick.  So

Page 136

1  somebody had to know what happened.  So we did a
2  deposition.  And she -- she came to the hospital and
3  did it, and I talked to her about what went on.  And
4  when she met -- got his lawyer and stuff together,
5  whether they was working together, I don't know, but
6  I had to tell what I saw.  I had to tell the truth.
7  If I don't tell the truth and I'm sitting up here --
8  if I don't tell the truth, this man has been sitting
9  up here in jail for all of these years for something
10  he didn't do, so I had to correct my mistake.
11      Q.  (By Mr. Haner)  And I really am almost
12  finished, Ms. Morrow.
13          MR. HANER:  And what was the exhibit
14      for this affidavit, the 2014 affidavit?
15      MR. HILKE:  7.
16      MS. PETERS:  7.
17      MR. HANER:  7.
18      Q.  (By Mr. Haner)  If you could go to
19  Exhibit 7, Ms. Morrow.  It's the affidavit that's
20  two pages long.  I believe it's signed by you and
21  Latahra Smith as a witness.
22      A.  Um-hum.
23      Q.  You -- when you're saying that you're on
24  your deathbed and you're wanting to tell the full
25  truth, is this affidavit an example of that?

888-893-3767
www.lexitaslegal.com

2:13-cv-00125-RFB-DJA

Document 114-2 (Services all 50 states and 30 licensed countries)
Filed 06/20/24
California Firm Registration #179

Nevada Registration #118B
Page 34 of 38



1    A.   Correct.

2    Q.   And you would agree with me that this
3  affidavit doesn't outline the interaction you had
4  with Ms. McGowan when she pulled up on you on the
5  street?

6    A.   What do you mean about that?

7    Q.   This affidavit doesn't talk about that
8  incident, correct?

9    A.   Correct.

10    Q.   But you talked about meeting her at the
11  White family's house in your trial testimony?

12    A.   Correct.  Can I say something?

13    Q.   Yes.

14    A.   When she took this deposition, I was very,
15  very sick, and she didn't ask me all those
16  questions.  She just asked me a few questions about
17  what happened.  She didn't ask me about Amy or
18  nothing like that, you know.  And then -- you know,
19  like I said, when we went to trial, I had to sit up
20  there and tell them what actually happened.  You
21  know, a regression is when you put something in the
22  back of your mind and you want to forget about it,
23  but I had to get it out.  I survived the death of,
24  you know, being -- from my lupus and stuff, so I
25  wanted to -- them to know that this man is innocent.

1    Q.   And you would agree with me that at your
2  habeas trial, that testimony, that was the first
3  time you mentioned that Amy McGowan had came out and
4  visited you at the White family's house?

5    A.   It was --

6         MR. HILKE:  Object to -- object to
7  foundation.

8         You can answer.

9    A.   It was the first time.  Everything that I
10  said at his trial was the truth, and I'm -- I'm --
11  I'm sitting up here, everything just come back.  And
12  like I said, regression, when you put it back in
13  mind, this man -- I was crying.  This man was in
14  jail for all these years.

15    Q.   Yeah.

16    A.   And his -- his -- I never seen his mother
17  in my day of my life, but she was in the courtroom,
18  and I apologized to this woman for her son being
19  incarcerated for my mistake.  I should have came --
20  I should have talked to the prosecutor Dawn Parsons
21  about it.  I should have told the police department
22  what was going on, but I don't know what -- how
23  people connected it into this situation because
24  sometimes things can be a dangerous situation in my
25  life, my kids' lives on the line -- I couldn't do

1  that.  I had to come out with the truth.

2    Q.   (By Mr. Haner)  And I guess my question is
3  you'd agree with me that this affidavit doesn't
4  outline that Amy McGowan went and visited you out in
5  the streets in any way, but the first time you
6  mentioned that is at your habeas trial testimony?

7    A.   Yes.

8         MR. HILKE:  Objection, foundation.

9         You can answer.

10    A.   Yes.

11    Q.   (By Mr. Haner)  And you would agree with
12  me that you hadn't met with any attorneys prior to
13  making this affidavit, correct?

14    A.   Correct.

15    Q.   And after you spoke with some of Keith's
16  attorneys and remembered more things, that's what
17  created your testimony at the habeas trial?

18         MR. HILKE:  Object to form, compound,
19  foundation.

20         You can answer.

21    A.   Correct.  I had to get this -- once again,
22  I had to get all of this off my chest because all
23  this stress is not good for me.

24    Q.   (By Mr. Haner)  Yeah, I understand.  And I
25  just -- what I'm trying to get at is if this was

1  your memory or this was the attorney's hopeful
2  memory to implant upon you.

3    A.   They didn't plant anything upon me.  When
4  I got on that stand, everything that I saw and I
5  told and got it off my heart, and it felt good.  I'm
6  just going to say it like that.

7    Q.   Okay.  And I have no further questions.

8         EXAMINATION

9  BY MR. HILKE:

10    Q.   Ms. Morrow, I've got just a couple for you
11  now.

12    A.   Okay.

13    Q.   I think you testified a minute ago about
14  suppression and putting memories in the back of your
15  mind.  Do you recall that testimony?

16    A.   Yes.

17    Q.   You testified about Ms. McGowan
18  threatening to put you in jail because of -- you
19  testified about that threat from her.  Do you recall
20  that?

21    A.   Yes.

22    Q.   You also testified about a death threat
23  from Reggie Thomas.  Do you recall that?

24    A.   Yes.

25    Q.   You testified about feeling guilt about

Lexitas - California states and 50 licensed reporters Nevada Registration #119
California Firm Registration #179



1 putting the wrong man in prison.  Do you recall
2 that?

**3     A.   Yes.**

4     Q.   And you've testified about your illness,
5 which you've dealt with for the last 20 years.  Do
6 you recall that?

**7     A.   Yes.**

8     Q.   Are all of those factors that can make it
9 difficult to pull out all the memories you have at
10 one time?

**11    A.   Correct.**

12    Q.   Now, am I correct that at this deposition
13 you've seen some documents for the very first time?

**14    A.   Correct.**

15    Q.   This is the first time you're seeing your
16 testimony from the habeas proceeding; is that
17 correct?

**18    A.   Correct.**

19    Q.   This is your first time, I think, since
20 you've signed them seeing some of these affidavits;
21 is that correct?

**22    A.   Correct.**

23    Q.   And did reviewing those documents help you
24 to refresh your memory?

**25    A.   Correct.**

1     Q.   And does it sometimes take you some time
2 to refresh your memory of this particular incident?

**3     A.   Correct.**

4     Q.   By the way, you testified about Amy --
5 strike that.

6         You testified about Wendy Lockett standing
7 behind you, you believed, while you spoke to Amy
8 McGowan on the street.  Do you remember that?

**9     A.   Correct.**

10    Q.   Do you know exactly what Wendy Lockett
11 heard or didn't hear of your conversation with Amy
12 McGowan at that time?

**13    A.   I don't know how much that she heard of my**
**14 conversation with Ms. Amy, but she was close enough**
**15 to hear some of it.**

16    Q.   Were you paying more attention to
17 Ms. McGowan at that time than to Wendy Lockett?

**18    A.   Correct.**

19    Q.   One second.

20        And you've been asked many questions, some
21 multiple times, about the timeline of the days after
22 you saw Larry White got murdered.  Do you remember
23 those questions?

**24    A.   Yes.**

25    Q.   And I think just before lunch -- am I

1 correct -- that you were feeling a little bit faint,
2 and we had to get you something to eat so you could
3 continue?

**4     A.   Correct.**

5     Q.   I just want to clear something up.  Is
6 there any doubt in your mind that you told the
7 prosecutor Amy McGowan that you saw Reggie Thomas
8 and Gary Kitchen kill Larry White?

**9     A.   I told her the truth.**

10    Q.   And was that the truth?

**11    A.   Yes.**

12    Q.   The truth wa- -- you told her the truth
13 that you saw Reggie Thomas and Gary Kitchen kill
14 Larry White?

**15    A.   Correct.**

16    Q.   And is there any doubt in your mind that
17 you also told the police detectives when they
18 interviewed you that Reggie Thomas was the murderer
19 in this case?

**20    A.   Correct.**

21    Q.   That's what you told them?

**22    A.   Um-hum.**

23    Q.   Is that a yes?

**24    A.   Yes.**

25    Q.   Okay.  I don't have anything further.

1                REEXAMINATION
2 BY MS. PETERS:
3     Q.   I -- I have just -- just one, I promise
4 you.

5         Ms. Morrow, you testified a few minutes
6 ago that there was a man that lived in the
7 neighborhood where the shooting happened that
8 believed Keith Carnes committed the murder of Larry
9 White; is that right?

**10    A.   Um-hum.**

11    Q.   Is that yes?

**12    A.   Yes.**

13    Q.   Do you recall this man's name?

**14    A.   I can't recall his name because it's been**
**15 so long ago that I've been even in that**
**16 neighborhood, because he had actually lived across**
**17 the street from the -- he lived across the street**
**18 from the -- the volleyball court.  You -- oh, you**
**19 got the paper?  I can show you what I was talking**
**20 about.  I think he also spoke with Ms. Latahra.**

21    Q.   Okay.  I'm showing you Exhibit 1.

**22    A.   Okay.  This is the volleyball court right**
**23 here (indicating), and that's the house.  She lived**
**24 there on the corner.  It used to be a -- I want to**
**25 say, daycare center.  They used to have daycare**

Exhibits produced in all states and 3 licensed prior to Nevada Registration #18
California Firm Registration #179



1  center there out on the -- on the -- it's on the
2  corner house.  I don't -- they probably have changed
3  the color, but it was a day- -- it was a daycare
4  center.
5      Q.  You believed he lived on the corner
6  of 29th and Wabash?
7      A.  Yes.
8      Q.  Do you recall what his street name was?
9      A.  Oh, it's -- I can't remember his street
10 name.
11     Q.  When you were there that night and
12 witnessed the shooting of Larry White, did you see
13 this man there also?
14     A.  On his porch, because when I was walking
15 down the street, you know, the side I would have
16 been on the -- once again, the left-hand side, and
17 their house is right there on the left-hand corner,
18 the last house on the left-hand corner.
19 (Indicating.)
20     Q.  Now, did you talk to this man yourself?
21     A.  No, ma'am.
22     Q.  How -- how do you know that he believed
23 that Keith Carnes committed the murder of Larry
24 White?
25     A.  He told that to the White family.

1      Q.  Okay.  Okay.
2      A.  Let me show you where the volleyball
3  court -- the house is right across the street
4  because there was a house there before they made the
5  volleyball court (indicating).
6      Q.  Do you know Alton Shaw?
7      A.  That name sound familiar but, you know,
8  people back then didn't use their correct name.
9      Q.  I don't have any further questions.
10     A.  Oh, good.
11         MR. HANER:  Nothing further.
12         MR. HILKE:  Nothing further.
13         THE REPORTER:  Would you like to read
14     and sign this deposition?
15         THE WITNESS:  Can you email it to me
16     and I can, you know, sign it?  Do you have
17     my email address?
18         THE REPORTER:  Yes.
19         THE WITNESS:  Okay.
20         THE REPORTER:  What is your email
21     address.
22         THE WITNESS:
23     Morrowlorianne3@gmail.com.
24         THE REPORTER:  Thank you.
25         (The deposition concluded at

1  1:17 p.m. and the witness was excused.)
2              *   *   *

1             CERTIFICATE OF REPORTER
2      I, Cherie L. House, a Certified Court
3  Reporter within and for the States of Kansas and
4  Missouri and a Registered Professional Reporter,
5  hereby certify that the foregoing proceedings as
6  herein set forth was first taken before me and
7  thereafter transcribed into computer-aided
8  transcription under my direction and control, and is
9  a true and correct record of the proceedings
10 reported.
11     I further certify that I am not a relative
12 or employee or attorney or counsel of any of the
13 parties, or a relative or employee of such attorneys
14 or counsel of any of the parties, or a relative or
15 employee of such attorneys or counsel, or
16 financially interested in the proceedings.
17
18 *Cherie L. House*
19
20     Cherie L. House, RPR, CCR (KS, MO)
21     Registered Professional Reporter #18811
22     Certified Court Reporter #275-MO, #1707-KS
23
24
25     Date:  June 15, 2024



Page 149

```
1          IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF MISSOURI
2                   WESTERN DIVISION

3   KEITH CARNES,

4                   Plaintiff,

5   vs.                    Case No. 23-cv-00278-RK

6   ROBERT BLEHM, et al.,

7                   Defendants.

8

               CERTIFICATE OF DEPOSITION
9

    Comes now Cherie L. House and pursuant to
10  Rule 57.03(g)(2)(a) states as follows:

11  The deposition of LORIANNE MORROW was taken on
    June 5, 2024.  The name and address of the person or
12  firm having custody of the original transcript:

13      Ms. Diane Peters
        WYRSCH HOBBS & MIRAKIAN, PC
14      One Kansas City Place
        1200 Main Street Suite 2110
15      Kansas City, Missouri 64105

16  At the time of delivery of the transcript the
    deposition charges had not been paid.  Payment
17  status will be updated at the request of the Court
    pursuant to Section 492.590(2) RSMo.

18

19      Cherie L. House
        _____
20      Cherie L. House

21

22                  LEXITAS LEGAL
                  1608 Locust Street
23             Kansas City, Missouri 64108
                  (800) 280-3376

24

25
```

Page 150

```
1                   LEXITAS LEGAL
                  1608 Locust Street
2              Kansas City, Missouri 64108
                  (800) 280-3376

3

4   June 15, 2024

5

6   Ms. Lorianne Morrow
    morrowlorianne3@gmail.com
7   In re:   Keith Carnes v. Robert Blehm, et al.

8   Dear Ms. Morrow:

9   Please find attached your copy of the deposition
    taken on June 5, 2024, in the above-referenced case.
10  Also attached are the original signature and errata
    pages.

11

    Please read your copy of the transcript, indicate
12  any changes and/or corrections desired on the errata
    sheet, and sign the signature and errata pages
13  before a notary public.

14  Please return the notarized signature pages to our
    office for filing prior to trial date.

15

    Address:
16  LEXITAS LEGAL
    Attn:  Production
17  1608 Locust Street
    Kansas City, Missouri 64108

18

19

    Sincerely,
20  Cherie L. House

21

    Cherie L. House, RPR, CCR

22

23

24

25
```

Page 151

```
1                   ERRATA SHEET

2   Witness:  LORIANNE MORROW
    In re:   Keith Carnes v. Robert Blehm, et al.
3   Date:   June 5, 2024

4

5   Page ____  line ____
        Should read: _____
6       Reason: _____

7   Page ____  line ____
        Should read: _____
8       Reason: _____

9   Page ____  line ____
        Should read: _____
10      Reason: _____

11  Page ____  line ____
        Should read: _____
12      Reason: _____

13  Page ____  line ____
        Should read: _____
14      Reason: _____

15  Page ____  line ____
        Should read: _____
16      Reason: _____

17  Page ____  line ____
        Should read: _____
18      Reason: _____

19  Page ____  line ____
        Should read: _____
20      Reason: _____

21

22

23                  _____
                    LORIANNE MORROW
24

25
```

Page 152

```
1               SIGNATURE OF WITNESS

2   Witness:  LORIANNE MORROW
    In re:   Keith Carnes v. Robert Blehm, et al.
3   Date:   June 5, 2024

4

5       ____  I certify that I have read my testimony
    and request that NO changes be made.

6

        ____  I certify that I have read my testimony
7   and request that the above changes be made.

8

9                   _____
                    LORIANNE MORROW
10

                    _____
11                  Date

12

13                  _____
                    Notary Public within and for

14  _____, _____
                    County          State
15

        My commission expires:
16

17

18

19

20

21

22

23

24

25
```

888-893-3767 | Nationwide in all 50 states and licensed in Nevada Registration #117F
www.lexitaslegal.com
California Firm Registration #179

