## Page 1

```
         IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
                           DIVISION 70
              THE HONORABLE WILLIAM F. MAUER, SENIOR JUDGE

STATE OF MISSOURI,        )
               Plaintiff, )
     v.                   )  No. CR03-06321
KEITH L. CARNES,          )
               Defendant. )
```

                    TRIAL TRANSCRIPT EXCERPT
                    TESTIMONY OF LORIANNE MORROW
                           APRIL 19, 2005

On Tuesday, April 19, 2005, the above cause came on for hearing before THE HONORABLE WILLIAM F. MAUER, Senior Judge of the Jackson County Circuit Court at Kansas City, Missouri.

**APPEARANCES**

For the Plaintiff:
    MS. DAWN M. PARSONS
    Prosecuting Attorney's Office
    16th Judicial Court of Missouri
    Jackson County Courthouse, 11th Floor
    415 East 12th Street
    Kansas City, MO 64106

For the Defendant:
    MR. WILLIS L. TONEY
    Attorney at Law
    1100 Main, Suite 600
    Kansas City, MO 64108

## Page 2

**INDEX**

**STATE'S EVIDENCE**

**LORIANNE MORROW**

Direct Examination by Ms. Parsons ........ 3
Cross-Examination by Mr. Toney .......... 29
Redirect Examination by Ms. Parsons ..... 40

Reporter's Certificate ................... 43

-oOo-

**STATE'S EXHIBITS**

| NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 40 | Photospread | 28 | 28 |
| 60 | Photograph of Ke-Ke | 24 | 24 |
| 65 | Photograph of Keith Carnes without eye patch | 8 | 8 |
| 66 | Photograph of Keith Carnes with eye patch | 8 | 8 |

Exhibit X (Morrow's April 2005 testimony)

## Page 3

*(The following proceedings were had in open court in the presence of the jury and the defendant on Tuesday, April 19, 2005.)*

THE COURT: Go on, Miss Parsons.

MS. PARSONS: Thank you, Your Honor. The State calls Lorianne Morrow.

**LORIANNE MORROW**

having been sworn by the Court, testified:

**DIRECT EXAMINATION**

BY MS. PARSONS:

Q. Good morning.
A. Good morning.
Q. You're going to have to speak up. There is a microphone which is-- There may be one here. There looks like there's one here.
A. Okay.
Q. Because they need-- You can scoot your chair up if you want to get closer. I think it scoots. Oh, no, it doesn't. Sorry. Can you state your name for the ladies and gentlemen of the jury?
A. My name is Lorianne Morrow.
Q. Miss Morrow, how old are you?
A. Forty.
Q. Do you know the defendant, Keith Carnes?

## Page 4

A. Yes, I do.
Q. What do you know him as?
A. As a drug dealer.
Q. And what do you call him?
A. Tre.
Q. You call him Tre?
A. Yes.
Q. And how long have you known the defendant?
A. For about a year.
Q. And what was the nature of your relationship?
A. I used to purchase drugs for other people from him.
Q. So did you buy drugs from him?
A. Yes.
Q. What type of drugs?
A. Crack cocaine.
Q. Now let me ask you this: Did you smoke crack cocaine a year ago?
A. No, ma'am.
Q. What kind of drugs did you use?
A. Marijuana.
Q. Okay. So I want to go to October of 2003. Where were you living?
A. 2100 East 33rd Street.
Q. Okay, and do you know where Tre, the defendant, was hanging out?

**Page 5**

1  A. Yes, I do.
2  Q. Where was he hanging out?
3  A. On 29th in an apartment building on Olive, in
4     between Olive and Wabash.
5  Q. Do you know if he lived there?
6  A. No, he didn't live there.
7  Q. Well, what was he doing there?
8  A. Selling drugs.
9  Q. Did you buy drugs from him at that location?
10 A. Yes, I did.    (10:07AM)
11 Q. Okay. So let's go to October 6, 2003, 8:39 p.m.
12    Okay?
13 A. Yes.
14 Q. Where were you?
15 A. I was walking up 29th Street, going east.
16 Q. Okay. Where were you headed?
17 A. Over to a friend of mine's house.
18 Q. Okay. On that day, October 6, at that time had you
19    used any drugs?
20 A. No, ma'am.    (10:07AM)
21 Q. Any marijuana?
22 A. No, ma'am.
23 Q. Have any alcohol?
24 A. No, ma'am.
25 Q. Okay. You're walking up 29th to your friend's

**Page 6**

1  house. What do you see?
2  A. I see him holler at Larry, which he was standing on
3     the corner there, and throw some, two dimes of
4     crack to these people in the car.
5  Q. Let me stop you there. You know what that means.
6     The jurors may not. Larry. Who is Larry?
7  A. Larry is the victim.
8  Q. And do you know his last name?
9  A. Yes. White.
10 Q. Larry White. Where was he?    (10:07AM)
11 A. He was standing on the corner of 29th and Olive.
12 Q. And you said he was selling two dimes?
13 A. Of crack cocaine.
14 Q. What's that?
15 A. Rocks. Drugs.
16 Q. Okay, and you saw him selling two dimes to who?
17 A. Some people in a car.
18 Q. Is that unusual?
19 A. No.
20 Q. Cars drive up?    (10:08AM)
21 A. All the time.
22 Q. That's how it's done?
23 A. Yes, sometimes, when they go purchase with him or
24    buy from other people off the corner.
25 Q. All right. So you're walking along 29th and you

**Page 7**

1  see Larry White selling drugs to somebody in a car?
2  Is that correct?
3  A. Yes, ma'am.
4  Q. You continue walking. What do you see?
5  A. I see Tre coming out, hollering at Larry, telling
6     him that he can't sell drugs out here: This is his
7     turf. Larry started running after he came off,
8     off the porch.
9  Q. Okay. Where did the defendant, Tre, come from?
10 A. From the apartment, off the apartment, the back of    (10:08AM)
11    the apartment on the first floor.
12 Q. Okay. It's nighttime. How can you see him?
13 A. Oh, I see very well at night.
14 Q. Okay. In court today you identified him. How did
15    he look different that night?
16 A. He had a patch over his eye.
17 Q. The times that you interacted with the defendant,
18    did he always wear a patch?
19 A. Yes, ma'am.
20 Q. All right. I'm going to show you two photographs    (10:09AM)
21    right now, State's Exhibits 65 and 66. I'm showing
22    you 65 and 66. What are these photos of?
23 A. Of Keith Carnes. This is him with the patch. This
24    is without.
25 Q. So 65 is Keith Carnes without the patch?

**Page 8**

1  A. Right.
2  Q. And 66 is with the patch?
3  A. Yes, ma'am.
4     MS. PARSONS: Your Honor, the State would
5     move to admit 65 and 66.
6        (State's Exhibit Nos. 65 and 66 were
7     offered into evidence.)
8     MR. TONEY: No objection.
9     THE COURT: State's Exhibits 65 and 66
10    will be admitted into evidence.    (10:09AM)
11       (State's Exhibit Nos. 65 and 66 were
12    received into evidence.)
13 Q. (By Ms. Parsons) So I'm showing the jury 65, and
14    that's without the patch, correct?
15 A. Yes, ma'am.
16 Q. And this is 66. He has the patch, right?
17 A. Yes, ma'am.
18 Q. Is this how you normally saw him?
19 A. Yes, ma'am.
20 Q. Did he have the patch on that night?    (10:10AM)
21 A. Yes, ma'am.
22 Q. Okay. So you're walking down 29th, you see Larry,
23    you see the defendant, and you had just said you
24    heard the defendant hollering at Larry?
25 A. Yes, ma'am.

## Page 9

1  Q. We'll get to this later with the photos. You hear
2     him hollering. What's the next thing you see?
3  A. Well, next time, next thing I see him chasing him,
4     jumping off the porch, chasing him with that gun
5     over here.
6  Q. Okay, and you saw the gun when you walked into
7     court today, and we're referring to that as State's
8     Exhibit 35.
9  A. Oh, yes.
10 Q. When you came in this morning, you said that's the
11    gun?
12 A. Yes, ma'am.
13 Q. So you saw Keith Carnes, the defendant, chasing
14    Larry White with State's--
15 A. That's it. That's the gun.
16 Q. Okay. How, if you remember, was the defendant
17    holding it? Both hands? One hand?
18 A. Well, running he had--
19 Q. Excuse me. I don't want to point. (Demonstrating)
20    Like this?
21 A. Yes.
22 Q. And was he running?
23 A. Yes, ma'am.
24 Q. Was he running with both hands on it?
25 A. Yes, ma'am.

## Page 10

1  Q. As he was running, what was he doing? The
2     defendant.
3  A. Shooting.
4  Q. Shooting. How do you know he was shooting?
5  A. I heard it. I see the fire. When you shoot a gun,
6     the bullet comes out and fire comes out with it,
7     too.
8  Q. So did you see the fire?
9  A. Yes, ma'am.
10 Q. Where did you first see the fire coming out, what
11    part on 29th?
12 A. When he was cutting this alley, and he cut through
13    the alleyway when he was chasing him through that
14    alley.
15 Q. Okay. Did you stay in the same place while you
16    were watching this? Did you just stand still?
17 A. No, ma'am.
18 Q. What did you do?
19 A. I just proceeded on walking where I was going, but
20    I went through some shortcuts because I know the
21    whole area real well, so I was hiding because it
22    was dangerous, the way things were going down.
23 Q. Did you say you were hiding?
24 A. Yes.
25 Q. Okay. You see a person you know with an assault

## Page 11

1     rifle running, chasing, and you just continue
2     walking on?
3  A. Well, he was gone ahead, ahead of me.
4  Q. Okay. All right. And you're walking and hiding?
5  A. (The witness nodded her head.)
6  Q. Is that a yes?
7  A. Yes, ma'am.
8  Q. The court reporter has to pick that up. We went
9     through this yesterday with the jury, so it's okay.
10    You're walking, following them. Tell us the
11    next thing you see.
12 A. The next thing I seen, when Larry got up from the
13    chasing to Fish Town, when he collapsed right in
14    front of the Fish Town, he turned him over and shot
15    him some more.
16 Q. Where were you when you saw this?
17 A. On the side of the church.
18 Q. Okay. Now again it's October. It's about nine
19    o'clock at night. How are you able to see this?
20    Was there a streetlight?
21 A. There's streetlights.
22 Q. Okay. After you saw the defendant shoot Larry
23    White in the head, what's the next thing you did?
24       MR. TONEY: Objection, Your Honor.
25 A. What was the next thing?

## Page 12

1        MR. TONEY: Excuse me.
2        THE COURT: Excuse me.
3     Up here.
4     (Counsel approached the bench and the
5  following proceedings were had.)
6        MR. TONEY: Your Honor, I'm going to
7  object to the form of the question. The prosecutor
8  said that after she saw Larry, after she saw my
9  client shoot Larry White in the head. She never
10 testified that she saw that.
11       MS. PARSONS: She just said that.
12       MR. TONEY: No, she didn't.
13       THE COURT: She didn't say anything about
14 the head.
15       MR. TONEY: She didn't say anything about
16 the head.
17       MS. PARSONS: All right.
18       THE COURT: Rephrase your question.
19    (The proceedings returned to open court.)
20 Q. (By Ms. Parsons) When you saw the defendant shoot
21    Larry, where did he shoot him at? Where on his
22    body did he shoot him?
23 A. When he was at Fish Town or when he was running
24    down the street?
25 Q. At Fish Town.

1  A. He turned him over and he shot him in the head.
2  Q. Okay. After that happened-- You saw that?
3  A. Yes.
4  Q. What did you do?
5  A. I freaked out, I kept on going, and I told my
6     friend what happened, and for three days I couldn't
7     sleep.
8  Q. Okay. After you kept going, did you see what
9     happened to Tre, the defendant?
10 A. No.                                          *10:14AM*
11 Q. So you just left?
12 A. Yes.
13 Q. Okay. I want to show you what we have already
14    admitted in as State's evidence. It's going to be
15    up there. Okay? We're going to dim some lights.
16    Can you see that?
17 A. Yes.
18 Q. What is that?
19 A. The apartment building.
20 Q. Okay. Let me go to the next one. What is that?  *10:15AM*
21 A. That's the apartment building with a balcony by the
22    alley here. That's the one next to the one on the
23    corner and that's one between the alley, the alley
24    between the two apartment buildings right there.
25 Q. Okay. I'm going to flip through these. I want to

13

1     get to this. What do we see here? Do you know
2     what street this is right here?
3  A. This is Olive.
4  Q. And what street is this right along here?
5  A. That's 29th.
6        MS. PARSONS: And I'm referring to, for
7     the record-- Excuse me, Your Honor. I know I need
8     to do that. I'm referring right now to State's
9     Exhibit 27, for the record.
10 Q. (By Ms. Parsons) Now when you were walking down   *10:15AM*
11    29th as we're looking at State's 27--
12 A. Right.
13 Q. --where was Larry?
14 A. He was standing on the corner.
15 Q. The corner right here?
16 A. Yes.
17 Q. Where the laser pointer is?
18 A. Right.
19 Q. Where were you?
20 A. On this side.                                    *10:16AM*
21 Q. Right here?
22 A. No. I hadn't quite--
23 Q. Here. Do you want to use this? You can try. Just
24    the red, the red button.
25 A. I hadn't quite made it up to the corner right

14

1     there.
2  Q. You need to press down on the red button. Okay.
3     You almost got it. You got to keep pressing it.
4  A. Oh, my hand.
5  Q. You just got to keep your finger on it. Oh, you
6     have arthritis, correct?
7  A. Yes.
8  Q. Okay. Sorry about that. So you're right where
9     this grate is?
10 A. Just a little bit farther back.                  *10:16AM*
11 Q. Right here?
12 A. Yes.
13 Q. Okay. In this area?
14 A. Yes.
15 Q. Where is the defendant?
16 A. The defendant is at the apartment.
17 Q. Which one? There's one, two, or three.
18 A. Two. He was at the first one where they used to
19    sell out of on the first floor.
20 Q. They used to sell out of this one right here?     *10:17AM*
21 A. Yes, ma'am.
22 Q. And where did you see the defendant?
23 A. The second one.
24 Q. This one I'm showing on State's 27?
25 A. Yes.

15

1  Q. Which porch did you see him on: on the left or the
2     right?
3  A. The left.
4  Q. This one here that I'm showing?
5  A. Uh-huh.
6  Q. So you're standing where the red dot is, correct?
7  A. Right.
8  Q. The defendant is up in this apartment?
9  A. Yes, ma'am.
10 Q. And the victim is over here?                     *10:17AM*
11 A. Yes, ma'am.
12 Q. On the corner. I'm referring to State's 27.
13    Okay. Now this is State's 28. This is where
14    you said the defendant was, correct?
15 A. Yes, ma'am.
16 Q. Where did they start running? Where did Larry
17    start running?
18 A. From where he was standing at to this way.
19 Q. So he's running along here?
20 A. Yes.                                             *10:18AM*
21 Q. Is he running in the street?
22 A. He was running in the street.
23 Q. So he was running in the street. Where's the
24    defendant?
25 A. Running behind him.

16

```
 1  Q.  So the defendant, as you told us earlier in your
 2      testimony, jumped off this apartment?
 3  A.  Yes, ma'am.
 4  Q.  Starts running?
 5  A.  Yes, ma'am.
 6  Q.  That's what you saw?
 7  A.  Yes, ma'am.
 8  Q.  When they start running, where do they go?
 9  A.  Through the alley.
10  Q.  This right here?
11  A.  Yes, ma'am.
12  Q.  I'm going to show another shot of it. We're now
13      referring to State's Exhibit 30. State's 30, this
14      is the alley you're discussing?
15  A.  Yes, ma'am.
16  Q.  So you see the defendant chasing Larry down this
17      alley?
18  A.  Yes, ma'am.
19  Q.  Where are you?
20  A.  Still walking up the street. There was a whole lot
21      of other people standing out there also.
22          MR. TONEY: Objection, Your Honor.
23      Nonresponsive to the question. I'm objecting.
24      She's narrating and not responding to the question.
25          THE COURT: Overruled.
                                                         17
```

```
 1  Q.  (By Ms. Parsons) You're continuing, walking east
 2      on 29th?
 3  A.  Yes.
 4  Q.  As you are walking behind Larry and the defendant,
 5      did you see or hear any shots?
 6  A.  Yes, ma'am.
 7  Q.  What did you see or hear?
 8  A.  I heard about three shots.
 9  Q.  As we're going down 29th along here?
10  A.  Yes, ma'am.
11  Q.  They make the corner to the alley?
12  A.  Yes, ma'am.
13  Q.  What do you do?
14  A.  I slowed down and kept on walking.
15  Q.  You hear gunfire in this neighborhood. Were you
16      scared?
17  A.  Yes.
18  Q.  Okay. So in State's 29 we see another shot of the
19      alley?
20  A.  Yes, ma'am.
21  Q.  Okay. Did you go down the alley?
22  A.  No, ma'am.
23  Q.  Where did you go?
24  A.  Straight forward, east.
25  Q.  Okay. I'm going to use State's Exhibit 4, which
                                                         18
```

```
 1      you have seen, correct?
 2  A.  Yes, ma'am.
 3  Q.  You know what? I'm going to move this out because
 4      I've got the computer in the way.
 5          MS. PARSONS: Can everyone see this?
 6      Okay.
 7  Q.  (By Ms. Parsons) All right. Let's get ourselves
 8      oriented on State's 4. This is 29th and Olive,
 9      correct?
10  A.  Right.
11  Q.  You're familiar with this area?
12  A.  Yes, ma'am.
13  Q.  Did you grow up here?
14  A.  I grew up here, yes, ma'am.
15  Q.  Okay. So is this the corner on State's 4 where
16      Larry was selling drugs?
17  A.  Yes, ma'am.
18  Q.  And these are the apartment buildings we just saw?
19  A.  Yes, ma'am.
20  Q.  This is the alley we just left off on?
21  A.  Yes, ma'am.
22  Q.  You saw the defendant chasing Larry down the alley
23      and you kept going east up 29th?
24  A.  Yes, ma'am.
25  Q.  Where did you turn?
                                                         19
```

```
 1  A.  After they get so far, I turn. There's some more
 2      apartments right there and there's a church sitting
 3      right over there.
 4  Q.  Is this the church right here I'm showing--
 5  A.  Yes, ma'am.
 6  Q.  --with the red dot?
 7  A.  Yes, ma'am.
 8  Q.  Where did you go?
 9  A.  I went behind the church. They got some steps,
10      some steps back there, and you can hide in the dark
11      and nobody can see.
12          MR. TWENTER: The jurors can't see.
13          MS. PARSONS: Oh, I'm sorry. Thank you.
14      I'll back up. We're going to back up because no
15      one can see.
16          MR. TWENTER: Just you were blocking.
17          MS. PARSONS: Oh, it was me. Oh, well,
18      okay. I can handle the problem with me. I'm going
19      to go around over here.
20          Is that good? Okay.
21  Q.  (By Ms. Parsons) We're on State's 4. You had just
22      testified you were going up, east on 29th?
23  A.  Yes, ma'am.
24  Q.  Using the red dot, I'm turning now north. Did you
25      walk through the parking lot here?
                                                         20
```

### Page 21

1  A. Yes, ma'am.
2  Q. Where are the stairs?
3  A. The stairs are right-- A little bit more.
4  Q. Back here?
5  A. No. It's in the back.
6  Q. Right here?
7  A. Yes, ma'am.
8  Q. I would have you do this, but I know you have
9     arthritis. So where the red dot is are stairs?
10 A. Yes, ma'am.  *10:22AM*
11 Q. What did you do there?
12 A. I stood back there for a minute.
13 Q. For a minute, like a real minute, 60 seconds?
14 A. (The witness nodded her head.)
15 Q. Okay. Because people use "a minute" to mean
16    10 minutes, 20 minutes.
17 A. No.
18 Q. While you're standing back here, do you see or hear
19    anything?
20 A. Gunshots.  *10:22AM*
21 Q. Okay. What's the next thing that happens after you
22    come out from the stairs of the church here on
23    State's 4?
24 A. To the other side.
25 Q. To the other side where the red dot is now?

### Page 22

1  A. No.
2  Q. Which side?
3  A. The other side.
4  Q. Up here?
5  A. Yes.
6  Q. This is the north side.
7  A. Right.
8  Q. So you're up here and when you're up here, what do
9     you see?
10 A. I seen him when he turned the boy over, hit Larry,  *10:22AM*
11    and he shot him some more.
12 Q. Okay. So you're standing where this red dot is?
13 A. Yes, ma'am.
14 Q. North of the church?
15 A. Yes. The view towards Fish Town.
16 Q. Okay, and this black body right here is where we've
17    all agreed where Larry's body was?
18 A. Right.
19 Q. So you're looking diagonally across. Is that
20    correct?  *10:23AM*
21 A. Yes, ma'am.
22 Q. Is there anything obstructing your view?
23 A. No.
24 Q. Okay. Where do you start walking after you see the
25    shooting?

### Page 23

1  A. I went back, straight down. Okay, that's Victor.
2     The other street next to Victor, when I went down
3     to Benton.
4  Q. Did you come down south Prospect, east on Victor?
5  A. Not Victor. It's another block after Victor.
6  Q. So you kept going north?
7  A. Yes.
8  Q. Okay. Did you see anyone else out there with a
9     gun?
10 A. Yes.  *10:23AM*
11 Q. Who did you see?
12 A. Ke-Ke.
13 Q. Who is Ke-Ke?
14 A. He's Tre's friend.
15 Q. And how long have you known Ke-Ke?
16 A. Well, they all was in that same apartment, so about
17    a year.
18 Q. Did you buy drugs from Ke-Ke?
19 A. Yes.
20 Q. Who did you buy mostly from?  *10:24AM*
21 A. From Tre.
22 Q. I'm going to show you what I've marked as State's
23    Exhibit 60. Showing you State's 60, what does that
24    depict?
25 A. That's Ke-Ke.

### Page 24

1  Q. That's Ke-Ke?
2  A. (The witness nodded her head.)
3  Q. Where was he? I lost my blinker. Here we go.
4     Where was he when you saw him with a gun?
5  A. He had came off the porch, but he didn't. He
6     didn't chase Larry.
7  Q. Did he stay on the porch?
8  A. (The witness nodded her head.)
9  Q. Is that a yes?
10 A. Yes.  *10:24AM*
11 Q. All right.
12         MS. PARSONS: Your Honor, the State at
13 this time would move to admit State's No. 60.
14         (State's Exhibit No. 60 was offered into
15 evidence.)
16         MR. TONEY: No objection, Your Honor.
17         THE COURT: What's the number again?
18         MS. PARSONS: Six-zero, 60.
19         THE COURT: State's Exhibit No. 60 will be
20 admitted into evidence.  *10:25AM*
21         (State's Exhibit No. 60 was received into
22 evidence.)
23 Q. (By Ms. Parsons) Now I'm showing the jury 60,
24    that's Gary Kitchen?
25 A. Right.

Page 25:

Q. And showing you what's been marked 66, that's Tre, the defendant?
A. Yes, ma'am.
Q. Ever confuse them?
A. No, ma'am.
Q. Okay. You told the jury that you couldn't sleep for three days, but you didn't talk to the police right after this crime?
A. No, I did not.
Q. Did you ever talk to the police?
A. Yes, I did.
Q. Do you know when that was?
A. On the 12th.
Q. October 12th?
A. (The witness nods her head.)
Q. Six days after this?
A. Yes, ma'am.
Q. Did they come to you or did you go to them?
A. Well, I've known his uncle also. I was talking to his Uncle Tim about what had happened and--
    MR. TONEY: Objection, Your Honor. That is nonresponsive to the question. The question was did the police go to her or did she go to the police. This is a narration, not a response.
    THE COURT: Sustained.

Page 26:

Q. (By Ms. Parsons) Miss Morrow--
A. Yes, ma'am.
Q. --did you go to the police or did they come to you?
A. The police picked me up.
Q. Okay. How did you notify that you wanted to talk to them?
A. Through the family.
Q. Okay. Then did you go to the police department?
A. Yes, ma'am.
Q. Did you make a formal statement?
A. Yes, ma'am.
Q. Did they show you a photospread?
A. Yes, ma'am.
Q. Did you identify anyone that you recognize as the shooter from the photospread?
A. Yes, ma'am.
Q. I'm going to show you what I've marked as State's Exhibit 40 and ask if you recognize the envelope, 40, and the contents of 40. What is that?
A. That's Keith Carnes, Picture No. 5.
Q. Okay. Well, let's talk about what the piece of paper is. What is this?
A. The spread, photo line-up spread.
Q. The photo line-up spread. That's okay. And it has the case number viewed by Loriann Morrow. That's

Page 27:

you?
A. Yes, ma'am.
Q. The date was October 12, '03?
A. Uh-huh.
Q. 2130, which is a police number for I think nine, 9:30, maybe, in the evening. Was this in the evening?
A. Yes, ma'am.
Q. All right. When you were shown this photospread, did you indicate on State's 40 who you knew?
A. Did I indicate?
Q. Yes.
A. To the police who I knew? No. The police already knew who he was and I showed him, pointed to the police.
Q. I guess my question was inartful.
A. Yes.
Q. Anyone on State's 40 that you recognize?
A. Yes.
Q. Who?
A. (The witness indicated.)
Q. Number 5?
A. Number 5.
Q. Who is that?
A. Keith Carnes.

Page 28:

Q. And after you recognized No. 5, did you write your initials, write your name?
A. I write my initials.
Q. On the back? Let's see. Are those your initials?
A. Yes, ma'am.
Q. Does this appear to be in the same or substantially same condition it was in when you viewed it and signed it on October 12th?
A. Yes.
    MS. PARSONS: Your Honor, the State would move to admit State's 40, the photospread.
    (State's Exhibit No. 40 was offered into evidence.)
    MR. TONEY: No objection, Your Honor.
    THE COURT: State's Exhibit No. 40 will be admitted into evidence.
    (State's Exhibit No. 40 was received into evidence.)
Q. (By Ms. Parsons) Miss Morrow, is there any doubt in your mind that this defendant shot Larry White?
A. There is no doubt in my mind.
    MS. PARSONS: All right. I have no further questions at this time.
    THE COURT: You may inquire, Mr. Toney.
    MR. TONEY: Thank you, Your Honor. I want

```
 1      to leave this up.
 2              CROSS-EXAMINATION
 3   BY MR. TONEY:
 4  Q. Miss Morrow, do you remember talking to me in the
 5      prosecutor's office back in October of 2004?
 6  A. Yes, sir.
 7  Q. And you told me at that time that you were telling
 8      the truth, right?
 9  A. Yes, sir.
10  Q. Okay, and when you talked to the police in October
11      of 2003, you told them you were telling the truth,
12      right?
13  A. Yes, sir.
14  Q. And then today you took an oath where you swore to
15      tell the truth, correct?
16  A. Correct.
17  Q. So that means that every time you said you were
18      going to tell the truth, that's what you did,
19      right?
20  A. Yes, sir.
21  Q. Let's start with the night of October the 6th of
22      2003. What had you had to drink that night?
23  A. Nothing.
24  Q. What had you had to smoke that night?
25  A. I had nothing to smoke.
                                                         29
```

```
 1  Q. And when was the last time before that that you'd
 2      had something to smoke?
 3  A. The last time I had something to smoke?
 4  Q. Yeah, before the 6th of October. Had you smoked
 5      crack on the 5th of October?
 6  A. I don't smoke crack, sir.
 7  Q. You just buy it, correct?
 8  A. I buy it. I was making my money that way, buying
 9      it.
10  Q. Would you buy it to resell it?
11  A. People have me to purchase for them.
12  Q. Do you buy it to resell it?
13  A. To resell it, no. I buy it for other people.
14  Q. Okay, so you just go and you buy crack from crack
15      dealers to give to other people?
16  A. Yes, when they're paying me a hundred fifty, two
17      hundred dollars.
18  Q. So people are paying you to pick up the crack?
19  A. Yes.
20  Q. Okay. So that makes you a crack dealer.
21  A. Make me a crack dealer?
22  Q. Right.
23  A. No.
24  Q. You're selling it. You're making a profit off of
25      it.
                                                         30
```

```
 1  A. I'm selling it. No, I'm not making profit.
 2      They're paying me to get it.
 3  Q. Okay. So you don't make any money off of it?
 4  A. I make the money they pay me to go get it for them.
 5  Q. Okay. How much do they pay you to go get the
 6      crack?
 7  A. Sometimes a hundred fifty.
 8  Q. All right. So you're getting crack from Ke-Ke?
 9  A. Ke-Ke, Tre.
10  Q. Who else you getting crack from?
11  A. Well, I mostly deal with Tre.
12  Q. Okay. So you were buying crack, but you weren't
13      using it?
14  A. No, sir, I wasn't.
15  Q. Okay. You were only smoking marijuana?
16  A. Yes, sir.
17  Q. Okay. And on this night why were you in the area
18      of 29th and Wabash?
19  A. I was leaving my girlfriend's house.
20  Q. And you were just walking down the street?
21  A. Yes, sir.
22  Q. All right, and it's nine o'clock at night?
23  A. Yes.
24  Q. Okay, and that's when you say you see Larry
25      standing on the corner? Is that correct?
                                                         31
```

```
 1  A. Yes.
 2  Q. And you said that Larry was selling customers two
 3      dimes?
 4  A. Yes.
 5  Q. How do you know he was selling them two dimes?
 6  A. I know I saw two dimes. I could hear the
 7      conversation.
 8  Q. You could hear the conversation?
 9  A. Yes.
10  Q. Isn't it true that you were participating in the
11      conversation? Weren't you there selling crack
12      also?
13  A. No, I wasn't.
14  Q. But you were close enough to hear Larry talking to
15      people in a car as you were walking down the
16      street?
17  A. Sir, I wasn't selling crack.
18  Q. No, but what I asked you was--
19  A. But I was close enough to hear what was going on.
20  Q. And was he selling two dimes?
21  A. Yes, he was.
22  Q. They asked for two dimes?
23  A. You can hear the conversation when people are
24      buying that stuff.
25  Q. Okay. And you supply it, too, right?
                                                         32
```

Case 4:23-cv-00278-RK   Document 139-26   Filed 09/09/24   Page 8 of 11

**Page 33**

1  A. I supply it?
2  Q. Right.
3  A. I have people that come to me and ask that I buy
4     them stuff and I go get it for them.
5  Q. You go get it, okay. So now you're talking to
6     Larry the drug dealer and he's selling to--
7  A. I'm talking to Larry the drug dealer?
8  Q. Right.
9  A. Me and Larry never had a conversation.
10 Q. Oh, so you didn't have a conversation with Larry?   [10:33AM]
11 A. No.
12 Q. You just overheard Larry?
13 A. I overheard the conversation.
14 Q. Okay, and you admit Larry was a drug dealer, right?
15 A. Yes.
16 Q. Okay, and he was out there on that corner selling?
17 A. Yes, he was.
18 Q. Was he out there every day selling?
19 A. No, he was not.
20 Q. Was he out there most days selling?   [10:34AM]
21 A. Yes.
22 Q. Okay, and what did he sell?
23 A. He sold crack just like Keith did.
24 Q. All right, and did Larry sell drugs to you?
25 A. No, he didn't.

**Page 34**

1  Q. Larry wasn't one of your suppliers?
2  A. No, he wasn't.
3  Q. Did you get marijuana from Larry?
4  A. No, I didn't.
5  Q. Now, you said Larry is standing there talking to
6     somebody on the corner of Olive? Is that correct?
7  A. In the car, yeah.
8  Q. All right. I want you to look at State's Exhibit
9     No. 3. Okay? I'm a little old-fashioned. Those
10    aerial photos don't work for me. Okay?   [10:34AM]
11       He's standing here, referring to State's
12    Exhibit No. 3. He would be on the southwest
13    corner. Is that correct?
14 A. Yes, sir.
15 Q. All right, and you were on the southeast corner?
16 A. Yes.
17 Q. All right, and you're saying that when you first
18    saw Mr. Carnes, he was in this middle apartment on
19    the front porch, which would be 2404. Is that
20    correct?   [10:35AM]
21 A. East 29th, yes.
22 Q. Okay. Now what you say is that Keith came down off
23    of the porch with a gun?
24 A. Yes, he did.
25 Q. Okay, and so when he came down off the corner, off

**Page 35**

1     the porch with a gun, this guy was standing right
2     here and Larry was standing here?
3  A. He was hollering at Larry when he came off the
4     porch and then Larry started to take off.
5  Q. Okay, and so Keith is coming this way. Larry is
6     standing here. You're saying that Larry turned
7     around, ran back in front of Keith, and went up the
8     alleyway?
9  A. Yes, he did.
10 Q. Okay, so he's going to run right at somebody who's   [10:35AM]
11    coming at him with a gun. Is that what you're
12    saying?
13 A. Yes, that's what I said.
14 Q. Okay. All right. Now he's not going to run away
15    from him. He's going to run right toward him.
16    Right? Run right toward him. The guy is standing
17    there with this gun pointed at him. He's going to
18    run right at him. That's what you're saying?
19 A. He ran. I know what I seen.
20 Q. All right, ma'am. Now as this guy runs right at   [10:36AM]
21    the person who is pointing an AK-47 at him, you
22    just calmly walk down the street?
23 A. I was walking down the street, yes, sir.
24 Q. Okay, and then you're saying that he turned and ran
25    up the alleyway?

**Page 36**

1  A. Yes, he did.
2  Q. Okay, and where are you at?
3  A. I'm still walking down the street, trying to get to
4     where I was going.
5  Q. All right. And so they run up the alleyway. Do
6     you lose sight of them then?
7  A. When they went through the alleyway? Yes, I did.
8  Q. Okay. So when they go up the alleyway, do you hear
9     any gunshots then?
10 A. Yes, I did.   [10:36AM]
11 Q. Okay. Now as they go up the alleyway, you hear
12    gunshots and you just keep walking? Is that right?
13 A. Yes, I keep walking.
14 Q. And according to your testimony, you cut through
15    this area here and go up here to behind the church,
16    right?
17 A. Yes.
18 Q. Now according to you, they're back here, up this
19    alleyway? That's what you said: They ran up the
20    alleyway.   [10:37AM]
21 A. According to what I said, they was already past the
22    alleyway towards Fish Town when I was behind the
23    church.
24 Q. Now wait a minute, ma'am. If they went up the
25    alleyway, Fish Town is up here, so they can't go

**Page 37**

1 two directions now. They're going up the alleyway.
2 Then how do they get over here to Fish Town?
3 A. I said heading towards Fish Town.
4 Q. No. You said they turned and ran up the alleyway,
5 ma'am. That's what you said. They turned and ran
6 up the alleyway, correct?
7 A. Yeah, they ran up the alley, correct.
8 Q. All right. Now, then you say you saw with your own
9 eyes Mr. Carnes turn over the victim's body and
10 shoot him?
11 A. Yes, I did.
12 Q. Point-blank?
13 A. Yes, I did.
14 Q. Okay. In that parking lot?
15 A. Yes, I did.
16 Q. Okay. What kind of gun did he have?
17 A. He had an AK-46.
18 Q. The same gun?
19 A. The same gun.
20 Q. And stood right over him and shot him, right?
21 A. Yes, sir, he did.
22 Q. How many times?
23 A. I heard about five more shots.
24 Q. Five more shots. In that parking lot five times,
25 that's your testimony?

**Page 38**

1 A. Yes.
2 Q. Okay, so there should have been, according to you--
3 He's shooting close range, right?
4 A. Yes.
5 Q. With that AK-47?
6 A. Yes, he did.
7 Q. In that parking lot?
8 A. Yes, he did.
9 Q. At least five times?
10 A. Yes, sir.
11 Q. Okay. Do you remember talking to the police and
12 telling them that you saw Ke-Ke with a gun?
13 A. Yes.
14 Q. And what kind of gun did Ke-Ke have?
15 A. Ke-Ke had a small gun.
16 Q. A small gun. Did you ever see Ke-Ke fire that gun?
17 A. No. He did not fire.
18 Q. And you never saw Ke-Ke run down the street, right?
19 A. No, sir. It wasn't him that shot him. It was Tre.
20 Q. All right, and did you see, did you ever see--ever
21 see--Mr. Carnes standing in this, the front yard?
22 A. Did I ever see him standing in the front yard?
23 Q. Right.
24 A. I don't remember.
25 Q. So that would be no, you didn't see him standing in

**Page 39**

1 the front yard?
2 A. That would be no.
3 Q. Okay. And, in fact, that front yard has a fence
4 around it, doesn't it?
5 A. Yes, it has a fence around it.
6 Q. You didn't see Mr. Carnes jump that fence, did you?
7 A. Jump the fence? Why would he jump the fence when
8 he could come down the stairs?
9 Q. Okay. So you never saw him in the yard of 2846?
10 Is that correct?
11 A. 2846?
12 (The witness shook her head.)
13 Q. All right. So, ma'am, I just want to make sure I
14 understand what you're saying. I don't want to be
15 confused here. Okay? You're standing on this
16 corner. Just follow me here. You're standing on
17 this corner. Okay? And you say that Keith comes
18 off this porch to confront Larry with the gun,
19 correct?
20 A. Correct.
21 Q. And you're saying Larry runs toward him while Keith
22 has that gun in his hand, correct?
23 A. Yes.
24 Q. All right, and you're saying that they run up the
25 alleyway? Is that correct?

**Page 40**

1 A. Yes.
2 Q. Okay, and then you're saying that you see this guy
3 up here, Larry, laying on the parking lot and you
4 see Keith stand over him and shoot him at least
5 five times?
6 A. Yes, I did.
7 Q. All right.
8     MR. TONEY: I don't think I have any other
9 questions of this witness, Your Honor.
10    MS. PARSONS: Just one question, or a
11 couple.
12       **REDIRECT EXAMINATION**
13 **BY MS. PARSONS:**
14 Q. Miss Morrow, when you saw the defendant and Larry--
15    MS. PARSONS: I hope everyone can hear me.
16 Q. (By Ms. Parsons) When you saw the defendant and
17 Larry make that, turn up the alley on State's 3,
18 with my finger between 2846 and 2847 but this alley
19 is over here next to 2408--
20 A. Right.
21 Q. --did you lose sight of them?
22 A. For a minute, yes.
23 Q. A minute? Sixty seconds?
24 A. No. I would say about what? Two or three?
25 Q. Two or three minutes you lost sight of them?

Case 4:23-cv-00278-RK Document 139-26 Filed 09/09/24 Page 10 of 11
Page 37 to 40 of 42
10 of 11 sheets

```
 1  A.  (The witness nodded her head.)
 2  Q.  Is that yes?
 3  A.  Yes.
 4          MS. PARSONS:  I have nothing further.
 5  Thank you.
 6          MR. TONEY:  I don't have anything to ask
 7  her.
 8          THE COURT:  Is this witness excused?
 9          MS. PARSONS:  Yes, sir.
10          THE COURT:  Thank you very much.  You may
11  step down.
12          THE WITNESS:  Thank you.
13          (Witness excused.)
14
15                      -oOo-
16
17
18
19
20
21
22
23
24
25
```

(10:42AM at line 10)

*41*

### REPORTER'S CERTIFICATE

```
 3      I, Patricia A. Manners, Certified Court
 4  Reporter, certify that I am the official court
 5  reporter for Division 11 of the Sixteenth Judicial
 6  Circuit of Missouri, at Kansas City, Missouri; that
 7  on Tuesday, April 19, 2005, I was present and
 8  reported all of the proceedings in Division 70 in
 9  STATE OF MISSOURI, Plaintiff, vs. KEITH L. CARNES,
10  Defendant, Case No. 16CR03006321.  I further
11  certify that the foregoing 41 pages contain a true
12  and accurate transcription of the proceedings of
13  the testimony of Lorianne Morrow.
14
15
16
17          _____
                Patricia A. Manners, CCR 320
18
19
    Prepared July 22, 2005
20  on behalf of Mr. Willis Toney.
21
    Copy ordered 8/23/05 by Ms. Dawn Parsons.
22  Copy prepared 8/26/05.  ($42.00)
23
24
25
```