Page 2

I N D E X

QUESTIONS BY:                                      PAGE

Direct Examination by Mr. Hilke                    7

Cross-Examination by Ms. Peters                    69

Cross-Examination by Mr. Haner                     73

EXHIBITS

EXHIBIT  DESCRIPTION                               PAGE

1        Declaration of Wendy Lockett              13

2        Map                                       14

3        Report Form Narrative                     27

4        Statement of Wendy Lockett                30

5        Affidavit of Wendy Lockett                61

Reporter's Note:  Electronic copies of the exhibits
                  returned with the transcript.

---

Page 3

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MISSOURI

WESTERN DIVISION


KEITH CARNES,              )

        Plaintiff,         )

vs.                        ) 4:23-cv-00278-RK

ROBERT BLEHM, et al,       )

        Defendant.         )



VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
WENDY LOCKETT CAHILL, produced, sworn and examined on
MARCH 20, 2024, between the hours of eight o'clock in
the forenoon and six o'clock in the afternoon of that
day, via videoconference, before Sarah J. Pokorski, a
Certified Court Reporter and Notary Public within and
for the State of Missouri, in a certain cause now
pending in the United States District Court for the
Western District of Missouri, Western Division,
between KEITH CARNES, Plaintiff vs. ROBERT BLEHM, et
al, Defendant; on behalf of the Plaintiff.

# EXHIBIT Y (Lockett's 2024 depo)

---

Page 4

A P P E A R A N C E S

For the Plaintiff:
Loevy & Loevy
Wallace Hilke
311 North Aberdeen Street
3rd Floor
Chicago, Illinois  60607
312-243-5900
hilke@loevy.com

For the Defendants:

Wyrsch Hobbs Mirakian
Diane Peters
1200 Main Street
Suite 2110
Kansas City, MO  64105
816-221-0080
dpeters@whmlaw.net

Jackson County Counselor's Office
Josh Haner
415 East 12th Street
Suite 200
Kansas City, Missouri  64106
816-881-3398
jhaner@jacksongov.org

Also Present:  Anthony Cahill

Court Reporter:
Sarah J. Pokorski, CCR
Missouri CCR No. 745
Kentuckiana Reporters

Videographer:
Steffi Cornejo
Kentuckiana Reporters
730 West Main Street
Suite 101
Louisville, Kentucky  40202
502-589-2273

---

Page 5

IT IS HEREBY STIPULATED AND AGREED by and
between counsel for the Plaintiff and counsel for the
Defendant that this deposition may be taken in
shorthand by Sarah J. Pokorski, CCR, a Certified Court
Reporter and Notary Public, and afterwards transcribed
into typewriting; and the signature of the witness is
waived.


* * * * *


(Starting time of the deposition:  12:14 p.m.)


THE VIDEOGRAPHER:  My name is Steffi
Cornejo.  I'm the online video technician today
representing Kentuckiana Court Reporters, located at
730 West Main Street, Suite 101 in Louisville,
Kentucky  40202.  Today is the 20th day of March 2024.
The time is 1:14 p.m.  We are convened by video
conference to take the deposition of Wendy Lockett
Cahill in the matter of Keith Carnes vs. Robert Blehm,
et al, pending in the United States District Court of
the Western District of Missouri, Western Division,
Case Number 4:23-cv-00278-RK.  Will everyone but the
witness please state your appearance, how you're
attending, and your location you're attending from,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Case 4:23-cv-00278-RK   Document 120-27   Filed 09/09/24   Page 2 of 29

502.589.2273 Phone
502.584.0119 Fax
Depos@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  starting with plaintiff's counsel.
2  MR. HILKE: Good morning. Wally Hilke,
3  attorney for Plaintiff Keith Carnes in this lawsuit.
4  And I'm calling from Chicago, Illinois.
5  THE REPORTER: Sorry. You're both muted.
6  THE WITNESS: Wendy -- oh ahead.
7  MS. PETERS: Diane Peters. I am the
8  attorney for all of the defendants except Amy McGowan,
9  and I am calling from Kansas City, Missouri.
10  MR. HANER: And I'm --
11  THE WITNESS: Wendy -- oh ahead.
12  MR. HANER: And I'm Josh Haner. I'm
13  attorney for Defendant Amy McGowan, and I'm calling
14  from Kansas City as well.
15  THE VIDEOGRAPHER: This is typically --
16  THE WITNESS: I'm Wendy -- go ahead, say
17  it.
18  THE VIDEOGRAPHER: You're okay. This is
19  typically where I would I.D. the witness, but all
20  parties have agreed that the witness is who they say
21  they are. Do all parties still agree that is in fact
22  Ms. Wendy Lockett Cahill?
23  THE WITNESS: Yes.
24  MR. HILKE: Yes.
25  MS. PETERS: Yes.

1  MR. HANER: Yes.
2  THE WITNESS: Uh-huh.
3  THE VIDEOGRAPHER: All right. Ms. Cahill,
4  will you please raise your right hand to be sworn in
5  by the court reporter.
6
7  WENDY LOCKETT CAHILL,
8  Of lawful age, produced, sworn and examined on behalf
9  of the plaintiff, deposes and says:
10
11  DIRECT EXAMINATION
12  QUESTIONS BY MR. HILKE:
13  Q.  Good morning, Ms. Cahill. How are you today?
14  A.  I'm fine. How are you?
15  Q.  I'm very well. Thank you. As I mentioned,
16  my name's Wally Hilke. I'm the lawyer for Keith
17  Carnes. And this is his lawsuit against Kansas City
18  Board of Police Commissioners and some Kansas City
19  police officers. I just want to go over a few things
20  today before we get started. I guess first of all,
21  even though we're on Zoom, and you're in your home,
22  we're in our offices, this is still a regular
23  deposition, just like I know you've experienced
24  before. Does that make sense to you?
25  A.  Yes.

1  Q.  And so just like usual, we'll want to make
2  sure to talk one at a time so the reporter can get
3  everything down. Does that make sense?
4  A.  Yes.
5  Q.  I want to make sure you understand all my
6  questions today, you know, both in case there's a bad
7  connection, and sometimes I just ask a question that
8  doesn't make as much sense as I want it to. Will you
9  please ask me to clarify if my question doesn't make
10  sense, or we have a bad connection, or for any reason
11  you don't understand.
12  A.  Yes.
13  Q.  And is there any reason why you wouldn't be
14  able to give truthful and accurate testimony today?
15  A.  No.
16  Q.  Okay. And then finally, this may take a
17  while. I'll have some questions for you, and I think
18  the other lawyers who represent the city -- the Kansas
19  City police officers, Board of Police Commissioners,
20  and Prosecutor Amy McGowan, they may have some
21  questions, too. And we can take as many breaks as you
22  need to before we're done. I'll just ask that if
23  there's a question you've been asked, that you answer
24  before we go on break. Is that fair enough?
25  A.  Yes.

1  Q.  I will try not to take too, too long. So
2  let's get started. Ms. Cahill, we've met in person
3  before. Correct?
4  A.  Yes.
5  Q.  And you met me when I was with an
6  investigator from my firm. Correct?
7  A.  Correct.
8  Q.  And that was a few weeks ago. Right?
9  A.  Yes.
10  Q.  And I told you when we met that I was the
11  attorney for Keith Carnes. Correct?
12  A.  Correct.
13  Q.  And you invited me to sit with you in your
14  home, and we sat on your porch together. Correct?
15  A.  Correct.
16  Q.  And I asked you some questions while we
17  talked. Correct?
18  A.  Yes.
19  Q.  And do you remember what I asked you about?
20  A.  You was asking me about the incident with
21  Larry White. Yeah. That's what you was asking me
22  about. And my recollection of what happened all those
23  years ago. Yeah.
24  Q.  And did I -- did I -- and when we spoke, did
25  you tell me and my investigator what your recollection

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 4:21-cv-00778-RK   Document 139-27   Filed 09/09/24   Page 2 of 29

Page 10

1  was?
2      A.   Yes.
3      Q.   Okay.  And were there -- did I make any --
4  any threats or promises to you during our
5  conversation?
6      A.   No.
7      Q.   Did I offer you anything at all for speaking
8  to me?
9      A.   No.
10     Q.   And then after our conversation, I typed a
11 statement there with you on your porch.  Correct?
12     A.   Correct.
13     Q.   And you looked over the statement I had
14 written up.  Correct?
15     A.   Yes.
16     Q.   And -- and did it truly and accurately
17 reflect what you had told me?
18     A.   Yes.
19     Q.   And then I went to get it printed and brought
20 it back.  Correct?
21     A.   Yes.
22     Q.   And did you sign the statement after I
23 brought it back?
24     A.   Yes.
25     Q.   And you understood that it was a sworn

Page 11

1  statement of the truth of what you had said there?
2      A.   Yes.
3      Q.   Great.  Is there anything else I'm forgetting
4  to mention, just about the -- I'll show -- I'll turn
5  to the statement in a minute.  But before I do, is
6  there anything else I'm forgetting to mention about
7  the interaction you had with me and my investigator?
8      A.   No.  I mean, you were asking me about my
9  recollection of things.  And a lot of things,
10 honestly, I don't remember.  It's been what?
11 Twenty-something years.  But the way in which you
12 questioned me brought about some memories.  So I
13 answered them honestly and truthfully.
14     Q.   Yeah.  And can you tell me a little bit more
15 about what you mean by that.  What was it about how I
16 asked the questions that brought up your memories?
17     A.   It was the way in which you asked the
18 questions.  I just feel like if I would have been
19 questioned the way that you were questioning me way
20 back then, then we wouldn't be here today.
21     Q.   Okay.  And why -- what do you mean -- sort of
22 why wouldn't we be here today?
23     A.   Because the type of questions you asked me,
24 like my recollection, you know, I was an active addict
25 at the time.  You know, and we were waiting for drugs

Page 12

1  to come.  But I still was high.  I was an active
2  addict, like I said.  But the way in which you
3  questioned me was like okay, so what did you see, and
4  how did you see this.  And it just made so much sense
5  to me.  I mean, it's kind of hard to explain.  But the
6  way in which you questioned me brung up a whole lot of
7  doubt of what I actually saw, being in a drug-induced
8  state.  I mean, I was an active addict for over twenty
9  years.
10     Q.   Yeah.  And when --
11     A.   And I'm currently sober for seventeen years,
12 so --
13     Q.   Congratulations.  I know it's not a small
14 thing to get sober and stay sober.
15     A.   It's not.  It's a job every day.
16     Q.   The way you describe the questions I asked,
17 like, you know, what do you recall, what did you see,
18 would it be fair to say that those questions were
19 open-ended?
20     A.   Yes.
21     Q.   And I -- I didn't suggest to you what you
22 should say one way or another?  I just asked you to
23 tell me what you remember?
24     A.   No.  Absolutely not.  You just asked me what
25 I remember.

Page 13

1      Q.   Okay.  Let me -- let me show you that -- let
2  me show you that statement now.  All right.  And I'll
3  ask you a few questions about it as I go through it.
4  Let's mark this Exhibit 1.
5          (EXHIBIT 1 MARKED FOR THE RECORD.)
6      Q.   (BY MR. HILKE.)  And this is stamped
7  Plaintiff 28656.  Do you -- Ms. Cahill, do you see
8  this document in front of you?
9      A.   Yes.
10     Q.   And first page says Declaration of Wendy
11 Lockett.  It has eight paragraphs.  Is this the first
12 page of the statement that you signed?
13     A.   Yes.
14     Q.   And then the second page continues to
15 Paragraph 15.  And then it's got a date and signature
16 on the bottom.  Do you see that?
17     A.   Yes.
18     Q.   And is that your signature?
19     A.   Yes.
20     Q.   Is this a statement you signed?
21     A.   Yes, it is.
22     Q.   Great.  I want to go through what's in here.
23 So the -- the first few paragraphs are just, you know,
24 your date of birth, where you reside.  Is that all
25 correct and accurate?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00178-RK   Document 139-27   Filed 09/09/24   Page 4 of 29

Page 14

1    A.   Yes.

2    Q.   And then the fourth paragraph is -- says that
3 you've been asked about your memories the night Larry
4 White was murdered, and that that evening, you were
5 standing outside on the corner of Olive and 29th
6 Street with Larry White.  Is that accurate?

7    A.   Yes.

8       MR. HILKE:  Let me -- let me mark this
9 Exhibit 2.

10      (EXHIBIT 2 MARKED FOR THE RECORD.)

11   Q.   (BY MR. HILKE.)  This is a map of the area
12 between Olive and Prospect on 29th Street.  Do you see
13 that here?

14   A.   Uh-huh.  Yes.

15   Q.   And do you see on the left side of this map
16 there's the corner of Olive and 29th Street?

17   A.   Yes.

18   Q.   Is that the corner you're referring to where
19 you and Larry White were standing the night Larry
20 White was murdered?

21   A.   Yes.

22   Q.   And can you tell me, was the corner you were
23 standing on -- was that like the northeast corner that
24 would be next to the building marked 2400-2402 East
25 29th Street?

Page 15

1    A.   Yes.

2    Q.   Okay.  Back to Exhibit 1.  In Paragraph 5 you
3 stated Larry White had been selling crack cocaine
4 earlier that night.  He had sold out, and waited at
5 least 30 minutes before I first heard shots.  Is that
6 accurate?

7    A.   It's about accurate.

8    Q.   Yeah.  Do you remember how you knew that
9 Larry White had sold out of crack cocaine and had been
10 waiting a while for a delivery?

11   A.   Well, how I first even knew Larry is through
12 my son.  Him and my son were good friends and stuff.
13 But he had sold out, because I was waiting to get some
14 from him.  And he was -- we were standing there
15 waiting for his connect to come.  And then the shots
16 rung -- rung out.

17   Q.   Okay.  Okay.  And so you -- you knew he had
18 been waiting for a while because you had also been
19 waiting for his -- his supplier to come.  Is that
20 correct?

21   A.   Yes.

22   Q.   So then in Paragraph 6, it says I don't
23 remember who was hanging out at the apartments at 2404
24 East 29th Street before the shooting started.  I knew
25 the men who sold drugs at 2404 East 29th Street.  I

Page 16

1 remember seeing several of them earlier wearing black
2 hoodies, but I don't remember who they were.  Is that
3 true and accurate?

4    A.   Yeah.  Yes, sir.

5    Q.   So going back to Exhibit 2 again, 2404 East
6 29th Street, is that the second of three apartment
7 buildings that were in a row on 29th Street, then?

8    A.   It is the first one of three apartment
9 buildings.  Yes.

10   Q.   I'm -- I'm sorry.  The first apartment
11 building on the left side, that's 2400-2402 East 29th
12 Street.  Right?

13   A.   I mean, I don't know the exact address, but I
14 know it was three apartment buildings.  We were
15 standing right there on the corner.  So it would be
16 the very first apartment building leading toward
17 Prospect.  Yes.

18   Q.   Got it.  That's the one you were standing in
19 front of.  Right?

20   A.   Yeah.  We were standing across the street
21 from it.

22   Q.   Okay.  But I'm -- I guess what I'm asking is
23 you knew that with -- among those three apartments,
24 there was kind of like a -- a -- an apartment that was
25 being used to sell drugs at the time.  Right?

Page 17

1    A.   Yes.

2    Q.   And you knew -- you know, that stage in your
3 life, you knew the several men that were selling drugs
4 out -- you knew several men who were involved in
5 selling drugs out of that apartment.  Is that correct?

6    A.   Yes.

7    Q.   And I -- I believe that prior testimony was
8 that the apartment being used to sell drugs out of was
9 in the middle building of 2404 East 29th Street.  Does
10 that sound correct?

11   A.   The building that they sold -- well, they
12 sold drugs out of all of them.  But main -- the main
13 building that the drugs were sold from was the first
14 apartment building.

15   Q.   Oh, okay.  Well, in any case, was it -- was
16 it one main -- one main group of several men who you
17 knew -- I guess what I'm asking is the several men you
18 knew who sold out of the apartment buildings, at that
19 time was it just like one group of men who you knew,
20 or were there multiple crews selling drugs out of
21 those apartments?

22   A.   It actually was multiple crews.  I only knew
23 a few of them, so I just automatically assumed that's
24 who was on the porch at that time.

25   Q.   Okay.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax

Schedule a Deposition Today!
scheduling@kentuckiana.com
www.kentuckiana.com

Case 3:22-cv-00678-RK   Document 129-27   Filed 09/09/24   Page 5 of 29

Page 18

1     A.  But it could have been a couple other people,
2 because there were several groups that sold from
3 there.
4     Q.  I understand. I'll come back to that. Let
5 me go back to your statement now on Exhibit 1. So in
6 your statement, in terms of the portion reading I
7 remember seeing several of them earlier wearing black
8 hoodies, but I don't remember who they were, is that
9 correct, that in terms of the specific identities of
10 the men you knew selling drugs from those apartments
11 the day of Larry White's murder, that you don't
12 remember which specific people were there that day?
13     A.  Correct.
14     Q.  Okay. So Number 7 in the statement, it said
15 you -- you said suddenly I heard gunfire and felt a
16 bullet whizzing by my head. Larry and I ran north on
17 Olive, and then cut behind the apartment buildings at
18 that corner. Is that correct?
19     A.  Yes.
20     Q.  So I'll take you back to Exhibit 2 again. If
21 I understand the route you took, you would have gone
22 north on Olive, and then back behind the buildings
23 that are labeled as two hundred -- 2400 East 29th
24 Street through 2408-2410 East 29th Street, back behind
25 those three apartment buildings?

Page 19

1     A.  Correct.
2     Q.  And was there a fence behind those buildings
3 at the time?
4     A.  Yes.
5     Q.  And was there a gap or a way to get through
6 the fence at the time?
7     A.  Yeah. It was a big old hole in the fence.
8     Q.  And so going back to your statement now,
9 under Number 8, you say I didn't see who fired the
10 shots when we were standing at the corner. Is that
11 correct?
12     A.  That's correct.
13     Q.  Okay. And so on the day of -- that Larry
14 White was murdered, after the bullet whizzed by your
15 head, did you turn to look at the shooter, or did you
16 just run without looking?
17     A.  I just ran. I wasn't looking. Yeah. I just
18 ran.
19     Q.  Before the -- you heard the gunfire, did you
20 hear anyone from the apartment buildings talking to
21 Larry White?
22     A.  No.
23     Q.  Was -- was Felisha Jones with you at the time
24 that you heard the gunfire start?
25     A.  No, she wasn't.

Page 20

1     Q.  And Felisha Jones is someone you know from
2 that time. Correct?
3     A.  Yes.
4     Q.  Going to the second page of the statement,
5 Number 9 says I then got separated from Larry, and I
6 don't know where he ran. Is that correct?
7     A.  Correct.
8     Q.  And was Larry -- and when you say you then
9 got separated from Larry, at what point when you were
10 running away did -- did Larry get separated from you?
11     A.  Soon as we hit the corner, we -- we started
12 running north. And then right behind the building --
13 soon as we got behind the buildings, we separated. I
14 don't know which way he went. I went through the
15 fence. That fence. The hole in the fence was there
16 purposely. It's a fence that -- an out that we used
17 when, say, we were beating somebody, or, you know,
18 taking something from somebody. We cut behind there,
19 go through that fence, you know, come out the back
20 way, they never know. You know?
21     Q.  Got it. That was a route you were familiar
22 with. That was -- that was a route you had used
23 before behind the fences in those buildings. Is that
24 right?
25     A.  Yes.

Page 21

1     Q.  So then at Number 10, it says I kept running
2 and ran to the church parking lot. Turning you back
3 to Exhibit 2 again, where it says church parking lot
4 on the corner of 29th Street and Prospect, is that
5 what you're referring to?
6     A.  No. The church -- yeah. The church is right
7 there on the corner. That parking lot. Yes. Yes.
8     Q.  Okay. Okay. And going back to the
9 statement, you say while I was in the church parking
10 lot, I saw two men in the Fish Town parking lot. I
11 saw one man standing over another man, shooting him.
12 Is that correct?
13     A.  Yes.
14     Q.  And you said -- under 12, you say I was far
15 away when I saw the shooting in the Fish Town parking
16 lot. I could tell the shooter had something over his
17 eye. I do not know if what was over his eye was an
18 eye patch, or the hood of a hoodie sweatshirt over his
19 head. Is that correct?
20     A.  Yes.
21     Q.  And when -- at that moment when you saw the
22 shooter from your vantage point in the church parking
23 lot, did you -- was that the first time that you
24 actually saw any -- any shooter that day?
25     A.  Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:23-cv-00478-RK   Document 29-27   Filed 09/09/24   Page 5 of 29

Page 22

1  Q.   And when -- what did you do -- I'm sorry.
2  And in Number 13, you wrote I was scared and concerned
3  for my own life when the shooting happened.  I ran
4  away as soon as I saw the shooting in the parking lot.
5  Is that correct?
6  A.   Yes.
7  Q.   Did you spend very long looking at the
8  shooter before you ran away?
9  A.   Absolutely not.  I -- like I said, I was
10 scared for my life.  When we come out the -- when we
11 come behind the buildings and through the gate, it
12 automatically opens up to the parking lot of the
13 church, which was lit up.  And that's when I saw one
14 man standing over another.  And I kept running down
15 the alley.  You know?  I -- I couldn't for real say
16 that it was -- who it was.  Because I didn't know who
17 it was.  As I said, I was running for my life.
18 Q.   Yeah.  Okay.  And did you see what the -- at
19 any time, did you see what the shooter's gun looked
20 like?
21 A.   No.
22 Q.   And do you know if the gun was a pistol, or
23 rifle, or something else?
24 A.   It was a handgun.
25 Q.   Handgun?  Okay.  And was there anything

Page 23

1  distinct about the handgun that you saw?
2  A.   No.
3  Q.   So in Number 14, your statement reads sitting
4  here today, I am not sure that Keith Carnes was the
5  shooter.  I saw something over the eye or head of the
6  shooter in the parking lot, but I am not sure it was
7  an eye patch.  Is that correct?
8  A.   That's correct.
9  Q.   And Number 15 says the first time I noticed
10 anything on the head of the shooter was when I saw him
11 in the Fish Town parking lot.  I did not see who was
12 shooting at Larry White before then.  Is that correct?
13 A.   Yes.
14 Q.   And I -- I think -- I think this is a term
15 you used in your criminal trial testimony way back in
16 2005.  But is it fair to say that what you saw of the
17 shooter was just a glimpse?
18 A.   That's fair.  Yes.
19 Q.   Let me -- so I'm going to stop -- I'm sorry.
20 A.   Go ahead.
21 Q.   That's okay.  I actually -- oh, there we go.
22 A.   Excuse me.
23 Q.   Okay.  So I want to ask you if a few other
24 statements are consistent with your memory.
25 A.   Uh-huh.

Page 24

1  Q.   Is it -- is it accurate to say that the day
2  Larry White was murdered, there were several persons
3  in the area, and most of them were wearing black
4  clothing?
5  A.   Yes.
6  Q.   Is it accurate to say that the person who
7  shot Larry White was wearing a black hoodie?
8  A.   Yes.
9  Q.   Is it accurate to say that you can't now say
10 the person who shot Larry White was Keith Carnes?
11 A.   Yes.
12 Q.   Is it accurate that it was dark at that time,
13 making it difficult to identify the shooter?
14 A.   Correct.
15 Q.   And is it accurate to say that as you look
16 back now, you can honestly say you're not certain that
17 Keith Carnes was the shooter?
18 A.   That's correct.  And that's what I mean about
19 the way in which you were asking me questions versus
20 when the State was just pounding me, pressuring me, on
21 me, badgering me.  I can honestly say that I don't
22 know who it was.  He -- I just assumed.  What I saw
23 was black.  I just identified it as the patch.  But it
24 could have very well been a hoodie.  And I didn't
25 literally see an open face like that.  So yes, it's

Page 25

1  accurate to say I don't know who it was.
2  Q.   Okay.
3  A.   Today.  Yeah.
4  Q.   Yeah.  So I -- I want to ask some questions
5  about that now, in terms of what was different in
6  terms of the questions you were asked, and what you
7  were experiencing back at the time.  Because you
8  did -- you did testify at both of Keith Carnes'
9  criminal trials.  Correct?
10 A.   Yes.
11 Q.   And at both of those trials, you did identify
12 him as the shooter.  Correct?
13 A.   Correct.
14 Q.   And at that time, did you have the same
15 uncertainty that you're expressing to me now?
16 A.   No.
17 Q.   What -- can you tell me about that.  Why --
18 what changed between that time?
19 A.   What changed between that time is the way in
20 which you asked me the questions.  It just raised a
21 bunch of doubt about what I thought I saw, I really
22 didn't see.  I basically assumed everything.  It's
23 just different in the way in which a person is
24 questioned.
25 Q.   Sure.  And -- and you described sort of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 4:22-cv-00078-RK   Document 99-27   Filed 09/09/24   Page 6 of 29

Page 26

1  badgering and pressuring.  Those were the words used a
2  minute ago.  Can you tell me a little bit more about
3  what you mean by that.
4      A.   What I mean by that is at one point, I was
5  supposed to show up in court or something other, and I
6  didn't show.  So an APB was put out on me, and I was
7  held in custody until I testified.
8      Q.   Okay.  And so let me -- is Vernon -- Vernon
9  Huth an officer who's known to you?
10     A.   Yes.
11     Q.   And is someone who you had multiple
12  interactions with around -- you know, around the time
13  of -- of Larry White's murder?
14     A.   Yes.
15     Q.   And am I correct that you talked to him
16  shortly after Larry White was murdered?
17     A.   He was the one who picked me up, and -- and
18  took me downtown.
19     Q.   I understand.  And I -- Vernon Huth wrote a
20  report in which he referred to you as a confidential
21  informant.  But my understanding is to your knowledge,
22  you were never a confidential informant for him.  Is
23  that correct?
24     A.   I've never been a confidential informant for
25  anybody.

Page 27

1      Q.   Got it.  And Vernon Huth never told you that
2  he was treating you as a confidential informant; did
3  he?
4      A.   No.  Never said that.
5      Q.   Did he ever tell you that anything you told
6  him was going to be kept confidential?
7      A.   No.
8      Q.   Okay.  So I'm going to share with you an
9  exhibit.  And the exhibit I'm sharing with you is a
10  report written by Vernon Huth.  And he's testified in
11  this case that you were the one who provided the
12  statements that are reflected in this report.  So I'm
13  going to go over it with you for a minute, and then
14  I'm going to ask you some questions about it.
15  We'll -- we'll mark this Exhibit 3.
16          (EXHIBIT 3 MARKED FOR THE RECORD.)
17     Q.   (BY MR. HILKE)  And I'll show you at this --
18  the bottom of this report the officer who wrote it is
19  V. Huth.  That's Vernon Huth at the bottom.
20     A.   Uh-huh.
21     Q.   And I'm just going to read you what he says
22  in the first few paragraphs of it.  He wrote on
23  10/7/03 -- so October 7, 2003 -- at 1115 -- 1155
24  hours, PO Begley and I were contacted by a
25  confidential informant in regard to information on a

Page 28

1  homicide that occurred on 10/6/03 at 28th and Wabash.
2  She stated that on 10/6/03 at approximately twenty --
3  2030 hours, she observed a black male running from
4  29th and Olive (apartment buildings) being pursued by
5  two other black males who were firing guns at him.
6  She stated that the black male ran north in the alley,
7  just east of the above-mentioned apartments, jumped a
8  fence, and ran eastbound beside 2846 Wabash.  The two
9  black males continued pursuing him while firing rounds
10  from an unknown weapon.  Did you get all of that?
11     A.   Yes.
12     Q.   And so some of what Vernon Huth wrote here
13  and testified came from a conversation with you.  Some
14  of this is consistent with what you knew at the time.
15  Right?  You did know that Larry White had been pursued
16  and then shot by someone with a gun.  Correct?
17     A.   Yes.  I did know that.  Yes.
18     Q.   And you -- it's -- it describes the weapon as
19  an unknown weapon.  And that's true, too.  Right?  You
20  didn't really have a good -- you didn't know a lot
21  about the weapon that was used in the murder.
22  Correct?
23     A.   Correct.  I didn't know a lot about the
24  weapon that was used, but I know it wasn't no AK or
25  assault rifle or shotgun.  Those are big weapons.

Page 29

1  That's not -- it was a handgun.  That, I know for a
2  fact.
3      Q.   Okay.  And in this -- in this statement, it
4  doesn't indicate that you saw an eye patch on the
5  shooter, or anything like that.  Correct?
6      A.   That's what I assumed.  Yes.  Correct.
7      Q.   And that's consistent with your recollection.
8  Right?  You're not really being sure if there was an eye
9  patch or not on the shooter.  Correct?
10     A.   Correct.
11     Q.   And also in this statement, it -- it doesn't
12  say that you know or even have a guess really as to
13  who the shooter was.  Correct?
14     A.   Correct.
15     Q.   And that's consistent with the uncertainty
16  you've expressed now about who the shooter was.
17  Correct?
18     A.   Correct.
19     Q.   So by the way, reading what Vernon Huth wrote
20  about this conversation with you, does it refresh any
21  additional recollection about this conversation you
22  had with him?
23     A.   It doesn't, because I never had that
24  conversation with Officer Huth.  Him and Begley picked
25  me up.  I was walking.  They literally picked me up

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
depos@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1  and took me downtown.  I was never his confidential
2  informant, and I never had that -- that conversation
3  with him.
4      Q.   Okay.  So let me ask -- so we -- that thing
5  you described of him picking you up to have a
6  conversation with detectives, we -- actually, let
7  me -- let me show you that now, just for a second.
8  This is Exhibit 4.
9          (EXHIBIT 4 MARKED FOR THE RECORD.)
10     Q.   (BY MR. HILKE.)  This is a statement by you
11 to Detective Williams on October 14, 2003.  Do you see
12 that here?
13     A.   Yes.
14     Q.   And this would have been a week later from
15 the October 7 report that Vernon Huth just described.
16 And does this -- does this match up with what you're
17 talking about with Vernon Huth picking you up and --
18 with Officer Begley to take you to the detectives,
19 this October 14 statement?
20     A.   I really -- I really don't even remember
21 that.  I made so many different statements, because I
22 was -- the -- the State was on me.  I was up under so
23 much pressure to testify in this trial.  As I said,
24 back then, I was an active addict, I was under the
25 influence.  So I can't really say for certainty today

Page 31

1  that what -- the statements I made back then were
2  accurate and true.
3      Q.   Sure.  No.  That -- that makes sense.  And
4  I -- I guess what I -- I'm going to stop sharing,
5  because just stepping away from the exhibits for a
6  second.
7      A.   Uh-huh.
8      Q.   Vernon Huth has testified that he never told
9  you that you were a confidential informant for him,
10 that you were never a confidential informant in any
11 official way, and that's just how he wrote his
12 reports, but that is, you know, not an understanding
13 he ever had with you, or anything he ever communicated
14 with you.  Is that consistent with your understanding
15 of your interactions with Vernon Huth?
16     A.   Yes.
17     Q.   Okay.  So leaving the -- so sort of stepping
18 aside from the confidential informant label --
19     A.   Uh-huh.
20     Q.   -- which Vernon Huth has testified he never,
21 you know, told you about, or you'd have any reason to
22 know about, is it possible that you did have a short
23 conversation with Vernon Huth the day after the
24 murder, and that you just don't remember?
25     A.   I don't believe so.

Page 32

1      Q.   Okay.  And one second, please.  Okay.  And is
2  there any like specific reason why you're able to
3  remember one way or another whether you'd had that
4  separate -- whether you had or hadn't had that earlier
5  conversation with Vernon Huth?
6      A.   I know I can say that I didn't have that
7  conversation with him because I was never a
8  confidential informant.  The only interaction I had
9  with Huth after the murder of Larry is when him and
10 Begley picked me up and took me downtown to talk to
11 the detectives.  Now, if there was a conversation,
12 maybe it was one in the car about saying we know you
13 were there, we know you know who did this.  That, yes.
14 But other than that, no, we never had a conversation.
15     Q.   Will you -- will you tell me a little bit
16 more about that conversation in the car.
17     A.   Yeah.  Well, when they picked me up,
18 basically, it was we know you were on the corner with
19 Larry, we know you know who shot him, and you have to
20 go down here and tell these people what's going on.
21 That was the conversation.
22     Q.   And do you remember whether it was Huth or --
23 was it Huth and Begley in the car when that
24 conversation happened?
25     A.   It was both of them in the car.  Yes.

Page 33

1      Q.   And do you remember whether -- which one of
2  them said that to you in the car?
3      A.   Huth.
4      Q.   Okay.  How did you feel when Huth said that
5  to you?
6      A.   You know what, honestly, I was under the
7  influence.  I was an active addict.  I was confused.
8  I was scared.  I just felt under duress the whole
9  time.  Just the whole time.  Because I'm pressured to
10 do this, to say this.  And honestly, today, I -- I
11 kind of fault myself for all the time that Keith has
12 did, because there is a shadow of a doubt, that I
13 honestly don't know if it was him or not.
14     Q.   Do you think -- did -- did Huth or Begley, as
15 far as you know, have any reason to believe you were
16 under the influence at that time?
17     A.   They knew I was an active addict.  Prospect
18 was their beat.  That was their beat.  They knew.  And
19 then I also knew Huth from down on Independence
20 Avenue.  They knew that I was an active addict.  You
21 know, they've arrested me, they've arrested my son.
22 You know, so they knew.
23     Q.   Yeah.  And what else -- what else do you
24 remember from that conversation with Huth in the car
25 on his way to bring you to the detective?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Page 34

1    A.    That's it.
2    Q.    So one second.  And -- okay.  So let me turn
3  you now to Exhibit 4.  Give me one second and I'll
4  share it.  All right.  So this -- this statement that
5  I'm sharing with you now was taken by Detective
6  Williamson on October 14, 2003 at 0910 hours.  And
7  the -- one second, please.  Going -- I want to go
8  through what's contained in this statement.  And
9  I'll -- I'll show you, if you want.  I'm going to the
10  second page.  There's a signature at the bottom that
11  seems to say Wendy Lockett.  Is that your signature?
12    A.    I don't know.  I don't see anything.
13    Q.    Oh, are you able to see my screen right now?
14    A.    I'm not seeing the paper or anything.  I can
15  see the screen where you have showed paperwork before,
16  where you share your screen.  But I'm not seeing
17  anything right now.
18    Q.    We might be having another technical problem,
19  then.  At the top of the screen, do you see where it
20  says statement right now?
21    A.    No.
22    Q.    Let me try one more time.  I'm sharing the --
23  sharing the exhibit again.  Do you see where it says
24  statement on the top?
25    A.    Yes.  I see that.  Yes.

Page 35

1    Q.    Okay.  Okay.  And so you see this is a
2  statement at the top.  It says statement of Wendy
3  Lockett taken at the offices of the violent crimes
4  division by Detective Williamson on this 14th day of
5  October 2003 at 0910 hours.  Do you see that?
6    A.    Yes.
7    Q.    Okay.  And -- and the bottom of the second
8  page, there's a -- it says signed, and it seems to say
9  Wendy Lockett.  Is that your signature?
10    A.    It is.
11    Q.    Okay.  So I want to ask you about what's in
12  this statement.  And then as far as you know, you only
13  gave one typed-up statement that you signed to
14  detectives around this time.  Correct?
15    A.    Uh-huh.
16    Q.    And so this would have been after Vernon Huth
17  had driven you to the detectives and had that
18  conversation in the car?
19    A.    Uh-huh.  Yes.
20    Q.    So then the first thing -- the first question
21  he asks is on 10/6/03 in the evening hours, were you
22  in the area of 29th and Olive.  And you answered yes.
23  That was true.  Right?
24    A.    Yes.
25    Q.    And then he asks what did you observe when

Page 36

1  you were in the area of 29th and Olive.  And the
2  response here is I observed a confrontation between
3  Larry and Tre.  Tre is the same person as Keith
4  Carnes.  Right?
5    A.    Yes.
6    Q.    And says Tre went in the house and came back
7  out with a gun, and started shooting at Larry.  Larry
8  ran up the street.  Tre chased him.  Was that
9  something -- was that what you had seen at the time
10  you gave the statement?
11    A.    At the time I gave the statement, honestly,
12  I -- I more than likely said that.  But I mean, I was
13  an addict.  At that point, anything that was actually
14  being said was really questioned.  I was an addict.  I
15  would say anything, for real, just so I could get back
16  out and get my drugs.  That's where I was at that
17  point in my life.
18    Q.    I understand.  Did you -- okay.  And so was
19  that -- was that -- what you just described motivating
20  you when you gave the statement?  Meaning wanting to
21  get back out on the streets and not be in the
22  detective division anymore.
23    A.    Absolutely.  I wanted to go get -- get high.
24    Q.    Yeah.  And what -- what you -- what you
25  describe here, you know, Larry ran up the street, Tre

Page 37

1  chased him, that -- that's -- that's totally -- strike
2  that, actually.
3    A.    Yeah.  That's not accurate.  When the
4  shooting started, we were on the corner, and they were
5  on the porch.  A couple guys were on the porch.
6  Everybody had on black hoodies.  We ran north behind
7  the buildings, and then separated.  I actually didn't
8  see anyone chasing him.  What I saw was someone
9  standing over him when I came in the clearing of the
10  church parking lot.
11    Q.    Sure.  So this part about Larry ran up the
12  street, Tre chased him, that's not what happened; is
13  it?
14    A.    No.  That's not what happened.
15    Q.    And the -- when Larry collapsed at the Fish
16  Town parking lot, Tre walked up to him and shot him in
17  the head, if I -- going back to your recollection
18  before, did you actually see the shooter walk up to
19  the victim, or just see him standing over the victim
20  in the parking lot?
21    A.    No.  He was standing -- the shooter was
22  standing over him.  Where he shot him at, I don't
23  know.  But he was already standing over him when I
24  came out the clearing in the back.
25    Q.    And then there's also the question -- the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Case 2:22-cv-04178-RK   Document 39-27   Filed 09/09/24   Page 9 of 29

Page 38

1  next question:  Where was Larry standing when the
2  argument between him and Tre began.  Answer:  On 29th
3  and Olive.  Had you actually witnessed an argument
4  between Larry and Tre earlier that day?
5      A.  No.
6      Q.  And the part that Larry was selling drugs at
7  29th and Olive, that was true.  Right?
8      A.  He wasn't selling drugs.  We were just there
9  waiting for the drugs to be dropped off.  He was not
10  literally standing there selling drugs, because he
11  didn't have any.
12      Q.  I understand.
13      A.  Yeah.
14      Q.  And then -- the next one about that he --
15  the argument between Larry and Tre that -- before the
16  shooting being that Tre had told Larry that he
17  couldn't sell no dope on the corner, was that true?
18      A.  Those was word -- they did have words, but
19  that wasn't on that day.  That was before the --
20  before the shooting ever took place.
21      Q.  Okay.  So was that like a borrowed detail
22  from a prior interaction, as opposed to what happened
23  on that day?
24      A.  Yes.
25      Q.  And then the next one.  When Tre came out of

Page 39

1  the apartment, did he have anything in his hands.  He
2  had a gun.  That wasn't something you had observed;
3  was it?
4      A.  No.  I didn't observe that.
5      Q.  And the thing about the gun being a long
6  thing with a banana clip, it was actually a pistol.
7  Right?
8      A.  Yeah.  It was a handgun.  It wasn't -- yeah.
9  It was a handgun.
10      Q.  Okay.  And the thing about what Tre was
11  wearing that day, you didn't -- you didn't actually
12  have a memory of what clothing Tre had when you gave
13  the statement; did you?
14      A.  No.  I don't know what -- what he literally
15  had on.  I know that all the people that were on the
16  porch, everybody was in black hoodies.
17      Q.  Okay.  So fair to say, then, also, that you
18  didn't hear Tre come out of the apartments and say you
19  gonna die, motherfucker to Larry?
20      A.  No.
21          MS. PETERS:  Objection.  Leading.
22      Q.  (BY MR. HILKE.)  Okay.  I'm sorry.  Let me
23  ask it a different way.  Do you see here where it says
24  the question did Tre make any statements when he
25  exited the apartments?  And the answer in the

Page 40

1  statement was yeah, he said you gonna die motherfucker
2  to Larry.  Do you see that on the statement?
3      A.  I see it.
4      Q.  Was that true?
5      A.  That's not true.
6      Q.  All right.  And then he asked about if there
7  was another person with you.  And the answer is
8  Felisha, I think her last name is Johnson.  Do you see
9  that?
10      A.  Yes.  I see it.
11      Q.  Was that true?
12      A.  She was not with me.  She -- it was other
13  people around, but it was literally just me and Larry.
14  Felisha wasn't with me.  Red wasn't with me.  It was
15  me and Larry.
16      Q.  Going on to the second page, there's a
17  question was there anyone else with Tre when the
18  shooting occurred.  And your answer, Fuzzy and Debo.
19  Do you see that?
20      A.  Yes.  I see it.
21      Q.  Now, was that true?
22      A.  They -- they were always together.  I can't
23  literally say that they were the ones on the porch.
24  Again, for the record, I'm going to say that a lot of
25  things were leading back then.  And yes, I agreed to

Page 41

1  say a lot of things because I was trying to get back
2  out on the streets to get my drugs.  So --
3      Q.  And by the way, when -- when this statement
4  we're looking at -- did you give a statement with the
5  detective where there was someone typing down what you
6  said?
7      A.  Did -- say that again.  I'm sorry.
8      Q.  Yeah.  I'm wondering like was there a
9  stenographer, or someone typing down the statement as
10  you were speaking to the detective that day.
11      A.  No.
12      Q.  Okay.  Well, do you know who typed the
13  statement that we're looking at now?
14      A.  I don't know who typed it.
15      Q.  Okay.  Now, before you gave your statement --
16  before you gave your question and answer statement to
17  the detective, had you had a --
18      A.  Uh-huh.
19      Q.  -- prior conversation with the detective
20  about the murder?
21      A.  No.
22      Q.  Okay.
23      A.  I don't even know who Detective Williams is.
24  I don't even know who that is.
25      Q.  Okay.  I'll come back to that in a second.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana.com
www.kentuckiana.com

Case 3:21-cv-00088-RK   Document 189-27   Filed 09/09/24   Page 10 of 29

Page 42

1  And it says here that Damon Rhodes -- that you were
2  shown a picture of Damon Rhodes, and you identified
3  him as Debo. Was Debo someone known -- known to you
4  at the time?
5     A. Yes.
6     Q. You would have been able to identify a
7  picture -- would you have been able to identify a
8  picture of him, then?
9     A. Yes.
10     Q. I mean --
11     A. I mean, I only knew him as Debo. I don't --
12  I didn't know his name was Damon -- Damon Rhodes.
13  Hell, I didn't even know Tre's name was Keith Carnes.
14  I didn't even know that. Everybody used street names,
15  not real names, so -- yeah.
16     Q. Got it. It also mentions a Fuzzy. Is that
17  someone you knew by street name back then?
18     A. Yeah.
19     Q. Is that someone you would have been able to
20  identify if shown a photo?
21     A. If shown a photo. Yeah.
22     Q. Got it. You mentioned the word -- you used
23  the word leading a little -- like a minute ago in the
24  context of this conversation.
25     A. Uh-huh.

Page 43

1     Q. Can you tell me what you mean by leading.
2     A. What I mean by leading is when I was taken
3  downtown -- even when I got in the car with Huth, this
4  is what was said. We know you were there. You know
5  who did this. That's leading. You know. You know
6  that you were there, and exactly what happened, and --
7  yeah. That's what I mean by leading.
8     Q. Got it. Did that -- did that also occur
9  during your conversation with the detective after you
10  got at the station?
11     A. Yes. It -- it was already embedded in them
12  that I was present, so I had to know everything that
13  took place. That was already embedded in them. So I
14  mean, looking back at it, a lot of it, I felt like I
15  was pressured. I was up under pressure, so I would
16  say anything at that point. I'm not -- you know, I
17  was an addict. We have to keep that in mind. I was
18  an addict.
19     Q. I understand. That -- that detail about the
20  banana clip gun earlier, do you know where that came
21  from, the banana clip detail?
22     A. No. I don't know where that came from.
23     Q. Okay. What about the other details about
24  like the -- like the chase, like how the chase
25  happened? Do you know where those details came from?

Page 44

1     A. No. When I was questioned by -- by the
2  detective, it was just me and the detective in the
3  room. There was nobody sitting there writing anything
4  down or anything like that. After he got through
5  questioning me, he went back in his office somewhere,
6  or wherever he went, and came back with the statement.
7  And yes, I signed it.
8     Q. Got it. Did he -- and what do you remember
9  about when the detective asked you to sign the
10  statement?
11     A. I -- you know, honestly, I really don't even
12  remember. All I know is I signed it.
13     Q. Got it.
14     A. I know that I went down and had a
15  conversation with the detective. I didn't even
16  proofread when he brought it back. I just
17  automatically signed it.
18     Q. Did he -- did he ask you to read it carefully
19  before you signed it?
20     A. No.
21     Q. Did he ask you to read it at all before you
22  signed it?
23     A. No, he didn't. He said this is -- I just
24  typed up the conversation we had, and I need you to
25  sign it. I signed it. He let me go.

Page 45

1     Q. All right. And then the -- going like in the
2  middle of this -- when Tre begins to chase Larry,
3  where did they run to. Up 29th, up the alley, across
4  the church parking lot. Is that true?
5     A. Not to my recollection, it's not true. I --
6  I came out in the church parking lot. When I came
7  through the back, nobody was in that parking lot but
8  me. That, I remember. When your life is
9  threatened -- when my life was threatened, yes, I can
10  recollect every detail of that. I mean, you -- no one
11  is in my shoes. I'm an active addict.
12     Q. Yeah.
13     A. There are shots being fired in the direction
14  in which I was. I could literally hear the bullet
15  whiz past my ear. I was in flight for my life.
16     Q. Yeah.
17     A. And I know for a fact when I came out of that
18  opening in the fence in the back, there was nobody
19  visible but the Fish Town parking lot. That's it.
20     Q. And I -- I understand. I want to be -- I
21  want to be clear that I'm not -- I'm not trying to
22  suggest anything negative whatsoever. I'm just -- I'm
23  just trying to get all the way through the statement.
24  And I -- I know you've -- you've suffered a lot, and
25  you've gone through a lot. So I appreciate you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00278-RK   Document 189-27   Filed 09/09/24   Page 11 of 29

Page 46

1  bearing with me.  One more question here.  It says you
2  were shown a photo line-up consisting of six black
3  males with similar features, and you recognized Number
4  5 as Tre.  Do you have a memory of that from your
5  conversation with the detective?
6      A.  I think they did show me a photo.
7      Q.  And --
8      A.  I'm not -- I'm not really for sure.  I think
9  they did, though.
10     Q.  Okay.  And Tre is someone you would have been
11  able to identify, because you knew who he was.  Right?
12     A.  Yeah.  I knew who he was.  I bought a lot of
13  drugs from him.  So I knew who he was.  So yeah.
14     Q.  All right.  I don't have any -- I'm going to
15  stop showing you the statement now.  I don't have any
16  other questions about that right now.  And the
17  detective who interviewed you, did -- did they ask you
18  like -- did he -- it was -- was it a male detective,
19  like a man who interviewed you during this -- when you
20  were at --
21     A.  Yes.
22     Q.  After Huth brought you in?  Okay.
23     A.  Uh-huh.  It was a male.
24     Q.  And did -- did he ask you open-ended
25  questions?  Did he just give you a chance to tell the

Page 47

1  full story of what you remembered?
2      A.  He didn't ask open-ended questions.  He --
3  the type of questions he -- he were asking was like so
4  was -- was Tre present -- well, was Keith present.
5  Well, honestly, I said yes, but I honestly -- I
6  couldn't tell you if he was present or not.  They all
7  had on black hoodies.  It was nightfall.  You know, I
8  was focused on the person coming to bring the drugs.
9  I wasn't focused on, for real, who was on the porch,
10 or anything like that.  I don't know.
11     Q.  Yeah.  And -- okay.  Okay.  And so let me ask
12 you, when you testified at Keith's two criminal
13 trials, did you feel like you could contradict the
14 statement that you had given to the detective on
15 October 14th?
16     A.  Did I feel like I could contradict it?
17     Q.  Yeah.  Did you feel free to -- to -- you
18 know, if you remembered something different, or had
19 doubts, did you feel free to -- to say something
20 different from your prior statement?
21     A.  I didn't.
22     Q.  And why not?
23     A.  When you're up under -- for me -- I'm
24 speaking for me.  When you're up under so much
25 pressure from police department, the investigators,

Page 48

1  and all that, you -- me -- pretty much stuck to what
2  was -- what I had said.  I didn't even try to
3  intercede and say well, you know what, that's not
4  accurate.  Because I was still in my addictive stage
5  during the first trial.  Even when the second one
6  came, I still just -- just stayed with it.  I did.  It
7  wasn't until you came and asked me the questions in
8  which the way you asked me, which made me think that
9  there's a possibility I could be wrong.  You know, I
10 can't say for a shadow of a doubt that it was
11 literally him, as I was saying back in the trials.  I
12 was saying that because I felt I was supposed to say
13 it.  You know?  Yes, I was there when -- when the --
14 the shooting took place.  Yes, I saw someone standing
15 over him.  But to say -- actually say it was Keith
16 Carnes, I just said it was.  I assumed.  I could have
17 been wrong.  Very much wrong.  Because I didn't
18 literally see the patch.  I saw the black hoodie, and
19 the hoodie could have very well been covering his
20 face, which could have been -- looked to me like a
21 patch.  I was an active addict.  Come on, now.
22     Q.  I understand.  Okay.  One second.  Got it.
23 And I was -- I just want to -- I think I've covered a
24 lot of this, but I want to ask about some specific
25 testimony from those criminal trials.  From Keith's

Page 49

1  two criminal trials.  Give me one second here.  Got
2  it.  Now, do you recall saying at the -- at the
3  criminal trials that Felisha Jones had come with you
4  and run through the alley all the way to the church?
5      A.  No.  I don't remember that.
6      Q.  Okay.  And was that true?  Did Felisha Jones
7  run with you to the church?
8      A.  No.  It was just me.
9      Q.  Okay.  Do you recall saying -- saying at the
10 trial that when the shooter shot Larry White in the
11 parking lot, that he said something like die,
12 motherfucker, you're going to die?  Do you remember
13 saying that?
14     A.  No.
15     Q.  And would -- would that have been true?  Did
16 you hear anything the shooter had said at the time the
17 victim was shot?
18     A.  No.  I didn't hear anything but the bullet
19 going past my head.
20     Q.  Okay.  And by the way, just to be clear, I
21 mean at the very end, when you're in the church
22 parking lot, and --
23     A.  No.  I didn't hear anything.  No.
24     Q.  Thank you.  Do you recall saying at the trial
25 that you saw the shooter cross Prospect Street all the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:23-cv-00018-RK   Document 139-27   Filed 09/09/24   Page 13 of 29

1  way up into the Fish Town parking lot?
2      A.   No.
3      Q.   And was that true?
4      A.   No.  He was already there.  Both of them were
5  already there when I came out the clearing.
6      Q.   And do you recall saying that you were very
7  close to the shooter when Larry White was shot in the
8  parking lot?
9      A.   No.  I don't recall that.
10     Q.   And was that true?  Were you very close to
11 the shooter?
12     A.   No.  I was a distance -- I was a distance
13 from them.  I wasn't nowhere close to them at all.
14     Q.   And -- and do you recall saying that what you
15 saw of the shooter was just a -- a temporary flash?
16     A.   It was a temporary flash.
17     Q.   Okay.  Okay.  And in -- in 2021, you also
18 testified at the habeas proceeding.  Correct?
19     A.   Yes.
20     Q.   And I'm -- just checking.  Do you need a
21 short break?
22     A.   No.  We're -- we're fine.
23     Q.   Okay.  And by the way -- and you talked
24 before about feeling some pressure, and also feeling
25 like you weren't free to change from your original

1  police statement.  Did you feel any of those same
2  things in connection with the habeas proceedings?
3      A.   I -- I did.
4      Q.   And can you tell me a little bit more about
5  that.  How did you feel when you were brought in to
6  participate in the habeas proceedings?
7      A.   I mean, I feel like -- I still feel like
8  every time something comes up pertaining to this
9  situation, I just feel so much pressure.  I'm going to
10 stick to and be adamant about that I honestly don't
11 know who shot him.  I assumed a lot.  I did, back
12 then.  And I still felt that pressure even during
13 the -- the habeas corpus, because the -- the attorney
14 for him at the time, I mean, he was just firing at me,
15 you're a confidential informant, you did this, and you
16 did -- you know, come on, now.  I'm not coming to
17 these proceedings to be badgered.  You know, I feel --
18 I'm tired of looking over my shoulder.  Honestly, I
19 am.  You know, I've been approached by that boy's
20 people.  You know.  And nobody's walking in the shoes
21 that I have to walk in.  Even during my addiction, I
22 never said anything that was literally true.
23 Everything I felt like I was forced to say, and I went
24 along with it.  But today, I'm able to honestly say,
25 and this -- and this be my truth, I don't know who

1  shot Larry.  I am tired of every time I turn around
2  that I'm being subpoenaed for this, I'm being
3  subpoenaed for that.  It's --
4      Q.   Yeah.  I understand.  Fair to say that -- and
5  it was Ken Gibson -- right -- Keith's lawyer who asked
6  you --
7      A.   Yes.
8      Q.   -- those questions at the deposition.  And
9  fair to say that the way he questioned you didn't make
10 you feel free to open up to him?
11     A.   It didn't.
12     Q.   Yeah.  Let me ask you -- you mentioned
13 something about being approached -- actually, strike
14 that.  In terms of -- I'm going to come back to that
15 in a second.  I want to ask you a different question
16 now, and just sort of keep us on track and moving.  Do
17 you remember in the -- in the statement you -- your
18 statement, you mentioned that you knew -- you knew the
19 men who sold drugs at 2404 East 29th Street?  Do you
20 remember that?
21     A.   Yes.
22     Q.   And you knew them by their street names at
23 the time.  Right?
24     A.   Yes.
25     Q.   Was -- was Fuzzy one of those people?

1      A.   Yes.
2      Q.   Was Debo one of those people?
3      A.   Yes.
4      Q.   Was Kiki one of those people?
5      Tre?  Yes.
6      Q.   Well, Tre was one of those people, too.
7  Right?
8      A.   Uh-huh.
9      Q.   I was actually asking about Kiki, also known
10 as Gary Kitchen.  Was he one of those people?
11     A.   I don't know.  Not to my knowledge.
12     Q.   Okay.  Was Reginald Thomas -- or Reg -- one
13 of those people?
14     A.   Not to my knowledge.
15     Q.   Okay.  Was Arnold Carr -- or OG -- one of
16 those people?
17     A.   I don't know.  No.
18     Q.   Okay.
19     A.   I mean, like I said, it was groups that sold
20 there.  That could have been another group.  But I
21 wasn't familiar with everybody that sold there.  Just
22 a particular set.  I mean, back in those days, you --
23 when you're buying, you buy from a particular person,
24 and, you know, that's what you stick with.
25     Q.   That makes sense.  I think you mentioned at

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00078-RK   Document 159-27   Filed 09/09/24   Page 14 of 29

1  some point not long -- at some point after the -- the
2  murder, there was someone who tried to hit you with a
3  car.  Is that correct?
4      A.   Yes.
5      Q.   And he was someone who you thought was -- who
6  you knew was friends with the men who sold drugs on
7  that block.  Correct?
8      A.   Yes.
9      Q.   And he was friends with multiple of the men
10 you knew.  Right?  Not just one of them?
11     A.   No.  Not just one of them.  Multiple.  Yeah.
12     Q.   And you didn't -- you didn't ever -- did you
13 ever talk to him, or he talk to you after that
14 interaction?
15     A.   No.
16     Q.   Okay.  Is there anything else you remember
17 about that interaction?
18     A.   No.
19     Q.   Okay.  And is it -- I think this is in your
20 criminal trial transcript.  But do you recall there
21 was a case in 2003 for drug possession for which you
22 were convicted and sentenced?
23     A.   I don't remember.  But probably.
24     Q.   Okay.  If you want, I can try to find a --
25 well, let me ask you this.  Is -- is it possible

1  from -- that you were on probation at this time in
2  October of 2003 from a prior conviction?
3      A.   Yes.  It's very possible.
4      Q.   Okay.  And assuming that that's true, that
5  you were on probation, do you think that -- would --
6  like did that contribute to the pressure you felt at
7  the time you were questioned?
8      A.   No.  Not -- not being on probation.  I mean,
9  I probably had a warrant for me anyway.  I -- no.  I
10 didn't have a warrant.  I know that, because when they
11 locked me up to make sure that I showed up in court,
12 and I was locked up in Jackson County, but I was
13 released two days later.  Had I had a warrant, they
14 wouldn't have released me, so -- yeah.
15     Q.   Makes sense.  Okay.  I want to -- I want to
16 ask you a few questions about Latahra Smith.  Latahra
17 Smith -- am I right that you met her when she just
18 showed up at your door one day?
19     A.   Yes.
20     Q.   And you didn't know then, but you eventually
21 learned that she was working on Keith Carnes' case.
22 Correct?
23     A.   Yes.
24     Q.   And at some point, she -- you and she went
25 to -- went to Alvin Brooks' office together.  Is that

1  right?
2      A.   Yes.
3      Q.   And at Alvin Brooks' office, did you sign an
4  affidavit?
5      A.   Yes.
6      Q.   And did you -- did you keep a copy of that
7  affidavit, by the way?
8      A.   I didn't.
9      Q.   Okay.
10     A.   I mean, I had it for a while, but, you know,
11 I don't have it.  Yeah.
12     Q.   I understand.  Yeah.  And then you were shown
13 that affidavit in connection with the habeas
14 proceedings.  Correct?
15     A.   I don't know if they showed it to -- they
16 questioned me about it.
17     Q.   Okay.
18     A.   Yeah.
19     Q.   And at the time they questioned you about it
20 at the habeas proceedings, how long had it been since
21 you had looked at the affidavit?
22     A.   I hadn't looked at the affidavit for months
23 after that it happened.  Like I said, I had a copy of
24 it, but I threw it away.  You know, I don't -- or I
25 haven't kept anything pertaining to that situation.

1  That was my past, and now I'm into a new life, a whole
2  totally different person.  But every time I turn
3  around, I'm haunted about this situation again, and
4  again, and again.
5      Q.   I understand.
6      A.   It's kind of gotten old to me.  Yeah.
7      Q.   Yeah.  Give my one second, please.  Sorry.
8  Just give me one second here.  Counsel, I'm going to
9  send you now a copy of this affidavit.  I meant to
10 send it with my -- with my other exhibits, but I don't
11 think I did.
12         MR. HANER:  Sounds good, Wally.
13         MR. HILKE:  Thanks.  Sorry.  I have to -- I
14 have to share the -- I have to -- since we're all on
15 Zoom, I have to e-mail this to the other attorneys
16 before I send it -- before I show it to you.  So I
17 just need one second here.
18         MR. HANER:  Yeah.
19     Q.   (BY MR. HILKE.)  Okay.  I guess my -- before
20 I show it -- before I show it to you, Ms. Cahill, do
21 you have -- before you testified -- well, strike that,
22 actually.  Do you remember how many conversations, if
23 any, you had with prosecutors before you testified at
24 Keith Carnes' criminal trials?
25     A.   I had no prior conversations with

Kentuckiana Reporters
39 South Wacker Drive, Suite 2200
Chicago, Illinois 60606
Case 4:20-cv-00078-RK   Document 189-27   Filed 09/09/24   Page 14 of 29
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA
COURT REPORTERS

Page 58

1  prosecutors.
2      Q.   So as you remember it, the first conversation
3  with them was -- was when they were questioning you on
4  the stand?
5      A.   No.  It was one time that we went to a -- we
6  had a meeting somewhere -- I don't even remember
7  where -- where Keith's attorney at the time, the --
8  the man blew up on me.  He got mad at me then because
9  I told him I was not going to change my testimony.
10         MR. CAHILL:  He was from the State.
11         THE WITNESS:  Huh?
12         MR. CAHILL:  He was from the State.
13         THE WITNESS:  Yeah.  He was from the State.
14         MR. CAHILL:  He was from the attorney
15  general.
16         THE WITNESS:  Yeah.
17      Q.   (BY MR. HILKE.)  I'm sorry to -- I'm sorry to
18  interrupt, Ms. Cahill.  It sounds like your husband
19  may be with you.  And we should -- we should make sure
20  he's not getting on the record here.  So just for the
21  record, the voice we just heard, that was your husband
22  right now?
23      A.   Yeah.  He was -- because he was with me when
24  we went, had the meeting with the attorney general.
25      Q.   Sure.

Page 59

1      A.   I mean, I can remember it.  And he just said
2  it to me.  But he has not been a part of this.  Yeah.
3  It was with the attorney general.  And -- yeah.  The
4  attorney that Keith had at the time.  Oh, yes, he --
5  yeah.
6      Q.   Yeah.  And --
7      A.   He was so angry.
8      Q.   (BY MR. HILKE.)  I understand.  You're
9  totally fine.  Let me just take a step back for a
10  second.  I want to make sure for this deposition that
11  I'm just getting your testimony and your memory, and
12  not your husband -- what your -- so your husband's not
13  allowed to participate, if that makes sense.  Is that
14  fair?
15      A.   Yeah.  Yeah.  That's fair.  He knows that.
16      Q.   And has he -- has he been participating in
17  any way thus far?  Like has he been talking to you, or
18  giving you notes, or anything like that during the
19  deposition?
20      A.   No.  Actually, he just woke up.  He's getting
21  ready to go to work.
22      Q.   Okay.  Perfect.  So everything thus far, it's
23  been just you, and just your memory.  Correct?
24      A.   Yes.  Uh-huh.
25      Q.   Perfect.  Just want to make clear for the

Page 60

1  record.  Okay.  So there's a -- the meeting with the
2  prosecutor, you remember, where Keith's attorney at
3  the time -- and this was in the time period of the
4  criminal trials, like back in 2005.  Is that right?
5      A.   No.  This was before the -- I mean, I don't
6  remember when it -- the date, or anything like that.
7  But this was before the habeas corpus hearing.
8      Q.   I understand.  And I know I -- I just want to
9  ask about the prosecutors at Keith's two criminal
10  trials back in 2005, and just whether you recall any
11  meetings with them or any other prosecutors around
12  that time.
13      A.   No.
14      Q.   Because I know there's some stuff in your
15  affidavit that you signed at Alvin Brooks' office
16  about Amy McGowan.  And do you have any recollection
17  of Amy McGowan?
18      A.   I really don't even know who she is.  But
19  I've had no conversations with her, period.
20      Q.   Okay.  So anything about -- in there about
21  Amy McGowan, that's not something that you would
22  testify to today.  Correct?
23      A.   Absolutely not.
24      Q.   Okay.  So I want to -- I want to show you
25  just like a different -- I want to -- I'm going to

Page 61

1  show you the affidavit, but I'm actually going to ask
2  you about the part in it where you're talking about
3  the murder of Larry White, specifically.  So I want to
4  draw your attention to that part.  This is Exhibit 5.
5         (EXHIBIT 5 MARKED FOR THE RECORD.)
6      Q.   (BY MR. HILKE.)  And do you see here Exhibit
7  5?  There's a document titled affidavit at the top.
8      A.   Yes.
9      Q.   And then at the bottom, is this your
10  signature dated December 3rd, 2014?
11      A.   Yes.  That's my signature.
12      Q.   And Alvin Brooks' signature is here as a
13  witness.  Is that correct?
14      A.   Yeah.  That's Alvin Brooks -- yeah.  I see
15  it.
16      Q.   Okay.  And was -- was he there when you
17  signed the statement?
18      A.   He was there, but he wasn't -- he wasn't
19  present when we had this conversation.  Me and Latahra
20  had a conversation, and then it went -- nobody was
21  there to witness it.  It was just me and her.  She
22  went and -- and typed it up, and came back, and I
23  signed it.
24      Q.   Certainly.  And what I was wondering is I
25  know Alvin Brooks wasn't there when you talked to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:00078-RK   Document 189-27   Filed 09/09/24   Page 16 of 29  Page 15 of 29

1 Latahra.  But was he there when you actually signed
2 the affidavit?  Do you remember?
3     A.   I don't think he was there, because he had --
4 I don't think he was there.  As a matter of fact, it
5 wasn't nobody but me and Latahra.  It was at Alvin
6 Brooks' office where the conversation took place.
7     Q.   Okay.  I want to draw your attention to the
8 second paragraph that starts the day of the murder of
9 Larry White.  Do you see that?
10    A.   Yes.
11    Q.   The first sentence says the day of the murder
12 of Larry White, there were several persons in the area
13 in which a homicide was committed, and most of them
14 were wearing black clothing.  Was that true?
15    A.   That was true.  Yes.
16    Q.   And the next one says the person who shot
17 Larry White had on a black hoodie.  I cannot
18 positively say the person who shot Larry White was
19 Keith Tre Carnes.  Was that true?
20    A.   That was true.
21    Q.   And the next one says it was dust dark,
22 making it difficult for me to identify Keith Carnes as
23 the shooter.  Was that true?
24    A.   Yes.
25    Q.   And it says as I now look back with a clean,

1 sober and competent mind, I can honestly attest to my
2 uncertainty that Keith Carnes was the shooter.  Was
3 that true?
4     A.   That was true.
5     Q.   And there's more about -- about Amy McGowan.
6 But I understand that that part, you don't believe you
7 spoke with Amy McGowan, and so I'm just going to -- my
8 understanding would be that that's not testimony you'd
9 give today.  Is that correct?
10    A.   Absolutely, because I've never spoken to her.
11 I don't even know who she is.
12    Q.   Okay.  So at his deposition -- one second.
13 At his deposition, Vernon Huth testified that you
14 called him several months before he testified in the
15 habeas proceedings.  Do you remember having a phone
16 conversation with Vernon Huth around the time of the
17 habeas proceedings?
18    A.   No.  I did have a conversation with him, but
19 it wasn't around the habeas.  It was way before that.
20 It was when the second trial came about, and I called
21 him, I'm like why are they still bothering me about
22 this case.
23    Q.   And --
24    A.   He said just -- just answer to the questions,
25 or do -- you know.  And that was that.  It wasn't even

1 a whole minute on the phone.
2     Q.   Okay.
3     A.   Yeah.
4     Q.   How -- do you remember how you -- how you
5 contacted Vernon Huth?
6     A.   I called him.
7     Q.   What -- do you remember what -- what number
8 you called?
9     A.   I don't remember what number it was.
10    Q.   Is it possible you had his cell phone number?
11    A.   I did have his cell phone number.
12    Q.   How -- how did you get his cell phone number?
13    A.   From his card.
14    Q.   Okay.  And so one more thing.  That's all
15 right.  So I want to talk a little bit about police
16 activity at the time -- like going back to 2003.  And
17 I guess just to -- was the area of Olive and 29th
18 Street, was that an area that you frequented regularly
19 back in 2003?
20    A.   Yeah.
21    Q.   And was it uncommon for the police to come
22 through that area?
23    A.   No.  They came through it all the time.
24    Q.   Yeah.  And were you familiar with police
25 trying to talk to people in the area, trying to get

1 information about crimes?
2     A.   I'm pretty sure they did.
3     Q.   Yeah.
4     A.   I'm not aware of it, but I'm pretty sure they
5 did.  I mean, they're police.  That's their job.  You
6 know?
7     Q.   Totally.  And when -- I hate to ask this,
8 Ms. Cahill.  But can we take a five-minute break.
9 It'll give me a chance to find my remaining questions,
10 and I should be able to bring us to a close pretty
11 soon.  It'll help me go a little faster.
12    A.   Okay.
13    Q.   Okay.
14         THE VIDEOGRAPHER:  All right.  Give me one
15 second to get us off the record.  We're going off the
16 record.  The time is now 2:33 p.m.
17         (OFF THE RECORD.)
18         THE VIDEOGRAPHER:  We're now back on the
19 record for the deposition of Wendy Lockett Cahill
20 during -- being conducted by video conference.  My
21 name is Steffi.  Today is March 20th, 2024, and the
22 time is 2:38 p.m.
23         MR. HILKE:  I think it's 1:38 p.m. Central
24 Time.  Anyways.
25    Q.   (BY MR. HILKE)  Ms. Cahill, I have like five

Kentuckiana Reporters
39 South Wacker Drive, Suite 7700
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 5:20-cv-00078-RK   Document 139-27   Filed 09/09/24   Page 16 of 29

1  more minutes for you.  And then the other attorneys
2  may have some questions for you, too.  I just have one
3  follow-up.  Do you remember saying -- do you remember
4  your testimony earlier that when you gave your police
5  statement in 2003, that you were saying what they
6  wanted you to say?
7      A.   Yes.
8      Q.   I'm sorry if I asked you this already, but
9  how did you know what the police wanted you to say?
10     A.   Because they said.  They said that I knew.
11  They knew that I knew.  They knew that I -- they knew
12  that I was present.  They knew everything -- they
13  basically told me what happened.  You know.  And I --
14  I didn't go against it.  I felt pressured, so -- yeah.
15     Q.   Yeah.  And did -- and I think you -- you've
16  said this before.  But your goal at that time was to
17  get back to the street as soon as you could.  Right?
18     A.   Yes.
19     Q.   And based on how they were questioning to
20  you, did you feel like you could deny knowledge and
21  still get back on the street in -- in just as fast?
22     A.   No.
23     Q.   What did you think would happen if you denied
24  knowledge?
25     A.   That they would keep me locked up.

1      Q.   And why did you think that?
2      A.   Because that's what they were displaying.  I
3  mean, they literally didn't say it, but I was up under
4  so much pressure that you know this happened, you know
5  he -- he walked this way -- I mean, they knew details
6  of everything before they even picked me up.  They
7  basically told me what happened, and I agreed to it.
8      Q.   Do you think that detail in your statement
9  about the gun having the banana clip, do you think
10  that came from the police?
11     A.   Yeah.  That came from police.  Because it
12  wasn't no banana clip.  It was just a handgun.  I
13  didn't even know handguns could even take a banana
14  clip.  I'm not a gun specialist or anything like that.
15  I didn't see no clip.  I was from a distance, but I
16  know a handgun when I see one.
17     Q.   Okay.  And just one more question.  You
18  mentioned something about -- I think it was Keith's
19  people approaching you at some time.  Do you remember
20  saying that?
21     A.   Yes.
22     Q.   And was that around the time of the criminal
23  trials?
24     A.   It was.
25     Q.   And what do you -- what do you remember from

1  that interaction?
2      A.   That interaction happened at a CVS on -- on
3  Troost that is now closed.  It was me, my
4  granddaughter, and my husband.  We had went in to CVS
5  to get some medicine for her.  She was sick.  I seen
6  Ducky -- well, no.  I didn't -- actually, he saw me.
7  And he was like hey, fam, how you doing.  You know, I
8  mean, we hung around the same neighborhoods and things
9  like that, sold drugs and all that.  So that's how I
10  knew him.  And he's -- he's like yeah, I want to talk
11  to you about -- you know, about cousin's case.  What
12  about it.  Well, you know, it's something in it for
13  you if you, you know, change your statement.  And I
14  just walked off and immediately got my husband, told
15  him what was going on, and we left.
16     Q.   And did he say anything else to you?
17     A.   No.  He just said it would be -- it would be
18  something in it for me if I changed my statement.
19     Q.   Sure.  And you weren't -- you were not
20  tempted by that offer; were you?
21     A.   No, I wasn't.
22     Q.   Okay.  And other than -- and you said his
23  name -- you knew him as Ducky.  Is that right?
24     A.   Yes.
25     Q.   So other than that interaction with Ducky,

1  and your interactions with Latahra, because -- which
2  I'm not going to ask you about, because you've
3  testified them -- about them separately -- is there
4  anyone else you're referring to when you talk about
5  Keith's people contacting you?
6      A.   No.
7      Q.   Okay.  Ms. Cahill, I'm so grateful for your
8  time this afternoon.  I don't have any more questions
9  for now.  I'm quite sure the other attorneys will.
10  And then I'll have some more questions if they do.  I
11  may.  But thank you.  I know it's not easy to talk
12  about any of this.
13     A.   You're welcome.
14          CROSS-EXAMINATION
15  QUESTIONS BY MS. PETERS:
16     Q.   Ms. Cahill, can you hear me?  My name is
17  Diane Peters.
18     A.   Yes, ma'am.
19     Q.   Ma'am, I only have a handful of questions for
20  you.  I know you've been through a lot, and I know you
21  want to get out of here.  I want --
22     A.   Yes, ma'am.
23     Q.   -- to go back to Vernon Huth's report.
24          Wally, would you mind pulling it up, just
25  so she can see it again.

Kentuckiana Reporters
39 South Wacker Drive, Suite 720
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana.com
www.kentuckianareporters.com

1          MR. HILKE: I'm happy to.

2    Q. (BY MS. PETERS.) You remember giving

3 testimony about this report? Or do you remember when

4 Wally was asking you questions about it a little bit

5 earlier, ma'am?

6    A. Yes, ma'am.

7    Q. Okay.

8    A. He read it to me. Yes, ma'am.

9    Q. All right. Is the first time you've ever

10 seen this report today?

11    A. Yes, ma'am.

12    Q. Okay. And number one, you were not a

13 confidential informant; were you?

14    A. No, ma'am.

15    Q. And you've never been a confidential

16 informant. Right?

17    A. Correct.

18    Q. Okay. This conversation that Vernon Huth

19 wrote in this report was not a conversation you had

20 with him. Right?

21    A. Right.

22    Q. And if anyone would have asked you about this

23 report, and about this conversation back in 2005

24 during Keith Carnes' criminal trials, you would have

25 told him the same thing. Right?

1          MR. HILKE: Objection to form.

2          THE WITNESS: Yes, ma'am.

3          MR. HILKE: Sorry. I'm -- Ms. Cahill, I

4 may -- I may object, and you can still answer the

5 questions, but I'll just put them on the record. I'll

6 just object to form and foundation.

7    Q. (BY MS. PETERS.) Okay.

8    A. Okay.

9    Q. So do you remember Willis Toney, the attorney

10 for Keith Carnes during the criminal trials?

11    A. I think -- I think so. I think it was a

12 black man. Yeah.

13    Q. Yes, ma'am.

14    A. Uh-huh.

15    Q. So if Mr. Willis Toney would have showed you

16 this report that we're looking at on this screen now,

17 Vernon Huth's October 7th, 2003 report, and said

18 ma'am, were you a confidential informant, what would

19 you have said?

20    A. I would have told him I am not a confidential

21 informant.

22    Q. And if Mr. Willis Toney, at Keith Carnes'

23 criminal trial, would have showed you this report and

24 said ma'am, did you have this conversation with

25 Officer Huth, what would you have said?

1          MR. HILKE: Same objection.

2          THE WITNESS: I would --

3          MR. HILKE: Go ahead.

4          THE WITNESS: Okay. I would have said that

5 this is not true. I didn't have this conversation.

6    Q. (BY MS. PETERS.) Ma'am, do you remember the

7 investigator's name that was at your house with Wally

8 just a couple weeks ago or so?

9    A. I think -- was it Ethan? I think.

10    Q. It was a male?

11    A. Yes, ma'am.

12    Q. All right. Have you talked to Wally on the

13 phone before?

14    A. No, ma'am.

15    Q. First time you ever met him was at your house

16 that day?

17    A. Yes, ma'am.

18    Q. Have you talked to any other of Keith Carnes'

19 attorneys in this lawsuit?

20    A. No, ma'am.

21    Q. And this is the first day you and I met.

22 Right?

23    A. Yes, ma'am.

24          MS. PETERS: I have no further questions.

25 Thank you, ma'am.

1                  CROSS-EXAMINATION

2 QUESTIONS BY MR. HANER:

3    Q. And Ms. Cahill, I -- I represent Defendant

4 Amy McGowan. But you previously testified that you

5 didn't have interactions with Amy McGowan, and you

6 don't know her. And is that still correct?

7    A. Yes, sir.

8    Q. And I have no further questions. Thank you

9 very much for your testimony. And apologies for all

10 you've been through.

11    A. Thank you.

12          MR. HILKE: We're all done. Again,

13 Ms. Cahill, much, much -- I guess one question,

14 Ms. Cahill. You've got the right to reserve your

15 signature and get a copy of any transcript. You can

16 also trust that our capable court reporter has

17 transcribed it accurately, which is called waiving

18 your signature. Would you like to waive your

19 signature, or would you like to review it and sign the

20 deposition transcript?

21          THE WITNESS: I'll waive my signature.

22          MR. HILKE: All right. And I think we're

23 all done.

24          THE VIDEOGRAPHER: All right. Give me one

25 second. I just have a question for the attorneys.

Kentuckiana Reporters
30 South Wacker Drive, Suite 2800
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 4:20-cv-00078-RK   Document 189-27   Filed 09/09/24   Page 19 of 29

Page 74

1  Was it -- sorry -- Mr. Hilke?
2           MR. HILKE:  Hilke.
3           THE VIDEOGRAPHER:  Sorry.  Thank you.
4  Mr. Hilke, how would you like your copy for today?
5           MR. HILKE:  Good question.  May I do the
6  order off the record, please.
7           THE VIDEOGRAPHER:  Oh, yeah.  Definitely.
8  For sure.  Give me one second to go off the record.
9  We're now going off the record.  The time is now
10 2:48 p.m.
11           (OFF THE RECORD.)
12           THE REPORTER:  And I guess we still need to
13 get orders on the record.  Or off the record, but --
14           MR. HILKE:  Yeah.  I know we don't need a
15 video yet.  Steffi, what's the right e-mail to send
16 with the order?  I just need to check in with my team
17 on how we're handling that.
18           THE VIDEOGRAPHER:  Yeah.  Give me one
19 second.  I will just send it into the chat so you can
20 just copy and paste it.
21           MR. HILKE:  Thank you so much.
22           THE VIDEOGRAPHER:  You're welcome.
23           THE REPORTER:  Do you -- do you know about
24 the transcript order, what you want?
25           MR. HILKE:  I don't know yet.  I'm going to

Page 75

1  follow up, and I don't know yet.
2           MR. HANER:  For my transcript order, I'll
3  take the mini eTran transcript.  And I'm Josh Haner
4  with Jackson County.
5
6           (Ending time of the deposition:  1:49 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 76

1           CERTIFICATE OF REPORTER
2  STATE OF MISSOURI   )
3                      ) ss.
4  COUNTY OF PHELPS    )
5
6           I, Sarah J. Pokorski, Certified Court
7  Reporter within and for the State of Missouri, do
8  hereby certify that the witness whose testimony
9  appears in the foregoing deposition was duly sworn by
10 me; that the testimony of said witness was taken by me
11 to the best of my ability and thereafter reduced to
12 typewriting under my direction; that I am neither
13 counsel for, related to, nor employed by any of the
14 parties to the action in which this deposition was
15 taken, and further that I am not a relative or
16 employee of any attorney or counsel employed by the
17 parties thereto, nor financially or otherwise
18 interested in the outcome of the action.
19
20
21           _Sarah Pokorski_
22
23           _____
23           Sarah Pokorski, CCR 745
24
25

Kentuckiana Reporters
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
Schedule@Kentuckianareporters.com
www.kentuckianareporters.com

Case 4:23-mc-00078-RK   Document 19-27   Filed 09/09/24   Page 19 of 29

## Exhibits

**Exhibit 1_
Cahill** 13:4,5
15:2 18:5

**Exhibit 2_
Cahill** 14:9,10
16:5 18:20 21:3

**Exhibit 3_
Cahill** 27:15,16

**Exhibit 4_
Cahill** 30:8,9
34:3

**Exhibit 5_
Cahill** 61:4,5,6,
7

## 0

**0910** 34:6 35:5

## 1

**1** 13:4,5 15:2
18:5

**10** 21:1

**10/6/03** 28:1,2
35:21

**10/7/03** 27:23

**101** 5:16

**1115** 27:23

**1155** 27:23

**12** 21:14

**12:14** 5:11

**13** 22:2

**14** 23:3 30:11,
19 34:6

**14th** 35:4 47:15

**15** 13:15 23:9

**1:14** 5:18

**1:38** 65:23

**1:49** 75:6

## 2

**2** 14:9,10 16:5
18:20 21:3

**2003** 27:23
30:11 34:6 35:5
54:21 55:2
64:16,19 66:5
71:17

**2005** 23:16
60:4,10 70:23

**2014** 61:10

**2021** 50:17

**2024** 5:17
65:21

**2030** 28:3

**20th** 5:17 65:21

**2400** 18:23

**2400-2402**
14:24 16:11

**2404** 15:23,25
16:5 17:9 52:19

**2408-2410**
18:24

**2846** 28:8

**28656** 13:7

**28th** 28:1

**29th** 14:5,12,
16,25 15:24,25
16:6,7,11 17:9
18:23,24 21:4
28:4 35:22 36:1
38:2,7 45:3
52:19 64:17

**2:33** 65:16

**2:38** 65:22

**2:48** 74:10

## 3

**3** 27:15,16

**30** 15:5

**3rd** 61:10

## 4

**4** 30:8,9 34:3

**40202** 5:17

**4:23-cv-00278-
rk** 5:23

## 5

**5** 15:2 46:4
61:4,5,7

## 6

**6** 15:22

## 7

**7** 18:14 27:23
30:15

**730** 5:16

**7th** 71:17

## 8

**8** 19:9

## 9

**9** 20:5

## A

**above-
mentioned**
28:7

**Absolutely**
12:24 22:9
36:23 60:23
63:10

**accurate** 8:14
13:25 14:6
15:6,7 16:3
24:1,6,9,12,15
25:1 31:2 37:3
48:4

**accurately**
10:16 73:17

**active** 11:24
12:1,8 30:24
33:7,17,20
45:11 48:21

**activity** 64:16

**adamant** 51:10

**addict** 11:24
12:2,8 30:24
33:7,17,20
36:13,14 43:17,
18 45:11 48:21

**addiction**
51:21

**addictive** 48:4

**additional**
29:21

**address** 16:13

**affidavit** 56:4,
7,13,21,22 57:9
60:15 61:1,7
62:2

**afternoon** 69:8

**age** 7:8

**agree** 6:21

**agreed** 6:20
40:25 67:7

**ahead** 6:6,11,
16 23:20 72:3

**AK** 28:24

**alley** 22:15
28:6 45:3 49:4

**allowed** 59:13

**Alvin** 55:25
56:3 60:15
61:12,14,25
62:5

**Amy** 6:8,13
8:20 60:16,17,
21 63:5,7 73:4,
5

**angry** 59:7

**anymore**
36:22

## apartment

16:6,8,10,14,
16,24 17:5,8,
14,18 18:17,25
19:20 28:4 39:1

**apartments**
15:23 16:23
17:21 18:10
28:7 39:18,25

**APB** 26:6

**apologies** 73:9

**appearance**
5:24

**approached**
51:19 52:13

**approaching**
67:19

**approximately**
28:2

**area** 14:11 24:3
35:22 36:1
62:12 64:17,18,
22,25

**argument**
38:2,3,15

**Arnold** 53:15

**arrested** 33:21

**asks** 35:21,25

**assault** 28:25

**assumed**
17:23 24:22
25:22 29:6
48:16 51:11

**assuming** 55:4

**attending** 5:25

**attention** 61:4
62:7

**attest** 63:1

**attorney** 6:3,8,
13 9:11 51:13
58:7,14,24
59:3,4 60:2
71:9

**attorneys**
57:15 66:1 69:9

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 4:23-cv-00278-RK    Document 139-27    Filed 09/09/24    Page 20 of 29

72:19 73:25

**automatically** 17:23 22:12 44:17

**Avenue** 33:20

**aware** 65:4

**B**

**back** 10:20,23 11:20 15:2 16:5 18:4,5,20,22,24 19:8 20:19 21:2,8 23:15 24:16 25:7 30:24 31:1 36:6,15,21 37:17,24 40:25 41:1,25 42:17 43:14 44:5,6,16 45:7,18 48:11 51:11 52:14 53:22 59:9 60:4,10 61:22 62:25 64:16,19 65:18 66:17,21 69:23 70:23

**bad** 8:6,10

**badgered** 51:17

**badgering** 24:21 26:1

**banana** 39:6 43:20,21 67:9, 12,13

**based** 66:19

**basically** 25:22 32:18 66:13 67:7

**bearing** 46:1

**beat** 33:18

**beating** 20:17

**began** 38:2

**begins** 45:2

**Begley** 27:24 29:24 30:18 32:10,23 33:14

**behalf** 7:8

**big** 19:7 28:25

**birth** 13:24

**bit** 11:14 26:2 32:15 51:4 64:15 70:4

**black** 16:1 18:7 24:3,7,23 28:3, 5,6,9 37:6 39:16 46:2 47:7 48:18 62:14,17 71:12

**Blehm** 5:20

**blew** 58:8

**block** 54:7

**Board** 7:18 8:19

**borrowed** 38:21

**bothering** 63:21

**bottom** 13:16 27:18,19 34:10 35:7 61:9

**bought** 46:12

**boy's** 51:19

**break** 8:24 50:21 65:8

**breaks** 8:21

**bring** 33:25 47:8 65:10

**Brooks** 61:14, 25

**Brooks'** 55:25 56:3 60:15 61:12 62:6

**brought** 10:19, 23 11:12,16 44:16 46:22 51:5

**brung** 12:6

**building** 14:24 16:11,16 17:9, 11,13,14 20:12

**buildings** 16:7,9,14 17:18 18:17,22,25 19:2,20 20:13, 23 22:11 28:4 37:7

**bullet** 18:16 19:14 45:14 49:18

**bunch** 25:21

**buy** 53:23

**buying** 53:23

**C**

**Cahill** 5:20 6:22 7:3,7,13 9:2 13:7 57:20 58:10,12,14,18 65:8,19,25 69:7,16 71:3 73:3,13,14

**called** 63:14,20 64:6,8 73:17

**calling** 6:4,9, 13

**capable** 73:16

**car** 32:12,16, 23,25 33:2,24 35:18 43:3 54:3

**card** 64:13

**carefully** 44:18

**Carnes** 5:20 6:3 7:17 9:11 23:4 24:10,17 36:4 42:13 48:16 62:19,22 63:2 71:10

**Carnes'** 25:8 55:21 57:24 70:24 71:22 72:18

**Carr** 53:15

**case** 5:23 8:6 17:15 27:11 54:21 55:21 63:22 68:11

**cell** 64:10,11, 12

**Central** 65:23

**certainty** 30:25

**chance** 46:25 65:9

**change** 50:25 58:9 68:13

**changed** 25:18,19 68:18

**chase** 43:24 45:2

**chased** 36:8 37:1,12

**chasing** 37:8

**chat** 74:19

**check** 74:16

**checking** 50:20

**Chicago** 6:4

**church** 21:2,3, 6,9,22 22:13 37:10 45:4,6 49:4,7,21

**city** 6:9,14 7:17,18 8:18,19

**clarify** 8:9

**clean** 62:25

**clear** 45:21 49:20 59:25

**clearing** 37:9, 24 50:5

**clip** 39:6 43:20, 21 67:9,12,14, 15

**close** 50:7,10, 13 65:10

**closed** 68:3

**clothing** 24:4 39:12 62:14

**cocaine** 15:3,9

**collapsed**

37:15

**Commissioners** 7:18 8:19

**committed** 62:13

**communicated** 31:13

**competent** 63:1

**concerned** 22:2

**conducted** 65:20

**conference** 5:19 65:20

**confidential** 26:20,22,24 27:2,6,25 30:1 31:9,10,18 32:8 51:15 70:13,15 71:18,20

**confrontation** 36:2

**confused** 33:7

**Congratulations** 12:13

**connect** 15:15

**connection** 8:7,10 51:2 56:13

**consistent** 23:24 28:14 29:7,15 31:14

**consisting** 46:2

**contacted** 27:24 64:5

**contacting** 69:5

**contained** 34:8

**context** 42:24

**continued** 28:9

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**continues** 13:14

**contradict** 47:13,16

**contribute** 55:6

**convened** 5:18

**conversation** 10:5,10 28:13 29:20,21,24 30:2,6 31:23 32:5,7,11,14, 16,21,24 33:24 35:18 41:19 42:24 43:9 44:15,24 46:5 58:2 61:19,20 62:6 63:16,18 70:18,19,23 71:24 72:5

**conversations** 57:22,25 60:19

**convicted** 54:22

**conviction** 55:2

**copy** 56:6,23 57:9 73:15 74:4,20

**Cornejo** 5:14

**corner** 14:5,16, 18,22,23 16:15 18:18 19:10 20:11 21:4,7 32:18 37:4 38:17

**corpus** 51:13 60:7

**correct** 9:3,6,7, 11,12,14,15,17 10:11,12,14,20 13:25 15:20 17:5,10 18:9, 13,18 19:1,11, 12 20:2,6,7 21:12,19 22:5 23:7,8,12 24:14,18 25:9, 12,13 26:15,23

**28:16,22,23** 29:5,6,9,10,13, 14,17,18 35:14 50:18 54:3,7 55:22 56:14 59:23 60:22 61:13 63:9 70:17 73:6

**counsel** 6:1 57:8

**County** 55:12 75:4

**couple** 18:1 37:5 72:8

**court** 5:15,21 7:5 26:5 55:11 73:16

**cousin's** 68:11

**covered** 48:23

**covering** 48:19

**crack** 15:3,9

**crews** 17:20,22

**crimes** 35:3 65:1

**criminal** 23:15 25:9 47:12 48:25 49:1,3 54:20 57:24 60:4,9 67:22 70:24 71:10,23

**cross** 49:25

**CROSS-EXAMINATIO N** 69:14 73:1

**custody** 26:7

**cut** 18:17 20:18

**CVS** 68:2,4

---

**D**

**Damon** 42:1,2, 12

**dark** 24:12 62:21

**date** 13:15,24 60:6

**dated** 61:10

**day** 5:17 12:15 18:11,12 19:13 21:24 24:1 31:23 35:4 38:4,19,23 39:11 41:10 55:18 62:8,11 72:16,21

**days** 53:22 55:13

**Debo** 40:18 42:3,11 53:2

**December** 61:10

**Declaration** 13:10

**Defendant** 6:13 73:3

**defendants** 6:8

**delivery** 15:10

**denied** 66:23

**deny** 66:20

**department** 47:25

**deposes** 7:9

**deposition** 5:11,19 7:23 52:8 59:10,19 63:12,13 65:19 73:20 75:6

**describe** 12:16 36:25

**describes** 28:18

**detail** 38:21 43:19,21 45:10 67:8

**details** 43:23, 25 67:5

**detective** 30:11 33:25 34:5 35:4 36:22

**41:5,10,17,19,** 23 43:9 44:2,9, 15 46:5,17,18 47:14

**detectives** 30:6,18 32:11 35:14,17

**Diane** 6:7 69:17

**die** 39:19 40:1 49:11,12

**difficult** 24:13 62:22

**DIRECT** 7:11

**direction** 45:13

**displaying** 67:2

**distance** 50:12 67:15

**distinct** 23:1

**District** 5:21, 22

**division** 5:22 35:4 36:22

**document** 13:8 61:7

**door** 55:18

**dope** 38:17

**doubt** 12:7 25:21 33:12 48:10

**doubts** 47:19

**downtown** 26:18 30:1 32:10 43:3

**draw** 61:4 62:7

**dropped** 38:9

**droven** 35:17

**drug** 54:21

**drug-induced** 12:7

**drugs** 11:25 15:25 16:25

**41:5,10,17,19,** 23 43:9 44:2,9, 15 46:5,17,18 47:14

**detectives** 30:6,18 32:11 35:14,17

**Diane** 6:7 69:17

**die** 39:19 40:1 49:11,12

**difficult** 24:13 62:22

**DIRECT** 7:11

**direction** 45:13

**displaying** 67:2

**distance** 50:12 67:15

**distinct** 23:1

**District** 5:21, 22

**division** 5:22 35:4 36:22

**document** 13:8 61:7

**door** 55:18

**dope** 38:17

**doubt** 12:7 25:21 33:12 48:10

**doubts** 47:19

**downtown** 26:18 30:1 32:10 43:3

**draw** 61:4 62:7

**dropped** 38:9

**droven** 35:17

**drug** 54:21

**drug-induced** 12:7

**drugs** 11:25 15:25 16:25

**17:3,5,8,12,13,** 20 18:10 36:16 38:6,8,9,10 41:2 46:13 47:8 52:19 54:6 68:9

**Ducky** 68:6,23, 25

**duress** 33:8

**dust** 62:21

---

**E**

**e-mail** 57:15 74:15

**ear** 45:15

**earlier** 15:4 16:1 18:7 32:4 38:4 43:20 66:4 70:5

**east** 14:24 15:24,25 16:5, 11 17:9 18:23, 24 28:7 52:19

**eastbound** 28:8

**easy** 69:11

**embedded** 43:11,13

**end** 49:21

**ending** 75:6

**et al** 5:21

**Ethan** 72:9

**etran** 75:3

**evening** 14:4 35:21

**eventually** 55:20

**exact** 16:13

**EXAMINATIO N** 7:11

**examined** 7:8

**Excuse** 23:22

**exhibit** 13:4,5 14:9,10 15:2

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 4:23-cv-00278-RK   Document 139-27   Filed 09/09/24   Page 22 of 29

16:5 18:5,20
21:3 27:9,15,16
30:8,9 34:3,23
61:4,5,6

**exhibits** 31:5
57:10

**exited** 39:25

**experienced**
7:23

**experiencing**
25:7

**explain** 12:5

**expressed**
29:16

**expressing**
25:15

**eye** 21:17,18
23:5,7 29:4,8

———————

**F**

**face** 24:25
48:20

**fact** 6:21 29:2
45:17 62:4

**fair** 8:24 12:18
23:16,18 39:17
52:4,9 59:14,15

**fam** 68:7

**familiar** 20:21
53:21 64:24

**fast** 66:21

**faster** 65:11

**fault** 33:11

**features** 46:3

**feel** 11:18 33:4
47:13,16,17,19
51:1,5,7,9,17
52:10 66:20

**feeling** 50:24

**Felisha** 19:23
20:1 40:8,14
49:3,6

**felt** 18:15 33:8

43:14 48:12
51:12,23 55:6
66:14

**fence** 19:2,6,7
20:15,16,19
28:8 45:18

**fences** 20:23

**finally** 8:16

**find** 54:24 65:9

**fine** 7:14 50:22
59:9

**fired** 19:9
45:13

**firing** 28:5,9
51:14

**firm** 9:6

**Fish** 21:10,15
23:11 37:15
45:19 50:1

**five-minute**
65:8

**flash** 50:15,16

**flight** 45:15

**focused** 47:8,9

**follow** 75:1

**follow-up** 66:3

**forced** 51:23

**forgetting**
11:3,6

**form** 71:1,6

**foundation**
71:6

**fourth** 14:2

**free** 47:17,19
50:25 52:10

**frequented**
64:18

**friends** 15:12
54:6,9

**front** 13:8
16:19

**full** 47:1

**Fuzzy** 40:18
42:16 52:25

———————

**G**

**gap** 19:5

**Gary** 53:10

**gate** 22:11

**gave** 35:13
36:10,11,20
39:12 41:15,16
66:4

**general** 58:15,
24 59:3

**get all** 28:10
45:23

**Gibson** 52:5

**give** 8:14 34:3
41:4 46:25 49:1
57:7,8 63:9
65:9,14 73:24
74:8,18

**giving** 59:18
70:2

**glimpse** 23:17

**goal** 66:16

**good** 6:2 7:13
15:12 28:20
57:12 74:5

**granddaughte
r** 68:4

**grateful** 69:7

**Great** 11:3
13:22

**group** 17:16,19
53:20

**groups** 18:2
53:19

**guess** 7:20
16:22 17:17
29:12 31:4
57:19 64:17
73:13 74:12

**gun** 22:19,22
28:16 36:7

39:2,5 43:20
67:9,14

**gunfire** 18:15
19:19,24

**guns** 28:5

**guys** 37:5

———————

**H**

**habeas** 50:18
51:2,6,13
56:13,20 60:7
63:15,17,19

**hand** 7:4

**handful** 69:19

**handgun**
22:24,25 23:1
29:1 39:8,9
67:12,16

**handguns**
67:13

**handling** 74:17

**hands** 39:1

**Haner** 6:10,12
7:1 57:12,18
73:2 75:2,3

**hanging** 15:23

**happen** 66:23

**happened**
9:22 22:3 32:24
37:12,14 38:22
43:6,25 56:23
66:13 67:4,7
68:2

**happy** 70:1

**hard** 12:5

**hate** 65:7

**haunted** 57:3

**head** 18:16
19:15 21:19
23:5,10 37:17
49:19

**hear** 19:20
39:18 45:14
49:16,18,23

69:16

**heard** 15:5
18:15 19:19,24
58:21

**hearing** 60:7

**held** 26:7

**Hell** 42:13

**hey** 68:7

**high** 12:1 36:23

**Hilke** 6:2,24
7:12,16 13:6
14:8,11 27:17
30:10 39:22
57:13,19 58:17
59:8 61:6
65:23,25 70:1
71:1,3 72:1,3
73:12,22 74:1,
2,4,5,14,21,25

**hit** 20:11 54:2

**hole** 19:7 20:15

**home** 7:21
9:14

**homicide** 28:1
62:13

**honestly**
11:10,13 24:16,
21 33:6,10,13
36:11 44:11
47:5 51:10,18,
24 63:1

**hood** 21:18

**hoodie** 21:18
24:7,24 48:18,
19 62:17

**hoodies** 16:2
18:8 37:6 39:16
47:7

**hours** 27:24
28:3 34:6 35:5,
21

**house** 36:6
72:7,15

**hundred** 18:23

**hung** 68:8

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 4:23-cv-00278-RK   Document 139-27   Filed 09/09/24   Page 23 of 29

**husband** 58:18,21 59:12 68:4,14

**husband's** 59:12

**Huth** 26:9,19 27:1,10,19 28:12 29:19,24 30:15,17 31:8, 15,20,23 32:5, 9,22,23 33:3,4, 14,19,24 35:16 43:3 46:22 63:13,16 64:5 70:18 71:25

**Huth's** 69:23 71:17

_____

**I**

**I.D.** 6:19

**identified** 24:23 42:2

**identify** 24:13 25:11 42:6,7,20 46:11 62:22

**identities** 18:9

**Illinois** 6:4

**immediately** 68:14

**incident** 9:20

**Independence** 33:19

**influence** 30:25 33:7,16

**informant** 26:21,22,24 27:2,25 30:2 31:9,10,18 32:8 51:15 70:13,16 71:18,21

**information** 27:25 65:1

**interaction** 11:7 32:8 38:22 54:14,17 68:1, 2,25

**interactions** 26:12 31:15 69:1 73:5

**intercede** 48:3

**interrupt** 58:18

**interviewed** 46:17,19

**investigator** 9:6,25 11:7

**investigator's** 72:7

**investigators** 47:25

**invited** 9:13

**involved** 17:4

_____

**J**

**Jackson** 55:12 75:4

**job** 12:15 65:5

**Johnson** 40:8

**Jones** 19:23 20:1 49:3,6

**Josh** 6:12 75:3

**jumped** 28:7

_____

**K**

**Kansas** 6:9,14 7:17,18 8:18

**Keith** 5:20 6:3 7:16 9:11 23:4 24:10,17 25:8 33:11 36:3 42:13 47:4 48:15 55:21 57:24 59:4 62:19,22 63:2 70:24 71:10,22 72:18

**Keith's** 47:12 48:25 52:5 58:7 60:2,9 67:18 69:5

**Ken** 52:5

**Kentuckiana** 5:15

**Kentucky** 5:17

**Kiki** 53:4,9

**kind** 12:5 16:24 33:11 57:6

**Kitchen** 53:10

**knew** 15:8,11, 17,24 16:23 17:2,3,4,17,18, 19,22 18:10 28:14 33:17,18, 19,20,22 42:11, 17 46:11,12,13 52:18,22 54:6, 10 66:10,11,12 67:5 68:10,23

**knowledge** 26:21 53:11,14 66:20,24

_____

**L**

**label** 31:18

**labeled** 18:23

**Larry** 9:21 14:3,6,19 15:3, 9,11 18:11,16 19:13,21 20:5, 8,9,10 23:12 24:2,7,10 26:13,16 28:15 32:9,19 36:3,7, 25 37:11,15 38:1,4,6,15,16 39:19 40:2,13, 15 45:2 49:10 50:7 52:1 61:3 62:9,12,17,18

**Latahra** 55:16 61:19 62:1,5 69:1

**lawful** 7:8

**lawsuit** 6:3 7:17 72:19

**lawyer** 7:16 52:5

**lawyers** 8:18

**leading** 16:16 39:21 40:25 42:23 43:1,2,5, 7

**learned** 55:21

**leaving** 31:17

**left** 14:15 16:11 68:15

**life** 17:3 22:3, 10,17 36:17 45:8,9,15 57:1

**line-up** 46:2

**lit** 22:13

**literally** 24:25 29:25 38:10 39:14 40:13,23 45:14 48:11,18 51:22 67:3

**located** 5:15

**location** 5:25

**locked** 55:11, 12 66:25

**Lockett** 5:19 6:22 7:7 13:11 34:11 35:3,9 65:19

**long** 9:1 22:7 39:5 54:1 56:20

**looked** 10:13 22:19 48:20 56:21,22

**lot** 11:9 12:6 21:2,3,7,10,16, 23 22:4,12 23:6,11 28:20, 23 37:10,16,20 40:24 41:1 43:14 45:4,6,7, 19,24,25 46:12 48:24 49:11,22 50:1,8 51:11 69:20

**Louisville** 5:16

_____

**M**

**mad** 58:8

**made** 12:4 30:21 31:1 48:8

**main** 5:16 17:12,16

**make** 7:24 8:1, 3,5,8,9 10:3 39:24 52:9 55:11 58:19 59:10,25

**makes** 31:3 53:25 55:15 59:13

**making** 24:13 62:22

**male** 28:3,6 46:18,23 72:10

**males** 28:5,9 46:3

**man** 21:11 22:14 46:19 58:8 71:12

**map** 14:11,15

**March** 5:17 65:21

**mark** 13:4 14:8 27:15

**marked** 13:5 14:10,24 27:16 30:9 61:5

**match** 30:16

**matter** 5:20 62:4

**Mcgowan** 6:8, 13 8:20 60:16, 17,21 63:5,7 73:4,5

**Meaning** 36:20

**meant** 57:9

**medicine** 68:5

**meeting** 58:6, 24 60:1

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 4:23-cv-00278-RK   Document 139-27   Filed 09/09/24   Page 24 of 29

**meetings** 60:11

**memories** 11:12,16 14:3

**memory** 23:24 39:12 46:4 59:11,23

**men** 15:25 17:3,4,16,17,19 18:10 21:10 52:19 54:6,9

**mention** 11:4,6

**mentioned** 7:15 42:22 52:12,18 53:25 67:18

**mentions** 42:16

**met** 9:2,5,10 55:17 72:15,21

**middle** 17:9 45:2

**mind** 43:17 63:1 69:24

**mini** 75:3

**minute** 11:5 26:2 27:13 42:23 64:1

**minutes** 15:5 66:1

**Missouri** 5:22 6:9

**moment** 21:21

**months** 56:22 63:14

**morning** 6:2 7:13

**motherfucker** 39:19 40:1 49:12

**motivating** 36:19

**moving** 52:16

**multiple** 17:20, 22 26:11 54:9,

11

**murder** 18:11 26:13 28:21 31:24 32:9 41:20 54:2 61:3 62:8,11

**murdered** 14:4,20 19:14 24:2 26:16

**muted** 6:5

_____

**N**

**name's** 7:16

**names** 42:14, 15 52:22

**negative** 45:22

**neighborhoods** 68:8

**night** 14:3,19 15:4

**nightfall** 47:7

**nobody's** 51:20

**north** 18:16,22 20:12 28:6 37:6

**northeast** 14:23

**notes** 59:18

**noticed** 23:9

**number** 5:23 18:14 19:9 20:5 21:1 22:2 23:3, 9 46:3 64:7,9, 10,11,12 70:12

_____

**O**

**object** 71:4,6

**objection** 39:21 71:1 72:1

**observe** 35:25 39:4

**observed** 28:3 36:2 39:2

**occur** 43:8

**occurred** 28:1 40:18

**October** 27:23 30:11,15,19 34:6 35:5 47:15 55:2 71:17

**offer** 10:7 68:20

**office** 44:5 55:25 56:3 60:15 62:6

**officer** 26:9 27:18 29:24 30:18 71:25

**officers** 7:19 8:19

**offices** 7:22 35:3

**official** 31:11

**OG** 53:15

**Olive** 14:5,12, 16 18:17,22 28:4 35:22 36:1 38:3,7 64:17

**online** 5:14

**open** 24:25 52:10

**open-ended** 12:19 46:24 47:2

**opening** 45:18

**opens** 22:12

**opposed** 38:22

**order** 74:6,16, 24 75:2

**orders** 74:13

**original** 50:25

_____

**P**

**p.m.** 5:11,18 65:16,22,23 74:10 75:6

**paper** 34:14

**paperwork** 34:15

**paragraph** 13:15 14:2 15:2,22 62:8

**paragraphs** 13:11,23 27:22

**parking** 21:2,3, 7,9,10,15,22 22:4,12 23:6,11 37:10,16,20 45:4,6,7,19 49:11,22 50:1,8

**part** 37:11 38:6 59:2 61:2,4 63:6

**participate** 51:6 59:13

**participating** 59:16

**parties** 6:20,21

**past** 45:15 49:19 57:1

**paste** 74:20

**patch** 21:18 23:7 24:23 29:4,9 48:18,21

**pending** 5:21

**people** 18:1,12 32:20 39:15 40:13 51:20 52:25 53:2,4,6, 10,13,16 64:25 67:19 69:5

**Perfect** 59:22, 25

**period** 60:3,19

**person** 9:2 24:6,10 25:23 36:3 40:7 47:8 53:23 57:2 62:16,18

**persons** 24:2 62:12

**pertaining**

51:8 56:25

**Peters** 6:7,25 39:21 69:15,17 70:2 71:7 72:6, 24

**phone** 63:15 64:1,10,11,12 72:13

**photo** 42:20,21 46:2,6

**picked** 26:17 29:24,25 32:10, 17 67:6

**picking** 30:5, 17

**picture** 42:2,7, 8

**pistol** 22:22 39:6

**place** 38:20 43:13 48:14 62:6

**plaintiff** 6:3 7:9 13:7

**plaintiff's** 6:1

**PO** 27:24

**point** 20:9 21:22 26:4 36:13,17 43:16 54:1 55:24

**police** 7:18,19 8:19 47:25 51:1 64:15,21,24 65:5 66:4,9 67:10,11

**porch** 9:14 10:11 17:24 37:5 39:16 40:23 47:9

**portion** 18:6

**positively** 62:18

**possession** 54:21

**possibility** 48:9

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 4:23-cv-00278-RK   Document 139-27   Filed 09/09/24   Page 25 of 29

**pounding** 24:20

**present** 43:12 47:4,6 61:19 66:12

**pressure** 30:23 43:15 47:25 50:24 51:9,12 55:6 67:4

**pressured** 33:9 43:15 66:14

**pressuring** 24:20 26:1

**pretty** 48:1 65:2,4,10

**previously** 73:4

**printed** 10:19

**prior** 17:7 38:22 41:19 47:20 55:2 57:25

**probation** 55:1,5,8

**problem** 34:18

**proceeding** 50:18

**proceedings** 51:2,6,17 56:14,20 63:15, 17

**produced** 7:8

**promises** 10:4

**proofread** 44:16

**prosecutor** 8:20 60:2

**prosecutors** 57:23 58:1 60:9,11

**Prospect** 14:12 16:17 21:4 33:17 49:25

**provided** 27:11

**pulling** 69:24

**purposely** 20:16

**pursued** 28:4, 15

**pursuing** 28:9

**put** 26:6 71:5

---

**Q**

**question** 8:7,9, 23 35:20 37:25 38:1 39:24 40:17 41:16 46:1 52:15 67:17 73:13,25 74:5

**questioned** 11:12,19 12:3,6 25:24 36:14 44:1 52:9 55:7 56:16,19

**questioning** 11:19 44:5 58:3 66:19

**questions** 7:12 8:6,17,21 9:16 11:16,18, 23 12:16,18 13:3 24:19 25:4,6,20 27:14 46:16,25 47:2,3 48:7 52:8 55:16 63:24 65:9 66:2 69:8,10,15,19 70:4 71:5 72:24 73:2,8

---

**R**

**raise** 7:4

**raised** 25:20

**ran** 18:16 19:17,18 20:6 21:2 22:3,8 28:6,8 36:8,25 37:6,11

**read** 27:21 44:18,21 70:8

**reading** 18:6 29:19

**reads** 23:3

**ready** 59:21

**real** 22:15 36:15 42:15 47:9

**reason** 8:10,13 31:21 32:2 33:15

**recall** 12:17 49:2,9,24 50:6, 9,14 54:20 60:10

**recognized** 46:3

**recollect** 45:10

**recollection** 9:22,25 11:9,24 29:7,21 37:17 45:5 60:16

**record** 13:5 14:10 27:16 30:9 40:24 58:20,21 60:1 61:5 65:15,16, 17,19 71:5 74:6,8,9,11,13

**Red** 40:14

**referred** 26:20

**referring** 14:18 21:5 69:4

**reflect** 10:17

**reflected** 27:12

**refresh** 29:20

**Reg** 53:12

**regard** 27:25

**Reginald** 53:12

**regular** 7:22

**regularly** 64:18

**released** 55:13,14

**remaining** 65:9

**remember** 9:19 11:10 12:23,25 15:8, 23 16:1,2 18:7, 8,12 30:20 31:24 32:3,22 33:1,24 44:8,12 45:8 49:5,12 52:17,20 54:16, 23 57:22 58:2,6 59:1 60:2,6 62:2 63:15 64:4,7,9 66:3 67:19,25 70:2,3 71:9 72:6

**remembered** 47:1,18

**report** 26:20 27:10,12,18 30:15 69:23 70:3,10,19,23 71:16,17,23

**reporter** 6:5 7:5 8:2 73:16 74:12,23

**Reporters** 5:15

**reports** 31:12

**represent** 8:18 73:3

**representing** 5:15

**reserve** 73:14

**reside** 13:24

**response** 36:2

**review** 73:19

**Rhodes** 42:1,2, 12

**rifle** 22:23 28:25

**Robert** 5:20

**room** 44:3

**rounds** 28:9

**route** 18:21 20:21,22

**row** 16:7

**run** 19:16 45:3 49:4,7

**rung** 15:16

**running** 20:10, 12 21:1 22:14, 17 28:3

---

**S**

**sat** 9:14

**scared** 22:2,10 33:8

**screen** 34:13, 15,16,19 71:16

**sell** 16:25 17:8 38:17

**selling** 15:3 17:3,5,20 18:10 38:6,8,10

**send** 57:9,10, 16 74:15,19

**sense** 7:24 8:3, 8,10 12:4 31:3 53:25 55:15 59:13

**sentence** 62:11

**sentenced** 54:22

**separate** 32:4

**separated** 20:5,9,10,13 37:7

**separately** 69:3

**set** 53:22

**seventeen** 12:11

**shadow** 33:12 48:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**share** 27:8 34:4,16 57:14

**sharing** 27:9 31:4 34:5,22,23

**shoes** 45:11 51:20

**shooter** 19:15 21:16,22,24 22:8 23:5,6,10, 17 24:13,17 25:12 29:5,9, 13,16 37:18,21 49:10,16,25 50:7,11,15 62:23 63:2

**shooter's** 22:19

**shooting** 15:24 21:11,15 22:3,4 23:12 36:7 37:4 38:16,20 40:18 48:14

**short** 31:22 50:21

**shortly** 26:16

**shot** 24:7,10 28:16 32:19 37:16,22 49:10, 17 50:7 51:11 52:1 62:16,18

**shotgun** 28:25

**shots** 15:5,15 19:10 45:13

**shoulder** 51:18

**show** 11:4 13:1,2 26:5,6 27:17 30:7 34:9 46:6 57:16,20 60:24 61:1

**showed** 34:15 55:11,18 56:15 71:15,23

**showing** 46:15

**shown** 42:2,20, 21 46:2 56:12

**sick** 68:5

**side** 14:15 16:11

**sign** 10:22 44:9,25 56:3 73:19

**signature** 13:15,18 34:10, 11 35:9 61:10, 11,12 73:15,18, 19,21

**signed** 13:12, 20 35:8,13 44:7,12,17,19, 22,25 60:15 61:17,23 62:1

**similar** 46:3

**sir** 16:4 73:7

**sit** 9:13

**sitting** 23:3 44:3

**situation** 51:9 56:25 57:3

**small** 12:13

**Smith** 55:16,17

**sober** 12:11,14 63:1

**sold** 15:4,9,13, 25 17:11,12,13, 18 18:2 52:19 53:19,21 54:6 68:9

**son** 15:12 33:21

**sort** 11:21 25:25 31:17 52:16

**sound** 17:10

**sounds** 57:12 58:18

**speaking** 10:7 41:10 47:24

**specialist** 67:14

**specific** 18:9,

12 32:2 48:24

**specifically** 61:3

**spend** 22:7

**spoke** 9:24 63:7

**spoken** 63:10

**stage** 17:2 48:4

**stamped** 13:6

**stand** 58:4

**standing** 14:5, 19,23 15:14 16:15,18,20 19:10 21:11 22:14 37:9,19, 21,22,23 38:1, 10 48:14

**start** 19:24

**started** 7:20 9:2 15:24 20:11 36:7 37:4

**starting** 5:11 6:1

**starts** 62:8

**state** 5:24 12:8 24:20 30:22 58:10,12,13

**stated** 15:3 28:2,6

**statement** 10:11,13,22 11:1,5 13:2,12, 20 18:5,6,14 19:8 20:4 21:9 23:3 29:3,11 30:10,19 34:4, 8,20,24 35:2, 12,13 36:10,11, 20 39:13 40:1,2 41:3,4,9,13,15, 16 44:6,10 45:23 46:15 47:14,20 51:1 52:17,18 61:17 66:5 67:8 68:13,18

**statements**

23:24 27:12 30:21 31:1 39:24

**States** 5:21

**station** 43:10

**stay** 12:14

**stayed** 48:6

**Steffi** 5:13 65:21 74:15

**stenographer** 41:9

**step** 59:9

**stepping** 31:5, 17

**stick** 51:10 53:24

**stop** 23:19 31:4 46:15

**story** 47:1

**street** 5:16 14:6,12,16,25 15:24,25 16:6, 7,12,20 17:9 18:24 21:4 36:8,25 37:12 42:14,17 52:19, 22 64:18 66:17, 21

**Street all** 49:25

**streets** 36:21 41:2

**strike** 37:1 52:13 57:21

**stuck** 48:1

**stuff** 15:12 60:14

**subpoenaed** 52:2,3

**suddenly** 18:15

**suffered** 45:24

**suggest** 12:21 45:22

**Suite** 5:16

**supplier** 15:19

**supposed** 26:5 48:12

**sweatshirt** 21:18

**sworn** 7:4,8 10:25

---

**T**

**taking** 20:18

**talk** 8:2 32:10 54:13 64:15,25 68:10 69:4,11

**talked** 9:17 26:15 50:23 61:25 72:12,18

**talking** 19:20 30:17 59:17 61:2

**team** 74:16

**technical** 34:18

**technician** 5:14

**temporary** 50:15,16

**tempted** 68:20

**term** 23:14

**terms** 18:6,9 25:5,6 52:14

**testified** 26:7 27:10 28:13 31:8,20 47:12 50:18 57:21,23 63:13,14 69:3 73:4

**testify** 25:8 30:23 60:22

**testimony** 8:14 17:7 23:15 48:25 58:9 59:11 63:8 66:4 70:3 73:9

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

thing 12:14
30:4 35:20
39:5,6,10 64:14
70:25

things 7:19
11:9 40:25 41:1
51:2 68:8

Thomas 53:12

thought 25:21
54:5

threatened
45:9

threats 10:4

threw 56:24

time 5:11,18
8:2 11:25 16:25
17:19,24 19:3,
6,23 20:2 21:23
22:19 23:9
24:12 25:7,14,
18,19 26:12
28:14 33:9,11,
16 34:22 35:14
36:9,11 42:4
49:16 51:8,14
52:1,23 55:1,7
56:19 57:2
58:5,7 59:4
60:3,12 63:16
64:16,23 65:16,
22,24 66:16
67:19,22 69:8
70:9 72:15 74:9
75:6

tired 51:18
52:1

titled 61:7

today 5:14,17
7:13,20 8:6,14
11:20,22 23:4
25:3 30:25
33:10 51:24
60:22 63:9
65:21 70:10
74:4

told 9:10 10:17
27:1,5 31:8,21
38:16 58:9
66:13 67:7
68:14 70:25

71:20

Toney 71:9,15,
22

top 34:19,24
35:2 61:7

totally 37:1
57:2 59:9 65:7

Town 21:10,15
23:11 37:16
45:19 50:1

track 52:16

transcribed
73:17

transcript
54:20 73:15,20
74:24 75:2,3

Tre 36:3,6,8,25
37:12,16 38:2,
4,15,16,25
39:10,12,18,24
40:17 45:2
46:4,10 47:4
53:5,6 62:19

Tre's 42:13

treating 27:2

trial 23:15
30:23 48:5
49:10,24 54:20
63:20 71:23

trials 25:9,11
47:13 48:11,25
49:1,3 57:24
60:4,10 67:23
70:24 71:10

Troost 68:3

true 16:3 28:19
31:2 35:23
38:7,17 40:4,5,
11,21 45:4,5
49:6,15 50:3,10
51:22 55:4
62:14,15,19,20,
23 63:3,4 72:5

trust 73:16

truth 11:1
51:25

truthful 8:14

truthfully
11:13

turn 11:4 19:15
34:2 52:1 57:2

Turning 21:2

twenty 12:8
28:2

Twenty-
something
11:11

type 11:23 47:3

typed 10:10
41:12,14 44:24
61:22

typed-up
35:13

typically 6:15,
19

typing 41:5,9

—————

U

—————

Uh-huh 7:2
14:14 23:25
27:20 31:7,19
35:15,19 41:18
42:25 46:23
53:8 59:24
71:14

uncertainty
25:15 29:15
63:2

uncommon
64:21

understand
8:5,11 18:4,21
26:19 36:18
38:12 43:19
45:20 48:22
52:4 56:12 57:5
59:8 60:8 63:6

understanding
26:21 31:12,14
63:8

understood
10:25

United 5:21

unknown
28:10,19

usual 8:1

—————

V

—————

vantage 21:22

Vernon 26:8,
19 27:1,10,19
28:12 29:19
30:15,17 31:8,
15,20,23 32:5
35:16 63:13,16
64:5 69:23
70:18 71:17

versus 24:19

victim 37:19
49:17

video 5:14,18
65:20 74:15

violent 35:3

visible 45:19

voice 58:21

—————

W

—————

Wabash 28:1,8

waited 15:4

waiting 11:25
15:10,13,15,18,
19 38:9

waive 73:18,21

waiving 73:17

walk 37:18
51:21

walked 37:16
67:5 68:14

walking 29:25
51:20

Wally 6:2 7:16
57:12 69:24
70:4 72:7,12

wanted 36:23
66:6,9

wanting 36:20

warrant 55:9,
10,13

weapon 28:10,
18,19,21,24

weapons
28:25

wearing 16:1
18:7 24:3,7
39:11 62:14

week 30:14

weeks 9:8 72:8

Wendy 5:19
6:6,11,16,22
7:7 13:10 34:11
35:2,9 65:19

West 5:16

Western 5:22

whatsoever
45:22

White 9:21
14:4,6,19,20
15:3,9 19:14,21
23:12 24:2,7,10
26:16 28:15
49:10 50:7 61:3
62:9,12,17,18

White's 18:11
26:13

whiz 45:15

whizzed 19:14

whizzing 18:16

Williams 30:11
41:23

Williamson
34:6 35:4

Willis 71:9,15,
22

witnessed
38:3

woke 59:20

wondering
41:8 61:24

word 38:18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

42:22,23

**words** 26:1
38:18

**work** 59:21

**working** 55:21

**writing** 44:3

**written** 10:14
27:10

**wrong** 48:9,17

**wrote** 22:2
26:19 27:18,22
28:12 29:19
31:11 70:19

_____
Y
_____

**years** 9:23
11:11 12:9,11

_____
Z
_____

**Zoom** 7:21
57:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 4:23-cv-00278-RK   Document 139-27   Filed 09/09/24   Page 29 of 29