IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
DIVISION 70
THE HONORABLE WILLIAM F. MAUER, SENIOR JUDGE

STATE OF MISSOURI, Plaintiff,

v. — No. CR03-06321

KEITH L. CARNES, Defendant.

TRIAL TRANSCRIPT EXCERPT
TESTIMONY OF FELICIA MARIA JONES
APRIL 19, 2005

On Tuesday, April 19, 2005, the above cause came on for hearing before THE HONORABLE WILLIAM F. MAUER, Senior Judge of the Jackson County Circuit Court at Kansas City, Missouri.

APPEARANCES

For the Plaintiff:

MS. DAWN M. PARSONS
Prosecuting Attorney's Office
16th Judicial Court of Missouri
Jackson County Courthouse, 11th Floor
415 East 12th Street
Kansas City, MO 64106

For the Defendant:

MR. WILLIS L. TONEY
Attorney at Law
1100 Main, Suite 600
Kansas City, MO 64108

INDEX

STATE'S EVIDENCE

FELICIA MARIA JONES

Direct Examination by Ms. Parsons . . . . . . . . 3
Cross-Examination by Mr. Toney. . . . . . . . . 29
Reporter's Certificate. . . . . . . . . . . . . 37

-oOo-

STATE'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 45 | Felicia Jones' police statement | 19 | 19 |

-oOo-



*(The following proceedings were had in open court on Tuesday, April 19, 2005, in the presence of the jury. The defendant was present.)*

THE COURT: Call your witness.

MS. PARSONS: Thank you, Your Honor. The State of Missouri calls Felicia Jones to the stand.

Ma'am, walk up to the stand. It's up here. You'll have to step over this cord. And then the judge will swear you in.

01:21PM THE COURT: Raise your right hand, please.

**FELICIA MARIA JONES**

having been sworn by the Court, testified:

**DIRECT EXAMINATION**

**BY MS. PARSONS:**

Q. Ma'am, could you introduce yourself to the ladies and gentlemen of the jury?
A. **Yes. My name is Felicia Maria Jones.**
Q. Miss Jones, how old are you?
A. **Thirty-five.**
01:22PM Q. I want to ask you, do you have any criminal convictions?
A. **Yes, I do. I have possession, paraphernalia, and aggravated battery.**
Q. Okay. Do you have anything from the state of Kansas?



A. **Oh, that was from the state of Kansas, aggravated battery.**
Q. Okay. When did you get your aggravated battery?
A. **When I was 17 years old.**
Q. And did you receive a sentence for that?
A. **Five to 20 years.**
Q. In the penitentiary?
A. **Yes.**
Q. How much time did you do?
01:22PM A. **I'd say around the first time I did maybe a year or maybe two, and then I did 120 days when they valleyed me. Then I did five years of paper I walked through.**
Q. Paper is probation, right?
A. **Yes. Yes, ma'am.**
Q. So, then, you told the jurors that you had a possession charge. Was that possession of a controlled substance?
A. **Yes, ma'am.**
01:23PM Q. And you also said possession of drug paraphernalia?
A. **Yes.**
Q. Did you go to the penitentiary for that?
A. **Yes. I received time in the penitentiary.**
Q. Was that in the state of Missouri?
A. **Yes.**



Exhibit AA (Jones' April 2005 testimony)

Q. And, actually, you got out of the penitentiary last Wednesday, right?
A. **Yes.**
Q. All right. Let's talk about why we're here today. Do you know the defendant, Keith Carnes?
A. **Well, I don't know him as Keith Carnes. I know him as another name.**
Q. What do you know him as?
A. **Tre.**
01:23PM Q. Okay. So the person sitting right here is Tre?
A. **Yes, ma'am.**
Q. How do you know him?
A. **Well, he was one of the guys that I bought rock from before.**
Q. Okay. What's rock?
A. **Rock cocaine.**
Q. Okay, and I want to go back to October of 2003. Okay?
A. **Uh-huh.**
01:23PM Q. A couple years ago.
A. **All right.**
Q. At that time do you remember where you were living?
A. **Off and on on the streets, high on drugs.**
Q. All right. At that time you just told us you were on drugs. Were you using crack?

A. **Yes.**
Q. Did you buy your crack from the defendant?
A. **I bought it from him before on 39th Street off and on, different places whenever I saw him, but I had other dope dealers that I bought it from.**
Q. Okay. Can you estimate for the jury how many times you may have bought drugs from the defendant?
A. **Not really, no. Maybe more than ten times or whatever, but it's never been a real quantity.** 01:24PM **Maybe a $10 rock or a $20 rock here and there.**
Q. Okay, and when you used to interact with the defendant that you know as Tre, did he look different than he does today?
A. **Still looked nice looking, the same. Wore a black patch over his eye.**
Q. Had a patch over his eye?
A. **Uh-huh.**
Q. Is that a yes?
A. **Yes.**
01:25PM Q. The court reporter has to write down everything you're saying.
A. **Yes.**
Q. That's okay. We've all been doing it.
All right. On October-- I want to direct your attention to October 6th of 2003. Okay?

A. ***(The witness nodded her head.)***
Q. Do you remember that day at all?
A. **Vaguely. I remember different pieces, but not much.**
Q. All right. Let's start with what you remember. Do you remember if you were in the area of 29th and Olive?
A. **I'm always in the area.**
Q. Why?
01:25PM A. **Because that was my stomping grounds.**
Q. And what were you stomping there for?
A. **It's a thing. Stomping grounds is where I hang out at. That's my hood.**
Q. Okay. Is that where you would see the defendant?
A. **Well, at first Tre wasn't around that area, but then he came around that area. But that's where I saw him, you know, when I did see him, so. . .**
Q. Where did you see him when you saw him in that area?
01:26PM A. **At apartment buildings off of Olive. I can't remember exactly what apartment building. It was one of the apartment buildings.**
Q. And what was going on at that apartment building?
A. **They'd sell dope.**
Q. Okay. Did you go there to buy drugs ever?

A. **Yes. That was a main place to go buy dope at. That was the dope, drugs.**
Q. Okay, and you were using crack at the time, so you knew where to go?
A. **Yeah.**
Q. Talking about October 6th in the evening, you had just told us you vaguely remember that time. Tell us what you remember.
A. **I remember talking to someone and hearing gunshots** 01:26PM **and the gunshots was just going off and then I jumped into a trick car and we pulled down the street and when I came back, they had yellow thingies around Fish Town, the police did. That's basically it.**
Q. All right. You said you jumped into a trick car. What's that?
A. **It's a john, someone who buys women's body.**
Q. All right, and was that trick buying your body?
A. **Well, not after hearing the gunshot, no.**
01:27PM Q. Okay. All rightee. At that time were you high on crack?
A. **Yes. Very.**
Q. Okay. When you're high on crack, does it impair your ability to see or hear?
A. **It causes me to hallucinate.**

Case 4:23-cv-00278-RK Document 139-29 Filed 09/09/24 Page 2 of 10

Q. Okay. Now, did you talk to the police about what happened, the shots and everything? Did you talk to the police that night?
A. **No, I don't think so. No.**
Q. Okay. Did you ever talk to the police?
A. **Apparently I did. You all got me standing on the stand, yes.**
Q. Okay. Do you remember speaking to the police?
A. **No, I do not.**
01:27PM Q. Okay. I'm going to show you what I have marked for evidence as State's Exhibit 45.

MR. TONEY: Judge, may we approach, please?

*(Counsel approached the bench and the following proceedings were had.)*

MR. TONEY: Your Honor, for the record I want to object that the witness-- The State is going to try to impeach their own witness with her prior statement that we were never allowed to be 01:28PM present or my client--

THE COURT: Who were never allowed to what?

MR. TONEY: Judge, the statement that was given to the police, all right, we were never allowed. My client would have never been allowed

to confront or cross-examine her about this statement because that statement was given to the police officers, not under oath, not a deposition, just a statement that she gave to the police. Okay?

Our objection is that it denies my client the right to cross-examine her about this statement because she's saying she doesn't even remember giving a statement. Under the Missouri law, it 01:29PM says that it is discretionary to the trial court whether or not you allow them to do that. We would submit that it infringes upon my client's Sixth Amendment right.

MS. PARSONS: He has the opportunity to cross-examine her about the statement. I'm entitled to impeach her with the prior inconsistent statement. I'm also entitled to lay the foundation to attempt to admit this as an inconsistent statement.

MR. TONEY: Your Honor, it only becomes inconsistent if she says that she didn't make the statement. If she doesn't remember what was in it--

THE COURT: She didn't say she didn't make it. She said she didn't remember it.

MR. TONEY: Correct, so it's not inconsistent yet.

THE COURT: All right. The objection is overruled.

*(The proceedings returned to open court.)*

Q. (By *Ms. Parsons*) All right. I'm going to show as soon as I get this microphone situated. I show you what I've marked for identification as State's Exhibit 45. Do you recognize this?
01:30PM A. **Yes. This is what we just seen, I seen in the office a minute ago.**
Q. You were in my office a few minutes ago?
A. **Yes, ma'am.**
Q. And I showed this to you?
A. **Yes, ma'am.**
Q. Do you recognize it as what?
A. **It says it's a statement from--a statement of Felicia Jones taken at the office of the Victim Crimes Division.**
01:30PM Q. Okay. At the bottom of State's 45, which is a four-page document, do you see your initials?
A. **Yes, ma'am.**
Q. Are those your initials?
A. **Yes.**
Q. And on page 2 of State's 45 do you see your

initials?
A. **Yes, I do.**
Q. And at page 3 do you see your initials?
A. **Yes.**
Q. "F.M.J."?
A. **Yes.**
Q. On page 4 do you see your signature?
A. **Yes, ma'am.**
Q. Is that your signature?
01:30PM A. **Yes, it is.**
Q. Did you sign this?
A. **That is my signature.**
Q. All right. And State's 45, it's a four-page statement?
A. **Uh-huh.**
Q. And it is different than what you just told us today--
A. **Uh-huh.**
Q. --because it details what happened, correct?
01:31PM A. **I don't know. I didn't read it. I haven't read it.**
Q. All right. You want to take a moment and read it?
A. **No. I really don't.**
Q. Have you read it before?
A. **I don't know. I might have.**

Case 4:23-cv-00278-RK Document 139-29 Filed 09/09/24 Page 3 of 10

Q. Well, you know it's important to me. I need to know. I need you to take a moment.

THE COURT: Excuse me, Ms. Parsons. Approach the bench.

*(Counsel approached the bench and the following proceedings were had.)*

THE COURT: You may give her that statement. Ask her to look it over privately, not to read it, so she can refresh her recollection. 01:31PM If that works, okay.

MS. PARSONS: Okay.

*(The proceedings returned to open court.)*

Q. (By *Ms. Parsons*) Miss Jones, obviously it's important to me, so I want you to take a moment to review this privately to yourself. Read it, you don't have to read it out loud, and then we'll go from there. Okay?

A. **Okay.**

Q. Take as much time as you need.

01:31PM A. **(The *witness complied.*)**

Q. Does that refresh your recollection of what you told the police?

A. **It doesn't refresh my memory, you know. This is what the paper says, but it don't refresh my memory because I don't remember anything.**

Q. Your signature is at the bottom of the statement, correct?

A. **Correct.**

Q. You remember going to the police department, or do you remember going to the police department to this?

A. **I really don't remember that too much. Now I remember talking to police. I remember police picking me up one day, you know, because I have** 01:36PM **nightmares of several things that happened to me from me being on drugs, you know, me finding dead bodies and different things like that, so pieces and pieces of things flash through my mind. You understand what I'm saying?**

Q. Okay. Let me stop you there.

A. **Okay.**

Q. We're going to get kind of off the course with other dead bodies.

A. **All right. All right.**

01:36PM Q. My question for you: You made a statement to the police, correct?

A. **Apparently, yes.**

Q. You're not saying that you were never there or that never happened?

A. **No. I can't say I wasn't ever there.**

Q. Okay. That's what I'm trying to establish with you.

A. **Okay.**

Q. You just read that, the contents of State's 45, correct?

A. **Yes.**

Q. And you understand what's in that?

A. **Yes, ma'am.**

Q. That, in State's 45, you tell the police that you 01:37PM saw the shooting, correct?

MR. TONEY: Objection, Your Honor. May we approach?

THE COURT: You may.

*(Counsel approached the bench and the following proceedings were had.)*

MR. TONEY: Your Honor, same objection. I don't--

THE COURT: What is the objection?

MR. TONEY: The objection is they're 01:37PM improperly impeaching her with a prior inconsistent statement that is not inconsistent because she's never said she didn't say it. They're trying to use it as an inconsistent statement, but there's nothing inconsistent.

THE COURT: You can inquire an adverse

witness. Right?

MS. PARSONS: Right.

THE COURT: But you can't impeach your own witness.

MS. PARSONS: With all due respect, I believe I have case law that says that I can do exactly that, Judge.

THE COURT: With all due respect, I'd like to see it.

01:37PM MS. PARSONS: Oh, sure.

Your Honor, in *State v. Patterson*, the exact same thing happened. The witness denied making it or couldn't remember it.

*(Ms. Parsons passed a document to the Court.)*

THE COURT: You haven't satisfied the foundation that this witness calls for.

MS. PARSONS: And in *State v. Cravens*, it says that the legislature's passage of 491.074 01:39PM "ever gives the traditional common rule that a party cannot impeach his own witness with a prior inconsistent statement absent showing no surprise," so I don't have to show that anymore. This is a 2004 case.

THE COURT: You still haven't satisfied

Case 4:23-cv-00278-RK Document 139-29 Filed 09/09/24 Page 4 of 10

the foundation. She has not stated that the statement is true.

MS. PARSONS: But she doesn't have to state the statement is true. She just--

THE COURT: That's what the case says.

MS. PARSONS: Well, this one in *Patterson* says it does not have to say that.

THE COURT: Okay. Show me where it says you don't have to do that. Most cases, they have to prove that she made it and that it was true.

01:40PM

MS. PARSONS: There are cases and then through the--

THE COURT: Let me see the statement.

*(Ms. Parsons complied.)*

THE COURT: The statement she signs as the truth.

MR. TONEY: Your Honor, she signs that statement, but the Court--

THE COURT: Wait just a minute. I want to hear your objection. What she said so far is going to be overruled. Okay?

01:41PM

MR. TONEY: Okay. Then I have nothing else to say.

THE COURT: All right. Overruled.

MS. PARSONS: Okay.

*(The proceedings returned to open court.)*

Q. (By *Ms. Parsons*) All right, Miss Jones. Turning back to State's 45, again let me get my microphone situated, and my glasses. I think I'm all situated now. Now on the back page of State's Exhibit 45-- Are we there?

A. **Yes.**

Q. The last thing, the first question says, "Will you read and sign the statement?"

01:42PM

A. **Huh?**

Q. Does that say that, "Will you read and sign the statement?" Do you see that question?

A. **Yes.**

Q. And your answer: "I have read the above statement which consists of four pages. I understand I'm signing it because it's the truth"?

A. **Yes. Apparently I did, yes. I did sign it.**

Q. Okay. In State's Exhibit 45, I want to talk to you about the contents of State's Exhibit 45.

01:42PM

THE COURT: Excuse me.

*(Counsel approached the bench and the following proceedings were had.)*

THE COURT: Before you read the statement, you're going to have to have it marked and offered.

MS. PARSONS: Okay. I thought I had to do

a little bit more foundation, but I can do that.

THE COURT: All right.

*(The proceedings returned to open court.)*

MS. PARSONS: Your Honor, at this time the State would move to admit State's 45 into evidence as a prior inconsistent statement.

MR. TONEY: Same objection as before, Your Honor.

THE COURT: Overruled.

*(State's Exhibit No. 45 was received into evidence.)*

Q. *(By Ms. Parsons)* Okay. We're going to go through State's 45 a little bit with you. All right, ma'am?

A. **Okay.**

Q. The question, I want to go to the bottom of page 1. Are you with me?

A. **On the bottom of page 1 where it says "Q" or "A"?**

Q. "Q". We're starting with "Q", the question: "After you left the apartment complex, tell me what you observed happen on the street in front of the apartment."

01:43PM

Is that the question?

A. **That's what--that's what it says.**

Q. The answer: "In front of the apartment I saw Puffy

standing out in front of the apartment with a brown hood like a sweatshirt jacket with both of his hands in his pocket. Tre went across the street to his car and pulled out guns. They started walking slowly towards the east, going towards Prospect. I was telling my home girl, Delisa, if that boy knew what he was doing, he would get off the corner. Then I started telling her how they had dissed me earlier and how they'd be acting a fool. That's when a trick pulled up and went up the street and I followed him. I followed him fast because that's when gunshots started like pow, pow, pow. Me and Delisa tried to jump in a car, but he wouldn't let Delisa in, and then I looked back and I saw Tre on the porch of the house at the corner of 29th and Wabash shooting at the dope dealer that was selling on the corner. He was running towards Fish Town. I saw Puffy standing in front of the apartment shooting at the same kid who was selling on the corner towards Fish Town. I got in the car and left with the trick."

01:44PM

01:44PM

Is that your answer?

A. **That's what it says, yes.**

Q. Who is Puffy? Do you know?

A. **I'm-- It was a dope dealer.**

Q. Okay.
A. **A nickname or whatever. I can't remember his face or nothing like that. I can't even remember, but I remember the name "Puffy."**
Q. Is he a different dope dealer than the defendant, Tre?
A. **Yeah. They're two different people.**
Q. Okay. Who is Delisa? Do you remember?
A. **A prostitute.**
01:45PM Q. Okay. Was she able-- Do you remember if she was able to get in the car with you?
A. **I don't remember that part, no.**
Q. Okay. Then the next question they asked you: "Describe what the car looked like that Tre got the guns out of."

Your answer: "It's a black, old-school car. It has clear windows to it and fancy gold wheels."

Is that your answer?
A. **That's what it says, yes.**
01:45PM Q. "Question: How many guns did Tre get out of the car?"

And the answer: "I know it was more than one because he had two guns in his hands"?
A. **Well, I'm not going to. I'm not going to say that I know anything because I don't know what he got**

21

**out of the car because I don't remember.**
Q. Right, but this is--
A. **This is what this paper is saying that I said.**
Q. Okay.
A. **You understand what I'm saying? So, no, I'm not going to say I, me, Felicia Jones. This person today, I don't know what he got out of that car.**
Q. Okay.
A. **So I'm not going to lie under oath and say that. What this paper is saying could have been something that was coerced from me because I was on drugs at the time. I'm not going to stand under oath and say may I tell the truth, so help me God, and today I'm living with God and I don't remember saying none of this.**
Q. That's fair.
A. **You understand what I'm saying?**
Q. I understand what you're saying.
A. **I could have said anything to get me some crack.**
01:46PM Q. Okay, but my point is or the reason we're going through this is that these are the questions and these are your answers.
A. **Yes, I can understand that, but it's kind of frustrating because it's like it's being forced down my throat this is what I'm saying, but I'm not**

22

**saying this. Today I don't know what I said two and a half years ago.**
Q. Right.
A. **You understand what I'm saying?**
Q. I understand.
A. **The other thing I could have did because I was-- back then I know I was wanted. I was running from police myself, so no telling I told whatever they wanted me to tell now.**
01:47PM Q. Okay.
A. **Okay? And I don't remember this. I don't remember any of this.**
Q. Okay.
A. **I remember a whole different person than this piece of paper is portraying. You understand?**
Q. I got it. We're just going to go through this. I'm certainly not asking you to violate your oath at all, Miss Jones, and I appreciate what you're telling me and this jury. Okay? What you're telling them is you don't remember saying this.
A. **No, I don't. No, ma'am.**
Q. Okay. Next question: "When you saw Tre shooting at the kid, can you describe what the gun looked like?"

"No." Your answer: "I was in the car moving.

23

All I saw was little sparks coming from the gun that Tre was holding."

The next question: "Do you know what kind of gun Puffy had?

"No, but it looked like something on the end of it and it sounded like a paint gun."

Your answer, correct? Is this your answer?
A. **Now that might. That sounds like something I'd say because they'll usually always just kid with us, you know. We'd come by and we'd stand out in front of the apartment building and they used to shoot the paint gun at us so we wouldn't want to be out in the middle of the street now. You know, it was just something crazy, you know, or if we dressed up real nice, like, "I'm going to mess up your clothes and shoot a paint gun." It was just, you know--**
Q. Is that how it was then?
A. **You know, that's what I'm saying, is I don't remember anything that was so tragic, only one person that I remember that was so tragic around there, and that was old school Webb, his name was. He was always threatening to shoot people, kill people, some crazy stuff.**
Q. Okay. Let's go through the next question.
A. **But I don't remember all the other stuff.**

24

Q. "Do you know how many shots were fired by Tre?"
Your answer: "No."
"Do you know how many shots were fired"--well, actually there's a typo, "were fried by Puffy," but I think that means "fired by Puffy."
"It couldn't have been much because we didn't get all the way up to the stop sign and I didn't see Puffy no more."
All right?
01:49PM "Question: Once the shooting started, did anyone else come out of the apartment building?"
Your answer: "I don't know.
"Did you actually see the victim make it to Fish Town?"
"Answer: No. I did not see him make it to Fish Town because I got in the car and took off and I was going southbound."
Do you remember the police showing you photographs?
01:49PM A. **I remember police showing me some photographs of some people. I don't remember picking out no photo of Puffy, but you showed me a picture of him earlier, but I didn't remember how he looked even in the picture.**
**But then I remember a picture, them showing me**

**of Tre again. They tell me his real name or the name they have him arrested under, and I told them yes, I knew him, but at first I couldn't hardly recognize him without the patch. I had to put a hand over one of his eyes.**
Q. Okay. I'm going to show you what I've marked as State's 66. Do you recognize this?
A. **Yeah.**
Q. And who is this?
01:50PM A. **Tre.**
Q. In State's 66, what does Tre have on?
A. **He has a patch.**
Q. Is this how you knew him?
A. **Yeah.**
Q. Okay. So continuing on in State's 45, the police are showing you photographs of different people. You're telling the jury you kind of remember that? You kind of remember that process?
A. **Yeah. You know, they showed me so many different** 01:50PM **boys that was locked up or in the hood, you know, and stuff like that and wanted me to point them out, but I couldn't remember all of them, you know.**
Q. Okay. Do you remember what happened after you made the statement?
A. **After I made this statement?**

Q. Yes.
A. **What do you mean?**
Q. Like how did it end? Were you arrested?
A. **No.**
Q. "No." Do you remember how you got home from the police department?
A. **Yeah, I can remember. I basically remember most of that. The detectives dropped me off.**
Q. Did they drop you off at home?
01:51PM A. **I had no home, didn't have no home to drop me off at.**
Q. Okay. Well, did you tell them where to drop you off at?
A. **They dropped me off at a park.**
Q. Okay.
A. **They dropped me off at the park and gave me $5.**
Q. Okay, and after that time you spoke to the detectives, was the next time that you talked to anyone else the lawyers in this case?
01:51PM A. **I never talked to anyone else.**
Q. We're the lawyers. Well, not me. Another attorney and Mr. Toney. Do you remember talking to him?
A. **Oh. I remember talking to him one time. They took me on out count, brought me here on out count, and I talked to him.**

Q. Okay.
A. **And I talked to a prosecutor and I told, like I told I don't remember anything--**
Q. Okay.
A. **--about anything.**
Q. I'm just trying to--
A. **I don't know if it was the first out count that I talked to him on or second out count, but they brought me on two out counts.**
01:52PM Q. Let me stop you there. You're using terms we don't know.
A. **"Out count" means that you're in prison. They take you from prison. They bring you here for a quarter or whatever like that, but because you're on out count, that don't mean your time stops. That means your time still continues to roll.**
Q. Essentially, it's almost like a travel service. Someone picks you up in the penitentiary and brings you to the Jackson County Jail?
01:52PM A. **Well, the penitentiary takes you from the penitentiary and brings you to Jackson County and again will come back and get you.**
Q. So the last time you were here, you were in custody?
A. **Yes.**

Q. And now you're not?
A. **No.**
Q. Just a second.
Miss Jones, I don't have anything else for you at this time.
THE COURT: Mr. Toney, you may inquire.
MR. TONEY: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. TONEY:

01:53PM Q. Good afternoon, Miss Jones.
A. **Good afternoon.**
Q. The last time you and I spoke other than today would have been October 26th of 2004, when they brought you from Vandalia. You were in Vandalia, right?
A. **Uh-huh.**
Q. Brought you from Vandalia, a women's penitentiary, to the Jackson County Jail, correct?
A. **Yeah.**
01:54PM Q. Okay, and on that day I just asked you to tell me the truth about what you knew about this incident, correct?
A. **Yes.**
Q. And you told me you had no memory of Keith Carnes shooting at anybody? Is that correct?

A. **Correct.**
Q. You told me that for the month of October of 2003, you don't remember much of anything because you were using crack cocaine for a solid month every day?
A. **Yes.**
Q. And that you didn't remember anything about that incident because during the month of October of 2003, you probably only slept one week in that 01:54PM entire month? Is that correct?
A. **Correct.**
Q. You also told me that you remember hearing gunshots that day, but you don't remember anything about seeing Keith shoot at anybody, correct?
A. **Correct.**
Q. Okay. You also told me that you had been suffering from some mental health issues? Is that correct?
A. **Correct.**
Q. That you had bipolar disorder?
01:55PM A. **Bipolar schizophrenic paranoia.**
Q. Okay. I was going to get into that. Okay. That you had schizophrenia, which is a multiple personality disorder?
A. **Yes.**
Q. And that you heard voices?

A. **Yes.**
Q. And that when you were using crack, you became delusional and thought you saw things that you really didn't see?
A. **Correct.**
Q. And at the time in October of 2003, you were using crack extensively to drown out the voices in your head?
A. **Yes.**
01:55PM Q. Okay. Do you remember telling me that you thought that the shooting that the police were talking to you about occurred in the daytime?
A. **No, I don't remember.**
Q. Don't remember telling me that.
Do you remember telling me that your street name back at the time was Dollar Bill?
A. **Yes.**
Q. Okay, and that you acquired the name of Dollar Bill because of your ability to make money by selling 01:56PM drugs?
A. **By selling drugs, no.**
Q. By using drugs? How did you get the name "Dollar Bill"?
A. **It's I didn't let the money make me. I made it.**
Q. Okay.

A. **And I was good at making money.**
Q. All right.
A. **And if somebody was hungry or somebody needed some clothes or even they wanted drugs, I would buy drugs for them and let them smoke it. You know what I'm saying?**
Q. All right. So you had an ability to make money. Were you also-- And I'm not trying to offend you. I just want to go over the stuff that we talked 01:57PM about.
A. **You can't. You can't offend me.**
Q. All right. You were also prostituting in that area, correct?
A. **Yes.**
Q. Okay, and the statement that the prosecutor just had you go over, in that statement on the second page at the top, this paragraph right there, do you recall-- I mean obviously you don't recall, but in there, it says, "That's when a trick pulled up and 01:58PM went up the street. I followed him"--
A. **Okay. What line?**
Q. We're like four lines down and I'm going to read it to you. "That's when a trick pulled up and went up the street and I followed him. I followed fast because that's when the gunshots started like pow,

pow, pow. Me and Delisa tried to jump into the car, but he wouldn't let Delisa in and then when I looked back, I saw Tre on the porch."

Do you even recall making that statement at all?

A. **No.**

Q. You indicated earlier that at the time, you were wanted by the police?

A. **Yes.**

01:58PM Q. And you had warrants for your arrest?

A. **Yes, I did, at the time.**

Q. And when the police officers brought you in, you said in answering the prosecutor's questions that for all you know, they could have coerced you into making the statement?

A. **That's what I said. They could have.**

Q. Okay, and you also indicated that you know you had warrants, correct?

A. **Yes.**

01:59PM Q. They took you in?

A. ***(The witness nodded her head.)***

Q. *Yes?*

A. **Yes.**

Q. They had you sign a statement that you don't remember ever signing?

33

A. **No.**

Q. And then instead of arresting you on those warrants, they took you back to a park, let you go, and gave you $5?

A. **Yeah.**

Q. Would you say that they did that because you had given them something that they wanted?

MS. PARSONS: Objection. That calls for speculation.

01:59PM THE COURT: Excuse me. Approach the bench.

*(Counsel approached the bench and the following proceedings were had.)*

THE COURT: Let me make myself clear. I don't ever allow speaking objections. You do it at the bench.

MS. PARSONS: I'm sorry, sir.

Objection. That question calls for speculation on behalf of this witness, what do you

01:59PM think the police wanted.

MR. TONEY: Well, Your Honor, I think she could testify as to--

THE COURT: Wait just a minute. Respond to the objection.

MR. TONEY: I don't think it calls for her

34

to speculate. I think she can testify about-- I'll rephrase the question and ask her if the police asked her anything when they gave her the $5 when they let her off.

THE COURT: The objection is sustained.

MR. TONEY: All right. Thank you.

*(The proceedings returned to open court.)*

Q. (By *Mr. Toney*) Felicia, do you-- I'm sorry. Miss Jones, I don't want to disrespect you. Do you

02:00PM remember the police saying anything to you when they gave you the $5?

A. **No. They didn't say anything. I just got out. Well, no.**

Q. So would it be fair to say, Felicia, that you don't actually remember anything about any facts of that shooting that night?

A. **No, I don't.**

Q. And you're not here telling the ladies and gentlemen of the jury that you saw Keith Carnes

02:01PM shoot Larry White, are you?

A. **No. I didn't.**

Q. Okay.

MR. TONEY: I don't have any other questions.

MS. PARSONS: No redirect, Your Honor.

35

THE COURT: Thank you. You may step down.

*(Witness excused.)*

36

Case 4:23-cv-00278-RK Document 139-29 Filed 09/09/24 Page 9 of 10

**REPORTER'S CERTIFICATE**

I, Patricia A. Manners, Certified Court Reporter, certify that I am the official court reporter for Division 11 of the Sixteenth Judicial Circuit of Missouri, at Kansas City, Missouri; that on Tuesday, April 19, 2005, I was present and reported all of the proceedings in Division 70 in STATE OF MISSOURI, Plaintiff, vs. KEITH L. CARNES, Defendant, Case No. 16CR03006321. I further certify that the foregoing 36 pages contain a true and accurate transcription of the proceedings regarding the testimony of Felicia Maria Jones.

____________________

Patricia A. Manners, CCR 320

Prepared July 22, 2005 on behalf of Mr. Willis Toney.

Copy ordered 8/23/05 by Ms. Dawn Parsons. Copy prepared 8/26/05. ($37.00)