## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| KEITH CARNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 23-cv-00278-RK |
| | ) | |
| ROBERT BLEHM, *et. al*, | ) | The Hon. Roseann A. Ketchmark |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO
## DEFENDANT McGOWAN'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ........................................................................................................1

PLAINTIFF'S RESPONSE TO DEFENDANT McGOWAN'S STATEMENT OF
UNDISPUTED MATERIAL FACTS .........................................................................1

PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS......................................10

ARGUMENT ............................................................................................................15

    I.     McGOWAN IGNORES THE STANDARD THAT APPLIES TO HER
         MOTION FOR SUMMARY JUDGMENT. ............................................15

    II.    McGOWAN IS NOT ENTITLED TO ABSOLUTE PROSECUTORIAL
         IMMUNITY FOR HER ACTIONS IN THIS CASE.................................16

    III.   WHETHER THE ACTIONS OF McGOWAN CAUSED MORROW TO
         TESTIFY FALSELY AT PLAINTIFF'S TRIAL IS A QUESTION OF FACT
         THAT MUST BE RESOLVED BY A JURY. ...........................................21

    IV.   McGOWAN HAS NOT SHOWN THAT QUALIFIED IMMUNITY SHIELDS
         HER FROM LIABILITY FOR HER ACTIONS IN THIS CASE. ......................22

    V.    STATE LAW OFFICIAL IMMUNITY AND COMMON LAW IMMUNITY
         DOES NOT SHIELD McGOWAN FROM THE CLAIMS IN THIS CASE.......24

    VI.   THE FINDINGS OF THE STATE COURT SPECIAL MASTER DO NOT
         BEAR ON WHETHER SUMMARY JUDGMENT SHOULD BE GRANTED IN
         McGOWAN'S FAVOR. ............................................................................25

CONCLUSION ........................................................................................................26

i

# TABLE OF AUTHORITIES

*McGhee v. Pottawattamie Cnty.,* 547 F.3d 922 (8th Cir. 2008) ...................................................19

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................................15, 20

*Brady v. Maryland*, 373 U.S. 83, 87 (1963) ...................................................................................24

*Buckley v. Fitzsimmons,* 509 U.S. 259 (1993) ...............................................................................18

*Burns v. Reed,* 500 U.S. 478 (1991) ...............................................................................................19

*Celotex v. Catrett*, 477 U.S. 317 (1986) ...................................................................................15, 19

*Barnard v. Jackson Cnty.,* 43 F.3d 1218 (8th Cir. 1995).............................................................22

*Cherne Contracting Corp. v. Marathon Petroleum Co.*, LLC, 578 F.3d 735 (8th Cir. 2009). .....16

*Coonley v. Fortis Benefit Ins. Co.*, 128 F.3d 675 (8th Cir. 1997). ...............................................15

*Coonley v. Fortis Benefit Ins. Co.*, 956 F. Supp. 841 (N.D. Iowa 1997) .....................................15

*Cox v. Mortgage Electronic Registration System, Inc.*, 685 F.3d 663 (8th Cir. 2012) ................23

*Fields v. City of Chicago,* 2014 WL 12778835 (N.D. Ill. April 29, 2014)................................. 26

*Graham v. Catamaran Health Sols. LLC*, 940 F.3d 401 (8th Cir. 2017) .....................................25

*Int'l Land Acquisitions, Inc. v. Fausto,* 39 Fed. Appx. 751 (3d Cir.2002)..................................26

*Lustgraaf v. Behrens*, 619 F.3d 885-86 (8th Cir. 2010) ................................................................25

*Martinez v. California*, 444 U.S. 277 (1980) ................................................................................22

*Mauzy v. Mexico Sch. Dist. No. 59,* 878 F. Supp. 153 (E.D. Mo. 1995). .....................................24

*Milwaukee & St. P.R. Co. v. Kellogg*, 94 U.S. 469 (1876) ...........................................................22

*Monroe v. Pape*, 365 U.S. 167 (1961) ...........................................................................................21

*Nipper v. Snipes,* 7 F.3d 415 (4th Cir. 1993) ................................................................................26

*Owen v. City of Independence*, 445 U.S. 622 (1980) .....................................................................21

*Price v. Montgomery Cnty., Kentucky*, 72 F.4th 711 (6th Cir. 2023)............................................19

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000)..........................................15, 21

*Slusarchuk v. Hoff,* 346 F.3d 1178 (8th Cir. 2003)......................................................................22

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) .............................................15, 21

*United States v. Brown*, 108 F.3d 863 (8th Cir. 1997)..................................................................23

*United States v. Consumer L. Prot., LLC,* No. 4:22 CV 1243 JMB, 2024 WL 379787, at *1 (E.D. Mo. Feb. 1, 2024) ........................................................................................................... 23

*United States v. Jones,* 29 F.3d 1549 (11th Cir. 1994) .................................................................26

*United States v. Sine,* 493 F.3d 1021 (9th Cir. 2007) ...................................................................25

*White v. Camden Cnty. Sheriff's Dep't,* 106 S.W.3d 626 (Mo. Ct. App. 2003) ........................... 24

*White v. Smith*, 696 F.3d 740 (8th Cir. 2012). ..............................................................................16

*Wilson v. Lawrence Cnty.*, 260 F.3d 946 (8th Cir. 2001) .............................................................23

*Woodworth v. Hulshof,* 891 F.3d 1083 (8th Cir. 2018). ......................................................... 18, 19

iii

Defendant Amy McGowan has filed a motion for summary judgment (ECF No. 140) contending that she is entitled to absolute prosecutorial immunity and qualified immunity on Plaintiff's claims against her for coercion, fabrication and concealment of witness testimony and that she is also protected from this suit by the state law doctrines of official and common law immunity.

These are the same arguments that Defendant McGowan advanced unsuccessfully in her Rule 12(b)(6) motion to dismiss. *See* Order on Motion to Dismiss (ECF No. 57), at pp. 10-15. They fare no better at the summary judgment stage. McGowan's motion does not even pause to recite the standard for summary judgment, much less does it acknowledge or address the disputes of fact that necessarily defeat her motion. The timing and nature of McGowan's interactions with witness Lorianne Morrow (the interactions upon which Plaintiff's claim against McGowan is based; *see* Complaint, ECF No. 1 at ¶¶ 46-52) are the subject of inconsistent testimony. Morrow's description of those interactions—which McGowan's motion does not address or even acknowledge—flatly contradict McGowan's own self-serving testimony. McGowan's motion for summary judgment must therefore be denied.

## PLAINTIFF'S RESPONSE TO DEFENDANT McGOWAN'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1. On October 6, 2003, Larry White was shot and killed. KCPD Defendants MSJ Exhibit B, Deposition of Keith Carnes, 18:3-5 ("Q. Okay. Larry White was shot and killed on October 6, 2003, correct? A. Yes.").

**RESPONSE:** Undisputed.

2. On October 14, 2003, around 2:30 p.m., Carnes was arrested for Larry White's murder. KCPD Defendants MSJ Exhibit T, KCPD investigative file pgs. Plaintiff 000222-000226.

**RESPONSE:** Undisputed.

3. Robert Blehm was the lead detective for the Larry White homicide investigation. KCPD Defendants MSJ Exhibit H, Keith Carnes v. Michele Buckner, Case No. 21PH-CV00030 and

1

Related Case No. SC98736, Master's Amended Final Report to the Missouri Supreme Court and Findings of Fact, February 10, 2022, pg. 102.

**RESPONSE:** Undisputed.

4. The day after Larry White was murdered, Defendants Huth and Begley acting on behalf of KCPD developed a lead and spoke with Wendy Lockett who indicated that she saw the shooting. Complaint, Keith Carnes v. Robert Blehm et al, 4:23-CV-00278-RK, ¶ 28-29.

**RESPONSE:** Undisputed that Huth and Begley spoke with Lockett and that she indicated she saw the shooting. Disputed that Huth and Begley "developed a lead" because that statement is not supported by the cited materials.

5. A family member of Larry White told KCPD Detective Robert Blehm that Lorianne Morrow witnessed the murder of Larry White, so Blehm talked to Morrow. KCPD Defendants MSJ Exhibit D, State of Missouri v. Keith L. Carnes, Case No. 16CR03006321, November 2005 trial transcript, testimony of Robert Blehm, 273:22-274:10 ("Q. Now, how did you develop Lorianne Morrow as a person to talk to? A. She was developed based on information we had gotten from another witness. Q. Was that other witness a family member of the deceased in this case? A. Yes. Q. And that family member indicated to you that Lorianne Morrow might know something about this case? A. Indicated that she had witnessed it. Q. That she had witnessed it. Okay. And then you went and talked to Lorianne Morrow? A. Yes.").

**RESPONSE:** Undisputed that Defendant Blehm so testified, but disputed in that a reasonable jury could conclude that Defendant Blehm and others conspired to develop false testimony from women known to frequent the area of the shooting and sought Morrow's testimony in furtherance of that conspiracy. This paragraph is further disputed to the extent that it is intended to imply that Blehm spoke with Morrow at an earlier time that Defendant McGowan. Morrow has testified that McGowan spoke with her before the police did. *See* PSOF ¶¶ 4-7.[1]

6. On October 15, 2003, a Jackson County, Missouri judge found probable cause to arrest Carnes for the murder of Larry White, based on the statement of probable cause completed by Avery Williamson. KCPD Defendants MSJ Exhibit S, 2003 Statement of Probable Cause.

**RESPONSE:** Undisputed.

---

[1] The citations to "PSOF" in these Suggestions are to the material facts in opposition to McGowan's motion for summary judgment at pp. 11-15, *infra*.

7. KCPD Detective Avery Williamson's statement of probable cause was based on Morrow's and Lockett's statement to detectives in that both stated they saw Keith Carnes shoot Larry White. KCPD Defendants MSJ Exhibit S, 2003 Statement of Probable Cause.

**RESPONSE:** It is undisputed that Williamson's statement of probable cause describes statements of Morrow and Lockett, but it is disputed that probable cause could properly be "based on" those statements; a reasonable jury could conclude that Williamson participated in a conspiracy to blame Carnes for the murder; that the statements of Morrow and Lockett were coerced and fabricated; and that Williamson wrote the statement of probable cause in furtherance of that conspiracy. *See* PSOF ¶¶ 4-7.

8. After the Kansas City Police Department ("KCPD") submitted the probable cause to the Prosecutors Office for charges to be filed Defendant Amy McGowan was the prosecutor who filed the charges submitted by KCPD. Exhibit 1 2024 Deposition of Amy McGowan, 35:25, 36: 1-8 ("Q. Do any of the suspects or potential suspects stand out in your independent recollection? A. There was only Keith Carnes, who was developed as a suspect. So – I mean, I remember you know, I remember the general facts of the case at the time. As, you know, once I was told I was a charging attorney, obviously, I remember that. But that's, you know, all I remember around the time of charging and the event.")

**RESPONSE:** Undisputed that Defendant McGowan filed charges after KCPD submitted a probable cause statement.

9. Defendant Amy McGowan filed charges against Keith Carnes in October 2003 for the homicide of Larry White but left the office in January 2005. Exhibit 1 2024 Deposition of Amy McGowan, 59:11-25, 60:1-25, 61:1-10 ("Q. Ms. McGowan, do you remember the time period you were involved in the Larry White murder prosecution? A. I-you mean- I don't know- you mean from the time of charging until I left the office or- Q. Yeah. Do you remember when the case was charged? A. I think it was October 2003. Q. Yeah. And did you remain on the case until you left the office? A. Well, there would have been an intermediate after charging, then it would go over to the warrant desk, where the grand jury attorney was located, and they would take it – all homicides went to grand jury. They would take it to grand jury, get it bound over on an indictment. Then it would come back to the main criminal floor and be assigned from there. And then it was assigned out from there. And then it was assigned to me, and I couldn't tell you when that was but….Q. Okay. And so I'll go a step at a time to make sure I've got it. You--you were the—you charged the— the—you charged—you made the charging decision as to Keith Carnes—A. Yes. Q. – correct? And if I remember from your testimony, you had—you were on call—you had the pager for charging in October 2003; correct? A. Yes. Q. Once Keith Carnes was indicted, the case would have been assigned to you; correct? A. It was assigned to me. It wouldn't necessarily be assigned to because I charged it. Q. And then you—

3

you continued to be the first chair until you left the office correct? A. Yes. Q. And you left the office in January 2005? A. It was near the end of January, yes.")

**RESPONSE:** Undisputed.

10. Defendant Amy McGowan in her practice would rely on the detectives to conduct investigation, arrest the suspect, and then come present the case to the prosecutor for charging. Exhibit 1 2024 Deposition of Amy McGowan, 72: 17-22 ("Q. I guess let me take a step back. In your practice working with homicide detectives, did it occur that the detectives would conduct the investigation, arrest the suspect, and then come and present the case? A. Yes.")

**RESPONSE:** Disputed that this was McGowan's practice; the cited materials support only that it "would occur" that detectives conducted the investigation, arrested the suspect, and then presented the case. McGowan also testified that, in her capacity as the homicide "charging attorney," she would monitor a "homicide pager" as police investigations were unfolding; would be in communication with the police investigators; and might have occasion to go to the scene of the homicide during the investigation. *See* PSOF ¶¶ 1-3; Ex.1 (McGowan Dep.) at 62-62; 67-68.

11. Defendant Amy McGowan followed this practice for the Larry White murder and relied on the information provided by KCPD in filing criminal charges against Keith Carnes. Exhibit 1 2024 Deposition of Amy McGowan, 283:1-5 ("Q. And in the course of the investigation you wouldn't even know the names of witnesses until charges are submitted from the cops? A. Right. Until the reports were given to me.")

**RESPONSE:** Disputed. A reasonable jury could conclude that Defendant McGowan participated in the investigation of Larry White's murder, spoke with witnesses and developed fabricated evidence to convict Carnes of that murder, and that she did so prior to Carnes being criminally charged. Lorianne Morrow has testified that McGowan "pulled up on" her on the street two or three days following the shooting; that Morrow told McGowan that the murder was committed by Reggie and Kiki; that McGowan told Morrow that if Morrow did not agree that Plaintiff committed the murder, she would be charged with drug possession; and that Morrow changed her account because she did not want to go to prison. Morrow testified that, shortly after, she also met with McGowan in McGowan's office and received further coaching as to what she had to say, as well

4

as additional threats as to the consequences of failing to go along with McGowan's pressure. Morrow testified that McGowan showed her photographs of Plaintiff and other individuals, as well as photographs of a house where shell casings were recovered to assist her in fabricating an account. In her most recent testimony, Morrow was clear that both meetings with McGowan occurred before she first spoke with police, and therefore it is a reasonable inference that McGowan interacted with Morrow prior to October 12, 2003, the date of her statement to police, and prior to October 14, the date police claimed to have probable cause to charge Plaintiff. PSOF ¶¶ 4-7. Dkt. 139-24 (Morrow Dep. Day One) at 26-31, 61-63; 77-80. Dkt. 139-25 (Morrow Dep. Day Two) at 10, 13-18; Ex 7 (Morrow 2021 Dep.) at 28-29; 38-44. Ex. 3 Morrow 10/3/14 Affidavit.

12. Defendant Amy McGowan was not involved with the Larry White murder until the KCPD presented her with the results of their investigation. Exhibit 1 2024 Deposition of Amy McGowan, 282: 9-13, 18-25 ("Q. And you wouldn't have known those names because you hadn't had filed charges until October 14? A. Right. But I don't even know if they had spoken to the police yet. I don't—I don't know. Q. Were there ever times that you would go to the murder scene a day or two after the murder had happened and before charges were filed? A. No. Q. Likewise, did you ever meet with witnesses before charges were filed? A. No. Because that would be part of the investigation. We weren't involved in that.")

**RESPONSE:** Disputed. A reasonable jury could conclude that Defendant McGowan participated in the investigation of Larry White's murder, spoke with witnesses and developed fabricated evidence to convict Plaintiff of that murder, and that she did so prior to Plaintiff being criminally charged, as set forth in Plaintiff's response to paragraph 11, above. PSOF ¶¶ 4-7.

13. Defendant Amy McGowan did not talk to any witnesses prior to making a charging decision in homicide cases. Exhibit 1 2024 Deposition of Amy McGowan, 104: 20-24 ("Q. Can you recall any case where you talked to witness – any homicide case at Jackson County where you talked to a witnesses prior to making a charging decision? A. No. that wouldn't happen.") KCPD Defendants MSJ Exhibit K Keith Carnes v. Michele Buckner, Case No. 21PH-CV00030 and Related Case No. SC98736, Trial Trancript testimony of Robert Blehm 489:15-21 ("Q. Is there any indication in your reports that Amy McGowan ever told witnesses who the shooter was? A. No. Q. And there wouldn't be? A. No. Absolutely not. Q. Because this is so outside the practice you followed? Yes.")

5

**RESPONSE:** Disputed. A reasonable jury could conclude that Defendant McGowan participated in the investigation of Larry White's murder, spoke with Lorianne Morrow and developed fabricated evidence to convict Plaintiff of that murder, and that she did so prior to Plaintiff being criminally charged, as set forth in Plaintiff's response to paragraph 11, above. PSOF ¶¶ 4-11.

14. Defendant Amy McGowan followed this practice for the Larry White murder and did not speak with any witnesses until after she was presented with the results of KCPD's investigation and had filed charges against Keith Carnes. Exhibit 1 2024 Deposition of Amy McGowan, 282: 9-13, 18-25, 283:1-5 ("Q. And you wouldn't have known those names because you hadn't had filed charges until October 14? A. Right. But I don't even know if they had spoken to the police yet. I don't—I don't know. Q. Were there ever times that you would go to the murder scene a day or two after the murder had happened and before charges were filed? A. No. Q. Likewise, did you ever meet with witnesses before charges were filed? A. No. Because that would be part of the investigation. We weren't involved in that. Q. And in the course of the investigation you wouldn't even know the names of witnesses until charges are submitted from the cops? A. Right. Until the reports were given to me.")

**RESPONSE:** Disputed. A reasonable jury could conclude that Defendant McGowan participated in the investigation of Larry White's murder, spoke with Lorianne Morrow and developed fabricated evidence to convict Plaintiff of that murder, and that she did so prior to Plaintiff being criminally charged, as set forth in Plaintiff's response to paragraph 11, above. PSOF ¶¶ 4-11.

15. Defendant Amy McGowan did not go to the crime scene until after charges had been filed in preparation for trial and did not speak to any witnesses at the crime scene. Exhibit 1 2024 Deposition of Amy McGowan, 146: 9-19 (Q. Okay. And I think, according—if I understood your testimony correctly, you would have no reason to be at the homicide scene in the precharging stage in this instance. Is that correct? A. On this case, no, I was not out there. Q. When you went out to the scene, did you talk to any witnesses there? A. Did— when I—no. I think it was just to drive around to get an idea of where everything was.")

**RESPONSE:** Disputed. A reasonable jury could conclude that Defendant McGowan participated in the investigation of Larry White's murder, spoke with Lorianne Morrow in the neighborhood where the crime occurred and developed fabricated evidence to convict Plaintiff of that murder, and that she did so prior to Plaintiff being criminally charged, as set forth in Plaintiff's response to paragraph 11, above. PSOF ¶¶ 4-11.

16. Defendant Amy McGowan's practice would be to review and rely on evidence provided by police and would review all police reports prior to charging. Exhibit 1 2024 Deposition of Amy McGowan, 147: 20-25, 148: 1-5 (Q. Okay. And that would have been based on the evidence that the police had provided you at that time about probable cause; correct? A. It would be their reports, yes. Q. And so before charging Mr. Carnes, you would have reviewed all the reports that the police had brought to you; correct? A. I cannot remember, but I not—myself, I did not charge on an affidavit along. I wanted the supporting reports. So I would make the assumption that they did.")

**RESPONSE:** Undisputed that Defendant McGowan testified that this was her practice. This paragraph is disputed to the extent that it is offered to support an inference that McGowan did not participate in the investigation by speaking with Lorianne Morrow prior to Plaintiff being criminally charged and developing fabricated evidence to convict Plaintiff of that murder, as set forth in Plaintiff's response to paragraph 11, above. PSOF ¶¶ 4-7.

17. Defendant Amy McGowan was not involved in any way in the investigation of the Larry White homicide and relied on police officers to investigate and determine probable cause which was then sent to the prosecutor's office for charging. KCPD Defendants MSJ Exhibit L 2024 Deposition of Robert Blehm, 41:17-25, 41: 1 ("Q. Do you remember any interactions with the prosecutor Amy McGowan during the White homicide investigation? A. I think I submitted my probable cause affidavit to her but that would have been – that would have been about it. Q. You don't remember any interactions with her other than maybe giving her the probable cause affidavit? A. No.") Exhibit 1 2024 Deposition of Amy McGowan, 287:9-12 ("Q. Going back to what is probable cause, is probable cause determined by the cops? A. Yes, they make their determination.") KCPD Defendants MSJ Exhibit R 2024 Deposition of Doug Niemeier, 239: 4-11 ("Q. Yeah. Is it fair to say that Amy McGowan, do you ever – do you independently recollect Amy McGowan controlling the investigation into the homicide? A. Like controlling when we were doing it? No, no. Not when we were controlling – like when we were working it? No. I don't remember that.") KCPD Defendants MSJ Exhibit N 2024 Deposition of Vernon Huth, Jr., 59: 13-16, 259: 25, 260: 1-4 ("Q. All right. Now, do you recall interacting with any prosecutor relative to the White homicide investigation? A. No, not independently, no. Q. Do you have any independent recollection other than what you testified today of Amy McGowan's involvement at all in the investigation of the White homicide? A. No sir.") KCPD Defendants MSJ Exhibit K Keith Carnes v. Michele Buckner, Case No. 21PH-CV00030 and Related Case No. SC98736, Trial Trancript testimony of Robert Blehm 488: 21-25, 489: 1-12 , 503: 23-25, 504: 1 ("Q. And I'm just going to put it out there you know one of the questions I'm going to ask about. Did you take those witnesses to Amy McGowan at any point in time for her to tell them who the shooter was? A. No. That wouldn't be something we would do in any case, much less this one. Prosecutor contact, or any type of consultation or advisory, that's not going to take place in the early steps of an investigation unless there is maybe a search warrant that you need to file an affidavit or possible, I guess, if you had enough for an arrest warrant. But until we have a case that's pretty much either ready to file a probable cause statement on or there is

some legal thing that is outside of our normal court of business, we're not going to consult with the prosecuting attorney. That's somebody we present our case to, not consult how to investigate it necessarily. Q. Okay. So it's fair to say that you wouldn't keep the prosecutor abreast of all the updates going on with the investigation of the case? A. Yes.")

**RESPONSE:** Disputed. A reasonable jury could conclude that Defendant McGowan participated in the investigation of Larry White's murder, spoke with Lorianne Morrow and developed fabricated evidence to convict Plaintiff of that murder, and that she did so prior to Plaintiff being criminally charged, as set forth in paragraph 11, above. PSOF ¶¶ 4-11.

18. Defendant Amy McGowan did not coerce, bribe, or offer drugs to witnesses Wendy Lockett, Lorianne Morrow, Felicia Jones or Margot Thomas to testify in the case against Keith Carnes. Exhibit 1 2024 Deposition of Amy McGowan, 279:3-17, ("Q. Did you ever coerce or bribe Wendy Lockett? A. No. Q. Did you ever coerce or bribe Felicia Jones? A. No. Q. Did you ever coerce or bribe Lorianne Morrow? A. No. Q. Did you ever coerce or bribe Margo Thomas? A. No. Q. And, likewise, for all those individuals, did you offer them drugs in exchange for their testimony? A. No.")

**RESPONSE:** Disputed: Morrow, Jones, and Thomas have testified or sworn statements and declarations saying otherwise. Dkt. 139-29 (Jones 2005 trial testimony) at 8:6-14; 21:20-22:15; 29:23-30:15; Dkt. 139-24 (Morrow 5/31/24 Dep.) at 26:13-32:4, 60:21-63:15, 71:13-79:22; Dkt. 139-25 (Morrow 6/5/24 Dep.) at 10:8-19:10; 18:13-18; 64:1-14; Ex. 3 (Morrow 10/3/2014 Affidavit); Ex. 4 (Margo Thomas 2015 Interview).  PSOF ¶¶ 4-11.

19. Defendant Amy McGowan was not the prosecutor who prosecuted the case against Keith Carnes and had no involvement in the case after she left the Jackson County Prosecuting office in January 2005. Exhibit 1 2024 Deposition of Amy McGowan, 289:24-25, 290: 1- 2 ("Q. I think I'm finished, but just to be clear for the record, you were not the prosecutor involved in either of Keith Carnes convictions; correct? A. His trials? Q. Yes. A. No, I wasn't.")

**RESPONSE:** Undisputed.

20. Morrow testified at Carnes' criminal trials, and consistently testified, she saw Keith Carnes murder Larry White. KCPD Defendants MSJ Exhibit X, State of Missouri v. Keith L. Carnes, Case No. CR03-00321, April 19, 2005 testimony of Lorainne Morrow, 8:22-9:5 ("Q. Okay. So you're walking down 29th, you see Larry, you see the defendant, and you had just said you heard the defendant hollering at Larry? A. Yes, ma'am. Q. We'll get to this later with the photos. You hear him hollering. What's the next thing you see? A. Well, next time, next thing I see him chasing him, jumping off the porch, chasing him with that gun over there."), 10:1-3

8

("Q. As he was running, what was he doing? The defendant. A. Shooting."); KCPD Defendants MSJ Exhibit D, State of Missouri v. Keith L. Carnes, Case No. 16CR03006321, November 2005 trial transcript, 113:23-114:4 ("Q. Out of the apartment. Okay. We're at the point where Larry is selling to people in cars. What's the next thing that you remember? A. The next thing I remember is him telling Larry that he is on his territory and he couldn't sell drugs out there, and then they were arguing and he started to pursue, chasing him."), 132:5-8 ("Q. Which person shot these three shots? A. Kiki didn't shoot. Tre shot the gun. Kiki did not shoot."), 116:9-10 ("Q. Who did you know out there? A. I know Wendy…").

**RESPONSE:** Undisputed that Morrow so testified at the criminal trials. It is disputed that Morrow has "consistently testified" that Plaintiff murdered Larry White to the extent that phrase is intended to suggest or imply that Morrow adhered to that account after Plaintiff's conviction. Beginning on October 3, 2014, Morrow has consistently testified that Plaintiff did *not* commit the crime. Dkt. 139-24 (Morrow 5/31/24 Dep) at 26-31; Ex. 7 (Morrow 2021 Dep. at 28-29; 38-44; Ex. 3 (Morrow 10/3/14 Affidavit).

21. The family of victim Larry White offered money to Lorianne Morrow if she would identify Keith Carnes as the murderer of Larry White. KCPD Defendants MSJ Exhibit W2 2024 Deposition of Lorianne Morrow, 115: 14-16, 123: 12-15 ("Q. Okay. So Larry White's family did offer you money to identify Keith? A. Yes. Q. And I believe you also indicated that you had pressure from the White Family to point the finger at Keith, correct? A. Correct.")

**RESPONSE:** Disputed. In addition to the testimony cited in this paragraph, Morrow also testified that Larry White's family never told her she should identify Plaintiff as the shooter; never offered to pay her money if she identified Plaintiff; and never caused her to feel threatened in relation to the murder of Larry White. Dkt. 139-24 (Morrow 5/31/24 Dep) at 58-59.

22. Reggie Thomas threatened the life of Lorianne Morrow in court during her testimony in which she implicated Keith Carnes in the murder of Larry White. Exhibit 2 Deposition Testimony of Lorianne Morrow Keith Carnes v. Michele Buckner, Case No. 21PH- CV00030 and Related Case No. SC98736, 2021 53:9-13, 54: 23-25, 55:2-9 ("Q. Now, you said Reggie was in the gallery when you testified, right, in Court? A. Yes. Q. And was he looking at you? A. Yes. Q. How would you describe the way he was looking at you? A. He had this mean look at me. It was like a mean look. You know how a person who sat there and staring, like you better not say this, and you better -- it better not come out of your mouth, this is what is going to be done, and this is what --this is going all to be said. I don't know if they was working together or -- you know, the prosecutor and him was working together, I don't know, but it was just like, why he never got caught. Q. Did he have his finger like a knife and like did a cutting motion

9

across the throat? A. It was like his hand was straight and just going across his neck. Q. Like he had a knife and cutting your throat? A. Yeah, yeah. Q. Is that the way you interpreted it? A. Yes. Q. Did you interpret that as a death threat? A. Yes.")

**RESPONSE:** Undisputed that Morrow testified to Thomas's behavior as set forth in the quotations in this paragraph. The inference from the cited testimony that Thomas "threatened the life of Lorianne Morrow" is disputed. Inferences must be drawn in favor of the non-moving party at the summary judgment stage.

23. On November 22, 2005, Judge Gene Martin convicted Carnes of first-degree murder and armed criminal action for the murder of Larry White. KCPD Defendants MSJ Exhibit D, November 2005 trial transcript, 487:7-15 ("I find the defendant, beyond a reasonable doubt, guilty of murder in the first degree. I also find beyond a reasonable doubt in connection with that murder in the first degree that it was done with the use, aid, and assistance of a deadly weapon, namely, a gun, and that he is guilty beyond a reasonable doubt of the offense of armed criminal action.").

**RESPONSE:** Undisputed.

24. The Honorable William E. Hickle, in his role as Special Master for the Missouri Supreme Court, reviewed actions of Amy McGowan in her role as a prosecutor relating to this prosecution and conviction of Keith Carnes and stated that "[t]he Master does not believe that Ms. McGowan engaged in any prosecutorial misconduct in this case." KCPD Defendants MSJ Exhibit H Master's Final Amended Report to the Missouri Supreme Court and Findings of Fact pgs. 97-98, Case No.21PH-CV00030, and Related Case No. SC98736.

**RESPONSE:** It is undisputed that the findings of Special Master Hickle included the quoted language. The truth of the Special Master's finding as to McGowan is disputed and may not be judicially noticed. That finding constitutes inadmissible hearsay.

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

1. Defendant Amy McGowan was the "charging attorney" in relation to the investigation and charging of Plaintiff for the murder of Larry White. Ex. 1 (McGowan 7/18/24 Dep.) at 34:5-23.

2. Morrow has no independent memory of the investigation that led to the charging of Plaintiff. *Id.* at 34:11-21.

3.      In general, as "charging attorney" in a homicide investigation, McGowan would have carried a "homicide pager" and would have been in touch with detectives as they investigated homicides. *Id.* at 61:22-62:8. Detectives would keep her apprised of ongoing developments, including testing of evidence and witness information. *Id.* at 63:5-18. Her involvement might include going to the scene of a homicide as the scene was being processed. *Id.* at 67:13-68:9.

4.      According to the testimony of Lorianne Morrow, days after the shooting, Defendant Amy McGowan "pulled up on her" and others who were on the street in the neighborhood where the murder of Larry White occurred. McGowan told Morrow that Plaintiff did the shooting. Morrow responded that she had seen Reggie and Kiki commit the crime. McGowan had a mug book and a photo of Plaintiff. McGowan said that it was Plaintiff who did the shooting and threatened Morrow with jail time if she did not say that Plaintiff was the shooter. Dkt. 139-24 (Morrow 5/31/24 Dep.) at 26:13-28:2; 60:21-63:15; 71:13-79:22.

5.      Morrow also spoke with McGowan in McGowan's office. In that meeting, McGowan displayed a photograph of Plaintiff to Morrow and told her that this was the person who did the shooting. Morrow again said that Reggie and Kiki were the shooters. McGowan told Morrow that Plaintiff was a big drug dealer and that they wanted him off the streets. McGowan threatened Morrow with jail time; said she would "plant drugs" on Morrow; and said that Morrow would lose her kids if Morrow did not agree that Plaintiff was the shooter. Dkt. 139.24 (Morrow 5/31/24 Dep.) at 30:16-31:31:12.

6.      In response to McGowan's threats, Morrow "did what [she] was told to do" and identified Plaintiff as the shooter. In Morrow's words: "She [referring to McGowan] said to me, 'If you don't say this [*i.e.,* that Plaintiff was the shooter], I will plant drugs on you. You will go

to jail.' And I have never been in jail in my life. And I was scared, so I did what I was told because I had—at the time I had seven children." Morrow told police detectives that Plaintiff was the murderer because she had agreed with McGowan that she would say that, and because she was afraid. McGowan showed Morrow a photograph of a house and told her that that was the location where shell casings had been found, a fact that Morrow did not previously know. Dkt. 139-24 (Morrow 5/31/24 Dep.) at 28:25-32:4; Dkt. 139-25 (Morrow 6/5/24 Dep.) at 10:8-19:10; 18:13-18; 64:1-14.

7.     Both of the two meetings described in the preceding three paragraphs occurred before Morrow first spoke with police regarding the crime. Dkt. 139-25 (Morrow 6/5/24 Dep.) at 21:10-19. Morrow estimates that she spoke with McGowan in McGowan's office between October 9 and October 12, 2003 (the date on which police interviewed her). *Id.* at 95:4-97:15. When Morrow spoke with police and said that Plaintiff did it, she said that because McGowan had told her that was what she should say and had threatened her. *Id.* at 63:6-12; 64:1-14.

8.     At her deposition, Morrow said that she did not feel threatened by the family of Larry White before or at the time of her trial testimony. According to Morrow, her earlier testimony that she had felt threatened by the family had been given in error, without understanding the question. *Id.* at 69:4-70:13.

9.     McGowan has no memory of Lorianne Morrow. She has no memory of meeting with Morrow and does not recall meeting one-on-one with Morrow, although McGowan acknowledges that that could have happened. *Id.* at 53:3-13; 283:6-16. Although McGowan does not recall the meeting, she believes that she was present when Willis Toney, Plaintiff's criminal trial counsel, spoke with Morrow. *Id.*

10. Margo Thomas was also a witness to the shooting of Larry White. McGowan testified in her deposition that, at the suggestion of one of the detectives, she met with Ms. Thomas at her home and spoke with her on her front porch. In that conversation, according to McGowan, Thomas said that Plaintiff was the shooter but was not willing to testify because she was fearful of retaliation. *Id.* at 40:18-42:20.

11. According to Thomas, McGowan provided Thomas with an eight ball of crack cocaine in exchange for Thomas agreeing to testify that Plaintiff was the shooter. Thomas disclosed this information in a January 2015 interview with Lathara Smith, Plaintiff's investigator, and Pastor Jacqueline Buycks, the assistant pastor at Thomas's church. Because she feared retaliation from McGowan, Thomas was unwilling to include this aspect of her interactions with McGowan in her transcribed statement detailing her interaction with McGowan. Ex. 4 (Margo Thomas 2015 Interview); Ex. 5 (Lathara Smith 1/10/20 Aff.); Ex. 6 (Jacqueline Buycks 4/3/20 Aff).

12. A prosecutor other than McGowan presented the evidence against Plaintiff to a grand jury, which indicted Plaintiff for the murder of Larry White on December 3, 2004. Following the indictment, McGowan was randomly assigned to serve as lead trial prosecutor of the case against Plaintiff. Ex. 1 (McGowan 7/18/24 Dep.) at 60:17-61:4; Ex. 8 (12/3/04 Indictment of Keith Carnes for Murder and Armed Criminal Action).

13. McGowan did not try the case against Plaintiff. She left the Jackson County Prosecutor's Office in January 2005. *Id.* at 61:5-10. Plaintiff's first trial took place in April 2005, some four months after McGowan left the Prosecutor's Office. Dkt 139-9 at 5. Plaintiff's trial had been scheduled for an earlier date when McGowan was still in the office, but McGowan

13

chose to dismiss the case and refile it, rather than going to trial, "because of the difficulty in finding witnesses." Ex. 1 (McGowan 7/18/24 Dep.) at 55:16-25.

14. McGowan has no memory of the discovery process in Plaintiff's criminal case. *Id.* at 55:8-12. As a general matter, McGowan did her trial preparation and spoke to witnesses for trial preparation purposes in the two to three weeks immediately before the trial. *Id.* at 39:6-20. It would not be "a common thing" for her to speak with a witness for trial preparation purposes months before the trial was scheduled to go. *Id.* at 39:21-40:9.

15. McGowan has also been accused of misconduct in other cases. McGowan handled the Jackson County prosecution of Ricky Kidd, whose convictions were overturned by the Circuit Court of DeKalb County based on a finding that McGowan failed to disclose material exculpatory evidence to the defense. Ex. 2 (Judgment Granting Writ of Habeas Corpus).

16. McGowan prosecuted Robert Grey in Douglas County, Kansas. Mr. Grey's conviction was overturned by the Kansas Court of Appeals because McGowan (1) failed to notify the defense that she had obtained evidence from an expert that was not included in the expert's report; (2) failed to disclose to the defense that the victim initially could not identify Grey as her attacker (even though she identified Grey at trial); and (3) argued improperly in closing argument. *State v. Grey,* 268 P.3d 1218 (Kan. 2012).

17. McGowan handled the sentencing hearing of Robert Peterson, whose sentence was reversed by the Kansas Supreme Court because McGowan made comments during the sentencing hearing that violated Mr. Peterson's plea agreement. The Kansas Supreme Court's opinion referred to four other cases in which McGowan was found to have made improper statements in closing argument. *State v. Peterson,* 293 P.3d 730, 738 (Kan. 2013).

18.     McGowan handled the Jackson County prosecution of Richard Buchli whose conviction for the beating death of his law partner was vacated based on a finding that McGowan had withheld exculpatory portions of a surveillance tape. *Buchli v. State,* 242 S.W.3d 449 (Mo. App. W.D. 2007).

## ARGUMENT

## I.     McGOWAN IGNORES THE STANDARD THAT APPLIES TO HER MOTION FOR SUMMARY JUDGMENT.

The standard that applies to motions for summary judgment is very familiar. The court may grant a motion for summary judgment only if "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). When it rules on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and must draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Id.* at 249.

Summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries. *Coonley v. Fortis Benefit Ins. Co.*, 956 F. Supp. 841, 843 (N.D. Iowa 1997), *aff'd by Coonley v. Fortis Benefit Ins. Co.*, 128 F.3d 675 (8th Cir. 1997). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000)). In sum, summary judgment should be granted only "where no

reasonable jury could find the facts necessary to entitle a plaintiff to relief." *Cherne Contracting Corp. v. Marathon Petroleum Co.*, LLC, 578 F.3d 735, 740 (8th Cir. 2009).

McGowan contends that she is entitled to various immunities because the misconduct that she is alleged to have committed occurred when she was acting in her prosecutorial capacity, evaluating the evidence for charging and preparing the case against Plaintiff for trial. McGowan insists that she only interacted with Lorianne Morrow and other witnesses after the investigation was complete and had determined that there was probable cause to charge Plaintiff.

To sustain this argument at the summary judgment stage, McGowan must ignore the evidence in the record that contradicts her theory. That approach is self-defeating. McGowan does not even pay lip service to the summary judgment standard. She proffers as "undisputed" the "fact" that she "was not involved in any way in the investigation of the Larry White homicide" (McGowan Br. at 7) and fails to make any mention of the testimony of Lorianne Morrow that, to the contrary, McGowan was on the streets in the days following the murder talking with witnesses and looking for evidence. A jury might credit McGowan's testimony over Morrow's but that is hardly a basis to grant summary judgment. As the Eighth Circuit has made clear, if a jury could rule either way, the case must be tried. *White v. Smith*, 696 F.3d 740, 756–57 (8th Cir. 2012).

## II. McGOWAN IS NOT ENTITLED TO ABSOLUTE PROSECUTORIAL IMMUNITY FOR HER ACTIONS IN THIS CASE.

The evidence in the summary judgment record includes the testimony of Lorianne Morrow that, just days after Larry White's October 6, 2003 murder, Defendant McGowan was in her car on the streets in the neighborhood where the shooting occurred looking for witnesses. PSOF, ¶ 4. She "pulled up on" Morrow and other witnesses and called Morrow over to her car. *Id.* She told Morrow that Plaintiff was the one who shot White; showed Morrow photographs of

16

Plaintiff and others; rejected Morrow's insistence that "Reggie and Kiki" were the shooters; and told Morrow she would face a drug case and lose her children if Morrow did not agree that Plaintiff committed the crime. *Id.*

According to her sworn testimony, Morrow had a second meeting with McGowan in her office a short time later. PSOF, ¶ 5. In that second meeting, McGowan reinforced the message from the earlier encounter: Morrow would have to agree that Plaintiff, not Reginald Thomas, shot Larry White unless she wanted to face drug charges and the possible loss of her children. *Id.* When Morrow told police in her October 12 statement that she saw Plaintiff shoot Larry White, she did so because McGowan had *previously* threatened and coerced into making a statement that she knew to be false and fabricated, but felt she had no choice than to provide. PSOF, ¶ 4-7.

McGowan professes to have no memory of her interactions with Morrow. PSOF, ¶ 9. She denies that she would have interacted with Morrow or any other witness prior to the police providing her with their "Statement of Probable Cause" on October 14, 2003, because, prior to that, she would not have known the witnesses' names. *See* Morrow SOF, ¶¶ 11, 14.

There is circumstantial and other evidence that undercuts McGowan's proposed factual inference. *First,* McGowan was the "charging attorney" in the investigation of Larry White's homicide, a role that enmeshed her in the police investigation. As charging attorney, it was common for McGowan to be in communication with the police investigators regarding the progress of the investigation *prior* to charging. PSOF, ¶ 1. In that role, McGowan might visit the crime scene. *Id.* She would receive information about witness development, among other things. PSOF, ¶ 3.

*Second,* although McGowan served as the trial attorney for the prosecution of Plaintiff for the White murder, she did not ultimately try the case. McGowan left the Jackson County

17

Prosecutor's Office in January 2005. PSOF, ¶ 13. Plaintiff's first trial was not until April of that year. McGowan testified that, because of limited resources, her practice was not to prepare witnesses for trial testimony until two to three weeks prior to a scheduled trial. *Id.* at ¶ 14. Thus, it would be inconsistent with McGowan's habit and practice for her to have had a conversation with Morrow for the purpose of trial witness preparation. She departed the Jackson County Prosecutor's Office months before Plaintiff's criminal trial.

*Third,* McGowan's self-serving testimony that she could not and would not have spoken with Morrow as part of the investigation is subject to impeachment based on McGowan's other bad acts. Another witness, Margo Thomas, reported to witnesses that McGowan furnished her with crack cocaine in an attempt to secure her false testimony that Plaintiff was the person who shot Larry White. *See* PSOF, ¶ 11. There are multiple judicial opinions finding that McGowan engaged in prosecutorial misconduct in other cases, including by concealing exculpatory evidence. *See id.*, ¶¶ 13-16.

As McGowan's brief acknowledges, courts apply a "functional approach" to determining whether a defendant is shielded from liability by absolute prosecutorial immunity. *See* Def. Mot. at 12. Prosecutorial immunity does not shield "investigatory functions that do not relate to the initiation of a prosecution or for judicial proceedings." *Woodworth v. Hulshof,* 891 F.3d 1083, 1089 (8th Cir. 2018). As the Supreme Court long ago explained, absolute immunity is not available to protect a prosecutor who fabricates evidence "during the preliminary investigation of an unsolved crime." *Buckley v. Fitzsimmons,* 509 U.S. 259, 275 (1993). And the Court clarified that "[a] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial." *Id.* Such a rule would enable a

18

prosecutor to claim immunity merely by ensuring that the innocent victim of their misconduct was put on trial. *Id. Accord McGhee v. Pottawattamie Cnty.,* 547 F.3d 922, 929 (8th Cir. 2008) ("Before the establishment of probable cause to arrest, a prosecutor generally will not be entitled to absolute immunity.").

*Price v. Montgomery Cnty., Kentucky*, 72 F.4th 711, 719 (6th Cir. 2023), the case on which McGowan principally relies is to the same effect. There, the prosecutor was deemed to have absolute immunity, but only because her participation in the destruction of evidence occurred after the defendant had been indicted and after the witness whose materials were destroyed had reached an agreement with trial prosecutors that they would testify. *Id.* at 717-18. Thus, at the pleading stage, this Court held that, unless McGowan could affirmatively show that her acts "occurred as a prosecutorial function instead of an investigative or administrative function," she was not entitled to the absolute immunity defense. 10/24/23 Order, ECF No. 57, at 12.

It is axiomatic that the prosecutor seeking absolute immunity must shoulder the burden of proving her entitlement to the defense. *Burns v. Reed,* 500 U.S. 478, 486 (1991) ("[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."); *Woodworth,* 891 F3d at 1089 (cited in the Court's prior order, ECF No. 57, at 12). At the summary judgment stage, this means that the prosecutor must show, in the language of Rule 56, that "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and the prosecutor is entitled to absolute immunity as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

McGowan cannot possibly sustain that burden here. She contends that she is entitled to absolute immunity because all her interactions with Morrow and other witnesses took place after Plaintiff was charged and in the run-up to trial. Morrow's testimony—which McGowan conspicuously ignores throughout her argument—throws that factual premise into dispute. According to Morrow, McGowan threatened her and fabricated her statement in the days immediately following the White murder and *before* Morrow had even spoken with police. Though she does not recall Morrow or anything about their interactions, McGowan contends that her habit and practice would have been to have no interaction with witnesses until she was in the process of trial preparation. But there is evidence to support a contrary inference: Among other things, McGowan herself acknowledged being the "charging attorney" in the White murder investigation, a role in which she would have been in communication with police and apprised of police development of potential witnesses. McGowan's later role as trial prosecutor was cut short long before Plaintiff's first trial, when McGowan left the Prosecutor's Office for a different position. Thus, it would have been contrary to her professed practice of only speaking with witnesses in the two to three weeks before trial for McGowan's meetings with Morrow to have occurred when McGowan was preparing for trial and functioning in the prosecutorial role, And, finally, McGowan's self-serving testimony will be undercut with evidence as to her pattern of misconduct.

In short, the facts are in dispute. Where the facts are disputed and where competing inferences are possible, the Court must defer to Plaintiff and consider the evidence in the light most favorable to him. Competing inferences from disputed facts must be resolved in Plaintiff's favor at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. To restate the obvious and well-worn principle: "Credibility determinations, the weighing of the evidence, and the drawing

of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d at 1042 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000)).

On this record, the doctrine of absolute prosecutorial immunity cannot shield McGowan from trial.

### III. WHETHER THE ACTIONS OF McGOWAN CAUSED MORROW TO TESTIFY FALSELY AT PLAINTIFF'S TRIAL IS A QUESTION OF FACT THAT MUST BE RESOLVED BY A JURY.

McGowan's next argument is that an alleged threat to Morrow from Reggie Thomas, the real perpetrator, and/or the offer of money from the victim's family were the actual cause of Morrow's false testimony implicating Plaintiff. *See* Def. Mot. at 26-27. If anything, this argument is less suited to summary judgment than the prior one.

Morrow has testified unequivocally that her statements to police implicating Plaintiff were the product of her fear that she would be charged with a crime and would lose her children. *See* PSOF, ¶ 6-7. Other factors may or may not have contributed to Ms. Morrow's false testimony.[2] But that cannot absolve McGowan from liability. Common law causation principles apply in § 1983 cases and under those principles, if the defendant official can reasonably foresee that their conduct will cause violations of constitutional rights, then § 1983 renders them liable. *Monroe v. Pape*, 365 U.S. 167, 187 (1961) holding that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions"); see also *Owen v. City of Independence*, 445 U.S. 622, 654 (1980) ("Elemental notions

---

[2] In an earlier proceeding, Morrow said that pressure from Larry White's family contributed to her decision to testify falsely. But in her deposition in this case, Morrow repudiated that testimony, explaining that she did not understand the question when she so testified. *See* PSOF, ¶ 8. The role, if any, that pressure from the White family might have played in connection with Morrow's testimony is obviously for the jury.

of fairness dictate that one who causes a loss should bear the loss."). Under established tort principles, if an injury is foreseeable, there may be liability. *Milwaukee & St. P.R. Co. v. Kellogg*, 94 U.S. 469, 475 (1876) (proximate cause requires "that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances").

If the injury was remote and unforeseeable, there may not be liability. *E.g.*, *Martinez v. California*, 444 U.S. 277, 285 (1980) (holding that parole officials are not responsible for injuries inflicted by a paroled prisoner that were not foreseeable). But that is a question for the jury to determine. *Cf. Barnard v. Jackson Cnty.,* 43 F.3d 1218, 1227 (8th Cir. 1995) (in a First Amendment case, summary judgment was improper; whether defendants acted with a motive to retaliate against the plaintiff for his speech was a jury question).[3]

In this case, weighing Morrow's own testimony that her fear that McGowan could make good on her threat caused her to falsely implicate Plaintiff in her police interview, a jury could reasonably determine that Morrow's later false testimony was a foreseeable consequence of McGowan's fabrication and coercion. Therefore, summary judgment may not be awarded on the theory that McGowan did not cause Morrow's false testimony.

## IV. McGOWAN HAS NOT SHOWN THAT QUALIFIED IMMUNITY SHIELDS HER FROM LIABILITY FOR HER ACTIONS IN THIS CASE.

McGowan's motion correctly recites the standard for qualified immunity: where the alleged constitutional right was not "clearly established" at the time of the defendant's actions, the defendant is entitled to immunity, even if their actions were unconstitutional. To overcome

---

[3] McGowan's cited case of *Slusarchuk v. Hoff,* 346 F.3d 1178 (8th Cir. 2003) is not on point. That case does not discuss causation principles, but merely holds that for "shocks the conscience" substantive due process liability, the defendant must act with a fixed intent to cause the injury plaintiff suffers. Such intent is absent in the case of a police chase in which the plaintiff is unintentionally injured.

22

the defense, the plaintiff must show both that the defendant violated the plaintiff's constitutional right *and* that the right in question was clearly established. *See* Def. Mot. at 17.

But McGowan's motion includes no argument whatsoever as to whether the fabrication of evidence that she is alleged to have engaged in was a constitutional violation and whether the right not to be convicted based on fabricated evidence was clearly established at the time.[4] Nor does McGowan address whether it violates the constitution to conceal evidence of witness coercion and fabrication and whether that right was clearly established. Therefore, McGowan must be found to have waived or forfeited any argument that she is entitled to qualified immunity. *See e.g., Cox v. Mortgage Electronic Registration System, Inc.*, 685 F.3d 663, 674-675 (8th Cir. 2012) (finding party waived argument by failing to "provide a meaningful explanation of the argument and citation to relevant authority in their opening brief"); *United States v. Brown*, 108 F.3d 863, 867 (8th Cir. 1997). ("Absent some reason for failing to raise an argument in an opening brief, this court will not consider an argument first raised in a reply brief."); *United States v. Consumer L. Prot., LLC, No. 4:22 CV 1243 JMB, 2024 WL 379787, at *1* (E.D. Mo. Feb. 1, 2024) (applying *Cox* and finding defendant waived argument by failing to develop it).

Even absent the waiver, there is clearly no basis for qualified immunity as to McGowan's fabricating Morrow's false identification of Plaintiff and coercing her to adhere to it. The Eighth Circuit held years prior to the events of this case that "[i]f officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated." *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 954 (8th Cir. 2001). Nor could McGowan contend that it was not

---

[4] Instead of developing a qualified immunity argument, McGowan repeats her arguments as to absolute prosecutorial immunity and as to causation. Those arguments are unavailing for the reasons set forth in the prior two sections.

clearly established at the time of this case that Plaintiff had a right to disclosure of the exculpatory information that Morrow's statement was fabricated and coerced—that right was firmly established decades before the events in this case. *See generally Brady v. Maryland*, 373 U.S. 83, 87 (1963). Thus, even if she had developed the argument, qualified immunity is not available to McGowan on the record of this case. McGowan's wrongdoing, if established, violated clearly established law.

## V.     STATE LAW OFFICIAL IMMUNITY AND COMMON LAW IMMUNITY DOES NOT SHIELD McGOWAN FROM THE CLAIMS IN THIS CASE.

Next, McGowan argues that she is entitled to summary judgment based on state law immunity doctrines. In the ruling on McGowan's motion to dismiss, this Court had no difficulty holding that state law "official immunity" and "common law immunity" cannot shield McGowan from the claims in this case. *First,* common law immunity at the state level is functionally equivalent to federal prosecutorial immunity. For the same reasons that McGowan's absolute immunity arguments fail, her claim to common law immunity is likewise foreclosed. *See* 10/24/23 Order, ECF No. 57, at 14 (citing *White v. Camden Cnty. Sheriff's Dep't,* 106 S.W.3d 626, 633 (Mo. Ct. App. 2003)). *Second,* official immunity is unavailable for discretionary acts "done in bad faith or with malice"—as is alleged against McGowan in this case. *See id.* at 14-15 (citing *Mauzy v. Mexico Sch. Dist. No. 59,* 878 F. Supp. 153, 156 (E.D. Mo. 1995). There is ample evidence in this case from which a jury could find that McGowan acted "in bad faith or with malice."

McGowan does not contend that this Court erred in its earlier analysis—indeed, she does not pause to acknowledge that ruling. And she offers no arguments in the present motion different from her earlier rejected contentions. This Court should hold that there is no basis to

depart from its earlier decision and should reject McGowan's claim to state law and official immunity.

## VI. THE FINDINGS OF THE STATE COURT SPECIAL MASTER DO NOT BEAR ON WHETHER SUMMARY JUDGMENT SHOULD BE GRANTED IN McGOWAN'S FAVOR.

Finally, McGowan quotes a finding of the Special Master assigned to make findings in Plaintiff's state court post-conviction proceedings that McGowan did not engage in prosecutorial misconduct. But McGowan offers the Court no argument and cites no authority as to how the Special Master's finding might bear on or warrant summary judgment in this case.

McGowan cited the same Special Master's finding in support of her motion to dismiss, but, as she does here, provided no argument or authority for using those findings in this case. In its order denying the motions to dismiss, the Court observed that, while it would be permissible to take judicial notice that the Special Master did make the findings McGowan cites, it is *not* permissible to take judicial notice of the *truth* of those findings. *See* 10/24/23 Order, ECF No. 57, at 12 n. 8 (citing *Graham v. Catamaran Health Sols. LLC*, 940 F.3d 401, 405 n.1 (8th Cir. 2017); *Lustgraaf v. Behrens*, 619 F.3d 885-86 (8th Cir. 2010) (district court abused its discretion to the extent it took judicial notice of the truth of the record's content as to a fact otherwise reasonably in dispute); Fed. R. Civ. P. 201(a) (federal courts may take judicial notice only of adjudicative facts)).

Thus, at summary judgment, the cited Special Master findings are clearly inadmissible and can have no bearing on the Court's decision. Those findings are hearsay and do not qualify for the public records exception in Fed. R. Evid. 803(8) or any other exception to the rule against hearsay. *United States v. Sine,* 493 F.3d 1021, 1035-36 1037 n.16 (9th Cir. 2007) (when offered for their truth, judicial opinions are hearsay; they do not fall under the public records

exception); *Int'l Land Acquisitions, Inc. v. Fausto,* 39 Fed. Appx. 751, 756–57 (3d Cir.2002) (a

state court judicial opinion is hearsay and does not fall within Rule 803(8)'s public records

exception); *United States v. Jones,* 29 F.3d 1549, 1554 (11th Cir. 1994) (judicial findings of fact

are hearsay and not within the public records exception); *Nipper v. Snipes,* 7 F.3d 415, 417 (4th

Cir. 1993) (same); *Fields v. City of Chicago,* 2014 WL 12778835, at *4 (N.D. Ill. April 29,

2014).

In sum, the Special Master's findings are no support for McGowan's request for

summary judgment.

## CONCLUSION

For the foregoing reasons, this Court should enter an order denying Defendant

McGowan's motion for summary judgment.

Respectfully submitted,

**KEITH CARNES**

By**:** /s/ Locke E. Bowman
*One of Plaintiff's Attorneys*

Joshua Loevy
Jon Loevy*
Locke Bowman*
Wally Hilke*
LOEVY & LOEVY
311 North Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Attorneys for Plaintiff
*Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2024, the foregoing was served on all counsel of record via the Court's e-filing system.

/s/ Locke E. Bowman