# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| KEITH CARNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 23-cv-00278-RK |
| | ) | |
| ROBERT BLEHM, *et. al*, | ) | The Hon. Roseann A. Ketchmark |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF KEITH CARNES'S RESPONSE TO THE KCPD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [139]

# <u>TABLE OF CONTENTS</u>

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ............................ 1

PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS .................................. 61

I.      Larry White is shot and killed on October 6, 2003 .......................................... 61

II.     Defendants are assigned to investigate the murder ......................................... 61

III.    Evidence identified by Defendants at the crime scene. ................................... 61

IV.     Defendants fabricate a statement from the victim's uncle to illegitimately obtain a
        search warrant. ........................................................................................ 62

V.      Police attempt to coerce an incriminating statement from Kermit O'Neal while
        interrogating an unidentified woman. ........................................................... 62

VI.     Fabricated statements and suppressed evidence regarding Wendy Lockett. ................... 63

        A.      Defendants interview Lockett on October 7, 2003. ............................... 63

        B.      Defendants suppress report(s) of Lockett's October 7, 2003 interviews. ............. 64

        C.      Defendants arrest Lockett on October 14, 2003 and fabricate a statement from
                her. ........................................................................................ 65

        D.      Because of the fabricated statement, Lockett gives false testimony at trial against
                Plaintiff. ................................................................................. 68

VII.    Fabricated statements regarding Lorianne Morrow. ........................................ 68

VIII.   Fabricated statements and suppressed impeachment evidence regarding Felicia Jones ... 69

IX.     Lockett, Morrow, and Jones's fabricated statements were contradicted by forensic and
        other evidence. ........................................................................................ 70

X.      Plaintiff is arrested and charged based on Defendants' fabricated evidence .................. 71

XI.     Other evidence is destroyed by Defendants ................................................... 72

XII.    Defendants should have continued investigating but instead stopped investigating or
        corroborating suspect alibis. ..................................................................... 72

XIII.   Defendant Kansas City Board of Police Commissioner's policies and practices
        contributed to Plaintiff's wrongful conviction ................................................ 74

XIV.    Defendant Kansas City Board of Police Commissioner's failure to regulate
        identification procedures led to systematic pressure of witnesses ........................... 76

i

XV.     Plaintiff is convicted but eventually overturns his wrongful conviction. ........................ 77

SUGGESTIONS IN OPPOSITION .................................................................................. 78

INTRODUCTION ............................................................................................................ 78

LEGAL STANDARD ....................................................................................................... 78

SUMMARY OF RELEVANT BACKGROUND ........................................................... 79

ARGUMENT ................................................................................................................... 83

I.      Plaintiff's suppression of evidence claim must be tried. ...................................... 83

        A.      A reasonable jury could conclude defendants suppressed evidence .................... 83

        B.      A reasonable jury could conclude the suppressed evidence was material ........... 85

        C.      Defendants' intent is a fact issue that must be tried ............................................ 87

        D.      Qualified immunity is unavailable .................................................................... 88

II.     Plaintiff's fabrication of evidence claim must be tried ........................................ 89

        A.      A reasonable jury could conclude Defendants fabricated evidence. .................... 89

        B.      A reasonable jury could find causation ................................................................. 93

        C.      Qualified immunity is unavailable ...................................................................... 94

III.    Plaintiff's reckless investigation claim must be tried. ........................................ 94

        A.      A reasonable jury could conclude defendants systematically pressured
                witnesses, failed to investigate leads, and ignored evidence. ............................... 95

        B.      A reasonable jury could conclude defendants' failures shock the conscience. .... 96

        C.      Qualified immunity is unavailable ...................................................................... 99

IV.     Plaintiff's Fourth Amendment claims must be tried ............................................ 99

        A.      Plaintiff's unlawful pretrial detention claim must be tried. ............................... 100

        B.      Plaintiff's federal malicious prosecution claim must be tried. ........................... 101

V.      Plaintiff's § 1983 conspiracy claim against the individual officers must be tried ......... 102

VI.     Plaintiff's *Monell* claims must be tried ............................................................. 103

A.    Legal standard. ...................................................................................... 103

B.    Failure to ensure disclosure of exculpatory evidence. ......................................... 104

C.    Failure to regulate confidential informants. ......................................................... 105

D.    Failure to regulate witness identifications and tolerance of witness coaching. ... 106

VII.  Plaintiff's state-law malicious prosecution claim must be tried. .................................. 107

VIII. Plaintiff's state-law conspiracy claim must be tried. ..................................................... 107

CONCLUSION ........................................................................................................... 107

# TABLE OF AUTHORITIES

*Akins v. Epperly*, 588 F.3d 1178 (8th Cir. 2009). .........................................................................94

*Albright v. Oliver*, 510 U.S. 266, 274 (1994). ............................................................................. 101

*Amrine v. Brooks*, No. 04-4300-CV-C-NKL, 2007 WL 436087 (W.D. Mo. Feb. 6, 2007)..........92

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).............................................................79, 85

*Arizona v. Youngblood*, 488 U.S. 51 (1988)................................................................................ 85

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015) ...............................................................85, 102

*Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201 (8th Cir. 2013) ....................................103

*Bagby v. Brondhaver*, 98 F.3d 1096 (8th Cir. 1996) ................................................................. 100

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397 (1997) ............................. 104

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................99, 104

*Bledsoe v. Carreno*, 53 F.4th 589 (10th Cir. 2022) ..................................................................101

*Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103 (8th Cir. 2016)..........................102

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................................................88

*Brockinton v. City of Sherwood,* 503 F.3d 667 (8th Cir. 2007)....................................................98

*Burton v. St. Louis Bd. of Police Comm'rs*, No. 10-cv-1540-TCM (E.D. Mo. May 29, 2012).... 98

*C.f. Ferguson v. Short*, No. 2:14-CV-04062-NKL(W.D. Mo. Aug. 14, 2015) ...............................

.................................................................................................................................... 91

*California v. Trombetta*, 467 U.S. 479 (1984). ...........................................................................89

*Celotex v. Catrett*, 477 U.S. 317 (1986). ...................................................................................78

*Colemon v. City of Cincinnati*, No. 21-5968, 2023 WL 5095804 (6th Cir. Aug. 9, 2023) ........105

*Cox v. Mortgage Electronic Registration System, Inc.*, 685 F.3d 663 (8th Cir. 2012) .90, 100, 102

*Dalmida v. Warden*, No. 17-cv-488, 2019 WL 1573206 (S.D. Ohio Apr. 11, 2019)................... 92

*Davis v. Dawson*, 33 F.4th 993 (8th Cir. 2022) ..........................................................................99

*Dunaway v. New York*, 442 U.S. 200 (1979). ..............................................................101

*Est. of Nash v. Folsom*, 92 F.4th 746 (8th Cir. 2024). ................................................100

*Fin. Timing Publ'ns, Inc. v. Compugraphic Corp.,* 893 F.2d 936 (8th Cir. 1990) ......................99

*Franks v. Delaware,* 438 U.S. 154 (1978) ..................................................................100

*Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) ...............................101

*Habiger v. City of Fargo*, 80 F.3d 289 (8th Cir. 1996) ..........................................100, 101

*Hedges v. Poletis*, 177 F.3d 1071 (8th Cir. 1999) .......................................................93

*Holmes v. Slay*, 895 F.3d 993 (8th Cir. 2018) ...................................................... 87, 102

*Ienco v. City of Chicago*, 286 F.3d 994 (7th Cir. 2002) ................................................89

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) ........................................ 105

*Kyles v. Whitley*, 514 U.S. 419 (1995) ..................................................................85

*Larson by Larson v. Miller*, 76 F.3d 1446 (8th Cir. 1996) ......................................... 102

*Manuel v. City of Joliet, Ill.*, 580 U.S. 357 (2017) ..................................................101

*Maryland v. Pringle*, 540 U.S. 366 (2003) ..........................................................88, 100

*Mayes v. City of Hammond*, 442 F. Supp. 2d 587 (N.D. Ind. 2006) ...........................105

*McGee v. Hester*, 724 F.2d 89 (8th Cir. 1983) ..........................................................87

*McKay v. City of St. Louis*, 960 F.3d 1094 (8th Cir. 2020) ........................................ 83

*Napue v. Illinois*, 360 U.S. 264 (1959) .................................................................94

*State ex rel. Carnes v. Buckner*, No. SC 98736, 2022 WL 1040070 (Mo. Apr. 5, 2022) ............86

*Stockley v. Joyce,* 963 F.3d 809 (8th Cir. 2020) .......................................................107

*Symington v. Daisy Mfg. Co.*, 360 F. Supp. 2d 1027 (D.N.D. 2005) ............................99

*Thelma ex rel. Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929 (8th Cir. 1991) .... 103

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). .................................79

Case 4:23-cv-00278-RK    Document 148    Filed 10/21/24    Page 6 of 115

*Turpin v. Cnty. of Rock*, 262 F.3d 779 (8th Cir. 2001). ............................................................100

*United States v. Agurs*, 427 U.S. 97 (1976) ................................................................93

*United States v. Brown*, 108 F.3d 863 (8th Cir. 1997). ........................................................88

*United States v. Dones-Vargas*, 936 F.3d 720 (8th Cir. 2019) ....................................86

*United States v. One 1989 Jeep Wagoneer*, 976 F.2d 1172 (8th Cir. 1992).................................87

*Villasana v. Wilhoit*, 368 F.3d 976 (8th Cir. 2004). ......................................................89

*Virgil v. City of Newport*, 545 F. Supp. 3d 444 (E.D. Ky. 2021) ......................................105, 106

*Washington v. Baltimore Police Dep't*, 457 F. Supp. 3d 520 (D. Md. 2020) ............................105

*Wearry v. Cain*, 577 U.S. 385 (2016) ........................................................83

*White v. McKinley*, 519 F.3d 806 (8th Cir. 2008)................................................89, 103

*White v. Smith*, 696 F.3d 740 (8th Cir. 2012) ............................................................79

*Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020) ..............................................101

*Wilson v. Lawrence Cnty.*, 260 F.3d 946 (8th Cir. 2001). ...........................................89

*Winslow v. Smith*, 696 F.3d 716 (8th Cir. 2012). .........................................................89

## OTHER AUTHORITIES

Charles Alan Wright et al, Federal Practice and Procedure § 2730 (4th ed. 2024)......................87

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS**

## A. Overview

1.  On October 6, 2003, Larry White was shot and killed. **Exhibit B**, Deposition of Keith Carnes, 18:3-5 ("Q. Okay. Larry White was shot and killed on October 6, 2003, correct? A. Yes.").

**Response:** Undisputed.

2.  In October 2003, Carnes was arrested for the murder of Larry White. **Exhibit B**, Deposition of Keith Carnes, 18:6-10 ("Q. Do you remember what month – A. Excuse me. Q. – month, day and year you were arrested for Larry White's murder? A. That same month. Same year.").

**Response:** Undisputed.

3.  In April 2005, Carnes was convicted of first-degree murder and armed criminal action by a jury for the murder of Larry White. **Exhibit B**, Deposition of Keith Carnes, 19:11-20 ("Q. You had a jury trial for the murder of Larry White in April of 2005, is that correct? A. If the record reflects that, yes. Q. Okay. You were charged with murder in the first degree and armed criminal – armed criminal action, is that correct? A. Yes. Q. Okay. Let me see. And you were convicted by a jury from your first trial? A. Yes.").

**Response:** Undisputed.

4.  Carnes's April 2005 jury conviction was overturned by the judge who presided over Carnes's April 2005 jury trial. **Exhibit C**, *State of Missouri v. Keith L. Carnes*, Case No. 16CR03006321-01, Order Ruling on Post-Trial Motions and Judgment, August 2, 2005.

**Response:** Undisputed.

5.  In his Order Ruling on Post-Trial Motions and Judgment, Judge William Mauer stated "[t]he Court finds that the Defendant was unfairly prejudiced at trial by the Court's failure to grant Defendant's motion to exclude the testimony of Wendy Lockett. This prejudice resulted not from any fault of the assistant prosecutor or Defendant's trial counsel, but as a result of the circumstances surrounding the appearance of the witness late in the trial. The Court finds that such prejudice requires that the Court set aside the jury's verdict and grant Defendant a new trial." **Exhibit C**, *State of Missouri v. Keith L. Carnes*, Case No. 16CR03006321-01, Order Ruling on Post-Trial Motions and Judgment, August 2, 2005

**Response:** Undisputed.

6.  In November 2005, Carnes had a second trial – this time it was a bench trial. **Exhibit B**, Deposition of Keith Carnes, 21:7-21 ("Q. Okay. So according to this document, it appears as if your second trial started on November 7, 2005, is that correct? A. Okay. Second—November— did you say 2nd or 7th? Q. 7th. A. Yes. Q. November 7th? A. Yes. I see that. Q. And it states here

1

that you waived a jury trial; is that correct? A. Yes. Q. And so you had a bench tried case, correct? A. Yes.").

**Response:** Undisputed.

7.   On November 22, 2005, Judge Gene Martin convicted Carnes of first-degree murder and armed criminal action for the murder of Larry White. **Exhibit D**, November 2005 trial transcript, 487:7-15 ("I find the defendant, beyond a reasonable doubt, guilty of murder in the first degree. I also find beyond a reasonable doubt in connection with that murder in the first degree that it was done with the use, aid, and assistance of a deadly weapon, namely, a gun, and that he is guilty beyond a reasonable doubt of the offense of armed criminal action.").

**Response:** Undisputed.

8.   On March 10, 2006, Carnes was sentenced to life without probation and parole for the first-degree murder conviction and life for the armed criminal action conviction, to run concurrently. **Exhibit. D**, *State of Missouri v. Keith L. Carnes*, Case No. 16CR03006321, November 2005 trial transcript, 565:21-25 ("…life imprisonment without probation and parole for the offense of murder in the first degree. The defendant is sentenced to a term of life imprisonment for the offense of armed criminal action. Those sentences shall run concurrently.").

**Response:** Undisputed.

9.   Carnes appealed his November 2005 convictions. **Exhibit B**, Deposition of Keith Carnes, 28:17-19 ("Q. You, or your attorneys, I should say, appealed your convictions from November 2005, correct? A. Correct.").

**Response:** Undisputed.

10. On October 2, 2007, the Missouri Court of Appeals for the Western District denied Carnes's appeal of his November 2005 convictions. **Exhibit E**, State of Missouri v. Keith L. Carnes, Case No. WD67426, Order, October 2, 2007.

**Response:** Undisputed.

11. After his appeal was denied, Carnes timely filed a petition for post-conviction relief. **Exhibit B**, Deposition of Keith Carnes, 29:19-22 ("Q. Okay. Thank you, Mr. Carnes. After – after your appeal was denied, you timely filed a petition for post-conviction relief, correct? A. Yes.").

**Response:** Undisputed.

12. On July 26, 2010, Carnes's petition for post-conviction relief was denied. **Exhibit F**, *Keith L. Carnes v. State of Missouri*, Case No. 0816-CV04757, Judgment on Motion for Post-Conviction Relief (Pursuant to Rule 29.15), July 26, 2010.

**Response:** Undisputed.

13. Carnes appealed the judgment denying his petition for post-conviction relief. **Exhibit B,** Deposition of Keith Carnes, 32:10-13 ("Q….And you or your attorney appealed the judgment denying your post-conviction relief, correct? A. Yes.").

**Response:** Undisputed.

14. On November 8, 2011, Missouri Court of Appeals for the Western District upheld the denial of Carnes's post-conviction relief. **Exhibit G**, *Keith L. Carnes v. State of Missouri,* Case No. WD72916, Order, November 8, 2011.

**Response:** Undisputed.

15. On September 17, 2020, Carnes filed a petition for writ of habeas corpus in the Missouri Supreme Court challenging his Jackson County convictions for first degree murder and armed criminal action related to the murder of Larry White. **Exhibit H**, *Keith Carnes v. Michele Buckner*, Case No. 21PH-CV00030 and Related Case No. SC98736, Master's Amended Final Report to the Missouri Supreme Court and Findings of Fact, February 10, 2022, pg. 1.

**Response:** Undisputed.

16. On December 22, 2020, the Missouri Supreme Court appointed the Honorable William Hickle as Master in Carnes's 2020 habeas corpus case. **Exhibit H**, *Keith Carnes v. Michele Buckner*, Case No. 21PH-CV00030 and Related Case No. SC98736, Master's Amended Final Report to the Missouri Supreme Court and Findings of Fact, February 10, 2022, pgs. 2, 116.

**Response:** Undisputed.

17. On September 23-24, 2021, an evidentiary hearing was conducted in Carnes's 2020 habeas corpus case, over which Judge Hickle presided. **Exhibit H**, *Keith Carnes v. Michele Buckner,* Case No. 21PH-CV00030 and Related Case No. SC98736, Master's Amended Final Report to the Missouri Supreme Court and Findings of Fact, February 10, 2022, pg. 2.

**Response:** Undisputed.

18. On February 10, 2022, Judge Hickle issued his amended factual findings in Carnes's 2020 habeas corpus case, and submitted those findings to the Missouri Supreme Court. **Exhibit H**, *Keith Carnes v. Michele Buckner*, Case No. 21PH-CV00030 and Related Case No. SC98736, Master's Amended Final Report to the Missouri Supreme Court and Findings of Fact, February 10, 2022, pg. 116.

**Response:** Undisputed.

19. On April 5, 2022, the Missouri Supreme Court granted Carnes's habeas relief. **Exhibit B,** Deposition of Keith Carnes, 35:1-4 ("Q. And this document appears to be the Missouri Supreme Court's decision granting your habeas relief on April 5, 2022, correct? A. Yes.); **Exhibit I**, *State*

3

*ex rel. Keith Carnes v. Michele Buckner, Superintendent, South Central Correctional Center,* Case No. SC98736, Order, April 5, 2022.

**Response:** Undisputed.

20. On April 7, 2022, the Jackson County, Missouri Prosecutor dismissed the criminal case against Carnes for the murder of Larry White. **Exhibit J**, *State of Missouri v. Keith Carnes*, Case No. 16CR03006321-02, Dismissal Order, April 7, 2022.

**Response:** Undisputed.

21. On April 11, 2022, Carnes was released from prison. **Exhibit B**, Deposition of Keith Carnes, 35:5-7 ("Q. Okay. And remind me again, what – what day were you released from prison? A. I believe April the 11th 2022.").

**Response:** Undisputed.

22. On April 26, 2023, Carnes filed this lawsuit. Complaint, Doc. No. 1.

**Response:** Undisputed.

### B. The Parties

#### (1) Plaintiff

23. On April 11, 2022, Carnes was released from prison for the murder of Larry White after serving eighteen years and seven months behind bars. **Exhibit B**, Deposition of Keith Carnes, 14:17-20 ("Q. How many years and months were you incarcerated for the murder of Larry White? A. I can't be exact, but I – 18 years and seven months is what I believe."), 35:5-7 ("Q. Okay. And remind me again, what – what day were you released from prison? A. I believe April the 11th 2022.").

**Response:** Disputed in part. Undisputed that Carnes was released from prison on April 11, 2022. Disputed to the extent that the calculation of length does not account for all pre-trial incarceration.

#### (2) Defendants – the Commissioners

24. Defendants Mark Tolbert, Cathy Dean, Dawn Cramer, and Quinton Lucas were all commissioners of the Kansas City, Missouri, Board of Police Commissioners at the time this suit was filed. Complaint, Doc. No. 1, ¶16, and Answer, Doc. No. 39, ¶16.

**Response:** Undisputed; Plaintiff refers to these Defendants collectively as "the Board."

25. Commissioner Madeline Romious was sworn in as a commissioner of the Kansas City, Missouri, Board of Police Commissioners on April 3, 2024; she replaced former Commissioner Mark Tolbert. **Exhibit A**, Aff. of Bethany Ruoff, ¶4.

4

**Response:** Undisputed.

26. Commissioner Ed Elder was sworn in as a commissioner of the Kansas City, Missouri, Board of Police Commissioners on June 12, 2024; he replaced former Commissioner Cathy Dean. **Exhibit A**, Aff. of Bethany Ruoff, ¶5.

**Response:** Undisputed.

### (3) Defendants – the Detectives and Officers.

27. From about 2002 to 2009, Defendant Doug Niemeier was a Kansas City, Missouri, Police Department (KCPD) homicide sergeant and supervised the homicide detectives working the Larry White murder investigation; he currently is a KCPD deputy chief. **Exhibit R**, 2024 Deposition of Doug Niemeier, 58:3-59:2 ("Q. Yes, sir. A. Started the police academy in '95. [ ] I was promoted to sergeant in 2001. Worked at east patrol. A year and-a-half, two years after that, I was sergeant, homicide sergeant of 1010. Was there for I believe it was late 2009, early 2010ish. [ ] And then I was promoted to deputy chief."), 13:8-12 ("Q. Do you have an independent recollection of your involvement in the Larry White murder investigation? A. I was – I was there. I was a supervisor of the 1010 squad.").

**Response:** Undisputed.

28. As a homicide sergeant, Niemeier's responsibilities generally were to oversee the 7-8 detectives who worked under him, assign a homicide case to a detective, review reports, and manage people. **Exhibit R**, 2024 Deposition of Doug Niemeier, 26:5-16 ("Q. As a 1010 squad sergeant, what were your responsibilities? A. I oversaw the – that unit or that squad. So I had at times eight detectives, seven detectives, kind of the overview of, of the squad. Q. And what were the activities you performed in overviewing the squad? A. Come to work every day, obviously, assign –when we had a homicide, I would be the person that assigned the case to a detective. I would review reports that they turned in, kind of manage people.").

**Response:** Undisputed.

29. As the supervisor, Niemeier would not review every single page of every single case file that his squad worked. **Exhibit R**, 2024 Deposition of Doug Niemeier, 36:5-11 ("Q. But you weren't necessarily reviewing every page of every case file to review the contents of the reports before submitted. Correct? A. I wouldn't review every—I would not review every single page of every single case file that my squad worked, no.").

**Response:** Undisputed.

30. When Niemeier assigned a homicide case to a detective, that detective would be the lead detective on that case. **Exhibit R**, 2024 Deposition of Doug Niemeier, 27:3-8 ("Q. And when you responded to the scene as a sergeant, what were your responsibilities on the scene? A. Again,

5

you managed – when I showed up, I would assign a detective. They would then become the lead detective of the case.").

**Response:** Undisputed.

31. Lead detectives worked the crime scene, attended hearings, submitted evidence to the lab for analysis, maintained the case file, made sure all reports were in the case file, and that all reports were given to the prosecutor. **Exhibit R**, 2024 Deposition of Doug Niemeier, 27:13-17 ("Q. And what were the responsibilities of the lead detective on a death investigation? A. Well, it's their responsibility then. They would work the crime scene, the initial scene."), 28:8-25 ("Q. And am I correct that one of the things a lead detective does is maintain the case file for the investigation? A. Yes. Q. It's their job to make sure that all the reports in an investigation get to a single place? A. Yes. Q. All the reports from the investigation should end up in the case's master file. Correct? A. Yes. Q. And then the master file should be provided to the prosecutor when the case is submitted. Correct? A. Yes. Q. And all the reports on the case should go to this prosecutor at that time. Correct? A. Yes."); **Exhibit K**, 2021 habeas testimony of Robert Blehm, 484:20-485:5 ("Q. How does that, would? A. You're on the squad with, obviously, other detectives and supervisor, but going to be the – you're going to maintain the file, kind of direct the tempo of the investigation. Most of the reports, if not all, should go through you. You're going to maintain that actual file. You're going to go to the hearings. You're going to –if there's a grand jury, you do that. You're going to take the crime scene, the report, submit for analysis evidence, stuff of that nature.").

**Response:** Undisputed.

32. In 1994, Defendant Robert Blehm started his KCPD employment, and at all relevant times, was the lead homicide detective for the Larry White homicide investigation; he retired as a sworn employee due to a work-related injury, and currently works as civilian employee as KCPD's Wellness Coordinator. Complaint, Doc. No. 1, ¶9; **Exhibit L**, 2024 Deposition of Robert Blehm, 91:11-92:21 ("Q. All right. Could you briefly, briefly walk me through the positions you've held with the Kansas City Police Department since you started your career here. A. Sure. I was hired in—I started the police academy in September of 1994, and I graduated the police academy in March of '95…And I went to 1010 homicide squad I believe in 2000, and I stayed there to 2010, 2011, somewhere in there, at which time I was retired in 2011 because of an on-duty injury in 1996…And then in 2020, I believe, I became the wellness supervisor, coordinator. And that's where I remain."), 16:13-17 ("Q. All right. Now, you, you at some point retired as a detective and became a civilian employee at the Kansas City Police Department. Correct? A. Yes."), 20:1-4 ("Q. Was it typical when you had – and you were the lead on Larry White's homicide investigation. Correct? A. Yes.").

**Response:** Undisputed.

33. Blehm was the lead detective for the Larry White homicide investigation. **Exhibit H**, *Keith Carnes v. Michele Buckner*, Case No. 21PH-CV00030 and Related Case No. SC98736, Master's Amended Final Report to the Missouri Supreme Court and Findings of Fact, February 10, 2022, pg. 102.

6

**Response:** Undisputed.

34. Blehm testified at Carnes's November 2005 bench trial for Larry White's murder. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, pgs. 252-288.

**Response:** Undisputed.

35. Defendant Steve Morgan started working for KCPD in 1994 and at all relevant times, was involved in the Larry White homicide investigation. Complaint, Doc. No. 1, ¶11; **Exhibit Q**, 2024 Deposition of Steve Morgan, 24:23-25:6 ("Q. You have a bachelor's degree? A. I do. Q. What – what's the – what did you receive you major in? A. Criminal justice. Q. Okay. And when did you receive that degree? A. 1993."), 25:17-19 ("Q. Okay. And subsequently you obtained a job with the Kansas City Police Department? A. Correct. I was hired in September of '94.").

**Response:** Undisputed.

36. As a KCPD homicide detective from 2001 to 2007, Morgan has some memory of working the Larry White homicide investigation, but he was not the case (or lead) detective, so he was not in charge of everything pertaining to that case; he currently works for the KCPD Intelligence Unit. **Exhibit Q**, 2024 Deposition of Steve Morgan, 25:23-26:24 ("Q. Okay. Could you walk me through as best you can the positions you've held in the Kansas City Police Department and the time period, as you go, that you've held those positions, please. A. [ ] Around 2001 I went –somewhere in 2001 I was assigned to the 1010 homicide squad for homicides. I was there till around 2007…around 2011 where I – I got the opportunity to go to the intelligence unit with the Kansas City Missouri Police Department, and I've been in that capacity ever since."), 15:24-16:7 ("Q. Okay. So can you tell me – do you have some memory of being – of participating in the Larry White homicide investigation? A. I do have memory of the incident. I was a homicide detective for quite some time, did a lot of cases. But I am aware of working this case in some capacity. I was not the case detective; so, therefore, I was not personally in charge with everything pertaining to this case.").

**Response:** Undisputed.

37. Morgan testified at Carnes's November 2005 bench trial for Larry White's murder. **Exhibit D**, *State of Missouri v. Keith L. Carnes*, Case No. 16CR03006321, November 2005 trial transcript, pgs. 288-300.

**Response:** Undisputed.

38. After 4-5 years in patrol at KCPD, Defendant Avery Williamson was assigned to the Homicide Unit, where he was a probationary homicide detective, and Blehm was his training detective while both worked on the Larry White homicide investigation. **Exhibit P**, 2024 Deposition of Avery Williamson, 20:19-21 ("Q. And after four and a half to five years in east patrol, what was your next assignment? A. I applied for the investigative bureau."), 21:3-8 ("Q.

And were you accepted into the investigative bureau when you applied? A. I was. Q. What was your first assignment in the investigative bureau? A. I went to homicide."); **Exhibit L**, 2024 Deposition of Robert Blehm, 23:13-21 ("Q. Do you have an independent recollection of working with Avery Williamson on the White homicide investigation? A. Yes. Q. What's her –what's your recollection of working with Mr. Williamson? A. He was a new probationary homicide detective, and he had come down to our squad, and I was his training detective.").

**Response:** Undisputed.

39. Blehm's responsibilities as Williamson's training detective were "oversight of what he was doing, following procedure, policies, and making sure that he was trained properly." **Exhibit L**, 2024 Deposition of Robert Blehm, 23:24-24:3.

**Response:** Undisputed that Defendant Blehm so testified, but disputed to the extent that Defendants assert Blehm's **only** responsibilities were as Blehm testified; Williamson has testified that he did not independently conduct witness interviews without supervision, and Blehm has stated that he was involved in every report and other document signed by Williamson. Ex. 9 (Blehm 2017 statement – Lockett interview) at 8; Dkt. 139-17 (Williamson Dep.) at 32:3-8; 39:18-40:17.

40. As Williamson's training detective, Blehm "did try to be with [Williamson] as much as possible." **Exhibit L**, 2024 Deposition of Robert Blehm, 24:7-13.

**Response:** Undisputed.

41. Most of the time Blehm and Williamson rode together when going out on an investigation. **Exhibit L**, 2024 Deposition of Robert Blehm, 24:17-20 ("Q. When you were his training detective, did you typically like ride together when you went out on investigations? A. Most of the time.").

**Response:** Undisputed.

42. Williamson was transferred out of Homicide because while off duty, he drove his patrol car while he had been drinking alcohol on one occasion, he missed a call-out and wasn't able to fulfill his duties to be available around the clock on one occasion, and twice, the supervisor maybe smelled alcohol on him. **Exhibit R**, 2024 Deposition of Doug Niemeier, 24:8-16 ("Q. What's your understanding of why Detective Williamson left the homicide unit? A. He left – so there was sort of a third – someone had reached out to me and stated while he was off duty, that he had possibly driven his patrol car while he'd been drinking. And I went to my, my supervisor and told my supervisor that this had possibly happened. And he ended up being transferred."); **Exhibit L**, 2024 Deposition of Robert Blehm, 26:11-16 ("Q. Why did he leave homicide? A. I think he had a couple of instances where the boss maybe smelled alcohol or his – he missed a call-out. And it was just assumed that he wasn't able to fulfill the duties and be, and be available for duty around the clock, so…").

**Response:** Undisputed.

43. Niemeier does not recall any other issues with Williamson's performance other than the single incident where he consumed alcohol and drove a patrol car while off duty. **Exhibit R**, 2024 Deposition of Doug Niemeier, 24:17-23 ("Q. Other than the information you got about Detective Williamson possibly having, I guess, consumed alcohol and drove, did you identify any other issues with Detective Williamson's performance while you were his supervisor? A. I don't, I don't recall.").

**Response:** Undisputed that Defendant Niemeier did not recall at his deposition whether he had identified other issues with Defendant Williamson's performance.

44. Niemeier did not form an opinion about Williamson's performance in the Homicide Unit, because Williamson had not been there very long. **Exhibit R**, 2024 Deposition of Doug Niemeier, 25:14-23 ("Q. Yeah. So sitting here today, is there anything you remember about Detective Williamson's time under your supervision? A. He wasn't there very long. Q. Yeah. I understand that. I just want to make sure I'm – yeah. A. Sorry. You said not speak at the same time. My thoughts, he wasn't there very long, so I don't know that I would have formed an opinion.").

**Response:** Undisputed.

45. Blehm does not recall ever smelling alcohol on Williamson; if he had, he would have reported it, and he does not have any memory of reporting such. **Exhibit R,** 2024 Deposition of Robert Blehm 26:17-25 ("Q. Did you ever smell alcohol on him while you worked with him? A. I don't remember. That's been a long time. Q. Would you have reported it if you had? A. Oh, absolutely. Q. All right. Do you have any memory of reporting it? A. No.").

**Response:** Undisputed.

46. Morgan, who worked with Williamson in the Homicide Unit, never saw Williamson drinking on the job, never smelled alcohol on Williamson, never suspected Williamson of drinking on the job, and had never seen signs of Williamson intoxicated on the job. **Exhibit Q**, 2024 Deposition of Steve Morgan, 125:21-126:7 ("Q. Have you ever seen Avery Williamson drinking on the job? A. No, I have not. Q. Have you ever smelled alcohol on him on the job? A. No, I have not. Q. Have you ever suspected him of drinking on the job? A. No, I have not. Q. Have you ever seen signs of him being intoxicated on the job? A. I have not.").

**Response:** Undisputed.

47. After leaving KCPD, Williamson obtained his doctorate in education from St. Louis University, and has been teaching for the last 17 years. **Exhibit P**, 2024 Deposition of Avery Williamson, 48:13-19 ("Q. Okay. And could you just briefly tell me what other employment you've had since you left the Kansas City Police Department and for what time periods. A. I've worked education. After I left insurance fraud, I worked for – this next years will be year number 17."), 51:13-21 ("Q. Before I show you this—sir, I—I forgot to ask you earlier—you've received a PhD; correct? A. It's a –it's what's called an EdD in education. It's an educational doctorate. It's

9

the same as a PhD; just different philosophy. Q. And when and where did you earn your EdD? A. I graduated in 2018 from the University—St. Louis University, I should say.").

**Response:** Undisputed.

48. In 1999, Defendant Vernon Huth started his law enforcement career with the KCPD, and in October 2003, he was a KCPD patrol officer; he is currently the KCPD detective sergeant of the 960 assault squad. **Exhibit N**, 2024 Deposition of Vern Huth, 84:10-85:20 ("Q. Sure. All right. And so can you, can you walk me through the positions and times you've held them at the Kansas City Police Department? [ ] A. '99, January '99 till 2000 of July, I was in the police academy. From 2000 to 2003, I was a patrol officer…And as of June '23 to present, I am now the detective sergeant of this 960 assault squad.").

**Response:** Undisputed.

49. Huth's role in the Larry White homicide investigation as a patrol officer was to assist homicide detectives in locating potential witnesses. **Exhibit L**, 2024 Deposition of Robert Blehm, 34:6-24 ("Q. Do you have independent recollection of Vernon Huth's role in the White homicide investigation? A. Yes. Q. What was his role? A. He and another officer were pretty good at working the area when this homicide happened. They knew a lot of the people that were involved there. So I just remember him being involved on the street level as a district officer. Q. Had you worked with Mr. Huth on other investigations before this time? A. Oh, yeah. Q. Was he – had he been helpful to you in the same way with witnesses in the area? A. He was, he was really, really good at locating folks. So if we needed to find someone, he was very, very good at that.").

**Response:** Undisputed that Huth contacted witnesses, but disputed that this was the extent of his role; Huth also interviewed an eyewitness to the homicide, Wendy Lockett, and later pressured Lockett to change her statement to fit the Defendants' theory of the murder. *See* Pl.'s Statement of Additional Material Facts ("PSOF") ¶¶ 23-31.

50. In October 2003, Defendant Ed Begley was a patrol officer for KCPD and partners with Huth. **Exhibit O**, 2024 Deposition of Ed Begley, ("Q. So by October 2003, you would have already have been working – been partnered with Vern Huth for more than a year; correct? A. Yes."), 19:5-10 ("Q. And you worked with Vern Huth in the Kansas City Police Department? A. I did. Q. And was he your partner as a patrol officer? A. Yes, he was."); **Exhibit K**, 2024 Deposition of Robert Blehm, 37:18-23 ("Q. Do you remember anything about Ed Begley's role in the White homicide investigation? A. Yes. Q. What do you remember? A. I think Ed was Vern's partner at the time, I think.").

**Response:** Undisputed.

### C. The Murder Investigation: Detectives follow the evidence and investigate several suspects[1]

---
[1] Although Plaintiff is not submitting a response to Defendants' section headings, which organize Defendants' asserted facts and outline Defendants' argument, needless to say, Plaintiff does not agree that

**(1) With no eyewitnesses, Detectives fail to develop any leads the night of the murder.**

51. On October 6, 2003, at approximately 8:50 p.m., KCPD officers were dispatched on a reported shooting to the Fish Town restaurant at 2831 Prospect, Kansas City, Missouri, and upon arrival, found Larry White in the parking lot, suffering from gunshots who died a short time later. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000045-000048.

**Response:** Undisputed.

52. That night, detectives questioned several witnesses who heard gunshots, but did not see the shooting. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000047-000048, 000053-000054, 000162-000165, 000166-000169, 0000984; Complaint, Doc. No. 1, ¶ 27.

**Response:** Undisputed.

53. When detectives went home that night, they had no suspects and no witnesses to the homicide. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, testimony of Robert Blehm, 260:5-9 ("Q. When you went home, did you have any suspects in custody? A. No. Q. Did you have any witnesses to the crime? A. No."); Complaint, Doc. No. 1, ¶ 27.

**Response:** Disputed in part. Detective Blehm testified only that he had no suspects in **custody**. Undisputed that Defendants wrote no reports regarding witnesses who claimed to have seen the homicide.

54. Initially, Blehm had no idea Keith Carnes killed Larry White; he was wide open in identifying folks involved. **Exhibit L**, 2024 Deposition of Robert Blehm, 165:4-12 ("Q. ..has your belief in how the murder occurred changed since Keith Carnes was arrested? A. Well, initially I had no idea it was Keith Carnes. So this night I have no idea. We're wide open, identifying folks involved. Since this was—we developed the witnesses, since we completed the investigation, there's no doubt in my mind.").

**Response:** Disputed. To start, Keith Carnes did not kill Larry White. Further, a reasonable jury could conclude from the evidence that Defendant Blehm was not "wide open" but instead had decided to close the case by any means necessary, including illegitimate means. PSOF ¶¶ 2-3, 83-111.

55. Prior to the Larry White homicide investigation, Blehm did not know Keith Carnes and had never heard of him. **Exhibit L**, 2024 Deposition of Robert Blehm, 118:21-119:1 ("Q. "By Mr. Hilke) Sir, did you know Keith Carnes before you got involved in the White homicide investigation? A. No, surprisingly. Q. Had you heard of him at all before? A. No.").

**Response:** Undisputed.

---

the Defendant detectives "follow[ed] the evidence" and disputes Defendants' characterizations of the facts.

**(2) Detectives get a lead the next day about a suspect named O.G. (Arnold Carr).**

56. On October 7, 2003, the day after the murder, around 10:00 a.m., the victim's uncle, Ronald White, Sr., reported to Blehm he overheard O.G. (Arnold Carr) brag about killing Larry White. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000369.

**Response:** Disputed. At his deposition, Ronald White, Sr. denied knowing anyone who used the nickname "O.G." or any person named "Arnold Carr," and he further testified that the contents of Robert Blehm's report of his statement was false. Ex. 16 (Dep. of Ronald White, Sr.) at 9:16-24; 13:12-17:12.

57. After Ronald White, Sr. reported O.G. (Arnold Carr) bragged about shooting Larry White, Blehm definitely considered O.G. a suspect in Larry White's murder. **Exhibit L**, 2024 Deposition of Robert Blehm, 208:24-209:6 ("Q. Now, if you had –after Ronald White had said that Arnold Carr had bragged about shooting Larry White—A. Uh-huh. Q. –were you looking to arrest Arnold Carr on the murder. A. He was definitely a suspect at that point.").

**Response:** Disputed. As described in the response to #56, White, Sr. did not report O.G. bragging about shooting Larry White. Further disputed because Blehm's statement is based on the false premise that White Sr. provided a statement to him, when this in fact did not happen. Ex. 16 (Dep. of Ronald White, Sr.) at 9:16-24; 13:12-17:12.

58. In a June 24, 2024 deposition, Ronald White, Sr. denied ever telling Blehm that. **Exhibit V,** 2024 Deposition of Ronald White, Sr., 15:1-11 ("Q. –he wrote 'He advised while he was at that location he heard a guy he knows as 'O.G.' talking with some others about the homicide that occurred last night. He advised O.G. stated, 'I blasted that, N-word—all the way to Prospect and then capped his ass.'" Did you tell Robert Blehm that, that you heard O.J – O.G. – A. No. Q. –say those words? A. No.").

**Response:** Undisputed.

59. On that same day, detectives "received information that 'O.G.' drives a purple/maroon Ford, Mustang that he parks in front of [2404 E. 29th Street] apartment 1W[;]" detectives responded to that apartment building and interviewed O.G. who told them he "lives alone at 2404 E. 29th Street Apt. #1W". **Exhibit T**, KCPD investigative file, pg. Plaintiff 000101.

**Response:** Disputed; as noted in Plaintiffs' response to facts 56 and 57, there is reason to doubt the Defendants' account of this portion of the investigation because Blehm fabricated a report from Ronald White, Sr.

**(3) While executing a search warrant on O.G.'s (Arnold Carr) apartment, detectives locate the murder weapon.**

60. On October 7, 2003, around 4:00 p.m., Blehm obtained a search warrant for O.G.'s

12

(Arnold Carr) apartment at 2404 E. 29th Street, Apartment 1W based, in large part, on the information from Ronald White, Sr., which White denies giving to Blehm. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000097-000101; **Exhibit V**, 2024 Deposition of Ronald White, Sr., pgs. 13-17.

**Response:** Disputed; as noted in Plaintiffs' response to facts 56 and 57, there is reason to doubt the Defendants' account of this portion of the investigation because Blehm fabricated a report from Ronald White, Sr. Undisputed that Blehm obtained a search warrant for the apartment at 2404 E. 29th Street.

61. While executing the search warrant at O.G.'s (Arnold Carr) apartment, Blehm observed another apartment in the building (2406 E. 29th Street, Apartment 1E) that appeared to be vacant. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000097.

**Response:** Undisputed.

62. Morgan contacted the vacant apartment's (Apartment 1E) owner who consented to detectives searching it. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000095, 000097.

**Response:** Undisputed.

63. In Apartment 1E, Detective Morris found the murder weapon (MAC 90 assault rifle). **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000095, 000097; **Exhibit D**, *State of Missouri v. Keith L. Carnes*, Case No. 16CR03006321, November 2005 trial transcript, Kathy May's testimony, 347:9-17 ("And did you then compare the test-fired casings to the casings that had been submitted to you from the crime scene technicians? A. Yes, I did. Q. And can you tell us if the casings from the crime scene matched either of those weapons? A. Yes, they did. Q. And which one did they match? A. It matched the Norinco MAK-90, Exhibit Number 35.").

**Response:** Undisputed.

**(4) Detectives rule out O.G. (Arnold Carr) but get names of additional potential suspects.**

64. On October 7, 2003, while executing the search warrant at O.G.'s (Arnold Carr) apartment, Kermit O'Neal was found inside and later interviewed by Detectives Hoffman and Williams, and then separately interviewed by Blehm. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000333-000334, 000372.

**Response:** Undisputed.

65. O'Neal reported to Blehm that "Fuzzy" (whom he identified as Mitchell Powell),

"Tre,"[2] and "G-Bone" "had weapons at the scene prior to the shooting." **Exhibit T**, KCPD investigative file, pg. Plaintiff 000372.

**Response:** Undisputed.

66. That night, October 7, 2003, Morgan issued a "pick up" for suspect O.G. (Arnold Carr). **Exhibit T**, KCPD investigative file, pg. Plaintiff 001052.

**Response:** Undisputed.

67. Detectives issue pickup orders to patrol officers, when they have probable cause to arrest someone, and want that person arrested. **Exhibit L**, 2024 Deposition of Robert Blehm, 149:2-21 ("Q. is the pickup order when you've got – when you actually want an arrest of the person that? A. That you've got enough to arrest them. Q. That you've got enough to arrest them. And so if you've got a pickup order, a patrol officer is authorized to make an arrest if they encounter that person. Correct? A. Under certain circumstances. Q. What are those circumstances? A. Well, we're not going to be able to arrest them in they go over into Kansas. Q. Okay. So you have to be—A. It's not, it's not, its not as firm as a warrant, but it's it's probable cause to arrest that person.").

**Response:** Undisputed that Blehm so described his process for using pickup orders.

68. Pick ups are issued for people who are considered suspects. **Exhibit L**, 2024 Deposition of Robert Blehm, 338:4-9 ("Q. In your mind, since some of them were on the scene with guns according to witnesses, were they still possible suspects? A. If I put pick-ups out for them, they were suspects. You don't put pick-ups out for people who are not suspects.").

**Response:** Undisputed that Blehm so described his process for using pickup orders.

69. On October 8, 2003, Blehm and Williamson interrogated suspect O.G. (Arnold Carr); O.G. (Arnold Carr) stated he was with friends having dinner and watching football at the time of Larry White's murder. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000198-000202.

**Response:** Undisputed.

70. O.G. (Arnold Carr) admitted to Blehm and Williamson that he sold drugs out of his Apartment (2404 E. 29th Street, Apt. 1W), and that the following were involved in selling drugs: Gary Kitchen, Reginald Thomas, Damon Rhodes, and Mitchell Powell (also known as "Fuzzy"); O.G. (Arnold Carr) also stated he knew "Tre" but could not recall "Tre's" real name. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000202.

**Response:** Undisputed.

---

[2] "Tre" is identified later in the investigation by several witnesses as Keith Carnes. **Exhibit T**, KCPD investigative file, pgs. Carnes 000185, 000190, 000779.

71. While Blehm and Williamson were interrogating O.G. (Arnold Carr), Morgan and Niemeier interviewed Hilliard Woodcox, O.G.'s friend, who confirmed he was with O.G. at the time of Larry White's murder. **Exhibit T**, KCPD investigative file, pg. Plaintiff 0000373.

**Response:** Undisputed.

72. Morgan and Niemeier interviewed Woodcox, O.G.'s (Arnold Carr) alibi witness, while Blehm and Williamson had O.G. detained, so O.G. couldn't contact Woodcox to get his alibi established. **Exhibit L**, 2024 Deposition of Robert Blehm, 226:13-227:2 ("Q. And at this time you've got Arnold Carr being questioned. Would you agree that this is a good time to go out and try to corroborate his alibi? A. I think we did. Q. No, I know. But in your practice as a homicide detective, the best time to corroborate an alibi is while you've still got the person being questioned or detained, so they can't go around and try to make one? A. Well, exactly. And if we were to—if we were to finish with him, which I think we did fairly quickly, we would put him on, on a no phone order up in the holding facility so that he couldn't contact anybody.").

**Response:** Undisputed.

73. O.G. (Arnold Carr) was investigated as being potentially involved, but then was eliminated as a suspect. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, Blehm's testimony, 264:21-25 ("Q. Initially, did you learn that Arnold Carr was potentially involved? A. Yes. Q. Did you eliminate him as a suspect? A. Yes.").

**Response:** Undisputed.

74. On October 9, 2003, witness Elvin Shelton voluntarily came forward and reported to Williamson that Larry White's cousin, "Red," saw "Tre" and "O.G." shoot Larry White. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000171.

**Response:** Disputed. The police report is hearsay and Shelton has not been deposed in this case.

75. Shelton also reported that the shooting stemmed from Larry White selling drugs in the area of 29th Street after being warned not to do so. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000171.

**Response:** Disputed. The police report is hearsay and Shelton has not been deposed in this case.

76. On October 11, 2003, Williamson and Blehm conduct a secondary area canvass to talk to anyone in the area who they were unable to talk to on the night of the crime. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000058; **Exhibit L**, 2024 Deposition of Robert Blehm, 230:21-231:7 ("Q. And it's a canvas you and he conducted on October 11 at 10:45 a.m. Right? A. Yes, the secondary area canvas. Q. All right. What's a secondary area canvass? A. Normally an area canvas would take place at the crime scene. Oftentimes if we're trying to obtain more information or hopefully get in contact with maybe someone we were unable to contact the night of the crime, we'll go back out and start knocking on doors again, and that's what occurred here.").

**Response:** Undisputed that they conducted a secondary area canvass, but disputed in that a reasonable jury could disbelieve that Williamson and Blehm were conducting the canvass in good faith for the reasons argued in Plaintiff's summary judgment motion.

77. On October 13, 2003, Ronald White, Jr., Larry White's cousin, reported to Williamson and Morgan that he was with Larry White when Tre (identified by him as Keith Carnes) threatened to shoot Larry White if he did not stop selling drugs in the area. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000181.

**Response:** Disputed. The police report is hearsay and White, Jr. has not been deposed in this case.

### (5) Detectives get their first eyewitness, Lorianne Morrow, from the victim's family; she said, Keith Carnes did it.

78. A family member of Larry White told Blehm that Lorianne Morrow witnessed the murder of Larry White, so Blehm talked to Morrow. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, testimony of Robert Blehm, 273:22-274:10 ("Q. Now, how did you develop Lorianne Morrow as a person to talk to? A. She was developed based on information we had gotten from another witness. Q. Was that other witness a family member of the deceased in this case? A. Yes. Q. And that family member indicated to you that Lorianne Morrow might know something about this case? A. Indicated that she had witnessed it. Q. That she had witnessed it. Okay. And then you went and talked to Lorianne Morrow? A. Yes.").

**Response:** Disputed. Ms. Morrow has testified that prosecutor Amy McGowan coerced her to identify Keith Carnes as the shooter. A reasonable jury could conclude that Blehm learned of Ms. Morrow from Amy McGowan, and not from an unidentified family member of Larry White. Notably, no police report documents any family member of Larry White giving Lorianne Morrow's name to the police. Dkt. 139-24 (Morrow 2024 Dep.) at 26:13-27:20; Ex. 20 (police file).

79. On October 12, 2003, Morrow reported to Blehm and Williamson that on October 6, 2003, near 29th Street and Olive, she saw "Tre" (whom she identified as Keith Carnes) shooting at Larry White while chasing him through an alley and yelling, "Don't be selling on my turf." **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000777-779.

**Response:** Disputed. Ms. Morrow has testified that she told Blehm and Williamson that Reginald Thomas and Gary Kitchen were the shooters. A reasonable jury could conclude that the Defendant Officers told her what to say and the report does not reflect her statement. PSOF ¶¶ 67-75.

80. She further reported that at the same time, "Kiki" (whom she identified as Gary Kitchen), was armed and also chased Larry White, but did not fire any shots. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000778-000779; **Exhibit W2**, 2024 Deposition of Lorianne Morrow, 31:5-9 ("Q. The question is 'What kind of gun did Kiki have?' The answer on here says 'His was small.' Is that part of your answer true? A. Yes, ma'am."), 31:14-17 ("Q. If you look at

the next question: 'Did Kiki fire any shots?' and the answer says, 'No.' Is that a true statement? A. That's correct."), 33:14-34:1 ("Q. And then the next question: 'Ms. Morrow, I'm showing you a picture of a black male. Is this the man you know as Kiki?' Answer: 'Yes.' And then it says 'Note: It should be noted the picture shown to Ms. Morrow was that of Gary D. Kitchen, b/m, 7/23/80.' Did the detectives show you a picture of Kiki? A. Yes. Q. And did you identify that picture as being Kiki? A. Yes, ma'am.").

**Response:** Undisputed.

81. She also reported that Wendy Lockett witnessed the shooting. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000779; **Exhibit W2**, 2024 Deposition of Lorianne Morrow, 37:23-38:6 ("Q. And then the very last question: 'Who else witnessed the shooting?' Answer: 'Wendy Lockett; Lisa, a black female about 30 years old; Red, black male—he works the door at the drug house—and Star, a white female. She's in her 30s. There were several other people.' Was that a true statement? A. Yes, ma'am.").

**Response:** Undisputed.

82. Morrow testified at Carnes' April 2005 and November 2005 criminal trials, and consistently testified, she saw Keith Carnes murder Larry White. **Exhibit X**, State of Missouri v. Keith L. Carnes, Case No. CR03-00321, April 19, 2005 testimony of Lorainne Morrow, 8:22-9:5 ("Q. Okay. So you're walking down 29th, you see Larry, you see the defendant, and you had just said you heard the defendant hollering at Larry? A. Yes, ma'am. Q. We'll get to this later with the photos. You hear him hollering. What's the next thing you see? A. Well, next time, next thing I see him chasing him, jumping off the porch, chasing him with that gun over there."), 10:1-3 ("Q. As he was running, what was he doing? The defendant. A. Shooting."); **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 113:23-114:4 ("Q. Out of the apartment. Okay. We're at the point where Larry is selling to people in cars. What's the next thing that you remember? A. The next thing I remember is him telling Larry that he is on his territory and he couldn't sell drugs out there, and then they were arguing and he started to pursue, chasing him."), 132:5-8 ("Q. Which person shot these three shots? A. Kiki didn't shoot. Tre shot the gun. Kiki did not shoot."), 116:9-10 ("Q. Who did you know out there? A. I know Wendy…").

**Response:** Undisputed that she so testified.

**(6) According to Lorianne Morrow, the prosecutor coerced her, not the police.**

83. Morrow claims before she talked to Blehm and Williamson, Amy McGowan coerced her to falsely identify Keith Carnes as Larry White's killer. **Exhibit W2**, 2024 Deposition of Lorianne Morrow, 18:9-18 ("Q. After Amy McGowan told you, 'You're going to go to trial and say it was Keith Carnes,' what did you say if anything? A. I was saying, 'No, it wasn't.' And then she said to me, 'If you don't say this, I will plant drugs on you. You will go to jail.' And I have never been to jail in my life. And I was scared, so I did what I was told because I had –at the time I had seven children. I still have seven children."), 61:15-17 ("Q. And you talked to Amy McGowan before you ever talked to the police, right? A. Yes, ma'am.").

**Response:** Undisputed.

84. Amy McGowan was a prosecutor involved in the Larry White homicide case and is a defendant in this lawsuit. Complaint, Doc. No. 1 ¶14.

**Response:** Undisputed.

85. In her 2024 deposition, Morrow testified she told Blehm and Williamson that Kiki and Reggie killed Larry White. **Exhibit W2**, 2024 Deposition of Lorianne Morrow, 65:1-4 ("Q. So you told—if I understand you right, you told the detectives that Kiki and Reggie killed Keith Carnes; is that correct? A. Correct.").

**Response:** Undisputed.

86. In her 2024 deposition, Morrow testified Blehm and Williamson told her that Kiki and Reggie were not the shooters, and also told her to say "Tre is the one that killed Larry." **Exhibit W1**, 2024 Deposition of Lorianne Morrow, 33:3-9 ("Q. What did they do after you told them you saw Kiki and Reggie? A. They said no, they didn't –wasn't the shooter. I guess I –I'm not going to say they – every officer is corrupt, but it is a lot of corrupt police officers. And they told me that –to say this – Tre is the one that killed Larry.").

**Response:** Undisputed.

87. In her 2024 deposition, Morrow testified she told Blehm and Williamson that Keith Carnes did <u>not</u> shoot Larry White. **Exhibit W2**, 2024 Deposition of Lorianne Morrow, 35:5-9 ("Q. Is it your testimony today that you identified Keith Carnes in that photograph lineup, but you told the detectives Keith Carnes did not do the shooting? A. Yes, ma'am.").

**Response:** Undisputed.

88. However, later in that same deposition, Morrow corrected her testimony, and testified "the police department didn't know what Amy did, so I just want to make that clear because the detective didn't have anything to do with that." **Exhibit W2**, 2024 Deposition of Lorianne Morrow, 60:15-61:6 ("Q. In this Exhibit 5, your affidavit that you signed, there's nothing in this affidavit that talks about the police or the detectives that took your statement, right? MR. HILKE: Object to form. A. Right. Correct. Can I say something? MR. HILKE: You have to wait for a question. THE WITNESS: Okay. Q. (By Ms. Peters) My question is going to be what do you – what would you like to say? A. Okay. In all this, the police department didn't know about what Amy did, so I just want to make that clear because the detective didn't have anything to do with that. It was – I was just coerced to say what I was supposed to say, and that's how they got involved.").

**Response:** Disputed that such testimony was a "correction"; undisputed that Morrow gave the quoted testimony about what she believed the police department knew.

89. Morrow also corrected her testimony, and testified that she <u>did</u> in fact tell Blehm and Williamson that Keith Carnes killed Larry White. **Exhibit W2**, 65:5-8 ("Q. And then you also told detectives that Keith Carnes killed Larry White because you were afraid? A. Correct.").

**Response:** Disputed that such testimony was a "correction"; Morrow continuously testified that she told Blehm and Williamson that Reginald Thomas and Gary Kitchen were the shooters. Dkt. 139-24 (Morrow 2024 dep.) at 26:13-28:2, 28:25-29:30:1.

90. Morrow then further corrected her testimony and testified <u>Blehm and Williamson never told her to say Keith Carnes shot and killed Larry White</u>. **Exhibit W2**, 2024 Deposition of Lorianne Morrow, 65:22-66:9 ("Q. The police detectives never told you to say Keith Carnes shot and killed Larry White, correct? MR. HILKE: Same objection and asked and answered. A. Correct.").

**Response:** Disputed that such testimony was a "correction"; the question was improper as it had been asked and answered and was leading. When asked an open-ended question about what the detectives did after she told them Reginald Thomas and Gary Kitchen were the shooters, Morrow answered that the detectives told her to say that "Tre is the one that killed Larry." Dkt. 139-24 (Morrow Dep.) at 33:3-9.

91. Morrow additionally clarified that Blehm and Williamson <u>did not coerce her statement</u>. **Exhibit W2**, 2024 Deposition of Lorianne Morrow, 62:13-21 ("Q. So did the police actually coerce your statement to them? MR. HILKE: Object to the form. You can answer. A. I was – when I told them what I was told to say, that's what I told the police officer. They had nothing to do with the statement. I just was told to tell them that Keith Carnes murdered this young man.").

**Response:** Disputed. Whether Blehm and Williamson coerced Morrow's statement is a question for the jury. Undisputed that Morrow primarily blamed Amy McGowan for coercing her false identification of Keith Carnes.

92. Morrow further corrected her testimony by explaining she reported to Blehm and Williamson that Keith Carnes killed Larry White, because Amy McGowan told her to do so. **Exhibit W2**, 2024 Deposition of Lorianne Morrow, 62:3-8 ("Q. (By Ms. Peters) So when you told the police that Keith Carnes did it, you were telling the police what Amy McGowan told you to say? MR. HILKE: Same objection. You can answer. A. Yes, ma'am.").

**Response:** Disputed that this was a "correction" but undisputed that Morrow primarily blamed Amy McGowan for coercing her false identification of Keith Carnes.

93. Morrow made it clear that she lied to police and during Carnes' criminal trials when she identified Carnes as the shooter, because she felt pressure from Amy McGowan to do so. **Exhibit W2**, 70:14-20 ("Q. Is it your testimony today still that you lied to both police and during the trial of Keith Carnes saying that Keith Carnes was the shooter? A. Correct. Q. And the reason that you lied is because you felt pressure from Amy McGowan? A. Yes.").

**Response:** Undisputed.

19

**(7) After Morrow's statement, detectives interrogate suspect Gary Kitchen.**

94. Blehm believed there were two people with guns chasing Larry White when he was murdered. **Exhibit L**, 2024 Deposition of Robert Blehm, 243:1-7 ("Q. And you mentioned at the beginning when you talked about your belief of how the crime was committed that you do believe that there were two people with guns chasing the victim that night. Correct? A. It's possible, yeah. That's what, that's what the witnesses stated.").

**Response:** Undisputed.

95. Even though "Kiki" (Gary Kitchen) had a gun but did not fire any shots (according to Lorianne Morrow), detectives still continued to investigate him as a potential suspect. **Exhibit L**, 2024 Deposition of Robert Blehm, 242:14-20 ("Q. Now, if that had been true, if Kiki only had a pistol and didn't fire any shots, does that mean—would that mean you would stop investigating him in connection with the murder? A. No. If he was running and participating in that, he would still be a suspect.").

**Response:** Disputed and not supported by the cited testimony. In the cited testimony, Blehm says that according to his practice he would keep investigating Kitchen as an accomplice. A reasonable jury could conclude that Blehm and other Defendants stopped investigating other suspects after they decided to pin the murder on Carnes regardless of the evidence.

96. On October 13, 2003, around 10:15 a.m., Williamson issued a pick up for Gary Kitchen. **Exhibit T**, KCPD investigative file, pg. Plaintiff 001100.

**Response:** Undisputed.

97. On October 14, 2003, Williamson and Blehm interrogated suspect Gary Kitchen two times, and detectives searched his house with his consent but find nothing; Kitchen stated he was at home when the murder happened. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000213-000215, 000258; **Exhibit L**, 2024 Deposition of Robert Blehm, 320:2-16 ("Q. And on the next page, you and Williamson questioned him. Right? A. Yeah, for seven hours. Q. Well, if it looks at page 213, it states that you actually questioned him twice. The first time he said he wasn't there—A. We paused in the middle. Q. And then he came back later. Do you see that? A. Yeah. Q. He said he wanted to talk later and gave you some more information, right? Do you see that on, it's Plaintiff 213? A. I see it. I'm just looking at my documentation.").

**Response:** Undisputed.

98. Blehm did not confirm Kitchen's alibi while Kitchen was still in custody, because it was already a week after the murder, and he had plenty of time to create an alibi if he wanted to. **Exhibit L**, 2024 Deposition of Robert Blehm, 323:18-324:6 ("Q. And the best time to confirm an alibi is while he's still with you at the police station before he can make up an alibi. Right? A. Well, he'd had plenty of time to make up an alibi if he wanted to, because this is almost a week after the murder. Q. So it wouldn't have been a problem to do it then or later? It wouldn't really

20

make a different? A. When someone's been out that long, yeah. Q. Okay. A. That's more of a, that's more of a fresh thing.")

**Response:** Disputed. A jury would not need to believe Blehm's self-serving account of his actions and Blehm's failure to investigate Kitchen's alibi violated generally accepted practices and standard investigatory procedure. PSOF ¶¶ 97-111.

99.     Kitchen also reported to Williamson and Blehm that he owned a MAC 90 assault rifle and kept it at (O.G.) Arnold Carr's apartment at 2404 E. 29th Street, #1W. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000213-000215.

**Response:** Undisputed.

100.     Kitchen was investigated as a potential suspect, but was eliminated, because no witness was able to identify him as the shooter. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, Blehm's testimony, 266:2-9 ("Q. Did you investigate the possibility that Gary Kitchen was involved? A. Yes. Q. And was anybody in your investigation able to identify him? A. As being involved? Q. Yes. A. No."), 277:23-24 ("Q. Did Wendy Lockett indicate to you that Gary Kitchen, or Kiki, was present that evening? A. No."), 285:7-9 ("Q. Okay. So my question now is, did Lorianne Morrow ever say that Gary Kitchen, Kiki, fired any shots? A. No.").

**Response:** Disputed. The cited testimony does not say that Kitchen was "eliminated" as a suspect or explain why he was "eliminated." Blehm's actions violated accepted policing practices and his own practices as he described them and a jury would not need to believe his self-serving account. PSOF ¶¶ 97-111.

### (8) Witness Margo Thomas voluntarily provided information.

101.     On October 14, 2003, around 8:30 a.m., Detective Delameter contacted Morgan about a potential witness (Margo Thomas) to the Larry White homicide. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000192.

**Response:** Disputed. The police report is hearsay and Morgan lacks independent recollection of how he came to contact Thomas. Ex. 5 (Morgan Dep.) at 40:24-41:10.

102.     Morgan and Williamson interviewed Margo Thomas who stated she was in the area at the time of Larry White's murder, and after she heard gunshots, she saw a man with the same build and hair as Keith Carnes jump a fence while holding an assault rifle. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000192.

**Response:** Disputed. The police report is hearsay, and Thomas has pleaded the Fifth Amendment in response to questions about her interactions with detectives. Ex. 47 (Thomas 2021 Dep.) at 6:19-7:4.

103.     She further stated Carnes wears an eye patch, but she could not tell if the person

jumping the fence was wearing an eye patch or not. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000192.

**Response:** Disputed. The police report is hearsay, and Thomas has pleaded the Fifth Amendment in response to questions about her interactions with detectives. Ex. 47 (Thomas 2021 Dep.) at 6:19-7:4.

104.    She also placed suspect Reggie Thomas at the scene at the time of the shooting, but never saw him shoot Larry White. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000192.

**Response:** Undisputed.

**(9) A second eyewitness, Wendy Lockett, also said, Keith Carnes did it.**

105.    After Morrow's statement indicating Lockett was at the scene at the time of the shooting, detectives were looking for Lockett. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, Blehm's testimony, 262:7-11 ("Q. Okay. So you talked to Lorianne. With the information that she provided to you, what was the next step? A. She provided the names of two additional witnesses that we needed to locate and also speak with."), 262:19-21 ("Q. Who were you looking for? A. At that point, we were looking for Wendy Lockett and Felicia.").

**Response:** Disputed. Detectives had already spoken with Lockett and did not receive her name for the first time from Morrow. Ex. 22 (Oct. 7, 2003 report); PSOF ¶¶ 23-40.

106.    Detectives found Lockett on October 14, 2003, after issuing a "question advisory" for her. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, Blehm's testimony, 262:25-263:10 ("Q. Okay. So did you find these witnesses? A. Yes, we did. Q. Who did you find first? A. The first one we found, of course, was Lorianne Morrow. The second one we found was Wendy Lockett. Q. When was that? A. That was on the 14th. Q. Okay. And did she come to you or did you guys go to her? A. We had to find her.").

**Response:** Undisputed, but note that the Detectives had already been aware Lockett witnessed the murder for the past seven days. PSOF ¶¶ 23-40.

107.    On October 13, 2003, around 2:50 p.m., Williamson issued a "questioning advisory" for Wendy Lockett. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 001107.

**Response:** Undisputed.

108.    A "questioning advisory" is issued by detectives if they want to talk to a witness. **Exhibit L**, 2024 Deposition of Robert Blehm, 148:18-21 ("Q. And a questioning advisory, that's if you want to talk to like a witness in the case; is that right? A. Pretty much.").

**Response:** Undisputed.

109.     If a patrol officer comes across a witness with a questioning advisory, that officer knows to call detectives so detectives can talk to that witness. **Exhibit L**, 2024 Deposition of Robert Blehm, 148:22-25 ("Q. So if a patrol officer comes across a witness, you've got an advisory out, they know to call you so you can try to talk to them? A. Exactly.").

**Response:** Undisputed.

110.     On October 14, 2003, Huth and Begley brought Lockett to detectives to be interviewed; Lockett denied having any earlier conversation with Huth and Begley prior to that day. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000183; **Exhibit Y**, 2024 Deposition of Wendy Lockett, 29:19-30:3 ("Q. So by the way, reading what Vernon Huth wrote about this conversation with you, does it refresh any additional recollection about this conversation you had with him? A. It doesn't, because I never had that conversation with Officer Huth. Him and Begley picked me up. I was walking. They literally picked me up and took me downtown. I was never his confidential informant, and I never had that – that conversation with him.").

**Response:** Undisputed that Huth and Begley brought Lockett to detectives to be interviewed; undisputed that Lockett denied earlier conversation with Huth and Begley.

111.     In the patrol car, Huth said to Lockett, "we know you know who shot him, and you have to go down here and tell these people what's going on." **Exhibit Y**, 2024 Deposition of Wendy Lockett, 32:15-33:3 ("Q. Will you – will you tell me a little bit more about that conversation in the car. A. Yeah. Well, when they picked me up, basically, it was we know you were on the corner with Larry, we know you know who shot him, and you have to go down here and tell these people what's going on. That was the conversation. Q. And do you remember whether it was Huth or – was it Huth and Begley in the car when that conversation happened? A. It was both of them in the car. Yes. Q. And do you remember whether – which one of them said that to you in the car? A. Huth.").

**Response:** Undisputed.

112.     Lockett was under the influence and felt under duress and pressured when Huth said that. **Exhibit Y**, 2024 Deposition of Wendy Lockett, 33:4-13 ("Q. Okay. How did you feel when Huth said that to you? A. You know what, honestly, I was under the influence. I was an active addict. I was confused. I was scared. I just felt under duress the whole time. Just the whole time. Because I'm pressured to do this, to say this. And honestly, today, I – I kind of fault myself for all the time that Keith has did, because there is a shadow of a doubt, that I honestly don't know if it was him or not.").

**Response:** Undisputed.

113.     In the patrol car, Huth never asked Lockett any questions. **Exhibit CC**, 2005 Deposition of Wendy Lockett, 57:14-58:4 ("Q. Do you remember the first police officer you talked to? A. Yes. Q. Who was it? A. Huth. Q. Huth? A. Officer Huth. Q. And what did you tell him? A. He just told me I was wanted for questioning. I said, "Okay." Q. You went with him? A. Uh-huh. Q. Did he ask you any questions—A. No. Q. --while you were in the car? No? A. No.").

23

**Response:** Disputed. Lockett has testified that Huth pressured her to give a false statement in the patrol car. PSOF ¶¶ 43-44, 51, 54.

114.   Huth and Begley knew Lockett was an active addict at the time. **Exhibit Y**, 2024 Deposition of Wendy Lockett, 33:14-22 ("Q. Do you think – did—did Huth or Begley, as far as you know, have any reason to believe you were under the influence at the time? A. They knew I was an active addict. Prospect was their beat. That was their beat. They knew. And then I also knew Huth from down on Independence Avenue. They knew that I was an active addict. You know, they've arrested me, they've arrested my son. You know, so they knew.").

**Response:** Undisputed.

115.   At the time, it was the practice of detectives to document a witness's apparent signs of intoxication or impairment, if observed by the detective. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 100:23-101:8 ("Q. Okay. Was there a practice? Like, if as a detective, you learn that a witness has a drug addiction, that that's something that should be documented or not? A. I think it was a practice. And I think it probably extended more so as to anything that you observed in them at the time. Q. Sure. So meaning if they seem intoxicated during an interview with an officer, that's something that you should write down? A. Absolutely. Yes. Q. But in – in terms of investigating was there any prac – you know, say you're talking to an eyewitness who you learn or believe has a drug addiction. Was there a practice whether that witness should be asked whether they were under the influence of drugs while witnessing the crime? A. I think the practice, again, would have gone back as to whether they were displaying anything that might – that –that seemed out of the ordinary or their behavior was dictating that.").

**Response:** Undisputed.

116.   On October 14, 2003, around 9:00 a.m., after Huth drove Lockett to detectives, Lockett gave only one typed-up statement, which was to Williamson; and Lockett signed that statement. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000183-000185; **Exhibit Y**, 2024 Deposition of Wendy Lockett, 35:1-19 ("Q. Okay. Okay. And so you see this is a statement at the top. It says statement of Wendy Lockett taken at the offices of the violent crimes division by Detective Williamson on this 14th day of October at 0910 hours. Do you see that? A. Yes. Q. Okay. And – and the bottom of the second page, there's a – it says signed, and it seems to say Wendy Lockett. Is that your signature? A. It is. Q. Okay. So I want to ask you about what's in this statement. And then as far as you know, you only gave one typed-up statement that you signed to detectives around this time. Correct? A. Uh-huh. Q. And so this would have been after Vernon Huth had droven (sic) to the detectives and had that conversation in the car? A. Uh-huh. Yes.").

**Response:** Undisputed.

117.   Williamson did not document anywhere in Lockett's statement that he observed signs of impairment or intoxication in Lockett. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000183-000185.

**Response:** Undisputed, but note that there is no testimony that signs of impairment or intoxication would typically be noted in a witness's **statement**.

118.    Before Lockett gave her statement to Williamson, she had no prior conversation with Williamson about Larry White's murder. **Exhibit Y**, 2024 Deposition of Wendy Lockett, 41:15-21 ("Q. Okay. Now, before you gave your statement – before you gave your question and answer statement to the detective, had you had a – A. Uh-huh. Q. –prior conversation with the detective about the murder? A. No.").

**Response:** Undisputed.

119.    When Lockett was questioned by Williamson, it was just her and Williamson in the room. **Exhibit Y**, 43:23-44:7 ("Q. Okay. What about the other details about like the – like the chase, like how the chase happened? Do you know where those details came from? A. No. When I was questioned by –by the detective, it was just me and the detective in the room. There was nobody sitting there writing anything down or anything like that. After he got through questioning me, he went back in his office somewhere, or wherever he went, and came back with the statement. And yes, I signed it.").

**Response:** Undisputed, but clarify that Blehm participated in the interview and watched and listened to it through a live video feed. Ex. 9 (2017 Blehm Statement).

120.    When Lockett gave her statement to Williamson, she felt under pressure, because Williamson knew she was present, so assumed she had to know everything that took place. **Exhibit Y**, 2024 Deposition of Wendy Lockett, 43:8-18 ("Q. Got it. Did that – did that also occur during your conversation with the detective after you got at that station? A. Yes. It –it was already embedded in them that I was present, so I had to know everything that took place. That was already embedded in them. So I mean, looking back at it, a lot of it, I felt like I was pressured. I was up under pressure, so I would say anything at that point. I'm not – you know, I was an addict. We have to keep that in mind. I was an addict.").

**Response:** Undisputed that Lockett felt under pressure. This testimony could be read by a reasonable jury as indicating that Williamson made Lockett feel like she had to provide details that she did not really remember. To the extent this statement implies anything further, disputed.

121.    Lockett did not feel pressure from being on probation—and she did not have warrants at the time she testified at Carnes' criminal trial. **Exhibit Y**, 2024 Deposition of Wendy Lockett, 55:4-14 ("Q. Okay. And assuming that that's true, that you were on probation, do you think that –would—like did that contribute to the pressure you felt at the time you were questioned? A. No. Not—not being on probation. I mean, I probably had a warrant for me anyway. I –no. I didn't have a warrant. I know that, because when they locked me up to make sure that I showed up in court, and I was locked up in Jackson County, but I was released two days later. Had I had a warrant, they wouldn't have released me, so –yeah.").

**Response:** Disputed in part. This testimony doesn't say anything about whether Lockett had warrants at the time of Carnes's criminal trial. Undisputed that Lockett said she didn't feel pressure from being on probation.

122. Lockett told Williamson "Tre went in the house and came back out with a gun, and started shooting at Larry. Larry ran up the street. Tre chased him;" but when Lockett said that, she was an addict and would say anything so she could get back on the street and get drugs. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000184; **Exhibit Y**, 2024 Deposition of Wendy Lockett, 36:6-17 ("Q. And says Tre went in the house and came back out with a gun, and started shooting at Larry. Larry ran up the street. Tre chased him. Was that something –was that what you had seen at the time you gave your statement? A. At the time I gave my statement, honestly, I – I more than likely said that. But I mean, I was an addict. At that point, anything that was actually being said was really questioned. I was an addict. I would say anything, for real, just so I could get back out and get my drugs. That's where I was at that point in my life.").

**Response:** Disputed. Williamson typed up a statement in a separate room while he left Lockett in the interview room. In 2024, Lockett did not affirm that testimony; instead, she said only "I more than likely said that." Ex. 21 (Locket 2024 Dep.) at 43:23-44:7.

123. Lockett also reported to Williamson that "[w]hen Larry collapsed at the fish town parking lot, Tre walked up to him and shot him in the head." **Exhibit T**, KCPD investigative file, pg. Plaintiff 000184.

**Response:** Disputed. The report is hearsay. Williamson typed up the statement in a separate room while he left Lockett in the interview room; the report does not reflect Lockett's live statement to Williamson or a stenographer. Ex. 21 (Locket 2024 Dep.) at 43:23-44:7.

124. Lockett identified Keith Carnes as "Tre" in a photo line up shown to her by Williamson. **Exhibit T,** KCPD investigative file, pg. Plaintiff 000185; **Exhibit Y**, 2024 Deposition of Wendy Lockett, 46:1-13 ("Q…It says you were shown a photo line-up consisting of six black males with similar features, and you recognized Number 5 as Tre. Do you have a memory of that from your conversation with the detective? A. I think they did show me a photo. Q. And – A. I'm not –I'm not really for sure. I think they did, though. Q. Okay. And Tre is someone you would have been able to identify, because you know who he was. Right? A. Yeah. I knew who he was. I bought a lot of drugs from him. So I knew who he was. So yeah.").

**Response:** Disputed. Lockett testified that she thinks the detectives showed her "a photo" and she would have been able to identify Carnes as "Tre." She did not testify whether she actually identified him in that interview.

125. In her 2024 deposition, Lockett testified the police "basically told [her] what happened, and [she] agreed to it; for example, that the murder weapon had a "banana clip" came from the police—she never saw a banana clip. **Exhibit Y**, 2024 Deposition of Wendy Lockett, 67:1-16 ("Q. And why did you think that? A. Because that's what they were displaying. I mean, they literally didn't say it, but I was up under so much pressure that you know this happened, you know he—he walked this way—I mean, they knew details of everything before they even picked

26

me up. They basically told me what happened, and I agreed to it. Q. Do you think that detail in your statement about the gun having the banana clip, do you think that came from the police? A. Yeah. That came from police. Because it wasn't no banana clip. It was just a handgun. I didn't even know handguns could even take a banana clip. I'm not a gun specialist or anything like that. I didn't see no clip. I was from a distance, but I know a handgun when I see one.").

**Response:** Undisputed.

126.     When testifying about the murder weapon at Carnes' April 2005 and November 2005 trials and at her October 2005 deposition, Lockett never mentioned a banana clip. **Exhibit Z**, April 20, 2005 trial testimony of Wendy Lockett, 13:18-23; **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 231:16-232:4; **Exhibit CC**, 2005 Deposition of Wendy Lockett, 52:13-22.

**Response:** Disputed in part. Lockett testified that the part of the gun she remembered was "like a handle part . . . [i]t put me in the mind of like a clip" and that she "couldn't tell . . . if it was a pistol or a rifle or a sawed-off or what" and couldn't tell if it was long or short. Ex. 21 (Lockett 2024 Dep.) at 20:1-6; Dkt. 139-31 (Lockett 2005 Dep.) at 52:16-21. Undisputed that she never mentioned a "banana clip."

127.     Lockett testified consistently at Carnes' April 2005 and November 2005 trials, and in an October 2005 deposition taken by Carnes' attorney, Willis Toney, that Carnes shot Larry White. **Exhibit Z**, April 20, 2005 trial testimony of Wendy Lockett, 13:5-12 ("Q. Okay. Then what happened? A. Words was passed and shots was fired. Q. Okay. Where was Larry when the words were passed between he and Tre? A. On the corner. Q. Where was Tre? A. Tre was on the balcony, on the porch."); **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 200:23-201:1 ("Q. Is there any doubt in your mind that Keith Carnes, Tre, this man right here, shot Larry White on October 6, 2003? A. No doubt in my mind."); **Exhibit Y**, 2024 Deposition of Wendy Lockett, 25:8-13 ("Q. –you did testify at both of Keith Carnes' criminal trials. Correct? A. Yes. Q. And at both of those trials, you did identify him as the shooter. Correct? A. Yes."); **Exhibit CC**, 2005 Deposition of Wendy Lockett, pg. 1, 67:1-68:2 ("Q. And you're saying that you believe it was Mr. Carnes you—A. No, I know it was Mr. Carnes.").

**Response:** Undisputed that Lockett testified that Carnes shot White on those three occasions.

128.     Lockett felt badgered and pressured to testify at Carnes' trials, because an APB was put out on her, and she was held in custody until she testified. **Exhibit Y**, 2024 Deposition of Wendy Lockett, 25:25-26:7 ("Q. Sure. And – and you described sort of the badgering and pressuring. Those were the words used a minute ago. Can you tell me a little bit more about what you mean by that. A. What I mean by that is at one point, I was supposed to show up in court or something other, and I didn't show. So an APB was put out on me, and I was held in custody until I testified.").

**Response:** Undisputed.

129.    Moreover, at Carnes' trials, Lockett did not feel like she could contradict her statement to Williamson, because of the pressure she felt from the police department and the investigators. **Exhibit Y**, 2024 Deposition of Wendy Lockett, 47:17-48:9 ("Q. Yeah. Did you feel free to – to – you know, if you remembered something different, or had doubts, did you feel free to –to say something different from your prior statement? A. I didn't. Q. And why not? A. When you're up under – for me—I'm speaking for me. When you're up under so much pressure from police department, the investigators, and all that, you – me—pretty much stuck to what was—what I had said. I didn't even try to intercede and say well, you know what, that's not accurate. Because I was still in my addictive stage during the first trial. Even when the second one came, I still just –just stayed with it. I did. It wasn't until you came and asked me the questions in which the way you asked me, which made me think that there's a possibility that I could be wrong….").

**Response:** Undisputed.

130.    Today, Lockett is not certain that Carnes killed Larry White; but when she testified at both criminal trials, she did not have the same uncertainty. **Exhibit Y**, 2024 Deposition of Wendy Lockett, 24:9-11 ("Q. Is it accurate to say that you can't now say the person who shot Larry White was Keith Carnes? A. Yes."), 24:15-25:1 ("Q. And is it accurate to say that as you look back now, you can honestly say you're not certain that Keith Carnes was the shooter? A. That's correct. And that's what I mean about the way in which you were asking me questions versus when the State was just pounding me, pressuring me, on me, badgering me. I can honestly say that I don't know who it was. He –I just assumed. What I saw was black. I just identified it as the patch. But it could have very well been hoodie. And I didn't literally see an open face like that. So yes, it's accurate to say I don't know who it was."), 25:11-16 ("Q. And at both those trials, you did identify him as the shooter. Correct? A. Correct. Q. And at that time, did you have the same uncertainty that you're expressing to me now? A. No.").

**Response:** Undisputed that Lockett is uncertain that Carnes was the shooter. Disputed in that Lockett has indicated that Huth's report on October 7, 2003—in which he memorialized that Lockett did not mention an eye patch and did not identify the shooter (or even hazard a guess at his identity)—was consistent with Lockett's mental state at the time, namely that she doesn't remember if the shooter had an eye patch and wasn't sure who the shooter was. Ex. 21 (Lockett 2024 Dep.) at 27:17-29:18.

131.    Lockett now says, when she identified the man who shot Larry White in the Fish Town parking lot as Carnes, she assumed it was him, and she "could have been wrong." **Exhibit Y**, 2024 Deposition of Wendy Lockett, 21:8-13 ("Q. Okay. Okay. And going back to the statement, you say while I was in the church parking lot, I saw two men in the Fish Town parking lot. I saw one man standing over another man, shooting him. Is that correct? A. Yes."); 48:13-17 (A. …when the –the shooting took place. Yes, I saw someone standing over him. But to say—actually say it was Keith Carnes, I just said it was. I assumed. I could have been wrong. Very much wrong.").

**Response:** Undisputed, but clarify that Lockett did not say she just "assumed" it was Carnes but instead stated that she identified Carnes as the shooter because "the State was just pounding me, pressuring me, on me, badgering me." Ex. 21 (Lockett 2024 Dep.) at 24:15-25:1.

28

132. Lockett now says, she believes she mistook a black hoodie for Carnes' eye patch. **Exhibit Y**, 2024 Deposition of Wendy Lockett, 21:14-20 ("Q. And you said – under 12, you say I was far away when I saw the shooting in the Fish Town parking lot. I could tell the shooter had something over his eye. I do not know if what was over his eye was an eye patch, or the hood of a hoodie sweatshirt over his head. Is that correct? A. Yes.").

**Response:** Undisputed that Lockett testified that she could tell the shooter had something over his eye but she believes it may have been a hooded sweatshirt. Disputed in that Lockett did not testify that she just made a mistake, but instead stated that she identified Carnes as the shooter because "the State was just pounding me, pressuring me, on me, badgering me." Ex. 21 (Lockett 2024 Dep.) at 24:15-25:1.

**(10)  After Lockett's and Morrow's statements to detectives, Keith Carnes is arrested for the murder of Larry White.**

133. On October 14, 2003, around 2:30 p.m., Carnes was arrested for Larry White's murder. **Exhibit T**, KCPD investigative file pgs. Plaintiff 000222-000226.

**Response:** Undisputed.

134. Later that day, he was interrogated by Williamson and Blehm, for approximately one hour, after Carnes' signed the Miranda waiver, wherein he denied involvement in narcotics, denied being "friends with any of the other guys who are friend's (sic) with 'O.G.,' denied knowing the victim, and denied being at the scene at the time of Larry White's shooting. **Exhibit T**, KCPD investigative file pgs. Plaintiff 000222-000226.

**Response:** Undisputed, but object that it is irrelevant to the summary judgment motions.

135. Years later, Carnes admitted to being at 2404 East 29th Street at the time of Larry White's shooting, but claims he does not know who killed Larry White. **Exhibit B**, 2024 Deposition of Keith Carnes, 147:10-23 ("Q. Let's go to the second paragraph, Mr. Carnes in your affidavit. It says, in fact, during the course of my trials, I informed my trial attorney that there were at least five people there—excuse me, at least five people that were standing in front of the middle apartment building of 2404 East 29th Street with me when the shooting started up the street in the Walbash (sic) area as the victim ran straight up 29th Street by himself as the shooting continued. And did I read that correctly? A. Yes. Q. Do you remember writing that paragraph in this affidavit? A. Yes. It works. Some memories I remember."), 146:20-21 ("Q. Okay. Do you know who killed Larry White? A. No."); **Exhibit B1**, 2011 Affidavit of Keith Carnes.

**Response:** Undisputed.

136. Years later, Carnes stated he saw Reginald Thomas and Mitchell Powell (both suspects in the Larry White murder investigation) at 2404 East 29th Street at the time of Larry White's shooting, but never saw Thomas or Powell armed with a gun and never saw them shoot or chase Larry White. **Exhibit B**, 2024 Deposition of Keith Carnes, 161:23-162:21 ("Q. Do you

recall seeing Mitchell Powell and Reginald Thomas standing in front of 2404 East 29th Street when the shooting stopped? A. Yes. Q. Do you recall seeing Mitchell Powell armed—A. No. Q. –with a gun? Do you recall seeing Reginald Thomas armed with a gun? A. No. Q. Did you ever see Mitchell Powell shoot at Larry White that night? A. No. Q. Did you ever see Mitchell Powell chase anybody that night? A. No. Q. Same for Reginald Thomas, did you ever see Reginald Thomas shoot at Larry White or anyone else that night? A. No. Q. Did you ever see Reginald Thomas chase anyone that night? A. No."); **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000041-000042, 000241-000245, 000248-000249, 001101-001102.

**Response:** Disputed in part. Carnes testified that he does not remember if he saw Powell or Thomas armed with a gun. Otherwise undisputed.

137. Also, years later, Carnes identified others at the scene at the time Larry White was murdered: Jakama Cutchlow, Enrique Valiente, and Stephanny Carpenter. **Exhibit B**, 2024 Deposition of Keith Carnes, 158:7-14 ("Q. Jakama Cutchlow, Enrique Valiente, Mitchell Powell, Reginald Thomas, and Stephanny Carpenter, you recall seeing them at the time the shooting happened? MR. HILKE: Objection to form—objection to form. You can answer. THE WITNESS: I recall seeing them.").

**Response:** Undisputed.

138. Carnes never told Blehm and Williamson he was at the scene at the time of Larry White's shooting. **Exhibit T**, KCPD investigative file pgs. Plaintiff 000222-000226.

**Response:** Undisputed.

139. Carnes never told Blehm and Williamson that Thomas and Powell were at the scene at the time of shooting, but were unarmed and never chased or shot Larry White. **Exhibit T**, KCPD investigative file pgs. Plaintiff 000222-000226.

**Response:** Undisputed.

140. Carnes never told Blehm and Williamson that Cutchlow, Valiente, Carpenter, and Harper were at the scene at the time of Larry White's murder and could alibi him. **Exhibit T**, KCPD investigative file pgs. Plaintiff 000222-000226.

**Response:** Undisputed, but note that Blehm and Williamson never asked Carnes to provide them with alibi witnesses.

141. On October 15, 2003, a Jackson County, Missouri judge found probable cause to arrest Carnes for the murder of Larry White, based on the statement of probable cause completed by Williamson. **Exhibit S**, 2003 Statement of Probable Cause.

**Response:** Undisputed.

142. Williamson's statement of probable cause was based on Morrow's and Lockett's

30

statement to detectives in that both stated they saw Keith Carnes shoot Larry White. **Exhibit S**, 2003 Statement of Probable Cause.

**Response:** Undisputed that the sole basis for Williamson's statement of probable cause was Morrow and Lockett's statements but clarify that those statements were fabricated. PSOF ¶¶ 41-64, 67-73.

> **(11)    A third eyewitness, Felicia Jones, identified Keith Carnes as the shooter.**

143.    A few hours after Williamson interviewed Lockett, Morgan interviewed witness Felicia Jones. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000188-000190, 000366.

**Response:** Undisputed that Williamson and Blehm interviewed Lockett before Morgan interviewed Jones on 10/14/2003, but note that Lockett was interviewed at 8:00 am on October 14, 2003, but according to reports, Huth and Begley did not refer Jones to the detectives until 3:30 pm. DSOF ¶ 144; Ex. 28 (2003.10.15 Inv Report (Williamson) - Lockett interview report).

144.    On October 14, 2003, around 3:30 p.m., Huth and Begley told Morgan they talked to Felicia Jones who advised them that she had information about the Larry White murder. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000366.

**Response:** Undisputed.

145.    On October 14, 2003, at 4:35 p.m. Morgan interviewed Jones; Jones told him that on October 6, 2003, at the time Larry White was murdered, Reginald Thomas said "make him disappear" about "the kid selling on the corner." **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000188-000190.

**Response:** Undisputed.

146.    Jones also told Morgan that she saw Keith Carnes and Mitchell Powell shooting at "the same kid who was selling on the corner running towards Fish Town." **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000189-000190.

**Response:** Disputed. Jones's testimony was that she was coerced to make a statement, that she was made to sign a statement that she could not read, and that she remembered someone else as involved in Carnes's murder. PSOF ¶¶ 76-82.

> **(12)    After Carnes is arrested, Detectives continued to investigate Larry White's murder, interrogating more suspects.**

147.    When Lockett gave her statement to Williamson on October 14, 2003, she stated that Damon Rhodes and Mitchell Powell were with Keith Carnes when the shooting occurred. **Exhibit T**, KCPD investigative file, pg. Plaintiff 000185; **Exhibit Y**, 2024 Deposition of Wendy Lockett, 42:1-9 ("Q. And it says here that Damon Rhodes—that you were shown a picture of Damon Rhodes, and you identified him as Debo. Was Debo someone known – known to you at

the time? A. Yes."), 42:16-21 ("Q. Got it. It also mentions a Fuzzy. Is that someone you knew by street name back then? A. Yeah. Q. Is that someone you would have been able to identify if shown a photo? A. If shown a photo. Yeah.").

**Response:** Undisputed.

148. On October 16, 2003, Williamson issued pick ups for suspects Damon Rhodes, Reginald Thomas, and Mitchell Powell. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 001049, 001101-001102.

**Response:** Undisputed.

149. On November 12, 2003, at 10:50 a.m., Damon Rhodes voluntarily responded to police headquarters with his attorney. **Exhibit T**, KCPD investigative file, pg. Plaintiff 001162.

**Response:** Undisputed.

150. Rhodes told Blehm and Williamson that his girlfriend had a job cleaning Bank of America at 78th Street and Quivera, and he was there with her at the time of Larry White's murder. **Exhibit T**, KCPD investigative file, pg. Plaintiff 001162.

**Response:** Undisputed.

151. On November 12, 2003, at 1:10 p.m., Blehm and Morgan responded to Lenexa, Kansas Police Department, where they viewed surveillance tape from inside the Bank of America, which clearly showed Rhodes inside the bank at the time of Larry White's murder. **Exhibit T**, KCPD investigative file, pg. Plaintiff 001163.

**Response:** Undisputed.

152. Rhodes was eliminated as a potential suspect. **Exhibit D**, *State of Missouri v. Keith L. Carnes*, Case No. 16CR03006321, November 2005 trial transcript, Blehm's testimony, 265:3-15 ("Q. Was Damon Rhodes also a potential suspect? A. Yes, he was. Q. Did you investigate that probability? A. Yes, I did. Q. And was he eliminated? A. Yes, he was. Q. How was he eliminated? A. He had told us where he was at during the homicide, that he was cleaning a bank, and we responded and got that. Q. Videotape? A. Yeah.").

**Response:** Undisputed.

153. On December 4, 2003, Williamson interrogated suspect Reginald Thomas who stated he was at his girlfriend's house all night watching her kids on the night of Larry White's homicide. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000241-00243.

**Response:** Undisputed.

154. On January 1, 2004, Mitchell Powell was arrested and escorted to detectives.

**Exhibit T**, KCPD investigative file, pgs. Plaintiff 000248-000249.

**Response:** Undisputed.

155.    On January 2, 2004, Blehm tried to interrogate Powell, but Powell did not sign the Miranda waiver, did not agree to be questioned, and did not say anything, so he was released. **Exhibit T**, KCPD investigative file, pgs. Plaintiff 000041-000042; **Exhibit L**, 2024 Deposition of Robert Blehm, 349:6-9 ("Q. Here, you've got a Miranda waiver with your name and serial number on it and Mitchell Powell's name. Correct?"), 349:19-22 ("Q. So you came in to try to interview him the next day. Correct? A. I don't have the time on there, but yeah. That would make sense."), 350:9-14 ("Q. And it looks like –there's no sign he signed Miranda. Right? A. Yeah. Looks like he didn't sign Miranda. Didn't agree to be questioned. Didn't say anything. There's nothing noted in miscellaneous. He didn't call anybody."), 350:15-18 ("Q. As far as you know, he was let go after that. Right? A. I don't think he had any other cases or warrants, so yeah.").

**Response:** Disputed. Blehm's testimony is speculation and does not establish that Powell did not sign the Miranda waiver, did not agree to be questioned, or did not say anything. Blehm should have written a report of the interview but failed to do so, which obfuscates our ability to know what Powell did or did not do. PSOF ¶¶ 106, 108.

### D.    Felicia Jones: Morgan, Huth, and Begley did not fabricate her statement or pay her and ignore her warrants in exchange for her statement.

### (1) April 2005 Trial: Felicia Jones' testimony.

156.    On April 19, 2005, Felicia Jones testified at Carnes' criminal trial as a State's witness. **Exhibit AA**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, April 19, 2005 testimony of Felicia Jones.

**Response:** Undisputed.

157.    The State admitted Jones' statement to Morgan (marked as State's Exhibit 45) into evidence over objections. **Exhibit AA**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, April 19, 2005 testimony of Felicia Jones, pgs. 15-17; **Exhibit BB**, State's Exhibit 45, Jones' statement to Morgan.

**Response:** Undisputed.

158.    Jones testified that she had no memory of Carnes shooting anybody, that she was using crack for the entire month of October 2003, that she had only slept one week in the month of October 2003, that she had bipolar schizophrenia paranoia, and that she heard voices. **Exhibit AA**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, April 19, 2005 testimony of Felicia Jones, 29:24-30:11 ("Q. And you told me you had no memory of Keith Carnes shooting at anybody? Is that correct? A. Correct. Q. You told me that for the month of October 2003, you don't remember much of anything because you were using crack cocaine for a solid month every day? A. Yes. Q. And that you didn't remember anything about that incident because

33

during the month of October of 2003, you probably only slept one week in that entire month? Is that correct? A. Correct."), 30:19-31:1 ("Q. That you had bipolar disorder? A. Bipolar schizophrenic paranoia. Q. Okay. I was going to get into that. Okay. That you had schizophrenia, which is a multiple personality disorder? A. Yes. Q. And that you heard voices? A. Yes.").

**Response:** Undisputed.

159.    She also testified she was very high on crack at the time of Larry White's homicide, which caused her to hallucinate. **Exhibit AA**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, April 19, 2005 testimony of Felicia Jones, 8:20-25 ("Q. Okay. All rightee. At that time were you high on crack? A. Yes. Very. Q. Okay. When you're high on crack, does it impair your ability to see or hear? A. It causes me to hallucinate.").

**Response:** Undisputed.

160.    She further testified that she had no memory of giving a statement to police, but when confronted with her statement at trial, she admitted her initials and signature were on the statement. **Exhibit AA**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, April 19, 2005 testimony of Felicia Jones, 11:16-12:10 ("Q. Do you recognize it as what? A. It says it's a statement from – a statement of Felicia Jones taken at the office of the Victim Crimes Division. Q. Okay. At the bottom of State's 45, which is a four-page document, do you see your initials? A. Yes, ma'am. Q. Are those your initials? A. Yes. Q. And on page 2 of State's 45 do you see your initials? A. Yes, I do. Q. And at page 3 do you see your initials? A. Yes. Q. 'F.M.J.'? A. Yes. Q. On page 4 do you see your signature? A. Yes, ma'am. Q. Is that your signature? A. Yes, it is."), 33:4-6 ("Q. Do you even recall making that statement at all? A. No.").

**Response:** Undisputed.

161.    She testified she <u>did</u> recall police showing her photos of some people, including of "Tre," whom she identified to police.  **Exhibit AA**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, April 19, 2005 testimony of Felicia Jones, 25:18-26:5 ("Q. Do you remember the police showing you photographs? A. I remember police showing me some photographs of some people, I don't remember picking out no photo of Puffy, but you showed me a picture of him earlier, but I didn't remember who he looked even in the picture. But then I remember a picture, them showing me of Tre again. They tell me his real name or the name they have him arrested under, and I told them yes, I knew him, but at first I couldn't hardly recognize him without the patch. I had to put a hand over one of his eyes.").

**Response:** Undisputed.

162.    When confronted with her statement, she testified that she could have been coerced by detectives because she was on drugs at the time and could have said anything to get some crack. **Exhibit AA**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, April 19, 2005 testimony of Felicia Jones, 22:8-19 ("Q. Okay. A. So I'm not going to lie under oath and say that. What this paper is saying could have been something that was coerced from me because I was on drugs at the time. I'm not going to stand under oath and say may I tell the truth, so help me God,

and today I'm living with God and I don't remember saying none of this. Q. That's fair. A. You understand what I'm saying? Q. I understand what you're saying. A. I could have said anything to get some crack.").

**Response:** Undisputed.

163. She testified that after she gave her statement to police, she recalled detectives dropped her off at a park and gave her $5.00. **Exhibit AA**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, April 19, 2005 testimony of Felicia Jones, 27:12-16 ("Q. Okay. Well, did you tell them where to drop you off at? A. They dropped me off at a park. A. Okay. A. They dropped me off at the park and gave me $5.").

**Response:** Undisputed.

164. She further testified that at the time she gave her statement to police, she had warrants, but was never arrested by detectives. **Exhibit AA**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, April 19, 2005 testimony of Felicia Jones, 33:17-19 ("Q. Okay, and you also indicated that you know you had warrants, correct? A. Yes."), 34:2-5 ("Q. And then instead of arresting you on those warrants, they took you back to a park, let you go, and gave you $5? A. Yes.").

**Response:** Undisputed.

### (2) The November 2005 trial: Felicia Jones' testimony.

165. Felicia Jones testified at Carnes' November 2005 criminal trial, again, as a State's witness. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, pgs. 159-181.

**Response:** Undisputed.

166. Once again, the State admitted Jones' statement to Morgan (marked as State's Exhibit 45) into evidence over objections. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, pgs. 167-168; **Exhibit BB**, State's Exhibit 45, Jones' statement to Morgan.

**Response:** Undisputed.

167. Similar to her April 2005 testimony, she testified she did not recall talking to police, but admitted her initials and signature were on her statement. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 165:15-17 ("Q. do you remember talking to the police about a shooting? A. No, I do not remember."), 166:5-6 ("Q. And then on page 1 there is 'FMJ'? A. That's my initials."), 166:9-10 ("Q. And then you have page 2, 'FJM'? A. Yes. That's what you told me last time."), 166:13-14 ("Q. And then page 3, 'FMJ.' Are those your initials? A. Yes."), 166:21-22 ("Q. And finally, page 4, is that your signature? A. Yes, it is my signature.").

**Response:** Undisputed.

168.    Similar to her April 2005 testimony, she testified at the time she gave her statement to police, she had been smoking crack for 30 days straight and hardly slept, had bipolar disorder, borderline schizophrenia, paranoia, depression and mood swings, and heard voices. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 175:18-22 ("Q. I remember talking to you and you told me that prior to police picking you up you had been smoking crack for 30 days straight with hardly any sleep at all. Is that correct? A. Yes."), 176:22-24 ("Q. And you told me that you have been diagnosed with a bipolar disorder? A. Yes, I have bipolar."), 177:2-11 ("Q. All right. You also told me that you had paranoid schizophrenia where you had a multiple personality disorder, is that correct? A. I have borderline schizophrenia and paranoia, depression and mood—Q. Mood swings? A. Yeah. Q. Okay. You also told me that you heard voices at times, is that correct? A. I heard voices, yeah, the majority of the time.").

**Response:** Undisputed.

169.    She testified that she did not read well, and when police gave her a document to read over, she probably couldn't have read it. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 174:8-14 ("Q. Your reading wasn't well. Okay. Can you read that document that's in front of you (referring to her statement to Morgan)? A. Not really. Q. Okay. So if the police gave you a document and asked you to read over it, you probably couldn't have read it, is that true? A. That's true.").

**Response:** Undisputed.

### (3) The November 2005 trial: Steve Morgan's testimony.

170.    Morgan also testified at Carnes' November 2005 criminal trial as a State's witness. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, pgs. 288-300.

**Response:** Undisputed.

171.    He testified that he did not fabricate Jones' statement. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 290:9-11 ("Q. Here are my questions (sic), Detective Morgan: Did you make the statement up? A. No, I did not.").

**Response:** Undisputed.

172.    He testified that he had never arrested Jones before, and did not know she had been arrested five days prior to giving a statement to him.  **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 293:16-21 ("Q. Have you ever arrested Felicia Jones? Have you ever arrested her? A. No, I have not. Q. Do you know if she had been arrested five days prior to your taking that statement from her? A. Did I know at the time? No, I did not.").

**Response:** Undisputed.

173.     Morgan explained the process when taking a formal statement from a witness: the witness is interviewed to determine whether they've witnessed the incident; if they did, then, they are taken to a typist, and all questions and answers are typed; the typed statement is printed; the witness is given the opportunity to read it and make any corrections to it; and they then sign the statement as the truth. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 290:14-291:7 ("Q. Now the statement –it's already in evidence, State's 45, I believe. It's in question-and-answer format. Can you tell the Court how that goes down? A. Basically, we interview the individual. We ask questions regarding what that person may know about what had occurred. Once it's determined that she had witnessed the incident or had information regarding the crime itself, we then take them to a steno, or a typist. At that point, we ask questions, formal questions, and she answers the questions. Everything that is said is typed. At the end of that, it's printed out and that person, he or she, is afforded the opportunity to read it, make corrections, make sure that everything –all of their answers that they say – is correct and what they said, and then they are asked if that is the truth. If they say it is, then they sign it at that time.").

**Response:** Disputed in part: Morgan testified that statements were taken from witnesses who "witnessed the incident **or** had information regarding the crime itself," per the above citation. Undisputed that the above was his testimony.

174.     Morgan testified that at the time he took her statement, Jones read the statement to herself, made a couple of changes to it, did not appear to be under the influence or suffering from any mental disease, and appeared normal. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 290:5-8 ("Q. Did she make a statement to you? A. She made a formal typed statement to us regarding the incident that occurred that night which involved the homicide."), 291:12-292:4 ("Q. Do you remember if you read the statement to her or if she read it to herself? A. She read it to herself, and I do believe she actually made a couple of corrections just based on what she had to say. Q. Okay. When you came into contact with her, did she appear to be under the influence? A. Not at the time, no. Q. Was there anything unique about her that in your years as a police officer made you think that she just didn't know what she was talking about, like a schizophrenic hearing voices? A. Other than the fact that she was scared based on talking to us with the information that she had, she was concerned with what might happen to her based on what she was going to tell us, but besides that, no, she appeared normal at that time."), 298:20-25 ("Q. Did you – you say that when you talked to Ms. Jones she didn't seem like she was high or suffering from any mental disease? A. At that time, I wasn't able to tell. I'm not a doctor, but based on my previous experience, no, she did not appear to be.").

**Response:** Undisputed that he so testified but note, as explained above, Jones testified in contradiction to Morgan's testimony.

175.     Morgan testified that he gave Jones a copy of her statement and asked her if it was correct; he did not ask Jones if she could read, and did not ask her to read the statement out loud to him. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November

2005 trial transcript, 297:10-17 ("Q. Did you ask Mr. (sic) Jones if she could read? A. No, I did not ask her that. Q. Okay. Did you have her read that statement out loud to you? A. No, I did not. Q. Okay. You handed it to her, you asked her if it was correct, and asked her to sign it, correct? A. That is correct.").

**Response:** Undisputed.

176.     He also testified that he believed she was able to read, because she made a correction to her statement, but he did not recall what that correction was. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 297:18-25 ("Q. Okay. But you don't know whether or not she was able to read it and understand what was on that paper, do you? A. I believe she was able to read it, since she made a correction. I don't believe she would have made the correction if she couldn't have read it. Q. What correction did she make, sir? A. I don't recall what correction it was.").

**Response:** Undisputed that he so testified but note, as explained above, Jones testified in contradiction to Morgan's testimony.

177.     He testified that the copy of Jones' statement before she made the corrections to it, was shredded right there and then. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 298:1-14 ("Q. Okay. Do you have it noted? On the document that I saw, there were no initials on there showing any corrections. A. And there isn't. Basically, it's a format of where they sit down and they read it page by page. If they see something that's on there that they say they didn't say or is incorrect, they ask us to correct it, we shred that copy, and we print a new one."), 298:18-19 ("Q. And when did you shred it? A. Right then and there.").

**Response:** Undisputed.

178.     He testified that there was no record of what Jones changed in her statement or how many changes she made. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 298:10-17 ("Q. Okay. So the one that you're saying she made a correction on, that's been shredded, and, of course, since it's shredded, I can never see it, right? A. Correct. Q. Okay. So I just have to take your word for that, right? A. That is correct.").

**Response:** Undisputed.

179.     He further testified that he did not promise her anything, and she was dropped off where she wanted to go after her statement. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 292:5-14 ("Q. Okay. Did you promise her anything? A. No, I did not. Q. Did you promise that you would get her some crack or anything? A. No, I did not. Q. Did you drop her off somewhere where she could get some crack? A. No. We asked her where she wanted to go, she told us where she wanted to go, and that's where we took her.").

**Response:** Undisputed that he so testified, but note that he did not arrest her or effect her arrest on her outstanding warrants.

### (4) Morgan's 2024 Deposition Testimony.

180.    Today, Morgan remembers nothing about his interview of Felicia Jones. **Exhibit Q**, 2024 Deposition of Steve Morgan, 41:5-7 ("Q. Anything you recall other than what you read in the reports about Felicia Jones? A. No."), 136:8-14 ("Q. And we've asked some questions about Felicia Jones and my recollection – and tell me if I'm wrong—is that you don't have an independent recollection of your back-and-forth when you interviewed her. Is that correct? A. I don't have—no, I do not recall the—the interview process.").

**Response:** Undisputed.

181.    In his 2024 deposition, Morgan testified he would not ask a witness whether they were under the influence of drugs unless he believed they were under the influence based on talking to them. **Exhibit Q**, 2024 Deposition of Steve Morgan, 104:18-24 ("Q. Was that something you asked witnesses in homicides, whether they were under the influence of drugs when they spoke to you? A. I don't think that question would be asked unless we believed based on their – you know, their—just talking to them, whether we believe that they were under the influence of anything.").

**Response:** Undisputed.

182.    In his 2024 deposition, Moran testified that it was common practice to make the corrections a witness wanted made to her statement and just print the page with the corrected version for the witness to reread, determine it was the truth, then initial that page; and the incorrect version would be shredded. **Exhibit Q**, 2024 Deposition of Steve Morgan, 131:13-25 ("Q. At any point when you were a homicide detective and a witness that you took a formal statement from made corrections, would you encompass those corrections into a new formal statement? A. The common practice at the time would be to make the corrections that she wanted made and a –that page ideally would –just that page would be printed back out. She would then reread it, or they would reread it, whoever the person was, to determine that that was the truth, that was her words before she initialed the bottom of the page. And then the – the incorrect version would be shredded.").

**Response:** Undisputed that he so testified.

183.    In his 2024 deposition, Morgan testified that the incorrect version of a witness's statement was shredded to avoid the confusion of having multiple incorrect versions of the same witness statement. **Exhibit Q**, 2024 Deposition of Steve Morgan, 132:4-14 ("Q. And what was your understanding of why the incorrect version of the statement would be shredded? A. At the time the thought process was –let's say somebody made multiple corrections throughout the statement, then we would be recovering three or four typed statements, and it would create confusion as to which statement was the final statement. So to eliminate that we just made the corrections to be "This is the truth, this is the statement, and this was recovered.").

**Response:** Undisputed that he so testified.

184.    In his 2024 deposition, Morgan testified that he has never given a witness money; however, he has no problem with a detective giving a witness $5 or $10 to buy a sandwich, after that witness gave a statement. **Exhibit Q**, 2024 Deposition of Steve Morgan, 135:25-136:7 ("Q. Okay. And no –so you wouldn't have taken any – any issue with a detective giving, like 5 or $10 to a witness after they gave a statement? A. If that—if they deemed that as the same thing as buying them a sandwich because we kept them for five, six, seven hours, then, no, I wouldn't have a problem with that.").

**Response:** Undisputed that he so testified, but note that Jones testified that Morgan paid her after she gave her statement.

### (5) Blehm's 2024 Deposition Testimony.

185.    In his 2024 deposition, Blehm testified he was not aware of an officer giving Felicia Jones $5 but admitted officers give money out of their own pockets all the time for various reasons, such as to pay for food or bus fare, and he did not believe that was inappropriate. **Exhibit L**, 2024 Deposition of Robert Blehm, 286:25-287:11 ("Q. Sure. And by the way, are you aware that Felicia Jones says she was given five dollars by officers after she was dropped off after this interview? A. I'm not aware of that, but sometimes folks that are on the street need something to eat or bus fare or who knows what. Officers go out of their own pockets all the time and give people money for various reasons. Q. Is there anything inappropriate with that? A. I don't think so.").

**Response:** Undisputed, but clarify that Blehm said that officers gave money to witnesses for "food or bus fare or who knows what."

### (6) Huth's 2024 Deposition Testimony.

186.    The only thing Huth recalls about Felicia Jones is transporting her to Morgan to give a statement. **Exhibit N**, 2024 Deposition of Vernon Huth, 63:24-64:3 ("Q. Felicia Jones, do you have an independent recollection of Felicia Jones? A. I believe that might have been the name of the party I spoke of earlier that I – that I transported down there."), 210:25-211:3 ("Q. Is there anything you remember about Felicia Jones here? A. Picked her up, took her to Detective Morgan.").

**Response:** Undisputed.

187.    In his 2024 deposition, Huth testified he never gave witnesses money, but has bought food for witnesses with his own money. **Exhibit N**, 2024 Deposition of Vern Huth, 151:8-18 ("Q. All right. Now, when you were a patrol officer, would you ever buy food for witnesses? A. I'm sure I bought a cheeseburger here or there. Q. Yeah. Would you ever give them like money for bus fare if they needed it? A. No. I never had any money myself. You know what we made back then. I didn't have any money. I had four boys and two girls I had to take care of."), 152:7-12 ("Q. Would it, would it have been appropriate to pay money out of your own pocket like in

40

terms of giving money to witnesses? A. I mean, giving my own money, no. To use my own money to buy food just to be human, yeah, I'm sure I've done that.").

**Response:** Undisputed.

### (7) Begley's 2024 Deposition Testimony.

188.    Today, Begley has no memory of Felicia Jones. **Exhibit O**, 2024 Deposition of Ed Begley, 21:3-4 ("Q. Do you have any memory of Keith Carnes? A. No, sir."); 21:21-22 ("Q. Or Felicia Jones? A. No, sir.").

**Response:** Undisputed.

### E.  Facts pertaining to Carnes' allegations that Huth, Begley, and Morgan destroyed their notes of their interactions with Felicia Jones and Wendy Lockett.

189.    In his 2024 deposition, Morgan testified that he would destroy his handwritten notes after those notes were encompassed in a report. **Exhibit Q**, 2024 Deposition of Steve Morgan, 107:14-22 ("Q. And what did – what did you do with your handwritten notes after you completed investigating a case in 2003? A. When—typically, when you dictate the report, the reports gets generated; the report reflects the notes that are generated. So once—once that was done and once that was completed, then the notes would be destroyed, because the report reflects the notes.").

**Response:** Undisputed that he so testified.

190.    In his 2024 deposition, Blehm testified that he would destroy his notes after he transcribed them into a free form 107, which is free form document. **Exhibit L**, 2024 Deposition of Robert Blehm, 78:19-79:6, ("Q. Q. Uh-huh. A. Depending on how busy that murder squad was, you may have not had time to generate all the reports from those notes. So the reason you're taking notes is to transcribe that information into a free form 107. So once the murder squad period was over, we went on to basically an admin period. Q. Uh-huh. A. I would go back through and make sure that I had documented those notes into investigative case documents, that I didn't miss anything, then I would destroy them."), 115:11-14 ("Q. And 107s, are those the reports you write about your own steps in the investigation? A. They're a free form document. You can write anything you want on them.").

**Response:** Undisputed that he so testified.

191.    In his 2024 deposition, Huth testified that once he transferred his notes, he'd shred them. **Exhibit N**, 2024 Deposition of Vernon Huth, 109:2-6 ("Q. And what my question is, if there's anything similar you did on patrol. A. I'm, I'm sure at one time yes. Notes or anything, you know, once transferred, they are shredded.").

**Response:** Undisputed that he so testified.

192.    In his 2024 deposition, Niemeier testified that as a supervisor, he relied on

detectives to make sure the details in their notebooks got into their written reports. **Exhibit R**, 2024 Deposition of Niemeier, 111:1-4 ("Q. In 2003, homicide detectives you supervised typically carried a notepad with them to take notes. Correct? A. Correct."), 111:16-20 ("Q. So as a supervisor, you would have relied on them to make sure the details in the notebooks got into their reports. Correct? A. Correct.").

**Response:** Undisputed that he so testified.

> **F. Carnes learned about Lockett's, Morrow's, and Jones' criminal histories and drug use and Jones' mental illnesses, prior to his November 2005 trial.**

193.    Carnes' criminal defense attorney, Willis Toney, deposed Wendy Lockett on October 28, 2005 and asked her about her arrests, convictions, and drug use. **Exhibit CC**, 2005 Deposition of Wendy Lockett, pgs. 9-18.

**Response:** Undisputed.

194.    On October 26, 2004, Toney interviewed Felicia Jones at the Jackson County Jail. **Exhibit AA**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, April 19, 2005 testimony of Felicia Jones, pg. 1, pg. 29:9-19 ("BY MR. TONEY: Q.Good afternoon, Miss Jones. A. Good afternoon. Q. The last time you and I spoke other than today would have been October 26th of 2004, when they brought you from Vandalia. You were in Vandalia, right. A. Uh-huh. Q. Brought you from Vandalia, a women's penitentiary, to the Jackson County Jail, correct? A. Yeah.")

**Response:** Undisputed.

195.    In November 2004, Toney interviewed Lorianne Morrow. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 25:3-22 ("Q. I see another motion here, pro se, filed August 25, a motion to preserve testimony, apparently requesting depositions of Felicia Jones, Wendy Lockett, and Lorianne Morrow. What's the status of that? MS. PARSONS: I'll let Mr. Toney answer. MR. TONEY: Your Honor, I took Wendy Lockett's deposition one day last week—I believe it was on November the 3rd—got the transcript of that, and provided a copy to my client. The State, I believe, has a copy of that deposition. Felicia Jones was over a year ago that I did hers. I believe it was October 24th of 2004. I spoke with her in the presence of the prosecutor, took a statement from her then. Lorianne Morrow, I took in November of 2004, spoke to her in the presence of the prosecutor, not Ms. Parsons, but Amy McGowan.").

**Response:** Undisputed.

196.    At the April 2005 trial, Lockett, Jones, and Morrow testified about their convictions and drug use, and Jones testified about her mental illnesses; and Toney had copies of that trial testimony before the November 2005 trial. **Exhibit X**, April 19, 2005 trial testimony of Lorianne Morrow, 4-5, 29-30; **Exhibit AA**, April 19, 2005 trial testimony of Felicia Jones, pgs. 3-8, 30-32; **Exhibit Z**, April 20, 2005 trial testimony of Wendy Lockett, pgs. 5-7, 21-23; **Exhibit D**, *State of*

*Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 25:23-26:8 (A. [by Mr. Toney]…Also, since there was a previous trial in this case, they were both cross-examined at the previous trial and I have copies of the transcript of the trial testimony and the cross-examination, and those have been provided to my client prior to today. Q. THE COURT: All three of them testified in the prior trial? MR. TONEY: All three of them testified. I got transcripts of them, and all transcripts have been provided to Mr. Carnes.").

**Response:** Undisputed.

197.    At the November 2005 trial, Lockett, Jones, and Morrow testified about their convictions and drug use, and Jones testified about her mental illnesses. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, pgs. 128-29, 159-61, 173-77, 183-87, 202-06.

**Response:** Undisputed.

198.    In addition, prior to the November 2005 trial, the State provided the convictions of its witnesses, including Lockett's, to Toney. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 22:13-23:1 ("Q. [by the Court] Has the State presented to the defendant the prior convictions of the witnesses that the State intend to produce? A. MS. PARSONS: Yes, Your Honor. On the State's supplemental responses to request for discovery, filed April 15th, 2005, the State filed a list of the State's witnesses, outlining their convictions. This morning, I had an update for Mr. Toney, and I actually took his motion and wrote the update onto his motion. He has had these since April 15th, and the only change was Wendy Lockett. I'm showing the Court a copy of the State's motion.").

**Response:** Disputed in that Lockett's testimony is not the best evidence of whether and to what extent Lockett's convictions were presented to Plaintiff's attorney, but that is irrelevant to summary judgment.

### G. Carnes was convicted of Larry White's murder by Judge Gene Martin in November 2005 based on eyewitness testimony.

199.    On November 22, 2005, Judge Gene Martin found Carnes guilty of the murder of Larry White based on the eyewitness testimony of Morrow, Lockett, and Jones. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, pgs. 480-487.

**Response:** Undisputed that Plaintiff was so convicted, but clarify that the eyewitness testimony was fabricated, as discussed throughout Plaintiff's Statement of Facts.

200.    Judge Martin noted that Morrow, Jones, and Lockett "all saw and heard the shooting at one point or another during this episode." **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 483:13-15.

**Response:** Undisputed that Judge Martin made those remarks on the record.

43

201. He recognized the discrepancies and inconsistencies in the eyewitness testimony, but concluded, "that's not uncommon in a situation like this where people are running and frightened and so forth." **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 485:24-486:5.

**Response:** Undisputed that Judge Martin made those remarks on the record.

202. Vernetta Bell testified at Carnes' November 2005 trial on behalf of Carnes that she was at the scene at the time of the shooting, and saw Carnes, who was unarmed and not shooting. **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 410:12-16 ("Q. Okay. And did he have a gun with him? A. Uh-uh. Q. Was he shooting at anybody? A. No. He was up there peeking like everybody else was.").

**Response:** Undisputed.

203. Judge Martin found Vernetta Bell's testimony "rather suspect" and he didn't "lend much credit to it really—or not at all, as a matter of fact." **Exhibit D**, *State of Missouri v. Keith L. Carnes,* Case No. 16CR03006321, November 2005 trial transcript, 482:22-24.

**Response:** Undisputed.

### H. Huth's October 7, 2003 report.

### (1) Special Master Judge Hickle's findings from Carnes' 2020 habeas case.

204. Judge Hickle found that "Petitioner's Exhibit 70" was produced to Carnes' public defender, Susan Hogan, "between the time that Ms. Hogan filed Petitioner's amended 29.15 motion on August 7, 2008, and when his evidentiary hearing was conducted on May 9, 2008 (sic).[3] **Exhibit H**, *Keith Carnes v. Michele Buckner,* Case No. 21PH-CV00030 and Related Case No. SC98736, Master's Amended Final Report to the Missouri Supreme Court and Findings of Fact, February 10, 2022, pgs. 109-110; **Exhibit M**, Petitioner's Exhibit 70.

**Response:** Undisputed.

205. Susan Hogan represented Carnes in his 29.15 (post-conviction relief) proceedings. **Exhibit H**, *Keith Carnes v. Michele Buckner,* Case No. 21PH-CV00030 and Related Case No. SC98736, Master's Amended Final Report to the Missouri Supreme Court and Findings of Fact, February 10, 2022, pg. 108.

**Response:** Undisputed.

206. Judge Hickle found that Hogan "wrote a letter date July 22, 2008 to the Records

---

[3] Carnes' 29.15 hearing was on September 4, 2009. **Exhibit F**, pg. 1.

Unit of the Kansas City Police Department 'formally requesting that the Kansas City Police Department allow me to inspect the master files regarding the [Keith Carnes] cause and for the records unit to make copies of all police reports relating to said files.'" **Exhibit H**, *Keith Carnes v. Michele Buckner,* Case No. 21PH-CV00030 and Related Case No. SC98736, Master's Amended Final Report to the Missouri Supreme Court and Findings of Fact, February 10, 2022, pg. 114.

**Response:** Undisputed.

207.    In his 2024 deposition, Carnes testified that he only ever received the second page of Huth's October 7, 2003 report during his 29.15 proceedings. **Exhibit B**, 2024 Deposition of Keith Carnes, 202:17-15 ("Q. And do you know if you had this page 1 of two at the time of your 2015—2915 proceedings? A. No, I don't believe that I did. If I did—no, I don't—I always had two of two. I was always looking for one. I didn't know what one was supposed to look like, but I always thought that number 1 would have the confidential informant's name on it, but I –so this is my first time noticing page 1.").

**Response:** Undisputed.

### (2) The contents of Huth's October 7, 2003 report.

208.    That report is 2 pages and on the second page, states "[o]n October 7, 2003, at 11:55 a.m., P.O. Begley [and Huth] were contacted by a confidential informant in regarding to information on a homicide that occurred on 10-6-03 at 28th and Wabash. She stated that on 10-6-03 at approximately 2030 hours, she observed a black male running from 29th and Olive (apartment buildings), being pursued by two other black males who were firing guns at him. She stated that the black male ran north in the alley, just east of the above-mentioned apartments, jumped a fence and ran eastbound beside 2846 Wabash. The two black males continued pursuing him while firing rounds from an unknown weapon. On 10-7-03 at 1200 hours, P.O. Begley and [Huth] conducted an area canvass in the area where the informant observed the incident and recovered the listed items. P.O. Begley recovered the listed items at EPD and placed them in EPD property with a value of $2.00. It should be noted the above-mentioned informant has in the past given us reliable information in regard to numerous crimes." **Exhibit U**, Vern Huth's October 7, 2003 report.

**Response:** Disputed; Defendants have quoted most, but not all of the report. It reads in full as follows (additions in bold):

On October 7, 2003, at 11:55 a.m., P.O. Begley [and Huth] were contacted by a confidential informant in regarding to information on a homicide that occurred on 10-6-03 at 28th and Wabash. She stated that on 10-6-03 at approximately 2030 hours, she observed a black male running from 29th and Olive (apartment buildings), being pursued by two other black males who were firing guns at him. She stated that the black male ran north in the alley, just east of the above-mentioned apartments, jumped a fence and ran eastbound beside 2846 Wabash. The two black males continued pursuing him while firing rounds from an unknown weapon. On 10-7-03 at 1200 hours, P.O. Begley and [Huth] conducted an area canvass in the area where the informant observed the incident and recovered the listed items **from the northside of 2846 Wabash. Sgt. Niemier and Det. Morris of the**

45

**Homicide Unit were on at the scene at the time of the recovery of the listed items**. P.O. Begley recovered the listed items at EPD and placed them in EPD property with a value of $2.00. It should be noted the above-mentioned informant has in the past given us reliable information in regard to numerous crimes."

Ex. 22 (Huth 10/7/2003 Report).

209.    On the first page, the report is dated October 7, 2003, was approved by an undecipherable signature, and marked to be routed to "Homicide," with the case number 03-095392. **Exhibit U**, Vern Huth's October 7, 2003 report.

**Response:** Undisputed.

210.    Case number 03-095392 was the case number for the KCPD Larry White homicide investigative file. **Exhibit T**, KCPD investigative file.

**Response:** Undisputed.

211.    The first page also lists 2 Wolf 762 shell casings with an estimated value of $2.00. **Exhibit U**, Vern Huth's October 7, 2003 report.

**Response:** Undisputed.

212.    The first page also states "LOGGED" and "SCANNED", and next to "LOGGED" is a handwritten number. **Exhibit U**, Vern Huth's October 7, 2003 report.

**Response:** Undisputed.

**(3) Huth's testimony related to his October 7, 2003 report.**

213.    Huth testified the "confidential informant" in his October 7, 2003 report is Wendy Lockett. **Exhibit N**, 2024 Deposition of Vern Huth, 66:5-10 ("Q. So let me ask about your independent recollection of Wendy Lockett on October 7, 2003. She was the one whose handwritten report naming a confidential informant you talked about earlier. Right? A. Yes.").

**Response:** Undisputed.

214.    Huth does not recall what he and Lockett said to each other on October 7, 2003. **Exhibit N**, 2024 Deposition of Vern Huth, 66:23-67:1 ("Q. Do you recall independently what you said to each other when you, when you spoke with her? A. No.").

**Response:** Undisputed.

215.    Huth's practice at the time was to ask people in his patrol area if they knew or saw

46

or heard anything related to a crime. **Exhibit N**, 2024 Deposition of Vern Huth, 148:11-15 ("Q. …if you know a crime has happened in your patrol area, would you ask people, you know, if they knew or saw or heard anything about it? A. Absolutely.").

**Response:** Undisputed.

216.    If a person said they knew something about a crime, Huth would not question them at all, and would encourage them to not tell him, so it wouldn't be misconstrued. **Exhibit N**, 2024 Deposition of Vern Huth, 149:21-150:2 ("Q. …And if they say they know something, you'd hear what they said, but didn't question them further. Right? A. Yeah. I didn't, I didn't question them at all. As a matter of fact, I would encourage them not to tell me so it, it wouldn't get misconstrued.").

**Response:** Undisputed that he so testified, but a jury could disbelieve Huth's self-serving testimony, as Special Master Hickle concluded. Dkt. 139-9 at 76 (finding that "to the extent [Huth] implies an officer is not to ask a single question . . . and instead is expected to remain mute when receiving a report from an eyewitness to a crime, [Huth] lacks credibility.").

217.    If a person told him they had information, he'd call the detective and would document whatever the person volunteered or uttered to him. **Exhibit N**, 2024 Deposition of Vern Huth, 150:23-151:4 ("Q. You'd only write a report when someone actually had some information. Right? A. Again, I wouldn't ask them any information. I would call the detective, and the detective would ask them about that. If they volunteered it or uttered it, then I would document it.").

**Response:** Undisputed that Huth would call the detective so the detective could question the witness and that his practice was to document what the person volunteered.

218.    After his October 7, 2003 contact with Wendy Lockett, he would have referred Lockett to a detective, he does not recall which one, but his best bet is that he referred her to Blehm; he would not have referred her to Niemeier. **Exhibit N**, 2024 Deposition of Vern Huth, 176:25-177:21 ("Q. Who would you have referred Wendy Lockett to? A. Whomever was up there at the time. Q. Okay. A. So whoever was up there at the homicide. I think in this case it was probably either detective—it had to have been Detective Blehm possibly. I can't remember exactly. Q. Because Blehm was the case agent. Right? A. Yes. Q. And so he might—got it. And so you think it was someone in the unit other than Niemeier and Morris who you referred Lockett to. Is that correct? A. Uh-huh. He would have been the boss. Q. Yeah. A. And would know—he wouldn't do that. Q. And Blehm is your best bet as to who you referred Wendy Lockett to. Right? A. Yes, sir.").

**Response:** Undisputed.

219.    Huth marked his October 7, 2003 report to be routed to the Homicide Unit, and expected it to be routed there. **Exhibit N**, 2024 Deposition of Vern Huth, 172:21-173:2 ("Q. In the right corner. And what's the –what does the routing box refer to there? A. Just to a – who a copy of the report should be routed to. Q. Got it. So that would be marking that a copy needs to go to the homicide unit. Correct? A. Yes, sir.").

47

**Response:** Undisputed.

220.    Huth understood that his report was scanned, and there was an electronic copy of it. **Exhibit N**, 2024 Deposition of Vern Huth, 173:6-15 ("Q. What – and it also says scanned under that. Right? A. Yep. Q. Now, is that what you were referring to before about electronic scanning? A. Yeah, log and scan, yes, sir. Q. So that would mean the department would have generated an electronic copy of this at the same time, too. Correct? A. That's my understanding of it.").

**Response:** Undisputed.

221.    Huth understood that his report would get to the Homicide Unit by either it being scanned or after it had been scanned, there was pan in the homicide office for it, but he didn't follow up to see if his report got to the Homicide Unit.  **Exhibit N**, 2024 Deposition of Vern Huth, 105:15-22 ("Q. And if your report related to an—say a homicide investigation, what was your understanding of how your report gets to the homicide investigator? A. There was either a pan after it had been scanned or scanned. It would get there. I mean, I never—I guess I didn't really follow up on it.).

**Response:** Undisputed.

222.    Huth assumed a scanned report should get to the investigator. **Exhibit N**, 2024 Deposition of Vern Huth, 106:17-20 ("Q. But if a report is scanned and things are working as intended, it should go to the investigator at the time. Right? A. I would assume that.").

**Response:** Undisputed.

223.    Huth did not have any role in whether his October 7, 2003 report got to the prosecutor; that was the case detective's job after he got the report. **Exhibit N**, 2024 Deposition of Vern Huth, 174:21-175:3 ("Q. I think we covered this before, right, but after you write this report, and it gets routed in homicide, you don't have any role in whether it goes to the prosecutor, do you? A. No, sir, not at all. Q. That's the case detective's job after they get the report. Right? A. Yes, sir.").

**Response:** Undisputed that it was Blehm's job to ensure that Huth's report got to the prosecutor, but disputed that Huth had no role in the disposition of his report—a reasonable jury could conclude that Huth agreed with others to hide the report. PSOF ¶¶ 23-40.

224.    As a patrol office, Huth never questioned what detectives did nor did he discuss investigative strategy with them. **Exhibit N**, 2024 Deposition of Vern Huth, 187:10-17 ("Q. Here would you have made sure the detectives questioning Ms. Lockett knew that she had actually already been contacted in this investigation? A. No. I didn't question what the detectives did, because perhaps—I had no—so from a patrol officer's perspective—let me break this down."), 188:9-11 ("Q. Sure. You're not going to be talking strategy with them? A. No.").

**Response:** Undisputed that he so testified, but disputed in that a reasonable jury could conclude that Huth agreed with officers on a plan to solicit false testimony from witnesses. PSOF ¶¶ 41-44.

225.     Even though Huth's report states that Niemeier and Morris, from the Homicide Unit, were in the area five minutes after his contact with Lockett, he would not have referred Lockett to them; instead, he would have referred Lockett to possibly Blehm or someone in the Homicide Unit other than Niemeier and Morris. **Exhibit N**, 2024 Deposition of Vern Huth, 176:21-177:21 ("Q. So would those have been the homicide detective and sergeant who you would have referred Wendy Lockett to at the time? A. No, sir. Q. Who would you have referred Wendy Lockett to? A. Whomever was up there at the time. Q. Okay. A. So whoever was up there at the homicide. I think in this case it was probably either detective – it had to have been Detective Blehm possibly. I can't remember exactly. Q. Because Blehm was the case agent. Right? A. Yes. Q. And so he might—got it. And so you don't, you don't think—you think it was someone in the unit other than Niemeier and Morris who you referred Lockett to. Is that correct? A. Uh-huh. He would have been the boss. Q. Yeah. A. And would know—he wouldn't do that. Q. And Blehm is your best bet as to who you referred Wendy Lockett to. Right? A. Yes, sir.).

**Response:** Undisputed.

226.     Begley brought the recovered shell casings to East Patrol Property.  **Exhibit N**, 2024 Deposition of Vern Huth, 177:22-178:5 ("Q. Now, and it says it was Begley who, I'm sorry, Officer Begley who actually recovered the listed items, the actual two shell casings. Right? A. Uh-huh, yep. Q. And he just, according to this anyway, he just took them and brought them right to east patrol property at that time. Right? A. Yes, sir.").

**Response:** Undisputed.

227.     Huth's report would have allowed the two shell casings to get tied to the homicide case. **Exhibit N**, 2024 Deposition of Vern Huth, 178:6-10 ("Q. And then since this is also flagged as recovered property, this report would have allowed the shell casings to get tied to the case. Is that right? A. That's my understanding at the time.").

**Response:** Undisputed.

228.     It would have been his practice to tell Niemeier and Morris about the two recovered shell casings, since both were there at the scene, when they were recovered. **Exhibit N**, 2024 Deposition of Vern Huth, 179:1-7 ("Q. And was that something, would you and in your practice as a patrol officer, if you recovered shell casings on the scene and there's homicide detectives in the area, would you tell them what you found? A. I'm sure, yeah. I'm sure. I'm sure that I probably told them, you know.").

**Response:** Undisputed.

229.     The two recovered shell casings were probably associated with the homicide case. **Exhibit N**, 2024 Deposition of Vern Huth, 178:11-21 ("Q. Is that—was that—was that your practice at the time, that completing a report in association with recovered property, is how you

made sure the property gets tied to the case? A. Well, not only that, but based on the facts of where she said she saw these individuals running—Q. Yeah. A. –firing a weapon. It made sense where she said she saw them, that they recovered, they were probably associated to the case.").

**Response:** Undisputed.

230.     Huth has no independent recollection of dropping Lockett off at the Homicide Unit on October 14, 2003, to give her statement, but would not have told detectives at that time about his October 7, 2003 interaction with her, because he would have assumed they already knew. **Exhibit N**, 2024 Deposition of Vern Huth, 188:21-189:10 ("Q. You're not relying on some independent memory of what you did after you dropped Wendy Lockett off in the room on October 14, right? Or do you have an independent recollection of that? A. Absolutely not. Q. That's what I assumed. A. Thank you. Q. Now, and in any case, by writing the report and referring Wendy Lockett to the detectives on October 7, you had doubly made sure the detectives knew about your interaction with Wendy Lockett. Right? A. No. I mean, I assume they already knew.").

**Response:** Undisputed, but clarify that Huth's testimony was that because he referred Lockett to the homicide team on October 7 and wrote a report on October 7, he would assume that the homicide detectives knew about her earlier statement. Ex. 7 at 188:21-190:5.

### (4) Begley's testimony related to Huth's October 7, 2003 report.

231.     Begley never saw Huth's October 7, 2003 report, because reports did not get routed through him. **Exhibit O**, 2024 Deposition of Ed Begley, 49:5-13 ("Q. Either way. Whatever you have knowledge of, please. A. I mean, we get information all the time from people. If –if he named a confidential informants (sic), I mean, that's –I –I—you know, it's not at –at the time, we were just –I –we were just equals. So I mean, if he wants to use it in a narrative—I haven't even seen this report. None of these reports go through me.").

**Response:** Disputed. A jury could disbelieve Begley's self-serving testimony in light of evidence that he agreed to fabricate or suppress evidence against Carnes. PSOF ¶¶ 6, 23-40.

232.     Begley has no memory of Wendy Lockett. **Exhibit O**, 2024 Deposition of Ed Begley, 21:17-18 ("Q. Any memory of Wendy Lockett? A. No, sir.").

**Response:** Undisputed.

233.     Begley has never used the term "confidential informant" in his reports. **Exhibit O**, 2024 Deposition of Ed Begley, 48:16-23 ("Q. And when he writes down 'confidential informant,' was that in—in your practice of report writing in Kansas City Police Department, does writing someone down as a confidential informant in a – in a report mean anything specific to you? A. Not to me, no. I never used 'confidential informant' in my reports.").

**Response:** Undisputed.

234.     It was the detective's job to test and diagram any shell casings, not a patrol officer's,

50

like Begley. **Exhibit O**, 2024 Deposition of Ed Begley, 58:4-11 ("Q. If in the investigation it's important to test the shell casings, for example, is that something you would do as a—you would initiate as a patrol officer? Or would that be the detective's job? A. That would be—yeah. That would not be the patrol officer's job. It would be the –the detective's job."), 61:24-62:3 ("Q. But as – as a patrol officer, you would never be the one to diagram the shell casings on a homicide investigation; is that right? A. That is correct. Crime scene detective would –would initiate that.").

**Response:** Undisputed.

### (5) Blehm's testimony related to Huth's October 7, 2003 report.

235. Blehm does not recall whether Huth told him about his October 7, 2003 contact with Wendy Locket. **Exhibit L**, 2024 Deposition of Robert Blehm, 269:11-18 ("Q. So if I understand you, you don't think Huth told you that he had talked to Wendy Lockett before she was brought in on the question advisory because it would have been written somewhere down by you if he had? A. I believe I would have, I would have taken something. So I don't know if it occurred. I honestly don't remember.").

**Response:** Undisputed.

236. However, had Huth told Blehm about Lockett, Blehm would have asked Huth to bring Lockett to the police department to give her statement, instead of issuing a question advisory for her. **Exhibit L**, 2024 Deposition of Robert Blehm, 269:19-270:5 ("…(by Blehm) I'm just trying to think. I don't think he—I don't think we were aware of that information downtown in investigations up until issuing the question advisory, because logically thinking, if that was the case, then why would I need to put a questioning advisory to go find her? Q. You would have just called them and said—A. I would have just called and say, hey, bring so-and-so down. I wouldn't have had to go through this process.").

**Response:** Undisputed.

237. Blehm did not know about Huth's October 7, 2003 report until Carnes' habeas hearing in 2021. **Exhibit L**, 2024 Deposition of Robert Blehm, 369:6-11 ("Q. No. When did you get the information that this was her, if you ever did? A. I didn't know—I didn't know about this until the—as far as I remember, until the issues with this report were brought up in the hearing in 2020").

**Response:** Disputed. A jury could disbelieve Blehm's self-serving testimony. The report would have been routed to Blehm in the normal course of business. A jury could find Blehm interviewed Lockett on October 7, 2003, took his own notes of that interaction, and then buried those notes or reports in addition to Huth's October 7, 2003 report. Further, Blehm's testimony here is that he didn't know about the **issues** with the report until the habeas hearing, not that he had not seen the report. PSOF ¶¶ 23-40.

238. Officers got their reports to Blehm by either placing them in his "stackable thing in

[his] box" or in the homicide squad pan; from the homicide squad pan, the reports would get matched with the proper case file. **Exhibit L**, 2024 Deposition of Robert Blehm, 369:24-370:15 ("Q. That same mailbox where you collect information about your cases—that's where you'd expect this report to show up. Right? So form 100 with the case number on it. Right? A. Yeah. Well, there's two places it could go. It could either go to the stackable thing in my box. We also had a squad pan. So officers in the middle of the night—they would come through and they could put it in the pan if they didn't' know which detective it was assigned to. One of the two. Q. And then from the pan, it gets matched to the case. Right? A. Right. Q. That's how you'd expect it to come to you after this was written? A. Yes.").

**Response:** Undsiputed.

239.    As a matter of normal procedure, assuming Huth and Begley relayed the information they got from Lockett on October 7, 2003 to Niemeier while they were all at the scene, Niemeier would have never talked to Wendy Lockett there. **Exhibit L**, 2024 Deposition of Robert Blehm, 365:1-12 ("Q. I just want to know if you're telling me you think it's possible that none of these four men asked this confidential informant if she saw who the shooter was? MS. PETERS: Objection. Calls for speculation. A. I can state with a high degree of confidence that two of these men never talked to this person, because they wouldn't have. A sergeant's not going to go talk to a —to a witness, much less someone who's purporting to be a confidential informant."), 366:11-19 ("Q. (By Mr. Hilke) That wasn't my question. A. I don't know what they did at the scene. I didn't even remember this report. I'm trying to give you context to what –what could have happened and what we normally –procedure, but a sergeant's not going to go talk to someone who district cops have developed and is identifying themselves and wants to be a confidential informant.").

**Response:** Undisputed that Blehm testified that Niemeier wouldn't have interviewed Lockett.

### (6) Niemeier's testimony related to Huth's October 7, 2003 report.

240.    Niemeier had never seen Huth's October 7, 2003 report until days before his 2024 deposition. **Exhibit R**, 2024 Deposition of Niemeier, 159:11-13 ("Q. Do you have any memory of seeing this report before? A. Only the other day.").

**Response:** Disputed; Niemeier's testimony was that he did not remember seeing the report. Further, per the testimony in this case, a copy of Huth's report would have been routed to Niemeier, then Blehm. DSOF ¶ 249.

241.    Niemeier does not remember being at the scene with Huth, Begley, and Morris on October 7, 2003. **Exhibit R**, 2024 Deposition of Niemeier, 163:6-8 (A. …I see my name in this report as well that he states, which I don't remember, that I was out at the scene on the 7th, so…").

**Response:** Undisputed that he so testified.

242.    If Niemeier knew Huth's October 7, 2003 report was missing, he would have told

detectives to put it in the file. **Exhibit R**, 2024 Deposition of Niemeier, 170:24-171:8 ("Q. All right. If when the file was sent to the prosecutor you noticed that this report was missing, you would have said make sure that goes in the file. Correct? A. If I knew it was. Q. Right. Is that correct? A. Did I know if it was missing? Q. No, sir. A. If I knew it was missing, I would have said put it in there.").

**Response:** Undisputed that he so testified.

### I. Lockett was never a confidential informant.

243.    Lockett has never been a confidential informant. **Exhibit Y**, 2024 Deposition of Wendy Lockett, 70:12-17 ("Q. Okay. And number one, you were not a confidential informant; were you? A. No, ma'am. Q. And you've never been a confidential informant. Right? A. Correct.).

**Response:** Undisputed that she so testified, but disputed in that Huth identified her as a confidential informant who had provided reliable information on multiple occasions, so there is evidence that Huth and detectives used Lockett as a "confidential informant" regardless of Lockett's knowledge of that designation. Ex. 22 (Huth 10/7/2003 Report) at 2.

244.    Huth called Lockett a "confidential informant" in his October 7, 2003 report, because it was a practice he picked up from his prior employment at the Miller County Sheriff's Department to call anyone who gave information a "confidential informant." **Exhibit N**, 2024 Deposition of Vern Huth, 67:6-14 ("Q. And do you recall independently why you identified her as a confidential informant instead of writing her name in your report? A. Before or prior to working here, and I think I testified to that in the habeas hearing that's documented, I worked at the Miller County Sheriff's Department. And it was common practice to, anyone to give information at all, to call them a confidential informant. And at that time, again, I was literally a basic patrol officer. And I wrote that in the report because I was in fear because I knew she was out on the street to be there. And I probably should have used the term now "confidential source," because I know it's different definition between confidential source versus confidential informant.").

**Response:** Disputed. A reasonable jury could conclude that Huth called Lockett a "confidential informant" as part of an agreement to fabricate testimony to solve the White homicide or suppress exculpatory evidence. PSOF ¶¶ 23-64. Further, there is testimony that patrol officers at KCPD used the "confidential informant" designation (despite that there being no policy for the use of confidential informants by patrol officers) and that supervisors endorsed that practice, meaning that Huth's use of the term was a practice of KCPD (or so a reasonable jury could find). Ex. 4 (Blehm Dep.) at 153:10-22, 157:25-158:7, Ex. 7 (Huth Dep.) at 1223-124:22.

### J. KCPD/Board Commissioners 2003 Practices Relating to Homicide Investigations.

### (1) Preservation of exculpatory evidence.

245.    Detectives were to gather evidence, find out the truth no matter what that was or what direction that took, and all the evidence should be made available. **Exhibit Q**, 2024 Deposition of Steve Morgan, 92:19-93:3 ("Q. Okay. And that—and that was—the answers you

gave to my questions are consistent with that definition, meaning you understood what I meant when I asked you about exculpatory—preserving exculpatory information? A. Yes. Again, you know, our job as detectives are just to gather evidence, find—you know, talk to people, find out the truth no matter what that is, how—what direction that takes. And that all should be made available.").

**Response:** Disputed. The testimony in this case is that there were no policies or practices about exculpatory evidence. PSOF ¶ 124.

### (2) Maintaining case files.

246. A case detective was assigned to a homicide investigation; the case detective was responsible for maintaining the master file in relation to the investigation. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 22:25-23:7 ("Q. so from 2003 to 2005, when the department investigated a homicide, was a case detective assigned to the investigation? A. Yes. Q. And was the case detective responsible for maintaining the master file in relation to the investigation? A. Yes.").

**Response:** Undisputed.

247. The method in which the master file was maintained was taught by hands-on training. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 24:24-25:3 ("Q. Was it – was the method by which homicide maintained the master files taught by hands-on training? Meaning a new detective would learn how to do it from the other detectives? A. Yes.").

**Response:** Undisputed, and note that there were no written policies. Ex. 24 (Dillenkoffer Dep.) at 14:14-17, 24:18-23.

248. The homicide sergeant was responsible for ensuring the master files were accurate and that nothing was missed. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 26:11-27:2 ("Q. And during this time period, how did sergeant—what—what was the practice among sergeants to ensure that the detectives kept a complete master file? A. The first thing would be for the sergeant—would just to be approving any reports that were initiated by the detectives within the unit. And then I would—each—each sergeant would have their own procedure, I guess, or their own way of doing things. But, I mean, you're the person in charge. It's your job to make sure that these—you know, these files are as accurate as possible and that nothing is missed. So a little vague, but I'd say that that was the procedure, you know, the sergeant was the ultimate—ultimately the responsible party for those.").

**Response:** Disputed. There were no written policies. Ex. 23 (Dillenkoffer Dep.) at 14:14-17, 24:18-23. Sgt. Niemeier has testified that he "could have" reviewed the case file before it went to the prosecutor but did not always do so and that it was the case detective's job to bring that file to the prosecutor. Ex. 6 (Niemeier 2024 Dep.) at 32:8-17.

249. If a patrol officer wrote a report in the course of a homicide investigation, that report

would be sent to the homicide unit, first to the sergeant, then the sergeant would disseminate to the case detective. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 29:17-30:2 ("Q. if a patrol officer writes a report—like, this would be an example of one relative to homicide—after completing it, a copy of the report would be sent to the homicide unit. Is that correct? A. Yes. Q. And then at the homicide unit, that report would be directed to the case detective so that they would have a copy of the report; is that correct? A. Generally, those would go through the supervisor, and then down to the case detective.").

**Response:** Undisputed.

250.    There was a pan in each sergeant's office for reports. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 30:5-14 ("Q. …And then they would make sure it gets to the case detective; is that—A. Yeah. Q. Correct? A. That—that was the –process. It was a –it was a pan in each sergeant's office where everything would go pertinent to the cases that the squad was working. Then that sergeant would disseminate any report out specific to whatever case.").

**Response:** Undisputed.

251.    The records unit also got copies of all reports. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 42:3-12 ("Q. And after the sergeant reviewed and approved a report, was there any place that report was kept other than the master file? Meaning was there, like, a secondary storage of approved reports separate from the master file during this time period? A. Yes. I believe our records unit would get copies of all the reports as well as the file that—that we kept. But I could not tell you any specific procedure on that at the time.").

**Response:** Undisputed.

252.    Reports were to be approved as soon as possible. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 39:15-19 ("Q. So—okay. So—but the practice in homicide during this time was when a report is written, it should be approved as soon as possible; is that correct? A. Yes.").

**Response:** Undisputed.

### (3) Relationship with prosecutors.

253.    All documents in the homicide files were given to the prosecutor. The records unit also got copies of all reports. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 47:17-22 ("Q. Okay. So during this time period, the practice was to –you know, first, to give everything to the prosecutor that you have when homicide detectives share documents with the prosecutor; is that correct? A. Yes.").

**Response:** Disputed in part. Undisputed that the case detectives were responsible for giving all files to the prosecutor. Disputed in that the cited testimony says nothing about the records unit.

254.    Detectives met with prosecutors routinely to ensure prosecutors had a complete

case file and all the information on the case. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 49:1-6 ("Q. …That detectives would meet with prosecutors before trial to make sure that the prosecutors had the complete file? A. Yes. That was—that was a normal course of business."), 49:11-22 ("Q. Am I correct that those meetings to make sure all the reports were given to the prosecutor before trial would typically happen not long before the actual criminal trial in those cases? A. Well, I would say that the meetings themselves were not specific to just getting the case files. We, just as a course of business, would have regular—would be regular in face-to-face contact with our assigned prosecutors. I mean, that's –we just had a close working relationship you know, in regard to the investigations. Making sure that they had all the information was one part of that.").

**Response:** Disputed. As cited, the testimony is that detectives "would be regular in face-to-face contact with our assigned prosecutors" but that "the meetings were not specific to just getting the case files." Undisputed that, according to Dillenkoffer's testimony, the detectives would meet with prosecutors before trial to ensure a complete file.

### (4) Witness interviews.

255. A detective would interview a witness, then the detective had the option of taking a formal statement from that witness by using a stenographer who would record the questions and answers exactly as given. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 51:9-17 ("Q. And the detective would start by interviewing the witness in one of those interview rooms; is that correct? A. Yes. Q. And if the detective wanted to memorialize that conversation or that witness's knowledge, he had the option of then taking a statement from the witness; is that correct? A. Yes."), 52:11-16 ("Q. Okay. And so when witnesses during this time period were taken to the stenographer, was the stenographer required to write down the questionings exactly how it's asked and the answer exactly how it's given? A. Yes.").

**Response:** Undisputed.

256. If a detective types up his own formal statement of a witness, he is required to record the questions and answers verbatim. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 58:21-24 ("Q. …And my question is the detectives typing up the statement—were they required to write down verbatim questions and answers? A. Yes.").

**Response:** Disputed. Detectives did not take type-written statements as stenographers were always available, and the proper procedure when a stenographer was not available was to audio-record the statement. PSOF ¶ 59.

257. A detective would take a formal statement of a witness if the witness was providing firsthand information about a crime; for example, I witnessed John Doe commit this crime. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 58:25-59:20 ("Q. Did the department have any rules about which witnesses or what kind of information needed to be recorded via a witness statement as opposed to summarized in a report? A. I could tell you from my experience that we would take a formal—I will say a 'formal statement'—that's one being typed out by a stenographer—from witnesses when they were providing firsthand witness information to –to a crime, like and I'm using this as a broad example—but 'I witnessed John Doe commit this crime'—you know, they

would provide it. If—if it was information that was not necessarily identifying in purpose, we typically would not take a formal statement from them at that time.").

**Response:** Undisputed that Dillenkoffer so testified, but object that his anecdotal experience does not establish a practice and clarify that KCPD lacked any policies on this topic. PSOF ¶ 118.

### (5) Photo lineups.

258.    Detectives used six-photo spreads for identification of someone who committed a crime; and a single photo for identification of someone the witness knew. **Exhibit Q**, 2024 Deposition of Steve Morgan, 64:15-65:3 ("Q. In your investigations, you know, in 2003, did you have a practice of when you would show a single photo line with six photos as opposed to a single photo to an eyewitness? A. Yes. Basically, if it was determined that the witness was identifying someone who had actually committed the act or committed the—the crime, then that would be have to be a lineup. If it was just somebody that they were identifying that was just present either—whether it be inside of a residence, outside, or just somewhere in or around the time of the incident but was not the person who committed the incident, it—it could just be a single photograph.").

**Response:** Undisputed that Morgan so testified but disputed that this was the general practice; testimony varies about this procedure. Ex. 23 (Dillenkoffer Dep.) at 90:1-6 (holding no policy prevented detectives from showing a single photo of a suspect in an identification procedure with a witness).

### (6) A witness's drug and alcohol use.

259.    The practice was to ask a witness about their possible drug addiction or whether they were under the influence of drugs while witnessing a crime, if the witness was displaying behavior that dictated that. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 100:12-18 ("Q. Okay. Was there a practice? Like, if as a detective, you learn that a witness has a drug addiction, that that's something that should be documented or not? A. I think it was a practice. And I think it probably extended more so as to anything that you observed in them at the time."), 101:2-8 ("Q. Was there a practice whether that witness should be asked whether they were under the influence of drugs while witnessing the crime? A. I think the practice, again, would have gone back as to whether they were displaying anything that might—that –that seemed out of the ordinary or their behavior was dictating that.").

**Response:** Undisputed that Dillenkoffer so testified, but disputed that Dillenkoffer has sufficient foundation to establish such a practice.

260.    If a witness appeared intoxicated during an interview, a detective would ask about the witness's intoxication, document it, and postpone their interview until they had sobered up. **Exhibit L**, 2024 Deposition of Robert Blehm, 126:15-127:5 ("Q. And if you—if a witness appears intoxicated to you during an interview, is that something you ask them about? A. Absolutely. That's one of the first questions. Q. And you write down what they tell you. Correct? A. We write down our observations. There's I believe there was a –I'm trying to think of what the form was. If someone's intoxicated and they're on a hold, we send them back upstairs, or we let them sit in the

room till they're—seem okay, if they're exhibiting—because we don't want people giving statements while they're intoxicated.").

**Response:** Undisputed that Blehm so testified regarding his practice, but disputed that his testimony establishes a practice.

### (7) Confidential informants.

261. If an officer identified a witness as "confidential informant" in his report, instead of by name, it was the general practice for the homicide detective to tell that officer, that the witness needs to be identified by name. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 134:12-23 ("Q. Uh-huh. And in the homicide detectives' practice, when an officer wrote down that a witness was a confidential source or confidential informant, was there a practice of how to get information about, you know, who that witness was? A. I don't know that there was a general practice that we had in place. I would say the general practice would be if it were in real time, we would get ahold of the officer and say, no, that person—we need to—that person needs to be identified. We need to know who they are and make every attempt for us to be able to talk with them.").

**Response:** Undisputed that Dillenkoffer testified that the general practice was for homicide detectives to discern the identity of, and subsequently interview, witnesses left anonymous because patrol officers designated them as a "confidential informant" in police reports.

262. If a detective learns that an officer identified a witness as "confidential informant" in his report, instead of by name, after the report was written, the detective would make every attempt to identify that person. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 135:5-15 ("Q. Go ahead. No. Go ahead. I'm sorry. A. I was just—right—and the only other difference would be—is whether or not we were getting that report from that officer real time or, you know, that report is getting dropped in the pan a day later. I don't know specifically—I'm—I'm not giving any specific incident. But either way we'd be making every attempt to identify that person through that officer with ever—for whatever means we deemed necessary to identify them and get them spoken to.").

**Response:** Undisputed that Dillenkoffer testified that this was the appropriate practice.

263. Homicide detectives would not treat that person as a confidential source or informant. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 134:24-135:2 ("Q. Sure. A. Again, there was no policy—we would not treat that person in any way as any type of confidential source of informant on our end.").

**Response:** Undisputed that Dillenkoffer testified that there was no policy to maintain the confidentiality of sources designated a "confidential source or informant" by patrol officers.

264. A patrol officer was required to identify a witness by name in a report. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 137:2-6 ("Q. So what—was the requirement that a patrol officer write down the name of any witness they speak to? A. If they're documented in a report and they know it, yes.").

58

**Response:** Disputed; there were no policies on the topic and KCPD allowed patrol officers to hide the identity of important eyewitnesses with no oversight. PSOF ¶¶ 123, 125-26.

### (8) Homicide detective training.

265.    New homicide detectives got on-the-job training where they worked with a more senior homicide detective through three 28-day cycles at least. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 149:14-22 ("Q. Okay. And was there—now there's—I will tell you there's been prior testimony in this case that a new homicide detective would be working with a –kind of like a—an FTO or field training officer, but it would be a -another more senior homicide detective. Is that something that was practiced at KCPD in the homicide unit from 2003 to 2005? A. Yes."), 151:4-7 ("Q. And would a new homicide detective be working with a training detective through three 28-day cycles at the least? A. Yes.").

**Response:** Undisputed but note that there were no specific requirements as to the nature or length of that training. Ex. 23 (Dillenkoffer Dep.) at 159:3-8.

266.    Beyond training, homicide detectives worked in pairs; and a tenured detective would be paired with a newer detective, so the newer detective had the opportunity to learn from his tenured partner. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 149:22-150:15 (A. …And not necessarily specific just to the training aspect of it. We generally worked in pairs as detectives, even going out and talking with people. So there—you know, a lot of times there'd be two of you there. So just the aspect of having two people there that, you know, you're allowing one person to learn while they're doing it. It wasn't just because we wanted—it wasn't just for our training purpose that we were doing that We just typically worked in pairs, and that allowed for that. And you wouldn't put—you know, let two tenured detectives be a—you know, partner up and then two nontenured detectives partner up. You would –the sergeant would typically split them up where you had a tenured detective and a newer detective, you know, working together. So just organically that's how you learned.").

**Response:** Undisputed.

267.    A new homicide detective was not given as many cases as a more senior homicide detective. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 148:16-19 ("Q. Okay. And then once they're a new homicide detective, they're not given as many cases as a more senior homicide detective? A. Correct.")

**Response:** Undisputed.

268.    During the new detective's training period, the goal was to expose that new detective to various types of cases. **Exhibit S**, 2024 Deposition of Eric Dillenkoffer, 152:8-11 ("Q. Okay. To get all the experience of all the different types of cases that you've just described? A. Right.").

**Response:** Undisputed.

269.     KCPD also provided outside training to homicide detectives during that time; for example, Blehm went to: detective school, the "Vernon Geberth Practical Homicide 1 and 2"—"[t]hose were both a week long[,]" "the New York State Police to a training with industry experts, Michael Baden, Henry Lee, and Sara Weck different disciplines with forensics[,]" "Reid 1 and 2, which is interrogation interview technique[,]" "Robert Kepley" training, and various "regional training, metro squad training." **Exhibit L**, 2024 Deposition of Robert Blehm, 94:8-23.

**Response:** Disputed, in that "during that time" is undefined; when Blehm received the described external programs is undefined.

270.     KCPD also provided a 2-3 day detective school training program for all detectives, not just homicide detectives. **Exhibit Q**, 2024 Deposition of Steve Morgan, 67:7-13.

**Response:** Disputed. In the time period at issue, there was a "new-detective training" that would be put on "[m]aybe every other year just depending. Probably depending on budget, depending on manpower." And there was no training specific to homicide. And the number of detectives who could be sent depended on budget—the training was not for all detectives. Further, detective school was not a requirement for all new detectives, and the Department assumed that any detective who had been on the job more than a year might not need detective school and so attendance was determined on a "case-by-case" basis. Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 20:8-22:5; 145:14-146:13.

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

**I.     Larry White is shot and killed on October 6, 2003.**

1.     On October 6, 2003, Larry White was shot and killed in the vicinity of 29th Street and Wabash Avenue in Kansas City, Missouri. Ex. 1 (2003.10.06 Field incident report (Blehm)).

2.     Plaintiff Keith Carnes had no involvement in Larry White's murder and was innocent of that murder. Ex. 2 (Carnes Dep.) at 146:25-147:1.

3.     No physical or forensic evidence ever connected Plaintiff to White's murder. Ex. 3 (Allio Report) at 8.

**II.     Defendants are assigned to investigate the murder.**

4.     Defendants Robert Blehm, Steve Morgan, and Avery Williamson ("Detective Defendants") were homicide detectives in the Kansas City Police Department ("KCPD") at the time White was murdered. Ex. 4 (2024 Blehm Dep.) at 91:11-92:21; Ex. 5 (Morgan Dep.) at 25:23-26:24.

5.     Sergeant Douglas Niemeier assigned Blehm to lead the Larry White homicide investigation. Morgan and Williamson participated in that investigation. Ex. 4 (2024 Blehm Dep.) at 20:1-4; 23:13-21; 29:13-30:2; Ex. 6 (Niemeier Dep.) at 27:3-8; Ex. 5 (2024 Morgan Dep.) at 25:23-26:24.

6.     Defendants Vernon Huth and Ed Begley were KCPD officers who participated in the homicide investigation, including by finding and transporting witnesses. Ex. 4 (2024 Blehm Dep.) at 34:6-24; 37:18-23; Ex. 7 (2024 Huth Dep.) at 14:9-15:13; Ex. 8 (2024 Begley Dep.) at 19:5-10; 27:18-28:7.

7.     At the time of the White homicide investigation, Williamson was in training and Blehm was his training detective. Ex. 4 (Blehm 2024 Dep.) at 23:13-21.

8.     Blehm was involved in any report or other document signed by Williamson. "[If there is a signature by Avery Williamson, it would denote that I am involved because he was under my direct supervision as a training detective, and not allowed to necessarily do things on his own until he was completely trained and given the okay to be on his own.") Ex. 9 (Blehm 2017 statement – Lockett interview) at 8.

**III.     Evidence identified by Defendants at the crime scene.**

9.     On the night Larry White was murdered, Defendants Blehm, Morgan, Williamson, and their sergeant Doug Niemeier all responded to the crime scene. Ex. 10 (Crime scene login); Ex. 11 (2003.10.08 Blehm Crime Scene Report.pdf).

10.     At the scene, Defendant Blehm determined that the victim Larry White had collapsed in front of 2831 Prospect (the "Fish Town" restaurant), where his clothes had been cut by paramedics. Ex. 11 (2003.10.08 Blehm Crime Scene Report.pdf).

61

11.     At the crime scene, Blehm observed 13 shell casings; the closest of those to White's body was at least 40 yards away from White. Ex. 11 (2003.10.08 Blehm Crime Scene Report.pdf).

12.     Defendants never found any bullets, bullet fragments, or shell casings in the Fish Town parking lot where White collapsed. Ex. 12 (2003.10.06 Crime Scene Report (VanRyn)); Ex. 3 (Allio Report) at 5.

## IV.     Defendants fabricate a statement from the victim's uncle to illegitimately obtain a search warrant.

13.     In a signed police report, Blehm claimed that on October 7, 2003, he had interviewed Ronald White Sr., the victim's uncle, who had told him that he had personally heard "a guy he knows as 'O.G.,'" who lived at a drug house near the murder, bragging about committing the murder. Ex. 13 (2003.10.09 Inv. Report (Blehm) – interview of Ronald White).

14.     Blehm's report was fabricated and false, because Ronald White Sr. never heard "O.G." bragging about committing the murder and never told Blehm that he had heard any such statement. Ex. 16 (White Sr. Dep.) at 13:18-17:16.

15.     Blehm used the fabricated interview from White Sr. to obtain a search warrant on 2404 E. 29th St Apt. #1W, which Huth and Begley were familiar with as a "known drug house." Ex. 14 (2003.10.07 Search Warrant; Blehm affidavit); Ex. 7 (2024 Huth Dep.) at 229:10-230:15.

16.     While executing the search warrant on 2404 E. 29th St, Defendants recovered the murder weapon, a Norinco MAK-90 rifle, from an adjoining apartment. Dkt. 139-5 (Nov. 2005 trial testimony) at 347:9-17; Ex. 15 (2003.10.07 Recovery of Rifle).

## V.     Police attempt to coerce an incriminating statement from Kermit O'Neal while interrogating an unidentified woman.

17.     While executing the search warrant based on Blehm's fabricated police report, Defendants arrested Kermit O'Neal on October 7, 2003, after finding him at the site of the search warrant, an apartment at 2404 E. 29th Street. Ex. 17 (O'Neal Dep.) at 19:16-21:7.

18.     No evidence linked O'Neal to the murder. Ex. 18 (2003.10.08 Matthews report RE O'Neal); Ex. 19 (2003.10.11 Blehm report RE O'Neal).

19.     At the police station, Detectives Hoffman and Williams attempted to coerce O'Neal into implicating a suspect in White's murder. Although O'Neal was detained and being questioned about his involvement in a murder, Hoffman and Williams never told him he was under arrest or advised him of his rights to remain silent. They yelled at him, threw chairs to intimidate him physically, and threatened that they would put the murder on him unless he gave them a suspect. Ex. 17 (O'Neal Dep.) at 21:11-22:18; 23:2-24:1; 42:13-43:2.

20.     While O'Neal was being questioned, he was placed in an interview room with the door closed and the detectives closed the door each time they left. After the interview was over,

the detectives told O'Neal "the [were] going to let [him] go." Ex. 17 (O'Neal Dep.) at 27:13-23; 62:4-19.

21.     At the station, O'Neal was questioned by Hoffman, Williams, and Blehm. During his interrogation, he heard each of these detectives leave the room and enter the adjacent interview room, where he could hear them interrogating a woman. O'Neal believes she was being questioned about the same case because the detectives took turns interviewing him and the woman. Ex. 17 (O'Neal Dep.) at 24:18-26:5.

22.     Wendy Lockett is the only woman who is documented anywhere as coming into contact with the White homicide investigative team on October 7, 2003. Ex. 20 (investigative file).

## VI.     Fabricated statements and suppressed evidence regarding Wendy Lockett.

### A.     Defendants interview Lockett on October 7, 2003.

23.     Wendy Lockett witnessed White's homicide. At the time of his murder, she was addicted to drugs. Ex. 21 (Lockett 2024 Dep.) at 30:14-31:2.

24.     Huth and Begley spoke to Lockett on October 7, 2003 regarding Lockett's observations of the homicide. Huth wrote a report that purported to document that conversation. That report does not identify Lockett by name but only as a "confidential informant." Ex. 7 (Huth Dep.) at 66:5-69:9; Ex. 22 (Huth 10/7/03 report of Lockett conversation).

25.     According to Huth's October 7, 2003 report, Lockett "observed a black male running from 29th and Olive (apartment buildings), being pursued by two other black males who were firing guns at him. She stated that the black male ran north in the alley, just east of the above-mentioned apartments, jumped a fence and ran eastbound beside 2846 Wabash. The two black males continued pursuing him while firing rounds from an unknown weapon." The statement contains no other identifying details about the victim or perpetrators. Ex. 22 (Huth 10/7/03 report of Lockett conversation).

26.     After Huth spoke to Lockett, Huth referred Lockett to one of the detectives investigating the White homicide, most probably Blehm, so that Lockett could be interviewed by them. Ex. 7 (Huth Dep.) at 15:6-22, 69:1-71:5.

27.     The detectives who spoke with Lockett after Huth referred her to them on October 7, 2003 either intentionally chose not to memorialize what she said or destroyed or hid any report of that interview. Ex. 3 (Allio Report) at 5; Ex. 20 (investigative file).

28.     Although Huth wrote on October 7, 2003 that Lockett had provided him with reliable information on multiple occasions, and Lockett called Huth nearly two decades later (on a cell phone number that was only available to those who Huth had given his card to) to ask for information about Carnes's habeas proceedings, Huth nevertheless denied remembering almost any details about Lockett or any other instances in which Lockett provided him information. Ex. 7 (Huth Dep.) at 19:20-21:5, 161:3-20, 162:10-25; Ex. 22 (Huth 10/7/03 report of Lockett conversation).

63

29. Blehm acknowledged that Huth and Begley "probably" shared any information about their recent interaction with Wendy Lockett relevant to the homicide and added "they should" have done so. Ex. 4 (Blehm 2024 Dep.) at 264:7-12.

30. Regarding the October 7 2003 statement naming a "confidential informant" (who was Wendy Lockett), Blehm explained, "I'm sure at some point, it . . . became readily apparent we were going to need to know who this person was and if they had additional information that they could offer." Ex. 4 (Blehm 2024 Dep.) at 405:12-19.

31. The patrol officers and detectives were in communication during the investigation and news of Lockett being contacted on October 7, 2003 would have been shared with Blehm. Ex. 4 (Blehm 2024 Dep.) at 264:7-19; Ex. 7 (Huth Dep.) at 176:5-177:21.

**B. Defendants suppress report(s) of Lockett's October 7, 2003 interviews.**

32. Defendant Blehm was responsible for including all documents in a "master file" given to prosecutors, but he did not include the October 7, 2003 report in that master file. Based on standard departmental procedures, he would have received the October 7, 2003 report. Ex. 3 (Allio Report) at 5, 10, 12, 23-24; Ex. 4 (2024 Blehm Dep.) at 49:1-17, 356:8-359:4; 369:24-370:15.

33. Defendant Blehm was responsible for directly providing documents relevant to the White homicide investigation to prosecutors. Ex. 23 (Dillenkoffer 30(b)(6) Dep) at 23:4-24:2; 36:4-18; Ex. 4 (2024 Blehm Dep.) at 82:5-11, 88:1-21, 89:14-24.

34. At her deposition in May 2024, Dawn Parsons, the lead prosecutor at both of Plaintiff's criminal trials, testified that she did not know that Lockett had given a statement as a "confidential informant" to Huth the day after White's murder. Ex. 24 (Parsons 2024 Dep.) at 94:4-18; 103:5-17.

35. Parsons testified that, assuming that Lockett was the "confidential informant" in Huth's October 7, 2003 report, she would have told the defense lawyer about Lockett's prior statement because Lockett's statement was *Giglio* information that a defense lawyer could use for impeachment. Ex. 24 (Parsons 2024 Dep.) at 119:6-25.

36. Brady Twenter, the second chair at Plaintiff's two criminal trials, testified at his May 2024 deposition that the differences in Lockett's October 7, 2003 statement were potentially impeaching *Giglio* material that needed to be disclosed. Ex. 25 (Twenter 2024 Dep.) at 97:8-14.

37. Defendant McGowan, who was the prosecutor assigned to the White homicide prosecution but left the office before the case went to trial, never saw the October 7, 2003 Huth report during her time assigned to that case. She did not learn that there was a report identifying a "confidential informant" who was Wendy Lockett—i.e., the October 7, 2003 Huth report—until November 2021, when she signed an affidavit in connection with Plaintiff's postconviction proceedings. Ex. 26 (McGowan 2024 Dep.) at 127:24-128:13; 128:25-131:11; 198:11-199:16.

64

38.     Plaintiff did not receive the October 7, 2003 Huth report until approximately 2009, when an investigator working for his postconviction attorney obtained the report directly from the KCPD. Ex. 27 (Hogan Aff.); Ex. 2 (Carnes Dep.) at 106:4-19.

39.     From 2003-2005, KCPD's practice was to number the complete investigative file so that there could be no doubt that the complete file had been disclosed, but Blehm did not do this in the Carnes homicide investigation. Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 47:23-48:3; Ex. 20 (investigative file).

40.     Blehm has no explanation for why the prosecutors or Plaintiff did not receive the October 7, 2003 Huth report. Ex. 4 (Blehm 2024 Dep.) at 356:8-359:4.

## C.     Defendants arrest Lockett on October 14, 2003 and fabricate a statement from her.

41.     On October 14, 2003, Huth and Begley arrested Lockett and transported her to police headquarters to be interviewed. Ex. 28 (Williamson report regarding Lockett 10/14/03).

42.     Defendant Blehm would later testify that another witness Lorianne Morrow had provided Wendy Lockett's name and that is why Blehm started searching for Lockett after interviewing Morrow on October 12, 2003. Dkt. 139-5 (Nov. 2005 trial tx.) at 262:4-263:7 (stating that "we found . . . Wendy Locket" on October 14, 2003).

43.     While he and Begley were transporting Lockett, Huth told Lockett, "we know you were on the corner with Larry [White], we know you know who shot him, and you have to go down here and tell these people what's going on." Lockett felt "under duress" and "pressured" during that interaction. Ex. 21 (Lockett 2024 Dep.) at 32:15-21; 33:4-13.

44.     Lockett explained that Huth's interactions were "leading" because he told her "You know who did this. . . . You know that you were there, and exactly what happened." Ex. 21 (Lockett 2024 Dep.) at 43:1-7.

45.     On October 14, 2003, detectives conducted a second interview with Lockett. Williamson interviewed her and wrote a statement that Lockett signed, and Blehm observed the interview. Ex. 28 (Williamson 10/14/03 report of Lockett interview); Ex. 29 (Lockett 10/14/03 statement); Blehm observed Williamsons' interview with Lockett on October 14, 2003 and observed it via a simulcast audio/video monitor. He viewed in real time to "look at the information that was coming out and make notes, just be aware of the statement and watch what was being said." Ex. 9 (Blehm 2017 statement – Lockett interview) at 2.

46.     Williamson's report regarding the reports of Lockett's October 14, 2003 interview and statement make no mention of the fact that Lockett was previously contacted and interviewed, potentially multiple times, which violated policing standards. Ex. 3 (Allio Report) at 12.

47.     Wendy Lockett's "statement" to Williamson on October 14, 2003, was false. For one, although the statement reflected that Lockett had seen White running up the street while Carnes chased him, that is not what happened. After the shooting started, Lockett ran behind the

apartment buildings and "actually didn't see anyone chasing [the victim]. Defs.' Ex. 21 (Lockett 2024 Dep.) at 36:24-37:14.

48.     Other false details in Lockett's October 14, 2003 "statement" included: that she had seen Carnes walk up to the victim and shoot him in the head; that Carnes had told White that he couldn't "sell no dope" on the corner earlier that day; that Lockett had seen Carnes exit the apartment before the shooting; that Lockett had observed a gun in Carnes's hands as he came out of the apartment; that the shooter had a gun that was a "long thing with a banana clip"; that she heard Carnes come out of the apartments and say "you gonna die, motherfucker"; and that she remembered the kind of clothing that Carnes was wearing. Instead of asking open-ended questions, Williamson asked questions suggesting Plaintiff was the perpetrator, like "was Keith present." Ex. 21 (Lockett 2024 Dep.) at 37:15-41:2; 46:14-47:10

49.     The fabricated October 14, 2003 statement also stated that Plaintiff "walked up to [White] and shot him in the head" in the Fish Town parking lot. Ex. 29 (Lockett Statement) at 1.

50.     There were numerous contradictions between the statement from Lockett memorialized in Huth's October 7, 2003 report, and the fabricated statement taken from Lockett on October 14, 2003, including:

- The October 7 statement does not identify a perpetrator; the October 14 statement identifies Plaintiff, "Fuzzy," and "Debo" by name.

- The October 7 statement states Lockett saw "two men" chasing the victim; the October 14 statement asserts that Plaintiff, identified by name, alone chased the victim.

- The October 7 statement states Lockett saw "two men" shooting at the victim. the October 14 statement describes Plaintiff alone (identified by name) shooting at the victim.

- The October 7 statement describes the murder weapon as "unknown;" the October 14 statement describes it as a "long thing with a banana clip."

- The October 7 statement does not describe either shooter as wearing an eyepatch or having any other distinct feature; the October 14 statement says the shooter was wearing an eyepatch (like Plaintiff did at the time of the murder).

- The October 7 statement does not identify any men present with the shooter; the October 14 statement says that two other men, "Fuzzy and Debo" (identified as Mitchell Powell and Damon Rhodes), were with Plaintiff during the shooting and were armed.

- The October 7 statement does not describe any shooting taking place in the Fish Town parking lot; the October 14 statements claims that Plaintiff killed the victim execution-style in that parking lot.

Ex. 22 (Oct. 7 Huth Report); Ex. 29 (Oct. 14 Lockett Statement).

51.     Regarding her false October 14, 2003 statement to Williamson, Lockett explained that she "**<u>agreed</u>** to say a lot of things because [she] was trying to get back out on the streets." Ex. 21 (Lockett 2024 Dep.) at 40:16-41:2 (emphasis added).

52.     Based on Williamson's actions, Lockett believed they would "keep [her] locked up" if she denied knowing details about the homicide. Ex. 21 (Lockett 2024 Dep.) at 66:23-67:7.

53.     When Williamson questioned Lockett, he "didn't ask open-ended questions" but instead led Lockett to identify Keith, asking, "was Tre present" and "was Keith present." Ex. 21 (Lockett 2024 Dep.) at 40:21-41:2; 46:24-47:10.

54.     Lockett knew what the police wanted her to say in her false statement on October 14, 2003 "[b]ecause they said" and ultimately "[t]hey basically told [Lockett] what happened, and [she] agreed to it." For example, the detail about the murder weapon having a "banana clip" came from the police and was inconsistent with her observations: she saw a handgun. The details she was given even included that "[Plaintiff] walked this way" during the homicide and "details of everything" related to the homicide. Ex. 21 (Lockett 2024 Dep.) at 66:8-14; 67:1-16.

55.     After Williamson spoke with Lockett on October 14, 2003, Williamson went to another room and came back with a statement for Lockett to sign. Lockett did not even read the statement before signing it. Williamson did not ask Lockett to read the statement, but said, "I just typed up the conversation we had, and I need you to sign it." Lockett believed she was detained by Williamson during this conversation; she said that after she signed it, Williamson "let [her] go." Lockett believed that the police would "keep [her] locked up" on October 14, 2003 if she denied knowledge. Ex. 21 (Lockett 2024 Dep.) at 43:23-44:25; 66:23-67:7.

56.     Williamson also fabricated that Lockett had voluntarily transported Lockett to police headquarters, as Lockett was detained against her will for questioning. Ex. 28 (Locket 10/14/2003 Interview Report) PL 183; Ex. 29 (Lockett 10/14/03 Statement) at PL 184-185; Ex. 21 (Lockett Dep. 2024) at 66:23-67:7.

57.     At KCPD, the practice was for stenographers to put their initials on statements they took to identify who had typed the statement. Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 54:5-15.

58.     The City testified, through its 30(b)(6) representative that it would be "extreme circumstances" to have a police officer type a witness statement instead of a stenographer because KCPD "had stenographers scheduled 24/7 on our floor" and the City could not think of any instance when that had been done. Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 55:8-56:8.

59.     Candeta Collins, a KCPD transcriptionist who transcribed Felicia Jones's statement, testified that Detective Morgan never typed up his own statements of witnesses because "there's always a typist there to transcribe or type a live statement." The proper procedure was to take an audio recording and have it typed up, not for the detectives to use the stenographers' office to type a statement, which Collins does not recall ever occurring. Ex. 30 (Collins Dep.) at 14:25-15:6; 27:8-28:4.

60.     After Lockett was interviewed, Blehm drove her home. Ex. 4 (Blehm 2024 Dep.) at 46:17-47:1.

61.     Williamson does not recall conducting interrogations or reviewing witnesses on his own because he was in training. Dkt. 139.17 (Williamson 2024 Dep.) at 32:3-8.

62.     Williamson does not believe he ever took the lead in interviewing witnesses and his role in the White homicide investigation was to "watch, listen, learn." Dkt. 139.17 (Williamson 2024 Dep.) at 39:18-40:17.

63.     Williamson believes that someone else was in the room with him when he interacted with Lockett because he was in training. Dkt. 139.17 (Williamson 2024 Dep.) at 87:1-10.

64.     Williamson had no explanation for why Blehm, or whoever else was in the room with him when Wendy Lockett's statement was signed, did not sign her statement. Dkt. 139.17 (Williamson 2024 Dep.) at 87:4-14.

**D.     Because of the fabricated statement, Lockett gives false testimony at trial against Plaintiff.**

65.     Lockett falsely implicated Plaintiff in White's murder at trial, consistent with the statement that Defendants fabricated from her. Dkt. 139-5 (Nov. 2005 trial transcript) at 190:7-195:23.

66.     Lockett explained that because of pressure from the police department and investigators, she was compelled to testify consistent with her fabricated statement at trial. Ex. 21 (Lockett 2024 Dep.) at 47:22-48:21.

**VII.    Fabricated statements regarding Lorianne Morrow.**

67.     Lorianne Morrow witnessed Larry White's murder. Dkt. 139.24 (Morrow 5/31/24 Dep.) at 17:10-18:15.

68.     According to the testimony of Lorraine Morrow, days after the shooting, Defendant Amy McGowan "pulled up on her" and others who were on the street in the neighborhood where the murder of Larry White occurred. McGowan told Morrow that Plaintiff did the shooting. Morrow responded that she had seen Reggie and Kiki commit the crime. McGowan had a mug book and a photo of Plaintiff. McGowan said that it was Plaintiff who did the shooting and threatened Morrow with jail time if she did not say that Plaintiff was the shooter. Dkt. 139.24 (Morrow 5/31/24 Dep.) at 26:13-28:2; 60:21-63:15; 71:13-79:22.

69.     Morrow also spoke with McGowan in McGowan's office. In that meeting, McGowan displayed a photograph of Plaintiff to Morrow and told her that this was the person who did the shooting. Morrow again said that Reggie and Kiki were the shooters. McGowan told Morrow that Plaintiff was a big drug dealer and that they wanted him off the streets. McGowan threatened Morrow with jail time; said she would "plant drugs" on Morrow; and said that

68

Morrow would lose her kids if Morrow did not agree that Plaintiff was the shooter. Dkt. 139.24 (Morrow 5/31/24 Dep.) at 30:16-31:31:12.

70.    In response to McGowan's threats, Morrow "did what [she] was told to do" and identified Plaintiff as the shooter. In Morrow's words: "She [referring to McGowan] said to me, 'If you don't say this [i.e., that Plaintiff was the shooter], I will plant drugs on you. You will go to jail.' And I have never been in jail in my life. And I was scared, so I did what I was told because I had—at the time I had seven children." Morrow told police detectives that Plaintiff was the murderer because she had agreed with McGowan that she would say that, and because she was afraid. McGowan showed Morrow a photograph of a house and told her that that was the location where shell casings had been found, a fact that Morrow did not previously know. Dkt. 139.24 (Morrow 5/31/24 Dep.) at 28:25-32:4; Dkt. 139.25 (Morrow 6/5/24 Dep.) at 10:8-19:10; 18:13-18; 64:1-14.

71.    Both of the two meetings described in the preceding three paragraphs occurred before Morrow first spoke with police regarding the crime. Dkt. 139.25 (Morrow 6/5/24 Dep.) at 21:10-19. Morrow estimates that she spoke with McGowan in McGowan's office between October 9 and October 12, 2003 (the date on which police interviewed her). *Id.* at 95:4-97:15.

72.    On October 12, 2003, Blehm and Williamson interviewed Morrow. Morrow told them that Reginald Thomas murdered Larry White. She told Blehm and Williamson that Plaintiff did not commit the murder, but subsequently, consistent with McGowan's coercion, she also told Blehm and Williamson that Plaintiff had committed the murder. Blehm and Williamson never wrote down that Morrow had identified Reginald Thomas as the killer. Dkt. 139-24 (Morrow Dep. 5/31/24) at 34:15-20; Dkt. 139-24 (Morrow Dep. 6/5/24) at 35:5-9; 63:6-9; 143:16-24; Ex. 31 (2003.10.13 Inv Report (Williamson) - Interview of Lorianne Morrow).

73.    The fabricated statement from Morrow on October 12, 2003 contains the fabricated detail that after White collapsed at the Fish Town restaurant, Plaintiff "rolled him over then shot him some more, probably five more times." Ex. 31 (2003.10.13 Inv Report (Williamson) - Interview of Lorianne Morrow) at 3.

74.    Morrow also stated that she had seen "Kiki" – Gary Kitchen – holding a firearm and chasing White alongside the shooter. Ex. 31 (2003.10.13 (Williamson) – Interview of Lorianne Morrow) at 3-4.

75.    At Plaintiff's criminal trial, Morrow testified consistent with the statement that McGowan fabricated and Blehm and Williamson perfected (by including Plaintiff as the shooter but omitting entirely Morrow's mention of Mr. Thomas). Dkt. 139-5 (trial transcript) at 143:18-147:12.

## VIII.    Fabricated statements and suppressed impeachment evidence regarding Felicia Jones.

76.    On October 14, 2003, Defendant Morgan met with Felicia Jones at the KCPD headquarters where she signed a statement implicating Plaintiff in the murder of Larry White. Defendants Huth and Begley transported her to be interviewed. Ex. 32 (Statement of Felicia Jones); Ex. 46 (Morgan Report - Jones 10.14.03 Pickup).

69

77. According to the fabricated statement from Jones, Mitchell Powell and Plaintiff both shot at "the same kid who was selling on the corner running towards Fish Town" (i.e., White) from in front of "the apartment" (i.e., the drug house at 2404 E 29th St). The statement claimed that Carnes had "two guns in his hands" and had retrieved the guns from the trunk of a car. Ex. 32 (Statement of Felicia Jones) at 1-2.

78. According to the fabricated statement from Jones, Reginald Thomas said "make him disappear" in regards to "the kid selling on the corner" shortly before White was murdered. Ex. 32 (Statement of Felicia Jones PL 188-90).

79. Jones testified that she cannot read; nevertheless, Morgan had Jones sign a statement saying that she had read the above statement and understood it (which was false, because Jones could not read). Morgan also claimed he destroyed "corrections" to Jones's statement that Jones made. Dkt. 139-5 (Nov. 2005 trial testimony) at 170:19-171:5; 291:12-16; 297:18-298:19; Ex. 32 (Statement of Felicia Jones PL 191).

80. At Carnes's April 2005 trial, Jones clarified what she remembered from the date Larry White was shot. She heard gunshots going off, then jumped into a "trick's" car, and came back after the police had secured the perimeter of the shooting. She did not recall Carnes having any involvement in the shooting. Dkt. 139-29 (Jones 2005 trial testimony) at 8:6-14; 21:20-22:1; 29:23-30:15.

81. Jones testified that she believed she was coerced into giving the written statement regarding the White murder and that she remembered "a whole different person," i.e., someone other than Keith Carnes, as involved in the murder. After signing the written statement, Morgan gave her five dollars and did not arrest her on her outstanding warrants. Dkt. 139-29 (Jones April 2005 trial testimony) at 21:29-22:15 ("I'm not going to say that I know anything . . . because I don't remember. . . . So I'm not going to lie under oath and say that. What this paper is saying could have been something that was coerced from me because I was on drugs at the time."; 23:5-15 ("I was running from police myself, so no telling I told whatever they wanted me to tell now. . . . I remember **a whole different person than this piece of paper is portraying. You understand?**") (emphasis added); 33:7-34:5.

82. The Court entered the fabricated written statement that Morgan had taken as substantive evidence in Carnes's criminal trial. Ex. 33 (Jones 11/08/2005 Testimony) at 168:11-21.

## IX. Lockett, Morrow, and Jones's fabricated statements were contradicted by forensic and other evidence.

83. The physical and forensic evidence contradicted Morrow and Lockett's fabricated statement that Plaintiff shot White in the Fish Town parking lot at point blank range because no shell casings or bullets were found in that parking lot and White's injuries were inconsistent with a point blank rifle shot. Ex. 3 (Allio Report) at 8-9; Ex. 34 (Mitchell Report) at 3-4.

84. Witnesses who were present in the Fish Town parking lot at the time White collapsed there testified that no shots were fired from within that parking lot. Dkt. 139-5 (Nov. 2005 trial transcript) at 377:15-378:2.

70

85. It was obvious from the crime scene that there was no close-range shot or "parking lot execution" of white and any reasonable homicide detective would have so concluded. Ex. 3 (Allio Report) at 8-9.

86. Jones and Lockett's statements included the details that Plaintiff shot at the victim from the apartment at 2404 E 29th St. Lockett's statement also said that Mitchell Powell shot at the victim from that apartment. However, no shell casings, bullets, or bullet fragments were recovered from the area of that apartment. Ex. 35 (2003.10.06 Crime Scene Report (VanRyn)).

87. Blehm testified that he had encountered a bullet fragment at the parking lot of the murder, but there is no evidence that he identified the bullet fragment for the KCPD crime scene analyst (Lutman) and, if he had seen a bullet fragment, there would have been documentation. However, no bullet fragments were ever documented. Ex. 4 (Blehm Dep. 2024) at 379:3-24; Ex. 34 (Mitchell Report) at 3.

88. Blehm and Williamson took major contradictions in Morrow's statement at face value, including contradictory physical evidence (White was not shot at close range or shot five times in the head) and contradictory identifications (Morrow said Gary Kitchen was involved in the shooting but detectives apparently ruled him out as a suspect). The accepted practice, which was not followed, as to question Morrow further and conduct further investigation to test the credibility and foundation for Morrow's statement. Ex. 3 (Allio Report) at 9-10.

89. The Defendants involved in questioning Lockett on October 14, 2003 (Williamson and Blehm) never asked Lockett why she was describing a shooting in the Fish Town parking lot that was completely contradicted by the physical evidence, which violates generally accepted police practices. Ex. 3 (Allio Report) at 11; Ex. 29 (Lockett statement).

90. In November 2003, Williamson and Blehm discovered that Lockett's October 14, 2003 statement was false for another reason—she claimed that Damon Rhodes was present, but he had an indisputable alibi video of him cleaning a bank in Kansas at the time of the murder. The obvious and accepted step would have been to re-interview Lockett about her impossible statement. Instead, Blehm and Williamson took no action to contact Lockett and ceased any further efforts to test alibis. Ex. 3 (Allio Report) at 12-13; Ex. 36 (2003.11.15 Inv Report (Blehm) - case info; Bank surveillance tape.pdf); Ex. 37 (2003.11.20 Inv Report (Williamson) - Damon Rhodes interrogation.pdf).

## X. Plaintiff is arrested and charged based on Defendants' fabricated evidence.

91. On October 14, 2003, Carnes was arrested in connection with Larry White's murder. Carnes denied any involvement in the murder. Ex. 38 (2003.10.15 Inv. Report by Williamson re: interrogation of Keith Carnes).

92. Williamson swore an affidavit of probable cause in support of Plaintiff's arrest and detention; per Blehm's statement that he was involved in every document signed by Williamson, Blehm participated in creating that affidavit. Ex. 42 (Williamson Statement Probable Cause); Ex. 9 (Blehm 2017 statement – Lockett interview) at 8; Dkt. 139-17 (Williamson Dep.) at 26:2-15 (explaining that other detectives typically dictated the reports Williamson wrote, or otherwise, reviewed them right after Williamson wrote them).

71

93.     The probable cause affidavit contained statements from two witnesses incriminating Plaintiff: Lockett and Morrow. The affidavit contained other details about the victim's death and the medical examiner ruling the autopsy a homicide, but had no other details incriminating Plaintiff. Ex. 42 (Williamson Statement Probable Cause).

## XI.    Other evidence is destroyed by Defendants.

94.     Defendant Blehm destroyed notebooks containing notes of his investigation using a shredder at the KCPD designated for that purpose. Ex. 4 (Blehm Dep.) at 78:14-80:7.

95.     Defendant Huth regularly shredded his notebooks using paper shredders and was trained to destroy his notes in that manner. Ex. 7 (Huth Dep.) at 109:9-23.

96.     Defendant Niemeier testified that detectives were allowed to shred their notebooks and he as a supervisor never looked at the notebooks to confirm that the detectives were accurately documenting their investigations. Ex. 6 (Niemeier Dep.) at 111:1-20.

## XII.   Defendants should have continued investigating but instead stopped investigating or corroborating suspect alibis.

97.     On October 14, 2003, Gary Kitchen was arrested and Blehm and Williamson twice interrogated him. Kitchen admitted that the murder weapon, which had been recovered, belonged to him. Ex. 39 (2003.10.15 Inv Report by Williamson re: interrogation of Gary Kitchen) at 3.

98.     Kitchen gave Williamson and Blehm a signed statement in which he admitted he was in the area of the murder during the evening hours of the murder, but he claimed that he had left the area by the time of the shooting and heard gunshots from his house nearby at 2700 Park. Ex. 39 (2003.10.15 Inv Report by Williamson re: interrogation of Gary Kitchen) at 3-4.

99.     According to Kitchen, "O.G." and "Fuzzy"—not Plaintiff—were at the scene when Kitchen left the area. Ex. 39 (2003.10.15 Inv Report by Williamson re: interrogation of Gary Kitchen) at 3.

100.    Detectives never questioned numerous eyewitnesses like Wendy Locket about whether Gary Kitchen was present and there is no explanation for why they did not. This violated accepted policing practices. Ex. 3 (Allio Report) at 9.

101.    Blehm described the failure to ask Wendy Lockett whether Gary Kitchen was at the scene at the time of White's homicide (after Morrow had identified Kitchen as the shooter's accomplice, according to her written statement) as a question that "wasn't discretionary" and the failure to do so as "possibly . . . a mistake." Ex. 4 (Blehm Dep. 2024) at 283:16-25.

102.    On December 2, 2003, Williamson and Morgan interrogated Reginald Thomas after he was arrested. Mr. Thomas claimed that at 3:05 pm on the day of White's murder, he was at 2700 Park—where Kitchen had claimed to be—and that he stayed there all night watching his girlfriend's kids. Mr. Thomas further claimed that he was never inside the apartment at 2404 E

72

29th St on October 6, 2003. Ex. 40 (2003.12.04 Inv Report by Williamson re: interrogation of Reginald Thomas) at 4.

103.    Two witnesses—Margo Thomas (no relation to Reginald Thomas), who was in the area but had not witnessed the shooting, and Jones—had both placed Reginald Thomas at the apartment at 2404 E 29th St, where the murder weapon was later found, on the day of the shooting. Ex. 32 (Jones Statement); Ex. 45 (2003.10.14 Inv Report (Morgan) - interview of Margo Thomas).

104.    Kitchen and Mr. Thomas's alibis conflicted: Kitchen said he was home at 2700 Park (but never mentioned Mr. Thomas), and Mr. Thomas later said he was with Kitchen on the day of the murder. No steps were taken to validate either person's alibi. This failure to investigate violated accepted police practices. Ex. 3 (Allio Report) at 14.

105.    Blehm explained that his procedure was to corroborate an alibi while the person being questioned is detained so they can't try to make one and to put an arrested suspect on a "no phone order" while corroborating their alibi. Nevertheless, he and Williamson never took this step with Gary Kitchen, Reginald Thomas or any other suspect. Ex. 4 (Blehm Dep.) at 226:13-227:2; Ex. 39 (2003.10.15 Inv Report by Williamson re: interrogation of Gary Kitchen); Ex. 40 (2003.12.04 Inv Report by Williamson re: interrogation of Reginald Thomas).

106.    Blehm never sought or obtained any alibi for Mitchell Powell, who Lockett and Jones placed at the murder scene and whom Jones described as shooting at White. This failure violated accepted police practices. Ex. 20 (investigative file); Ex. 4 (Blehm Dep.) 121:8-10; 377:8-11 (Blehm would have written down all the information he got about a suspect's alibi and does not remember taking any such steps as to Mitchell Powell); Ex. 3 (Allio Report) at 14.

107.    On January 1, 2004, Mitchell Powell was arrested on a pickup order, and on January 2, 2004, Blehm attempted to question him. Ex. 41 (2004.01.02 Miranda Waiver; Mitchell Powell.pdf).

108.    When Powell was arrested, an associate who was with him, Vernia Johnson, was also brought to KCPD headquarters and questioned by Blehm, but he wrote no report regarding his interactions with either Powell or Vernia Johnson. Ex. 4 (Blehm 2024 Dep.) at 351:18-24; 353:6-354:18.

109.    Niemeier testified that according to usual practices, the Detective Defendants should have continued pursuing additional suspects. For example, the Detective Defendants should not have stopped pursuing Mr. Thomas as a suspect just because Mr. Thomas said he was not involved. Ex. 6 (Niemeier 2024 Dep.) at 231:23-237:14.

110.    The Detective Defendants' failure to investigate alternate suspects' alibis deviated from generally accepted policing practices. Ex. 3 (Allio Report) at 13-14.

111.    The Detective Defendants' actions throughout the White homicide investigation deviated substantially from accepted policing practices. Ex. 3 (Allio Report) at 7-22.

**XIII. Defendant Kansas City Board of Police Commissioner's policies and practices contributed to Plaintiff's wrongful conviction.**

112. Williamson was not familiar when he was a detective with the right of criminal defendants to receive impeachment evidence that would discredit witnesses against them. Defs.' Dkt. 139-17 (Williamson Dep.) at 94:25-95:4.

113. The KCPD did not take measures to avoid manipulating vulnerable witnesses and may have encouraged it, violating generally accepted standards. For example, there were no rules against paying witnesses "off the books" (i.e., from detectives' pockets) in homicide investigations. Ex. 3 (Allio Report) at 19-20; Ex. 4 (Blehm Dep.) at 286:25-288:4; Ex. 5 (Morgan Dep.) at 135:513-24; Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 133:24-134:4.

114. KCPD had no policies regulating the use of confidential informants by homicide detectives or patrol officers. Ex. 3 (Allio Report) at 21; Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 133:24-134:4.

115. The KCPD lacked policies or oversight to prevent detectives from "solving" homicides with fabricated evidence from vulnerable witnesses. Ex. 3 (Allio Report) at 21-22.

116. KCPD lacked any standard procedure for supervisors to review police reports. Ex. 3 (Allio Report) at 22; Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 34:20-36:1.

117. It was common for detectives to destroy their notebooks containing notes from their investigations, but there was no KCPD policy or rule about shredding those notebooks. Ex. 4 (Blehm Dep.) at 80:5-10.

118. KCPD lacked any policies governing what information from witnesses should be recorded, including in the off-the-record "pre-interview" or in their on-the-record statements. Ex. 3 (Allio Report) at 23.

119. KCPD had no policies addressing how detectives should address witnesses who wanted consideration on criminal charges in exchange for their cooperation, and detectives were not required to document when they put in a good word for witnesses to prosecutors. Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 113:4-24.

120. The KCPD's homicide division had no system for establishing or documenting confidential informants or for formally documenting witness cooperation. Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 114:5-21.

121. In 2003 to 2005, the KCPD did not have any requirements a detective had to satisfy before joining the homicide unit. Ex. 23 (Dillenkoffer 30(b)(6) Dep) at 158:20-159:2.

122. Patrol officers who assisted in homicide investigations had no system to sign up or document confidential informants and there were no policies about confidential informants for them or for homicide detectives. Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 133:4-134:4.

74

123.    KCPD allowed patrol officers to hide the identity of important eyewitnesses to homicides with no oversight. Ex. 3 (Allio Report) at 23.

124.    KCPD had no policies defining exculpatory evidence or requiring that exculpatory evidence be disclosed, which violated generally accepted policing standards. Ex. 3 (Allio Report) at 24; Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 14:14-17; 110:8-19.

125.    KCPD had no written policies regarding the review and approval of police reports. Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 38:4-9.

126.    KCPD had no policies requiring that information from investigations be accurately and thoroughly recorded (a necessary step in preserving and producing exculpatory information), which violated generally accepted standards and the standards set by the International Association of Chiefs of Police. Ex. 3 (Allio Report) at 26.

127.    The absence of necessary policies and practices to ensure the integrity of investigations created a "tremendous risk" for the Department. Ex. 3 (Allio Report) at 24.

128.    Plaintiff's police practices expert Joseph Allio concluded that "KCPD's policies, practices, and training related to pre interviews, interviews, interrogations, and disclosure of exculpatory evidence, were woefully inadequate and deviated substantially from accepted police practices. The policies themselves were nonexistent and inadequate, as was the training." Ex. 3 (Allio Report) at 1.

129.    The KCPD lacked policies guiding detectives as to how to complete reports or how those reports should be approved. Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 34:19-35:3; 39:1-10.

130.    The KCPD lacked policies regarding how to maintain the master case file that constituted the documents disclosed to prosecutors. Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 14:14-17, 24:18-23 (As City's 30(b)(6) representative, Dillenkoffer's knowledge of policies was limited to those he reviewed, and he did not review any regarding how the master file should be kept).

131.    In 2004, another man, Yntell Duley, was convicted in a case where the KCPD also withheld an exculpatory witness statement which was withheld from the defendants and which only later surfaced because of a postconviction investigation. Ex. 43 (Yntell Duley 2008 PCR Judgment).

132.    The Department did not do anything to monitor whether sergeants adequately reviewed the master files in the homicide division and is not aware of anything that the supervisors of sergeants (captains) did to make sure the master files were complete and accurate. Ex. 23 (Dillenkoffer 30(b)(6) Dep) at 27:8-14; 28:3-7.

133.    KCPD's policies, practices, and training regarding interviews, interrogations, and disclosure of exculpatory evidence were inadequate and deviated substantially from accepted police practices. Ex. 3 (Allio Report) at 1.

75

**XIV. Defendant Kansas City Board of Police Commissioner's failure to regulate identification procedures led to systematic pressure of witnesses.**

134. At the time of White's homicide, KCPD homicide detectives almost never used live lineups to identify suspects. Instead, they used photo identification procedures. Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 153:7-11, 155:4-15.

135. KCPD had no policies governing the conduct of photo lineups. Ex. 3 (Allio Report) at 15; Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 64:17-65:13.

136. The KCPD detectives provided no admonition to any of the witnesses before conducting photo identifications, which violated generally accepted practices; further, KCPD had no policies requiring such admonitions. Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 74:7-19; Ex. 3 (Allio Report) at 16-19.

137. The KCPD's use of photo lineups showed that they had identified Carnes as their preferred suspect from the start of their documented photos of key witnesses. Williamson and Blehm showed Morrow a six-photo lineup identification of Carnes, who she knew, but only a single photo of Gary Kitchen, who had been identified by her as chasing and shooting at the victim. According to (someone's) testimony, the practice among these detectives was to use six-photo lineup identifications for **suspects** and single-photo identifications for **non-suspect witnesses.** Thus, the use of a six-photo lineup identification for Carnes alone, at an early stage in the investigation, shows that the detectives had already settled on Carnes as their suspect. Ex. 3 (Allio Report) at 16; Ex. 44 (Morrow statement); Ex. 23 (Dillenkoffer 30(b)(6) Dep.) at 74:20-76:2; 88:16-25 (practice was to use single photos to just confirm the identity of someone the witness knew but used six-photo lineup identifications when necessary "to preserve the integrity of the investigation.")

138. KCPD allowed detectives to destroy photographs they showed to witnesses when the witnesses failed to make an identification. Ex. 5 (Morgan Dep.) at 89:11-20.

139. Similarly, Lockett was shown a photo lineup of Keith Carnes but single photos of the other two armed persons she identified, Powell and Rhodes. Based on her statement, there was enough information to implicate Powell or Rhodes, but Blehm and Williamson were only interested in developing Carnes as a suspect. Ex. 3 (Allio Report) at 16-17.

140. When Morgan interviewed Felicia Jones, Morgan showed her just single photographs of Kitchen and Mr. Thomas, even though Jones had identified Mr. Thomas as ordering the victim's killing. Ex. 3 (Allio Report) at 17.

141. The Defendant Detectives should have shown a six-photo lineup of Reginald Thomas to eyewitnesses, not a single photo, but they failed to do so, violating generally accepted standards. Ex. 3 (Allio Report at 25); Ex. 6 (Niemeier Dep.) at 88:16-25 (Dillenkoffer stating he "can't think of any reason" why a six-photo lineup identification of Mr. Thomas should not have been shown).

142.     The KCPD's failure to create policies regarding admonishing eyewitnesses during photo identification procedures or otherwise provide policy and direction regarding eyewitness identifications violated generally accepted police practices. Ex. 3 (Allio Report) at 19.

143.     Safeguards regarding photo identifications were necessary to prevent false identifications, but the KCPD did not implement them. Ex. 3 (Allio Report) at 25.

**XV.     Plaintiff is convicted but eventually overturns his wrongful conviction.**

144.     In her closing argument at Plaintiff's November 2005 bench trial, the prosecutor emphasized the eyewitness testimony and a distinct feature of Plaintiff, his eyepatch, stating, "he has such a unique identifying characteristic. I think if he didn't have that patch it would be a significantly different case. They [the eyewitnesses] all know he's the shooter." Dkt. 139-5 (Nov. 2005 Trial Tx.) at 454:16-20.

145.     In November 2005, Plaintiff was found guilty of White's murder in a bench trial. In stating the basis for its verdict, the court discussed just three incriminating sources of evidence: the eyewitness statements from Lockett, Morrow, and Jones. Dkt. 139-5 (Nov. 2005 Trial Tx.) at 483:13-487:19.

146.     On April 5, 2022, the Missouri Supreme Court determined that a *Brady* violation had occurred in Plaintiff's criminal case and overturned Plaintiff's conviction. Dkt. 139-10.

## SUGGESTIONS IN OPPOSITION

## INTRODUCTION

Plaintiff Keith Carnes spent 18 years incarcerated for the October 2003 murder of Larry White—a crime of which Plaintiff is innocent. Plaintiff's conviction was overturned when it was revealed that the Defendant Officers concealed an exculpatory interview of Wendy Lockett, the key trial eyewitness against Plaintiff. Today, Lockett and every other eyewitness against Plaintiff have recanted their identifications of Plaintiff as the culprit. These witnesses have explained that the Defendant Officers coerced and coached them into providing false statements and testimony.

Defendants insist that there is no jury issue regarding Plaintiff's wrongful conviction. Their argument requires them to ignore the material facts recited above that give rise to liability and to ask the Court to make factual inferences and credibility determinations in *their* favor, not in Plaintiff's, as the summary judgment standard requires. Summary judgment is not the time to resolve disputed facts and decide competing inferences. There is a triable question of fact as to whether Plaintiff was framed for a murder he did not commit and whether the Defendants intentionally secured that result. Summary judgment must be denied.[4]

## LEGAL STANDARD

The Court may grant a motion for summary judgment only if "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). In passing on a motion for summary judgment, the Court must view the facts in the light most

---

[4] Plaintiff does not oppose the entry of summary judgment on all counts for Defendant Niemeier, on Count I for Defendant Begley, on Count II for Defendants Huth, Morgan, and Begley, and on Count VII for all Defendants.

favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Id.* at 249. The Court may not make credibility determinations or weigh the evidence; those "are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

Defendants' motion runs afoul of the summary judgment standard. They present a trial argument—that the facts *could be* deemed consistent with a good faith police investigation. But that is not enough for summary judgment. Taking inferences in Plaintiff's favor and viewing the evidence in the light most favorable to Plaintiff, a jury could hold for the Plaintiff. Therefore, a trial must result. *See White v. Smith*, 696 F.3d 740, 756–57 (8th Cir. 2012) (explaining that when a jury could rule either way, the case must be tried).

## SUMMARY OF RELEVANT BACKGROUND

On October 6, 2003, Larry White was murdered in Kansas City, Missouri. Pl.'s Statement of Additional Material Facts ("PSOF") ¶ 1. Defendant Blehm, a KCPD homicide detective, was assigned to lead the investigation, and Defendants Morgan and Williamson (homicide detectives) and Huth and Begley (patrol officers) participated in that investigation. *Id.* ¶¶ 4-8. Detectives found White's body in the "Fish Town" restaurant parking lot and thirteen shell casings, the closest of which was at least 40 yards from where White collapsed. *Id.* ¶¶ 9-11. Defendants found no bullets, bullet fragments, or shell casings in the parking lot. *Id.* ¶ 12.

The next day, Defendant Patrol Officer Huth spoke with Wendy Lockett, who frequented the area. *Id.* ¶¶ 23-24. Lockett told him, truthfully, that she had seen the shooting, but according to Huth's report she provided no identifying details about the shooter. *Id.* ¶ 24.

Huth referred Lockett to homicide detectives investigating the case (most likely, Defendant Blehm) and the detectives interviewed Lockett. *Id.* ¶¶ 26-27. The detectives either

failed to document that interview or they destroyed their notes and reports. *Id.* ¶¶ 27, 94-96. Huth generated a report of what Lockett said—a report that contradicted and undermined Lockett's later trial testimony against Plaintiff. *Id.* ¶¶ 24-25, 50, 65-66. Blehm would have known about what Lockett told Huth. *Id.* ¶¶ 29-31. Defendants concealed that report and withheld it from Plaintiff until around 2009, long after Plaintiff was convicted. *Id.* ¶¶ 38, 145.

The same day Lockett was interviewed, Defendants set their sights on a known drug house at 2404 E 29th St. *Id.* ¶ 15. The officers had no basis to search that house, so Defendant Blehm made up a witness statement from whole cloth and swore a false warrant to search the house. *Id.* ¶¶ 13-15 Defendant Detectives searched the apartment and found the murder weapon. *Id.* ¶ 16. Then, they arrested Kermit O'Neal, who worked for the drug dealers at the apartment, although they had no evidence linking O'Neal to the murder. *Id.* ¶¶ 17-18. Detectives threatened to pin the crime on O'Neal unless he gave up a suspect, but O'Neal refused. *Id.* ¶¶ 19-20.

Defendant Amy McGowan, a prosecutor, entered the picture just days after the murder. She interviewed eyewitness Lorianne Morrow. *Id.* ¶¶ 67-68. Morrow told her the truth: she saw Reginald Thomas and Gary Kitchen commit the murder. *Id.* ¶¶ 68-69. McGowan told Morrow that the killer was Plaintiff, not Reginald Thomas, and showed Morrow a picture of Plaintiff. *Id.* ¶ 69. McGowan threatened to jail Morrow if she did not go along with McGowan's theory. *Id.* ¶ 70. These conversations occurred before Morrow spoke with police. *Id.* ¶ 71.

On October 12, 2003, Defendants Blehm and Williamson interviewed Morrow. *Id.* ¶ 72. She told them, like she told McGowan, that Reginald Thomas shot and killed White, but Blehm and Williamson did not document that information. *Id.* Blehm and Williamson destroyed any notes of the conversation. *Id.* ¶¶ 94-96, 117. As memorialized in her written statement, Morrow's description of the murder was obviously physically impossible. *Id.* ¶¶ 83-90.

On October 14, 2003, Huth arrested Lockett, took her to KCPD headquarters, and told her "we know you were on the corner with Larry [White], we know you know who shot him, and you have to go down here and tell these people what's going on" and "[y]ou know that you were there, and exactly what happened." *Id.* ¶¶ 41, 43-44. Lockett was subsequently interviewed by Williamson, and Blehm participated in or witnessed the interview. *Id.* ¶ 45. Williamson provided Lockett with false details about the shooting and coached her through what to say. *Id.* ¶¶ 47-51, 53-54, 56. Williamson wrote a false statement and had Lockett sign the statement without reading it, and he violated procedures by typing the statement himself and without using a transcriptionist. *Id.* ¶¶ 55, 57-59. Throughout the interview, Lockett believed herself to be in custody and understood that she would only be released if she cooperated. *Id.* ¶¶ 51-52. The detectives would later claim that it was Lorianne Morrow who told them that Lockett was present at the crime scene, leading them to look for her. *Id.* ¶ 42. But that was a lie: the detectives had known about Lockett from the time they first interviewed her on October 7. *Id.* ¶¶ 23-31.

Later on October 14, 2003, Kitchen and Plaintiff were arrested. *Id.* ¶¶ 91, 97. Kitchen admitted that the murder weapon belonged to him; Plaintiff denied involvement. *Id.*

That same afternoon, Huth and Begley identified and brought in a third eyewitness, Felicia Jones. *Id.* ¶ 76. Defendant Morgan took her statement, which was inconsistent with the other statements: for example, Jones said that she saw Plaintiff taking two guns out of the trunk of his car (the murder weapon was a rifle that Kitchen kept at the apartment, as admitted by Kitchen and confirmed by KCPD analysts, not a gun Plaintiff took from his trunk). *Id.* ¶ 77. She also said that Mitchell Powell shot at the victim from in front of the drug house at 2404 E 29th St apartment, but there is no evidence (shell casings, bullets, etc.) of *any* shots coming from the apartment Jones specified. *Id.* ¶¶ 77, 86. Morgan had Jones sign a statement without reading it;

81

Jones could not read the statement and did not read it. *Id.* ¶¶ 55, 79. Because she cooperated, Morgan gave Jones $5 and did not arrest her on her outstanding warrants. *Id.* ¶ 81. At trial, Jones testified that her statement had been fabricated, that she had been coerced by police, and that she had seen a person other than Plaintiff commit the murder; the fabricated written statement was nevertheless entered as substantive evidence. *Id.* ¶¶ 80-82.

On October 14, 2003, Defendants determined that Plaintiff should be charged with murder. At that time, there were several other live suspects and at no time did the Defendant Detectives investigate the alibis of those other suspects or question them about their faulty alibis. *Id.* ¶¶ 97-111. Gary Kitchen said he was home when the shooting happened (but did not say that Reginald Thomas was with him); months later, Thomas was arrested and claimed he was with Kitchen at the time of the shooting. *Id.* ¶¶ 98-99; 102-105. The Defendant Detectives did not investigate, corroborate, or challenge these alibis. *Id.* ¶¶ 97-111.

Investigation revealed that the eyewitness "statements" were false. *Id.* ¶¶ 83-90. Wendy Lockett's fabricated statement said Damon Rhodes was accomplice to the shooting, but Rhodes had a video alibi of himself cleaning a bank with his girlfriend. *Id.* ¶ 90. Detectives never followed up with Lockett. *Id.* Further, Detectives eventually arrested Powell along with an associate, Vernia Johnson, but Blehm failed to document any interview or information gleaned from either of them. *Id.* ¶ 108. The Defendants repeatedly deviated from standard practices and generally accepted policing practices in investigating the case. *Id.* ¶¶ 109-111.

No physical or forensic evidence tied Plaintiff to White's murder, of which Plaintiff was innocent, but he was convicted based on the fabricated testimony of Jones, Morrow, and Lockett. *Id.* ¶¶ 2-3, 144-45. Plaintiff was exonerated nearly twenty years after his arrest after the suppressed October 7 report of Wendy Lockett's interview was revealed. *Id.* ¶ 146.

## ARGUMENT

### I.    Plaintiff's suppression of evidence claim must be tried.

Plaintiff claims that Defendants suppressed exculpatory evidence, thereby denying him of a fair trial. To prevail on this claim, Plaintiff must establish that "(1) the prosecution suppressed evidence (2) that was favorable to the defendant and (3) that the evidence was material," and that "a law enforcement officer other than the prosecutor intended to deprive [him] of a fair trial." *McKay v. City of St. Louis*, 960 F.3d 1094, 1099 (8th Cir. 2020) (citations omitted). Plaintiff need not prove he would have prevailed with the suppressed evidence, but only that there is "any reasonable likelihood it could have affected the judgment of the jury," meaning that "the new evidence is sufficient to undermine confidence in the verdict." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (cleaned up) (clarifying further that it "need not [be] show[n] that [the defendant] 'more likely than not' would have been acquitted").

### A.    A reasonable jury could conclude Defendants suppressed evidence.

The suppressed evidence in this case includes Huth's October 7, 2003 report; other notes and reports of the detectives' interactions with Wendy Lockett on October 7, 2003; a statement that eyewitness Felicia Jones supposedly made "corrections" to with Defendant Morgan; and other notes that would have impeached the investigation.

First, the October 7, 2003 report by Defendant Huth, described above, memorialized a conversation he had with key eyewitness Wendy Lockett. Defendants did not provide this report to the prosecutor and Plaintiff did not receive it until years after his conviction. PSOF ¶¶ 34-38. This report substantially undermined Lockett's later fabricated statement written on October 14, 2003. *Id.* ¶¶ 32-40. The differences were impeaching and exculpatory because:

- The October 7 statement does not identify a perpetrator; the October 14 statement identifies Plaintiff, "Fuzzy," and "Debo" by name.

- The October 7 statement states Lockett saw "two [unnamed] men" chasing the victim; the October 14 statement asserts that Plaintiff, identified by name, alone chased the victim.
- The October 7 statement states Lockett saw "two [unnamed] men" shooting at the victim; the October 14 statement describes Plaintiff alone shooting at the victim.
- The October 7 statement describes the murder weapon as "unknown;" the October 14 statement describes it as a "long thing with a banana clip."
- The October 7 statement does not describe either shooter as wearing an eyepatch or having any other distinct feature; the October 14 statement says the shooter was wearing an eyepatch (like Plaintiff did at the time of the murder).
- The October 7 statement does not identify any men present with the shooter; the October 14 statement says that two other men, "Fuzzy and Debo" (identified as Mitchell Powell and Damon Rhodes), were with Plaintiff during the shooting and were armed.
- The October 7 statement does not describe any shooting in the Fish Town parking lot; the October 14 statements claims that Plaintiff killed the victim execution-style in that lot.

*Id.* ¶ 50. These critical impeaching details were withheld from Plaintiff.

Second, Defendant Detectives also took notes and may have even written a report regarding their subsequent interview of Wendy Lockett on October 7, 2003. The undisputed testimony of the Defendant Officers is that Wendy Lockett was referred to one of the homicide detectives—most likely Blehm—after Huth spoke with her. *Id.* ¶ 26. Blehm further testified that Huth and Begley likely shared information about their interaction with Lockett with him and that he was "sure" that it "became readily apparent we were going to need to know who [the "confidential informant" in Huth's October 7 report] was." *Id.* ¶¶ 29-31. Thus, according to their regular practice, the detectives would have interviewed Lockett and then memorialized their interaction in a report. *Id.* ¶¶ 26-27, 29-31. A reasonable jury could infer that the Defendants brought Lockett back to the police station to question her, because Kermit O'Neal heard several detectives, including Blehm, questioning a woman in the interview room next to his that afternoon. *Id.* ¶¶ 21-22. Williamson, who was in training and did everything with Blehm, would have learned of the October 7, 2003 statement, too. *Id.* ¶¶ 7-8. It is also reasonable to infer that the Defendant Detectives' notes would have furnished additional evidence that Lockett gave statements on October 7, 2003 that were inconsistent with her trial testimony.

Plaintiff is entitled to these inferences at the summary judgment stage. Defendants are not entitled contrary inferences favoring them. *Anderson*, 477 U.S at 255. Failing to adhere to this bedrock principle of summary judgment procedure would permit Defendants to avoid a trial by destroying their notes—an outcome that would "strain[] *Brady* to the point of absurdity." *Armstrong v. Daily*, 786 F.3d 529, 550 (7th Cir. 2015) ("*Brady* would mean nothing if, . . . a prosecutor could comply with its command by deliberately destroying exculpatory evidence and then disclosing the fact of destruction to the defense.").

Third, Defendants suppressed the "corrections" to Felicia Jones's fabricated statement, which Detective Morgan testified that he destroyed. Because Jones has testified that her statement was fabricated, a reasonable jury could conclude that Morgan destroyed the purported corrections in bad faith, since they would have furnished evidence of the course of the fabrication. *See generally Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988) (holding destruction of potentially exculpatory evidence violates due process when done in bad faith).

Finally, Blehm admits that he observed from another room the interview Williamson took of Lockett on October 14, 2003 and that the purpose of him observing was to "make notes." PSOF ¶ 45. For the reasons discussed above, a reasonable jury could conclude that those notes would have revealed that Williamson coached and coerced Lockett into making false statements and would therefore have impeached her statement against Plaintiff.

### B.     A reasonable jury could conclude the suppressed evidence was material.

Suppressed evidence is material if there is a "reasonable probability that its disclosure would have produced a different result." *Kyles v. Whitley*, 514 U.S. 419, 422 (1995). Where, as here, suppressed evidence "would have entitled a jury to find that the eyewitnesses were not consistent in describing the killer . . . [and] were unreliable," that standard is met. *Id.* at 454. The impact of suppressed evidence is considered "collectively, not item by item." *Id.* at 436.

85

A jury could conclude the suppressed evidence was material. This was an eyewitness case. The evidence against Plaintiff consisted almost exclusively of the testimony of three eyewitnesses, all of whom have recanted their testimony and revealed that they were coerced and coached into false testimony. PSOF ¶¶ 23-82. The physical and forensic evidence pointed away from Plaintiff and proved Lockett and Morrow's testimony to be impossible. *Id.* ¶¶ 83-90. And Lockett's suppressed October 7 statement impeached every detail of her trial identification of Plaintiff. In this shaky eyewitness case, undisclosed evidence that could be used to impeach the eyewitnesses necessarily undermines confidence in the verdict. *See United States v. Dones-Vargas*, 936 F.3d 720, 722 (8th Cir. 2019) (holding that materiality of impeachment evidence hinges on "[t]he relative strengths of the prosecution's case").

For example, the prosecutor argued at trial that Plaintiff's eyepatch was the key identifying detail corroborating the eyewitness identifications. PSOF ¶ 144. But the factfinder at Plaintiff's criminal trial did not hear that Lockett never mentioned an eyepatch when she spoke to Defendants on October 7. And the prosecutors now all agree that the October 7 statement (which they never received) needed to be produced. The Missouri Supreme Court drew the same conclusion and reversed Plaintiff's conviction because that evidence had been suppressed. *State ex rel. Carnes v. Buckner*, No. SC 98736, 2022 WL 1040070, at *1 (Mo. Apr. 5, 2022).

Defendants argue that the materiality standard is different because Plaintiff took a bench trial and "the State only had to convince one person (Judge Martin), not twelve." Dkt. 139 at 57. They offer no legal basis for that conclusion, and in any case, their argument favors Plaintiff. They note that Judge Martin wondered "why would these witnesses [Morrow and Lockett] be making up a story here." *Id.* The suppressed evidence supplies the answer: the October 7, 2003

report shows Lockett lied about what she saw and that she was an informant who Huth had used in multiple cases and whom Defendants were able to manipulate.

## C.    Defendants' intent is a fact issue that must be tried.

A defendant's mental state is a classic jury issue. *See United States v. One 1989 Jeep Wagoneer*, 976 F.2d 1172, 1176 (8th Cir. 1992) ("Where mental state or intent (particularly willfulness) is at issue, summary judgment must be granted with caution, as usually such issues raise questions for determination by a factfinder."). Regarding the intent requirement, "when state of mind, or 'consciousness and conscience' is involved, credibility often will be central to the case and summary judgment inappropriate." Charles Alan Wright et al, Federal Practice and Procedure § 2730 (4th ed. 2024); *see also McGee v. Hester*, 724 F.2d 89, 91 (8th Cir. 1983) ("Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles.").

Here, there is evidence to support the inference that the Defendant Officers intended to deprive Plaintiff of a fair trial. The Defendants failed to document numerous key interactions, including the witness interview with Lockett on October 7 and interviews with alternate suspects. PSOF ¶¶ 27, 108. They failed to conduct standard steps to investigate alternate suspects' alibis after arresting Plaintiff. *Id.* ¶¶ 97-111. They cannot explain how the key exculpatory evidence in this case, including the October 7 report of Huth interviewing Lockett, went missing. *Id.* ¶ 40. Further, Blehm violated department policy by failing to number the case documents before giving them to the prosecutor, which a jury could find indicates that he did not intend to follow procedures designed to ensure full disclosure of material evidence. *Id.* ¶ 39. In sum, the Defendants' deviations from accepted police practices create an inference of ill intent. *See Holmes v. Slay*, 895 F.3d 993, 1000–01 (8th Cir. 2018) (holding deviations from professional standards and police protocols were relevant to establishing conspiracy and other inferences).

87

A jury could find that Huth, Blehm, Morgan, and Williamson each knew of, but intentionally did not disclose, exculpatory evidence. Blehm would have received the October 7 report per regular procedures. It was his job to put it in the case file and its omission is attributable to him. PSOF ¶¶ 32-33. Blehm knew about the October 7 conversation between Huth and Lockett and there is evidence that Blehm himself interviewed Lockett on October 7, yet he never disclosed such evidence. *Id.* ¶¶ 26-27, 29-30. Williamson was side-by-side throughout the investigation with Blehm and would have known of Lockett's inconsistent statement and the plan to suppress it. *Id.* ¶ 7-8. Huth helped to hide the report he wrote, a jury could conclude, based on Lockett's testimony that Huth pressured her by telling her "[you know who did this. . . . You know that you were there, and exactly what happened" during his second interview with her. *Id.* ¶ 44. And Morgan destroyed the "corrections" from Jones, and would not have fabricated Jones's statement absent an intent to join the broader scheme, or so a jury could find. *Id.* ¶ 79.

### D. Qualified immunity is unavailable.

Defendants fail to develop any argument that qualified immunity is available to them on the facts of this case, and thus have waived or forfeited argument on that point. *See e.g., Cox v. Mortgage Electronic Registration System, Inc.*, 685 F.3d 663, 674-675 (8th Cir. 2012) (finding party waived argument by failing to "provide a meaningful explanation of the argument and citation to relevant authority in their opening brief"); *United States v. Brown*, 108 F.3d 863, 867 (8th Cir. 1997). ("Absent some reason for failing to raise an argument in an opening brief, this court will not consider an argument first raised in a reply brief.").

In any case, the right of criminal defendants to receive exculpatory evidence was clearly established in 2003 (and decades prior) and thus the Defendant Officers would have known that they could not intentionally withhold exculpatory or impeachment evidence that would have helped Plaintiff. The United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 87 (1963)

88

recognized a violation of due process arising from the suppression of evidence favorable to an accused. *See also California v. Trombetta*, 467 U.S. 479, 485 (1984). The United States Court of Appeals for the Eighth Circuit has held that "*Brady's* protections also extend to actions of other law enforcement officers such as investigating officers." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008); *see also Ienco v. City of Chicago*, 286 F.3d 994, 1000 (7th Cir. 2002) (Plaintiff could bring *Brady* claim against officers where "the officers withheld exculpatory information and lied to the federal prosecutors who successfully indicted him.").

The same was well established for potentially exculpatory evidence like the destroyed notes and witness statements at issue here—it has long been held that a due process violation occurs when a police officer suppresses potentially exculpatory evidence in bad faith. *See Youngblood*, 488 U.S. at 57-58; *McKinley*, 519 F.3d at 814; *Villasana v. Wilhoit*, 368 F.3d 976 (8th Cir. 2004). Qualified immunity is therefore unavailable.

## II. Plaintiff's fabrication of evidence claim must be tried.

It violates a criminal defendant's due process rights where officers knowingly "use false evidence, including false testimony, to secure a conviction." *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 954 (8th Cir. 2001). It equally violates due process where "Defendants systematically coached witnesses into providing false testimony that was in line with the narrative of the Defendants' theory as to how the murder had been committed." *Winslow v. Smith*, 696 F.3d 716, 732–33 (8th Cir. 2012). Similarly, "a plaintiff can make out a violation of substantive due process by offer[ing] evidence of a purposeful police conspiracy to manufacture, and the manufacture of, false evidence." *White*, 696 F.3d at 754 (cleaned up).

### A. A reasonable jury could conclude Defendants fabricated evidence.

Fabrication of testimony is an actionable constitutional tort under the Due Process clause when the evidence is used to deprive a defendant of his liberty. *See, White*, 696 F.3d at 754

(discussing examples of actionable fabricated testimony). Further, when witness narratives change to match detectives' theory of the case, a jury can infer that the detective manipulated the witness into implicating their preferred suspect. *Id.*; *see also Winslow*, 696 F.3d at 716.

Defendants have waived or forfeited argument that their fabrications of evidence did not shock the conscience by not making one. *Cox*, 685 F.3d at 674-675. But even if Defendants had made such an argument, it would fail. If the jury believes the witness testimony that police officers told them what to say, including details of the homicide unknown to them, such fabrications would plainly rise to the level of shocking the conscience. *See White*, 696 F.3d at 758 (holding that "intentionally manufacturing false evidence to convict a criminal defendant is the sort of 'brutal and inhumane abuse of official power' that shocks the conscience").

### 1. There is ample evidence of fabrication.

Defendants cannot prevail by ignoring evidence of fabrication, including fabricated statements from the three eyewitnesses whose statements and testimony led to Plaintiff's conviction: Lockett, Morrow, and Jones. Defendants argue that no statements from Lockett were fabricated, but Lockett has testified that the following false statements were coerced from her:

- That Lockett had seen White running up the street while Plaintiff chased him;
- That Lockett had seen Plaintiff walk up to the victim in the Fish Town parking lot and shoot him in the head (which was physically impossible and against the evidence);
- That Plaintiff told White that he couldn't "sell no dope" on the corner earlier that day;
- That Lockett had observed Plaintiff come out of the apartment before the shooting;
- That Lockett observed a gun in Plaintiff's hands as he came out of the apartment;
- That the shooter had a gun that was a "long thing with a banana clip";
- That Lockett heard Plaintiff say "you gonna die, motherfucker";
- That Lockett remembered what clothing Plaintiff was wearing.

PSOF ¶¶ 47-48. Defendants acknowledge that Lockett testified that "police told her what happened, and she agreed to it." Dkt. 139 at 53. Lockett believed she had been detained and had to give the detectives what they wanted to be let go when she made her statement. PSOF ¶ 55.

90

Lockett further explained that she was pressured into giving these statements and ultimately, after detectives detained her, she "agreed to say a lot of things because [she] was trying to get back out on the streets." *Id.* ¶¶ 51-55. To complete the fabrication process, Williamson wrote up Lockett's statement outside of her presence and had her sign it without reading it. *Id.* ¶ 55. Thus, Defendants are wrong to say that there is no evidence Williamson intentionally fabricated a statement from Lockett, Dkt. 139 at 53; a reasonable jury could easily conclude that Defendant Officers coached, coerced, and otherwise manufactured false evidence from Lockett. *C.f. Ferguson v. Short*, No. 2:14-CV-04062-NKL, 2015 WL 4877539, at *22 (W.D. Mo. Aug. 14, 2015) (holding that evidence of leading questions by investigator gave rise to reasonable inference that detectives had fabricated evidence, requiring a trial).

A jury could also conclude that Defendant Officers fabricated Morrow's testimony. Morrow testified that she told officers that Reginald Thomas was the real killer. PSOF ¶ 72. Nevertheless, Defendants did not write down or record that identification in any police report and did not ask her about that identification in the Q and A statement that Morrow signed. *Id.* Morrow's statement also included a false and physically impossible detail about White being shot at close range in the Fish Town parking lot. *Id.* ¶ 73.

Likewise, Jones signed a statement implicating Plaintiff, but at trial she testified that she remembered a "whole different person" than Plaintiff involved in Larry White's murder. *Id.* ¶ 81. Jones testified that she could not read, but nevertheless Morgan had her sign a statement verifying that she had *read* her (false) statement implicating Plaintiff. *Id.* ¶¶ 55, 79. At trial, Jones said that to testify implicating Plaintiff would be to "lie under oath" and indicated that the statement "could have been something that was coerced from me because I was on drugs at the time." *Id.* ¶ 81. Still, the statement Morgan took from Jones was entered as substantive evidence

91

against Plaintiff. *Id.* ¶ 82. A jury could credit Jones's testimony and conclude that Morgan fabricated her identification. The Court cannot accept Defendants' invitation to credit Morgan's testimony and ignore Jones's contrary statement. Dkt. 139 at 55.

### 2. The fabricated Ronald White Sr. report is circumstantial evidence of fabrication.

On October 7, 2003, Blehm and Williamson used a fabricated report containing made-up statements from Ronald White, Sr. to obtain a search warrant. PSOF ¶¶ 13-16. White Sr.'s statements were not introduced at trial and he did not testify against Plaintiff. However, the fabrication itself is relevant to Plaintiff's claims in this case under Federal Rule of Evidence 404(b)—it shows knowledge and intent by Blehm and Williamson to fabricate evidence to "solve" a homicide. *See, e.g.*, *Winslow*, 696 F.3d at 732–34 (finding evidence that investigators "purposefully manufactured false evidence" relevant to fabrication and reckless investigation due process claims); *White*, 696 F.3d at 755 (similarly holding that evidence of dishonest investigation creates inference that defendants intentionally fabricated evidence).

### 3. Defendants' counterarguments fail.

In response, Defendants cite the report and recommendations of a magistrate judge in a single out-of-circuit district court case for the proposition that false statements "must be indisputably false, rather than simply misleading," to give rise to liability. Dkt. 139 at 52; *see Dalmida v. Warden*, No. 17-cv-488, 2019 WL 1573206 at *57 (S.D. Ohio Apr. 11, 2019). That is not the law in the Eighth Circuit; as discussed, evidence of a purposeful police conspiracy to manufacture false evidence creates a jury issue on fabrication, and so does evidence that police systematically coached witnesses into providing false testimony.

Defendants also rely on *Amrine v. Brooks*, No. 04-4300-CV-C-NKL, 2007 WL 436087 (W.D. Mo. Feb. 6, 2007), but that case is not on point, either. There, the plaintiff (who did not

even plead a due process violation) argued only that the officers' investigation was not thorough enough; the facts are very different than here, where witnesses have testified that they were coached and coerced into giving false statements. *Id.* at *8, 11; PSOF ¶¶ 23-82.

The cases cited by Defendants regarding "materiality" are not on point: they address suppression claims, not fabrication claims. *See United States v. Agurs*, 427 U.S. 97 (1976) (denying *Brady* claim regarding suppression of evidence); *Hedges v. Poletis*, 177 F.3d 1071, 1074 (8th Cir. 1999) (discussing Fourth Amendment claim as to probable cause, not Fifth Amendment fair trial claims like Plaintiff's fabrication of evidence claim). Instead, "[f]alse evidence or evidence derived from a reckless investigation only violates a criminal defendants' due process rights if it is 'used to deprive the defendant of her liberty in some way.'" *Winslow*, 696 F.3d at 735 (citation omitted). In any case, even if the *Brady* materiality test applied here (which it does not), it would be met: Lockett, Morrow, and Jones's testimony was fabricated, and as defendants admit, that testimony was the only evidence that led to Plaintiff's conviction.

Finally, it is incorrect that Plaintiff makes "no allegations" that Morrow's statement was fabricated, as Defendants assert (Dkt. 139 at 55). Plaintiff specifically alleged that "The officers relied on a network of drug-addicted women, many of whom were homeless and engaged in prostitution, to fabricate statements that Plaintiff was the killer." Dkt. 1 (Compl.) ¶ 3. Morrow was one of those women and the complaint gave notice that her testimony was at issue. Defendants also received additional notice that Plaintiff would claim the Morrow statement was fabricated via Morrow's deposition and in Plaintiff's expert reports. PSOF ¶¶ 83-90.

## B. A reasonable jury could find causation.

Defendants do not argue that the testimony and statements of Lockett, Morrow, and Jones were immaterial to Plaintiff's conviction or lack a sufficient causal link to Plaintiff's conviction. Nor could they. As Defendants acknowledge, "it was solely the testimony" of "Morrow, Lockett

93

and Jones that secured [Plaintiff's] conviction." Dkt. 139 at 52. Thus, if the testimony of those three witnesses was fabricated, those fabrications must have caused Plaintiff's conviction.

### C. Qualified immunity is unavailable.

Defendants' assertion of qualified immunity is frivolous. They make no specific argument as to why the facts of this case—i.e., fabricating witness statements and systematically coaching and coercing false testimony—would not have been clearly prohibited under the Constitution to any reasonable officer in 2003. It was clear decades earlier that such actions were prohibited. *See Winslow*, 696 F.3d at 738 ("Defendants do not dispute that the right to be free from the use of false evidence to secure a conviction was clearly established in 1989, nor could they.") (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

### III. Plaintiff's reckless investigation claim must be tried.

A plaintiff may establish a due process violation for reckless or intentional failure to investigate that shocks the conscience by establishing "(1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009). Where detectives had "multiple opportunities to see that the evidence they were assembling did not support their theory of the case," but "rather than allowing the discrepancies in the evidence to serve as red flags . . . instead pressed ahead and continued to exert pressure on vulnerable witnesses to provide testimony that was not within those witnesses' personal memory," there is sufficient evidence for a jury to try a reckless investigation claim. *Winslow*, 696 F.3d at 735. A jury could find such evidence here.

## A. A reasonable jury could conclude defendants systematically pressured witnesses, failed to investigate leads, and ignored evidence.

There is evidence that investigators systematically pressured witnesses to implicate Plaintiff despite contrary evidence. A jury could also find investigators purposefully ignored evidence suggesting Plaintiff's innocence. As argued above in Section II(A), investigators systematically pressured witnesses to implicate Plaintiff and hid evidence that those witnesses had identified other perpetrators. And the investigators also had ample reason to suspect other perpetrators, whom they instead ignored.

To start, there were the drug dealers who worked at the apartment where the murder weapon was found: Kitchen, Reginald Thomas, and Powell. Kitchen admitted he owned the murder weapon and was in the area to sell drugs the day of the shooting, but claimed he went home before White was killed. PSOF ¶¶ 97-98. Kitchen never identified specific alibi witnesses and Defendants never corroborated Kitchen's alibi. *Id.* ¶ 100. Nearly two months later, Reginald Thomas claimed he had been with Kitchen the entire evening on the day of the murder. *Id.* ¶¶ 102-104. Defendants did nothing to corroborate that alibi, either. *Id.* ¶ 105.

When Defendants subsequently arrested Powell and two of his acquaintances, Blehm photographed and questioned them but did not record any information they provided, including any information about Powell's alibi, even though Powell had also been implicated by an eyewitness. *Id.* ¶¶ 106-08 Defendant Niemeier, who supervised the detectives, testified that the standard practice would have been to keep looking for accomplices since witnesses implicated multiple individuals in the murder. *Id.* ¶ 109. A reasonable jury could include that they intentionally or recklessly failed to pursue those leads because the Defendant Detectives had "solved" the crime and did not wish to complicate the record.

But, nonetheless, it would be reasonable to infer that Defendants did not themselves believe their own fabricated account of the murder. Any homicide detective would have known that the victim had not been shot point-blank in the head with a high-powered rifle. *Id.* ¶¶ 83-85. There were no bullets or shell casings in the parking lot and the victim's injuries were inconsistent with such a shot. *Id.* Still, the Defendants did not investigate further or question the witnesses to understand why they said there was a point-blank kill shot. *Id.* ¶¶ 88-89. Instead, Defendant Blehm claimed that he had found a bullet fragment in the parking lot—which was blatantly false, as no such bullet fragment was ever documented or inventoried. *Id.* ¶¶ 86-87.

Likewise, a jury would not necessarily conclude, as Defendants argue, that "Kitchen was eventually eliminated, because no one reportedly saw him shoot White." Dkt. 139 at 48. According to their statements, Morrow identified Kitchen as chasing the victim with a firearm, Felicia Jones identified Powell as shooting at the victim, and Lockett identified Powell as present at the scene. PSOF ¶¶ 74, 77, 139. And Reginald Thomas was placed at the scene by the statements of two eyewitnesses—Jones (who said Thomas ordered White's murder) and Margo Thomas. *Id.* ¶¶ 78, 103. In sum, Kitchen, Powell, and Reginald Thomas were never ruled out of the murder. A jury would not need to credit Defendants' self-serving explanations for why they failed to pursue these possible perpetrators.

For all the above reasons, a jury need not credit Defendants' assertions that they conducted a reasonable and standard investigation A reasonable jury could find for the above reasons that the investigators kept putting pressure on vulnerable witnesses while ignoring the red flags that kept surfacing. *Winslow*, 696 F.3d at 735.

### B.    A reasonable jury could conclude Defendants' failures shock the conscience.

It shocks the conscience, and thus creates a triable jury issue, when investigators "coerce[] and threaten[] [witnesses] to provide false testimony; purposefully ignore[] the fact that

96

no witness could independently provide testimony about details of the crime; and exert[] undue pressure to implicate [a plaintiff] or to improperly strengthen the state's case" because "[s]uch actions severely undermine an individual's right to a fair criminal proceeding." *Winslow*, 696 F.3d at 736. A jury could find Defendants' actions shock the conscience.

Notably, as many as five witnesses independently stated the Defendants fabricated statements from them, tried to fabricate statements from them, or otherwise pressured or coerced them. Ronald White Sr. testified that Defendants fabricated a statement from him which they used for a search warrant; Kermit O'Neal testified that the Defendants arrested him without probable cause (he happened to be at the apartment they were searching, but no evidence linked him to the murder), and then threatened to pin the murder on him and threw chairs and tried to physically intimidate him; Lorianne Morrow testified that Defendants ignored her identification of Reginald Thomas as the shooter; Felicia Jones testified that police made her sign a statement that she couldn't even read and did not identify the person she had seen commit the murder; and Wendy Lockett testified that police arrested her and told her what to say in her fabricated statement. Defendants also failed to identify alternative suspects or corroborate alibis after they arrested Plaintiff. The record creates a triable issue of fact.

Defendants' authority is inapposite. To start, they cite a decision in *Amick v. Oregon County* which appears to be unpublished and has not been provided to the Court or identified by way of any available database. Dkt. 139 at 47, 49. Putting aside whether the Court and Plaintiff must consider that decision, it offers Defendants no help. Defendants cite it for the proposition that failing to pursue lines of investigation indicates negligence, not recklessness; that may be true in isolation, but given the extensive evidence of bad faith, coercion, and other misconduct presented above, a jury could conclude that Defendants' behavior was more than just negligent.

97

Defendants contend that Blehm and Williamson did not violate the constitution because they were entitled to rely on eyewitness testimony that is "inconsistent but not obviously false" and "credit" the eyewitnesses over Plaintiff's denials. *See Brockinton v. City of Sherwood,* 503 F.3d 667, 672 (8th Cir. 2007); *Burton v. St. Louis Bd. of Police Comm'rs*, No. 10-cv-1540-TCM, 2012 WL 1933761 at *22 (E.D. Mo. May 29, 2012). That is true enough but insufficient. Here, there is evidence that the eyewitness testimony *was* "obviously false" because it portrayed a physically impossible and forensically disproven execution-style kill shot. There is also evidence that the eyewitness testimony coerced, pressured, and fabricated. Thus, this case is distinctly different from *Brockington*, which involved a question of whether a woman who reported a boat stolen had ever actually owned that boat. There, the investigator obtained and investigated a purported bill of sale and weighed the credibility of both parties, and there was no pattern of misconduct and coercion such as is present in this case. 503 F.3d at 672. Same for *Burton*: there, the court found there was no evidence that the investigators tried to solicit a false identification or that the investigators knew any of the testimony they obtained was false. 2012 WL 1933761 at *22. For all the reasons discussed, a reasonable jury could make different findings.

Defendants add the baseless argument that because Plaintiff's complaint alleges that the Defendants "deliberately failed to use legitimate and accepted investigative practices" but did not specify in the complaint what precise practices those were, Plaintiff "fail[ed] to satisfy *Iqbal* and *Twombly*" in his complaint and should not "be permitted to rely upon that in his Opposition to this Motion." Dkt. 139 at 49. *Iqbal* and *Twombly* address pleading standards for the purpose of a motion to dismiss, not the issue of what evidence may be relied on at summary judgment. And *Twombly* acknowledges that "the Federal Rules eliminated the cumbersome requirement that a claimant set out *in detail* the facts upon which he bases his claim." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 n.3 (2007) (cleaned up). Instead, at summary judgment, "a district court may rely on any information that would be available as admissible evidence by the time of trial." *Symington v. Daisy Mfg. Co.*, 360 F. Supp. 2d 1027, 1030 (D.N.D. 2005) (citing *Fin. Timing Publ'ns, Inc. v. Compugraphic Corp.*, 893 F.2d 936, 942 (8th Cir. 1990)). It would be absurd for the allegations in the complaint to define the scope of the summary judgment record. The Federal Rules impose no such a requirement. *Cf.* Fed. R. Civ. P. 8(a)(2) (setting forth the familiar "short, plain statement" requirement for pleading a claim in a complaint).

### C. Qualified immunity is unavailable.

Defendants again fail to develop an argument for qualified immunity. The Eighth Circuit has ruled that the right to be free from reckless investigation was clearly established as early as 1986. *Winslow*, 696 F.3d at 739. Defendants' discussion of *Brockington* is not on point: there, the officers received qualified immunity because the court determined their actions—merely crediting one individual's statement over another—constituted, at worst, negligence, and did not shock the conscience. 503 F.3d at 672. As already discussed, with inferences made in Plaintiff's favor, Defendants' actions in purposefully ignoring evidence of Plaintiff's innocence—and systematically pressuring witnesses to implicate Plaintiff despite contrary evidence—is conscience-shocking and must be decided by the jury. *See Winslow*, 696 F.3d at 732.

## IV. Plaintiff's Fourth Amendment claims must be tried.

In Count II, Plaintiff asserted a claim for malicious prosecution and unlawful pretrial detention against all Defendants. The thrust of Plaintiff's claim was that he was arrested and detained without probable cause. "To establish a violation of the Fourth Amendment, the claimant must demonstrate a seizure occurred and the seizure was unreasonable." *Davis v. Dawson*, 33 F.4th 993, 997 (8th Cir. 2022) (cleaned up). As Defendants correctly identify, the standard is whether the Defendants, from the standpoint of an objectively reasonable officer, had

"arguable probable cause" against Plaintiff. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003);

*Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996).

> **A.** **Plaintiff's unlawful pretrial detention claim must be tried.**

Here, Defendants Blehm and Williamson had no arguable probable cause to detain

Plaintiff. "Government actors may violate the Fourth Amendment by including false information

in, or omitting truthful information from, a probable cause affidavit." *Est. of Nash v. Folsom*, 92

F.4th 746, 754 (8th Cir. 2024). Blehm and Williamson's probable cause affidavit was based

entirely on Lockett and Morrow's witness statements. PSOF ¶¶ 92-93. Defendants improperly

ask the Court to credit the officers' testimony about those statements (Dkt. 139 at 64) and ignore

what Morrow and Lockett have said actually happened, which is forbidden at summary

judgment. Crediting Lockett's testimony, she was coerced into giving false testimony provided

by the Defendants. Crediting Morrow's testimony, she told the Defendants that Thomas

committed the murder and they ignored her. If the jury believes Morrow and Lockett, the

Defendant Officers submitted a false probable cause affidavit that included fabrications and

omitted exonerating facts. *Bagby v. Brondhaver*, 98 F.3d 1096, 1098 (8th Cir. 1996) ("A warrant

based upon an affidavit containing 'deliberate falsehood' or 'reckless disregard for the truth'

violates the Fourth Amendment) (quoting *Franks v. Delaware,* 438 U.S. 154, 171 (1978)).

Qualified immunity is unavailable, too. Defendants failed to develop an argument on this

point and have waived or forfeited it. *Cox*, 685 F.3d at 674-675. In any case, there is no issue of

whether the right was clearly established. That right law has been clearly established since 1978

and was clearly established when Plaintiff was arrested in 2003. *Franks,* 438 U.S. at 171–72;

*Turpin v. Cnty. of Rock*, 262 F.3d 779, 783 (8th Cir. 2001).

**B.      Plaintiff's federal malicious prosecution claim must be tried.**

Defendants next argue that because a federal "malicious prosecution" tort was not clearly established in 2003, Plaintiff's claim may not proceed. This argument fails.

First, Defendants ignore controlling Supreme Court precedent. In 1975 and 1994, the Supreme Court held that the Fourth Amendment requires probable cause as to pretrial detention, even after a judge's determination of probable cause. *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 360 (2017) (citing *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Albright v. Oliver*, 510 U.S. 266, 274, 290 (1994). Thus, the Defendants knew or should have known that they could not arrest Plaintiff and cause him to be charged without probable cause.

In 1979, the Supreme Court held that officers "violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation." *Dunaway v. New York*, 442 U.S. 200, 216 (1979). This principle is established by "centuries of precedent." *Id.* at 214. Accordingly, in 1996, the Eighth Circuit held that there was a "clearly established right under the Fourth Amendment not to be arrested unless there was probable cause for [the] arrest." *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996). *See Williams v. Aguirre*, 965 F.3d 1147, 1169–70 (11th Cir. 2020) (holding that *Franks* clearly established Fourth Amendment right against false statements in arrest affidavits and that ambiguity as to the legal standard regarding malicious prosecution claims did not undermine whether the associated Fourth Amendment right was clearly established). Other circuits have determined by then there was a clearly established right against malicious prosecution based in the Fourth Amendment by 2003. *See Bledsoe v. Carreno*, 53 F.4th 589, 614 (10th Cir. 2022) (holding that right was clearly established as of 1996).

Defendants argue that the Supreme Court did not recognize the Fourth Amendment *claim* until *Manuel* was decided in 2017. But that argument misses the point. Qualified immunity turns

101

on whether the Defendants' *conduct* had been held to be a constitutional violation, not which *remedies* were available—and, of course, Defendants can make no argument that the right to be free of arrests unsupported by probable cause was not clearly established in 2003. *See Armstrong*, 786 F.3d at 556 (qualified immunity analysis turns on whether the conduct had been held to be a constitutional violation, not which remedies were available for such violations). Defendants are not entitled to quality immunity.

## V.      Plaintiff's § 1983 conspiracy claim against the individual officers must be tried.

Defendants fail to develop a substantive argument against Plaintiff's Section 1983 conspiracy claim. They make no argument that any relevant right was not clearly established and identify no law on that point. Instead, they merely cite the relevant legal standard and a single case (which they do not apply) holding that a "commonly held belief" is not a conspiracy. They have waived or forfeited argument on this claim. *Cox*, 685 F.3d at 674-675.

The elements of Section 1983 conspiracy are "(1) that the defendants conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured him." *Holmes*, 895 F.3d at 1001. Such a claim "should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." *Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996). A plaintiff need only put forward "at least some facts" of such an understanding to establish a triable claim. *Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1109 (8th Cir. 2016).

A reasonable jury could find that Defendants Blehm, Williamson, Morgan, Huth, and Begley conspired with one another. A jury could find that Morgan would not have fabricated a statement from Jones if he had not coordinated his efforts with Blehm and Williamson who were

102

fabricating statements from other witnesses. A jury could conclude that Blehm would not have withheld the exculpatory October 7 "confidential informant" report containing Lockett's impeaching statements unless Huth and his partner Begley had agreed to keep that information hidden. Likewise, a jury could conclude that Huth and Begley would not have pressured Lockett to testify falsely on October 14, 2003 unless they had coordinated their efforts with Williamson, who subsequently interviewed her. It is no obstacle that some of this evidence is circumstantial; "the elements of conspiracy are rarely established through means other than circumstantial evidence." *McKinley*, 519 F.3d at 816. And, of course, Defendants cannot seriously contest that there is evidence of overt acts (the fabrications and suppressions discussed above) or injury (Plaintiff's wrongful conviction). The claim must be tried.

## VI. Plaintiff's *Monell* claims must be tried.

The Board's failures to supervise its homicide detectives and implement obviously necessary policies give rise to a triable *Monell* claim.[5]

### A. Legal standard.

"Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy; (2) an unofficial custom; or (3) a deliberately indifferent failure to train or supervise. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013) (cleaned up). To establish deliberate indifference, Plaintiff must establish that the Board "had notice that its procedures were inadequate and likely to result in a violation of constitutional right." *Thelma ex rel. Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 934 (8th Cir. 1991). Plaintiff may make that showing by demonstrating that "the failure to train officers or employees is so likely to result in a violation of constitutional rights

---

[5] Plaintiff does not assert that the Board had facially unconstitutional policies or that the Defendant Officers were, themselves, policymakers.

that the need for training is patently obvious." *Id.* Finally, Plaintiff must demonstrate moving force causation—that the failure to train or supervise caused his constitutional injury. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 400 (1997).

Defendants devote most of their *Monell* section to arguments and theories that Plaintiff is not pursuing. Their primary argument is that Plaintiff has made only "conclusory allegations," but they cite cases discussing the pleading standards at the motion to dismiss stage, not evidence at summary judgment. Dkt. 139 at 67-68. Those cases are inapplicable, as discussed above, because a complaint need not contain every fact a plaintiff will rely on. *Twombly*, 550 U.S. at 555 n.3. In any event, Plaintiff's did identify the specific *Monell* theories he now relies on.

## B. Failure to ensure disclosure of exculpatory evidence.

Plaintiff's Complaint alleged that the Board "allowed officers to . . . fail to document or disclose exculpatory evidence" and "chose to not enact policies . . . [to ensure] the disclosure of exculpatory evidence." Dkt. 1 ¶¶ 88, 92. That theory has been borne out by the evidence.

Defendant Williamson did not even know that criminal defendants had a right to receive impeachment evidence that would discredit witnesses against them. PSOF ¶ 112. The Board implemented no policies defining exculpatory evidence or requiring that exculpatory evidence be disclosed, which created a "tremendous risk" for the Department and violated accepted standards. *Id.* ¶¶ 124, 126, 128. The Board failed to create policies for completing or approving reports, failed to regulate the master case file used to disclose documents, and failed to set standards for supervisor review of reports. *Id.* ¶¶ 116, 125, 129-30, 132. These failures violated generally accepted standards in effect at the time Plaintiff was arrested. *Id.* ¶ 126.

A jury could conclude that the Board failed to train its officers as to the constitutional requirements in relation to exculpatory evidence and failed to enact necessary policies to ensure the disclosure of exculpatory evidence. *Id.* ¶¶ 112-33. Testimony by officers that they received

no training on exculpatory evidence creates a jury issue on a plaintiff's *Monell* claim. *Jackson v. City of Cleveland*, 925 F.3d 793, 835-36 (6th Cir. 2019). Such evidence creates a triable issue of deliberate indifference because officers obviously will face the recurring situation of deciding what evidence to turn over. *Id.* at 836-37. The same is true for written policies that "fail to provide sufficient guidance to police officers on what constitutes exculpatory evidence." *Virgil v. City of Newport*, 545 F. Supp. 3d 444, 490 (E.D. Ky. 2021), *aff'd sub nom. Colemon v. City of Cincinnati*, No. 21-5968, 2023 WL 5095804 (6th Cir. Aug. 9, 2023); *Mayes v. City of Hammond*, 442 F. Supp. 2d 587, 643 (N.D. Ind. 2006) (finding failure to implement "policies or protocols concerning the basic investigative tasks . . . [of] documenting and disclosing exculpatory and impeachment evidence" created material issue regarding *Monell* liability).

This was not a one-time incident. Just a year before Plaintiff was convicted, Yntell Duley was convicted of a homicide based on a KCPD investigation that was later overturned because the KCPD suppressed an exculpatory witness report. PSOF ¶ 131. This is the exact kind of suppression that Plaintiff suffered and further indicates that wrongful convictions were the expected result of the Board's failure to ensure exculpatory evidence was produced.

A jury could easily find causation, too, because the Defendants felt free to withhold exculpatory evidence based on the Board's permissive policies and in fact did so. *See Washington v. Baltimore Police Dep't*, 457 F. Supp. 3d 520, 535 (D. Md. 2020) ("Plainly, a deficient *Brady* training program has a 'close fit' to a due process violation stemming from unlawfully withheld exculpatory evidence.").

### C.  Failure to regulate confidential informants.

Plaintiff's Complaint alleged that the Board "allowed officers to fabricate evidence from informants and chose to not require officers to document information about their informants or disclose evidence that would allow criminal defendants to impeach informant testimony," and

that the Board "chose not to enact policies or provide trainings" to ensure the integrity and disclosure of exculpatory evidence. Dkt. 1 ¶¶ 89, 92.

The KCPD had no rules against paying witnesses "off the books" in homicide investigations and had no system or rules for using witnesses like Lockett as "confidential informants" in homicide investigations. PSOF ¶¶ 113-15. Detectives were allowed to help informants with criminal charges by putting in a good word for them with prosecutors without documenting that fact in any way. *Id.* ¶ 119. The result was that KCPD allowed patrol officers to hide the identity of important eyewitnesses to homicides with no oversight. *Id.* ¶ 115.

Here, it was obvious that failing to regulate the use of confidential witnesses would lead to constitutional violations. When officers and detectives can interview witnesses and hide their names, it is too easy to also hide exculpatory or impeaching statements. *Virgil*, 545 F. Supp. 3d at 490. Given the Defendants' testimony about the lack of policies for confidential informants or unnamed witnesses, the Board's failure to enact required policies, and the circumstances of Plaintiff's wrongful conviction, a reasonable jury could find *Monell* liability. PSOF ¶¶ 112-33.

### D.    Failure to regulate witness identifications and tolerance of witness coaching.

Plaintiff's Complaint alleged that the Board allowed officers to "manipulate or coerce witnesses into making false or fabricated statements." Dkt. 1 ¶ 88. This practice is exemplified by the Board's failure to enact any policies regarding eyewitness photo identifications, which were practically the exclusive method of identification in homicide investigations. PSOF ¶¶ 134-35. As a result, the Defendant Detectives never provided any admonitions to eyewitnesses about identifying suspects (for example, that they were not obligated to identify someone). *Id.* ¶ 136.

Photo identification safeguards were accepted standards at the time of the White homicide investigation and were necessary to prevent false identifications. *Id.* ¶¶ 142-43. Nevertheless, the KCPD had no such policies, which led to the false identification of Plaintiff in

106

the White homicide investigation. *Id.* ¶¶ 134-43. A reasonable jury could conclude that the Board was deliberately indifferent to an obvious risk by failing to regulate the primary manner in which its homicide detectives obtained witness identifications.

## VII. Plaintiff's state-law malicious prosecution claim must be tried.

Defendants argue that there is no issue of probable cause or malice for the jury to try. As discussed above in Section IV, a jury could find the Defendants had no probable cause to arrest Plaintiff; for the reasons discussed above in Section I(C), the jury could find malicious intent. *See Stockley v. Joyce,* 963 F.3d 809, 822 (8th Cir. 2020) (discussing the intent requirement of Missouri state-law malicious prosecution claims). The claim must be tried.

## VIII. Plaintiff's state-law conspiracy claim must be tried.

Defendants argue only that Plaintiff has not presented evidence of an agreement among Defendants to violate his constitutional rights. For the reasons discussed in Section V, there is evidence of such an agreement, and the claim must be tried.

## CONCLUSION

Plaintiff respectfully requests the Court deny Defendants' motion for summary judgment.


Respectfully submitted,


**KEITH CARNES**

By**:** /s/ Wallace Hilke
*One of Plaintiff's Attorneys*


Joshua Loevy
Jon Loevy*
Locke Bowman*
Wally Hilke*
LOEVY & LOEVY
311 North Aberdeen Street, 3rd Floor
Chicago, IL 60607

107

(312) 243-5900
Attorneys for Plaintiff
*Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2024, the foregoing was served on all counsel of record via the Court's e-filing system.

/s/ Wallace Hilke